UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN RAPILLO and HEIDI RAPILLO, | |
| Plaintiffs, | Index No. 09-CIV-10429 (VSB) |
| -against- | |
| BARRY FINGERHUT, DAVID HOLZER, FINGERHUT-HOLZER PARTNERS LLC, FINGERHUT-HOLZER EQUITIES, INC., FINGERHUT-HOLZER, INC., FINGERHUT-HOLZER FUND L.P., GEO-CAPITAL PARTNERS, INC., FINGERHUT-HOLZER THE WAVERLY I, LLC., FINGERHUT-HOLZER THE WAVERLY II, LLC., LESLIE HOLZER, DOUGLAS HOLZER, JENNIFER HOLZER, JOSHUA HOLZER and JOSEPH HOLZER, | |
| Defendants. | |

**Memorandum of Law in Support of Motion for Summary Judgment**

**FOLKENFLIK & McGERITY LLP**
1500 Broadway, 8th Floor
New York, N.Y. 10036
212-757-0400
212-757-2010 Facsimile
Max Folkenflik, Esq.
*Attorneys for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................ iii

INTRODUCTION ....................................................................................... 1

STATEMENT OF FACTS ........................................................................... 3

ARGUMENT ............................................................................................. 9

    ALL OF PLAINTIFFS CLAIMS MUST BE DISMISSED........................................... 4

        A.  THE STANDARD ON A MOTION FOR SUMMARY JUDGMENT............... 9

        B.  THERE IS NO FACTUAL BASIS FOR ANY CLAIM AGAINST BARRY
            FINGERHUT OR ANY OF THE ENTITY DEFENDANTS ............................... 9

        C.  PLAINTIFFS CANNOT PROVE THE CLAIMS UNDER THE INVESTMENT
            ADVISORS ACT ....................................................................................... 13

        D.  PLAINTIFFS CLAIMS FOR FRAUD UNDER SECTION 10b AND RULE
            10b-5 MUST BE DISMISSED ................................................................... 16

        E.  PLAINTIFFS' COMMON LAW CLAIMS FOR FRAUD MUST BE
            DISMISSED ............................................................................................ 18

        F.  PLAINTIFFS' COMMON LAW CLAIMS FOR BREACH OF FIDUCIARY
            DUTY MUST BE DISMISSED .................................................................... 19

        G.  PLAINTIFFS' COMMON LAW CLAIM FOR CONVERSION MUST BE
            DISMISSED ............................................................................................ 20

CONCLUSION ....................................................................................... 21

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.,*
   477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)...................................... 9, 10

*Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank,*
   57 F.3d 146 (2d Cir. 1995) ...................................................................................... 19

*Belmont v. MB Inv. Partners, Inc.,*
   *708 F.3d 470 (3d Cir. Pa. 2013)* ............................................................................. 16

*Byrnie v. Town of Cromwell Bd. of Educ.,*
   243 F.3d 93 (2d Cir. Conn. 2001) ........................................................................... 10

*CMA CGM (America) L.L.C. v. Seafood Expert West Inc.,*
   2015 U.S. Dist. LEXIS 45311 (S.D.N.Y. Mar. 31, 2015) ......................................... 10

*Cort v. Ash,*
   422 U.S. 66 (1975)................................................................................................... 16

*DDCLAB Ltd. v. E.I. du Pont de Nemours & Co.,*
   2005 U.S. Dist. LEXIS 2721 (S.D.N.Y. Feb. 18, 2005) ................................ 19, 20, 21

*Fay v. Oxford Health Plan,*
   287 F.3d 96 (2d Cir. 2002) ........................................................................................ 9

*Feigen v. Advance Capital Mgmt. Corp.,*
   150 A.D.2d 281, 541 N.Y.S.2d 797 (N.Y. App. Div. 1989) ...................................... 21

*Haberman v. MFS Inv. Mgmt.,*
   *2015 U.S. Dist. LEXIS 36844 (D. Mass. Mar. 24, 2015)* ........................................ 16

*in Janus Capital Group, Inc. v. First Derivative Traders,*
   131 S. Ct. 2296 (2011)....................................................................................... 18, 19

*Kassover v. UBS AG,*
   619 F. Supp. 2d 28 (S.D.N.Y. 2008) ....................................................................... 15

*Kidz Cloz, Inc. v. Officially for Kids, Inc.,*
   2001 U.S. Dist. LEXIS 1135, 2002 WL 392291 (S.D.N.Y. Mar. 13, 2002) .............. 20

*Morris v. Wachovia Secs., Inc.,*
   277 F. Supp. 2d 622 (E.D. Va. 2003) ...................................................................... 16

*Murray v. Xerox Corp.*,
811 F.2d 118 (2d Cir. N.Y. 1987) ................................................................ 20

*Norman v. Salomon Smith Barney, Inc.*,
350 F. Supp. 2d 382 (S.D.N.Y. 2004) .................................................... 15, 16

