UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JOHN RAPILLO AND HEIDI RAPILLO

             Plaintiffs,

-against-

BARRY FINGERHUT, DAVID HOLZER, FINGERHUT-HOLZER PARTNERS LLC, FINGERHUT-HOLZER EQUITIES, INC., FINGERHUT HOLZER, INC., FINGERHUT-HOLZER FUND L.P., GEO-CAPITAL PARTNERS, INC., FINGERHUT-HOLZER THE WAVERYLY I, LLC., FINGERHUT-HOLZER THE WAVERYLY II, LLC.

             Defendants.
------------------------------------------------------------X

FILED BY ECF

09-CV-10429 (VSB)

## John Rapillo and Heidi Rapillo's Rule 56.1(b) Statement in Response to Defendants' Rule 56.1(a) Statement within their Motion for Summary Judgment

Pursuant to Rule 56.1 of the Local Rules of the Court, Plaintiffs John Rapillo and Heidi Rapillo ("Rapillos"), by its attorneys, Marshall, Conway & Bradley, P.C., respectfully submits this Opposition to Barry Fingerhut ("Fingerhut"), Fingerhut-Holzer Partners LLC ("Fingerhut/Holzer LLC" or "LLC", Fingerhut-Holzer Equities, Inc., Fingerhut Holzer, Inc., Fingerhut-Holzer Fund, L.P., Geo-Capital Partners, Inc., Fingerhut-Holzer The Waverly I, LLC ("Waverly I"), Fingerhut-Holzer The Waverly II, LLC's ("Waverly II) (collectively "defendants"), Local Civil Rule 56.1 Statement.

    1.    The Rapillos met the Holzers on or about the year of 1983, when John Rapillo, at the time a furniture salesman and designer, was consulted or hired for a number of decorating/design projects, and the Rapillos and the Holzers became friends. The Rapillos were invited to the Holzer's home for holiday meals several times a ear. See the testimony of John

Rapillo dated May 2, 2011 annexed as Exhibit F at 22:17-18, 32:12-16, hereinafter as "JR Tr."

<u>Rapillos' Response</u>: The Rapillos admits that John Rapillo met the Holzers and performed interior design work for the Holzers.

2.     In 2004, Holzer entered into business with Barry Fingerhut in the firm Fingerhut-Holzer Partners LLC. ("Partners LLC") which was intended to manage Fingerhut's and Holzer's personal investments which they would often go into together, and to provide them with an office employees to support their investment activities. *See* the testimony of David Holzer dated March 28, 2012 annexed as Exhibit H at 27:22-25, 28: 5-7, 32:1-3, 10-12, hereinafter as "DH Tr.".

<u>Rapillos' Response</u>: Disputed. Fingerhut and Holzer went in to business together, to invest other individual's money in an effort to make profit. Specifically, Holzer admitted:

> Q: What was the plan to earn money?
> A: By the investment process.
> Q: by participating in the investment process with your customers?
> A: That's correct.
> Q: Did you set out to make money together
> A: Yes
>
> Q: Did you solicit business investment from Mr. Rapillo in the Fingerhut-Holzer enterprises.
> A: Yes.
> Q: Did there come a time when you had conversations with Mr. Rapillo for the purpose of promoting investment with the Fingerhut-Holzer operation
> A: Yes
> A: I don't remember how the LLC was set up. If we took a certain portion of the profit or was there a fee involved, I can't remember.
> Q: So there would be profit back from an investment like Fingerhut the Waverly I, back to Fingerhut-Holzer Partners?
> A: A fee would be paid.
> A: And the fee would be paid on the sale of the assets

*See* R. Conway, Dec. Ex. 5 at 47-49.

3.     Holzer and Fingerhut were involved in a number of investments together,

2

investing together, investing their own money either directly, or through some form of limited liability investment vehicle. Fingerhut-Holzer Partners LLC was the name of entity that held the lease to their office, and dealt with accounts, lawyers and others in managing their own investments. DH Tr. at 45:5-46:5, Declaration of Barry Fingerhut dated July 31, 2015 at Para. 3, hereinafter "Fingerhut Decl."

