UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
                                      :

JOHN RAPILLO et al.,                    :

                          :

                   Plaintiffs,   :

                          :

         - v -           :

                          :

BARRY FINGERHUT et al.,       :

                          :

                Defendants.  :

                          :
-------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: __9/14/2016__
```

09-CV-10429 (VSB)

**MEMORANDUM & ORDER**

Appearances:

Robert J. Conway
Jeffrey Alan Marshall
Marshall, Conway & Bradley, P.C.
New York, NY
*Counsel for Plaintiffs*

Max Folkenflik
Folkenflik & McGerity
New York, NY
*Counsel for Defendants Barry Fingerhut,*
*Fingerhut-Holzer Partners LLC, Fingerhut-Holzer*
*Equities, Inc., Fingerhut-Holzer, Inc.,*
*Fingerhut-Holzer Fund, L.P., Geo-Capital*
*Partners, Inc., Fingerhut-Holzer the Waverly I, LLC,*
*and Fingerhut-Holzer the Waverly II, LLC*

David Holzer
*Defendant Pro Se*

VERNON S. BRODERICK, United States District Judge:

       Before me is the motion for summary judgment of Defendants Barry Fingerhut,

Fingerhut-Holzer Partners LLC, Fingerhut-Holzer Equities, Inc., Fingerhut-Holzer, Inc.,

Fingerhut-Holzer Fund, L.P., Geo-Capital Partners, Inc., Fingerhut-Holzer the Waverly I, LLC,

and Fingerhut-Holzer the Waverly II, LLC (collectively, "Movants"), (Doc. 69).[1]  Because I find

that Movants have established that no genuine factual dispute exists, and Plaintiffs failed to

demonstrate the existence of any genuine issue as to any material fact in support their theories of

liability, the Movants' motion for summary judgment is GRANTED as to each cause of action.

## I.   <u>Preliminary Legal Framework – Rule 56.1</u>

The factual summary that follows is based on my assessment of the facts that are not in

dispute, because I found the conclusory or unsupported allegations or statements in the parties'

respective Rule 56.1 Statements to be unreliable.  Rule 56.1 statements and counterstatements

are supposed to be "short and concise statement[s], in numbered paragraphs, of the material

facts" about which the parties contend there is or is not a "genuine issue to be tried."  S.D.N.Y.

Local Civ. R. 56.1.  "The purpose of Local Rule 56.1 is to streamline the consideration of

summary judgment motions by freeing district courts from the need to hunt through voluminous

records without guidance from the parties."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir.

2001).  "Statements in an affidavit or Rule 56.1 statement are inappropriate if they are not based

on personal knowledge, contain inadmissible hearsay, are conclusory or argumentative, or do not

cite to supporting evidence."  *Epstein v. Kemper Ins. Cos.*, 210 F. Supp. 2d 308, 314 (S.D.N.Y.

2002) (citations omitted).  A court may either disregard or strike portions of a Local Rule 56.1

statement that violate these principles.  *Holtz*, 258 F.3d at 73.

The majority of Plaintiffs' Rule 56.1 Statement is inconsistent with the Federal Rules in

that it disputes every one of Defendants' factual assertions and makes various factual assertions

purportedly in rebuttal however many of those assertions are merely conclusory statements or

---

[1] "Corporate Defendants" refers to Defendants Fingerhut-Holzer Partners LLC, Fingerhut-Holzer Equities, Inc., Fingerhut-Holzer, Inc., Fingerhut-Holzer Fund, L.P., Geo-Capital Partners, Inc., Fingerhut-Holzer The Waverly I, LLC, and Fingerhut-Holzer The Waverly II, LLC.

arguments without appropriate citations or with misleading citations in an improper attempt to create disputed issues of fact.[2]

A fact is not disputed simply because a litigant conclusorily proclaims it to be so if the underlying record evidence clearly contradicts that assertion.  *See BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (opposing party cannot defeat summary judgment by "merely . . . assert[ing] a conclusion without supplying supporting arguments or facts").  Further, I do not blindly accept the parties' 56.1 statements at face value, as "allegations are not 'deemed true simply by virtue of their assertion in [the] Local Rule 56.1 statement.'" *F.T.C. v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 302 (S.D.N.Y. 2008) (quoting *Holtz*, 258 F.3d at 73).  To ensure that Plaintiffs' "Local Rule 56.1 statement [did not] substitute for the admissibility requirement set forth in Fed. R. Civ. P. 56(e)," *Holtz*, 258 F.3d at 74, I have disregarded allegations that were "not accompanied by citation to admissible evidence" as well as allegations where "the cited evidence [did] not support the allegation."  *F.T.C. v. Med. Billers Network, Inc.*, 543 F. Supp. 2d at 302.  Accordingly, I have disregarded Plaintiffs' Rule 56.1 statements which are unsupported by citations to admissible evidence contained in the record.[3] The following facts are undisputed unless otherwise noted.

---

[2] Consequently, Plaintiffs' submission improperly resulted in an undue burden on this Court to parse through the parties' voluminous records, in direct contravention to the very purpose of Local Rule 56.1.  I therefore remind Plaintiffs' counsel that the purpose of a Rule 56.1 statement is to streamline the consideration of summary judgment motions and caution counsel against future submissions that are so clearly in violation of the letter and spirit of the Rule.

[3] I cite to Plaintiffs' 56.1 Statement throughout this Memorandum & Order to avoid confusion because it contains both the Defendants' assertions of fact and Plaintiffs' responses.  My citation to Plaintiffs' 56.1 Statement should not be viewed as my acceptance of the assertions made therein except as noted.

## II.    SUMMARY OF FACTS

### A.  The Parties

Plaintiff John Rapillo had a career as a furniture salesman and interior designer.  (Pls.' 56.1 Stmt. ¶ 1;[4] Conway Decl. Ex. 6, ¶ 4.)[5]  Plaintiff Heidi Rapillo, the wife of John Rapillo, is a hospital admissions officer.  (Conway Decl. Ex. 6, ¶ 2.)  During the relevant period, the Rapillos[6] lived in Westchester County, New York.  (AC ¶¶ 5, 6;[7] Conway Decl. Ex. 7, ¶ 1.)[8]  The Rapillos met Defendant David Holzer in 1983 when Holzer hired Mr. Rapillo to perform certain decorating and interior design projects at Holzer's home.  (Pls.' 56.1 Stmt. ¶ 1; JR Tr. 22:5-23:5.)[9]  Thereafter, Holzer hired Mr. Rapillo for certain other interior design services.  (JR Tr. 27-28.)  The Rapillos "became friends" with Holzer, (Pls.' 56.1 Stmt. ¶ 1), were invited to Holzer's home "for dinner many times," (JR Tr. 32:8-9), and celebrated holidays with Holzer and his family, (id.).

The Defendants in this action are two individuals, six corporations, and one limited partnership.  Fingerhut-Holzer Partners LLC, Fingerhut-Holzer the Waverly I, LLC, and Fingerhut-Holzer the Waverly II, LLC are limited liability corporations organized under the laws of New York.  (Ans. ¶¶ 19, 24, 25.)[10]  Fingerhut-Holzer Equities, Inc., Fingerhut-Holzer, Inc.,

---

[4] "Pls.' 56.1 Stmt." refers to Plaintiffs' Counterstatement Pursuant to Local Civil Rule 56.1.  (Doc. 79.)

[5] "Conway Decl." refers to the Declaration of Robert Conway.  (Doc. 80.)  The Affidavit of Plaintiff John Rapillo, dated September 23, 2015, is Ex. 6 to the Conway Declaration.  (Doc. 80-7.)

[6] "Rapillos" refers, collectively, to John Rapillo and Heidi Rapillo.

[7] "AC" refers to the Amended Verified Complaint, dated August 10, 2010, which is annexed as Ex. 1 to the Conway Declaration.  (Doc. 80-1.)

[8] The Affidavit of Plaintiff Heidi Rapillo, dated September 23, 2015, is Ex. 7 of the Conway Declaration.  (Doc. 80-8.)

[9] "JR Tr." refers to the deposition transcript of Plaintiff John Rapillo, dated May 2, 2011, which is annexed as Ex. F, (Doc. 72-6), to the Declaration of Max Folkenflik ("Folkenflik Decl."), dated July 31, 2015, (Doc. 72).

[10] "Ans." refers to Defendants' Answer to the Amended Complaint, dated March 21, 2011 which is annexed as Ex. 2 to the Conway Declaration.  (Doc. 80-2.)  "Defs.' Mem." refers to Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, dated July 31, 2015.  (Doc.71.)  Although Plaintiffs alleged in the Amended

and GEO Capital Partners, Inc. are corporations organized under the laws of New York.  (*Id.* ¶¶ 20, 21, 23.)  Fingerhut-Holzer Fund, L.P. is a limited partnership organized under the laws of New York.  (*Id.* ¶ 22.)

The individual Defendants are Barry Fingerhut and David Holzer.  (*Id.* ¶¶ 7, 8.)  During the relevant period, Fingerhut and Holzer each resided and worked in New York.  (*Id.*)  Fingerhut and Holzer were each managing members of Fingerhut-Holzer Partners LLC, Fingerhut-Holzer the Waverly I, LLC, and Fingerhut-Holzer the Waverly II, LLC.  (*Id.* ¶¶ 12, 16, 17.)  Additionally, Fingerhut and Holzer were each shareholders in Fingerhut-Holzer Equities, Inc. and Fingerhut-Holzer, Inc., (*id.* ¶¶ 13, 14), and general partners in Fingerhut-Holzer Fund, L.P, (*id.* ¶ 15).