*Oursler v. Women's Interart Ctr., Inc.*,
170 A.D.2d 407, 566 N.Y.S.2d 295 (N.Y. App. Div. 1991) ...................... 21

*Pro Bono Invs., Inc. v. Gerry*,
2005 U.S. Dist. LEXIS 22348 (S.D.N.Y. Sept. 30, 2005) ........................ 16

*" Reuben H. Connelly Corp. v. Mark I Mktg. Corp.*,
893 F. Supp. 285 (S.D.N.Y. 1995) ......................................................... 21

*Scotto v. Almenas*,
143 F.3d 105 (2d Cir. 1998) ................................................................... 10

*SEC v. Ryan*,
747 F. Supp. 2d 355 (N.D.N.Y 2010) ..................................................... 13

*South Cherry St., LLC v. Hennessee Group LLC*,
573 F.3d 98 (2d Cir. N.Y. 2009) ............................................................ 17

*Stein v. Northern Assur. Co. of Am.*,
2015 U.S. App. LEXIS 11517 (2d Cir. N.Y. July 2, 2015) ......................... 9

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
552 U.S. 148 (2008) .......................................................................... 17, 18

*Thyroff v. Nationwide Mut. Ins. Co.*,
460 F.3d 400 (2d Cir. 2006) ................................................................... 21

*Transamerica Mortg. Advisors (tama) v. Lewis*,
444 U.S. 11 (1979) ................................................................................. 16

**Statutes and Rules**

15 U.S.C Section 80b-6........................................................................ 15, 16

15 USCS Section 80b-2 (11) ...................................................................... 14

17 CFR § 240.10b-5 .................................................................................... 17

Fed. R. Civ. P. 56(a).................................................................................... 9

Rule 10b-5 .......................................................................................... 17, 18

Investment Advisors Act ............................................................................. 14, 15

Delaware Limited Liability Company Act. 6 Del. C. § 18-303 ........................................ 13

Defendants Barry Fingerhut,  and Defendants Fingerhut-Holzer Partners LLC,

Fingerhut-Holzer Equities, Inc., Fingerhut-Holzer, Inc., Fingerhut-Holzer Fund, L.P.,

Geo-Capital Partners, Inc., Fingerhut-Holzer The Waverly I, LLC, Fingerhut-Holzer The

Waverly II, LLC, (collectively the "Entity Defendants"), by their attorneys, Folkenflik &

McGerity LLP, hereby submit this Memorandum of Law in Support of their Motion for

Summary Judgment.

## **INTRODUCTION**

This is an action by Plaintiffs John Rapillo and Heidi Rapillo (the "Rapillos") who

according to the Complaint, who were defrauded out of $1.6 million by defendant David

Holzer ("Holzer").  Holzer was criminally convicted on multiple felony accounts frauds

against the Rapillos, and others, including in particular Barry Fingerhut ("Fingerhut"),

Fingerhut discovered and brought evidence of that fraud to the attention of the District

Attorney. As a result, there was a criminal investigation that ultimately uncovered all of

Holzer's frauds, including those against Plaintiffs.  Holzer was ordered to pay restitution

of $16 million, including restitution to the Rapillos ($1.6 million), and Barry Fingerhut

(nearly $12 million).  However, restitution has not been made except in limited amounts.

It is unsurprising, therefore, that Plaintiffs would sue Holzer and his wife, even

though the Holzers had been friends of the Rapillos for over 20 years.  The $1.6 million

Holzer took from the Rapillos was wired into Holzer's personal checking account held

jointly with his wife.  It is also unsurprising that Plaintiffs would seek to investigate

whether there were any others who might be liable for Holzer's frauds.

However it is both surprising and wrong that Plaintiffs would commence an action

against Fingerhut and all of the Entity Defendants when they had no proof that there

was any wrongful conduct by any of them at all, and only could survive a motion to dismiss by making allegations **which they knew to be false** as well as allegations for which they had, and after full discovery now have, no evidence at all.  They knew, and know, that there is no basis for this action.

The Rapillos knew that they made one legitimate investment in The Waverly, LLC ("Waverly") suggested to them by their friend Holzer in response to their inquiry for investment suggestions. There was nothing improper about that investment, it failed with the collapse of the Florida real estate market.  The Rapillos knew that.  The Assistant District Attorney told them the investment was legitimate.  They nonetheless sued Fingerhut and the Entity Defendants for the money they lost on the Waverly, claiming, knowingly falsely, that they had paid their money to Barry Fingerhut and the Entity Defendants, and it had been converted by those defendants for personal purposes.