Rapillos' Response: Disputed. As noted above, Fingerhut-Holzer LLC was engaged in the business of not only investing their own money, but *also* investing the money of multiple investors, including the Rapillos. See R. Conway, Dec. Ex. 5 at 47-49.

4. Fingerhut-Holzer Partners LLC was not a broker or investment advisor to any individuals, and neither was Fingerhut during the relevant period. When Holzer and Fingerhut invested directly, they would do that either in their own names or through an entity they established for that investment, and not through Fingerhut-Holzer Partners LLC. DH Tr. at 50:12-23, 52:6-15, Fingerhut Decl. Para 3.

Rapillos' Response: Disputed. As detailed in the Rapillos memorandum of law in opposition to defendants motion for summary judgment, Fingerhut/Holzer LLC were investment advisers in that the qualify as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings…" See Investment Advisers Act of 1940, §§ 206(1–3), 209(e) as amended 15 U.S.C.A. §§ 80b–6(1–3), 80b–9(e). Moreover, Fingerhut contacted the Rapillos multiple times, both in writing and via telephone to discuss investment strategies and opportunities. *See* R. Conway, Dec. Ex. 7 at 4. In fact, Fingerhut demanded that the Rapillos invest more money with Fingerhut/Rapillo LLC, or else he would "zero out" their account. *See* R. Conway, Dec. Ex. 7 at 4. Additionally, Fingerhut/Holzer LLC sent the Rapillos annual K-1s evidencing their investment with the partnership. *See* R. Conway,

Dec. Ex. 6 at 6.

5. From time to time Fingerhut and Holzer sought to raise money from other investors for specific investment opportunities. In those instances, they formed a limited liability entity, either a corporation or a limited liability corporation or limited liability partnership. That entity would sell membership units or shares to qualified investors. DH Tr. at 42:3-25, 43:1, Fingerhut Decl. Para 4.

Rapillos' Response: Disputed. It is clear that Holzer stole money from the Rapillos directly. He had the money wired directly to his account, and he then used that money to further commit fraud. *See* R. Conway, Dec. Ex. 9; R. Conway, Dec. Ex. 10; R. Conway, Dec. Ex. 11. It is unclear what exactly he did with the funds, however it is certain that membership units were not sold. *See* R. Conway, Dec. Ex. 6 at 6.

6. In each case, those sales were made only after delivering a prospectus and obtaining a signed subscription agreement. In those cases, Fingerhut and Holzer would sometimes act as managing members of those limited liability entities, either directly, or through a limited liability entity which served as managing member and which was owned by Fingerhut and Holzer. DH Tr. at 121:19-22, 32:1-12, 37:23-25.

Rapillos' Response: Disputed. The fact that Holzer took money directly from the Rapillos and did not deliver any paperwork, is indicative of the fact that the "sales" were not made pursuant to good business practices. *See* R. Conway, Dec. Ex. 6 at 7-9. Further, Fingerhut requested additional funds without any prospectus, and instead used threats in attempt to coerce the Rapillos into giving more money. *Id.*; *see* R. Conway, Dec. Ex. 7 at 3-4.

7. The Rapillos first became aware of Barry Fingerhut and Partners LLC from discussions with their friend about Holzer's new business. Holzer had said that Partner LLC.

4

Was investing in different ventures and "large companies" were "investing with them." JR Tr. at 18:2-20:22.

Rapillos' Response: Disputed. While, the Rapillos did learn of Fingerhut through Holzer, the alleged fact downplays the fact that Fingerhut actively recruited the Rapillos to invest with the LLC. See R. Conway, Dec. Ex. 7 at 4.

8. When John Rapillo ("John") was in mid-town Manhattan shopping with Leslie Holzer in connection with some decorating she had hired John to assist with, Leslie invited John to see the offices of Partners LLC., to show off the attractiveness of the office. JR Tr. at 15:8-11.