### B.  The Rapillos Seek to Invest Certain of Their Money

In 2001, Mr. Rapillo sustained permanent injuries to his "cervical spine" when he fell 18 feet off a balcony while working at a client's home.  (JR Tr. 43:14-24; Conway Decl. Ex. 6, ¶ 2.)  As a result of his injuries, Mr. Rapillo was unable to work for over nine months.  (JR Tr. 44:12-13.)  Between 2004 and 2011, Mr. Rapillo resumed his work as a decorator and performed substantially the same work he had done prior to his accident.  (*Id.* 47:4-9.)[11]  Mr. Rapillo filed a law suit in connection with that accident, (JR Tr. 5:19-6:3), and obtained a jury verdict in August 2004, (*id.* 47:19-48:5), for more than $8 million, (*id.* 53:24-54:11).  While an appeal was pending, the parties agreed to settle the matter for approximately $3 million in total damages, (*id.*

---

Complaint and Movants responded in their Answer that Fingerhut-Holzer Partners LLC was a limited liability corporation organized under the laws of New York, (AC ¶ 19; Ans. ¶ 19), discovery revealed that it was organized under the laws of Delaware, (Conway Decl. Ex. 4 at 49:15-50-2; *see* Defs.' Mem. 13).  However, whether Fingerhut-Holzer Partners LLC was organized under New York or Delaware law is irrelevant to my decision.

[11] In their Rule 56.1 Statement, Plaintiffs purport to dispute Mr. Rapillo's own deposition testimony with the conclusory statement that Mr. Rapillo "is now disabled and no longer working."  (Pls.' 56.1 Stmt. ¶ 11.)  I credit the earlier sworn testimony of Mr. Rapillo rather than his affidavit created four years after his deposition solely in connection with opposition to the summary judgment motion.  *See infra* n.14.

54:11), of which Mr. Rapillo received approximately $2.4 million after fees and expenses, (*id*. 53:14-16).

After the Rapillos received the $2.4 million settlement payment, (*id*.), Mr. Rapillo asked Holzer how he should invest the settlement proceeds.  (Pls.' 56.1 Stmt.¶ 12; HR Tr. 9:3-19).[12] Based on Mr. Rapillo's conversation with Holzer, the Rapillos both understood that Defendants did not accept investments from individual investors such as themselves, (HR Tr. 9:17-10:15), because Defendants "only [got] involved with" investments from "large companies, [or] large corporations," (JR Tr. 19:4-5).  Although the Rapillos could not invest directly with Defendants, Holzer said that he would let the Rapillos know when "a good deal came up."  (*Id*. 8:16-21.)

Between October 2005 and March 2006, the Rapillos made four separate wire transfers totaling $1,900,000.00.  With the exception of the first wire transfer for $300,000.00 related to their investment in Waverly I that was wired to a law firm, the remainder of the funds— $1,600,000.00—was wired to Holzer's personal bank account.  The Rapillos believed that the funds relating to each wire transfer would be channeled into an investment in which one or more of Defendants were participating.  The Rapillos believed that the four wire transfers related to the investments described below.

### 1. Waverly I

Waverly I was a residential real estate development project in or around Jacksonville, Florida that involved construction of approximately 200 condominium units.  (Pls.' 56.1 Stmt. ¶ 15; Conway Decl. Ex. 14; *id*. Ex. 6 ¶ 4b.)  In mid-October 2005, the Rapillos signed subscription agreements for the Waverly I development project.  (Pls.' 56.1 Stmt. ¶ 16.)  On or

---

[12] "HR Tr." refers Plaintiff Heidi Rapillo's deposition transcript, dated May 2, 2011, which is annexed as Ex. G to the Folkenflik Declaration.  (Doc. 72-7.)

about October 19, 2005, the Rapillos wired $300,000.00 to the trust account of the law firm

Foley & Lardner LLP, (Conway Decl. Ex. 8), for the purpose of investing in Waverly I, (JR Tr.

86:11-22).  Thereafter, Defendants sent the Rapillos annual K-1 statements for, at a minimum,

years 2005 and 2007.  These K-1 statements were issued by Defendant Fingerhut-Holzer the

Waverly I, LLC and set forth the status of the Rapillos' investment in Waverly I.  (Pls.' 56.1

Stmt. ¶ 14; JR Tr. 87:16-88:19; Conway Decl. Exs. 17, 18.)

The Rapillos' wire transfer to Foley and Lardner LLP relating to their $300,000.00

investment in Waverly I was the only investment that the Rapillos actually made with

Defendants.  (Pls.' 56.1 Stmt. ¶¶ 17, 18; HR Tr. 104:20-106:4.)  Plaintiffs do not dispute that

Waverly I was a legitimate investment.  (*See* Pls.' 56.1 Stmt. ¶ 17.)  Additionally, it is

undisputed that Waverly I failed for a variety of reasons, including the collapse of the Florida

real estate market in 2008.  (*Id*.)[13]

### 2. *"Dinner Theater Concept" in Boca Raton, Florida*

On or about December 15, 2005, the Rapillos wired $600,000.00 to Holzer's personal

bank account, (Conway Decl. Ex. 9), for the purpose of investing in a "dinner theater concept" in

Boca Raton, Florida, (JR Tr. 94:3-11).  Holzer represented to Mr. Rapillo that the dinner theater

investment project entailed "building many" additional theater locations, (*id*. 92:19), which

would showcase "this new concept in theater where you lounge and order food," (*id*. 91:19).  Mr.

Rapillo testified that he did not know the name or address of the existing dinner theater that the

project sought to replicate at the new locations, (*id*. 90:13-25), was not aware which entity or

entities were investing in the project, (*id*. 60:2-15), and did not sign any agreement or receive

---

[13] Here, Plaintiffs responded that the facts contained in paragraph 17 of Movants' 56.1 statement are "Disputed," however, Plaintiffs fail to even address the fact that Waverly I was a legitimate investment which failed for a variety of reasons.  (*See* Pls.' 56.1 Stmt. ¶ 17.)  Instead, as discussed in more detail below, Plaintiffs respond with improper narrative and legal argument unrelated to Waverly I.  (*Id*.)

any documentation regarding the project, (*id*.; *id.* 131:3-9).  (*See* Pls.' 56.1 Statement ¶¶ 20-22.)

The Rapillos transferred the $600,000.00 to Holzer's personal bank account without knowing

what the terms of investment were or what return on their investment they could expect.  (JR Tr.

94:3-11).  Because the $600,000.00 that the Rapillos intended to invest in the dinner theater

concept was not a substantial enough sum to invest through any of the Corporate Defendants,

Holzer told the Rapillos that he would "pool" their funds with his own funds when making the

investment.  (*See* Pls.' 56.1 Statement ¶ 20.)

### 3.  *Waverly II*

On or about January 31 2006, the Rapillos wired $200,000.00 to Holzer's personal bank

account, (Conway Decl. Ex. 10), with the intention of investing in "Waverly II," (JR Tr. 96:7-

13).  Mr. Rapillo testified that he understood Waverly II to be "phase 2" of construction for the

Waverly development which entailed building additional condominium units in Jacksonville,

Florida.  (JR Tr. 127:23-128:3; *see* Pls.' 56.1 Statement ¶ 23.)  The Rapillos believed that their

$200,000.00 investment would be used to purchase certain of these additional units.  (JR Tr.

96:12-13.)  The Rapillos received "a sheet on the Waverly II and what those units were going to

be sold for," (*id.*), but did not sign any agreements relating to Waverly II, (*id.* 131:3-9), or

receive any documentation evidencing their investment in Waverly II, (*id.*).  (*See also* Pls.' 56.1

Statement ¶ 23.)

### 4.  *Stock Purchase in V-Campus*

On or about March 23, 2006, the Rapillos wired $800,000.00 to Holzer's personal bank

account, (Conway Decl. Ex. 11), with the understanding that Holzer would purchase stock in V-

Campus on the Rapillos' behalf, (JR Tr. 102:21-103:5).  (*See* Pls.' 56.1 Stmt. ¶ 24.)  The

Rapillos did not sign any agreement or receive any documentation regarding their investment in

V-Campus.  (JR Tr. 131:3-9.)  Mr. Rapillo understood V-Campus to be a publicly traded

company, (JR Tr. 77:11-14), that featured "this new concept of learning, college learning," (*id*.

77:4-5).  Holzer represented to the Rapillos that the investment in V-Campus would yield

quarterly income.  (*Id*. 80:21-81:2; Pls.' 56.1 Stmt. ¶ 26.)  The Rapillos received only one

quarterly payment of $5,230, (JR Tr. 81:4-8)—only after they complained that multiple quarterly

payments had not been paid, (Pls.' 56.1 Stmt. ¶ 26)—which came in the form of a personal check

from Holzer, (*id*. 81:16-21; Folkenflik Ex. I; Pls.' 56.1 Stmt. ¶ 26).

### C.  Holzer Admits Taking The Rapillos' Money For Himself

Contrary to Holzer's representations to the Rapillos, the $1,600,000.00 that the Rapillos

transferred to Holzer's personal bank account was not "pooled" with Holzer's money or invested

by Holzer on behalf of the Rapillos.  Instead of investing any of Rapillos' money in Waverly II,

the "dinner theatre concept," or V-Campus stock, Holzer admitted that he took that money for

himself.  (Pls.' 56.1 Stmt. ¶ 18; HR Tr. 106:2-4; DH Tr. 102:6-15, 113:7-115:11).