As to the remaining $1.6 million that was transferred to their friend Holzer, so that they could secretly invest through Holzer, in investment ideas developed by Fingerhut. Holzer had told them that Fingerhut was an investment genius, but that Fingerhut would not take their money because they would not qualify as investors.    The Rapillos also knew that Holzer's frauds against them were only uncovered because Fingerhut initiated the criminal investigation against Holzer.  They knew that Fingerhut was found by the District Attorney to be a victim of Holzer's criminal conduct, and the far largest victim.  They knew that they never met Barry Fingerhut or communicated with Barry Fingerhut or any of the Entity Defendants other than with respect to the Waverly.  They knew that there were no facts at all to connect Barry Fingerhut or any of the Entity

2

Defendants to any of Holzer's crimes concerning their $1.6 million.  Yet they sued Barry Fingerhut and the Entity Defendants for making false statements to them, and converting their money, based on allegations the Rapillos knew to be false.

Accordingly, Fingerhut and the Entity Defendants respectfully request that the motion be granted and that this case be dismissed against with prejudice and with costs, including attorney's fees, awarded to Barry Fingerhut.

## STATEMENT OF FACTS

The Rapillos met the Holzer in or about 1983, when John Rapillo, at the time a furniture salesman and designer, was consulted by Holzer's wife about a decorating project she had in her home.  Over time, John was consulted or hired for a number of decorating/design projects, and the Rapillos and the Holzers became friends.  The Rapillos were invited to the Holzers' home for holiday meals several times a year. See the testimony of John Rapillo dated May 2, 2011 annexed as Exhibit F at 22:17-18, 32:12-16, hereinafter as "JR Tr.".

In 2004, Holzer entered into business with Barry Fingerhut in the firm Fingerhut-Holzer Partners LLC. ("Partners LLC") which was intended to manage Fingerhut's and Holzer's personal investments, and to provide them with an office and employees to support their investment activities.  See the testimony of David Holzer dated March 28, 2012 annexed as Exhibit H at 27: 22-25, 28: 5-7, 32:1-3, 10-12, hereinafter as "DH Tr.".

From time to time Fingerhut and Holzer sought to raise money from other investors for specific investment opportunities.  In those instances, they formed a limited liability entity, either a corporation or a limited liability corporation or limited liability partnership.  That entity would sell membership units or shares to qualified investors.

3

See DH Tr. at 42:3-25, 43:1.  In each case, those sales were made only after delivering a prospectus and obtaining a signed subscription agreement.  In those cases, Fingerhut and Holzer would sometimes act as managing members of those limited liability entities, either directly, or through a limited liability entity which served as the managing member and which was owned by Fingerhut and Holzer. *Id.* at 121: 19-22, 32:1-12, 37:23-25.

The Rapillos first became aware of Fingerhut and Partners LLC from discussions with their friend about Holzer's new business.  Holzer had said that Partner LLC. was "investing in different ventures" and "large companies" were "investing with them."  JR Tr. at 18:2-20:22.  When John Rapillo ("John") was in mid-town Manhattan shopping with Leslie Holzer in connection with some decorating she had hired John to assist with.  Leslie invited John to see the offices of Partners LLC., to show off the attractiveness of the offices. JR Tr. at 15: 8-11.  Holzer met them and discussed the decorating with them, but not investments or business.  There was no discussion of Partners LLC's business, and there was no solicitation of John Rapillo to invest in anything or be a "client" of Partners LLC.  Just decorating.  *Id.* at 43:8-11.

As they were in the hallway waiting for an elevator, Fingerhut walked out of the office.  Holzer pointed to him and said, in words or substance, "that's Barry Fingerhut." John saw the back of Fingerhut's head, but not his face.  Other than some communications concerning the Waverly that was the only contact either of the Rapillos had with Fingerhut or anyone working at his office until after Holzer's fraud was discovered.  JR Tr. at 8: 7-14, 21-25, 9: 2.

In 2004, John Rapillo settled a personal injury suit against one of his decorating clients for injuries he incurred when he fell 18 feet off a railing he was standing on while

4

working for that client.  At that trial, John claimed that his ability to work in the future would be "limited," JR Tr. at 45:6-46:20, although between the date of his trial in 2004, and the date of his deposition in this case in 2012, he did "substantially the same work that [he] had done prior to the accident in 2002." *Id.* at 47:2-9.  He received about $2.5 million from this settlement. Thereafter, John Rapillo asked Holzer in words or substance, "David, what do you think I should do with this money?"  Holzer responded that "we only get involved with...large companies, large corporations" Hedi Rapillo, who witnessed the conversation understood that Fingerhut and Holzer "didn't accept retail customers" like the Rapillos.  See the testimony of Heidi Rapillo dated May 2, 2011 annexed as Exhibit G at 9:3-13, hereinafter as "HR Tr.".

Later, Holzer told the Rapillos about the investment in The Waverly LLC.  They were sent offering documents, which John testified that he never read. See HR Tr. at 11: 4-6, and JR Tr. at 125: 25, 126:2-8. The Waverly, was established to raise funds for a 200 unit Florida development being built by a company called Trident Realty Corp. Fingerhut-Holzer The Waverly I, LLC was the managing member of that LLC. See DH Tr. at 76: 7-12. In mid-October 2005, the Rapillos signed subscription agreements, and wired $300,000 to an escrow account held by Foley & Lardner, LLP, a large, respected, international law firm.  They called the Partners LLC office to get information on sending in their documents and payments.  Other than those ministerial communications, they had no other communications with employees of Partners LLC about the Waverly. JR Tr. at 86:11-17.