Rapillos' Response: Disputed. The Rapillos were invited to the office by Holzer, himself. See R. Conway, Dec. Ex. 6 at 4b.

9. Holzer met them and discussed the decorating with them, but not business. There was no discussion of Partners LLC's business and there was no solicitation of John Rapillo to invest in anything or be a "client" of Partners LLC. Just decorating. JR Tr. at 43:8-11.

Rapillos' Response: Disputed. As noted above, John Rapillo invited by Holzer himself, not only to show off the office, but to recruit the Rapillos into investing with the partnership. See R. Conway, Dec. Ex. 6 at 4b.

10. As they were in the hallway waiting for an elevator, Barry Fingerhut walked out of the office. Holzer pointed to him and said, in words or substance, "that's Barry Fingerhut." John saw the back of Fingerhut's head, but not his face. That was the only contact either of the Rapillos had with Barry Fingerhut until after Holzer's fraud was discovered. JR Tr. at 8:7-14, 21-25, 9:2.

Rapillos' Response: Disputed. The Rapillos spoke with Fingerhut multiple times, and Fingerhut sent the Rapillos a letter requesting more funds. Same is admitted by Fingerhut,

5

himself:

> Q. Did there come a time when relative to the Waverly investment, you were on a phone call with Heidi Rapillo concerning additional funds for investments in order to sustain the business opportunity?
> A. I only remember a phone call, I don't remember the reason.
> Q. Now why would you have called?
> A. I don't believe it was Heidi, I believe it was Heidi calling us.
> Q. Did you have a conversation with the Rapillos in which you made a request of additional funds necessary for the Waverly I investment?
> A. I think it was discussed on that call. I believe it was a capital call for all investors.

*See* R. Conway, Dec. Ex. 4 at 64-65.

Fingerhut also sent the Rapillos a letter, in addition to multiple K-1s showing their investment status. *See* R. Conway, Dec. Ex. 6 at 6, 12. Moreover, after being contacted by Fingerhut, the Rapillos indicated they did not have more money to invest. Hearing this, Fingerhut expressed anger and said "I'll zero you out" if you the Rapillos did not invest more money in the Waverly. *See* R. Conway, Dec. Ex. 7 at 4.

11. In 2004, John Rapillo settled a personal injury suit against one of his decorating clients for injuries he incurred when he fell 18 feet off a railing he was standing on while working for that client. At that trial, John claimed that his ability to work in the future would be "limited," although between the date of his trail in 2004, and the date of his deposition in 2012, he did "substantially the same work that [he] had done prior to the accident in 2002." He received about $2.5 million. JR Tr. at 45:6-46:30, 47:2-0, 54: 9-11.

Rapillos' Response: Disputed. As a result of his injury, John Rapillo is now disabled and no longer working. *See* R. Conway, Dec. Ex. 6 at 2.

12. Thereafter, John Rapillo asked Holzer in words or substance, "David, what do you think I should do with this money?" Holzer responded that "we only get involved with…large companies, large corporations. Heidi Rapillo, who witnessed the conversation

6

understood that Fingerhut and Holzer "didn't accept retail customers" like the Rapillos. See the testimony of Heidi Rapillo dated May 2, 2011 annexed as Exhibit G at 9:3-13, hereinafter as "HR Tr."

<u>Rapillos' Response</u>: Disputed. Defendants' alleged fact entirely ignores the fact that the Rapillos were recruited first by Holzer, then eventually by Fingerhut. The defendants admit to same, stating:

> Q: Did you solicit business investment from Mr. Rapillo in the Fingerhut-Holzer enterprises.
> A: Yes.
> Q: Did there come a time when you had conversations with Mr. Rapillo for the purpose of promoting investment with the Fingerhut-Holzer operation
> A: Yes
> A: I don't remember how the LLC was set up. If we took a certain portion of the profit or was there a fee involved, I can't remember.
> Q: So there would be profit back from an investment like Fingerhut the Waverly I, back to Fingerhut-Holzer Partners?
> A: A fee would be paid.
> A: And the fee would be paid on the sale of the assets

*See* R. Conway, Dec. Ex. 5 at 47-49.