The Rapillos each testified that they never received any documentation from any of the

Movants evidencing the fact that they had made the three wire transfers to Holzer's personal

bank account.  (JR Tr. 94:15-19, 96:10-19, 103:22-24; HR Tr. 71:15-17, 72:7-13.)  Through their

discussions with the New York District Attorney's office, the Rapillos were informed that their

investment in Waverly I was legitimate, (Pls.' 56.1 Stmt. ¶ 17; HR Tr. 104:20-105:6), and each

of the other three so-called investments was illegitimate, (HR Tr. 105:14-25).  Holzer pleaded

guilty on April 30, 2009.  During his guilty plea allocution, Holzer admitted that he used the

Rapillos' money for his own purposes and did not invest any of the $1,600,000.00 on behalf of

the Rapillos.  Specifically, Holzer said that

> Between December 2005 and March 2006, I took $1.6 million
> dollars from Heidi and John Rapillo, people I have known for more
> than 20 years.  I represented to them I would invest their money in

> a movie theater and penthouse project.  In fact, I did not invest any money on their behalf.  I used Rapillo's money for my own personal use and invested some of it on my [own] behalf.

(Folkenflik Decl. Ex. C, 11:16-24.)  During his deposition, Holzer testified that he treated all $1.6 million of the Rapillos' money as his own money.  (DH Tr. 114:12-25.)  He also testified that he did not transfer any of the Rapillos' money to Fingerhut.  (*Id*. 113:7-114:11, 115:7-11.)

### D.  The Rapillos' Relationship with Fingerhut and the Corporate Defendants

The Rapillos first became aware of Fingerhut and the Corporate Defendants through their discussions with Holzer.  (Pls.' 56.1 Stmt. ¶ 7.)  In Spring 2004, Mr. Rapillo visited Holzer at Holzer's office located at 399 Park Avenue, New York, New York.  (JR Tr. 10:14-18.)  While Mr. Rapillo was visiting Holzer, Fingerhut walked past them and Holzer identified Fingerhut to Mr. Rapillo as his partner Barry Fingerhut, but Mr. Rapillo did not meet Fingerhut or see his face at that time.  (Pls.' 56.1 Stmt. ¶ 10; JR Tr. 7:14-9:13 (Mr. Rapillo states that he had "seen [Fingerhut] once before at the office," but the first time Mr. Rapillo met Fingerhut was long after the Rapillos made the wire transfers to Holzer).)  This brief glimpse of Fingerhut in Movants' office was the only in-person contact either of the Rapillos had with Fingerhut until 2009 when they met him in connection with the criminal proceedings against Holzer.  (*Id*.)

It is undisputed that the Rapillos had only three direct communications with Fingerhut. First, at some point in 2007, (HR Tr. 63:15-22, 112:25), Ms. Rapillo telephoned Fingerhut "in regard to the Waverly I investment" and expressed her desire "to cash out," ("2007 Telephone Call").  (Conway Decl. Ex. 7, ¶ 3.)  Second, subsequent to the 2007 Telephone Call, Fingerhut sent the Rapillos the November 7 Letter[14] regarding Waverly I and explaining that the "recent

---

[14] "November 7 Letter" refers to the letter, dated November 7, 2008, from Fingerhut to Heidi Rapillo, a copy of which is annexed as Ex. 20 to the Conway Declaration.  (Doc. 80-21.)

10

downturn in the real estate market generally and especially in Florida, has contributed to delays in our forecasts for completion of the project and sale of the units."  (November 7 Letter 1.) Third, as a follow-up to the November 7 Letter, Fingerhut called the Rapillos "for the purpose of obtaining additional funds to support" the Waverly I investment ("2008 Telephone Call").[15] (Conway Decl. Ex. 7, ¶ 4.)

It is also undisputed that the Rapillos did not communicate or correspond with Fingerhut until some point in 2007, approximately one year after the Rapillos' last wire transfer to Holzer's personal bank account in March 2006.  (Pls.' 56.1 Stmt. ¶ 10; JR Tr. 7:14-9:13.)  Mr. Rapillo testified that he never spoke to Fingerhut "about anything" until after Holzer was arrested, (JR Tr. 106:8-11), on May 22, 2008, (DH Tr. 115:15).  Additionally, it is undisputed that the substance of the 2007 Telephone Call, the November 7 Letter, and the 2008 Telephone Call solely concerned issues related to the Waverly I investment.  (Pls.' 56.1 Stmt. ¶¶ 14, 28.) Likewise, the communications Ms. Rapillo had with Jackie Cohen, an administrative assistant who worked for Fingerhut, also related solely to Waverly I and were ministerial in nature.  (HR Tr. 26:6-16.)[16]  Except with respect to these limited communications related to Waverly I, there

---

[15] The 2008 Telephone Call occurred within approximately two months after the Rapillos received the November 7 Letter.  (HR Tr. 117: 25-118:16.)

[16] In his sworn affidavit, (Conway Decl. Ex. 6 ¶ 7), Mr. Rapillo states that, in connection with the investment in the dinner theater concept, "[u]pon the advise [sic] of Jackie Cohen of Fingerhut Holzer Partners, money was wired directly into the account of David Holzer."  (*Id.*)  This testimony, however, directly contradicts the Rapillos' deposition testimony in which both Mr. and Ms. Rapillo state that they did not speak with Jackie Cohen about transferring any money.  (DH Tr. 59:20-25; HR Tr. 32:20-23; *see also* Defs.' Mem. 8-9.)  Further, Ms. Rapillo testified that Holzer himself instructed her to wire the money relating to the dinner theater concept to his personal bank account.  (HR Tr. 32:24-33:4.)  I credit the earlier sworn testimony of the Rapillos rather than John Rapillo's affidavit created four years after his deposition solely in connection with opposition to the summary judgment motion.  *See Bright v. Coca-Cola Refreshments USA, Inc.*, 639 F. App'x 6, 8 (2d Cir. 2015) (summary order) (emphasizing that it is "well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony") (quoting *Trans-Orient Marine Corp. v. Star Trading & Marine, Inc.*, 925 F.2d 566, 572-73 (2d Cir. 1991)).

is no evidence in the record before me demonstrating that Fingerhut or any Movant communicated or interacted with the Rapillos.  (Pls.' 56.1 Stmt. ¶¶ 14, 28.)

### E.  Fingerhut and the Corporate Defendants' Knowledge of Holzer's Alleged Frauds

It is undisputed that, on three separate occasions, (*see supra* Sections II.B.2-4), the Rapillos wired money into Holzer's personal bank account with the understanding that Holzer would "pool," (HR Tr. 51:4), his own money with the Rapillos' money and, in turn, invest the comingled funds in investments that Holzer represented the Movants were undertaking.  (Pls.' 56.1 Stmt. ¶ 33; HR Tr. 51:14-19.)  Movants state that they had no knowledge of Holzer's agreement with the Rapillos to pool their money with his to make investments; except for the Rapillos' investment in Waverly I, "neither Fingerhut nor the [Corporate Defendants] had anything to do with the Rapillos, or any 'investment' they supposedly made with Holzer," (Pls.' 56.1 Stmt. ¶ 14).

In response, Plaintiffs purport to dispute this fact and cite (1) an irrelevant section of Fingerhut's deposition transcript, (*see* Conway Decl. Ex. 4 at 32-37), (2) conclusory accusations contained in Mr. Rapillo's affidavit, (*see* Conway Decl. Ex. 6 ¶ 18 ("David Holzer operated his fraud out of the Fingerhut Holzer partners offices.  He made use of Fingerhut Holzer staff.  He was vested in perpetuating his fraud.  He was vested with authority under such circumstances."), and (3) the annual K-1 statements relating solely to the Rapillos' investment in Waverly I, (*see* Conway Decl. Exs. 17, 18).  Plaintiffs' response—although purporting to dispute Defendants' assertion—does not dispute that Movants had no knowledge of (1) the three wire transfers into Holzer's personal bank accounts or (2) the three investments the Rapillos believed they were making with Holzer.  (*See* Pls.' 56.1 Stmt. ¶ 14.)

Specifically with respect to Fingerhut's knowledge, "[t]here is no evidence that Fingerhut ever had any awareness of any investment by the Rapillos other than the legitimate investment in

the Waverly [I], until after Holzer's crimes against Fingerhut were discovered and the District Attorney uncovered crimes against the Rapillos."  (Pls.' 56.1 Stmt. ¶ 33.)  Plaintiffs purport to dispute this fact by stating they "maintain their belief that Fingerhut was well aware of the fraud being committed by Holzer and was an active participant."  (*Id.*)[17]  Additionally, Plaintiffs assert that they had "multiple" conversations and communications with Fungerhut regarding "the various properties that the Rapillos [*sic*] money was to be invested in," (Pls.' Mem. 16),[18] but this assertion is not supported by the record and the citation given is to a single conversation, i.e., the 2008 Telephone Call, between Fingerhut and Ms. Rapillo which occurred *after* Holzer's arrest and solely related to the Waverly I investment, (*id.* (citing Conway Decl. Ex. 7, ¶ 4)).[19]

Not only do Plaintiffs fail to cite any evidence to support their conclusory assertion that Fingerhut knew of their "pooling" arrangement with Holzer, there is ample evidence in the record, including the Rapillos' deposition testimony, that belies their assertion.  First, Mr. Rapillo testified that he did not know whether Fingerhut or any of the Movants knew, prior to Holzer's arrest, that the Rapillos were "pooling" their money with Holzer's money so that he could invest on their behalf.  (JR Tr. 92:17-93:10.)  Second, Mr. Rapillo testified that he did not know whether Fingerhut or any of the Movants knew, prior to Holzer's arrest, that the Rapillos had transferred money to Holzer for the purpose of investing on their behalf.  (*Id.* 135:9-136:2.) Third, Ms. Rapillo testified that she "assumed [Fingerhut] knew" they were pooling their money

---

[17] Plaintiffs offer no facts in the record to rebut Defendants' statement, instead they claim it is their belief that Fingerhut was aware of and participated in the fraud.  *See Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (affirming grant of summary judgment where plaintiff's unsupported belief was "largely unsubstantiated by any other direct evidence").  Plaintiffs do not cite to anywhere in the record where they articulated this belief.