5

They did, however, continue to talk to Holzer.  In mid-December, Holzer asked John to send him $600,000 to invest in a dinner theater concept.  According to John, Mr. Holzer said:

> That he and his partner were investing in this great concept, that they will be building many of them, and again, our money was not substantial enough, that he was pooling it with theirs to invest.

JR. Tr. 92:17-21.

John sent "$600,000 to Mr. Holzer supposedly to pool with his funds", *Id.* at 94:3-5.  John did not know the name of the entity he was investing in, the name of the theater, or the corporate owner of it, or even the terms of the investment or "what he was getting for his money."  JR Tr. 94:6-11.  John did not know where the dinner theater was located other than someplace "in Boca Raton."  *Id.* at 90:8-25.  He received no paperwork other than the wire transfer receipt he got from the bank.  *Id.* at 94:15-19. He did not know, and Holzer did not say, that Fingerhut was ever aware of Rapillo's "investment" with Holzer. JR Tr at 90:8-25, 94:15-19.

At the end of January 2006, the Rapillos sent $200,000 more to Holzer's personal checking account, this time, supposedly for phase 2 of the Waverly, but they have no documents to prove that was the intended use of the funds, but none of the procedures followed for the Waverly previously were followed with this supposed "investment," and the Rapillos never asked anyone about that.  JR. Tr. 96:6-97:12.

In March 2006, the Rapillos sent Holzer $800,000 for an investment in V-Campus, known by the Rapillos to be a publically traded stock.  *Id. at* 102:17-103:3. When asked, "And why didn't you go to a stock broker and buy that stock?" John answered:

6

> Because he offered it to me and it sounded -- again, we were looking for
> some income at that point, and that's what he came up with and offered to
> me as a possibly good thing to get involved with…he and his partner were
> buying millions of dollars of it and we should get involved in this.

JR Tr. 103:6-16.

According to John, Holzer was supposed to buy stock for John.  John

knew that stock brokers had to be licensed, and did know if Holzer or Fingerhut

were licensed, and John admitted that he never saw any document where

Fingerhut or Holzer held themselves out as brokers. JR Tr. at 104:23-105:24.

The investment in V-Campus was supposed to pay interest quarterly. When

Heidi Rapillo complained to Holzer that no interest was received he paid her

$5,000.00 out of Holzer's personal checking account. HR Tr. at 80:15-19

It was true that Fingerhut and Holzer were buying stock in V-Campus.

Holzer bought some stock *for himself*, using the Rapillo's money. HR Tr. at

96:19-97:6.

There is no evidence that Fingerhut ever had any awareness of any

investment by the Rapillos other than the legitimate investment in the Waverly,

until after Holzer's crimes against Fingerhut were discovered and the District

Attorney uncovered the crimes against the Rapillos. JR Tr. at 92:22-93:10.

In June 2007, after Holzer supposedly closed a real estate deal in which

Fingerhut and Holzer were partners called Dellwood Properties, Holzer deposited

a check for $33 million into the account of one of the Partners LLC's portfolio

companies.  It was quickly discovered that the check was not good, and was

drawn on an account controlled by Holzer which had been closed.  The bank

7

froze the account into which the check was deposited, and froze the main

Partners LLC bank account and a fraud investigation was started.  When Holzer

and Fingerhut met the next day, Holzer admitted that the Dellwood deal had not

closed, although he continued to insist that it was real. Holzer said that he was

broke. Fingerhut Decl. ¶14.  Much later he admitted that the "sale" of the

Dellwood Properties had fallen apart, but claimed that there were new potential

buyers available.  Finally, in early October, Holzer admitted that there was no

Dellwood Property, and that he had stolen all the money given to him by

Fingerhut and used it for personal purposes or for his personal business

expenses.  *Id.* at ¶15.

Fingerhut and Holzer discussed how Holzer could repay the money Holzer

had taken and agreed that if he did not pay nearly $7 million to Fingerhut by

October 15, 2007, than Holzer would assign "his share" of the investments they

had made together.  After the payment was not made, and checks written to

Fingerhut had bounced, Fingerhut went to the District Attorney and reported

Holzer's crimes against him.  It was through the District Attorney's investigation

that Fingerhut first learned that Holzer had also defrauded others, including the

Rapillos. Fingerhut Decl. ¶ 16.