13.     Later, Holzer told the Rapillos about the investment in the Waverly LLC (the "Waverly"). They were sent offering documents, which John testified that he never read. HR Tr. at 11:4-6, JR Tr. at 125:25, 126:2-8.

<u>Rapillos' Response</u>: Disputed. The Rapillos were informed, regarding the Waverly Investment, and were contacted by Fingerhut multiple times to invest further in the failed project. *See* R. Conway, Dec. Ex. 6 at 6; R. Conway, Dec. Ex. 7 at 4.

14.     With one exception, a legitimate investment the Rapillos made in a Florida real estate development called the Waverly I LLC ("Waverly I"), neither Fingerhut nor the Entity Defendants had anything to do with the Rapillos, or any "investment" they supposedly made with Holzer and the Rapillos have no reason to believe that I or they did. Fingerhut Decl. Para 5.

<u>Rapillos' Response</u>: Disputed. Defendants' self-serving affidavit attempts to claim that the defendants had nothing to do with the Rapillos. Obviously this is false. The entity defendants, Fingerhut/Holzer LLC, actively recruited the Rapillos to invest. Fingerhut, himself asked the Rapillos to invest further, and sent the partnership sent the Rapillos annual K-1's showing their investment status. *See* R. Conway, Dec. Ex. 4 at 32-37; R. Conway, Dec. Ex. 6 at 18.; R. Conway Dec. Ex. 17; R. Conway Dec. Ex. 18.

15. The Waverly, was established to raise funds for a 200 unit Florida development being built by a company called Trident Realty Corp. Fingerhut-Holzer The Waverly I, LLC. Was the managing member of the LLC. DH Tr. at 76:7-12.

<u>Rapillos Response:</u> Disputed. The Waverly project was completely under the auspices of Fingerhut/Holzer LLC. *See* R. Conway, Dec. Ex. 4 61-63; R. Conway, Dec. Ex. 5 at 79,85.

16. In mid-October 2005, The Rapillos signed subscription agreements, and wired $300,000 to an escrow account held by Foley & Lardner, LLP., a large, respected international law firm. They called the Partners LLC office to get information on sending in their documents and payments. Other than those ministerial communications, they had no other communication with employees of Partners LLC about the Waverly. JR Tr. at 86:11-17.

<u>Rapillos Response:</u> Disputed. This is obviously false given that Holzer is a member of the LLC, and the Holzers had constant communications with him. To wit, the Rapillos lost over $1,900,000.00 due to the near constant requests of Holzer to send more money. *See* R. Conway, Dec. Ex. 6 at 6. Further, Fingerhut himself admits to speaking on the phone with the Rapillos, which completely contradicts the contention that no one from the partnership spoke to the Rapillos. R. Conway, Dec. Ex. 4 at 64-65.

17.     The Waverly investment failed for a variety of reasons, including the collapse of the Florida real estate market in 2008. The Rapillos were informed by the District Attorney's office that the Waverly investment was a legitimate investment, and they have no discovered a single fact to even suggest otherwise, but they are suing me personally, as well as all of the Entity Defendants, for the money they unfortunately, but legitimately, lose in the Waverly. HR Tr. 104:20-105:6, Fingerhut Decl. Para 7.

Rapillos Response: Disputed. The Rapillos are suing Fingerhut and the entity defendants, because the defendants, Fingerhut included, engaged in repeated acts of fraud. Aside from Waverly I, Fingerhut/Holzer took money from the Rapillos for investments, and that money was embezzled and/or converted. *See* R. Conway, Dec. Ex. 6 at 4b-12. As the Rapillos' memo of law in opposition to defendants' motion clearly shows, Fingerhut individually is responsible for fraud either by knowingly engaging in the practice or by acting recklessly while Holzer committed fraud.