[18] "Pls.' Mem." refers to John and Heidi Rapillos' Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment, dated September 30, 2015.  (Doc. 78.)

[19] I note that Plaintiffs repeatedly mischaracterize and/or attempt to obfuscate the undisputed facts relating to (i) the timing of their communications with Movants, and (ii) the subject of those communications in an attempt to make it appear as though Fingerhut interacted with the Rapillos earlier and about more subjects than he did.  (*See, e.g.*, Pls.' 56.1 Stmt. ¶¶ 14, 16.)

with Holzer, (HR Tr. 54:11-17), but Holzer never represented to her that Fingerhut had knowledge of their pooling arrangement, (*id.* 55:8-12). Fourth, Ms. Rapillo acknowledges that she never saw any documentary evidence demonstrating Fingerhut's awareness of their pooling arrangement. (*Id.* 55:13-19, 72:7-13.)

Additionally, the Rapillos understood that Movants did not accept investments from individual investors such as themselves, (Pls.' 56.1 Statement ¶ 12;[20] HR Tr. 9:17-10:15), because Defendants "only [got] involved with" investments from "large companies, [or] large corporations," (JR Tr. 19:4-5). Thus, the Rapillos endeavored to invest with Fingerhut and the Corporate Defendants by channeling their money through Holzer. (Pls.' 56.1 Stmt. ¶ 18.) Ms. Rapillo testified that she and her husband channeled their money through Mr. Holzer because they "weren't big enough fish" for Fingerhut and the Corporate Defendants to deal with directly. (HR Tr. 50:24-51:19.) Similarly, Mr. Rapillo testified that their "money was not substantial enough" for Fingerhut and the Corporate Defendants to transact business with them directly. (JR Tr. 92:17-21.)

## III.   Procedural History

Plaintiffs commenced this action by filing their complaint on December 23, 2009.[21] (Doc. 1.) Holzer, proceeding pro se, submitted his Answer on February 4, 2010. (Doc. 39.)[22] On April 1, 2010, Fingerhut and the Corporate Defendants filed their motion to dismiss the complaint, (Doc. 7), together with a memorandum of law, (Doc. 9), and supporting declaration,

---

[20] Plaintiffs attempt to dispute this fact by referring to the Rapillos' investment in Waverly I, however, as set forth above, (*see supra* Section II.A), the investment in Waverly I was legitimate and the Rapillos were qualified investors pursuant to the subscription agreements concerning the Waverly I investment, (*see* Pls.' 56.1 Stmt. ¶ 16).

[21] This case was initially assigned to Judge George B. Daniels.

[22] Holzer's answer was in the form of a letter, and it was not filed until February 6, 2014. (Doc. 39.) It does not appear as if Holzer ever responded to the Amended Complaint.

(Doc. 7).  On August 17, 2010, Plaintiffs filed their Amended Complaint in lieu of opposing the motion to dismiss.  (Doc. 13.)  Following Plaintiffs' amendment, Defendants indicated in a letter that they no longer intended to move to dismiss.  (*See* Doc. 17.)  On or about March 21, 2011, Fingerhut and the Corporate Defendants submitted their Answer to the Amended Complaint. (Conway Decl. Ex. 2.)[23]

On February 5, 2014, the case was reassigned to me.  Discovery was completed by January 16, 2015.  (*See* Doc. 57.)  On February 20, 2015, I approved the briefing schedule for Defendants' motion for summary judgment.  (Doc. 60.)  After numerous extensions of the schedule, on August 3, 2015, Fingerhut and the Corporate Defendants filed their Motion for Summary Judgment as to each of Plaintiffs' causes of action, (Doc. 69), together with the Rule 56.1 Statement of Undisputed Material Facts, (Doc. 70), a memorandum of law, (Doc. 71), and supporting declarations with exhibits, (Docs. 72, 73).[24]  On September 30, Plaintiffs filed their memorandum of law in opposition, (Doc. 78),[25] the Rule 56.1 Counterstatement of Undisputed Material Facts, (Doc. 79), and supporting declaration with exhibits, (Doc. 80).  On October 14, Movants filed their reply, (Doc. 82), and supporting declaration with an exhibit, (Doc. 81).

## IV.   <u>Legal Standard</u>

Summary judgment is appropriate when "the parties' submissions show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Fay v. Oxford Health Plan*, 287 F.3d 96, 103 (2d Cir. 2002); *see* Fed. R. Civ. P. 56(a).

---

[23] It does not appear that Fingerhut and the Corporate Defendants filed their Answer to the Amended Complaint, however, Plaintiffs have not raised this issue and have submitted the Answer as part of the record before me.  (*See* Conway Decl. Ex. 2).

[24] Defendants initially attempted to file their motion consistent with the agreed upon schedule on July 31, 2015, but due to numerous filing errors did not successfully file the motion until August 3.

[25] "Defs.' Reply" refers to Defendants' Reply Memorandum of Law in Support of Their Motion for Summary Judgment.

"[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and "[f]actual disputes that are irrelevant or unnecessary will not be counted."  *Id.*

On a motion for summary judgment, the moving party bears the initial burden of establishing that no genuine factual dispute exists, and, if satisfied, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," *id.* at 256, and to present such evidence that would allow a jury to find in her favor, *see Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).  To defeat a summary judgment motion, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may," among other things, "consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it."  Fed. R. Civ. P. 56(e)(2), (3).  Additionally, a court need not credit a statement made in a Local Rule 56.1 submission if it determines that the record does not support it.  *Holtz*, 258 F.3d at 73-74.

In considering a summary judgment motion, a court must "view the evidence in the light

most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party."  *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir. 1995) (internal citations and quotation marks omitted); *see also Matsushita*, 475 U.S. at 587.  "[I]f there is any evidence in the record that could reasonably support a jury's verdict for the non moving party," summary judgment must be denied.  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002).

## V.   Discussion

### A.  Advisers Act Claims

In Counts I and II of the Amended Complaint, Plaintiffs allege that Defendants committed fraud and breached the fiduciary duty they owed to Plaintiffs in violation of § 80b-6 of the Investment Advisers Act of 1940, 15 U.S.C. §§ 80b-1 *et seq*. ("Advisers Act").  (*See* AC ¶¶ 52-60.)  For the reasons set forth below, I find that Plaintiffs did not have an investment advisory relationship, as defined under the Advisers Act, with any Movant.  Additionally, assuming for sake of argument that an investment advisory relationship did exist, the Advisers Act does not provide for the relief Plaintiffs seek.  Accordingly, Movants' motion for summary judgment is GRANTED as to Counts I and II of the Amended Complaint.

### *1.  Applicable Law*

"[T]here exists a limited private remedy under the Investment Advisers Act of 1940 to void an investment advisers contract, but . . . the Act confers no other private causes of action, legal or equitable."  *Transamerica Mortgage Advisors, Inc. v. Lewis*, 444 U.S. 11, 24 (1979).  With respect to this limited private remedy, Section 206 of the Advisers Act provides:

> It shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client . . . .

17

15 U.S.C. § 80b-6(2).  The remedy for violation of Section 206 appears in Section 215 of the Advisers Act which "provides that any investment adviser contracts whose formation or performance would violate the provisions of the IAA 'shall be void.'"  *Norman v. Salomon Smith Barney, Inc.*, 350 F. Supp. 2d 382, 388 (S.D.N.Y. 2004) (quoting 15 U.S.C. § 80b-15). Accordingly, the only relief available to a private litigant under the Advisers Act is rescission and "restitution of the consideration given under the contract . . ."  *Transamerica*, 444 U.S. at 24 n.14.  Therefore, under the Advisers Act a plaintiff may not seek "compensation for any diminution in the value of the rescinding party's investment alleged to have resulted from the adviser's action or inaction."  *Id.*; *see also Kassover v. UBS AG*, 619 F. Supp. 2d 28, 34-35 (S.D.N.Y. 2008).

To bring a claim under section 215 of the Advisers Act, a plaintiff must have entered into a contract for investment advisory services with an investment adviser.[26]  *See de Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1309-10 (2d Cir. 2002) (holding that the brokerage firm "did not in this case contract to serve in an advisory capacity" and thus "was not an 'investment adviser'" as defined by the Advisers Act); *Kassover*, 619 F. Supp. 2d at 32-33 (dismissing Advisers Act claim where plaintiff had brokerage agreements, not investment advisory agreements as required by the Advisers Act); *Clark v. Nevis Capital Mgmt., LLC*, No. 04-CV-2702, 2005 WL 488641, at *13 (S.D.N.Y. Mar. 2, 2005) ("Only parties to an investment advisory contract may sue for rescission under section 215."); *Neely v. Bar Harbor Bankshares*, 270 F. Supp. 2d 44, 49 (D. Me. 2003) ("[T]here is no right of action under the [Advisers Act] unless there is an investment adviser contract between the parties.").

---

[26] Section 80b-2(a)(11) of the Advisers Act defines an "investment adviser" as "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities . . . ."

### 2. *Analysis*

Plaintiffs' first Advisers Act claim alleges that, under the Advisers Act, Defendants "owed plaintiffs a duty to act with reasonable care," and "Defendants affirmatively breached this fiduciary duty." (AC ¶ 53.) Plaintiffs' second Advisers Act claim alleges that Defendants "misrepresent[ed] their rendering of personalized advise [*sic*] and omit[ted] material facts concerning the nature and type of investments." (AC ¶ 58.)