In April 2009, Holzer pleaded guilty to multiple felonies and he accepted a

$16 million restitution obligation. DH Tr. at 105:12-24. While throughout the

relevant time period Holzer had made certain payments to Fingerhut or Partners

LLC, all of those payments were for sums actually owed at the time the payments

were made. Fingerhut Decl. at ¶ 17

## ARGUMENT

## ALL OF PLAINTIFFS CLAIMS MUST BE DISMISSED

### A.   The Standard on A Motion for Summary Judgment

As this court is well aware, "summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." *Stein v. Northern Assur. Co. of Am.*, 2015 U.S. App. LEXIS 11517 (2d Cir. N.Y. July 2, 2015); *citing*, *D'Amico v. City of New York*, 132 F.3d 145, 149 (2d Cir. 1998). *See, also, Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); Fed. R. Civ. P. 56(a).

As this Court recently noted: "[T]he dispute about a material fact is 'genuine'. . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.*" *CMA CGM (America) L.L.C. v. Seafood Expert West Inc.*, 2015 U.S. Dist. LEXIS 45311, 16-17 (S.D.N.Y. Mar. 31, 2015).

"Even where facts are disputed, in order to defeat summary judgment, the nonmoving party must offer enough evidence to enable a reasonable jury to return a verdict in its favor." *Byrnie v. Town of Cromwell Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. Conn. 2001), *citing*, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998).

Thus the "non-moving party may not rely on conclusory allegations or unsubstantiated speculation." *Id., citing*, Scotto, 143 F.3d at 114. Where the non-moving

party seeks to rely on inferences from the record, it may only rely on "reasonable inference[s]." *Id.*

**B.**    **There Is No Factual Basis For Any Claim Against Barry Fingerhut**
**Or The Any of the Entity Defendants.**

As the statement of fact demonstrates, and the evidence in support of this motion proves, there are no genuine disputed issues of material fact which could support a judgment in this case against Barry Fingerhut or the Entity Defendants.  Leaving aside for the moment issues regarding Waverly I, there is no dispute about the fact that neither Barry Fingerhut nor any of the Entity Defendants made any representations at all to the Rapillos about their other investments, let alone any material misrepresentations.  There is no dispute over the fact that not one dollar of the $1.6 million given by the Rapillos for their "investments" went to anyone other than Holzer. There is no dispute that not one dollar of that money was "converted" by any of those Defendants.

While Holzer may have claimed that the Rapillos would be "pooling" their money with Holzer's money, that claim does not create any liability for Fingerhut or any of the Entity Defendants who did not know anything about that "pooling" arrangement, and did not, and legally could not have, consented to such an arrangement to evade laws concerning qualified investors.

The evidence proves that the Rapillos and Holzer intended that to keep any knowledge of any "pooling" arrangement secret from Fingerhut, and the Entity Defendants because, as the Rapillos both admitted in their testimony, Holzer told them that Fingerhut would not take their money because they were "too small."

There is no evidence to prove that Fingerhut or the Entity Defendants had any knowledge of, or complicity in, Holzer's frauds. The admissible evidence proves there was no such knowledge or complicity.

Other than as to Waverly I, the evidence proves that there was no relationship at all, let alone a fiduciary relationship, between Fingerhut or any of the Entity Defendants and the Rapillos. A breach of fiduciary duty could not have occurred.

As to Waverly I, the evidence proves that Waverly I was a legitimate investment which unfortunately failed and nothing else.  The Rapillos do not allege any material misstatements of fact by Holzer. His claim that Fingerhut was involved in Waverly I was clearly true.  The offering documents provided detailed information on the investment which John admits he never read.

There is no allegation of vicarious liability of Barry Fingerhut or the Entity Defendants, and no evidence from which one could prove vicarious liability by any of the Entity Defendants or Fingerhut for the frauds of Holzer under any theory.

Plaintiffs have not alleged liability under a *respondeat superior* theory, and it is too late for an amendment to be allowed.  Yet even if amendment were allowed, the evidence would require the entry of summary judgment against the Plaintiffs.  "Under New York law, an employee acts within the scope of his employment when both (1) 'he is doing something in furtherance of the duties he owes to his employer,' and (2) 'the employer is, or could be, exercising some control, directly or indirectly, over the employee's activities.'" Hamm v. United States, 483 F.3d 135, 138 (2d Cir. N.Y. 2007); *citing*,  Lundberg v. State, 25 N.Y.2d 467, 255 N.E.2d 177, 179, 306 N.Y.S.2d 947 (N.Y. 1969); *see also, Marfia v. T.C. Ziraat Bankasi*, New York Branch, 100 F.3d 243, 252 (2d

11

Cir. 1996) ("In New York, a master is not responsible for the wrongful acts of his servant who was not subject to the actual or potential control of the master when the wrongful acts took place.").

The evidence is clear that it was not within Holzer's duties, or allowed, for him to solicit and accept any investment money, particularly without delivering the legally required offering documents and obtaining a signed subscription agreement. It was not within Holzer's duties to take any money into his private bank account on behalf of any of the Entity Defendants, or to pay interest from his personal funds on behalf of the Entity Defendants.  The testimony of the Rapillos proves that the Rapillos did believed that this money was intended to go directly to Holzer, and that he would, on his own, pool that money with his and invest in his own name, in secret from the Entity Defendants.