18.     Other than their first investment, the rest of the Rapillo's "investments" with Holzer was money given to Holzer to be invested by him, surreptitiously because they knew, and were told by Holzer, that Fingerhut was an investment genius, but they could not invest with him, and that the entities he was involved with only took investments from extremely wealthy investors or corporations. In short, the Rapillos knew would not take their money, but gave money to Holzer so that they could hope to get the benefit of investing in Fingerhut's ideas without his knowledge. Fingerhut Decl. Para. 8.

Rapillos Response: Disputed. The defendants' contentions that Fingerhut would not take the Rapillos money, is absurd, considering that Fingerhut demanded more money from the Rapillos on multiple occasions. Twice via telephone, Fingerhut demanded the Rapillos invest

9

more money, and threated to "zero out" the Rapillos' account or return their money for "pennies on the dollar." *See* R. Conway, Dec. Ex. 7 at 3. Additionally, a letter was sent to the Rapillos' requesting more money for the projects. *See* R. Conway, Dec. Ex. 7 at 3-5.

19. Holzer was never authorized by Fingerhut or any of the Entity Defendants and could not take any money from any investor or "pool" any investor money with his money. Fingerhut Decl. Para 8.

Rapillos Response: Disputed. Holzer and Fingerhut did business as partners and held themselves out to be in a partnership. Both Fingerhut and Holzer had authority to act on behalf of the partnership. *See* R. Conway, Dec. Ex. 4 at 32-37; R. Conway, Dec. Ex. 6 at 18.

20. They did, however, continue to talk to Holzer. In mid-December, Holzer asked John Rapillo to send him $600,000 to invest in a dinner theater concept. According to John, Mr. Holzer said:

That he and his partner were investing in this great concept, that they will be building many of them, and again, our money was not substantial enough, that he was pooling it with their to invest. JR Tr. at 92:17-21

Rapillos Response: Disputed. The Rapillos were actively recruited by Holzer to invest an additional $600,00.00. *See* R. Conway, Dec. 6, Ex. 7.

21. John sent "$600,000 to Mr. Holzer supposedly to pool with his funds." John did not know the name of the entity he was investing in, the name of the theater, or the corporate owner of it, or even the terms of the investment or "what he was getting for his money." JR Tr. at 94:3-5, 94:6-11.

Rapillos Response: Disputed. The Rapillos sent the money to Holzer because they were assured that the investment was and "triple [their] money." *See* R. Conway, Dec. 6, Ex. 7.

22. John did not know where the dinner theater was located other than someplace "in

10

Boca Raton." He received no paperwork other than the wire transfer receipt he got from the bank. He did not know, and Holzer did not say, that Fingerhut was ever aware of Rapillo's "investment" with Holzer. JR Tr. at 90:8-25, 94:15-19.

<u>Rapillos Response</u>: Disputed. While it is admitted that the Rapillos did not receive paperwork regarding the $600,000.00, this only evidences that the Rapillos were not sophisticated investors and relied on Fingerhut/Holzer given their stated expertise. Moreover, Fingerhut certainly seemed aware, given that he demanded the Rapillos add more funds into the failing Waverly investment. *See* R. Conway, Dec. Ex. 7 at 3.

23. At the end of January 2006, the Rapillos sent $200,000.00 more to Holzer's personal checking account, this time, supposedly for phase 2 of the Waverly, but they have no documents to prove that was the intended use of the funds, but none of the procedures followed for the Waverly I were followed with this supposed "investment," and the Rapillos never asked anyone about that. JR Tr. at 96:6-97:12.

<u>Rapillos Response</u>: Disputed. In fact the Rapillos did become wary that their investment was failing and specifically asked Fingerhut to close their account, which angered Fingerhut who responded with a threat to "zero out" the account. *See* R. Conway, Dec. Ex. 7 at 3.