In their motion for summary judgment, Movants first argue that Plaintiffs' Advisers Act claims must be dismissed because no Movant ever executed an investment advisory contract with Plaintiffs. (Defs.' Mem. 13.) Second, Movants argue that, even if Plaintiffs entered into an investment advisory agreement with one or more Movants, dismissal of Counts I and II is required because the Advisers Act does not provide for damages other than the recoupment of fees. (*Id*.) Movants are correct.

The parties do not dispute that Plaintiffs never entered into an agreement with any Defendant to provide investment advice.[27] Instead, Plaintiffs claim that, while an investment advisory agreement is sufficient to establish an investment advisory relationship, an agreement is not necessary for relief under the Advisers Act. (Pls.' Mem. 20.) Plaintiffs are wrong; in order for the Advisers Act to apply, the parties must have entered into an investment advisory agreement. *See de Kwiatkowski*, 306 F.3d at 1309-10 (holding that the brokerage firm "did not in this case contract to serve in an advisory capacity" and thus was not an "investment adviser" as defined by the Advisers Act); *Norman*, 350 F. Supp. 2d at 388 (holding that "the remedies under the [Advisers Act] are only available where an investor brings suit on the investment adviser's allegedly improper conduct (or vice versa) pursuant to a contract for services");

---

[27] Plaintiffs do not argue that the subscription agreement entered into by Plaintiffs concerning the Waverly I investment provides a basis for a claim under the Advisers Act.

*Valentini v. Citigroup, Inc.*, 837 F. Supp. 2d 304, 324-25 (S.D.N.Y. 2011) (dismissing Advisers Act claim and holding that the investment advice defendants provided in course of their professional duties as brokers was insufficient for plaintiffs to establish an investment advisor contract or relationship).

After incorrectly asserting that an actual agreement is not necessary for relief under the Advisers Act, Plaintiffs claim that "both Fingerhut and Holzer held themselves out to be investment advisers," (Pls.' Mem. 20),[28] which gave rise to "an *implied* right of action under the [Advisers] Act," (*id.*) (emphasis in original).  In support of this assertion, Plaintiffs state that "New York Courts have routinely held that there is an *implied* right of action under the [Advisers] Act," (Pls.' Mem. 20); however, the cases cited by Plaintiffs to support this proposition are not from any New York court and do not even involve the Advisers Act.  *See Moses v. Burgin*, 445 F.2d 369, (1st Cir. 1971) (reversing a Massachusetts district court decision involving the Investment Company Act); *Herpich v. Wallace*, 430 F.2d 792, 796 (5th Cir. 1970) (affirming, in part, a Louisiana district court decision involving the Investment Company Act). Moreover, after the Supreme Court's decision in *Transamerica* courts in this district have long recognized that the Investment Company Act and the Advisers Act are distinguishable on the basis that the latter does not provide for a private right of action.  *See Krinsk v. Fund Asset Management, Inc.*, 654 F. Supp. 1227, 1232 (S.D.N.Y. 1987) (emphasizing that the Supreme Court decision in *Transamerica* foreclosed the possibility that the Advisers Act provides for a private right of action and noting that the Supreme Court had not yet "negated an implied right of action under the Investment Company Act").  In addition, to the extent it could be argued that the

---

[28] As set forth above, nothing in the record supports the claim that Fingerhut or any of the Corporate Defendants ever communicated or corresponded with the Rapillos concerning anything other than the Waverly I investment. (Pls.' 56.1 Stmt. ¶¶ 14, 33.)

decisions cited by Plaintiffs are relevant here, they predate the Supreme Court's decision in *Transamerica* holding that only recession is available under the Advisers Act. *Transamerica*, 444 U.S. at 24. Since *Transamerica*, courts have consistently held that only parties to an investment advisory contract may bring suit under the Advisers Act. *See, e.g.*, *de Kwiatkowski*, 306 F.3d at 1309-10; *Norman*, 350 F. Supp. 2d at 388; *Valentini*, 837 F. Supp. 2d at 324-25.

Even if the absence of an investment advisory agreement did not preclude Plaintiffs' Advisers Act claims, there is no evidence in the record to support Plaintiffs' assertion that Movants held themselves out as investment advisers to the Rapillos. (*See* Defs.' Mem. 13). To the contrary, Plaintiffs' assertion contradicts the undisputed facts that the Rapillos (1) knew the Movants did not accept retail customers like them, (HR Tr. 10:10-12), and (2) pooled their money with Holzer's money without Movants' knowledge, (*id*. 50:24-51:5; JR Tr. 92:17-21; *see supra* Section II.E). These undisputed facts also support the finding that there was no investment advisory relationship between the Rapillos and Movants.

In any event, assuming for the sake of argument that Plaintiffs could demonstrate the existence of an investment advisory relationship with Movants, Plaintiffs' sole remedy would be recession of the agreement and recovery of fees paid in consideration of such an agreement. *Transamerica*, 444 U.S. at 24 n.14. Here, Plaintiffs have failed to demonstrate that they paid any fees to Movants in consideration of the investment advice Plaintiffs claim to have received.[29] Moreover, Plaintiffs do not seek to recover any such investment advisory fees; instead, Plaintiffs seek to recover their entire $300,000.00 investment in Waverly I and the entire $1,600,000.00 they transferred to Holzer's personal bank account. (Pls.' Mem. 21; AC ¶ 60.) The Advisers Act

---

[29] In support of the claim that "a fee would be taken for the advice [Movants] provided [their] investors," (Pls.' Mem. 20), Plaintiffs cite to an irrelevant portion of Holzer's deposition transcript, (*id*.). Contrary to Plaintiffs' representation, Holzer's actual testimony is that he does not recall whether there was any fee involved in Waverly I. (Conway Decl. Ex. 5, 83:3-12.)

plainly does not provide for such a recovery.  *Transamerica*, 444 U.S. at 24 n.14.

Accordingly, Movants' motion for summary judgment is GRANTED with respect to Plaintiffs' Advisers Act claims in Counts I and II of the Amended Complaint.

### B. Fraud Claim in Violation of Section 10(b) of the Securities Exchange Act of 1934

In Count III, Plaintiffs allege that "in furtherance of their scheme to defraud, defendants, directly and indirectly, in connection with purchases and sales of securities, misrepresented material facts and omitted to state material facts," (AC ¶ 67), in violation of Section 10(b).  In addition to alleging that Movants should be held liable for fraud under Section 10(b) as primary actors, Plaintiffs argue controlling person liability under Section 20(a).  (Pls.' Mem. 13-17.)[30] Because I find that Plaintiffs have not identified any evidence demonstrating that any Movant made any misrepresentation to Plaintiffs or was a culpable participant in any fraud, I find that Plaintiffs have failed to identify any facts to buttress a viable theory of liability to support their Section 10(b) and Section 20(a) claims.  Accordingly, Movants' motion for summary judgment is GRANTED as to Count III.

#### 1. Primary liability under Section 10(b)

##### i. *Applicable Law*

Section 10(b) of the Securities Exchange Act makes it

> unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the

---

[30] Although Plaintiffs' Amended Complaint did not contain the traditional allegations supporting these additional theories of liability, I nevertheless consider whether the evidence in the record before me supports Plaintiffs' claims under each of these theories of liability.  *See Simonton v. Runyon*, 232 F.3d 33, 36-37 (2d Cir. 2000) (stating that "generally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories and statutory basis supporting the claim") (quoting *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 711 (2d Cir. 1980)); *Beckman v. United States Postal Service*, 79 F. Supp. 2d 394, (S.D.N.Y. 2000) (same).

Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  To establish primary liability under Section 10(b), "a plaintiff must prove (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."  *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008).

### ii.   *Analysis*

Movants argue that the Section 10(b) claim must be dismissed because Plaintiffs fail to identify any material misrepresentation made to the Rapillos by any Movant.  (Defs.' Mem. 16-17.)  Movants point out that the alleged misrepresentations Plaintiffs identify were made exclusively by Holzer to the Rapillos.  (*Id*.)  Additionally, the three communications between the Rapillos and Fingerhut, i.e., the 2007 Telephone Call, the November 7 Letter, and the 2008 Telephone Call, (*see supra* at Section II.D), each solely relate to the Waverly I investment, and the earliest of these communications was approximately one year after the Rapillos made their third and final wire transfer to Holzer's personal bank account, (*id*.).

In response, Plaintiffs claim that "Fingerhut/Holzer lied about the nature of the investments."  (Pls.' Mem. 16-17.)  Additionally, Plaintiffs reference communications and correspondence between Movants and the Rapillos as evidence that Movants made material misrepresentations.  (*Id*.)  However, each communication or correspondence that Plaintiffs identify relates solely to the Rapillos investment in Waverly I, (*see* Pls.' Mem. 16; *supra* Section II.D), and, as explained above, it is undisputed that Waverly I was a legitimate investment, (*see supra* Section II.B.1).  It is also undisputed that the Rapillos did not meet Fingerhut until after Holzer's frauds were exposed, (JR Tr. 7:14-8:9; *id*. Ex. G, 22:12-17), and had no contact with

Fingerhut until well after the Rapillos had transferred their money to Holzer's personal bank account, (*see supra* Section II.D).  Further, the Rapillos each testified that they had no basis for their belief that Fingerhut knew they were pooling their money with Holzer, (JR Tr. 93:10; HR Tr. 54:11-17), at least in part because they "had not had contact with [Fingerhut]," (JR Tr. 93:10).  (*See also supra* Section II.E.)  Accordingly, I have carefully reviewed the record before me in a light most favorable to Plaintiffs and I find that the Plaintiffs have failed to put forward any evidence demonstrating that any Movant made a material misrepresentation to Plaintiffs.