Holzer's acts in "pooling" the Rapillos money with his **to evade the policies** of the Entity Defendants and Fingerhut were not "doing something in furtherance of the duties he owes to"  Fingerhut or any of the Entity Defendants, but was, instead, directly contrary to and in violation of those duties.  Obviously, neither Fingerhut nor any of the Entity Defendants did or could have exercised any control over Holzer's fraudulent conduct with his friends, the Rapillos.  If the Entity Defendants could have exercised control, the Rapillos' money would have been refused.

As to Fingerhut, the testimony proves that he was not directly an employer or partner, in the legal sense, of Holzer, but was only a fellow member of certain limited liability entities, and he has no liability for Holzer's frauds.  Even were *respondeat superior* to be properly pleaded (which it has not been) and proven (and it has been

12

disproven), Fingerhut would still **have no liability as a member of any of the Entity Defendants, for any of their debts.** "The interest of the member of an LLC is analogous to a shareholder in a corporation in that he or she has no interest in specific assets nor can be held liable for the company's debts or obligations. *SEC v. Ryan*, 747 F. Supp. 2d 355, 362 (N.D.N.Y 2010). In particular, Partners LLC was a Delaware Limited Liability Corporation, and Fingerhut was therefore, insulated from liabilities for its debts by Section 18-303[1] of the Delaware Limited Liability Company Act. 6 Del. C. § 18-303.

## C.    Plaintiffs Cannot Prove The Claims Under the Investment Advisors Act

In addition to the fatal flaws in the fatal details concerning the  underlying assertions of wrongdoing, Plaintiffs cannot recover against Defendants under the Investment Advisors Act, because 1) those Defendants were not investment advisors within the meaning of the Advisors Act, and 2) there is no private cause of action for damages under the Advisors Act

The Advisors Act provides certain requirements and prohibitions, as well as certain remedies for customers of, investment advisors.  Investment advisors are a defined term under 15 USCS Section 80b-2 (11).  The definition provides, in relevant part:

---

[1] § 18-303. Liability to third parties

(a) Except as otherwise provided by this chapter, the debts, obligations and liabilities of a limited liability company, whether arising in contract, tort or otherwise, shall be solely the debts, obligations and liabilities of the limited liability company, and no member or manager of a limited liability company shall be obligated personally for any such debt, obligation or liability of the limited liability company solely by reason of being a member or acting as a manager of the limited liability company.

> (11) "Investment adviser" means any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities;…

15 SCS § 80b-2 (11).

There is no claim that Plaintiffs entered into an investment advisory contract with any Defendant, not even with Holzer, and the absence of an investment advisory contract is fatal to any claim under the Advisors Act.   "Courts have required plaintiffs to allege that the parties entered into an investment advisory contract in order for the Advisers Act to apply." *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 32 (S.D.N.Y. 2008)*; citing, Bogart v. Shearson Lehman Bros., Inc.*, 1993 U.S. Dist. LEXIS 1182, 1993 WL 33643, at *3 (S.D.N.Y. 1993) (dismissing Advisers Act claim that alleged the parties had entered into a brokerage agreement, and not an investment advisory contract); *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 388 (S.D.N.Y. 2004) ("the remedies under the IAA are only available where an investor brings suit on the investment adviser's allegedly improper conduct (or vice versa) pursuant to a contract for services")."

Equally fatal to Plaintiffs frivolous Advisors Act claim is that the act provides no such remedy.  Plaintiffs' First and Second Causes of Action respectively are for breach of fiduciary duty and fraud, based upon 15 U.S.C Section 80b-6, which broadly prohibits fraud, deceit and undisclosed self-interested transactions.[2]   While Section 80b-6 does

---

[2] Section 80b-6 provides:

create certain rights and duties, it has been definitively established for 45 years that the

Advisors Act does not create a private right of action for damages.  As the Supreme

Court held in *Transamerica Mortg. Advisors (tama) v. Lewis*, 444 U.S. 11 (U.S. 1979),

Section 80b-6  "simply proscribes certain conduct, and does not in terms create or alter

any civil liabilities."  *Id.* at 19.  Analyzing whether the private right of action might be

implied under the doctrine of *Cort v. Ash*, 422 U.S. 66 (U.S. 1975), the *Transamerica*

Court held that there was no basis under any theory to recognize such a right and that

Section 80b-6 does not establish any "private causes of action, legal  or equitable."