24. In March 2006, the Rapillos sent Holzer $800,000 for an investment in V-Campus, known by the Rapillos to be publically traded stock. When asked, "And why didn't you go to a stock broker and buy that stock?" John answered:

> "Because he offered it to me and it sounded –again, we were looking for some income at that point, and that's what he came up with and offered to me as a possibly good thing to get involved with…he and his partner were buying millions of dollars of it and we should get involved in this." JR Tr. at 102:17-103:3, 6-16.

11

Rapillos Response: Disputed. The Rapillos were invited to buy V. Campus stock by Fingerhut/Holzer LLC. on the advice that both Fingerhut and Holzer were also buying the stock. *See* R. Conway, Dec. Ex. 4 at 42-43; R. Conway, Dec. Ex. 6 at 10.

25. According to John, Holzer was supposed to buy stock for John. John knew that stock brokers had to be licensed, and didn't know if Holzer or Fingerhut were licensed, and he admitted he never saw any document where Fingerhut or Holzer held themselves out as brokers. JR Tr. at 104:23-105:24.

Rapillos Response: Disputed. Despite not seeing documents that evidenced Fingerhut or Holzer's broker status, it is clear that Fingerhut/Holzer held themselves out to be investors. Fingerhut/Holzer LLC. invited the Rapillos to invest in V. Campus claiming it was a "hot stock" that would be "major player" in the near future. *See* R. Conway, Dec. Ex. 6 at 10.

26. The investment in V-Campus was supposed to pay interest quarterly. When Heidi Rapillo complained to Holzer that no interest was received he paid her 5,000.00 out of Holzer's personal checking account. HR Tr. at 80:15-19.

Rapillos Response: The Rapillos admit that Holzer sent the Rapillos 5,000.00 when the Rapillos asked to close out their accounts. *See* R. Conway, Dec. Ex. 6 at 11.

27. It was true that Fingerhut and Holzer were buying stock in V-Campus. Holzer bought some stock for himself, using the Rapillo's money. HR Tr. at 96:19-97:6

Rapillos Response: Disputed. While it is admitted that Holzer bought stock for himself using the Rapillos money, It is also alleged that Holzer transferred some of the Rapillos $800,000.00 investment directly over to Fingerhut who then bought V. Campus stocks. *See* R. Conway Dec. Ex. 5 at 113. Further, the stocks that Holzer purchased for himself using the Rapillo money were later transferred to Fingerhut. Thus, Fingerhut converted the Rapillos'

12

money in effectuating the transfer. Specifically, Fingerhut admitted:

> Q. Now sir I'm going to ask you this two of ways, the District Attorney at page, in the affidavit of investigator, Shannon Row at page 0000178 indicates that on December 15, 2005 shortly after … on the day of the second investment of the Rapillos, a wire transfer of $600,000 was sent and Holzer transferred $200,000 to your personal account on the same date, are you familiar with that event?
> A. I mean I could probably look it up, but I'm not familiar with the other part.
> Q. Did Mr. Fingerhut transfer $200,000 to your personal account on or about December 15, 2005?
> A. If its in the statement by DA then I would say yes. I mean I can't tell you off hand.

*See* R. Conway, Dec. Ex. 4 at 93.

28. Neither Fingerhut, nor any of the Entity Defendants, had any relationship with the Rapillos other than with respect to the Waverly investments, and neither Fingerhut nor any of the Entity Defendants had any fiduciary relationship with them. Fingerhut Decl. Para. 9

Rapillos Response: Disputed. This is simply untrue. Whether a fiduciary duty is a legal question which is evidenced in the attached memorandum of law. Moreover, Fingerhut assuredly had a relationship with the Rapillos in that he consistently badgered the Rapillos for larger investments, and Fingerhut/Holzer LLC sent them annual K-1s. *See* R. Conway, Dec. Ex. 6 at 4-7. Additionally, Holzer acted through the Fingerhut/Holzer LLC partnership, thus the entity defendants are implicated by his actions.

29. Neither Fingerhut, nor any of the Entity Defendants, served as investment advisors to the Rapillos or, during the relevant time period, to serve as investment advisors to anyone. Fingerhut Decl. Para. 10.