Plaintiffs note that recklessness can, under certain circumstances, fulfill the element of scienter, (Pls.' Mem. at 15); however, the element of scienter is independent from the requirement that a defendant make a material misrepresentation.  *See Rolf v. Blyth, Eastman Dillon & Co., Inc.*, 570 F.2d 38, 44 (2d Cir. 1978) (holding that, where "the alleged aider and abettor owes a fiduciary duty to the defrauded party, recklessness satisfies the scienter requirement") (internal footnote omitted).  In *Rolf*, the material misrepresentation element was established by defendant's "constant" assurances to plaintiff in light of the fact that they were intended to assuage plaintiff's doubt in the investment strategy put forward by defendant's subordinate.  *Id.* at 47-48.  With respect to the scienter element, the district court held that the defendant was reckless in failing to ascertain the validity of his subordinate's statements and such recklessness satisfied the scienter requirement for a Section 10(b) violation.  *Id.* at 48.  Recklessness can satisfy the scienter element, but there still must be a material misrepresentation.

In light of the fact that Plaintiffs have offered no evidence that any Movant made any material misrepresentation, there is no basis upon which a reasonable juror could find any Movant primarily liable for a Section 10(b) violation.

## 2. Controlling-person liability under Section 20(a)

### i. *Applicable Law*

"Controlling-person liability" under Section 20(a) of the Securities Exchange Act involves a separate inquiry from that of primary liability and provides an alternative basis for finding culpability. *See SEC v. Mgmt. Dynamics, Inc.*, 515 F.2d 801, 812-13 (2d Cir. 1975). To establish controlling-person liability under Section 20(a), "a plaintiff must show: (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in the primary violation." *Boguslavsky v. Kaplan*, 159 F.3d 715, 720 (2d Cir. 1998) (quoting *SEC v. First Jersey Secs., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996), *cert. denied*, 522 U.S. 812 (1997)).

### ii. *Analysis*

Movants argue that liability cannot be premised on Section 20(a) because Plaintiffs have failed to offer any evidence upon which a reasonable juror could find that Fingerhut controlled Holzer or that any Movant was a "culpable participant," *see SEC v. First Jersey Secs., Inc.*, 101 F.3d at 1472-73, in the primary violation committed by Holzer, (s*ee* Defs.' Reply 17-18). Plaintiffs argue at length that Fingerhut "controlled" Holzer, (Pls.' Mem. 14-15), but do not articulate any argument regarding the "culpable participant" prong of Section 20(a) liability. Elsewhere in their memorandum of law, however, Plaintiffs make claims that I will construe as relating to the "culpable participant" prong, namely that "Fingerhut was clearly aware, if not actively involved, in the theft of the Rapillos' funds. He admits mistakes were made. He admits to knowing about the various properties that the Rapillos [sic] money was to be invested in, and he spoke to the Rapillos multiple times." (Pls.' Mem. 16.) Here, however, Plaintiffs' only citation to the record, (Conway Decl. Ex. 7 ¶ 4), relates to the 2008 Telephone Call between Fingerhut and Ms. Rapillo, which Ms. Rapillo herself characterizes as relating to the Waverly I

investment, (*id.*), an admittedly legitimate investment.  This conversation also occurred after

Holzer's arrest in May 2008.  In addition, the fact that the investments into which Holzer claimed

he would invest the Rapillos' money existed is not proof that Fingerhut was aware that the

Rapillos wired money to Holzer's personal bank account or that Holzer had agreed to "pool" his

money with the Rapillos' and invest it.

Even if Plaintiffs could demonstrate some culpable participation, Plaintiffs' controlling

person theory still fails because there is no basis to conclude that any Movant knew of Holzer's

primary violation.  First, Plaintiffs have offered no evidence that Fingerhut or any Movant knew

of the frauds Holzer perpetrated on the Rapillos until after their completion.  (*See supra* Sections

II.D-E.)  Second, the Rapillos transferred their funds into Holzer's personal bank account to

"pool" their money with Holzer's money because they understood that Movants would not

accept their money if the Rapillos attempted to invest directly with the Movants.  (JR Tr. 19:4-5;

HR Tr. 9:17-10:15; *see also supra* Section II.E.)  Indeed the only reasonable conclusion to draw

from these facts is that the Rapillos transferred their money to Holzer with the understanding that

Fingerhut would *not* know of their pooling of money with Holzer so that they could make

investments alongside Movants.  (Pls.' 56.1 Stmt. ¶ 18.)  In other words, their investments were

a secret between them and Holzer, and it was understood between the Rapillos and Holzer that

these investments would be hidden and/or not disclosed to Fingerhut or the Corporate

Defendants.  Plaintiffs' Section 20(a) controlling person theory fails because there is no basis

upon which a reasonable juror could find that any Movant was a "culpable participant" or even

knew of Holzer's primary violation.

Accordingly, Movants' motion for summary judgment is GRANTED with respect to

Count III of the Amended Complaint.

### C. Common Law Fraud Claims

In Counts IV and V, Plaintiffs allege that Defendants committed fraud with respect to "each and every investment." (AC ¶ 72.) Plaintiffs further allege that Defendants "represented to the plaintiffs that their investments were to be placed in sound real estate, equity, debentures, credits and bonds," (*id*.), but the "representations made by defendants were, in fact false," (*id*. ¶ 73), and "defendants knew their misrepresentations [to be] false," (*id*. ¶ 74). In addition to arguing that Defendants are primarily liable for fraud, Plaintiffs raise three alternative theories of liability. These theories—aiding and abetting, respondeat superior, and veil piercing—are not contained in the Amended Complaint or elsewhere other than in their opposition papers. (Pls.' Mem. 10-12, 17-19.)[31]

For the reasons set forth below, I find that Plaintiffs have failed to offer any evidence demonstrating liability as to any Movant pursuant to these three theories of liability—aiding and abetting, respondeat superior, and veil piercing. Accordingly, Movants' motion for summary judgment is GRANTED as to Counts IV and V.

### 1. Fraud—Primary Liability

#### *i.   Applicable Law*

The elements of common law fraud under New York law are "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the plaintiff, (5) that causes damage to the plaintiff." *Schlaifer Nance & Co. v. Estate of Warhol*, 119 F.3d 91, 98 (2d Cir. 1997). "Because the elements of common-law fraud are substantially identical to those governing [Section] 10(b), the identical analysis applies." *In re Optimal U.S. Litig.*, 837 F. Supp. 2d 244, 252 (S.D.N.Y.

---

[31] As noted *supra* footnote 30, although Plaintiffs did not allege these additional theories of liability in the Amended Complaint, I nevertheless consider whether the evidence in the record before me supports Plaintiffs' claims.

2011) (internal quotation marks omitted).

### ii.   *Analysis*

As set forth in detail above, (*see supra* Sections II.C-E), Holzer, not Movants, made the alleged material misrepresentations regarding the three fraudulent transactions, and the three communications between Fingerhut and Plaintiffs all occurred after Plaintiffs made their final transfer of funds to Holzer's personal bank account and related solely to the Waverly I investment, (*see supra* Section II.D), a legitimate investment.  In light of the fact that Plaintiffs have failed to identify any material misrepresentation made by any Movant, Movants cannot be found liable for fraud.  *Schlaifer Nance & Co.*, 119 F.3d at 98.

### 2.   Fraud—Aider and Abettor Liability

### i.   *Applicable Law*

To establish liability for aiding and abetting fraud under New York law,[32] a plaintiff must show (1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission.  *See Lerner v. Fleet Bank, N.A.,* 459 F.3d 273, 292 (2d Cir. 2006); *Wight v. BankAmerica Corp.*, 219 F.3d 79, 91 (2d Cir. 2000).  A defendant must be shown to possess "actual knowledge" of the underlying fraud "to impose liability [as] an aider and abettor under New York law."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d at 292; *JP Morgan Chase Bank v. Winnick*, 406 F. Supp. 2d 247, 252 (S.D.N.Y. 2005) ("The knowledge requirement of an aiding and abetting fraud claim is satisfied by alleging actual knowledge of the underlying fraud.").  "A defendant provides substantial assistance only

---

[32] "Under New York law, the elements of aiding and abetting a breach of fiduciary duty, aiding and abetting a conversion, and aiding and abetting a fraud are substantially similar.  The claims require the existence of a primary violation, actual knowledge of the violation on the part of the aider and abettor, and substantial assistance." *Kirschner v. Bennett*, 648 F. Supp. 2d 525, 533 (S.D.N.Y. 2009); *see also Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292-95 (2d Cir. 2006).

if [he] affirmatively assists, helps conceal, or by virtue of failing to act when required to do so

enables [the fraud] to proceed." *Id.* at 256 (internal quotation marks omitted).

> ## ii. *Analysis*

As already stated, Plaintiffs have failed to identify any evidence that demonstrates

Movants possessed actual knowledge of Holzer's alleged fraud, (*see supra* Section II.E), or any

evidence to support the claim that Movants provided substantial assistance to Holzer in

committing his fraud, (*id.*). To the contrary, the evidence contained in the record supports the

proposition that Movants played no part in Holzer's fraud. (*Id.*) Accordingly, Plaintiffs' aiding

and abetting fraud claims fail. *See Lerner v. Fleet Bank, N.A.*, 459 F.3d at 292 (holding that

"actual knowledge is required to impose liability on an aider and abettor under New York law").

> ### 3. **Fraud—Respondeat Superior**
> #### i. *Applicable Law*

Without citing any authority, Plaintiffs claim that Movants are liable for Holzer's fraud

under the theory of respondeat superior. (*See* Pls.' Mem. 11-12.) Under New York law, "an

employer may be vicariously liable for the tortious acts of its employees only if those acts were

committed in furtherance of the employer's business and within the scope of employment." *N.X.*

*v. Cabrini Med. Ctr.*, 97 N.Y.2d 247, 251 (2002) (citing *Riviello v. Waldron*, 47 N.Y.2d 297, 302

(1979)). Additionally, New York law "precludes suits against an employer for a theft committed

by employees so long as the employer did not induce the employee to commit the theft."