*Transamerica Mortg. Advisors (tama) v. Lewis*, *supra.* 444 U.S. at 24.  *Accord, Belmont*

*v. MB Inv. Partners, Inc., 708 F.3d 470, 502 (3d Cir. Pa. 2013)(*other than right to void

advisory contract, the Act *confers no other private causes of action, legal or equitable).*

*Haberman v. MFS Inv. Mgmt., 2015 U.S. Dist. LEXIS 36844 (D. Mass. Mar. 24,*

*2015)(*remedy only rescission of advisory contract, no cause of action for damages*); Pro*

*Bono Invs., Inc. v. Gerry*, 2005 U.S. Dist. LEXIS 22348, 38-39 (S.D.N.Y. Sept. 30, 2005)

(no private right of action for damages ); *Norman v. Salomon Smith Barney, Inc.*, 350 F.

Supp. 2d 382, 388-389 (S.D.N.Y. 2004) (no private damage remedy);  *Morris v.*

*Wachovia Secs., Inc.*, 277 F. Supp. 2d 622 (E.D. Va. 2003) ("Although § 206 (15

---

§ 80b-6.  Prohibited transactions by investment advisers

It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly--
  (1) to employ any device, scheme, or artifice to defraud any client or 15 USCS § 80b-6
  (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client
  (3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction. The prohibitions of this paragraph (3) shall not apply to any transaction with a customer of a broker or dealer if such broker or dealer is not acting as an investment adviser in relation to such transaction;
  (4) to engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative. The Commission shall, for the purposes of this paragraph (4) by rules and regulations define, and prescribe means reasonably designed to prevent, such acts, practices, and courses of business as are fraudulent, deceptive, or manipulative.

U.S.C.S. § 80b-6) of the IAA creates fiduciary standards for investment advisers, it creates no private right of action for damages.").

Plaintiffs' claims under the damages under Section 80b-6 of the Investment Advisors Act must be dismissed.

**D.    Plaintiffs' Claims for Fraud under Section 10b and Rule 10b-5 Must be Dismissed_____**

Plaintiffs' Third Cause of Action is for fraud under Section 10b of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder. 17 CFR § 240.10b-5.

As the Second Circuit re-iterated several years ago:

> To state a claim on which relief can be granted under § 10(b) and Rule 10b-5, a plaintiff must plead, inter alia, that in connection with the purchase or sale of securities, the defendant made a false representation as to a material fact, or omitted material information, and acted with scienter.

*South Cherry St., LLC v. Hennessee Group LLC*, 573 F.3d 98, 108 (2d Cir. N.Y. 2009)(citations omitted).  "[A] plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta*, *Inc.,* 552 U.S. 148, 157 (2008)

Although stated as a claim against Fingerhut and the Entity Defendants directly, for misrepresentations or frauds committed by them, the Rapillos admit that they had no communications at all with Fingerhut [cite]. The communications with employees of any of the entity defendants were ministerial.  No actual misrepresentations are alleged to

16

have been made by them.  The only misrepresentations or fraud claimed, are the frauds committed by Holzer.  As to Waverly I, there are no actionable misrepresentations stated, the money the Rapillos invested were invested with the company, and they received forms K-1 annually reflecting the investment.  There is no claim that the failure of that investment was due to anything other than legitimate investment risk or the collapse of the real estate market in Florida.  With respect to the claims Holzer made about "pooling" the Rapillos' money with his, and investing for them secretly although they were not qualified investors, there is nothing at all to connect Fingerhut or the Entity Defendants to any of those representations.

Under Section 10-b and Rule 10b-5, a plaintiff must show that it was the acts or statements of specific the defendant on which plaintiff relied to his detriment. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, *supra.*, 552 U.S. at 153, 159.  Several years later, *in Janus Capital Group, Inc. v. First Derivative Traders*, 131 S. Ct. 2296 (U.S. 2011), Supreme Court followed up *Stoneridge* with a very restrictive view of the scope of claims against other for a misrepresentation made by one speaker.

In *Janus,* the question was whether an investment advisor to a mutual fund could be held liable for misstatements made by the mutual fund.  Quoting Rule 10b-(b), the Supreme Court held that:

> "[u]nder Rule 10b-5, it is unlawful for "any person, directly or indirectly, [t]o make any untrue statement of a material fact" in connection with the purchase or sale of securities. 17 C.F.R. § 240.10b-5(b). To be liable, therefore, JCM [the investment advisor] must have "made" the material misstatements in the prospectuses."

17

*Janus Capital Group, Inc. v. First Derivative Traders*, *supra.* 564 U.S. ___ 131 S. Ct. 2296, 2301.

The Court then engaged in a detailed analysis of what it means to "make" a statement, and concluded, "the maker of a statement is the entity with authority over the content of the statement and whether and how to communicate it. Without such authority, it is not 'necessary or inevitable' that any falsehood will be contained in the statement.'" *Id.* at 2303.

There is no evidence that Barry Fingerhut or any of the Entity Defendants approved, ratified or had any "authority over" the statements made by Holzer about the alleged "pooling" of the Rapillos money.  In fact, given the Rapillos' testimony that their investment was "too small" to be accepted the only rational inference that any fact finder could draw from is that Fingerhut or any relevant Entity Defendant would have **disapproved any investment by the Rapillos** and that any "pooling" was an attempt to **defraud the Defendants into recovering an investment from an unqualified investor** whose money those Defendants would not knowingly accept.