Rapillos Response: Disputed. As noted above and detailed in the Rapillos memorandum of law in opposition to defendants motion for summary judgment, Fingerhut/Holzer LLC were investment advisers in that they qualify as "any person who, for compensation, engages in the business of advising others, either directly or through publications

13

or writings..." See Investment Advisers Act of 1940, §§ 206(1–3), 209(e) as amended 15 U.S.C.A. §§ 80b–6(1–3), 80b–9(e). Moreover, Fingerhut contacted the Rapillos multiple times, both in writing and via telephone to discuss investment strategies and opportunities. *See* R. Conway, Dec. Ex. 7 at 4. In fact, Fingerhut demanded that the Rapillos invest more money with Fingerhut/Rapillo LLC, or else he would "zero out" their account. *See* R. Conway, Dec. Ex. 7 at 4. Additionally, Fingerhut/Holzer LLC sent the Rapillos annual K-1s evidencing their investment with the partnership. *See* R. Conway, Dec. Ex. 6 at 6.

30. Neither Fingerhut, nor any of the Entity Defendants, served as stock brokers or broker/dealers for the Rapillos or, during the relevant time period, were registered as stock brokers or broker/dealers or served as stock brokers or broker dealers for anyone, or took any money from the Rapillos to buy stock for them, nor could we have legally done so. Fingerhut Decl. Para. 11.

Rapillos Response: Disputed. It is clear that Fingerhut/Holzer held themselves out to be investors. Fingerhut/Holzer LLC. invited the Rapillos to invest in V. Campus claiming it was a "hot stock" that would be "major player" in the near future. *See* R. Conway, Dec. Ex. 6 at 10. Further, money was taken from the Rapillos and used specifically to buy V. Campus shares (which were subsequently transferred from Holzer to Fingerhut).

31. Neither Fingerhut, nor any of the Entity Defendants, received a single penny of money from the Rapillos, and certainly did not "convert" or divert any of their money. Fingerhut Decl. Para. 12.

Rapillos Response: Disputed. Holzer used the Rapillos money to buy shares of V. Campus for himself. *See* R. Conway, Dec. Ex. 5 at 113. Further, 200,000.00 was transferred from Holzer to Fingerhut immediately after the Rapillos gave Holzer the money. Further, the V.

Campus Shares that Holzer bought using the Rapillos' money were eventually transferred to Fingerhut. *See* R. Conway, Dec. Ex. 21. Thus it is axiomatic that Fingerhut converted the money that the Rapillos had entrusted to Fingerhut/Holzer LLC.

32. Neither Fingerhut, nor any of the Entity Defendants, have any legal, moral or any other obligation to the Rapillos. Fingerhut Decl. Para 13.

Rapillos Response: Disputed. As stated above, Fingerhut and the entity defendants had a legal obligation by way of a fiduciary duty owed to the Rapillos. Fingerhut had a relationship with the Rapillos and he consistently badgered the Rapillos for larger investments, and Fingerhut/Holzer LLC sent them annual K-1s. *See* R. Conway, Dec. Ex. 6 at 4-7. Additionally, Holzer acted through the Fingerhut/Holzer LLC partnership, thus the entity defendants are implicated by his actions.

33. There is no evidence that Fingerhut ever had any awareness of any investment by the Rapillos other than the legitimate investment in the Waverly, until after Holzer's crimes against Fingerhut were discovered and the District Attorney uncovered the crimes against the Rapillos. JR Tr. at 92:22-93:10.

Rapillos Response: Disputed. The Rapillos maintain their belief that Fingerhut was well aware of the fraud being committed by Holzer and was an active participant. In the alternative, as argued in the attached memorandum of law, Fingerhut was at least reckless and should have known about the fraud being committed.