*Goldstein v. U.S.*, 14 F. App'x 115, 116 (2d Cir. 2001) (summary order) (dismissing suit against

the U.S. Department of Veterans' Affairs where plaintiff alleged employee stole certain of

plaintiff's documents and medical records). In *Goldstein*, the Second Circuit held that "[t]here is

no evidence in the record to suggest that the defendants induced or otherwise approved of its

employees committing the purported theft of Goldstein's medical records and, as such, the

doctrine of respondeat superior is not applicable to impose liability on the defendants." *Id.*

### ii.   *Analysis*

Here, Plaintiffs claim that Movants are liable for Holzer's fraud under the theory of respondeat superior because Holzer's fraud was committed "under the guise of the Fingerhut/Holzer LLC, and Fingerhut was a controlling member of the LLC who provided most (if not all) of the capital contribution to the LLC." (Pls.' Mem. 12.)[33]  This theory of liability fails for multiple reasons.  First, Holzer's scheme, inclusive of his fraud and conversion of Plaintiffs' money, was outside the scope of any purported employment relationship with Movants.  Plaintiffs concede that as retail customers they would not be accepted as investors by Fingerhut and the Corporate Defendants, and that Holzer offered them a means to circumvent this restriction.  (*See supra* Section II.E.)  Second, Holzer's scheme was not in furtherance of Movants' business since Holzer admits that he "used Rapillo's money for [his] own personal use and invested some of it on [his own] behalf."  (Folkenflik Decl. Ex. C, 11:16-24.)  Third, Plaintiffs do not claim that Fingerhut induced Holzer to take Plaintiffs' money, and the evidence in the record supports the proposition that Movants had no knowledge of Holzer's scheme.  (*See supra* Section II.E.)

Accordingly, Plaintiffs' respondeat superior argument is not supported by the record and is without merit.

---

[33] Plaintiffs cite no legal authority for the proposition that a member of an LLC is considered an employee of a controlling member of an LLC for purposes of respondeat superior liability.  Indeed the case law appears to suggest that such a relationship does not exist and that a controlling member cannot be held liable for the acts of another LLC member. *See Landa v. Herman*, No. 105360/03, 2005 WL 2899876,*2 (N.Y. Sup. Ct. Oct. 27, 2005) (citing *Connell v. Hayden*, 83 A.D. 2d 30, 58-59 (2d Dep't N.Y. 1981) (noting that under New York law a member of an LLC cannot be liable through respondeat superior for the alleged tort of another member).

### 4.  Fraud—Veil Piercing

##### i.  *Applicable Law*

Plaintiffs invoke the equitable doctrine of veil piercing, (Pls.' Mem. 10), but fail to articulate how the doctrine applies in this case.  Under New York law, a court may pierce the corporate veil where (1) "the owner exercised complete domination over the corporation with respect to the transaction at issue," and (2) "such domination was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997).  Veil piercing is "typically employed by a third party seeking to go behind the corporate existence in order to circumvent the limited liability of the owners and to hold them liable for some underlying corporate obligation." *Matter of Morris v. New York State Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 140-41 (1993).

##### ii.  *Analysis*

Here, Plaintiffs assert that Fingerhut should be held liable using veil piercing because "Fingerhut was personally intertwined with Fingerhut/Hozer LLC and it impossible [*sic*] to trace what happened with the Rapillos' money after it was given to Holzer.  It is likely that Holzer put these funds toward the partnership's investment vehicles, or even gave the money directly to Fingerhut." (Pls.' Mem. 10-11.)[34]

The undisputed evidence in the record refutes Plaintiffs' assertions that Fingerhut was involved in Holzer's fraud.  (*See* Folkenflik Decl. Ex. C, 11:16-24 (Holzer states that he "used Rapillo's money for [his] own personal use and invested some of it on [his own] behalf.").)  In addition, Plaintiffs failed to articulate how piercing the veil of any Corporate Defendant would

---

[34] Here, in plain contradiction to their assertion, Plaintiffs cite to Holzer's deposition testimony where Holzer: (i) acknowledges that he used the Rapillos' money for his own personal purposes, and (ii) repeatedly states that none of the Rapillos' money went to Fingerhut. (Pls.' Mem. 11, citing Conway Decl. Ex. 5 at 113-14.)  Additionally, Plaintiffs cite portions of the record that are either irrelevant to the stated proposition, (*see* Pls.' Mem. 11, citing Conway Decl. Ex. 4 at 113-14), or do not even exist, (*see* Pls.' Mem. 11, citing Conway Decl. Ex. 7 ¶¶ 11-17).

support holding Fingerhut personally liable for Holzer's scheme.  Additionally, contrary to what is required to sustain a veil piercing claim, Plaintiffs cite no evidence to support a finding (1) Fingerhut dominated the Corporate Defendants, (2) that such domination was used to commit the fraud, and/or (3) that there was undercapitalization of the Corporate Defendants, disregard of corporate formalities, or personal use of Corporate Defendant funds by Fingerhut.  *See NYKCool A.B. v. Ecuadorian Line, Inc.*, 562 F. App'x 45, 46 (2d Cir. 2014) (summary order) (listing ten factors that courts look to in evaluating a veil piercing claim).  Accordingly, Plaintiffs' veil piercing argument fails.

In light of the fact that Plaintiffs have failed to demonstrate the elements of fraud concerning any Movant, whether as a primary actor, or through aider and abettor liability, respondeat superior, or veil piercing, Movants' motion for summary judgment is GRANTED with respect to Counts IV and V of the Amended Complaint.

### D.  Conversion Claim

In Count VI Plaintiffs allege that instead of investing their money, Defendants "took plaintiffs' money and converted it for their own personal use."  (AC ¶ 87.)  Plaintiffs also allege that Defendants used Plaintiffs' money to purchase various luxury items including jewelry, art, clothes, equities, and stocks.  (*Id.* ¶ 88.)

#### 1.  Applicable Law

Under New York law, "[a] conversion takes place when someone, intentionally and without authority, assumes or exercises control over personal property belonging to someone else, interfering with that person's right of possession."  *Okyere v. Palisades Collection, LLC*, 961 F. Supp. 2d 522, 534 (S.D.N.Y. 2013) (quoting *Colavito v. N.Y. Organ Donor Network, Inc.*, 8 N.Y.3d 43, 49-50 (2006)); *Thyroff v. Nationwide Mut. Ins. Co.*, 460 F.3d 400, 403-04 (2d Cir. 2006) ("[C]onversion is the unauthorized assumption and exercise of the right of ownership over

goods belonging to another to the exclusion of the owner's rights." (quoting *Vigilant Ins. Co. of Am. v. Hous. Auth. of City of El Paso, Tex.*, 87 N.Y.2d 36, 44 (1995))).   "Money may be the subject of conversion if it is specifically identifiable and there is an obligation to return it or treat it in a particular manner."  *Hoffman v. Unterberg*, 780 N.Y.S.2d 617, 619 (2nd Dep't 2004), *abrogated on other grounds by Tzolis v. Wolff*, 10 N.Y.3d 100, 105 (2008); *see ADP Investor Commc'n Servs. v. In House Atty. Servs.*, 390 F. Supp. 2d 212, 224 (E.D.N.Y. 2005) ("The conversion claim must be for recovery of a particular and definite sum of money, although the specific bills are not identified.") (internal quotation marks omitted); *Double Alpha, Inc. v. Mako Partners, L.P.*, No. 99-CV-11541, 2000 WL 1036034, at *4 (S.D.N.Y. July 27, 2000) (dismissing conversion claim where plaintiff alleged a specific sum of money was converted but failed to "claim ownership to a specific, identifiable, segregated sum of money").

        New York law also permits a claim for aiding and abetting conversion where the plaintiff can prove "(1) the existence of a violation by the primary wrongdoer; (2) knowledge of the violation by the aider and abettor; and (3) proof that the aider and abettor substantially assisted the primary wrongdoer."  *Chemtex, LLC v. St. Anthony Enters., Inc.*, 490 F. Supp. 2d 536, 545-46 (S.D.N.Y. 2007); *Lesavoy v. Lane*, 304 F. Supp. 2d 520, 526 (S.D.N.Y. 2004) (citing *Briarpatch Ltd. L.P. v. Geisler Roberdeau, Inc.*, No. 99-CV-9623, 2002 WL 31426207, at *7 (S.D.N.Y. Oct. 30, 2002), vacated in part on other grounds, *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296 (2d Cir. 2004), cert. denied, 544 U.S. 949 (2005)).  While "wrongful intent is not an essential element of the conversion," *Leve v. Itoh & Co. (Am.), Inc.*, 136 A.D. 2d 477, 478 (1st Dep't 1988), appeal denied, 71 N.Y. 2d 806 (1988), a plaintiff must show that the defendant "aided and assisted" the converter "with culpable knowledge that such funds did not belong to [the converter]."  *Weisman, Celler, Spett & Modlin v. Chadbourne & Parke*, 271 A.D.

2d 329, 330 (1st Dep't 2000), appeal denied, 95 N.Y.2d 760 (2000).  New York "has not adopted

a constructive knowledge standard for imposing aiding and abetting liability."  *Lesavoy*, 304 F.

Supp. 2d at 526 (quoting *Kolbeck v. LIT Am., Inc*., 939 F. Supp. 240, 246 (S.D.N.Y. 1996)).

Thus, "New York law requires actual knowledge of the wrongful conduct."  *Diamond State Ins.

Co. v. Worldwide Weather Trading LLC*, No. 02-CV-2900, 2002 WL 31819217, at *6 (S.D.N.Y.