**E.**    **Plaintiffs' Common Law Claims for Fraud Must be Dismissed**

"To assert a claim for fraud under New York law, plaintiff must allege the following four elements:  (1) defendant made a material misrepresentation; (2) defendant did so with intent of defrauding plaintiff; (3) plaintiff relied upon the representation; and (4) plaintiff suffered damages as a result of its reliance.  *Banque Arabe et Internationale D'Investissement v. Maryland Nat'l Bank*, 57 F.3d 146, 153

(2d Cir. 1995) (citation omitted)."  DDCLAB Ltd. v. E.I. du Pont de Nemours & Co.,

2005 U.S. Dist. LEXIS 2721 (S.D.N.Y. Feb. 18, 2005).

In addition, if Plaintiffs' fraud claims are premised on promises that allegedly

were not kept, Plaintiffs "must demonstrate that promises were made to him with a

present intent not to perform the promised acts. Under New York law, a failure to

perform promises of future acts is not fraud unless there exists an intent not to comply

with the promise at the time it is made.  *Murray v. Xerox Corp*. 811 F.2d 118, 121 (2d

Cir. N.Y. 1987), *citing, Chase Manhattan Bank, N.A. v. Perla*, 65 A.D.2d 207, 411

N.Y.S.2d 66, 68 (4th Dep't 1978)."

There is no showing of any misrepresentation or promise by Fingerhut or the

Entity Defendants or any basis for liability by them for the acts of Holzer.  Plaintiffs have

not asserted any theory of vicarious liability, and none would be supported by the

testimony of the Rapillos or the evidence in this case.  It is true that the evidence does

show that Holzer had some relationship, sometimes direct, sometimes indirect, with the

Entity Defendants, but that ***does not*** make any such Defendant responsible for Holzer's

frauds under *respondeat superior* as we discuss above.

## F.   Plaintiffs' Common Law Claims for Breach of Fiduciary Duty Must be Dismissed

"To assert a cause of action for breach of fiduciary duty, plaintiff must plead the

following three elements:  (1) the existence of a fiduciary duty between the parties; (2)

the breach of that duty by defendant; and (3) damages suffered by plaintiff as a result of

defendant's breach. *See, Kidz Cloz, Inc. v. Officially for Kids, Inc*., 2001 U.S. Dist.

LEXIS 1135, 2002 WL 392291, *4 (S.D.N.Y. Mar. 13, 2002) (*citing Cramer v. Devon Group, Inc.*, 774 F. Supp. 176, 184 (S.D.N.Y. 1991))."  *DDCLAB Ltd. v. E.I. du Pont de Nemours & Co.*, 2005 U.S. Dist. LEXIS 2721 (S.D.N.Y. Feb. 18, 2005).

"Under New York law a fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another*."  Reuben H. Connelly Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995) (citation omitted).  A conventional business relationship alone does not give rise to a fiduciary relationship.  *Oursler v. Women's Interart Ctr., Inc.*, 170 A.D.2d 407, 566 N.Y.S.2d 295, 297 (N.Y. App. Div. 1991); *Feigen v. Advance Capital Mgmt. Corp.*, 150 A.D.2d 281, 541 N.Y.S.2d 797, 799 (N.Y. App. Div. 1989)." *DDCLAB Ltd. v. E.I. du Pont de Nemours & Co.*, 2005 U.S. Dist. LEXIS 2721 (S.D.N.Y. Feb. 18, 2005).

The evidence is clear that other than as to the Waverly 1, the Rapillos had no relationship with Fingerhut or the Entity Defendants at all, let alone a fiduciary relationship. As to Waverly I, no duty was breached as to Waverly I, even if a duty existed, no duty was breached.

## G.   Plaintiffs' Common Law Claim for Conversion Must be Dismissed

"To prove a claim for conversion Plaintiffs must show [Defendants] carried out the 'unauthorized assumption and exercise of the right of ownership over goods belonging to another to the exclusion of the owner's rights.'"  *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-404 (2d Cir. 2006) (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth.*, 87 N.Y.2d 36, 44, (1995).  The evidence shows that Fingerhut and the Entity Defendants never received one penny of the Rapillos' money. The Waverly I, did

receive the Rapillos' investment in Waverly I, but The Waverly I is not a Defendant, and the Rapillos' money was invested and used for the intended purposes.

For these reasons, the Sixth Cause of Action must be dismissed.

<u>**CONCLUSION**</u>

For all of these reasons, Fingerhut and the Entity Defendants respectfully request that costs, including attorneys' fees be awarded to Fingerhut.


Dated:   July 31, 2015



Respectfully Submitted,

FOLKENFLIK & McGERITY LLP


By:___/s/ Max Folkenflik_____
        Max Folkenflik
1500 Broadway
21st Floor
New York, New York 10036
(212) 757-0400