34. In June 2007, after Holzer supposedly closed a real estate deal in which Fingerhut and Holzer were partners called Dellwood Properties, Holzer deposited a check for $33 million into the account of one of the Partners LLC's portfolio companies. It was quickly discovered that the check was not good, and was drawn on a closed account controlled by Holzer. The bank

froze the account into which the check was deposited, and froze the main Partners LLC bank account and a fraud investigation was started. When Holzer and Fingerhut met the next day, Holzer admitted that the Dellwood deal had not closed, although he continued to insist that it as real, and that he was broke. Fingerhut Decl. Para 14.

Rapillos Response: The Rapillos admit this fact to the extent that Holzer did indeed issue a check for $33,000,000.00 that had no funds behind it, which cause the bank to shut down the main account of Fingerhut/Holzer LLC. *See* R. Conway, Dec. Ex. 4 at 117-18.

35. Later he admitted that the "sale" of the Dellwood Properties had fell apart, but that there were new buyer availability. Finally, in early October Holzer admitted that there was no Dellwood Property, and that he had stolen all the money given to him by Fingerhut and used it for personal purposes or for his personal business expenses. Fingerhut Decl. at Para. 15.

Rapillos Response: Disputed. It is unclear whether Fingerhut's self-serving affidavit is at all factually accurate, and thus the Rapillos cannot claim it as fact.

36. Fingerhut and Holzer discussed how Holzer could repay the money he had taken and agreed that if he did not pay nearly $7 million to Fingerhut by October 15, 2007, than he would assign "his share" of the investments they had made together. After the payment was not made, and checks written to Fingerhut had bounced, Fingerhut went to the District Attorney and reported Holzer's crimes against him. It was through the District Attorney's investigation that Fingerhut learned that Holzer had also defrauded others, including the Rapillos. Fingerhut Decl. Para. 16.

Rapillos Response: Disputed. Fingerhut prepared for Holzer's incarceration long before the checks to Fingerhut bounced. In fact, he immediately sought the counsel of a private investigator who assisted him in placing the entirety of Fingerhut/Holzer LLC's fraud on Holzer.

*See* R. Conway, Dec. Ex. 4 at 118, 123. It is also contended by the Rapillos, that due to Fingerhut's recklessness he knew of the fraud being perpetrated against the Rapillos long before he spoke with the District Attorney. Moreover, it is asserted in Fingerhut's deposition that he never spoke to the District Attorney but rather the Assistant District Attorney.

37. In April 2009, Holzer pleaded guilty to multiple felonies and he accepted a $16 million restitution obligation. DH Tr. at 105:12-24.

Rapillos Response: The Rapillos admit that Holzer plead guilty to multiple felonies and was sentenced 5-15 years in prison. *See* R. Conway, Dec. Ex. 17.

38. While throughout the relevant time period Holzer had made certain payments to Fingerhut or Partners LLC, all of those payments were for sums actually owed at the time the payments were made. Fingerhut Decl. at Para. 17.

Rapillos Response: Disputed. While defendants' statement here is entirely unclear, it is untrue that Fingerhut accepted payment for sums "actually owed." It is unclear what was actually owed, however, the facts clearly show that Fingerhut accepted 200,000.00 from Holzer. *See* R. Conway, Dec. Ex. 4 at 93-94. This money was taken directly from the Rapillos by Holzer and then given to Fingerhut. Further, Fingerhut would take 500,000 shares of V. Campus that were fraudulently purchased with the Rapillos money. *See* R. Conway, Dec. Ex. 21.

Dated: New York, New York
       September 30, 2015

                                MARSHALL, CONWAY,
                                & BRADLEY, P.C.
                                45 Broadway – Suite 740
                                New York, NY  10038
                                (212) 619-4444
                                Attorneys for Plaintiff
                                *John Rapillo and Heidi Rapillo*

                                By: _____
                                      Robert J. Conway (RJC-2373)

TO:    FOLKENFLIK & MCGERITY
        Attorneys for Defendants
        1500 Broadway – 21st Floor
        New York, New York 10036
        (212) 757-0400
        File No.:11-AD-661 BJM

        DAVID HOLZER
        c/o Pamela Lustig
        500 Kappock Street
        Bronx, New York 10463