Dec. 16, 2002) (citations omitted).

### 2. *Analysis*

The Rapillos claim that the $1,900,000.00 that they transferred in the four separate wire

transfers was converted by Defendants, (AC ¶ 89); however, in light of the undisputed fact that

the Waverly I investment was legitimate, (*see supra* Section II.B.1), the Rapillos' $300,000.00

investment in Waverly I cannot give rise to a conversion claim.  It is also undisputed that the

Rapillos transferred the funds relating to their investment in Waverly I to an escrow account

controlled by Foley and Lardner LLP.  (Pls.' Mem. 4; Conway Decl. Ex. 6, ¶ 6; *id*. Ex. 8.)  After

they invested in Waverly I, the Rapillos received K-1 statements for at least two years updating

them on the status of their investment in Waverly I.  (Conway Decl. Exs. 17, 18.)  Mr. Rapillo

acknowledges that the $300,000.00 he and his wife transferred to Foley and Lardner LLP was to

be invested in Waverly I, although the Waverly I development project ultimately failed.  (JR Tr.

142:17-25.)  In light of the fact that the Rapillos intended to, and did, transfer the $300,000.00 to

Foley and Lardner LLP for the purpose of investing in Waverly I, and that money was in fact

invested in Waverly I, the Rapillos investment in Waverly I cannot give rise to a conversion

claim against Movants.  *See Thyroff*, 460 F.3d at 403-04 (noting that conversion requires the

"*unauthorized* assumption and exercise of the right of ownership") (emphasis added).  In other

words, the $300,000.00 was invested as Plaintiffs expected.  Thus, Plaintiffs' conversion claim

relates, at the uppermost limit,[35] to the $1,600,000.00 that the Rapillos transferred, in three separate wire transfers, from their personal bank account to Holzer's personal bank account, (*see* Conway Decl. Exs. 9, 10, 11).

After carefully reviewing the evidence contained in the record before me, I find that Plaintiffs have failed to put forward any evidence upon which a reasonable juror could find any Movant liable for conversion as a primary actor.  The undisputed evidence demonstrates that, on three separate occasions, the Rapillos transferred their money to Holzer's personal bank account, (*id*.), and Holzer admits that, upon receiving their money, he treated the Rapillos' money as his own, (Folkenflik Decl. Ex. C, 11:16-24 ("I used Rapillo's money for my own personal use and invested some of it on my [own] behalf.")).  In light of the fact that Holzer, and not any Movant, "assume[d] or exercise[d] control over [the Rapillos'] personal property," *Okyere*, 961 F. Supp. 2d at 534, only Holzer could be liable to the Rapillos for conversion as a primary actor.

Plaintiffs' argument that Movants aided and abetted Holzer in the conversion is also unsupported by the evidence in the record.  As set forth above, (*see supra* Section II.E), Plaintiffs failed to proffer any evidence to support their conclusory assertion that Movants had the requisite "actual knowledge" of Holzer's conversion, *Diamond State Ins. Co.*, 2002 WL 31819217, at *6, or that any Movant provided substantial assistance to Holzer in committing the alleged conversion, *Chemtex, LLC*, 490 F. Supp. 2d at 547.  In light of the fact that Plaintiffs have failed to any facts demonstrating that any Movant (1) had actual knowledge of Holzer's alleged conversion or (2) substantially assisted Holzer in the conversion, Plaintiffs' claim for aiding and abetting conversion fails.

---

[35] Although Plaintiffs allege $1,900,000.00 was converted, (AC ¶ 89), I note that in their opposition brief Plaintiffs refer only to $700,000.00 as the basis for their conversion claim, (*see* Pls.' Mem. 23 (identifying $200,000.00 of their $600,000.00 investment in the dinner theatre concept and $500,000.00 related to their $800,000.00 investment in V-Campus)), however, I nevertheless construe Plaintiffs' claims as broadly as possible.

Accordingly, Movants' motion for summary judgment is GRANTED with respect to Count VI of the Amended Complaint.

### E.  Breach of Fiduciary Duty Claims

In Counts VII, VIII, and IX Plaintiffs assert claims for breach of fiduciary duty.  In Count VII Plaintiffs allege that Defendants breached "their fiduciary duty to perform their professional services by investing monies and all funds in sound investments with utmost good faith and with the highest standards of care, foreclosure and fidelity."  (AC ¶ 92.)  In Count VIII Plaintiffs allege that Fingerhut, "in exercise of his duty as a principal, agent, associate or fiduciary of [the Corporate Defendants] knew that his partner DAVID HOLZER was involved in fraud, deceit, dishonesty, in the theft, stealing, asportation, and purloinment of the assets, chattels, goods and monies of [the Rapillos] and that [Fingerhut] took the benefit of the monies, goods and assets for his own use."  (*Id.* ¶ 96.)  In Count IX, styled as a claim for "breach of fiduciary duty," Plaintiffs allege that they "are entitled to treble damages and punitive damages against each of the defendants for the theft, dishonesty, breach of fiduciary duty, conversion, fraud and violation of all of the statutes enumerated above."  (*Id.* ¶ 98.)

#### 1.  *Applicable Law*

To sustain a claim for breach of fiduciary duty, a plaintiff must demonstrate (1) the existence of a fiduciary duty between the parties, (2) the knowing breach of that duty by defendant, and (3) damages suffered by plaintiff as a result of the breach.  *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 138 (2d Cir. 2011) (citing *Barrett v. Freifeld*, 64 A.D.3d 736, 739 (2d Dep't 2009)).  To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must show "(1) breach of fiduciary obligations to another of which the aider and abettor had actual knowledge; (2) the defendant knowingly induced or participated in the breach; and (3) plaintiff suffered actual damages as a result of the breach."  *Anwar v. Fairfield Greenwich Ltd.*,

728 F. Supp. 2d 372, 442 (S.D.N.Y. 2010); *see Kaufman v. Cohen*, 307 A.D.2d 113, 124 (1st Dep't 2003).[36]

Under New York law, a fiduciary relationship may be found "when one [person] is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Flickinger v. Harold C. Brown & Co.*, 947 F.2d 595, 599 (2d Cir. 1991) (quoting *Mandelblatt v. Devon Stores, Inc.*, 132 A.D.2d 162, 168 (1st Dep't 1987)).  In determining whether a fiduciary relationship exists, "New York courts conduct a fact-specific inquiry into whether a party reposed confidence in another and reasonably relied on the other's superior expertise or knowledge." *Facella v. Fed'n of Jewish Philanthropies of N.Y., Inc.*, No. 98-CV-3146, 2004 WL 1700616, at *6 (S.D.N.Y. July 30, 2004) (citation omitted).

### 2. *Analysis*

Assuming, without deciding, that Plaintiffs' investment in Waverly I gave rise to a fiduciary relationship between Plaintiffs and Movants, the scope of such a relationship would relate solely to the Waverly I investment and would not extend to the three wire transfers Plaintiffs made with Holzer believing he would invest their money after pooling it with his own money.  (*See supra* Sections II.B.2-4.)  *See Thermal Imaging, Inc. v. Sandgrain Sec., Inc.*, 158 F. Supp. 2d 335, 344 (S.D.N.Y. 2001) (the scope of the "fiduciary duty extends only to those matters with which [the fiduciary] is entrusted").  For the reasons already stated, Waverly I was a legitimate investment that was administered properly despite ultimately failing, (*see supra* Section II.B.1); thus, Plaintiffs have no claim for breach of fiduciary duty premised on Movants' involvement with Waverly I.

---

[36] A claim of aiding and abetting a breach of fiduciary duty is similar to a claim for aiding and abetting a fraud in that both causes of action require a plaintiff to allege actual knowledge, substantial assistance, and proximate causation.  *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 201 (S.D.N.Y. 2006) (collecting cases).

With respect to the three wire transfers to Holzer's personal bank account, (*see supra* Sections II.B.2-4), since Fingerhut and the other Movants had no knowledge of those transfers or Holzer's promise to pool those funds with his own and invest them, (*see supra* Section II.E), I find that there was no fiduciary relationship between Movants and Plaintiffs with respect to the three wire transfers and expected investments. *See Ciccone v. Hersh*, 530 F. Supp. 2d 574, 578 (S.D.N.Y. 2008) (noting that even if a fiduciary relationship did exist with respect to certain investments, "such obligations did not extend into an ongoing relationship"). Accordingly, Plaintiffs breach of fiduciary duty claims fail.

Plaintiffs' aiding and abetting a breach of fiduciary duty claims fail for the same reasons that Plaintiffs' aiding and abetting conversion and aiding and abetting fraud claims fail: Plaintiffs have not identified any evidence in the record to support their conclusory allegations that any Movant had actual knowledge of Holzer's fraud scheme. (*See supra* Section II.E.) Since Plaintiffs have failed to demonstrate the element of actual knowledge, *Anwar*, 728 F. Supp. 2d at 442, Plaintiffs' aiding and abetting breach of fiduciary duty claims must be dismissed.

Accordingly, Movants' motion for summary judgment dismissing Plaintiffs' breach of fiduciary duties claims contained in Counts VII, VIII and IX is GRANTED.

VI.   <u>**CONCLUSION**</u>

For the foregoing reasons, Movants' motion for summary judgment is GRANTED as to each cause of action contained in the Amended Complaint.  The Clerk's Office is respectfully directed to terminate the pending motion at Doc. 69.  Plaintiffs and Defendant Holzer are directed to appear for a conference on October 14, 2016 at 10:30 a.m. in Courtroom 518 of the Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York to discuss the next steps in the case.

SO ORDERED.

Dated: September 14, 2016
      New York, New York

Vernon S. Broderick
United States District Judge