UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE
2019 JUN 27  AM 11: 32
S.D. OF N.Y.

John Rapillo
_____

_____

Fill in above the full name of each plaintiff or petitioner.

Case No.   09    CV 10429 (VSB)

-against-

Barry Fingerhut, et al
_____

_____

_____

_____

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6-27-19

Fill in above the full name of each defendant or respondent.

## DECLARATION

In support of Motion to Vacate Order dated September 14, 2016 pursuant to
Fed.R.Civ.P. Rule 60(b)

Briefly explain above the purpose of the declaration, for example, "in Opposition to Defendant's Motion for Summary Judgment."

I, _____John Rapillo_____ ,  declare under penalty of perjury that the

following facts are true and correct:

In the space below, describe any facts that are relevant to the motion or that respond to a court order. You may also refer to and attach any relevant documents.

During the Spring of 2007, I was at David Holzer's home in New City, NY.
David Holzer received a phone call from Barry Fingerhut.  David Holzer
reiterated the content of that conversation to me stating "All he wants is
money – he wants me to refinance my house and get more money wherever I can."
This shows the pressure Fingerhut was putting on David Holzer.

Rev. 6/30/16

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Attach additional pages and documents if necessary.

6 24-19

Executed on (date)                                       Signature

John Rapillo

Name                                                     Prison Identification # (if incarcerated)

14 Winding Lane                    Scarsdale              NY    10583

Address                            City                   State      Zip Code

914-472-8191                              hrapillo@optonline.net

Telephone Number (if available)              E-mail Address (if available)

Table of Contents

Affirmation of Investigator Shannon Rowe dated 2/18/09        Exhibit 1

Thacher Associates Report, October 2007        Exhibit 2

Barry Fingerhut's Deposition dated 2/7/13        Exhibit 3

Letter from Max Folkenflik dated 4/2/14        Exhibit 4

David Holzer's Plea Agreement dated 4/30/09        Exhibit 5

David Holzer's Deposition dated 3/28/12        Exhibit 6

V-Campus – Page 3 of Schedule 13-D-SEC.gov        Exhibit 7

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-----------------------------------------------------------------------X

ROBERT M. MORGENTHAU,
District Attorney of New York County,

             Plaintiff-Claiming Authority,

           -against-

David Holzer,

             Defendant.

-----------------------------------------------------------------------X

Index No. 400891/08

AFFIRMATION
IN SUPPORT OF
AMENDING SUMMONS,
COMPLAINT, AND ORDER
TO SHOW CAUSE

STATE OF NEW YORK    )
                      : ss.:
COUNTY OF NEW YORK  )

Investigator SHANNON ROWE, being duly sworn, deposes and says:

1.     I am an Investigator, Shield #158, in the New York County District Attorney's Office, and as such I am a public servant of the kind specified in CPL 690.05(1). I have been a member of DANY Investigations for over five years. Previous to that I was an investigator with DOI for two years, and I have training and experience in investigating white collar crime, including money laundering, grand larceny and identity theft cases. I am currently assigned to an investigation involving David Holzer and Lesley Holzer, and am familiar with its facts.

2.     Except as otherwise stated below, I make this affirmation upon information and belief based upon: (i) my review of information contained in plaintiff's files, (ii) my conversations with Barry Fingerhut, Heidi and John Rapillo, and Michael and Barbara Zackman; (iii)

conversations with private investigators hired by one of the victims in this case, (iv) my review, and the review by a financial analyst, of the defendant's and the victims' bank records.

3.     I submit this affidavit in support of Plaintiff's request to add Lesley Holzer to the instant action as a non-criminal defendant, pursuant to the provisions of Article 13-A of the CPLR. I also submit this affidavit in support of Plaintiff's request to add Lesley Holzer to the TRO previously issued in the instant action. In this case, specifically, plaintiff seeks the forfeiture from David and Lesley Holzer of certain property, to wit, $16,645,483.33 (Sixteen Million, Six Hundred and Forty-Five Thousand, Four Hundred and Eighty-Three Dollars and Thirty-Three Cents), which constitutes the "proceeds," and/or the "substituted proceeds," of the felony crime of Grand Larceny in the First Degree (Penal Law § 155.42). Alternatively, plaintiff seeks forfeiture from the criminal defendant David Holzer for the value of the aforementioned property, to wit, the sum of $16,645,483.33 (Sixteen Million, Six Hundred and Forty-Five Thousand, Four Hundred and Eighty-Three Dollars and Thirty-Three Cents), as the instrumentality of his crimes. Also alternatively, plaintiff seeks a money judgment against the criminal defendant David Holzer for the value of the aforementioned property in the sum of $16,645,483.33 (Sixteen Million, Six Hundred and Forty-Five Thousand, Four Hundred and Eighty-Three Dollars and Thirty-Three Cents).

## STATEMENT OF FACTS

### The Defendant's Activities With Regard to Barry Fingerhut

4. The summons and verified complaint in this action for forfeiture pursuant to Article 13-A of the CPLR, which is appended hereto as Exhibit A, is grounded upon the defendant's illegal activities during the period from on or about March, 2002 to March, 2008. I am informed by Barry

000173

Fingerhut that Fingerhut met David Holzer while Holzer worked as a trader for Brean Murray. They formed a working relationship in which Holzer would trade Over-the-Counter (OTC) stocks for Fingerhut.

5.      As of early 2002, Holzer and Fingerhut had worked with one another for several years, and had known each other for approximately 12 years.  In March 2002, Holzer contacted Fingerhut at his place of business, GeoCapital, located at 825 Third Avenue, New York City, New York County, New York, and proposed an investment opportunity to Fingerhut.  Holzer told Fingerhut that he had formed a partnership with two other individuals, Daniel Katz and Jeffrey Schwartz, called Dellwood Partners, and that the partnership was investing in real estate in upstate New York.  Holzer asked Fingerhut to take a one-half interest in Holzer's one-third of the partnership.  Fingerhut agreed.

6.      Fingerhut began wiring money in stages to Holzer to make up his half of their one-third partnership for a piece of property that Holzer claimed Dellwood was buying in Haverstraw, NY.  As time went by, Holzer told Fingerhut that Dellwood was making additional investments in real estate, in Haverstraw, Monticello, Beacon, Newburgh and Nyack, New York.  Fingerhut wired money to Holzer's account to pay for those additional investments.

7.      Fingerhut wired the following amounts on the following dates to Holzer's account at JP Morgan Chase Bank totaling $12,062,200.00:

| DATE | DEPOSIT AMOUNT |
| --- | --- |
| March 27, 2002 | $62,500 |
| April 29, 2002 | $862,500 |
| July 25, 2002 | $1,500,000 |

3

| | |
|---|---|
| July 25, 2002 | $1,593,000 |
| October 17, 2002 | $140,000 |
| November 8, 2002 | $187,000 |
| January 13, 2003 | $266,000 |
| April 2, 2003 | $489,000 |
| July 24, 2003 | $283,000 |
| October 14, 2003 | $231,150 |
| November 24, 2003 | $383,000 |
| December 22, 2003 | $216,000 |
| February 2, 2004 | $270,000 |
| April 21, 2004 | $516,000 |
| July 23, 2004 | $900,000 |
| October 12, 2004 | $600,000 |
| November 23, 2004 | $244,000 |
| April 20, 2005 | $693,750 |
| May 17, 2005 | $289,000 |
| July 11, 2005 | $98,300 |
| August 3, 2005 | $519,000 |
| October 18, 2005 | $190,000 |
| November 9, 2005 | $300,000 |
| December 7, 2005 | $255,000 |
| December 7, 2005 | $125,000 |
| December 16, 2005 | $10,000 |
| May 23, 2006 | $360,000 |
| August 8, 2006 | $215,000 |
| September 15, 2006 | $294,000 |
| TOTAL | $12,062,200 |

8.     Holzer's bank records show that the above figures were received by him.  Those records also show that in 2002, Holzer gave over three million dollars to an individual who was apparently not connected with any company named Dellwood Partners, or with Daniel Katz or Jeffrey Schwartz.  In fact, there is no indication that any company named Dellwood Partners ever existed, and Holzer's bank records do not show any transactions with either Katz or Schwartz.  Also from 2002 to 2006, Holzer's bank records demonstrate that he and his wife lived a lavish lifestyle,

4

spending extravagantly on clothing, travel, an interior designer, jewelry, Holzer's children's rent, his father's senior residence in upstate New York, and that these and other personal expenses were primarily how Holzer spent the money he obtained from Fingerhut.

9.     In 2004, Holzer told Fingerhut that the Haverstraw property was going to be sold for approximately $99 million, and that their share of the profit would be approximately $33 million. At that time, Fingerhut suggested to Holzer that they use the proceeds of the real estate sale to start their own partnership, through which they could manage their money by making investments. The two formed a partnership, FH Partners, and opened an office while Fingerhut waited for the proceeds from the sale of the Haverstraw property that Holzer said was imminent. During this time, as can be seen above, Fingerhut continued to pay money to Holzer for investments that Dellwood partners was supposedly making.

10.     I am further informed by Fingerhut, that in or about February 2005, Holzer asked Fingerhut to loan him some money because Holzer claimed that he had a capital call at Brean Murray, and he needed cash to pay to Brean Murray for an investment he had there. I am informed by Fingerhut that on February 4, 2005, and March 8, 2005, Fingerhut wired $202,000 and $860,000, for a total of $1,062,000, to Holzer based on Holzer's representations that Holzer had to pay the capital call and that the money would be paid back to Fingerhut. I am informed by Nick Cangro, financial analyst for the New York County District Attorney's Office ("DANY") that a review of records from Brean Murray reveal that no capital call or money was put in to Brean Murray investments in February or March of 2005. I am further informed by Nick Cangro that he has reviewed Holzer's JP Morgan Chase Bank records for the same time period, and the records reveal that the two above-described deposits were made into Holzer's

000176

accounts, but that no money went to Brean Murray at that time, but rather a good portion of the money, $560,053 went to the U.S. Treasury.

11.     In the spring of 2007, Holzer told Fingerhut that the sale of the Haverstraw property had closed, and showed Fingerhut a deposit receipt from JP Morgan Chase bank showing a deposit of a check for $33.6 million into Holzer's accounts.  I am informed by Nick Cangro that a review of the bank accounts show that after the $33 million check was deposited, it in fact bounced, and the account was closed thereafter.[1]

12.     In October 2007, Lincoln Ornston, of a private investigative firm named Thacher Associates, met with Holzer in FH Partners' office.  Holzer admitted to Ornston that Dellwood Partners never existed, and that Holzer never had a partnership with Schwartz or Katz.  He also admitted that he did not purchase property in Haverstraw, that he did not use Fingerhut's money to purchase property in Haverstraw or any other location, and that he instead used Fingerhut's money for personal and business-related expenses.  Holzer also told them that all of the money was gone, and that he only had about $40,000 left in his bank accounts.

13.     Holzer promised to pay Fingerhut back, and in late November 2007 issued two checks drawn on a Citibank account made payable to Fingerhut totaling approximately $7 million. A review of Holzer's Citibank account records reveals that those checks were written on an account with insufficient funds.

---

[1] It was later determined that Holzer in fact wrote the $33.6 million check to himself, from an account that did not have sufficient funds to cover it.

000177

## The Defendant's Activities With Regard to Heidi and John Rapillo

14.      In October 2005, defendant Holzer told Heidi and John Rapillo that he was involved in some good investments, and encouraged them to invest through him.  The Rapillos gave David Holzer a total of $1.6 million between December 2005 and March 2006, believing, based on Holzer's representations, that Holzer would invest that money for them.

15.      First, on December 15, 2005, the Rapillos sent a wire for $600,000 to Holzer because Holzer told them he was investing their money in a movie theater.  DANY financial analyst Nick Cangro reviewed Holzer's bank records, and has informed me that, rather than invest the money, once the $600,000 was received in Holzer's account on December 15, 2005, Holzer transferred $200,000 to Barry Fingerhut's personal account; then on January 9, 2006, he transferred $50,000 to FH Partners' account, on January 9, 2006 Holzer also paid $35,025.63 to American Express for his personal charge card bill; on January 10, 2006, and January 13, 2006, he transferred $20,000 and $15,000 respectively to FH Partners' account; on January 17, 2006, he paid $24,360 to Mid Hudson Fence company.  Holzer also generally spent the rest of the money on smaller personal and business transactions, none of which appear to be "investments," but instead largely supported the extravagant lifestyle he and his wife were living.

16.      John and Heidi Rapillo wired $200,000 to Holzer's account on January 31, 2006, because Holzer told them he would invest their money in a penthouse project. Rather than invest the money, however, a review of Holzer's bank records by Nick Cangro shows that after Holzer received the $200,000 from the Rapillos, on January 31, 2006, and February 10, 14, and 27, 2006, Holzer transferred $20,000, $15,000, $16,500, and $10,000, respectively, to FH Partners' account; on February 14, 2006 he paid $48,280.77 towards his American Express charge card

7

bill; on March 2, 2006, he paid $8,509.61 to his Washington Mutual home mortgage account, and spent the rest of the money on smaller personal and business transactions, none of which appeared to be investments made on the Rapillos' behalf.

17.   I am informed by the Rapillos that on March 23, 2006, they wired $800,000 to Holzer because Holzer said that he would invest all of that money in a company called VCampus. Rather than invest all of that money, however, a review of Holzer's bank records by Nick Cangro shows that after Holzer received $800,000 from the Rapillos on March 23, 2006, that same day Holzer wired VCampus only $500,000. That $500,000 was initially put only in Holzer's name, and later he assigned all of his rights in that stock to Barry Fingerhut.

18.   I am further informed by Nick Cangro that on March 24, 2006, and April 21, 2006, Holzer paid $32,309.16 and $61,595.43 respectively to American Express; on March 30, 2006, and April 10 and 13, 2008, Holzer wired $25,000, $27,000, and $30,000 respectively to the FH Partners' account; on March 31, 2006, Holzer wired $17,500 to a company called CE Technologies, Inc.; on April 18, 2006, Holzer gave his daughter, Jennifer Holzer $5,000; and on April 20, 2006, Holzer paid someone named Neal Richard $20,000.

### The Defendant's Activities With Regard to Michael and Barbara Zackman

19.   I am informed by Michael Zackman, that between November 2006 and November 2007, he paid Holzer a total of $1,773,283.33. Michael Zackman informs me that this money was paid to Holzer because Holzer told him he would make him a partner in his investments if Zackman paid for half of the investment.

000179

20.     I am informed by Zackman that on November 10, 2006, Zackman wired Holzer $600,000 which Zackman says he believed was for an investment Holzer had already made in Knox Lawrence International, LLC for a company called Vertex. I am further informed that on December 11, 2006, David Holzer and his wife, Lesley Holzer, and Michael and Barbara Zackman signed a partnership agreement that created a partnership with regard to the funds that were supposed to be invested. The agreement stated that the Holzers contributed $600,000 to the partnership and that the Zackmans contributed $600,000 to the partnership. I am further informed by Zackman that on December 19, 2006, Zackman wired another $175,000 to Holzer, and that on January 23, 2007, Zackman wired another $133,000 to Holzer, for further investment into Knox Lawrence. Zackman signed an addendum to his partnership with Holzer on June 11, 2007, that referenced these additional funds as investments to Knox Lawrence. A review of the amendment to the partnership agreement indicates that an additional $308,000 was contributed by the Zackmans for the Vertex deal through Knox Lawrence that would make them 50 percent owners of Holzer's holdings in that deal.

21.     I am further informed by Michael Zackman that in 2007, David Holzer told him about an investment that Knox Lawrence was doing in a company called Consonus, and asked that Zackman participate in three different investments with him in Consonus. The first investment, on May 18, 2007, was to be a $250,000 investment split three ways between David Holzer, Michael Zackman, and Barry Fingerhut. The next two payments, in October and November of 2007 were to make additional investments in Consonus through Knox Lawrence. I am informed that Michael Zackman wired to David Holzer $83,333.33 on May 18, 2007, $78,000 on October 10, 2007, and $42,000 on November 30, 2007 for these investments.

000180

22.    I believe that Holzer lied to the Zackmans when he claimed that the money they sent was to buy a half share into investments that Holzer had made or was going to make through Knox Lawrence. The only way Holzer's claim could have been accurate is if he had invested in Knox Lawrence twice the total amount of money that Zackman sent for the investments, or $2,222,666.66. I am informed by Barry Fingerhut that he did not make a $250,000 investment in Knox Lawrence in May 2007 with David Holzer and Michael Zackman. A review of Holzer's bank account records show that on November 10, 2006, the same day that Zackman sent the initial $600,000 for the Vertex investment through Knox Lawrence, Holzer wired $300,000 to Knox Lawrence. I am further informed by DANY financial analyst Nick Cangro that an analysis of Holzer's JP Morgan Chase bank account records from January 2001 through June 2007 show that the total amount of money that Holzer sent to Knox Lawrence, LLC is $363,667. Furthermore, between November 10, 2006, the date of Zackman's initial payment for a purported Knox Lawrence-related investment, and December 19, 2006, the date of the next payment for what was supposed to be the Vertex deal through Knox Lawrence, there are no payments from Holzer's account to Knox Lawrence. Furthermore, from December 19, 2006, until Holzer's account was closed in June of 2007, the records show no payments were made to Knox Lawrence from Holzer's account. I am further informed by Nick Cangro that a review of Holzer's Citibank account, which was opened after Holzer's Chase account was closed in June 2007, shows that there were no payments to Knox Lawrence between June 2007 and December 2007.

23.    I am informed by Michael Zackman that on or about February 14, 2007, David Holzer asked Zackman to invest in a real estate deal in Florida called St. Augustine, through a

000181

company called Trident. Zackman had invested with Trident in the past at Holzer's suggestion, and had sent the money for those investments directly to the lawyers who held the trust account for the company, Foley and Lardner, in Florida. For this investment, however, Holzer told Zackman to send the money directly to Holzer, as Zackman would be taking a half interest in what Holzer owned already. In order to make the $600,000 investment (which Zackman understood from Holzer to be half of Holzer's $1.2 million investment), Zackman sold some stock in his portfolio, and wired the following funds on the following dates to Holzer:

| DATE | AMOUNT WIRED |
|---|---|
| February 14, 2007 | $100,000 |
| March 14, 2007 | $200,000 |
| April 3, 2007 | $100,000 |
| April 16, 2007 | $25,000 |
| April 24, 2007 | $175,000 |
| TOTAL | $600,000 |

24.    In fact, Holzer had only about $100,000 of his own funds invested in the St. Augustine investment at that time. In October, 2007, Holzer assigned all his rights in the St. Augustine investment to Fingerhut, not to Zackman.

25.    I am further informed by Michael Zackman that he sent Holzer a wire on July 12, 2007, for $41,650. After that wire was sent, Zackman was uncertain how Holzer was going to invest the money, and so contacted Holzer to find out. I am informed by Zackman that initially

11

Holzer could not remember, but then got back to Zackman several days to a few weeks later, and told Zackman that the investment was in parking spots for a real estate investment that Zackman had made previously through Trident, called "Waverly."

26.   I believe that Holzer lied to Zackman when he said that the money Zackman was investing in the Trident investments was for half the interest that Holzer had in Trident. A review of Holzer's bank records by Nick Cangro revealed that the total amount of money Holzer sent to Foley & Lardner between January 2001 and December 2007, was $665,471.91. I am certain that no investments were made prior to January 2001 because I am further informed by Barry Fingerhut that Fingerhut had found this investment and told Holzer about the investment sometime after they started FH Partners in 2004.

27.   I was further informed by Barbara Zackman that on October 9, 2007, she transferred $20,300.00 from her and Michael Zackman's account at Citibank to Holzer's Citibank account. They did this because David Holzer told them there were legal bills connected with one of their investments equaling $36,600, of which they had to pay half, and that he also wanted to borrow another $2,000, which he would return at a later time. I am further informed that later, possibly in January 2008, Holzer did pay them back $2,000. I am informed by Nick Cangro, however, that a review of Holzer's bank records show that Holzer did not use the $18,300 he kept to pay legal fees, nor did he invest it for them. Instead, on October 9, 2007, the same day he received the money from them, he paid American Express $16,280 for his charge card bill.

000183

## The Defendant's Activities with Regard to Barry Pessar

28.     I am informed by Michael Zackman that Barry Pessar told Zackman that he gave Holzer $150,000 to invest during the week of March 24, 2008.

29.     I am further informed by Nick Cangro that a review of records recently received from Citibank shows that on March 13, 2008, Holzer had a negative balance of $13,333.29 in his bank account.  On March 27, 2008, Holzer received a deposit in the amount of $150,000, and that money was withdrawn from the account between March 27, 2008, and April 3, 2008, through checks in amounts no larger than $22,000.  On April 3, 2008, the balance in Holzer's account was $15,517.60.  This activity is consistent with the defendant's prior pattern of taking money from would-be "investors" and then using the money for his own personal benefit rather than investing it on their behalf.

## The Proceeds of the Defendant's Crimes

30.     Based on the foregoing, and based on my training and experience, it is my opinion that the defendant has been engaging in a pattern of activity that constitutes numerous crimes, including but not limited to the felony crime of Grand Larceny in the First Degree (Penal Law § 155.42).

31.     The total proceeds of defendant Holzer's criminal activities, with regard solely to Barry Fingerhut, in this case is $13,124,200.00.  This figure represents the total sum of the funds that Barry Fingerhut gave to the defendant from March 27, 2002 to September, 15, 2006, during which time the defendant fraudulently represented that he was investing the money.  In addition, the proceeds of Holzer's crimes against Heidi and John Rapillo is $1,600,000.00.  This figure represents

000184

the total sum of the funds that the Rapillos sent to Holzer during the period between December 2005 and March 2006. In addition, the total proceeds of the defendant's crimes against Michael and Barbara Zackman are $1,771,283.33, which figure represents the total amount of money sent by the Zackmans to Holzer from November 2006 until November 2007, minus the $2,000.00 that was returned to them. Lastly, the proceeds of the defendant's crime against Barry Pessar is $150,000.00, the amount of money that Pessar gave to Holzer during the week of March 24, 2008. Thus, by adding up these amounts, the total proceeds of defendant's crimes in the instant case is $16,645,483.33 (Sixteen Million, Six Hundred and Forty-Five Thousand, Four Hundred and Eighty-Three Dollars and Thirty-Three Cents).[2]

### Lesley Holzer's Receipt Of The Illegal Proceeds

32.    The investigation has determined that defendant David Holzer is married to Lesley Holzer, and that they reside at 10 Sky Drive, New City, New York. A review of property records shows that 10 Sky Drive in New City, New York, is jointly owned by the defendant and his wife, Lesley Holzer. From 2002 through the present this appears to be their primary address, and the investigation has revealed that they live there together. At the time of the defendant's arrest, he and his wife also shared a rented apartment in Manhattan, at 50 East 78th Street, Apartment 10A. They have three children in common, aged 23, 29 and 31.

33.    I am informed by Nick Cangro, that he reviewed the defendant's bank records, and that from March, 2002, to June, 15, 2007, the defendant and Lesley Holzer shared a joint checking

---

[2] Criminal defendant David Holzer's activities constitute a well-known type of scheme called a "Ponzi" scheme, in which a defendant will steal from new victims to pay back previous victims. The investigation in this case revealed that David Holzer's Ponzi scheme actually began prior to his first theft in 2002 from Barry Fingerhut, and that he had at least one prior victim.

000185

account, number ending in 5365, at Chase Bank. I am further informed that from June 14, 2007, they shared a joint checking account, number ending in 0313, at Citibank. During both those periods of time, neither the defendant nor Lesley Holzer appeared to have any other personal checking accounts.

34.    I am informed by Nick Cangro that both the defendant and Lesley Holzer regularly wrote checks from their joint checking accounts at both Chase and Citibank, and that they both appeared to pay their living expenses and personal bills from those accounts. These expenses included mortgage payments for the house in New City, rent for the apartment in Manhattan which they shared, utilities for both addresses, and credit card bills. I am informed that a review of the defendant and Lesley Holzer's credit card bills show purchases such as jewelry, expensive family vacations, cars, furs, designer clothing, high-end electronics, and furniture.

35.    I have been informed by Nick Cangro of the information from here through paragraph 41, based on his review of the defendant and Lesley Holzer's joint bank records and tax returns.[3] In 2002, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $4,579,011.17. Of that sum, $4,345,000.00 came from deposits made by Barry Fingerhut, one of the defendant's victims. In their joint federal tax return for that year, however, the defendant and Lesley Holzer declared a total income of $144,403.00. They then claimed $76,929.00 in deductions, and demanded a $21,395.00 refund.

36.    In 2003, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $1,971,592.62. Of that sum, $1,868,150.00 came from deposits made by Barry Fingerhut. In their joint federal tax return for that year, however, the

---

[3] Copies of the tax returns were obtained with subpoenas to the Holzers' accountants, and are not copies of the final, signed returns that were actually filed with the Internal Revenue Service.

000186

defendant and Lesley Holzer declared a total income of $107,239.00. They then claimed $116,022.00 in deductions, and demanded a $6,641.00 refund.

37. In 2004, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $2,606,237.58. Of that sum, $2,530,000.00 came from deposits made by Barry Fingerhut. In their joint federal tax return for that year, however, the defendant and Lesley Holzer declared a total income of $115,542.00. They then claimed $110,156.00 in deductions, and declared that they owed $304.00 in taxes.

38. In 2005, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $4,329,298.68. Of that sum, $4,112,050.00 came from deposits made by Barry Fingerhut and Heidi Rapillo. In their joint federal tax return for that year, however, the defendant and Lesley Holzer declared a total income of -$496,515 (negative income), based on an income of $52,795.00 and then by writing off $3,000.00 in capital losses and $546,310.00 in business losses from Fingerhut Holzer Associates. On the Profit & Loss statement attached to the defendant and Lesley Holzer's taxes, they claimed that FH Associates earned $0.00 income in that year. They then demanded a refund of $1,619.00.

39. In 2006, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $3,147,861.04. Of that sum, $2,844,000.00 came from deposits made by Heidi Rapillo, Barry Fingerhut and Michael Zackman. In their joint federal tax return for that year, however, the defendant and Lesley Holzer declared a total negative income of $891,623.00. This was based on an income of $42,189.00, and then by writing off $3,000.00 in capital losses, $408,161.00 in business losses from Fingerhut Holzer Associates, and a net operating loss carryover of $522,651.00. They claimed a refund of $1,654.00.

40.     From January, 2007, through May, 2007, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $883,038.55. Of that sum, $641,333.33 came from deposits made by Michael Zackman. As of May 29, 2007, the balance in that checking account was $8,788.32. On May 30, 2007, the defendant wrote himself a check for $33,600,000.00 and deposited it into the joint checking account he held with his wife, and showed the deposit slip to Barry Fingerhut. However, on June 5, 2007, the bank stopped payment on the check for insufficient funds, prompting the bank to subsequently close the account on June 15, 2007. The defendant and Lesley Holzer opened a joint Citibank checking account on June 14, 2007.

41.     From May, 2007 through December 2007, of the approximately $812,047.89 that was deposited into the Holzers' joint checking account, $181,950.00 was deposited by Michael or Barbara Zackman.[4] During that time, on November 29, 2007, the defendant wrote two checks to Barry Fingerhut, one for $5,600,000.00 and one for $1,400,000.00. At that time, the defendant and Lesley Holzer's joint checking account contained a little more than $9,000.00. Both checks bounced.[5]

42.     All of the money deposited into the defendant and Lesley Holzer's joint checking accounts by Fingerhut, the Zackmans, the Rapillos, and Barry Pessar were sent via wire transfer, and therefore the source of those funds appeared directly on the joint bank statements. The bank statements show an address of 10 Sky Drive in New City.

---

[4] Much of the remaining deposits appear to have come from sales of personal items such as jewelry and a car.
[5] The defendant's accountant did not send copies of the Holzers' 2007 tax returns, so those are not examined here.

17

000188

43.   It is clear from the defendant and Lesley Holzer's joint bank statements that Lesley Holzer obtained and spent a substantial portion of the proceeds of the defendant's crimes.

WHEREFORE, I respectfully urge that plaintiff's application for a temporary restraining order pending determination of the motion for a preliminary injunction be granted together with such other and further relief as to this court may seem just and proper, and the costs of this motion.

Dated:  New York, New York
        February 17 , 2009

_____
Investigator Shannon Rowe #58

Sworn to before me
This 18th day of
February, 2009.

_____
Notary Public

MADELEINE GUILMAIN
Notary Public, State of New York
No. 02GU6181568
Qualified in Queens County
My Commission Expires 02/04/20 12

18

000189

000190

2



BARRY FINGERHUT/DAVID HOLZER

## Barry Fingerhut

Education:    BA, University of Maryland 1967; MBA, NYU 1969
Professional: Co-Founder of Wheatley Partners (Currently a Partner)
              Former President of GeoCapital LLC
              Former General Partner of Weiss, Peck & Greer
              Formerly with First Manhattan Co.
              President/Board Member of FEGS Health and Human Services; Board
              Member of Achievement First; Board Member of Apollo International;
              Board Member of Edufund International; Board Member of WeatherWise
              USA
              Overseer to the Stern School of Business at NYU

## David Holzer

Date of Birth: 11/14/49
SSN:          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
Address 1:    10 Sky Drive, New City, NY (owned)
Address 2:    50 E. 78th Street, NY, NY (rented)
Education:    BA, City College 1971
Professional: 1971 – 1975: Abraham & Co.
              1975 – 2002: Brean Murray & Co.

Prior Legal Issues:

*Brean Murray*: Our research indicates that in 1982 Holzer was named head of the firm's
Capital Markets group, and that he remained in that position until he left the firm in 2002.
Brean Murray was investigated by the SEC and by NY AG Spitzer in 2003 regarding
market timing/late trading issues during the period from 2001 to 2003 (regarding trades
made by the firm for its hedge fund clients). In 2005, Brean Murray settled with the SEC
regarding charges that the firm had placed thousands of abusive mutual fund trades for at
least five hedge funds between 2001 and 2003; the firm paid a fine of $150K. A *New
York Post* article published on November 3, 2003, reported that in 2001 the firm had
formed a "special situations" group "to help facilitate market timing for some of its hedge
fund clients."

*US Tax Court*: Holzer and his wife Lesley filed a petition (docket number 7490-04)
against the Commissioner of Internal Revenue on May 4, 2004. A stipulated decision was
entered into the record on March 30, 2005. Further details about this decision were not
available online.

1



THACHER
ASSOCIATES

<u>Chronology</u>

1980s/1990s    Brean Murray/Holzer handle trades/clearing operations for firm(s) where Fingerhut is employed, and Fingerhut and Holzer develop a business relationship

2002    (1) Holzer informs Fingerhut that he has formed a partnership with two other individuals (Jeffrey Schwartz, Chairman/CEO of Traffix Inc.; and Daniel Katz, President/CEO Katz & Associates Corp.); Holzer tells Fingerhut that the partnership is called Dellwood Partners, and that it has been formed to make real estate investments in upstate New York (Rockland County)

(2) Holzer asks Fingerhut if he would like to take a 1/2 interest in Holzer's 1/3 interest in Dellwood; Fingerhut agrees; Fingerhut does not perform any due diligence on Dellwood (i.e., he does not review the partnership documents; he does not contact Schwartz or Katz)

(3) Holzer informs Fingerhut that Dellwood has identified a piece of property in Haverstraw, NY to purchase; Fingerhut wires funds to Holzer's personal account to cover his 1/2 interest in Holzer's 1/3 interest

(4) During 2002, Fingerhut sends 4 wires to Holzer's personal account, totaling $2,689,500; all wires have been sent at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood

2003    Fingerhut sends 6 wires to Holzer's personal account, totaling $1,868,150; all wires have been sent at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood

2004    (1) Fingerhut sends 5 wires to Holzer's personal account, totaling $2,530,000; all wires have been sent at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood

(2) Holzer informs Fingerhut that the Haverstraw property is going to be sold for approximately $99 million, and that their share of the proceeds will be approximately $33 million

(3) Fingerhut and Holzer form Fingerhut/Holzer Partners (FH Partners) for the purpose of investing the proceeds of their share of the sale of the Haverstraw property (Fingerhut will identify the investments to be made by FH Partners, and Fingerhut and Holzer will fund the investments 50-50); FH Partners rents office space

2



**THACHER**
**ASSOCIATES**

(4) Holzer informs Fingerhut that the sale of the Haverstraw property has been delayed

(5) Based on Holzer's repeated representations that the sale of the Haverstraw property is definite and imminent, Fingerhut begins to make investments on behalf of FH Partners, funding his share and the bulk of Holzer's share out of his own pocket; during the next 3 years, Holzer will fund some of the investments made by FH Partners out of his own pocket, but the bulk of his share of the amounts invested will be "fronted" for him by Fingerhut (Fingerhut "fronts" this money for Holzer based on Holzer's representations that he will use his share of the proceeds of the sale of the Haverstraw property to repay Fingerhut for the amounts Fingerhut has fronted for him)

**2005**

(1) Holzer continues to inform Fingerhut that the sale of the Haverstraw property has been delayed, but that the sale is definite and imminent; Holzer provides various excuses for the delays, ranging from soil remediation issues to the buyer not showing up at the closing with enough cash

(2) Fingerhut sends 8 wires to Holzer's personal account, and provides one bank check to Holzer, totaling $3,318,750; the wires and bank check have been provided at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood

(3) Based on Holzer's representations that the sale of the Haverstraw property is definite and imminent, Fingerhut continues to front money for Holzer with respect to investments made by FH Partners

**2006**

(1) Based on Holzer's representations that the sale of the Haverstraw property is definite and imminent, Fingerhut continues to front money for Holzer with respect to investments made by FH Partners

(2) Based on Holzer's representations that the sale of the Haverstraw property is definite and imminent, Fingerhut personally borrows $4.5 million from JPMorgan Chase to make two investments on behalf of FH Partners

(3) Fingerhut sends 2 wires to Holzer's personal account, totaling $575,000; both wires have been sent at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood

**2007**

(1) (Winter) Fingerhut develops idea for a venture capital partnership called Syncomium Partners; Adam Gurney, an Irish investor introduced to Fingerhut by Holzer, reviews a draft PPM and is interested in investing in

3

 THACHER
ASSOCIATES

Syncomium; Gurney allegedly shows the PPM to Sheikh Mohammed bin Rashid al Maktoum of Dubai, and the Sheikh is allegedly interested in investing in Syncomium; various meetings/conference calls with Gurney and the Sheikh and/or his business advisor(s) are cancelled at the last minute. (As of the date hereof: (a) Gurney and a business partner, JP McManus, have informed Fingerhut that they are prepared to invest $15 million in Syncomium; (b) the Sheik and/or his business advisor(s) have informed Fingerhut that the Sheikh and his brother are prepared to invest $300 million; (c) Gurney, McManus, and the Sheikh have been provided with all necessary documentation for the investment in Syncomium, but have not yet signed the documents or wired the promised funds.)

(2) (Spring/Summer) Holzer informs Fingerhut that the sale of the Haverstraw property has finally closed; Holzer shows Fingerhut a deposit receipt from JPMorgan Chase showing a deposit of a check for $33 million into one of FH Partners' accounts at the bank; Holzer tells Fingerhut, however, that the funds have not yet cleared; Fingerhut calls JPMorgan chase to find out when the funds will clear, and is told that (a) the check was written on an account with insufficient funds to cover the full amount of the check (the account on which the check was written had approximately $40,000 to $50,000 in it); (b) the FH Partners account into which the check was deposited has been frozen; and (c) the bank's fraud unit is launching an investigation into Holzer having deposited a phony $33 million check

(3) (Spring/Summer) Fingerhut meets with attorney Howard Wilson of the firm Proskauer Rose LLP to discuss whether Holzer's kiting of the $33 million check, and JPMorgan Chase's subsequent investigation, could result in any criminal liability for Fingerhut

(4) (Spring/Summer) Holzer informs Fingerhut that the sale of the Haverstraw property fell apart months ago; Holzer later informs Fingerhut that new buyers have been found to purchase their 1/3 interest in the Haverstraw property, and that the sale price for their 1/3 interest is $25 million (Holzer tells Fingerhut that the buyers are Alan Elkin, CEO of Active International, and Arthur Wagner, President of Active International [Wagner lives on the same street as Holzer, at 14 Sky Drive]); however, the sale of their 1/3 share is continually delayed, with Holzer offering multiple excuses for the delays

(5) (Spring/Summer) Fingerhut asks Holzer if the investments in Syncomium to be made by Gurney, McManus and the Sheiks are real – Holzer tells Fingerhut that they are real

TT0006420



**THACHER ASSOCIATES**

(6) (Summer/Fall) Fingerhut hires Thacher Associates to look into Holzer and Dellwood; Thacher determines that Dellwood does not exist and that Holzer has been defrauding Fingerhut

(7) (October) Toby Thacher and Lincoln Ornston of Thacher Associates meet with Holzer in his office at FH Partners; Holzer admits to them, and subsequently to Fingerhut, that (a) Dellwood does not exist; (b) everything he has told Fingerhut about Dellwood, including the alleged purchase of the land in Haverstraw, was a lie; (c) he has used the funds provided by Fingerhut for personal and business-related expenses, and that all of the money has been spent; and (d) neither Schwartz nor Katz were involved in the scheme; Holzer further states that (i) he has only approximately $40K in his savings/checking account, and no brokerage accounts; (ii) his wife and his children do not know that Dellwood is a fiction; (iii) he will immediately obtain a second mortgage on his house and provide all proceeds to Fingerhut; (iv) he will attempt to find a way to pay back to Fingerhut all of the money he has stolen; (v) he will provide Fingerhut and Thacher Associates will all bank account statements for the previous 5 years so that Thacher can determine what happened to the funds provided by Fingerhut to Holzer (which at that time amounted to over $18 million)

(8) (October 3) Holzer and Fingerhut sign a Contingent Assignment of Equity Interests Agreement, pursuant to which Holzer agrees that, if he has not paid the sum of $6,970,300 to Fingerhut by October 15, he will (a) assign to Fingerhut all of his share of the investments made by FH Partners (totaling $7,274,500); and (b) at Fingerhut's request, resign from FH Partners

(9) (October 9) Holzer signs a Secured Promissory Note, pursuant to which he agrees to pay Fingerhut the sum of $7,603,800

(10) (October 15) Holzer signs a Notice of Resignation from Barry/David Partners, LLC (Barry/David Partners was a vehicle formed by Fingerhut and Holzer that received carried interests in certain investments made by FH Partners)

(11) (October/November) Holzer tells Fingerhut that he has (a) obtained all bank account statements for the past five years, and that he will provide them to Fingerhut for review; (b) obtained a second mortgage from Citibank in the amount of approximately $1.45 million; (c) obtained cash from the sale of jewelry in the amount of approximately $560K; and (d) obtained a job as a trader with Buzzy Geduld (formerly of Herzog, Heine & Geduld), that Geduld has paid him an upfront bonus of $6 million, and that he (Holzer) will immediately wire all of the funds listed above to Fingerhut (totaling approximately $8 million)

TT0006421



(12) (October/November) Holzer continues to tell Fingerhut that he will wire approximately $8 million into Fingerhut's account, and that he will meet with Fingerhut to provide the bank statements; to date, no wires have been received by Fingerhut, and Holzer has not provided Fingerhut with the bank statements

<u>Amounts Stolen by Holzer</u>

(1) Cash: **$11,850,400**

* Based on Holzer's representations regarding properties allegedly purchased by Dellwood Partners, between 2002 and 2006 Fingerhut wired $10,981,400 to Holzer

* Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, Fingerhut loaned Holzer an amount equal to $869,000 (Holzer informed Fingerhut that this amount was needed by Brean Murray for a capital call; Holzer later admitted to Thacher, Ornston, and Fingerhut that no such capital call was made, and that Holzer lied to Fingerhut to obtain these funds)

(2) Other Amounts: **$10,284,968**

* Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, between 2004 and 2007 Fingerhut "fronted" $7,274,500 for Holzer to cover investments made by FH Partners

* Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, between 2004 and 2007 Fingerhut covered Holzer's share of the overhead expenses incurred by FH Partners; such share was equal to $330,468

* Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, Fingerhut fronted an additional $430,000 on behalf of Holzer in connection with a real estate investment made by FH Partners

* Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, and with Holzer's full knowledge, Fingerhut personally took out a $4,500,000 million loan from JPMorgan Chase in order to make additional investments on behalf of FH Partners; Holzer's share of this loan amount was $2,250,000

TT0006422

 THACHER ASSOCIATES

**TOTAL: $22,135,368**

(3) Interest on Cash Payments and Other Amounts: $2,570,548

**TOTAL: $24,705,916**

(4) After the fraud became known, Holzer assigned to Fingerhut his interest in the investments made by FH Partners; the amount of this assignment totaled: $8,997,501

**NET AMOUNT OWED TO FINGERHUT: $15,708,415**

TT0006423



# THACHER ASSOCIATES

330 WEST 42ND STREET, 23RD FLOOR
NEW YORK, NY 10036
PHONE: (212) 845-7500
FAX: (212) 845-7549

## MEMORANDUM

**TO:** XXXXXXXXX

**FROM:** LINCOLN ORNSTON

**SUBJECT:** DAVID M. HOLZER

**DATE:** XXXXXXX

This memorandum summarizes the results of public record research conducted by Thacher Associates, LLC ("Thacher Associates"), pursuant to your request, regarding David M. Holzer. Our research included online searches for records of Mr. Holzer's personal identifiers and reported addresses, general background information, corporate affiliations, professional licenses, litigation and bankruptcy filings, US Tax Court filings, US Securities and Exchange Commission ("SEC") filings, criminal records, asset ownership, Uniform Commercial Code ("UCC") filings, lien and judgment filings and Internet and media accounts.

Please note that electronic database research includes only those jurisdictions that are available online, rather than every jurisdiction in which public records may be filed. Please note also that the date coverage of available online records varies considerably from one jurisdiction to another, and may not always include relevant time periods.

Our research was focused on the jurisdictions in which Mr. Holzer has reportedly lived and/or worked, namely the State of New York and New Jersey. We also conducted online civil litigation, lien, judgment, Internet and media research for Mr. Holzer's previous employer, Brean Murray & Company as well as two (2) affiliates, Vcampus Corporation and Vion Pharmaceuticals.

It should also be noted that Brean Murray & Company is also affiliated with Brean-Murray, Foster Securities Inc., (Mr. Holzer is listed in the corporate records for this entity name) and Brean-Murray Inc. Due to a merger after Mr. Holzer left the company in 2002 they are also know as Brean-Murray, Carret & Co, LLC. Our online research encompassed all entity names which we reference as "Brean Murray."

© 2007 by Thacher Associates, LLC, 330 W 42nd St, NY, NY 10036. For more information, please call (212) 845-7500. Disclaimer: The information contained in this report is based upon data obtained from a number of government and other public and private sources. Thacher Associates, LLC assumes no responsibility for the accuracy or completeness of the information from its sources, for errors occurring in data transmission or conversion, or in any respect for losses or damages resulting from use of this information.



## EXECUTIVE SUMMARY

### Professional Background

According to the information provided to Thacher Associates, Mr. Holzer worked at Abraham & Co. from 1971-1975 as a proprietary trader after earning a Bachelor of Arts from City College. In 1975, Mr. Holzer joined Brean-Murray as head of proprietary trading and was promoted to the head of capital markets in 1982. He worked as the head of capital markets until 2002 and joined your partnership in 2004.

### Media – Brean Murray

An online review of media identified that Mr. Holzer's previous employer, Brean Murray, was investigated by the Securities and Exchange Commission ("SEC") for improper mutual fund trading practices as well Eliot Spitzer when he was Attorney General for New York State. Specifically, the *New York Post* reported on November 3, 2003, that the SEC subpoenaed Brean Murray for documents providing information about hedge funds, mutual funds, and brokerage firms – including Bank of America, Lehman Brothers and Bear Stearns Securities Corp. The article further notes that while Mr. Holzer was still there, *"Brean Murray formed a 'special situations' group in 2001 to help facilitate market timing for some of its hedge fund clients, say people familiar with the company."*

According to an article published by *TheStreet.com* on February 17, 2005, Brean-Murray settled charges issued by the SEC that they *"placed thousands of abusive mutual fund trades for at least five (5) hedge funds between 2001 and 2003."* The article further reports that the SEC contended brokers at Brean Murray engaged in both market-timing and late trading on behalf of their hedge fund customers. Hence, Brean Murray was fined $150,000 to settle the SEC's enforcement action.

Although Mr. Holzer was not personally implicated in the activities referenced above, he was still with Brean Murray in 2001 and therefore potentially aware of activities that took place.

Please refer to the section of this report herein entitled Media and Internet for a more detailed summary.

### Litigation – David Holzer

An online review of available civil filings in the State of New York and New Jersey identified six (6) cases filed between June 1991 and March 1994 naming Mr. Holzer as a defendant. Please refer to the section of this report herein entitled State and Local Court – David Holzer for a more detailed summary.

TT0006425



## US Tax Court

A search of US Federal Tax Court records identified the following petition pertaining to Mr. Holzer:

- David and Lesley Holzer filed a petition (docket number 7490-04) against the Commissioner of Internal Revenue on May 4, 2004. A stipulated decision was entered into the record on March 30, 2005. Further details about this decision were not available online.

## UCC Filings Judgments & Liens

An online review of UCC, judgments and lien filings in New York State and New Jersey identified seven (7) judgments and liens naming Mr. Holzer as a debtor between May 1991 and March 1994. Please refer to the section of this report herein entitled UCC Filings, Judgments and Liens – David Holzer for a more detailed summary.

### FINDINGS

### Personal Identifiers

Name: David M. Holzer
Date of Birth: November 14, 1949
Social Security No.: 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 (issued in the State of New York between and 1966)

Mr. Holzer currently resides at 10 Sky Drive, New City, New York 10965 (Rockland County).

The addresses set forth below have also been reported for Mr. Holzer. These addresses may include properties which Mr. Holzer may have rented or owned, in which he may have temporarily resided, or with which he may have had some other association (e.g., Mr. Holzer may have used such addresses on credit applications or other documents, and the information included on such applications or other documents may have eventually been listed in an electronic database).[1]

The following addresses in New York have been reported for Mr. Holzer:

- 22 Georgetown Oval, New City, New York 10956 (Rockland County)
- 231 Tenafly Road, Englewood, New Jersey 07631 (Bergen County)
- 3555 Oxford Avenue, Bronx, New York (Bronx County)

---

[1] *The primary purpose of identifying these addresses is to determine the various jurisdictions in which criminal and litigation research must be conducted.*

TT0006426



**THACHER ASSOCIATES**

<u>Criminal Records</u>

*Federal Court*

A review of electronically available criminal records conducted with the District of New Jersey and the Southern District of New York did not identify any records pertaining to Mr. Holzer.

*State Court - New York*

A review of electronically available criminal records conducted with the New York State Office of Court Administration did not identify any records pertaining to Mr. Holzer.

*State Court – New Jersey*

A review of electronically available criminal records conducted with the New Jersey State Police is currently pending and we will forward the results upon receipt. We also conducted an online of New Jersey Superior Court conviction records covering the period of January 2, 1997 through February 8, 2007 and no records pertaining to Mr. Holzer were identified.

*National Criminal Index[2]*

A search of the National Criminal Index did not identify any records with respect to Mr. Holzer.

*State and Federal Inmate Databases*

Searches of online inmate databases maintained by New York State, the City of New York, New Jersey and the Federal Bureau of Prisons did not identify any records with respect to Mr. Holzer.[3]

<u>Business Affiliations</u>

Searches of business databases, corporate filings and Internet sources identified the following entities related to Mr. Holzer:

---

[2] *The National Criminal Index is a database of over 50 million criminal records, including felony, misdemeanor, and inmate records, from databases maintained by states and counties throughout the United States.*

[3] *The Federal Bureau of Prison's inmate locater database contains information on all federal inmates presently or previously incarcerated since 1982.*

4

TT0006427



# THACHER ASSOCIATES

- **Brean Murray, Foster Securities, Inc.** This is an inactive entity that was incorporated in Delaware on August 28, 1978 and withdrew their active status on December 11, 1987. Mr. Holzer is listed in the corporate records as an officer.

- **Vcampus Corporation** This is an active entity that was incorporated in Delaware on March 20, 1985. This is a public company and according to a Form 10-K/A filed with the Securities and Exchange Commission on December 31, 2006, Mr. Holzer is "one of our largest beneficial shareholders" owning at least ten percent (10%) of their stock. Mr. Holzer, pursuant to Section 16(a) of the Exchange Act, filed Form 3 on December 5, 2006, as required by individuals owning ten percent (10%) or more of common stock.

- **Vion Pharmaceuticals, Inc.** This is an active entity that was incorporated in Delaware on April 20, 1995. According to his credit header data, Mr. Holzer has an unidentified relationship with this firm.

<u>Litigation</u>

*Federal Court – David Holzer*

A review of electronically available civil filings in the District of New Jersey and Southern District of New York did not identify any records pertaining to Mr. Holzer.

*Federal Court – Brean Murray*

A review of electronically available civil filings nationwide for Brean, Murray identified approximately forty (40) Securities Commodities actions naming the Brean Murray companies as a defendant. Over thirty (30) of these matters were filed between December 2003 and July 2004. These cases could possibly pertain to the Securities Exchange Commission investigating Brean Murray for improper mutual trading practices in 2003. Brean Murray ultimately settled with the SEC in February 2005. Eliot Sptizer, at the time New York State's Attorney General, also investigated the Brean Murray. Further details about these investigations are provided in the Media and Internet section of this report.

*Federal Court – Vcampus Corporation*

A review of electronically available civil filings nationwide identified the following case naming Vcampus Corporation as a party:

- *Techsearch LLC vs. Eschool.com Inc. and Vcampus Corp*, case number 4:01-cv-00126, a patent infringement suit filed with the United States District Court for the Southern District of Texas on January 12, 2001. The defendants filed counter-claims and a stipulation of dismissal without prejudice was entered into the record on May 7, 2002, closing the case.

TT0006428



**THACHER ASSOCIATES**

*Federal Court – Vion Pharmaceuticals*

A review of electronically available civil filings nationwide did not identify any matters naming Vion Pharmaceuticals as either a plaintiff or defendant.

*State and Local Court – David Holzer*

A review of electronically available civil filings in the State of New York and New Jersey identified the cases summarized below as pertaining to Mr. Holzer::

- *Bank of New York (Harrison) vs. David and Lesley Holzer,* case number 0067651993. A civil suit filed with the Supreme Court for Civil Suits for Rockland County, New York on March 8, 1994. This matter was also disposed with a pre-note and settled on March 8, 1994.

- *Norma Grossman vs. Across America Leasing, Aleet Leasing Corp. All Island Leasing, All Metro Car Leasing Inc., Citbank, Foster Securities, Inc., David M. Holzer, Maguire Brokerage, Murray Brean, North American Insurance Co., Philadelphia Insurance Co. and Royal Insurance Co.,* case number 12102593. A civil suit filed with the Supreme Court for Civil Suits for New York County, New York on January 20, 1994. Further details regarding the status of this matter were not available online.

- *Federated Dept. Store Inc. vs. David M. Holzer,* case number 00002574392. A $829 civil summons filed with the Civil Summons Civil Court of the City of New York on July 16, 1992. Further details regarding the status of the matter wee not available online.

- *Norman Grossman vs. David M. Holzer, et al.,* case number 03033592. A civil suit filed on November 6, 1992 with the Supreme Court for Civil Suits in New York County, New York. Further details regarding the status of this matter were not available online.

- *Citibank, N.A. vs. David Holzer*, et al., case number 0084041991. A civil suit filed on March 18, 1992 with the Supreme Court for Civil Suits for Rockland County, New York. This matter was disposed with a pre-note and settled on March 18, 1992.

- *Fred Marcus Inc. vs. David Holzer,* case number 00002915391. A $2,894 civil summons filed with the Civil Summons Civil Court of the City of New York on June 19, 1991. Further details regarding the status of this matter were not available online.

6



*State Court – Brean Murray*

A review of electronic civil filings in the State of New York identified twenty (20) cases naming the Brean Murray companies as party. Fifteen (15) of these matters listed the Brean Murray companies as a defendant.

*State Court – Vcampus Corporation*

A review of available electronic civil filings in state courts nationwide identified the following matters pertaining to Vcampus Corporation:

*Gerri Knilans vs. Vcampus Corporation,* case number SC-032820, a civil case filed with Ventura County California Superior Court on May 15, 2002. Further details about the status of this matter were not available online.

*Sage Interactive vs. Vcampus Corporation,* case number SCV-308527, a civil suit filed with San Francisco County California Superior Court on December 14, 1999. Further details about the status of this matter were not available online.

*State Court – Vion Pharmaceuticals*

A review of available electronic civil filings in state courts nationwide did not identify any matters naming Vion Pharmaceuticals as a party.

<u>Bankruptcy Filings</u>

- A review of electronically available bankruptcy filings nationwide did not identify any records naming David M. Holzer, Social Security Number 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, as the subject of a bankruptcy matter.

<u>US Tax Court</u>

A search of US Federal Tax Court records for petitions/trials involving tax disputes with the Internal Revenue Service identified the following proceeding involving Mr. Holzer:

- David and Lesley Holzer filed a petition (docket number 7490-04) against the Commissioner of Internal Revenue on May 4, 2004. A stipulated decision was entered into the record on March 30, 2005. Further details about this decision were not available online.

<u>UCC Filings, Judgments and Liens – David Holzer</u>

A review of electronically available UCC filings, judgments and liens in the State of New York and New Jersey identified following records pertaining to Mr. Holzer.

TT0006430



**THACHER ASSOCIATES**

- David Holzer is named the debtor to the Bank of New York in a $7,221 judgment filed on March 22, 1994 in Rockland County, New York. This matter was satisfied on February 20, 1998.

- David Holzer is named the debtor to Bloomingdales in a $989 judgment filed on April 7, 1993 in New York County, New York. This matter was satisfied on October 7, 1988.

- David Holzer is named the debtor to Malliouhana EC LTD. in a $8,117 judgment filed in Rockland County, New York on August 19, 1993. This matter was satisfied on October 19, 1994.

- David Holzer is named the debtor to Fred Marcus Inc. in a $2,410 judgment filed in New York County, New York on May 1, 1992. Further details about the status of this matter were not available online.

- David Holzer is named the debtor to G E Capital Corp. in a $2,169 judgment filed in Rockland County, New York on February 19, 1992. This matter was satisfied on May 6, 1994.

- David Holzer is named the debtor to the New York State Tax Commission in a $32,989 judgment filed in Rockland County, New York on May 7, 1991. This matter was satisfied on June 16, 1994.

- David Holzer is named the debtor to the New York State Tax Commission in a $4,629 judgment filed in Rockland County, New York on May 7, 1991. This matter was satisfied on March 12, 1997.

<u>UCC Filings, Judgments and Liens – Brean Murray</u>

A review of electronically available UCC filings, judgments and liens in the State of New York identified over 100 UCC filings naming Brean Murray as the debtor. Also identified were two (2) matters naming Brean Murray as creditors including a $945,000 judgment against their former broker Lorne Caplan who is referenced in the media section.

<u>UCC Filings, Judgments and Liens – Vcampus Corporation</u>

A review of electronically available UCC filings, judgments and liens nationwide identified approximately twenty-eight (28) UCC filings and eight (8) judgments naming Vcampus Corporation as a debtor.

TT0006431



## THACHER ASSOCIATES

<u>UCC Filings, Judgments and Liens – Vion Pharmaceuticals</u>

A review of electronically available UCC filings, judgments and liens nationwide identified eleven (11) UCC filings and one (1) judgment naming Vion Pharmaceuticals as a debtor.

<u>Regulatory and Administrative Actions</u>

*Office of Foreign Assets Control*

The Office of Foreign Assets Control ("OFAC") administers a series of laws that impose economic sanctions against hostile targets to further US foreign policy and national security objectives. Management of these sanctions is entrusted to the Secretary of the Treasury. OFAC is responsible for promulgating, developing, and administering the sanctions for the Secretary under eight basic statutes,[4] and all of the bank regulatory agencies cooperate in ensuring financial institution compliance with the Regulations.

The laws and regulations administered by OFAC apply to all American citizens and permanent resident aliens wherever they are located; individuals and entities located in the United States (including all foreign branches, agencies, rep offices, etc.); corporations organized under US law, including foreign branches; and entities owned or controlled by any of the above, the most important being foreign-organized subsidiaries of US corporations.

OFAC promulgates and regularly updates a list of those individuals and entities that the US government has determined are threats to US national security and interests. This list is entitled "Specially Designated Nationals and Blocked Persons." The list comprises individuals and entities, which are owned or controlled by, or acting for or on behalf of, the Governments of target countries or are associated with international narcotics trafficking or terrorism. These individuals and entities are listed on the Treasury Department's Specially Designated Nationals and Blocked Persons list so that persons subject to the jurisdiction of the United States will know that they are prohibited from dealing with them and that they

---

[4] *Trading With the Enemy Act, 50 U.S.C. App. §§ 1-44 ("TWEA") [North Korea, Cuba, Transaction Control Regulations]; International Emergency Economic Powers Act, 50 U.S.C. §§1701-06 ("IEEPA") [Libya, Iraq, Serbia & Montenegro and Bosnia, UNITA, Sierra Leone, Liberia, Sudan, Iran, the Balkans, Terrorism, Narcotics, Nonproliferation, the Taliban and Burma]; Iraqi Sanctions Act, Pub.L. 101-513, 104 Stat. 2047-55 ("ISA") [Iraq]; United Nations Participation Act, 22 U.S.C. § 287c ("UNPA") [Iraq, Libya (part), UNITA, Serbia & Montenegro, Sierra Leone, and Liberia]; International Security and Development Cooperation Act ("ISDCA") codified at 22 USC 2349 aa-9 (Iran); The Cuban Democracy Act ("CDA"), 22 U.S.C. § 6001-10 [relating to Cuba]; The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act, 22 U.S.C. 6021-91, [relating to Cuba]; The Antiterrorism and Effective Death Penalty Act, (enacting 8 U.S.C. 219, 18 U.S.C. 2332d and 18 U.S.C. 2339b) [Cuba, North Korea, Iran, Iraq, Libya, Syria and Sudan]; The Foreign Narcotics Kingpin Designation Act, Pub L. No. 106-120, tit. VIII, 113 Stat 1606, 1626-1636 (1999) (to be codified at 21 U.S.C. §§1901-1908) and; The Criminal Code at 18 U.S.C. § 1001.*

9



**THACHER ASSOCIATES**

must block all property within their possession or control in which these individuals and entities have an interest.

Mr. Holzer is not listed on OFAC's Specially Designated Nationals and Blocked Persons list.

*SEC Records*

An online search was performed for any SEC records referencing Mr. Holzer, including, but not limited to, Forms 3, 4 and 5, Schedule 13D and Schedule 13G.[5]  Online research identified numerous references to Mr. Holzer pertaining to his status as a beneficial stock holder for Vcampus Corp. We reference the most recent filing in the corporate affiliations section above.

*National Association of Securities Dealers*

Online searches were conducted with the National Association of Securities Dealers ("NASD") for any information pertaining to Mr. Holzer. No records relating to Mr. Holzer, including registrations and/or disclosure events, are currently on file with the NASD.

*National Futures Association*

Inquiries conducted with the National Futures Association ("NFA") for information pertaining to Mr. Holzer identified that he became a member of NFA on August 20, 1984. Mr. Holzer's status as an active member was withdrawn on August 31, 1985. It should also be noted, there are no NFA or Commodity Futures Trade Commission ("CFTC") regulatory actions or reparations cases, or NFA arbitration awards, reported for Mr. Holzer.

<u>Asset Ownership</u>

A review of Mortgage, Deed Transfer and Tax Assessor records in the State of New York and New Jersey identified the following property records pertaining to Mr. Holzer:

- **10 Sky Drive, New City, New York 10956.** This property, a single-family residence, was purchased by David and Lesley Holzer on March 1, 1999 for $350,000 from URARN Associates. According to the Tax Assessor's Office of New City, New York, the 2007 total assessed value for this property is $467,800.

---

[5] *Forms 3, 4 and 5 disclose directors, officers or owners of more than ten percent (10%) of a class of equity securities (initial filing, changes and annual reports, respectively); Schedule 13D discloses beneficial ownership (i.e., voting or investment power) of individuals who have acquired more than five percent (5%) of certain registered equity securities; and Schedule 13G discloses passive investors (i.e., those who own less than twenty percent (20%) of the class of securities and do not seek to influence control of the issuer).*

10



**THACHER ASSOCIATES**

<u>Driver Records</u>

Searches conducted with the New York State Department of Motor Vehicles indicate that Mr. Holzer has a valid Class D driver's license which is set to expire on November 14, 2010.

<u>Professional Licenses</u>

Inquiries conducted with the New York State Division of Licensing Services as well as the New Jersey Department of Consumer Affairs did not identify any professional license records with respect to Mr. Holzer.

<u>US Patents and Trademarks</u>

Searches of the US Patent and Trademark Office's online database were performed for any patents, patent applications and trademarks held by Mr. Holzer. No records were identified.

<u>Media and Internet</u>

A comprehensive media review, consisting of over 30,000 print, radio, television and Internet sources, identified the following article pertaining to Mr. Holzer:

- *The New York Times.* **November 9, 2001 (See Exhibit One)**. An article entitled, "Shares Are Mixed Despite An Early Boost From Europe," quoted Mr. Hozler in his professional capacity at Brean Murray as saying, *"You're gong to see a cumulative effect of rate cuts, and I think you're going to see a huge rally into the end of the year. There's no return in bonds, C.D.'s are yielding under two percent (2%), and investors have to switch to the equity market. Money managers are going to get fired if they sit on cash."*

A similar review of the Brean Murray companies identified the following articles of interest:

- *The Associated Press.* **May 16, 2006 (See Exhibit Two)**. An article entitled, "Stamford Man Gets Three (3) Years In Federal Prison For Defrauding Investors," reports that a former investment named Lorne Caplan banker who worked for Brean Murray Carteret & Co., LLC was sentenced to three (3) years in prison for cheating investors. According to the article, Mr. Caplan pleaded guilty to wire fraud and admitted he improperly took $990,000 in investor funds for his own use.

- *Newsday.* **May 14, 2005 (See Exhibit Three)**. An article entitled, "Former Hedge Fund Manager Testifies At Bank Broker's Trial," reports that former hedge fund manager for Canary Capital Partners LLC testified he was told by two (2) people at Brean Murray that a reputable law firm named LeBouef, Lamb, Greene and MacRae advised late trading was legal. Its possible Mr. Stern was told this prior to

TT0006434



THACHER
ASSOCIATES

Mr. Hozler's leaving Brean Murray in 2002. According to the article, Mr. Stern's late trading was a catalyst for a sweeping investigation of the mutual fund industry.

- *TheStreet.com.* **February 17, 2005 (See Exhibit Four).** An article entitled, "Brokerage Brean Murray Settles Market-Timing Case," reports that Brean Murray settled charges issued from the SEC that they *"placed thousands of abusive mutual fund trades fro at least five (5) hedge funds between 2001 and 2003."* According to the article, the SEC contended that brokers at Brean Murray engaged in both market-timing and late trading on behalf of their hedge fund customers which included Canary Capital Partners. Brean Murray was fined $150,000 to settle the SEC's enforcement action.

  The article further reports that in September 2004, two (2) former Brean Murray brokers alleged that a lawyer had given them faulty advice it was OK to engage in late trading through Brean Murray's trading platform.

  Harold McGuire, Brean Murray's attorney and a partner with Entwistle & Cappucci said that, *"The fact of the matter is there isn't anyone left at Brean Murray who has significant knowledge of these activities."* One (1) of those people may be Mr. Hozler who was a high ranking person at this small brokerage firm.

- *The New York Post.* **November 3, 2003 (Exhibit Five).** An article entitled, A Broader View In Brean Murray Request, SEC Eyes Lehman, BOFA," reports that the SEC subpoenaed Brean Murray in their ongoing investigation of improper mutual fund trading practices. According to the article,

  *"New York Attorney General Eliot Spitzer is also looking at the firm say people familiar with his investigation into whether funds allowed select clients to buy and sell shares at prices not available to most investors.*

  *The SEC subpoena requests that Brean Murray, a small brokerage house based in Midtown, provide all information related to a number of hedge funds, mutual funds and brokerage firms – including Bank of America, Lehman Brothers and Bear Stearns Securities Corp."*

  The article further reports that, *"Brean Murray formed a 'special situations' group in 2001 to help facilitate market timing for some of its hedge fund clients, say people familiar with the company."*

  It should be noted that Mr. Holzer was still with Brean Murray in 2001 and therefore potentially aware of the activities referenced above. However, Mr. Holzer is not implicated personally in this article or any of the others referenced in the previous bullet points.

12



A similar media review identified numerous references to Vcampus Corporation but no articles appeared to be integrity related. There were no articles identified for Vion Pharmaceuticals.

TT0006436



**THACHER ASSOCIATES**

## Exhibit One

<u>Source: Lexis-Nexis</u>

The New York Times

November 9, 2001 Friday
Late Edition - Final

## THE MARKETS: STOCKS & BONDS;
Shares Are Mixed Despite an Early Boost From Europe

**BYLINE:** By Reuters

**SECTION:** Section C; Column 3; Business/Financial Desk; Pg. 6

**LENGTH:** 544 words

   Blue-chip stocks ended with modest gains yesterday while technology stocks slipped as the market ran into a wall of profit taking after a big rally built on interest rate cuts by European central banks.

   Stocks also slid after the Oct. 2 minutes of the Federal Reserve's panel that sets interest rate said the Sept. 11 attacks could worsen the buildup of inventory -- a persistent problem for technology companies -- and that its current rate-cutting could be reversed if the economy expanded too quickly.

   Investors remained uncertain, with signs of an expected recovery still absent and corporate profits in dismal shape. The Nasdaq composite index has also risen 28 percent since it hit a three-year low on Sept. 21, a move that has prompted some investors to lock in profits, analysts said.

   "Now we're just getting some normal profit taking and pullback after a big move," said James Volk, co-director of institutional trading at D. A. Davidson & Company. "There are still a number of people who are skeptical, including myself, as to when and to what extent this economy is going to turn around."

   The technology-heavy Nasdaq composite index, which at one point had climbed 2.8 percent, ended with a loss of 9.76 points, or 0.5 percent, at 1,827.77. The Dow Jones industrial average rose 33.15 points, or 0.4 percent, at 9,587.52. The broader Standard & Poor's 500-stock index rose 2.74 points, or 0.3 percent, to 1,118.54.

   American stocks initially bolted higher after the European Central Bank and the Bank of England cut rates by a surprisingly hefty half a percentage point. The reductions came on the heels of a similar cut by the Federal Reserve on Tuesday.

14



**THACHER ASSOCIATES**

"To really combat recession and recessionary pressures here at home, we need to see the rest of the world firm up a little bit," said Charles Payne, an analyst at Wall Street Strategies. "The interest rate cut by the E.C.B. caught a lot of people off guard in a good way."

At the Dow's high of the day -- up almost 170 points -- the blue-chip index had erased all of the steep loss it made after the Sept. 11 attacks on the Pentagon and the World Trade Center sent the market tumbling. The Nasdaq and S.& P. 500 have already clawed back from their post-attack losses as investors looked past the bleak economic environment and bet on a comeback.

"You're going to see a cumulative effect of rate cuts, and I think you're going to see a huge rally into the end of the year," said **David Holzer,** managing director of trading at Brean Murray & Company. "There's no return in bonds, C.D.'s are yielding under 2 percent, and investors have to switch to the equity market. Money managers are going to get fired if they sit on cash." --------------------

Treasuries Are Lower
By Bloomberg News

Treasury bond prices fell yesterday as a decline in jobless claims and interest rate cuts by European central banks signaled the United States economy could rebound sooner than originally thought.

The 10-year Treasury note fell 22/32, to a price of 105 21/32. The note's yield, which moves in the opposite direction from the price, rose to 4.28 percent from 4.22 percent on Wednesday. The price of the 30-year Treasury bond fell 1 7/32, to 107 30/32. The bond's yield rose to 4.86 percent from 4.79 percent on Wednesday.

TT0006438



**TA THACHER ASSOCIATES**

### Exhibit Two

Source: Lexis-Nexis

May 16, 2006 Tuesday 2:01 AM GMT

## Stamford man gets 3 years in federal prison for defrauding investors

**SECTION:** STATE AND REGIONAL

**LENGTH:** 266 words

**DATELINE:** NEW YORK

A former investment banker who was sentenced Monday to three years and a month in prison deserved no leniency because he "had everything going for him" when he cheated investors, a judge said.

Lorne Caplan, of Stamford, Conn., apologized to U.S. District Judge Shira Scheindlin for hurting his family and investors. He had pleaded **guilty** to wire **fraud,** admitting he improperly took $990,000 in investor funds for his own use.

The judge said she wanted to send a message that those who commit white-collar **crimes** will be punished severely.

"This was completely a person of privilege who made his own bed," she said. "This man had everything going for him."

The judge said Caplan, who worked at **Brean Murray,** Carret & Co. LLC, stole from at least seven investors in response to a financial crisis he caused himself by spending far more than he earned. She said such **crimes** sometimes leave investors shattered.

"It's not a violent **crime,** but it destroys lives just the same," she said.

She ordered Caplan, 41, to pay back $945,000. She said the government can pursue any assets Caplan might have or he can pay it off through 10 percent of his salary for 20 years after he gets out of prison.

Caplan from June 2001 to January 2002 arranged the transfer of client funds to his accounts in New York, Florida and Holland, prosecutors said. Clients who had planned to invest in a medical equipment company had their funds diverted.

He provided New York-based Brean Murray with three phony letters purportedly signed by the chief executive of the medical equipment company authorizing the transfers, prosecutors said.

TT0006439



## THACHER ASSOCIATES

### Exhibit Three

<u>Source: Lexis-Nexis</u>

Newsday

May 14, 2005, Saturday

## Former hedge fund manager testifies at bank broker's trial

**BYLINE:** By Susan Harrigan

**LENGTH:** 512 words

A former hedge fund manager whose late trading of mutual funds set off a sweeping investigation of the mutual fund industry said yesterday that he "felt uncomfortable" with the practice, and that "in retrospect it was unfair."

Edward Stern, who managed the hedge fund Canary Capital Partners Llc, testified as a government witness at the trial of a former Bank of America broker, Theodore Sihpol III.

It was the first time Stern has spoken publicly about his 2003 settlement of charges of abusive trading brought by New York State Attorney General Eliot Spitzer, who went on to extract more than $ 3 billion in settlements from mutual funds he accused of abetting such practices.

Siphol is charged with larceny, securities fraud and falsifying business records. He faces up to 30 years in prison if he's convicted and a fine of $ 200,000.

Dressed in a dark gray suit and blue shirt and speaking slowly, Stern, a son of billionaire publisher, real estate and pet-food magnate Leonard Stern, said he placed trades through Sihpol after the 4 p.m. market close because "my job was to get the least amount of risk for the most amount of gain."

Sihpol's attorneys are contending that Sihpol's actions were known and approved by higher-ups at Bank of America, but are also trying to show that late trading isn't **illegal.** In an answer that the presiding judge cautioned the jury would constitute "hearsay," Stern answered "yes" when asked by defense lawyer Paul Shechtman if he had been told that a "reputable" law firm had issued a legal opinion that late trading was lawful.

Stern said that information had come from two people at **Brean Murray,** another brokerage that traded mutual funds for him, and he believed the name of the law firm was LeBoeuf.

In an interview, Steven Davis, chairman of LeBoeuf, Lamb, Greene and MacRae, said, "We emphatically deny that LeBoeuf ever issued an opinion on this point, and we have a

TT0006440



feeling that it may be a case of mistaken identity." Don Fletcher, senior vice president of Brean Murray, declined to comment. Both firms are based in Manhattan.

Stern said he once "had a cup of coffee" with Kenneth D. Lewis, the bank's chairman and chief executive. The two "just talked about the economy," rather than about Stern's business with the bank, he said. Robert Stickler, a spokesman for Bank of America, said "we don't discuss customer relationships," but that a meeting between Lewis and a customer would have been "quite common."

In 2004, Bank of America settled charges with Spitzer and federal regulators for $ 675 million. Neither the bank nor Stern, who paid $ 40 million to settle in 2003, admitted or denied wrongdoing.

TT0006441



## THACHER ASSOCIATES

### **Exhibit Four**

<u>Source: Lexis-Nexis</u>

TheStreet.com

TheStreet.com

February 17, 2005 Thursday

## Brokerage Brean Murray Settles Market-Timing Case

**BYLINE:** By Matthew Goldstein, Senior Writer

**SECTION:** MARKETS; Matthew Goldstein

**LENGTH:** 674 words

**Brean Murray** settled Securities and Exchange Commission charges Thursday that the small New York brokerage placed thousands of **abusive** mutual fund trades for at least five hedge funds between 2001 and 2003.

The SEC contends that brokers at Brean engaged in both market-timing and late trading on behalf of their hedge fund customers, which included Canary Capital Partners. Brean will pay $150,000 to settle the enforcement action, according to an SEC administrative order.

The administrative order also places blame on the clearing firm that permitted the late trading to occur, saying it also violated federal securities laws because of Brean's wrongful trading. The order doesn't identify the clearing firm by name, but people familiar with the investigation say it is Bear Stearns (BSC:NYSE).

In a civil lawsuit filed in September, two former Brean brokers alleged that a lawyer had given them faulty advice in telling them it was OK to engage in late trading through Bear's clearing platform. The two brokers, Ryan Goldberg and Michael Grady, who are still being investigated by the SEC and New York Attorney General Eliot Spitzer, claimed the lawyer had committed malpractice.

The brokers were not charged in the SEC action against Brean. In the civil lawsuit, Goldberg and Grady identified Canary, Veras Investment Partners and Tewksbury Capital, formerly called Trout Trading, as their customers.

Market-timing, or frequent trading of mutual fund shares, is legal, but it is prohibited under most mutual fund prospectuses because it can dilute the value of a portfolio's holdings. Late trading is the buying or selling of mutual fund shares after their 4 p.m. closing price, in order to take advantage of late-breaking or market-moving news.

TT0006442



**THACHER ASSOCIATES**

Regulators and prosecutors say late trading is an illegal practice, and a number of offenders are facing criminal charges.

The SEC notified Bear last June that it is considering filing civil charges against the firm's big clearing operation. Regulators believe Bear processed and financed abusive mutual fund trades for dozens of hedge funds and small brokerages.

Earlier this week, TheStreet.com reported that the SEC recently notified three former Bear brokers and Peter R. Murphy, a senior managing director, that they too could face civil charges for assisting hedge funds engaged in abusive trading of mutual fund shares. Murphy is one of the highest-ranking executives in Bear's big clearing and operations division.

Earlier Thursday, Bloomberg reported that Vincent Dicks, a top manager in Bear's private client group, also received a so-called Wells notice from the SEC. Bloomberg also reported the SEC was on the verge of settling with Brean.

People familiar with the investigation say at least one other current Bear employee has been informed he could be facing a possible enforcement action and additional Wells notices may be forthcoming.

A Bear spokeswoman said the brokerage has been cooperating with the SEC.

"Bear Stearns has taken significant action since the onset of the industrywide mutual fund investigation," said the spokeswoman, Elizabeth Ventura. "Under the auspices of the audit committee of the board of directors, we conducted an in-depth internal review of mutual fund trading practices. As a result of this internal review, we took swift and decisive disciplinary action -- including the termination of certain employees -- and, we proactively shared the information from this thorough review with the SEC."

SEC officials declined to comment.

Late last year, Bear increased its **litigation** reserve by about $100 million to cover the cost of a potential settlement with securities regulators over the firm's **alleged** involvement in the mutual fund trading **scandal.**

Harold McGuire, Brean's attorney and a partner with Entwistle & Cappucci, said his client is "very happy" to put the matter behind it.

"The fact of the matter is there isn't anyone left at **Brean Murray** who has significant knowledge of these activities," he said.

TT0006443



# THACHER ASSOCIATES

**Exhibit Five**

Source: Lexis-Nexis

The New York Post

November 3, 2003, Monday

# A BROADER VIEW ; IN BREAN MURRAY REQUEST, SEC EYES LEHMAN, BOFA

**BYLINE:** JENNY ANDERSON

**SECTION:** All Editions; Pg. 033

**LENGTH:** 643 words

The SEC has subpoenaed New York-based brokerage house **Brean Murray** in the agency's ongoing **investigation** of improper mutual fund trading practices, in an apparent attempt to dig deeper into some of Wall Street's biggest firms, The Post has learned.

New York Attorney General Eliot Spitzer is also looking at the firm, say people familiar with his **investigation** into whether funds allowed select clients to buy and sell shares at prices not available to the most investors.

The SEC subpoena requests that **Brean Murray**, a small brokerage house based in Midtown, provide all information related to a number of hedge funds, mutual funds and brokerage firms - including Bank of America, Lehman Brothers and Bear Stearns Securities Corp.

Spokesmen for all three firms declined comment.

The SEC subpoena also sought information on a list of hedge funds that named Canary Capital Partners, Tidewater Capital, Trout Trading Fund, Trout Trading Management Company, Peconic Capital Fund, Diamant Asset Management, Diamant Master Fund, Lighthouse Multi-Strategy Fund and Veras Investment Partners. (Trout Trading became Tewksbury Capital in April 2002).

Execs at those funds could not be reached by press time.

The subpoena also requested information on some mutual funds, including: Alger, Alliance, Deutsche Bank, Federated Investors, Invesco, Vanguard, Strong and Massachusetts Financial Services.

Brean Murray formed a "special situations" group in 2001 to help facilitate market timing for some of its hedge fund clients, say people familiar with the company.

21

TT0006444



# THACHER ASSOCIATES

Michael Grady and Ryan Goldberg were in charge of the group - which had Tewksbury Capital as one of its top clients.

Goldberg and Grady left in April to form their own hedge fund, called Epic Partners. They have been back working at Brean Murray in recent weeks to help the firm comply with the subpoena, say people familiar with the company.

Neither Grady nor Goldberg could be reached for comment.

"We do not believe we have done anything wrong," said A. **Brean Murray,** the company's chairman and CEO. "We have been subpoenaed for information and that's something we have fully complied with."

A SEC spokesman declined to comment.

One of the hedge funds listed in the subpoena - Canary Capital Partners - and its principal, Edward Stern, agreed with New York State Attorney General Eliot Spitzer in early September to pay $40 million to settle charges of late-day trading, which is **illegal,** and market timing, which is generally discouraged by mutual fund prospectuses and is considered a breach of fiduciary duty, because it drives down investor returns.

The ever-widening investigation of mutual funds has uncovered improper practices by a number of money managers and stock brokers and the firms they work for.

Firms have scrambled to fire or suspend almost three dozen execs because of improper trading.

The SEC prohibits late-day trading because it allows investors to take advantage of information that isn't available when a fund's closing price is set each day at 4 p.m.

Market timing, which is rapid in-and-out trading, is discouraged because it can benefit the investors who use it to the detriment of other mutual fund holders.

Widening **investigation**

The SEC has subpoenaed documents from brokerage **Brean Murray** for a **probe** into trading practices. The regulators want documents related to numerous other firms, including the following broker dealers and hedge funds, among others:

Broker Dealers

* Bank of America

* Lehman Brothers

* Bear Stearns

Hedge Funds

* Canary Canadian Imperial Holdings

* Epic Advisors

* Douglas Allen Ram Fund

* Tidewater Capital

22

TT0006445



* Trout Trading

* Peconic Capital

* Diamant

TT0006446

**Suits, Liens, Judgments in NY**
No records found

TT0006447

- *The Associated Press.* **May 16, 2006 (See Exhibit Two).** An article entitled, "Stamford Man Gets Three (3) Years In Federal Prison For Defrauding Investors," reports that a former investment named Lorne Caplan banker who worked for Brean Murray Carteret & Co., LLC was sentenced to three (3) years in prison for cheating investors. According to the article, Mr. Caplan pleaded guilty to wire fraud and admitted he improperly took $990,000 in investor funds for his own use.

- *Newsday.* **May 14, 2005 (See Exhibit Three).** An article entitled, "Former Hedge Fund Manager Testifies At Bank Broker's Trial," reports that former hedge fund manager for Canary Capital Partners LLC testified he was told by two (2) people at Brean Murray that a reputable law firm named LeBouef, Lamb, Greene and MacRae advised late trading was legal. It's possible Mr. Stern was told this while prior to Mr. Hozler's leaving Brean Murray in 2004. According to the article, Mr. Stern's late trading was a catalyst for a sweeping investigation of investigations in the mutual fund industry.

- *TheStreet.com.* **February 17, 2005 (See Exhibit Four).** An article entitled, "Brokerage Brean Murray Settles Market-Timing Case," reports that Brean Murray settled charges issued from the SEC that they *"placed thousands of abusive mutual fund trades fro at least five (5) hedge funds between 2001 and 2003."* According to the article, the SEC contended that brokers at Brean Murray engaged in both market-timing and late trading on behalf of their hedge fund customers which included Canary Capital Partners. Brean Murray was fined $150,000 to settle the SEC's enforcement action.

  The article further reports that in September 2004, two (2) former Brean Murray brokers alleged that a lawyer had given them faulty advice it was OK to engage in late trading through Brean Murray's trading platform.

  Harold McGuire, Brean Murray's attorney and a partner with Entwistle & Cappucci said that, "The fact of the matter is there isn't anyone left at Brean Murray who has significant knowledge of these activities." One (1) of those people may be Mr. Hozler who was a high ranking person at this small brokerage firm.

- *The New York Post.* **November 3, 2003 (Exhibit Five).** An article entitled, A Broader View In Brean Murray Request, SEC Eyes Lehman, BOFA," reports that the SEC subpoenaed Brean Murray in their ongoing investigation of improper mutual fund trading practices. According to the article,

  *"New York Attorney General Eliot Spitzer is also looking at the firm say people familiar with his investigation into whether funds allowed select clients to buy and sell shares at prices not available to most investors.*

*The SEC subpoena requests that Brean Murray, a small brokerage house based in Midtown, provide all information related to a number of hedge funds, mutual funds and brokerage firms – including Bank of America, Lehman Brothers and Bear Stearns Securities Corp."*

The article further reports that, *"Brean Murray formed a 'special situations' group in 2001 to help facilitate market timing for some of its hedge fund clients, sapy people familiar with the company."*

It should be noted that Mr. Hozler was still with Brean Murray when this article was published and therefore potentially aware of the activities referenced above. However, Mr. Hozler is not implicated personally in this article or any of the others referenced in the previous bullet points.

TT0006449



THACHER
ASSOCIATES

THOMAS D. THACHER II
PRESIDENT/CEO

THACHER ASSOCIATES, LLC
330 WEST 42ND STREET, 23RD FLOOR
NEW YORK, NY 10036
TELEPHONE (212) 845-7525
FAX (212) 845-7516
TODY @THACHERASSOCIATES.COM

September 10, 2007

Mr. Barry K. Fingerhut
Fingerhut/Holzer Partners, L.L.C.
399 Park Avenue, 32nd Floor
New York, New York 10021

Re:  Ownership/Sale of Properties in New York State

Dear Barry:

This will confirm your retention of Thacher Associates, LLC ("Thacher Associates") in connection with your request that we conduct an analysis and investigation of circumstances surrounding the purported sale to you of an ownership interest in certain properties (the "Properties") located in New York State.

### BACKGROUND

You have advised us that David Holzer, your partner in Fingerhut/Holzer Partners, L.L.C., has informed you that (1) he owns a one-third interest in a partnership called Dellwood Partners, L.P. ("Dellwood"); (2) his partners in Dellwood are Jeffrey L. Schwartz and Daniel Katz, each of whom holds a one-third interest in the partnership; and (3) Mr. Holzer's one-third interest in one of the Properties, located in Haverstraw, New York (the "Haverstraw Property") is about to be sold for approximately $25 million.  You have also advised us that you own one-half of Mr. Holzer's ownership interest in Dellwood.

### SERVICES

You have asked Thacher Associates to undertake an investigation and analysis to determine the bonafides of the above representations by David Holzer.  You have further asked that, based on information obtained in the course of that investigation and analysis, we assist you in taking appropriate steps to remediate any issues identified.  It is anticipated that such assistance will involve, at a minimum, database research, field interviews and ongoing consultation with you and counsel.

### CONFIDENTIALITY

We agree that any and all information and documents received from you, your agents or any other consultant you have retained or will retain relating to this matter are presumptively privileged and confidential.  All information and documents that Thacher Associates or any of our investigative associates or consultants develop during the course of providing these services

TT0006450

Barry Fingerhut
September 10, 2007
Page 2 of 4

 THACHER
ASSOCIATES

disclose any information and documents received or developed in connection with this matter unless we have received written authorization from you, or are required by law to do so.

In the event that any third-party, including a governmental entity, attempts to obtain documents or information related to this matter from Thacher Associates, our investigative associates or our consultants, by subpoena, other compulsory process or otherwise, to the extent we are permitted by law under the circumstances to do so, Thacher Associates will immediately notify you of that fact, afford you an opportunity to contest such third-party efforts and otherwise follow your direction with respect to our response. You agree to indemnify us for all costs and expenses reasonably incurred, including both reasonable legal expenses and the costs of Thacher Associates' and our investigative associates' and consultants' time, in responding to any such effort to obtain information or documents from Thacher Associates in connection with this matter.

You agree, however, that nothing herein shall prevent or prohibit Thacher Associates, our investigative associates or consultants from complying with any order of a court of competent jurisdiction, or a government or other official acting within his actual or apparent authority, for the production of documents or the provision of information.

## INDEMNIFICATION

You agree to hold harmless and indemnify Thacher Associates, our investigative associates and consultants, against and pay for all claims, damages and costs (including reasonable attorney's fees and disbursements) arising out of this engagement, except for such claims, damages and costs allegedly arising from any actions by Thacher Associates where it is finally adjudicated that such actions by Thacher Associates, our investigative associates or consultants were illegal, grossly negligent, or were beyond the scope of this engagement.

## FEES AND COSTS

In order to efficiently manage the fees and costs associated with the engagement, we will perform our services in incremental phases, and not proceed to a new phase without first advising you of the anticipated scope and costs of such new phase. We anticipate that the first phase of the engagement ("Phase I") will be comprised of (1) electronic database research regarding Mr. Holzer, Mr. Schwartz, Mr. Katz, Dellwood, and the Haverstraw Property; (2) on-site manual research regarding Dellwood and the Haverstraw Property; and (3) multiple meeting and telephone conferences with you.

Upon completion of Phase I, we will provide you with oral and/or written reports (at your discretion) detailing our findings, and setting forth our recommendations with respect to additional steps ("Phase II") that can be taken in furtherance of your interests. We agree that we will not to take any actions which would cause the total fees of Phase I, excluding expenses and applicable taxes, to exceed $25,000, without first discussing such actions with you.

Should you request that we extend the engagement to include a Phase II, we agree to consult with you regarding the scope and anticipated costs of our services to be provided during Phase II, and to set a maximum fee, excluding expenses and applicable taxes, for Phase II.

Barry Fingerhut
September 10, 2007
Page 3 of 4

 THACHER
ASSOCIATES

Thacher Associates bills on an hourly basis, plus costs and expenses, in accordance with the attached schedule. Thacher Associates will send its invoices directly to you.

### RETAINER

We ask that you provide us with a $10,000 retainer. The retainer will be held by Thacher Associates and will be applied against our final invoice for services. To the extent any amount remains in the retainer after it is applied against our final invoice, the balance will immediately be returned to you.

### EXECUTION

Your signature below indicates that you agree to engage Thacher Associates under the terms and conditions set forth herein.

We look forward to working with you on this matter.

Sincerely,

Thomas D. Thacher II

**Acknowledged & Agreed:**

BARRY K. FINGERHUT

By: _____          Dated: _9/11/07_

Barry Fingerhut
September 10, 2007
Page 4 of 4

 THACHER
ASSOCIATES

## FEE SCHEDULE

Principals (Thacher/DeLuca) ----------------------------------------------------425/390

Project Manager (Ornston)-----------------------------------------------------350

Senior Investigator ----------------------------------------------------------285

Senior Research Analyst-----------------------------------------------------200

Analyst ----------------------------------------------------------------------175

Research Associate ----------------------------------------------------------150

TT0006453

2887-1

Fingerhut

TT0006454

Jun 09 08 05:08p      HTI                    (631)924-7130           p.1

```
218-1108
418-1449
546-6221
783-4777
795-3016
adamgurney12
aifsocal
alfsocal
alpint55
Berlacher
bob81654
bryw23
buds142
caciman
cfghbrown
coolidge
dahlmancap
dawgs142
degx01
ericacoletti
garcijo710
Gina Storelli
globisfund01
gstorelli
holzerl
jackiepugs
jillianD80
jpatrodman
Kirschky
mase859
mzack1023
nmrichardl
pacamcharlie
PJ
putznik
rabruno46
rmw950
seamus
szack9
thescorpio14
tradersimon
zippy
zipzinc
```



To
Steve Moran
212-239-2096



! CONFIDENTIAL

TT0006455

**Project: 2852-1**
**Assets Identified**

| No. | Description | Identifying Number (Serial/Plate/VIN) (if known) | Vehicle Loss Insurance Payee (if applicable) | Purchase Date (if known) | Purchase Price (if known) | Appraised Value (if known) | Date of Appraisal (if applicable) | Notes | Source Doc. # |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2003 Mercedes Benz G500 | NY: BAK4286 VIN: WDCYR49E53X743840 | | | | $51,917 | 5/12/2005 | Driver listed as Lesley E. Holzer; Garaged in New City, NY | 8,9,10 |
| 2 | 2004 Mercedes Benz SL500 convertible | NY: BRX5940 VIN: WDBSK75F44F073883 | | | | $88,500 | 5/12/2005 | | 8,9,10,17 |
| 3 | 2005 Aston Martin Vanquish | VIN #: SCFAC24345B501806 | | Spring 2005 | | $298,000 | 5/12/2005 | "agreed value" from Chubb insurance policy document dated 5/12/05 | |
| 4 | 2005 Land Rover LR3 | NY: BZ2978L VIN: SALAA24475A410066 | CAB East LLC Loan #: 67877086 | | | $55,000 | 5/12/2005 | Driver listed as Joshua D Holzer; Garage location listed as Buffalo, NY | 8,9,10,17 |
| 5 | 2005 Porsche Cabriolet | VIN #: WP0CB29859S765645 | Porsche Financial Services Loan #510000117233 | | | $116,250 | 4/21/2007 | | 13,17 |
| 6 | 2005 Porsche Cayenne | VIN #: WP0AC29P75LA92302 | Sovereign Bank Vehicle Financing / Magnum Leasing Corp | | | $89,300 | 5/12/2005 | | |
| 7 | 2006 Land Rover Range Rover | VIN #: SALSH23426A934586 | | | | $73,980 | 4/21/2007 | | 13,17 |
| 8 | Bulgari Chronometer Watch with black rubber strap | | | | | $6,300 | 6/22/2000 | deleted from Chubb insurance policy 9/10/04 | 6 |
| 9 | Cartier 18K RG Demoiselle on bracelet diamond bezel | | | 9/21/2005 | $20,243 | | | | 12 |
| 10 | Cartier Tank Americaine 18K White Gold Men's Watch | | | | | $25,100 | 6/13/2005 | added to Chubb insurance policy 6/13/06 | 14 |

TT0006456

Project: 2852-1
Assets Identified

| No. | Description | Identifying Number (Serial / Plate / VIN) (if known) | Vehicle Loss Insurance Payee (if applicable) | Purchase Date (if known) | Purchase Price (if known) | Appraised Value (if known) | Date of Appraisal (if applicable) | Notes | Source Doc. # |
|---|---|---|---|---|---|---|---|---|---|
| 11 | Ladies Emerald Cabochon Beads, 9 strands, 467 carats | | | | | $12,500 | 6/7/2005 | | 11 |
| 12 | Men's Chronograph Watch with green leather strap | #B10560100590 | | | | $4,900 | 7/21/1994 | deleted from Chubb insurance policy 9/10/04 | 6 |
| 13 | Men's Jaeger LeCoultre Watch with brown ostrich strap | #792014066 | | | | $10,200 | 3/121/1995 | deleted from Chubb insurance policy 9/10/04 | 6 |
| 14 | Rolex Daytona Oyster Perpetual Swiss Wristwatch 18KT gold bracelet, silver arabic dial, sapphire crystal | Serial: 2D76766; Style: 1165099/7737849 | | | | $22,000 | 11/21/2006 | | 16 |
| 15 | Rolex GMT, White | | | | | $10,600 | | sold to Tourneau on 9/2/04 when purchasing Yachtmaster | 6 |
| 16 | Rolex Yachtmaster | Serial: F989382 Style: R16622885D5767676 | | 9/2/2004 | $19,200.00 | $19,200 | | added to Chubb insurance policy 9/10/04 | 6 |
| 17 | Vacheron Constantin 18K RG Chronograph Watch with crocodile strap | | | | | $18,711 | 7/29/2004 | added to Chubb insurance policy 7/28/04 | 3 |

TT0006457

Project: 2852-1
David Holzer: Documents Index

| No. | Description | Document Date (if known) | Time Period Covered from | to | Account Number (if applicable) | Individuals on Account (if applicable) | Total Pages |
|---|---|---|---|---|---|---|---|
| 1 | American Express Platinum Card; 2004 Year-End Summary; addressed to Jennifer Holzer | Feb-05 | 1/1/2004 | 12/31/2004 | Account #: 3713-880330-14002 (includes activity for card no's: 3713-880330-13020 and 3713-880330-13517) | Jennifer Holzer; David Holzer; Lesley Holzer | 28 (double-sided) |
| 2 | American Express Platinum Card; 2005 Year-End Summary; addressed to Jennifer Holzer | Feb-06 | 1/1/2005 | 12/31/2005 | Account #: 3713-880330-14002 (includes activity for card no's: 3713-880330-13020 and 3713-880330-13517) | Jennifer Holzer; David Holzer; Lesley Holzer | 17 (double-sided) |
| 3 | Chubb Masterpiece Policy Coverage Update | 7/28/2004 | 6/13/2004 | 6/13/2005 | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 4 | Chubb Masterpiece Policy Rate Sheet | 9/12/2004 | - | - | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 5 | Chubb Masterpiece Policy Coverage Update | 9/2/2004 | 6/13/2004 | 6/13/2005 | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 6 | Lawley Richwood Letter Re: Addition of Watches to Policy | 9/10/2004 | 6/13/2004 | 6/13/2005 | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 4 |
| 7 | Lawley Richwood Letter Re: Changes to Chubb Auto & Homeowner's Policy | 5/6/2005 | 6/13/2005 | 6/13/2006 | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 2 |
| 8 | Lawley Richwood "Authorization for Physical Damage Coverage Mandatory Photo Inspection" Notices (for 2004 Mercedes SL500; 2005 Land Rover LR3; 2003 Mercedes G500) | 5/6/2005 | - | - | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 3 |
| 9 | Chubb Vehicle Detail Premium Update | 5/12/2005 | 4/21/2005 | 4/21/2006 | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 5 (double-sided) |
| 10 | New York State Vehicle Inspection Reports (for 2004 Mercedes SL500; 2005 Land Rover LR3; 2003 Mercedes G500) | 5/19/2005 | - | - | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 3 |

TT0006458

Project: 2852-1
David Holzer: Documents Index

| No. | Description | Document Date (if known) | Time Period Covered from | to | Account Number (if applicable) | Individuals on Account (if applicable) | Total Pages |
|---|---|---|---|---|---|---|---|
| 11 | Fax from David Holzer to Sandy (@ Lawley Richwood) Re: Addition to "personal items" with Appraisal for jewelry attached | 6/7/2005 | - | - | | David Holzer | 2 |
| 12 | Fax from David Holzer to Sandy (@ Lawley Richwood) Re: Adding watch to "our personal items" - with Receipt attached | 9/21/2005 | - | - | | David Holzer | 3 |
| 13 | Chubb Vehicle Premium Update | 4/21/2006 | ? | ? | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 1 (double-sided; missing page) |
| 14 | Chubb Masterpiece Policy Coverage Update | 6/13/2006 | 6/13/2006 | 6/13/2007 | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 15 | Chubb Masterpiece Policy Rate Sheet | 6/13/2006 | - | - | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 16 | Fax from David Holzer to Sandy (@ Lawley Richwood) Re: Adding Rolex to "floater policy" -- with Appraisal attached | 11/21/2006 | - | - | | David Holzer | 2 |
| 17 | Chubb Auto Insurance Policies (Vehicle ID Cards and Premium Summary Renewal) | 2/21/2007 | 4/21/2007 | 4/21/2008 | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 28 (double-sided) |

TT0006459

Project: 2852-1
David Holzer
Insurance Policies Identified

| Policy Number | Insurance Agent | Insurance Provider | Type of Policy | Annual Premium | Additional Information |
|---|---|---|---|---|---|
| 12170325-01 | Lawley Richwood (Hawthorne, NY) | Chubb | Homeowner's | $9,000/year | |
| 12170325-02* | | Chubb | | | "no sign of a policy with this number, but assume it may exist or have existed at one point |
| 12170325-03 | Lawley Richwood (Hawthorne, NY) | Chubb | Auto Insurance | $11,000+/year | |
| 12170325-04 | Lawley Richwood (Hawthorne, NY) | Chubb | Excess Liability | | Issued May 2005; described as a "$10,000,000 excess liability policy issued over 2 locations and five vehicles" |

TT0006460

American Express Account #s Identified

| American Express Account Number | Name on Account | Period Active | Notes |
|---|---|---|---|
| 3713-880330-14002 | Jennifer Holzer | 2004-2005 | All three cards linked via single Amex Platinum Card Account; have 2004 and 2005 Year-End Summaries |
| 3713-880330-13020 | David Holzer | 2004-2005 | |
| 3713-880330-13517 | Lesley Holzer | 2004-2005 | |
| 3717-500471-21026 | David Holzer | 2005? | Have single receipt showing large purchase on 9/21/05 |

TT0006461

| No. | Description | Document Date (if known) | Time Period Covered | | Account Number (if applicable) | Individuals on Account (if applicable) | Total Pages |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | | from | to | | | |
| 6 | Lawley Richwood Letter Re: Addition of Watches to Policy | 9/10/2004 | 6/13/2004 | 6/13/2005 | Policy #: 12170325-01 | David M. Holzer | 4 |

TT0006462

3

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

-------------------------------------x

JOHN RAPILLO AND HEIDI RAPILLO,

                          Plaintiffs,

                                    Civil Action No.

            -against-              09-CV-10429

                                      (GBD)

BARRY FINGERHUT, DAVID HOLZER,

FINGERHUT-HOLZER PARTNERS, LLC,

FINGERHUT-HOLZER EQUITIES, INC.,

FINGERHUT-HOLZER, INC., FINGERHUT-

HOLZER FUND L.P., GEO CAPITAL

PARTNERS, INC., FINGERHUT-HOLZER

THE WAVERLY I, LLC, FINGERHUT-

HOLZER THE WAVERLY II, LLC,

LESLIE HOLZER, DOUGLAS HOLZER,

JENNIFER HOLZER, JOSHUA HOLZER

and JOSEPH HOLZER,

                          Defendants.

-------------------------------------x

                          February 7, 2013

                          11:00 a.m.


        Deposition of BARRY FINGERHUT, taken by

Plaintiffs, pursuant to notice, at the offices

of Folkenflik & McGerity, 1500 Broadway, New

York, New York, before SUZANNE PASTOR, a

Shorthand Reporter and Notary Public within and

for the State of New York.

APPEARANCES:

MARSHALL, CONWAY & BRADLEY, P.C.
Attorneys for Plaintiffs
    45 Broadway
    New York, New York 10006
BY:   ROBERT J. CONWAY, ESQ.
    (212) 619-4444
    rconway@mcwpc.com

FOLKENFLIK & McGERITY, LLP
Attorneys for Defendants and the Witness
    1500 Broadway
    New York, New York 10036
BY:   MAX FOLKENFLIK, ESQ.
    (212) 757-0400
    mfolkenflik@fmlaw.com

ALSO PRESENT:
    JOHN RAPILLO
    HEIDI RAPILLO

[Page 2]

A.   July 2nd, 1945.
Q.   And your social security number?
A.   Social security number?
        MR. FOLKENFLIK:  We object.  Unless
there's a reason for it.
        MR. CONWAY:  I always ask pedigree.
        MR. FOLKENFLIK:  That doesn't
matter.  We'll object.  We'll talk about giving
you the social security number in a confidential
submission in the event that it becomes
important.  As you know, if this document were
ever submitted to the court, you'd have to
redact it anyhow.
        MR. CONWAY:  What we can do is ask
the reporter to include on it the last four
digits --
        MR. FOLKENFLIK:  Those are the four
digits that contain all the useful information.
So the answer is respectfully no.  I decline.
You can ask the judge.
Q.   What is your country of origin,
sir?
A.   My country of origin?
Q.   Of origin.
A.   The U.S.  But it's Washington, D.C.

[Page 4]

BARRY FINGERHUT,
residing at 7884 East Clinton Drive, Scottsdale,
Arizona 85260, having been first duly sworn by
the Notary Public (Suzanne Pastor), was examined
and testified as follows:
EXAMINATION BY
MR. CONWAY:
Q.   Mr. Fingerhut, I'm going to ask you
a number of questions.  If any of those
questions are unclear, please feel free to say
so.
        Sir, the address is 1230 West
Washington Street, Tempe, Arizona, that is a
business for you?
A.   Yes.
Q.   Could I have your residence address
there?
A.   7884 East Clinton Drive, that's in
Scottsdale 85260.
Q.   All right, sir, how old are you
today?
A.   How old am I today?
Q.   Yes.
A.   67.
Q.   And your date of birth?

[Page 3]

I'm not sure what that is.
Q.   That may not be ours.
A.   That's right.  That's where I was
born.
Q.   Where were you educated, sir?
A.   Where was I educated?
Q.   Yes.
A.   Undergraduate school at the
University of Maryland, and then graduate at
NYU.  That's an MBA.
Q.   What did you study at Maryland?
A.   At Maryland?
Q.   Yes.
A.   I had a BS degree.
Q.   In what?  Math, science?
A.   Actually, pre law.  Then I made the
right decision.  Got an MBA instead.
Q.   If this weren't a transcript, I'd
agree with you.
        And where did you find employment
after you left NYU?
A.   My initial job was at Aetna Life
and Casualty.
Q.   In what capacity?
A.   I was an investment analyst.

[Page 5]

[2]  (Pages 2 to 5)

1    Q.    What year was that?
2    A.    1969.
3    Q.    And for how long did you remain
4    with Aetna?
5    A.    Two years. 1971 I came back to New
6    York, worked for a firm called Weiss, Peck &
7    Greer.
8    Q.    Is Weiss Peck one word?
9    A.    No, two words.
10   Q.    And what was the business of Weiss,
11   Peck & Greer?
12   A.    They were investment advisors,
13   specialists and venture capitalists.
14   Q.    For how many years were you with
15   Weiss Peck?
16   A.    Let me see, I left Weiss Peck in
17   '78. I joined them in '71, so I guess that was
18   seven years. Then I went to a firm called First
19   Manhattan Company. And I left them --
20   Q.    Was that a bank or a private
21   investment house?
22   A.    It was an investment advisory firm.
23   And broker. Mainly investment advisory.
24   Q.    Had you become a broker at any
25   time?

[Page 6]

1    Q.    Did Geo Capital cease to exist at
2    that point or did it remain a legally viable
3    entity?
4    A.    When it was sold you mean?
5    Q.    Yes.
6    A.    No. It was sold and controlled
7    by -- or owned I should say by AMG. And part of
8    the deal was that I needed to stay for a certain
9    period of time, which I did, until 2003 I think.
10   Q.    Now, did Geo Capital have an
11   investment specialty? Oil, technologies,
12   foreign, whatever it may be.
13   A.    We did.
14   Q.    What was that specialty?
15   A.    We were small cap investors. And I
16   was an asset -- an investor, if you will.
17   Q.    Did Geo Capital invest with its own
18   money or clients' money?
19   A.    No, no, it was an advisory firm.
20   It wasn't our capital. It was all clients.
21   Q.    Did you have any affiliation with
22   any other investment firm that did directly own
23   stocks or equities or bonds or anything of that
24   nature?
25   A.    I'm not sure what you mean by

[Page 8]

1    A.    No. Well, I shouldn't say that. I
2    passed the exams that you need -- well, that's
3    not really brokerage. It's really a -- it's a
4    Wall Street partnership, it's a GS65 I think.
5    Whatever it is. It's a capital --
6    Q.    Were you working off someone else's
7    license or the firm license?
8    A.    No, no. I just needed to pass this
9    to become a general partner. But it was really
10   an advisory firm.
11   Q.    Did you ever yourself practice as a
12   broker?
13   A.    No. I'm not a broker.
14   Q.    And for how many years were you
15   with First Manhattan?
16   A.    I left there in the spring of 1981
17   to join a partner at a firm called Geo Capital
18   Corp. That is a registered investment advisory
19   firm. We sold the firm in 1997. I needed to
20   stay --
21        MR. FOLKENFLIK: Just wait until he
22   asks a question.
23   Q.    To whom was that firm sold in 1997?
24   A.    Affiliated Managers Group. AMG is
25   the ticker symbol.

[Page 7]

1    "relationship."
2    Q.    While you were working for Geo
3    Capital, did you have any sideline occupations
4    or investments?
5    A.    The only thing that we did
6    separately was, this is another entity, but my
7    partner and I with another partner formed an
8    operation called Weekly Partners, which was a
9    venture fund, or a venture partnership I should
10   say. We now have seven partnerships in Weekly
11   Partners. That was started in '92.
12   Q.    All right, and that's still an
13   operational business?
14   A.    Yeah, but the business is -- I
15   mean, the funds are ending.
16        MR. FOLKENFLIK: He'll ask a
17   question. You just answer his question.
18   Q.    And who were the people with whom
19   you founded Weekly?
20   A.    One was my partner at Geo, his name
21   was Irwin Lieber. And the other was Barry
22   Rubinstein.
23   Q.    Now, when Geo was purchased, did
24   you move on to a different professional vehicle?
25        MR. FOLKENFLIK: He already

[Page 9]

[3]  (Pages 6 to 9)

1  answered that he stayed with Geo Capital for
2  seven years.
3      Q.   Yes, you stayed with Geo. When Geo
4  was sold --
5          MR. FOLKENFLIK: After it was sold
6  he stayed.
7      Q.   After it was sold did you continue
8  to stay with Geo?
9      A.   Yes. I couldn't leave. That was
10  part of the deal.
11     Q.   So you stayed until 2005?
12     A.   No. Late 2003 or 2004.
13     Q.   And did you leave by mutual
14  agreement?
15         MR. FOLKENFLIK: He sold the
16  business.
17     Q.   You then sold the remainder of the
18  business that was yours.
19         MR. FOLKENFLIK: He sold the entire
20  business and he had to stay on as part of the
21  contract.
22     A.   That was the deal.
23     Q.   So if the contract extended for
24  seven years and you leave in 2003, you would
25  have left in five years. I presume -- you left

[Page 10]

1  by agreement --
2      A.   It was '97 when we sold it. Then I
3  think I left in maybe it was early 2004. But it
4  was around that time.
5      Q.   All right, your contract with
6  them -- your obligations to them expired.
7      A.   Correct.
8      Q.   What did you then do?
9      A.   I formed what I thought was a
10  family partnership.
11     Q.   With whom?
12     A.   With David Holzer.
13     Q.   And what year was that?
14     A.   2004 I believe.
15     Q.   We have been sent a document
16  identified as the Fingerhut-Holzer Fund LP
17  Limited Partnership agreement date October 1 of
18  2004. Does that sound like the organization
19  that you founded at that time?
20     A.   That was I think an entity.
21     Q.   Why don't you take a look at that.
22         (Fingerhut Exhibit 1 for
23  identification, Bates No. BF 90 through 112)
24     Q.   Sir, can you identify that document
25  that's been passed to you?

[Page 11]

1      A.   Yes.
2      Q.   And what is that document?
3      A.   What is it.
4      Q.   Yes. What was it intended to be?
5      A.   It was a partnership agreement to
6  do a limited partnership, an investment vehicle.
7      Q.   And is that the memorialization of
8  an arrangement between yourself and David Holzer
9  for the operation of a business known as
10  Fingerhut-Holzer Partners?
11         MR. FOLKENFLIK: Excuse me. Its'
12  Fingerhut-Holzer Fund LP. Correct?
13         MR. CONWAY: Yes.
14         MR. FOLKENFLIK: Fingerhut-Holzer
15  Fund LP.
16     Q.   Is there a Fingerhut-Holzer
17  Partners LLC document?
18     A.   Here? I don't see it here.
19     Q.   Does one exist?
20     A.   I believe so.
21     Q.   And where would that be?
22     A.   Probably by your left hand.
23     Q.   What I have is the operating
24  agreement of October 25th, 2007.
25     A.   I don't know. I don't know the

[Page 12]

1  answer to that.
2          MR. FOLKENFLIK: I will represent
3  that we contacted the, for want of a better
4  word, corporate lawyers who were representing
5  Mr. Fingerhut in connection with the formation
6  of a number of these businesses and whatever
7  documents they were able to find about the
8  organizational structure of the Fingerhut-Holzer
9  entities we produced.
10         MR. CONWAY: All right, now, by
11  counsel, was that lawyers who were responsible
12  for the drafting of the document in 2004?
13         MR. FOLKENFLIK: Either responsible
14  for the drafting of the document in 2004 or
15  successors to the person who drafted the
16  document.
17     Q.   Let me ask you this. Sir, what law
18  firm drafted the initial arrangement between
19  yourself and Mr. Holzer?
20     A.   I don't remember the name. I mean,
21  it's on the document.
22         THE WITNESS: Do you remember the
23  name?
24         MR. FOLKENFLIK: No.
25     Q.   Was there --

[Page 13]

1    A.    They're on Third Avenue and 54th
2  Street, I know that. But I don't remember the
3  name.
4          MR. CONWAY:  Counselor, if you
5  could, is there anything --
6          MR. FOLKENFLIK:  If you want the
7  name of the firm I contacted, leave a space in
8  the transcript and I'll supply it to you.
9  INFORMATION REQUESTED TO BE SUPPLIED:
10     Law Firm I Hired to Draft Corporate Documents
11     Q.    Now, in 2004, did you determine to
12  open a business with David Holzer?
13     A.    I just told you.
14     Q.    And you indicated that you thought
15  that was a family business.
16     A    A family business to the extent
17  that it was only us making investments.
18     Q.    By "us" do you mean you and
19  Mr. Holzer?
20     A.    Mm-hmm.  I thought so.
21     Q.    Excuse me?
22     A.    At least I thought so at the time.
23     Q.    And when and where did you meet
24  Mr. Holzer for the first time?
25     A.    Oh, lord.  Probably -- well, he was

[Page 14]

1  a trader for Breen Murray and I was doing
2  business with Breen Murray probably about the
3  time I joined Irwin in Geo Capital.  That's like
4  early '80s.  So it was 22 -3 years.
5     Q.    Sure.  You finish then and I go,
6  You had known him for two or three years?
7     A.    23 years.
8     Q.    And had Mr. Holzer been involved in
9  business transactions with you over those 23
10  years?
11     A.    Mr. Holzer was a broker I used in
12  buying securities and selling securities in Geo
13  Capital as us being a registered advisor.
14     Q.    During the 23 years you knew him
15  prior to the creation of Fingerhut-Holzer
16  Partners, had you ever been aware of any
17  criminal investigations involving Mr. Holzer by
18  any authority?
19     A.    No.
20     Q.    Had you ever heard of any lawsuits
21  filed against him for his work or the manner in
22  which he operated as a broker.
23          MR. FOLKENFLIK:  And this is in
24  what period?
25     Q.    In the 23 years prior to the

[Page 15]

1  founding of Fingerhut-Holzer Partners.
2     A.    No.
3     Q.    Did the two of you develop a social
4  relationship during those 20 years in addition
5  to being --
6     A.    Yes.  But it was primarily
7  business.  I mean, I knew his family,
8     Q.    You saw each other on occasion, but
9  it was principally business.
10     A.    It was pretty rare.
11     Q.    When you saw each other socially,
12  what type of relationship did you have?  Dinner,
13  traveling?
14     A.    I think it was dinner a couple of
15  times.  But we -- well, it wasn't at that point.
16  Later there was a safari we went on.  But that
17  wasn't until after 2004.
18     Q.    Now, what prompted you prior to
19  2004 to select David Holzer to go into business
20  with?
21     A.    Well, I talked to him every day,
22  probably every business day a few times.  Got to
23  know him pretty well, thought he was -- I
24  thought he was a pretty good trader.  You gotta
25  understand what trading meant back then.

[Page 16]

1     Q.    All right, tell me what trading
2  meant back then.
3     A.    Well, first of all, you have to
4  understand that the types of positions that we
5  owned were small companies.  Relatively
6  illiquid.  We used initially a base of -- a top
7  of a hundred million in market value, so as we
8  got larger we owned more and more different
9  companies.  Got to a point where we had -- we
10  filed 13Gs, which are 5 percent or greater as an
11  advisor, not as an independent person, on about
12  40 companies.
13          So buying and selling securities
14  was important in the sense of who you used, what
15  firm you used, how deep they made the market, et
16  cetera.  It was not like buying IBM, that kind
17  of stuff.
18     Q.    Mm-hmm.
19     A.    Pretty much continues to be like
20  that now.
21     Q.    Now, the 40 companies would have
22  been owned by Geo Capital?
23     A.    No, they would be owned by the
24  clients of Geo Capital.  We managed money, when
25  I started we were about -- when I joined my

[Page 17]

1  partner we had about 60 million under
2  management.
3      Q.   So --
4      A.   When we sold we were about -- well,
5  by the time I left in 2004, we were about 3
6  billion.
7      Q.   So Geo was essentially a management
8  company that --
9      A.   Investment advisory firm.
10     Q.   Investment advisory. And clients
11 would place money with you to be invested based
12 upon your best judgment, but the money continued
13 to be the clients'. It was not your money.
14     A.   Correct. Clients made a fee for us
15 to manage their money.
16     Q.   And at its height Geo managed how
17 large a total --
18     A.   About 3 billion.
19     Q.   And that would be 3 billion in
20 2003?
21     A.   Yeah, 2003/2004. When we sold it
22 was about -- in '97 it was like two and a
23 quarter billion. This, by the way, is a large
24 amount for smaller cap. You should know.
25     Q.   Now, when you severed your

[Page 18]

1  relationship with Geo Capital, you were then
2  opening a new venture for yourself?
3      A.   Yes.
4      Q.   And were you intending to in the
5  venture invest your own money or also
6  clients' --
7      A.   My own money.
8      Q.   Principally your own or investors'
9  money?
10     A.   I'm sorry.
11         MR. FOLKENFLIK: He just answered
12 the question.
13     Q.   You were planning to invest your
14 own money in Fingerhut-Holzer Partners?
15         MR. FOLKENFLIK: Answer out loud.
16 Don't just shake your head.
17     Q.   You have to answer orally so that
18 the --
19     A.   Yes.
20     Q.   Now, was it also your intent under
21 Fingerhut-Holzer Partners to invest for other
22 people and guide their --
23     A.   Not necessarily. That was not my
24 initial idea. I could have stayed at Geo for
25 that.

[Page 19]

1      Q.   At the time that you were looking
2  for a partner --
3         MR. FOLKENFLIK: Objection.
4      Q.   At the time you were setting up for
5  your next venture after Geo --
6      A.   I already had a next venture. I
7  had Weekly at this time, too.
8      Q.   Weekly also. For what particular
9  purpose were you setting up a venture with
10 Mr. Holzer? What was different from
11 Fingerhut-Holzer than from Weekly?
12     A.   Weekly we didn't -- this was not
13 our money in Weekly. Weekly was a limited
14 partnership. The difference being -- you know
15 the difference between an advisory firm and a
16 partnership.
17     Q.   Yes.
18     A.   So in Weekly we could be both
19 general partners and to a certain extent limited
20 partners. But we were essentially managing
21 other people's money also in Weekly. In that
22 case it was primarily institutional money.
23 Actually so was Geo. But Fingerhut-Holzer was
24 just family monies.
25     Q.   Fingerhut-Holzer was to be the

[Page 20]

1  vehicle for the investment of your own money.
2      A.   Correct.
3      Q.   Now, did there come a time when you
4  and Mr. Holzer came to an oral agreement to set
5  up a firm together? This is before you sit down
6  with lawyers, did you agree to do business
7  together?
8      A.   Yes.
9      Q.   Did Mr. Holzer have a similar sum
10 of money to invest in Fingerhut-Holzer Partners
11 as did you?
12     A.   I don't know what he had, but he
13 certainly gave me the impression that he had
14 capital. I didn't ask him the specific number.
15     Q.   And when you agreed to go into
16 business together, did the two of you
17 subsequently sit down with lawyers for the
18 purpose of drafting a document to memorialize
19 your arrangement?
20     A.   Yes.
21     Q.   All right, and do you at this time
22 remember the name of the lawyers that you sat
23 down with?
24     A.   It's the same group I just
25 mentioned that I don't remember the name.

[Page 21]

1       MR. FOLKENFLIK: Well, we had
2   received materials from Manning Fulton --
3       THE WITNESS: That's Kevin. That's
4   his new firm.
5       MR. FOLKENFLIK: And Fulton &
6   Skinner PA. Pardon me?
7       THE WITNESS: That's not the guys
8   who set it up. This is the guy from North
9   Carolina who I've used now for about 12, 15
10  years.
11      Q.   Are you still doing business with
12  him?
13      A.   Not the guys who set up the fund.
14  The firm. Those were a different group. This
15  is a guy I've used now for just about everything
16  I've done since I don't know how long. It's a
17  long time.
18      Q.   Manning Fulton & Skinner is the law
19  firm in North Carolina?
20      MR. FOLKENFLIK: Yes.
21      MR. CONWAY: Do we have an address,
22  by counsel?
23      THE WITNESS: He just moved there
24  last week. He was with Williams & Mullin. Do
25  you know that firm?

[Page 22]

1       Q.   No.
2       A.   He's in Raleigh.
3       MR. FOLKENFLIK: He's in Raleigh,
4   North Carolina.
5       Q.   The gentleman who you followed to
6   Manning, Fulton & Skinner, what was his name?
7       A.   Kevin Prakke, P-R-A-K-K-E.
8       Q.   And he was with the law firm that
9   set up Fingerhut-Holzer Partners?
10      A.   No. He was the one who I have used
11  for a long time. The guys who set up that, I
12  don't remember their names, as I've said
13  already.
14      Q.   They were also in North Carolina?
15      A.   No. They were on Third Avenue in
16  the 50s. But I don't remember their name.
17  Obviously that was --
18      Q.   Forgive me just for checking my
19  records.
20          If we leave a blank in the records,
21  do you think you'll be able to find the --
22      A.   I should.
23  INFORMATION REQUESTED TO BE SUPPLIED:
24      Law Firm Representing Fingerhut-Holzer
25  Partners

[Page 23]

1       Q.   Do you know if that firm on Third
2   Avenue in New York in the 50s is still an
3   operating entity?
4       A.   I think so. I think so.
5       Q.   Now, do you recall if you and
6   Mr. Holzer sat down together to discuss the
7   arranging of Fingerhut-Holzer Partners?
8       A.   I believe so.
9       Q.   And was there eventually prepared a
10  document which announced the existence of a
11  relationship between yourself and Mr. Holzer as
12  business partners?
13      MR. FOLKENFLIK: Announced?
14      Q.   Not announced. Created.
15  Established.
16      MR. FOLKENFLIK: Do you mean was
17  there an operating agreement?
18      Q.   Well, first, was there a document
19  that was prepared that indicated an ongoing
20  arrangement between yourself and Mr. Holzer to
21  do business together?
22      A.   My assumption is yes. The LLC was
23  set up for that reason.
24      Q.   And there was a Fingerhut-Holzer
25  Partners LLC. Was that set up in Delaware or in

[Page 24]

1   New York?
2       A.   It was set up on Third Avenue. I
3   don't know where the hell it was. Either one,
4   I think it was Delaware actually.
5       Q.   Your operating agreement of 2007
6   refers to a Delaware limited liability company.
7       A.   Okay. Good guess. You don't have
8   the law firm there?
9       Q.   I believe Mr. Holzer used the name
10  of a law firm in his deposition. I do not have
11  his deposition transcript with me. But he may
12  have identified it.
13      MR. FOLKENFLIK: I don't believe he
14  did. I just reread it yesterday.
15      MR. CONWAY: He may not have used
16  the name. I remember him saying there was a law
17  firm in New York that did their work. He may
18  not have included the name.
19      MR. FOLKENFLIK: That's the law
20  firm Mr. Fingerhut is referring to on Third
21  Avenue I believe.
22      Q.   When a corporation was set up in
23  Delaware --
24      A.   I think this is LLC.
25      Q.   When a limited liability

[Page 25]

1  corporation was set up known as Fingerhut-Holzer
2  Partners, was there an arrangement for each of
3  you to share in that corporation?
4      MR. FOLKENFLIK: That arrangement
5  is reflected in the operating agreement. Which
6  we've produced to you.
7      MR. CONWAY: Dated October 25th,
8  2007.
9      Q.   For the period prior to 2007, was
10 there an agreement between the two of you to
11 share in the investments and in the profits of
12 Fingerhut-Holzer Partners?
13     A.   I can't tell you. I don't
14 remember.
15     Q.   When you went into business with
16 Mr. Holzer, what was the arrangement that you
17 understood to be memorialized in the
18 corporation?
19     MR. FOLKENFLIK: Go ahead.
20     A.   I think it was fairly
21 straightforward. It was both of us investing,
22 and in one way or another, I don't remember
23 exactly, sharing the profits. But again, this
24 was essentially a family office.
25     Q.   Now, by both investing, was the

[Page 26]

1  intention that each of you would produce the
2  same amount of money to invest?
3      A.   Not necessarily.
4      Q.   Was it understood that each of you
5  would benefit equally from the good work of
6  Fingerhut-Holzer Partners?
7      MR. FOLKENFLIK: What does that
8  mean?
9      A.   I don't understand that.
10     MR. FOLKENFLIK: Objection.
11     Q.   Would you each take profits on a
12 50/50 basis?
13     A.   I think it was basically only --
14 there were no profits per se that would be
15 outside of the monies managed. If you see what
16 I'm saying.
17     Q.   Yes, I do.
18     A.   The profits would be a function of
19 how much you had in it. And you should
20 understand that I was the one who was the
21 investor.
22     Q.   We're just about to get there.
23          Was there a division of
24 responsibility between the two of you in the
25 operating of Fingerhut-Holzer Partners?

[Page 27]

1      A.   I was the one who was the investor.
2      Q.   By using the term "investor" you
3  were the one who picked the investments and
4  decided what sums were to be invested?
5      MR. FOLKENFLIK: Answer out loud.
6      A.   Yes. Yes, yes, yes.
7      Q.   And what function did Mr. Holzer
8  serve?
9      A.   Basically was doing the trading.
10     Q.   Now, in the furtherance of this
11 business, did you open a place of business?
12     A.   We had an office.
13     Q.   And where was that?
14     A.   The initial office was in Citicorp
15 Center.
16     Q.   In the Citicorp building?
17     A.   Mm-hmm.
18     Q.   For how long were you in the
19 Citicorp building?
20     A.   That's a good question. Long after
21 Fingerhut-Holzer, but let's see, it was 2004 I
22 guess we were there. And then I left. We
23 subleased from Park Avenue Equities.
24     Q.   Was that the premises at 399 Park
25 Avenue?

[Page 28]

1      A.   Yes. And they moved in -- I think
2  they moved in 2006 maybe. 2006. To 149 East
3  49th Street, just south of Saks where I leased
4  space.
5      Q.   149?
6      A.   David wasn't there at that time.
7      Q.   149 East 49th Street?
8      A.   Yes, I think it was 149. Maybe 140
9  East 49th. Beautiful building.
10     Q.   And that would be after
11 Mr. Holzer's difficulties.
12     A.   He was gone. But until that time I
13 was at Citicorp.
14     Q.   Do you recall when you opened the
15 premises at 399 Park Avenue?
16     A.   It was sometime around that time,
17 2004.
18     Q.   Now, what was the division of
19 operations between the Citicorp building and 399
20 Park Avenue? What did you do in each place?
21     A.   399 Park was the Citicorp Center.
22     Q.   I'm sorry.
23     A.   You mean the other one?
24     Q.   Yes.
25     A.   Same thing.

[Page 29]

[8]  (Pages 26 to 29)

1    Q.  What did you do in the two places?
2      MR. FOLKENFLIK: They didn't -- I
3 don't believe, but you ask the witness, that
4 they had both offices simultaneously.
5    A.  No, no, we didn't.
6      MR. FOLKENFLIK: They just moved.
7 They moved their office.
8    A.  It wasn't "we," it was me going to
9 49th Street when the guy --
10    Q.  When David left.
11    A.  No.  When Bill Mayer ran Park
12 Avenue Equities moved his office to 140 East
13 49th Street.  So I went with him.  That's all.
14 Citicorp wanted $125 a square foot rent.
15 Ridiculous.
16    Q.  Now, when you're referring to the
17 Citicorp building and 399 Park Avenue, you're
18 referring to the same office?
19    A.  Yes.
20    Q.  And the signage at 399 Park Avenue,
21 that was Fingerhut-Holzer Partners?
22    A.  Yes.
23      MR. FOLKENFLIK: LLC?
24    A.  LLC.
25    Q.  LLC.  And how large a space was

[Page 30]

1 that?
2    A.  Good question.  I'd say 2500 square
3 feet, something like that.  The office in total
4 was maybe twice that size, but we only occupied
5 part of that office.
6    Q.  Did you have a superior landlord?
7    A.  I didn't think he was that good.  A
8 superior landlord.  We subleased.
9    Q.  Subleased from whom?
10    A.  From Park Avenue Equities.
11      MR. FOLKENFLIK: Do you mean to ask
12 who was the master lessor?
13    Q.  Yes, that's fine.
14      MR. FOLKENFLIK: If you know.
15    A.  I don't think it was -- this was a
16 very odd situation.  They subleased from another
17 group, I don't remember the name of the other.
18 From my perspective, I only subleased from Park
19 Avenue Equities.
20    Q.  Do you know if there still exists a
21 lease for Fingerhut-Holzer Partners LLC for that
22 space?
23    A.  There wasn't a lease when we
24 left -- when I left Citicorp Center.
25    Q.  All right, was this a handshake

[Page 31]

1 agreement between you?
2    A.  Yes.
3    Q.  Who were you shaking hands with?
4    A.  Bill Mayer.  In fact, I use his
5 office now when I come to the city.  He's moved
6 again.
7    Q.  Now, would you describe the space
8 that you tenanted at 399 Park Avenue?  How many
9 offices, file rooms, conference rooms?
10      MR. FOLKENFLIK: Let me say,
11 Mr. Conway, I recognize that under the federal
12 rules the way to respond to questioning that is
13 irrelevant is to terminate the deposition and
14 seek a court order.  But you have --
15      MR. CONWAY: Not with a guy in
16 Arizona.
17      MR. FOLKENFLIK: You have requested
18 the witness to come from out of town and these
19 questions have less than zero to do with the
20 claims in this case.
21      MR. CONWAY: They don't.
22      MR. FOLKENFLIK: As to what the
23 file room looked like.
24      MR. CONWAY: No, no, the
25 question --

[Page 32]

1      MR. FOLKENFLIK: All of these
2 questions --
3      MR. CONWAY: The question is what
4 did the office look like.
5      MR. FOLKENFLIK: And that has zero
6 to do with the facts at issue in the case.  I'm
7 just mentioning it because there may come a time
8 when I will terminate the deposition and we'll
9 move on.
10    A.  There were three -- basically three
11 offices and then like a secretarial area for a
12 couple desks.
13    Q.  And who were the employees of
14 Fingerhut-Holzer Partners LLC?
15    A.  Well, the most important was Jackie
16 Cohen, who was my secretary.
17    Q.  Did you maintain an office there
18 for yourself?
19    A.  I had an office there.
20    Q.  Did Mr. Holzer have an office
21 there?
22    A.  Yes.
23    Q.  And the third office went to
24 Jackie?
25    A.  No.  No.

[Page 33]

[9]  (Pages 30 to 33)

**[Page 34]**

1  Q.  Who --
2  A.  Jackie was the secretary.
3  Q.  What was Jackie's last name?
4  A.  Cohen.
5  Q.  And who else worked in that space?
6  A.  David's daughter.
7  Q.  What was her name?
8  A.  I don't remember. I don't
9  remember.
10  Q.  Was the space --
11  A.  She was -- I guess she was the
12  secretary. I'm not sure what she did.
13  Q.  Were there any other family members
14  that worked there?
15  A.  Yes, one of his sons worked there.
16  And I'm sorry, I had another employee, too.
17  There was a guy name Brandon Blum, who was like
18  a treasurer.
19  Q.  Did Mr. Holzer do his trading out
20  of that office?
21  A.  I believe so.
22  Q.  And did you spend time at that
23  office?
24  A.  Every day. Just about.
25  Q.  We've been given a document, I'll

**[Page 35]**

1  ask that it be marked.
2  (Fingerhut Exhibit 2 for
3  identification, Bates No. BF 07)
4  Q.  What exactly is that, sir?
5  A.  Beats me. I can't even see it.
6  Obviously the schedule -- the investment
7  schedule.
8  Q.  Now, there's a document -- are you
9  familiar with that document?
10  A.  Yes.
11  Q.  What is that document?
12  A.  The schedule of investments that we
13  made at FH.
14  Q.  And FH is Fingerhut-Holzer?
15  A.  Yes.
16  Q.  Does the left column indicate the
17  name of particular investment vehicles that
18  would be under a Fingerhut-Holzer umbrella?
19  A.  Yes.
20  Q.  Could you indicate any familiarity
21  with those investments?
22  A.  Say that again.
23  Q.  Could you indicate any familiarity
24  with those investments?
25  A.  I have familiarity with all.

**[Page 36]**

1  Q.  Could you go down that column and
2  tell us what they are.
3  A.  Okay. I wish I had my glasses.
4  Q.  Do you need a pair of glasses?
5  MR. FOLKENFLIK: Do you have a
6  better copy?
7  MR. CONWAY: No. This is what you
8  sent us.
9  MR. FOLKENFLIK: Yeah, but I
10  printed out the same copy I sent to you and it's
11  legible.
12  MR. CONWAY: Do you want to blow
13  this up?
14  MR. FOLKENFLIK: I can get another
15  copy.
16  A.  It doesn't matter.
17  Q.  Do you need glasses?
18  MR. FOLKENFLIK: It's okay.
19  A.  A real estate investment in
20  Jacksonville, CE Technology --
21  Q.  Who are Barry/David Partners?
22  MR. FOLKENFLIK: Why don't we go in
23  order.
24  Q.  Yes, down the line. What is
25  Barry/David Partners?

**[Page 37]**

1  A.  That's probably the general partner
2  of this investment.
3  Q.  By Barry/David, is that the two of
4  you? Barry, you, and David, Mr. Holzer?
5  A.  I would suspect so.
6  Q.  Below that?
7  A.  Does that say CE Tech?
8  Q.  CE Tech, yes.
9  A.  CE Tech was a technology company
10  involved in training. And I can't see what
11  it's --
12  Q.  DH Breen Murray Investment.
13  A.  I don't know what that is.
14  MR. FOLKENFLIK: Why don't I get
15  another copy, Barry.
16  THE WITNESS: Okay.
17  MR. CONWAY: And of course we'll
18  say nothing in your absence.
19  (Recess taken.)
20  MR. FOLKENFLIK: Exhibit 3 is a
21  cleaner copy of the document that's been marked
22  that bears production number BF 000007.
23  (Fingerhut Exhibit 3 for
24  identification, Legible Copy of Bates No. BF 7)
25  Q.  We have replaced Exhibit 2 with

1   Exhibit 3 which is a larger copy of Exhibit 2.
2       Sir, is this a document which would
3   have been kept in the ordinary course of the
4   business of Fingerhut-Holzer Partners?
5       A.   I would suspect yes. This is just
6   a compilation of investments.
7       Q.   And would it be part of the
8   business of Fingerhut partners to keep such a
9   document?
10      A.   Yes.
11      Q.   And would such a document be made
12  contemporaneously with the information included
13  herein?
14      MR. FOLKENFLIK: By
15  "contemporaneously with the information," do you
16  mean that the document -- that each time there
17  was an investment, simultaneously the number was
18  recorded on the sheet?
19      MR. CONWAY: Not necessarily on
20  this sheet, but it would have been recorded so
21  that it could in time be placed on this sheet.
22      MR. FOLKENFLIK: Why don't you just
23  ask the witness how this document was prepared
24  or for what purpose.
25      MR. CONWAY: Okay, I want to be

[Page 38]

1   sure it's admissible.
2       Q.   Sir, how exactly was this --
3       MR. FOLKENFLIK: I will stipulate
4   to the admissibility of this document.
5       Q.   Sir, how would this document be
6   prepared?
7       MR. FOLKENFLIK: How was it
8   prepared?
9       Q.   How would it be prepared?
10      A.   It was compiled as a function of
11  the investment. It probably would have been
12  prepared by Brandon Blum, our treasurer.
13      Q.   Continuing down, what is DH Breen
14  Murray Investment?
15      A.   I'm not certain what that is.
16      Q.   What is Edu Fund?
17      A.   Edu Fund was a company involved in
18  educating -- well, education, but basically
19  financing student loans for foreign students in
20  the states.
21      Q.   What is KLI?
22      A.   KLI is Knox Lawrence. And it's a
23  company that essentially -- at this time at
24  least was essentially a merchant banker. They
25  owned different types of investments.

[Page 39]

1       Q.   And from reading this document, can
2   you indicate what type of investments
3   Fingerhut-Holzer Partners participated in?
4       MR. FOLKENFLIK: At Knox Lawrence.
5       Q.   At Knox Lawrence, yes.
6       A.   That Fingerhut-Holzer Partners I
7   believe is just a GP piece of the overall
8   investment in Knox Lawrence.
9       Q.   It's indicated below that there is
10  a letter of credit.
11      A.   Okay.
12      Q.   Of $100,000. How did
13  Fingerhut-Holzer come to be in possession of
14  that?
15      A.   It's a good question. I have no
16  idea. We didn't use a letter of credit. This
17  was something supposedly -- well, you see what
18  it is.
19      Q.   Can you tell me what it is, based
20  upon the document?
21      A.   No.
22      Q.   Below that, Upstate New York Real
23  Estate. What is that?
24      A.   What is it or what did I think it
25  was?

[Page 40]

1       Q.   What do you think that means?
2       A.   That means investments that we in
3   theory made in Haverstraw and a number of other
4   spots upstate in New York.
5       Q.   And below that, Tango Publishing
6   Corporation.
7       A.   That was a company involved in a
8   website called Your Tango about women's love and
9   relationships.
10      Q.   And was Fingerhut-Holzer making
11  investments in Tango Publishing?
12      A.   Yes.
13      Q.   Below that --
14      A.   I'm the chairman.
15      Q.   You're the chairman of Tango?
16      A.   Mm-hmm.
17      Q.   Is Tango still an active
18  corporation?
19      A.   Yes.
20      Q.   Below that, the Waverly, what is
21  that?
22      A.   That is real estate development in
23  Jacksonville. Or was.
24      Q.   Now, in the columns next to it,
25  intended FP contributions, intended DH

[Page 41]

1   contributions and total contributions, what does
2   that mean?
3       A.   That means that there was a number,
4   a total of 5.7 million, of which I had supplied
5   half and was -- assuming that the other half
6   would be supplied by Holzer.
7       Q.   Below that, C Campus Corporation,
8   what is that?
9       A.   It's no more, but that was a
10  company involved in education, basically in
11  building websites, maintaining websites for a
12  lot of member organizations. ISC Squared, a
13  number of nonprofits.
14      Q.   Now, in the column that reads
15  "total investments," it's indicated 2.3 million.
16  And apparently each of you and Mr. Holzer to
17  contribute 1,150,000. Does this document
18  reflect that each of you had actually
19  contributed 1,150,000 --
20      A.   No.
21      Q.   -- to the --
22      A.   It shows me advancing a certain
23  portion to Holzer.
24      Q.   All right, so as we move to the
25  next column, "gross total funds by Barry

[Page 42]

1   comport with?
2       A.   Waters Edge was another real estate
3   development, and these are different portions of
4   investments at different times in the
5   development.
6       Q.   Now, as we proceed to the second
7   column, these would be the intended
8   contributions by Barry Fingerhut. The third
9   column is "Intended David Holzer investment
10  contributions," and in most instances that is
11  equal, correct?
12      A.   Yes.
13      Q.   And the fourth column reflects how
14  much was actually paid on the investment by you.
15      A.   Yes.
16      Q.   The fifth column indicates how much
17  on the investment was actually paid by David
18  Holzer.
19      A.   Yes. Not much.
20      Q.   And in the investment totals, if
21  I'm correct, reading from the document Barry
22  Fingerhut had advanced $19,302,501.
23      A.   19 million?
24      Q.   That's what it says. Am I reading
25  19 million?

[Page 44]

1   Fingerhut to David Holzer." You would have
2   advanced 2,812,500, and --
3       A.   Wait a minute, are you talking
4   about -- that's Waverly.
5       Q.   Excuse me. V Campus. You would
6   have advanced $650,000, and the column of "David
7   Fingerhut to BF" contains --
8       A.   That's David Holzer.
9       Q.   David Holzer to Barry Fingerhut,
10  that includes nothing. So does that mean that
11  you made the contribution of $650,000?
12      A.   Yes.
13      Q.   And Mr. Holzer made nothing?
14      A.   Correct.
15      Q.   And as we look below that at the
16  investment Waters Edge --
17      A.   Village Walk first.
18      Q.   Village Walk, what is Village Walk?
19      A.   That's another real estate
20  development down in Jacksonville.
21      Q.   And below that there is Waters Edge
22  initial investments.
23      A.   Mm-hmm.
24      Q.   Waters Edge with a date, Waters
25  Edge with another date. What do those numbers

[Page 43]

1       A.   I'm not sure where you're looking
2   at. On the bottom? Sorry.
3       Q.   $19,302,501, is that correct?
4       A.   That's what it says.
5       Q.   And in the David Holzer column,
6   $7,385,500 contributed by him. Correct?
7           MR. FOLKENFLIK: What is the
8   number?
9       A.   No.
10      Q.   7,385,500 is the David Holzer
11  total.
12          MR. FOLKENFLIK: No --
13      Q.   That's by you --
14      A.   To me.
15      Q.   -- to you. Okay, got it. The
16  David Holzer column is only $111,000.
17      A.   Correct.
18          MR. FOLKENFLIK: That's DH to BF.
19      Q.   The third column, the 19,302,501,
20  over and above your contribution, where did the
21  rest of that money come from?
22      A.   It wasn't made.
23      Q.   The 19 million was an intended
24  investment that was not funded, is that correct?
25      A.   That's what it looks like.

[Page 45]

1      **Q.**  And we have your funding of
2  $7,385,500, and Mr. Holzer's funding of
3  $111,000, correct?
4      **A.**  That's what it says.
5      **Q.**  The next column is the net total --
6      **A.**  By the way, you skipped one
7  investment.
8      **Q.**  I did? Which one?
9      **A.**  Zing.
10      **Q.**  What is Zing?
11      **A.**  Zing is actually a company called
12  Coalition Works. They are a company that's
13  monetized food coupons. The kind you clip in
14  the weekends.
15      **Q.**  Now, this document does not bear a
16  date. Do you know what year this document would
17  have been created?
18      **A.**  It was 2007 for sure because you
19  could see that the latter investments are made
20  in that period.
21      **Q.**  Now, the Waters Edge investments
22  are after 2007.
23      **A.**  No. They're during 2007.
24      **Q.**  During 2007.
25      **A.**  Correct. And Tango also I see.

[Page 46]

1      **Q.**  Now, proceeding to the right there
2  is a column identified as "net total funds
3  advanced by Barry Fingerhut to David Holzer."
4  At the bottom of that column the number is
5  7,274,500.
6      **A.**  Yes.
7      **Q.**  And did you consider that an
8  indebtedness by Mr. Holzer to you?
9      **A.**  I'm not certain how to answer that.
10  I would assume yes.
11      **Q.**  The next column is "net ownership."
12  The bottom figure is 17,579,500. How should we
13  interpret that column?
14      **A.**  I think it's pretty clear the way
15  you should interpret it. The ownership was that
16  I fronted the majority, more than the majority,
17  just about every penny that was supposedly to be
18  supplied by Holzer.
19      **Q.**  Now, the --
20      **A.**  In addition to my own.
21      **Q.**  Sure. The BF ownership
22  contributions and the DH ownership contributions
23  result in a differential of about 10 to 1. If
24  you look at the bottom of your column, 17
25  million, and Mr. Holzer's column of $1,700,000.

[Page 47]

1  That would be approximately a 10 to 1 ratio to
2  your benefit.
3      **A.**  Yes.
4      **Q.**  Did this constitute a
5  disappointment to you?
6      **A.**  Are you kidding?
7      **Q.**  No, I'm afraid I have to ask that
8  seriously.
9      **A.**  Yes.
10      **Q.**  After the commencement of the
11  Fingerhut-Holzer partnership, did there come a
12  time when it became apparent to you that
13  Mr. Holzer did not have the funds necessary to
14  be a partner of equal contribution to you and
15  Fingerhut-Holzer Partners?
16      **A.**  Yes.
17      **Q.**  And did that constitute a -- did
18  that bother you?
19      **A.**  Yes.
20      **Q.**  And did you attempt to rectify that
21  in any way?
22      **A.**  Yes.
23      **Q.**  How did you attempt to rectify it?
24      **A.**  Well, it's a long story, but I
25  basically attempted to rectify it by beginning

[Page 48]

1  an investigation of what was going on with
2  Mr. Holzer.
3      **Q.**  Now, when you say investigation,
4  what do you mean by that?
5      **A.**  Private investigation.
6      **Q.**  Did you hire a private
7  investigator?
8      **A.**  Yes.
9      **Q.**  And who was that?
10      **A.**  Thatcher. I forgot the other guy.
11      MR. FOLKENFLIK: Thatcher
12  Associates.
13      MR. CONWAY: Why don't we go off
14  the record for a second.
15      (Discussion off the record.)
16      **Q.**  Sir, after some discussions off the
17  record, your counsel has pointed out that there
18  is a certificate of cancellation which indicates
19  that a limited liability company known as
20  Fingerhut-Holzer Partners was incorporated on
21  June 21st, 2004 in the State of Delaware. Would
22  you have any reason to disagree with that?
23      **A.**  No.
24      **Q.**  And to the best of your knowledge,
25  Fingerhut-Holzer Partners LLC was incorporated

[Page 49]

1   in Delaware on or about June 21st of 2004.
2      A.   If that's what it says.
3      Q.   Were there other businesses that
4   you and Mr. Holzer became involved in?
5      A.   Other businesses?
6      MR. FOLKENFLIK:  Other than what?
7      A.   You mean other than --
8      Q.   Other than Fingerhut-Holzer
9   Partners.
10     A.   Oh, there may have been
11   Fingerhut-Holzer Fund or Management or whatever.
12   There were a lot of names. But it was
13   essentially all the same. I don't think most of
14   them were used.
15     Q.   The other names were Fingerhut --
16   are you familiar with Fingerhut-Holzer Equities,
17   Inc.?
18     A.   No.
19     Q.   Do you know if there was another
20   company that you and Mr. Holzer operated which
21   operated under the name of Fingerhut-Holzer
22   Equities?
23     A.   No.
24     Q.   Do you know of a business
25   identified as Fingerhut-Holzer, Inc.?

[Page 50]

1     A.   No.
2     Q.   Are you familiar with a
3   Fingerhut-Holzer Fund LP?
4     A.   That sounds familiar.
5     Q.   What was Fingerhut-Holzer Fund LP?
6     A.   It's likely that it was a fund that
7   was initially done to be the fund that would
8   comprise Synconium, which is a --
9     Q.   We'll get to that. Because you've
10   responded in that fashion, what is Synconium?
11     A.   What was it.
12     Q.   What was it?
13     A.   It was a proposed limited
14   partnership that would invest within the fields
15   of disabilities.
16     Q.   And was that --
17     A.   New technologies.
18     Q.   Was that set up in or around 2004?
19     A.   No. It was later than that.
20     Q.   It was set up somewhere between
21   2004 and 2008?
22     A.   Yes, I think right in the middle.
23     Q.   Now, the principal operating entity
24   was Fingerhut-Holzer Partners?
25     MR. FOLKENFLIK:  You mean for the

[Page 51]

1   LLC?
2     Q.   For the LLC, yes.
3     A.   Fingerhut-Holzer Partners LLC?
4     Q.   Yes.
5     A.   Yes.
6     Q.   Now, as one of the business avenues
7   in Fingerhut-Holzer Partners, did you then begin
8   taking in investments and managing them for
9   other people?
10     A.   Not consciously, no.
11     Q.   Are you aware of any parties that
12   came into Fingerhut-Holzer as investors?
13     MR. FOLKENFLIK:  As investment
14   advisees?
15     MR. CONWAY:  Okay, we'll use that
16   term.
17     Q.   As investment advisees.
18     MR. FOLKENFLIK:  Answer out loud.
19     A.   No. No, no, no.
20     Q.   Are you familiar with Mr. and Mrs.
21   Rapillo?
22     A.   I am now.
23     Q.   And during the course of the
24   investment life of Fingerhut-Holzer Partners,
25   did Mr. and Mrs. Rapillo become clients of that

[Page 52]

1   firm?
2     MR. FOLKENFLIK:  Fingerhut-Holzer
3   Partners LLC.
4     Q.   Fingerhut-Holzer Partners LLC.
5     A.   Not that I would define as
6   "client." There was no fee charged.
7     Q.   How would you define the
8   relationship between Fingerhut-Holzer Partners
9   and Mr. and Mrs. Rapillo?
10     MR. FOLKENFLIK:  The LLC.
11     Q.   The LLC.
12     A.   To be honest, I don't know. I
13   don't know what they were doing there. I know
14   that there was an investment in one of these
15   investments. Aside from that, I didn't know
16   them.
17     Q.   Now, are you familiar that an
18   investment of $300,000 was made with
19   Fingerhut-Holzer Partners and placed in an
20   investment vehicle called the Waverly I?
21     MR. FOLKENFLIK:  Objection.
22   Misstates facts not in evidence. There was
23   never an investment that was made through
24   Fingerhut-Holzer Partners LLC in Waverly. There
25   was a direct investment in the Waverly.

[Page 53]

1    A.    Fingerhut-Holzer Partners did not
2  oversee that. That was a direct investment that
3  they made. It was not under the aegis of
4  Fingerhut-Holzer Partners. There was no fee or
5  anything taken. Or carried interest. At least
6  not by me. I should say that.
7    Q.    Do you know if that was arranged by
8  Mr. Holzer?
9    A.    I don't know what it was.
10  Certainly it was not arranged by me. Okay?
11    MR. FOLKENFLIK:  If by "arranged"
12  you mean Mr. Holzer sent a subscription
13  agreement which your clients testified was
14  filled out and returned to Foley & Lardner
15  together with a check, it appears according to
16  your client's testimony that's what occurred.
17  And I don't recall your asking Mr. Holzer
18  specifically about that investment.
19    Q.    Sir, could you tell us what you
20  know about the Rapillo investment in the
21  Waverly?
22    A.    What I know is what you just told
23  me. It was a separate investment made by them.
24    Q.    Was it made through Mr. Holzer?
25    A.    I have no idea.

[Page 54]

1    Q.    Was it made through
2  Fingerhut-Holzer Partners?
3    A.    No.
4    Q.    Is there a record of funds coming
5  in to Fingerhut-Holzer from the Rapillos?
6    A.    Not that I'm aware of. I've never
7  seen it.
8    MR. FOLKENFLIK:  Counsel, you have
9  a copy of the check so we know who the check
10  went to. And it didn't go to Fingerhut-Holzer
11  Partners LLC.
12    Q.    Now, are you aware at any time
13  prior to 2008 that Mr. Holzer was dealing with
14  individual investors?
15    A.    No.
16    Q.    When did you learn of the identity
17  of the Rapillos for the first time?
18    A.    I think you called the office after
19  the investment went sour or something. I'm not
20  really sure, but it wasn't -- it was only after
21  the fact that I remember anything with Rapillo.
22    MR. FOLKENFLIK:  The record should
23  reflect that when the witness used the word
24  "you" he was looking at Heidi Rapillo.
25    MR. CONWAY:  As opposed to me,

[Page 55]

1    MR. FOLKENFLIK:  As opposed to you.
2    Q.    Sir, early on in the investment in
3  the year 2004 --
4    A.    The investment?
5    Q.    The investment that was
6  Fingerhut-Holzer Partners.
7    MR. FOLKENFLIK:  It's not --
8    Q.    Excuse me, correct, I'll rephrase
9  that.
10    During the period -- early in the
11  operating of Fingerhut-Holzer Partners, did it
12  become apparent to you that Mr. Holzer did not
13  have the assets that he had indicated to you
14  prior to the commencement of Fingerhut-Holzer
15  Partners?
16    A.    No.
17    Q.    When exactly did you learn for the
18  first time that Mr. Fingerhut did not have --
19    MR. FOLKENFLIK:  Mr. Holzer.
20    Q.    Excuse me, Mr. Holzer. I
21  apologize.
22    A.    2007.
23    Q.    You did not realize that at any
24  time prior?
25    A.    No. If you read the diary you'll

[Page 56]

1  see.
2    Q.    Well, I read the diary as of 2007.
3  Did Mr. Holzer make any contributions --
4    MR. FOLKENFLIK:  Counsel, can I
5  help you a little on this? You're using the
6  word "assets." Assets means a lot of things,
7  but it doesn't necessarily mean liquid cash.
8    MR. CONWAY:  I understand. We'll
9  deal with that.
10    Q.    Now, sir, you've indicated that by
11  2007 your contributions to the Fingerhut-Holzer
12  assets was 10 times that of Mr. Holzer.
13    A.    Actually, it was more than 10
14  times.
15    Q.    More than 10 times. How much
16  greater would it have been?
17    A.    Well, it's on the sheet right
18  there. 7 plus million versus whatever the
19  numbers that he has.
20    Q.    110,000.
21    A.    That's a stretch, 110.
22    Q.    All right, he may not have
23  contributed 110,000?
24    A.    There's a whatchamacallit, a
25  $50,000 note there. I don't know what that is.

[Page 57]

[15]  (Pages 54 to 57)

1  Q.  So if he only contributed 111,000,
2  that effectively made Mr. Holzer a
3  non-contributor to Fingerhut-Holzer Partners,
4  correct?
5  A.  Well, that --
6  MR. FOLKENFLIK: To the assets.
7  Q.  To the assets.
8  A.  To the assets, yes.
9  Q.  Now, that would have been
10  noticeable to you in 2004, 2005, 2006 and 2007.
11  A.  Not true. Because the majority of
12  the investments were made in 2007. And
13  actually, there was a lot that he would state
14  that he already had invested that he was going
15  to put in, which was some of that real estate
16  piece there.
17  Q.  All right, now, the issue of the
18  real estate, did you use a name for that within
19  the firm?
20  MR. FOLKENFLIK: By the real estate
21  you mean the Upstate New York?
22  Q.  The Upstate New York real estate.
23  What was that intended to be? What did you call
24  it? Did you call it the Suffern investment, did
25  you call it the New York State investment? What

[Page 58]

1  would you call it?
2  A.  I don't know. Are you looking for
3  a name?
4  Q.  Yes.
5  A.  I don't know.
6  Q.  How did you refer to it when you
7  were with --
8  A.  Well, they were different pieces of
9  property.
10  Q.  What was the nature of the
11  investment?
12  A.  It was real estate development.
13  Q.  And how was that development to
14  occur? Did you have to accumulate the property
15  first, did you have to make purchase of the
16  property? Did the property exist as a whole?
17  A.  I think it was a function of the
18  piece that we owned. As an example, Haverstraw
19  was a property that we purchased and then --
20  well, I thought it was being purchased and then
21  developed.
22  MR. FOLKENFLIK: And counsel, it
23  might help to look at the document we've
24  produced bearing production number BF 000023,
25  which is a schedule of investments in the

[Page 59]

1  Upstate New York properties and the purpose of
2  the investment -- the purpose of each
3  investment.
4  A.  Well, at least I thought it was.
5  MR. FOLKENFLIK: The claimed
6  purpose is probably a better way to put it.
7  Q.  Now, you're talking JM 000023?
8  MR. FOLKENFLIK: BF.
9  A.  This is what it looks like.
10  Why don't we take 5.
11  MR. CONWAY: Sure.
12  (Recess taken.)
13  (Fingerhut Exhibit 4 for
14  identification, Bates No. K-1)
15  B MR. CONWAY:
16  Q.  Sir, could you identify that as --
17  this is -- could you identify Exhibit 4?
18  A.  Looks like a K-1 to me.
19  Q.  And was that K-1 sent pursuant to
20  the cover letter that is the face page of
21  Exhibit 4 by Fingerhut-Holzer Partners to the
22  Rapillo family indicating that this is your K-1
23  for 2005?
24  A.  That's what it says.
25  Q.  All right, and if you would flip

[Page 60]

1  the K-1, would you identify the address of the
2  Waverly investment.
3  A.  Yes, okay.
4  Q.  Would you indicate that for the
5  record, please.
6  A.  It's the address 399 Park.
7  Q.  And on the cover letter at the
8  face, what is the address of Fingerhut-Holzer
9  Partners?
10  A.  Same one.
11  Q.  All right, so could you say, sir,
12  that there was a business relationship between
13  Fingerhut-Holzer Partners and the Rapillo family
14  that existed at least as regards the Waverly
15  investment?
16  MR. FOLKENFLIK: Objection as to
17  form. I don't know what "business relationship"
18  is.
19  Q.  I'll phrase it again. Was there a
20  business relationship as reflected in those
21  documents between Fingerhut-Holzer Partners and
22  the Rapillo family?
23  MR. FOLKENFLIK: Objection as to
24  form. Counsel, are you aware of the
25  relationship between Fingerhut-Holzer Partners

[Page 61]

[16]  (Pages 58 to 61)

1   LLC and Fingerhut-Holzer the Waverly?
2          MR. CONWAY: Yes, I am. I'm fully
3   familiar with it.
4          MR. FOLKENFLIK: It was the
5   managing member.
6          MR. CONWAY: I'm fully familiar
7   with it.
8          MR. FOLKENFLIK: If you want to ask
9   precisely about that, your question will make
10  sense.
11     Q.   First, sir, do you identify the
12  cover letter us being from Fingerhut-Holzer
13  Partners?
14     A.   Yes.
15     Q.   And that a K-1 was issued from
16  Fingerhut-Holzer Partners concerning an
17  investment within the Fingerhut-Holzer family of
18  businesses.
19     A.   Yup.
20     Q.   And were Mr. And Mrs. Rapillo
21  investors in that investment?
22     A.   I suspect so. I don't see any fee
23  or anything like that. This means nothing to
24  me.
25     Q.   Well --

[Page 62]

1      A.   We didn't charge them for this. I
2   mean, I don't know what it is.
3      Q.   Whether or not they were charged
4   anything would be Mr. Holzer's option, would it
5   not?
6          MR. FOLKENFLIK: Objection as to
7   form.
8      A.   I don't know.
9      Q.   I'll phrase it another way.
10     A.   It would not be -- I mean, anybody
11  could invest this way, or we could always do a
12  K-1 for them. But it has nothing to do with
13  partnership -- or a client position.
14     Q.   Well, we'll allow the courts to
15  determine what it means.
16         MR. FOLKENFLIK: The documents in
17  question determine what it means.
18         MR. CONWAY: Yes, exactly.
19         MR. FOLKENFLIK: And they make it
20  clear that the Rapillos are not clients of the
21  managing member of the LLC -- or the LP. The
22  Rapillos are investors in the LP. The managing
23  member has certain obligations to send out
24  documents on behalf of the LP.
25     Q.   Now, sir, when did you become aware

[Page 63]

1   of an investment possibility for yourself and
2   for Fingerhut-Holzer in property in Haverstraw?
3      A.   Property in Haverstraw? I don't
4   know, you'd have to look on the sheet that shows
5   the timing of these properties.
6          MR. FOLKENFLIK: Counsel, I do note
7   that your client never purported to have
8   invested in property in Haverstraw.
9          MR. CONWAY: Yes, my client did
10  not.
11     Q.   Sir, do you know if K-1s were
12  issued to the Rapillos in 2005, 2006, 2007?
13     A.   I'd have to ask Brandon.
14     Q.   Did there come a time when relative
15  to the Waverly investment you had a phone call
16  with Heidi Rapillo concerning additional needs
17  for investments in order to sustain that
18  business opportunity?
19     A.   I only remember a phone call. I
20  don't remember the reason.
21     Q.   Now, why would you have called?
22     A.   I didn't. I believe it was Heidi
23  calling us.
24         MR. FOLKENFLIK: I think that was
25  the testimony earlier. As well as the testimony

[Page 64]

1   by your client.
2      Q.   Did you have a conversation with
3   the Rapillos in which you made a request for
4   additional funds necessary for the Waverly I
5   investment?
6      A.   I think that was discussed on that
7   call. And I believe it was a capital call for
8   all investors.
9      Q.   And did you make any indication if
10  there was further contribution by the Rapillos,
11  that you would zero out their investments?
12     A.   No. Why would I do that? If there
13  was no further investment, then we would wipe
14  out the initial investment? Is that what you
15  said?
16     Q.   Yes.
17     A.   No.
18     Q.   Now, what was --
19     A.   That's pretty tough.
20     Q.   What was the investment in upstate
21  properties to be? What was the intended
22  investment?
23     A.   Didn't I just answer that?
24     Q.   Forgive me, could I ask you again.
25     A.   It was land development in

[Page 65]

1  different spots upstate. Well, I mean, in
2  whatever the county across the river.
3     Q.  What was to be developed?  A mall,
4  a swimming pool, a hotel?
5     A.  I think it depended on the spot.
6     Q.  Were the plots of land contiguous?
7     A.  No.  Why don't you take a look at
8  that sheet.
9     Q.  Sure, that's fine.
10       MR. FOLKENFLIK:  Did you find it?
11       MR. CONWAY:  I had it here a second
12  ago amidst everything else I had.
13       MR. FOLKENFLIK:  Do you want me to
14  make a copy and you'll mark it?  As I say, it's
15  number 23 in the production numbers.
16     Q.  Having directed me to it, I had it
17  and now I don't have it.  So if I could ask you
18  to make an additional copy, I'd appreciate it.
19       (Fingerhut Exhibit 5 for
20  identification, Bates No. BF 23)
21       MR. FOLKENFLIK:  The witness does
22  not have in front of him Exhibit 5.
23       MR. CONWAY:  Well, I'd like he and
24  I to be on the same page.
25       MR. FOLKENFLIK:  Why don't you take

[Page 66]

1  a look at the exhibit and then hand it to him.
2     Q.  Sir, would you consider yourself a
3  skilled investor?
4     A.  That's a tricky question.  I would
5  suppose so.  Certainly in equities.
6     Q.  Now, a document has been presented
7  by your counsel identified as -- it's Bates
8  stamped BF 000023.  What does this purport to
9  be, sir?
10     A.  This is a series of investments in
11  properties upstate.  Should I have known
12  about --
13       MR. FOLKENFLIK:  Wait until he asks
14  a question.
15     Q.  Wait for me.
16       Now, sir, these indicate a series
17  of -- does this indicate a series of land
18  purchases in Haverstraw, New York, Beacon, New
19  York and Newburgh, New York?
20     A.  Yes.  Monticello too, it looks
21  like.
22       MR. FOLKENFLIK:  And Nyack.
23     Q.  Who was supposed to be purchasing
24  these?
25     A.  Who was supposed to be purchasing

[Page 67]

1  these.
2     Q.  Yes.  Who was the purchaser for
3  value?
4     A.  We were participating in a purchase
5  that Holzer was participating with another
6  group.  This was buying a piece of his share.
7     Q.  Now, what did Mr. Holzer say to you
8  about this particular investment group?
9     A.  It's all in the diary, if you would
10  look at it.
11     Q.  We'll get to the diary.  Are you
12  familiar with the name Daniel Katz?
13     A.  I know the name.  I don't know who
14  it is.
15     Q.  Are you familiar with the --
16     A.  Cass?
17     Q.  Katz, K-A-T-Z.
18       Are you familiar with the name
19  Jeffrey Schwartz?
20     A.  It sounds like a relative.  No, I
21  don't know.
22     Q.  Were these two parties identified
23  by Mr. Holzer as his fellow investors in the
24  Haverstraw investment?
25     A.  You know, I think so, but again,

[Page 68]

1  you'd have to look at the notes.  It's in there,
2  whatever the names are.
3     Q.  We'll get to the notes.
4     A.  Okay.
5     Q.  And did you advance funds for
6  Mr. Holzer to make purchase of his portion of an
7  investment in real estate properties upstate?
8     A.  Yes.
9     Q.  And for how long did you continue
10  doing this?
11     A.  If you look on this chart, it goes
12  from '02 to '05.
13     Q.  And --
14     A.  Excuse me, '06.
15     Q.  And did you make a series of
16  investments in this process?
17     A.  Yes.
18     Q.  Now, how were those funds
19  transferred by you?
20     A.  To Holzer.
21       MR. FOLKENFLIK:  You mean did he
22  write a check or wire the funds?
23     Q.  Yes.
24     A.  Yes.
25     Q.  How was it transferred?  By check

[Page 69]

1  or wire?
2     A.   I think primarily wire.
3     Q.   To what account?
4     A.   To Holzer's account.
5     Q.   To Holzer individually?
6     A.   Yes.
7     Q.   And in doing so, did you have any
8  record of that -- record of your transfer to
9  Mr. Holzer?
10    A.   Yes.
11    Q.   What was the record?
12    A.   Wire transfers.
13    Q.   Was that the only record?
14    A.   Yes.
15    Q.   And for how long did you go on
16 making payments on this investment?
17    A.   It's right here on the chart.
18 Depending on the investment made, in some cases
19 it went on for a year for Haverstraw. I mean,
20 you can break it down here. But basically from
21 2002 to 2006, depending on the properties.
22    Q.   And did you at any time ask to see
23 documents of title memorializing the purchase?
24    A.   No. But I did see plans, at least
25 initial investment plans in Haverstraw and I

[Page 70]

1  believe in Monticello.
2     Q.   And what was to be developed?
3     A.   The land was going to be developed,
4  both in shopping areas, shopping malls.
5     Q.   The documents that you saw, the
6  plans, who produced them?
7     A.   David.
8     Q.   By producing then you mean he
9  showed them to you?
10    A.   Showed them to me.
11    Q.   Who was the producer of them?
12    A.   I don't know. An architect.
13    Q.   Do you still have copies of those?
14    A.   No.
15    Q.   Do you know what happened to what
16 it is that David showed you?
17    A.   No. They're obviously fraudulent.
18 Okay?
19    Q.   When did you come to realize
20 that -- I'll withdraw that.
21    A.   2007.
22    Q.   I'm withdrawing the question.
23         Sir, in the document which we will
24 identify -- I suppose we should identify it
25 right now. The documents dated TA draft

[Page 71]

1  11/15/07 is an investigation by whom?
2     A.   I don't know what the document is.
3  You have to show me.
4     Q.   This is the Thatcher Associates --
5         MR. FOLKENFLIK:  Why don't you mark
6  a copy of the document.
7         MR. CONWAY:  We have an entire
8  document here, we'll make that 6.
9     A.   That includes the diary.
10        (Fingerhut Exhibit 6 for
11 identification, Bates No. BF 25 through 46)
12        MR. FOLKENFLIK:  I'd like to note
13 for the record that Exhibit 6, first of all, the
14 copy that's marked is a copy which includes
15 sections that are apparently inadvertently
16 redacted because there were stickers placed on
17 them.
18        MR. CONWAY:  That's my copy.
19        MR. FOLKENFLIK:  Well, it's a
20 copy --
21        THE WITNESS:  What is the sticker?
22        MR. FOLKENFLIK:  Those red --
23        THE WITNESS:  I understand. But
24 what's it for?
25        MR. FOLKENFLIK:  Just to mark the

[Page 72]

1  sheet. So I think we need to mark a clean copy
2  of this document. Do you have a clean copy?
3         MR. CONWAY:  I didn't notice that
4  when I re-produced it. I'm sure I did
5  everything. Do we have a clean copy?
6         MR. FOLKENFLIK:  I can get a clean
7  copy. How much longer do you anticipate?
8         MR. CONWAY:  Certainly past lunch.
9         MR. FOLKENFLIK:  You're going to
10 break for lunch?
11        MR. CONWAY:  I don't need to.
12        MR. FOLKENFLIK:  How much longer?
13        MR. CONWAY:  Right now I would
14 guess probably till 3. Best guess.
15        MR. FOLKENFLIK:  Do you want to
16 break for lunch?
17        THE WITNESS:  Sure.
18        MR. FOLKENFLIK:  I'll make
19 arrangements for that, and why don't we take a
20 few minutes and I'll get a document that we can
21 use as an exhibit.
22        (Recess taken.)
23        (Fingerhut Exhibit 7 for
24 identification, Bates No. BF 25 through 46)
25 BY MR. CONWAY:

[Page 73]

```
 1      Q.   Sir, would you take a look at
 2  what's been marked as TA draft 11/15/07, BF
 3  000025.
 4      MR. FOLKENFLIK:  Yes, before you
 5  question the witness, it goes through BF 000046,
 6  and this is not one document; it was a composite
 7  of several documents.  And continue with your
 8  examination, sir.
 9      Q.   Sir, would you tell us -- have you
10  seen this document before?
11      A.   Yes.
12      Q.   And what is this?
13      A.   There's two pieces.  One is a diary
14  that I wrote, which is the second one.  The
15  first is I believe a compilation from Thatcher.
16      Q.   Thatcher Associates.
17      A.   Excuse me, Thatcher Associates
18  regarding the whole situation with
19  Fingerhut-Holzer.
20      Q.   Is this a document that you caused
21  to have prepared having approached Thatcher and
22  asking for an investigation into Mr. Holzer?
23      A.   Yes.
24      Q.   And this would be --
25      A.   At least the first part.  Page 1 to
```

[Page 74]

```
 1  5.
 2      Q.   And this occurred --
 3      MR. FOLKENFLIK:  Just for the
 4  record, 1 to 5 means the pages marked BF 25
 5  through BF 31.
 6      Q.   And this is dated 11/15/07.  So it
 7  would be the latter part of 2007.
 8      A.   Yes.
 9      Q.   And adding thereafter is a series
10  of diary -- is a document called "a timeline of
11  events" on page 000032.
12      A.   I'm sorry, I believe that's
13  actually also part of their work.  What I wrote
14  started on 00036.
15      MR. FOLKENFLIK:  Can I just point
16  out one thing to the witness?  You notice it
17  uses the first person, "I purchased one half of
18  David's interest."  Paragraph 1.  So it may be
19  something you prepared.  Rather than Thatcher
20  Associates.
21      THE WITNESS:  I don't know, maybe I
22  did.
23      MR. FOLKENFLIK:  In any event,
24  continue on.
25      Q.   And sir, this continues thereafter
```

[Page 75]

```
 1  with inserts that are marked "diary."
 2      A.   Yes.
 3      Q.   And those diary notes are yours.
 4      A.   Correct.
 5      Q.   Dictated by you or typed by you?
 6      A.   Correct.
 7      Q.   They are of your origin.
 8      A.   Correct.
 9      Q.   And the inserts that were created
10  as a result of the difficulties at the firm?
11      A.   Yes.
12      Q.   And are the contents of these diary
13  notes true, as best you know?
14      A.   As best I know.
15      Q.   And did you create these for the
16  purpose of the investigation in the business?
17      A.   Yes, but it was also for my own
18  keeping.
19      Q.   And was this intended to be made
20  part of the business record of Fingerhut-Holzer
21  Partners?
22      A.   That was one of the purposes.
23      Q.   And have these diary notes been
24  kept by Fingerhut-Holzer through the present and
25  your --
```

[Page 76]

```
 1      A.   There is no Fingerhut-Holzer
 2  anymore.
 3      Q.   To the end of the existence of
 4  Fingerhut-Holzer these were held.
 5      A.   Yes.
 6      Q.   Now, sir, in that on page 00030
 7  there are a series of investments made by you in
 8  the Haverstraw property, correct?
 9      A.   Yes.  I think it's the same as
10  this, right?
11      MR. FOLKENFLIK:  It's a different
12  schedule, but --
13      A.   The same numbers.
14      Q.   Same thing.  And on each of the
15  inserts reflected here it is intended to
16  memorialize that you issued funds from your
17  personal wealth to David Holzer for the purchase
18  of these properties.
19      A.   That's correct.
20      Q.   And was there any type of business
21  record other than the transfer memorializing an
22  arrangement between yourself and Mr. Holzer for
23  the future sale of these properties?
24      A.   No.
25      Q.   When these properties were
```

[Page 77]

[20]  (Pages 74 to 77)

1 transferred -- excuse me, when the funds were
2 transferred and properties were allegedly
3 purchased, did you become a participating owner
4 in the document of title?
5     A.  No.
6       MR. FOLKENFLIK: Counsel,
7 objection. There was no document.
8       MR. CONWAY: Well, they were
9 intended to be for purchases of property.
10     Q.  Correct?
11     A.  They were intended to be his
12 investment in purchases of property.
13     Q.  Did he tell you he had partners in
14 this?
15     A.  Yes.
16     Q.  Did he indicate to you what
17 percentage of partner he was?
18     A.  I believe he said a third.
19     Q.  So that each of these contributions
20 of capital would have been followed by two other
21 contributions in equal measure by the parties he
22 identified as Jeffrey Daniel Katz and Jeffrey
23 Schwartz?
24       MR. FOLKENFLIK: Objection as to
25 form. It's not clear at all, but you can

[Page 78]

1 establish if you care to the order of events.
2 For all we know based on your questioning thus
3 far, the purchase could have been made years
4 earlier and this could have been funding
5 Mr. Holzer's participation or some other event.
6     Q.  In your discussions with
7 Mr. Holzer, what was it did you believe he was
8 doing with these funds?
9     A.  I think it depended on the
10 properties. But it was what I've been saying,
11 it was for purpose and development of these
12 properties.
13     Q.  And was there supposed to be a
14 master buyer at the end of this program?
15     A.  There's no such thing as a master
16 buyer. Was there a buyer of part of the
17 properties maybe at some time, yes.
18     Q.  Was there intended to be a buyer of
19 these properties?
20     A.  I don't think it was done exactly
21 that way. There was -- I was told at one point
22 that there was a buyer.
23     Q.  Did he indicate to you who the
24 buyer was?
25     A.  I believe he might have. But I

[Page 79]

1 don't remember. It's in the diary.
2     Q.  Yes, it's in the diary. Do you
3 have any recollection of the name of the
4 prospective purchaser?
5     A.  I don't.
6     Q.  Are the contents of the Thatcher
7 document correct?
8     A.  The contents of the Thatcher
9 document. As far as I know, yes.
10       MR. CONWAY: Counsel, for
11 evidentiary purposes, there's no point in my
12 reading all of this. Could we stipulate that
13 the contents of this document are based upon
14 information given to Thatcher by Mr. Fingerhut
15 as are the contents of his diaries?
16     A.  No, it's not true.
17       MR. FOLKENFLIK: No.
18     A.  Go ahead.
19       MR. FOLKENFLIK: We couldn't
20 stipulate that the Thatcher investigation was an
21 investigation. Some information might have come
22 from Mr. Fingerhut --
23     A.  Correct.
24       MR. FOLKENFLIK: -- some
25 information might have come from elsewhere.

[Page 80]

1 Mr. Fingerhut's diaries are his understanding of
2 what occurred when it involved directly him.
3 That would be first person understanding, but it
4 also involved hearsay he obtained from other
5 people, including the Thatcher people and
6 statements by David Holzer that we know are not
7 true, but in all events were hearsay.
8       What we can say is that the
9 Thatcher draft is a draft prepared by Thatcher
10 as a result of their investigation, which
11 included conversations with Mr. Fingerhut. And
12 then Mr. Fingerhut's diaries are Mr. Fingerhut's
13 recollection contemporaneously with the date on
14 the diary of what occurred and what information
15 he had received at that time, which included
16 both third party hearsay information and
17 information he was personally aware of.
18       MR. CONWAY: Would you stipulate to
19 the admissibility of the Thatcher document?
20     A.  I'd stipulate to its admissibility
21 as a document created by Thatcher draft, created
22 by Thatcher & Associates which was intended to
23 reflect the result of their investigation.
24       MR. CONWAY: And you would
25 certainly stipulate to the admissibility of the

[Page 81]

[21] (Pages 78 to 81)

1    diary notes as being Mr. Fingerhut's own
2    recollections of events for those particular
3    times? And as he indicated, as he drafted.
4         MR. FOLKENFLIK: I would stipulate
5    to the admissibility of the diary entries as
6    diary entries which reflected Mr. Fingerhut's
7    understanding contemporaneously with the date on
8    each diary, but the fact that he was either
9    personally aware of in some cases and had
10    understood from other sources in other cases.
11       Q.   Sir, why would you have extended
12    money to Mr. Holzer instead of extending money
13    to Fingerhut-Holzer Partners?
14       A.   Fingerhut-Holzer Partners?
15       Q.   Yes.
16       A.   It was my understanding that it
17    wasn't going to be done that way. Look, I can
18    tell you right now this was all a big mistake
19    that this happened, that I did it all
20    incorrectly. I'll be the first to say that. It
21    didn't go through Fingerhut-Holzer Partners.
22    There was no issue about doing that. This was
23    something that preceded Fingerhut-Holzer
24    Partners. It started in 2002.
25        MR. FOLKENFLIK: And just so the

[Page 82]

1    record's clear, I think the question intended,
2    and I believe the answer intended to refer to be
3    just referring to the payments of funds as
4    reflected on BF 000030.
5       A.   Yes, I think that's what you're
6    talking about.
7       Q.   Yes.
8        MR. FOLKENFLIK: And there are
9    other transfers of funds on 000031 which are
10    indicated not to be involving those properties.
11    The payment of money to Mr. Holzer of $1,062,000
12    that are identified as "Holzer personal."
13        MR. CONWAY: On 00031?
14        MR. FOLKENFLIK: 31. Which appears
15    to be --
16        MR. CONWAY: The 2405 and the 3850?
17        MR. FOLKENFLIK: Yes.
18       Q.   Now, the initial transfer of funds
19    by you commenced on March 27th, 2002 with the
20    transfer of $62,500. And that was transferred
21    to Mr. Holzer, correct?
22       A.   Correct.
23       Q.   Now, you two had not set up
24    Fingerhut-Holzer Partners at that time, had you?
25       A.   No.

[Page 83]

1       Q.   And Mr. Fingerhut was engaged --
2        MR. FOLKENFLIK: Mr. Holzer.
3       Q.   I apologize.
4       A.   It's all right.
5       Q.   Profusely. Mr. Holzer was still
6    engaged at another firm at the time.
7       A.   Yes.
8       Q.   So the original discussions
9    concerning the purchase of Haverstraw predate
10    Fingerhut-Holzer Partners.
11       A.   That's correct.
12       Q.   And when you were discussing this,
13    did it occur to you to ask who the investor was
14    who would buy this after the properties were
15    accumulated?
16       A.   No.
17       Q.   Did it occur to you to create an
18    arrangement between --
19       A.   By the way, I should just say that
20    I've never heard of anybody investing that way.
21    People can say that they do, but that is not a
22    condition on purchasing this. I mean, if
23    somebody comes along, great. That isn't the
24    reason the investment's made.
25        MR. FOLKENFLIK: Just to clarify

[Page 84]

1    the record, "that" meaning that there's a
2    purchaser identified in advance.
3        THE WITNESS: Right.
4       Q.   Yes. You purchase property hoping
5    to transfer it to someone later or use it
6    yourself.
7       A.   Could be.
8       Q.   Now, what was it that you were
9    purchasing with each of these?
10        MR. FOLKENFLIK: Objection. Asked
11    and answered.
12       Q.   Do you know what you were -- were
13    you purchasing bare land, were you purchasing
14    farmland? Were you purchasing dilapidated
15    structures, old houses?
16       A.   It's on this sheet. I've already
17    told you about five times what I've been
18    purchasing on each piece of property. This is
19    the other sheet, whatever it is. No, no, this
20    one here. Exhibit number 5.
21       Q.   Yes, but this document doesn't --
22        MR. FOLKENFLIK: This doesn't refer
23    to these.
24       Q.   This document doesn't indicate what
25    it was you were buying. It just indicates that

[Page 85]

[22]   (Pages 82 to 85)

1      you bought something.
2           MR. FOLKENFLIK: With all respect,
3      sir, what earthly difference does it make if
4      they had a sack of straw with the Taj Mahal on
5      the piece of land he purchased in Haverstraw to
6      your client's case, which has zero to do with
7      Haverstraw?
8           MR. CONWAY: My client's case has
9      to do with the relationship between
10     Mr. Fingerhut and Mr. Holzer.
11          MR. FOLKENFLIK: No it doesn't. It
12     doesn't have to do with the fact of whether they
13     went out to eat and what they ordered. It has
14     to do with some aspect of the relationship that
15     you may think gives you some right. So inquire
16     about that aspect of the relationship.
17          Q.   Now, sir, at any time in the
18     transfer of $12 million, did you create a
19     document between yourself and Mr. Holzer
20     concerning the nature of that transfer?
21          A.   No.
22          Q.   At any time --
23          A.   Ask me why I did it.
24          Q.   We'll get there. We'll get there.
25          A.   Okay. All right.

[Page 86]

1           Q.   At any time did you view any of
2      these properties?
3           A.   Yes.
4           Q.   And when you viewed them, what did
5      you see?
6           A.   I saw land.
7           Q.   What type of land?
8           A.   Land that was going to be
9      purchased.
10          Q.   And what was on that land?
11          A.   Grass.
12          Q.   Just grass.
13          A.   Yes. Well, there was a pier in
14     one.
15          Q.   And was there intended to be a
16     total fund necessary for the purchase of these
17     properties?
18          A.   I don't understand.
19          MR. FOLKENFLIK: Was there a dollar
20     amount that was established that had to be
21     obtained?
22          Q.   Yes. Mr. Holzer was a one-third
23     participator, correct?
24          A.   Well, that's not correct but that's
25     what I thought. No, it clearly wasn't because

[Page 87]

1      there were subsequent pieces.
2           Q.   Was there a reason that you did not
3      create documentary intent for the use of the
4      funds that you transferred to Mr. Holzer?
5           MR. FOLKENFLIK: You mean
6      documentary intent meaning that he wrote
7      something on a piece of paper?
8           Q.   Wrote something to say this is what
9      we're going to do with the money.
10          A.   Would you repeat that, please?
11          Q.   You asked me to say why didn't you
12     create a documentary history. What did you mean
13     by that?
14          A.   In the relationships that I've had
15     in Geo Capital, my other partners, we have
16     invested like this in each other's deals for I
17     guess now 30 plus years. No documentation. A
18     very heavy reliance on trust with each other.
19          Now, in the case of my partners in
20     Geo Capital and in Weekly, it's never been an
21     issue. And it's been on both sides. I've done
22     the same with them saying I'm investing in X,
23     would you like to come in, and they say yes or
24     no. That was it. And them asking me.
25          Q.   During the period that you were

[Page 88]

1      investing with Mr. Holzer, with Mr. Holzer
2      essentially contributing nothing --
3           A.   Wait, wait, I didn't know that. I
4      didn't know that he was contributing nothing.
5           Q.   When did you learn for the first
6      time --
7           A.   2007.
8           Q.   Not before?
9           A.   No. You can't tell from that. All
10     that is, is monies invested, a piece of him. I
11     didn't know that he wasn't putting his own money
12     in.
13          MR. FOLKENFLIK: The record should
14     reflect that the word "that" was referring to
15     the document on BF 30 and -- BF 30.
16          Q.   BF 23.
17          MR. FOLKENFLIK: BF 23, no. It's
18     page BF 30 in Exhibit 7.
19          Q.   During the time that you were
20     working with Mr. Holzer, did Mr. Holzer bring
21     any funds in excess of $111,000 into the
22     Fingerhut-Holzer organization?
23          MR. FOLKENFLIK: LLC.
24          Q.   LLC.
25          A.   What does that chart show?

[Page 89]

[23]  (Pages 86 to 89)

**[Page 90]**

1     MR. FOLKENFLIK: By the chart he's
2 referring to a work product I created from the
3 affidavit submitted by the district attorney to
4 the court in connection with the Holzer criminal
5 conviction and restitution order. And that
6 affidavit --
7     MR. CONWAY: Is that the one that
8 was identified here?
9     MR. FOLKENFLIK: No. That
10 affidavit which you obtained from the district
11 attorney's office and was produced by you that
12 shows a series of funds being contributed to
13 Fingerhut-Holzer Partners LLC in small amounts
14 apparently for operating expense of
15 approximately $200,000.
16     THE WITNESS: Was that 2005 and '6?
17     MR. FOLKENFLIK: It was 2005 and
18 '6.
19    Q.   And during that time, during --
20     MR. FOLKENFLIK: By the way, and
21 that's not reflected on these documents,
22 including in particular Exhibit number 3 because
23 that was operating expenses as opposed to
24 investments.
25     THE WITNESS: Correct.

**[Page 91]**

1    Q.   Now, you're not indicating that
2 these documents were prepared by you, were you?
3     MR. FOLKENFLIK: No, no.
4     THE WITNESS: That's not it.
5     MR. FOLKENFLIK: I'm just talking
6 about there was an affidavit supplied to me.
7 The affidavit said there were -- the following
8 payments by Mr. Fingerhut to Mr. Holzer and it
9 reflected approximately the $12 million that
10 appears on the Exhibit 7. And there were monies
11 paid by Mr. Holzer to Mr. Fingerhut and to
12 Fingerhut-Holzer Partners. If you want to ask
13 about those --
14     MR. CONWAY: They're here. I got
15 'em.
16    Q.   During the time that you were
17 together -- that you were functioning as
18 Fingerhut-Holzer Partners, did you have to
19 support Mr. Fingerhut?
20    A.   I am Mr. Fingerhut.
21    Q.   Jesus. During the time that you
22 were working with Mr. Holzer in Fingerhut-Holzer
23 Partners, did you have to support Mr. Holzer for
24 his personal needs?
25    A.   That's a tough question. I don't

**[Page 92]**

1 know what his personal needs were. Did I pay
2 monies --
3    Q.   Did you lend him monies?
4    A.   Did I pay monies to support the
5 rent and the overhead, yes. But there were
6 parts in whatever those two years were that he
7 did.
8    Q.   Did you give any personal funds to
9 Mr. Holzer directly for his own personal
10 expenses?
11    A.   It may have ended up that way. But
12 that was not the idea.
13     MR. FOLKENFLIK: Maybe you want to
14 bring the witness' attention and clarify what
15 page 31 on Exhibit 7 refers to.
16     THE WITNESS: Is that the Breen
17 Murray thing?
18     MR. FOLKENFLIK: Yes.
19    A.   I'm not really sure that is. That
20 might be something that he had --
21    Q.   Excuse me --
22     MR. FOLKENFLIK: Let the witness
23 finish.
24    Q.   There wasn't a question. We were
25 going there. You indicated at BF 000031 that

**[Page 93]**

1 there were two additional transfers to
2 Mr. Holzer which were identified as personal.
3 February 4th, 2005, $202,000; March 8, 2005,
4 $860,000. For what reason did you extend a
5 million dollars for personal expenses of
6 Mr. Holzer?
7    A.   That was to cover him on an
8 investment that we made that he couldn't cover.
9    Q.   Now, if Mr. --
10    A.   At least I thought so.
11     MR. FOLKENFLIK: I think there's a
12 reference in the diary pages to this as well.
13    Q.   Did you ever see any funds --
14     MR. FOLKENFLIK: Excuse me -- go
15 ahead.
16    Q.   Did you ever see any funds in
17 excess of $111,000 brought by Mr. Holzer into
18 Fingerhut-Holzer Partners?
19    A.   There was a series — do you have
20 those sheets? The sheet we just talked about.
21 The thing that Max got from you.
22     MR. FOLKENFLIK: The affidavit from
23 the district attorney's office. It specifies
24 payments that were made in both directions.
25    Q.   Forgive me. I don't recall that.

1    A.    A series of investments -- well,
2  he'll show you.
3    Q.    Are you familiar with the affidavit
4  of the district attorney of New York?  Have you
5  read it yourself?
6    A.    I'm not sure.
7        MR. FOLKENFLIK:  That's what I sent
8  you.
9    A.    Yes.
10       MR. FOLKENFLIK:  The one that you
11 produced in this case?
12       MR. CONWAY:  Yes.
13   Q.    Now, sir, I'm going to ask this two
14 ways.  The district attorney at page -- in the
15 affidavit of investigator Shannon Rowe at page
16 0000178 indicates that on December 15th, 2005,
17 shortly after -- on the day of the second
18 investment of the Rapillos, a wire of $600,000
19 to Holzer was sent and Holzer transferred
20 $200,000 to your personal account on that same
21 day.
22       Are you familiar with that event?
23   A.    I mean, I could probably look it
24 up, but I'm not familiar with the other part.
25   Q.    Did Mr. Fingerhut transfer

[Page 94]

1  $200,000 --
2        MR. FOLKENFLIK:  He is
3  Mr. Fingerhut.
4    Q.    Did Mr. Holzer transfer $200,000 to
5  your personal account on or about December 15th
6  of 2005?
7    A.    If it's in this statement by the
8  DA, then I would say yes.  I mean, I can't tell
9  you offhand.
10   Q.    Now, sir, do you have the account
11 numbers for the various accounts that were
12 issued by -- that were held by Fingerhut-Holzer
13 Partners LLC?
14   A.    Bank account numbers?
15   Q.    Bank account numbers, yes.
16   A.    I do.
17   Q.    And how many different bank
18 accounts did Fingerhut Partners have?
19 Fingerhut-Holzer Partners.
20   A.    I'd have to look it up.  Probably
21 four.
22   Q.    And you still have access to those
23 account numbers.
24   A.    They're all gone.  I've shut them
25 all down.

[Page 95]

1    Q.    The accounts may be gone.  Do you
2  have access to the numbers?
3    A.    I think so.
4    Q.    I'd ask you, we'll leave a blank in
5  the record, when you execute the deposition,
6  would you fill those in?
7    A.    If I have them, I'll give them to
8  you, sure.
9  INFORMATION REQUESTED TO BE SUPPLIED:
10 Fingerhut-Holzer Bank Account Number
11   Q.    And in light of the statements by
12 the district attorney, I would ask you to -- do
13 you have access to the accounts that you
14 yourself operated for your own personal benefit
15 on or about December 15th of 2005?
16   A.    Personal accounts?
17   Q.    Yes.
18   A.    You mean my own --
19       MR. FOLKENFLIK:  Your own bank
20 accounts.
21   Q.    You indicated --
22   A.    Yes.  Yes, yes.
23   Q.    -- that you are not rejecting as
24 untrue the statement by the district attorney
25 that on December 15th you received $200,000 from

[Page 96]

1  Mr. Holzer.
2    A.    I don't accept it or reject it.  I
3  don't know.  I'd have to check.
4    Q.    Sir, could I ask you to include in
5  the transcript when it's executed the banks and
6  account numbers for your personal bank accounts
7  on or about December 15th of 2005.
8        MR. FOLKENFLIK:  I'll take that
9  under advisement.  I think an easier way to deal
10 with this would be that we will discuss and
11 consider stipulating to the correctness of the
12 district attorney's assertion if we investigate
13 it and find it to you true.
14   A.    That's fine.  I can do that.  But
15 giving you the bank account is crazy.
16   Q.    Sir, with whom did you do your
17 personal banking in 2005?
18   A.    JPMorgan.
19   Q.    And you would have had investment
20 accounts as well as operating accounts and
21 personal accounts there?
22   A.    Yes.
23   Q.    And do they continue to be your
24 personal bank?
25   A.    Yes.

[Page 97]

1    Q.   And are the same personal and
2    operating accounts still active?
3    A.   I'd have to check. I don't know.
4    Q.   Now, also in the district
5    attorney's report, he indicated at page 000179
6    that on the occasion of the transfer of $800,000
7    from the Rapillos on the date of March 23rd,
8    2006, Mr. Holzer made purchase of $500,000 of a
9    stock called V Campus, and that that $500,000
10   investment was later transferred to you. Do you
11   know that to be correct, sir?
12   A.   That's not correct --
13       MR. FOLKENFLIK: Let's take a step
14   at a time. Why don't you ask about the initial
15   purchase and then ask about what happened to
16   Mr. Holzer's interest in V Campus.
17       MR. CONWAY: Well, we're going to
18   go into V Campus, but at the moment I'll just
19   ask that.
20   Q.   Do you dispute in any way that the
21   statement of the district attorney that of the
22   $800,000 transferred by the Rapillos to
23   Mr. Holzer on March 23rd, 2006, that $500,000 of
24   V Campus was purchased by Mr. Holzer and then
25   subsequently transferred to you?

[Page 98]

1        MR. FOLKENFLIK: Objection. Let me
2    take --
3        MR. CONWAY: Any way you want to
4    phrase it,
5        MR. FOLKENFLIK: Look. First of
6    all, we don't know whether it was or was not the
7    Rapillos' money that Mr. Holzer used. It may
8    have been, it may not have been. It was
9    $500,000 out of his account to V Campus.
10       MR. CONWAY: Out of Mr. Holzer's
11   account to V Campus.
12       MR. FOLKENFLIK: And $800,000 went
13   into his account from the Rapillos. We don't
14   know whether there were millions of dollars in
15   that account --
16       MR. CONWAY: From Mr. Holzer, we
17   know there was nothing there.
18       MR. FOLKENFLIK: We don't know. We
19   have assumptions and that may be correct.
20       MR. CONWAY: However, on the day he
21   received $800,000.
22       MR. FOLKENFLIK: Let's take it a
23   step at a time. There was a public filing. V
24   Campus was a public company. They publicly
25   stated in their public filing that Mr. Holzer.

[Page 99]

1    with his own funds, according to them --
2        MR. CONWAY: I have seen those
3    files.
4        MR. FOLKENFLIK: Mr. Holzer with
5    his own funds bought 500,000 shares of
6    securities on that day. We can stipulate that
7    that's what they said publicly. That's fine
8    with us.
9        MR. CONWAY: Right.
10       MR. FOLKENFLIK: Now, what happened
11   to Mr. Holzer's interest in V Campus, such as it
12   was, you can ask Mr. Fingerhut to explain. We
13   gave you documents reflecting that transaction
14   between Mr. Holzer and Mr. Fingerhut.
15       MR. CONWAY: What you gave me last
16   Friday? We'll get to that. That's still down
17   the road.
18       MR. FOLKENFLIK: Let's get to some
19   of those things that may be relevant to your
20   theories as opposed to Haverstraw.
21   Q.   Sir, did there come a time when
22   Mr. Holzer transferred to you $500,000 worth of
23   V Campus stock?
24       MR. FOLKENFLIK: Objection as to
25   form. Did there come a time when there was a

[Page 100]

1    transfer concerning -- when there was a
2    transaction concerning V Campus?
3    Q.   You want to try it that way. Sir,
4    did there come a time subsequent to the date of
5    March 23rd, 2006 where there was a transaction
6    between yourself and Mr. Holzer --
7    A.   No.
8    Q.   -- of V Campus stock?
9    A.   No.
10   Q.   Did you at any time -- did
11   Mr. Holzer at any time transfer $500,000 worth
12   of V Campus stock to you?
13   A.   That was -- I don't know. That was
14   the -- no, this was the later -- you know what?
15   I'm sorry. I'll take that back. He did. He did
16   that. That stock is worthless. But I would
17   just tell you that's what happened.
18   Q.   Okay, he gave you --
19   A.   He didn't give me a thing, believe
20   me.
21   Q.   He gave you stock that he had
22   purchased for $500,000.
23       MR. FOLKENFLIK: Counsel, there was
24   a transaction, a contingent assignment. The
25   contingencies occurred and certain securities

[Page 101]

[26]  (Pages 98 to 101)

1  would have been transferred in accordance with
2  the contingency assignment when those
3  contingencies occurred.
4       THE WITNESS:  Correct.
5       MR. FOLKENFLIK:  We gave you the
6  contingent assignment.  Why don't you ask about
7  it, because it doesn't refer to the 500,000
8  shares specifically.  It refers to stock
9  ownership.
10      MR. CONWAY:  I agree.
11      MR. FOLKENFLIK:  So you're creating
12  a confusing record by --
13      MR. CONWAY:  No, not intentionally.
14      MR. FOLKENFLIK:  I didn't say the
15  word "intentionally."
16      MR. CONWAY:  I'm following the same
17  timeline that the district attorney did.
18      MR. FOLKENFLIK:  But the district
19  attorney didn't refer to the contingent
20  assignment or to the timeline.
21      MR. CONWAY:  So let us clarify
22  that.
23      MR. FOLKENFLIK:  So clarify it.
24  And since you have the document, why don't you
25  use it.

[Page 102]

1  A.  Of what?
2  Q.  Proofs of purchase of the
3  properties that were in question.
4  A.  No.
5  Q.  At any time during the multiyear
6  period when Mr. Holzer was supposedly making
7  these purchases and you were extending large
8  sums to him, did you ever discuss with him the
9  parties that were involved in the transactions?
10  Lawyers, closing companies, anything like that?
11  A.  Yes.  I mean, what was discussed
12  were these two guys, the other buyers.
13  Q.  Did you ask where the documentation
14  was?
15  A.  I've already told you I haven't.
16  We can go over this a hundred times.  I will
17  tell you I have not done it, I'm not happy that
18  I didn't do it.  It was a big error.  Okay?  But
19  you keep asking me the same question.  I haven't
20  done it.
21  Q.  Now, you consider this a
22  $12 million error?
23  A.  At least.  Does that make you feel
24  better?
25  Q.  Yes.

[Page 104]

1       MR. CONWAY:  We'll get there, Max.
2  We'll get there.  We'll get there.
3       MR. FOLKENFLIK:  I doubt it.
4  Q.  At the time that Mr. Holzer
5  transferred the $200,000 to you that you've
6  already referred to --
7  A.  You mean paid me 200,000.
8  Q.  Okay, now, was this as part of a
9  transaction that had additional elements?
10  A.  I have no idea except that he owed
11  me a huge amount of money and there was a time
12  when he paid me something.
13  Q.  You would not dispute the date of
14  the transfer as being December 15th, 2005.
15      MR. FOLKENFLIK:  Counsel, I told
16  you we'll see if we can dig up the record and we
17  will stipulate to it.  My supposition is that
18  date is correct because the affidavit was
19  supposedly prepared after review of the banking
20  records.  But we will verify that and stipulate
21  to it.
22  Q.  Now, sir, while you were extending
23  the portions of the $12 million over this
24  three-year period, did you ask Mr. Holzer at any
25  time for any proofs of purchase?

[Page 103]

1  A.  Good.  I'm glad.
2  Q.  Let's take a look at the Thatcher
3  document.
4       MR. FOLKENFLIK:  Can we go off the
5  record for a moment?
6       MR. CONWAY:  You certainly may.
7       (Discussion off the record.)
8  Q.  During the time that you and
9  Mr. Holzer also were partners --
10      MR. FOLKENFLIK:  Objection as to
11  form.
12  Q.  When you and Mr. Holzer were
13  participating in Fingerhut-Holzer Partners --
14      MR. FOLKENFLIK:  LLC.
15  Q.  -- LLC, did Mr. Holzer show an
16  inability to pay his personal expenses?
17      MR. FOLKENFLIK:  His personal
18  expenses.
19  Q.  Personal expenses, yes.
20      MR. FOLKENFLIK:  Other than the
21  expenses that may have been covered by the
22  $1,062,000.
23      MR. CONWAY:  Right.
24  A.  Do me a favor, repeat that, please.
25  Q.  During the period that you were

[Page 105]

1  functioning as Fingerhut-Holzer Partners, did
2  Mr. Holzer show you an inability to cover his
3  personal obligations?
4       MR. FOLKENFLIK: Other than the
5  $1,062,000.
6       A.   I don't believe so.
7       MR. CONWAY: That would be part of
8  it.
9       A.   Just that.
10      Q.   And what were the circumstances
11  around your extending a million dollars of your
12  personal funds to Mr. Holzer for his personal
13  needs?
14      A.   Didn't I just tell you this about
15  five minutes ago?
16      MR. FOLKENFLIK: Yes.
17      Q.   Okay.
18      Now, there were parties identified
19  in this document, a gentleman by the name of
20  Adam Gurney, an Arab investor.
21      A.   A what? What was the last name?
22      MR. FOLKENFLIK: An Arab investor.
23  A sheik.
24      A.   Sheikh Mohammed.
25      Q.   What was your hoped for involvement

[Page 106]

1  of Sheikh Mohammed with Fingerhut-Holzer
2  Partners?
3       A.   That was the Synconium limited
4  partnership.
5       Q.   And what was that about?
6       A.   That was the partnership investing
7  in the area of disabilities. It was to be a
8  limited partnership, a venture partnership
9  essentially. Adam Gurney -- I don't know what
10  kind of a friend he was with David but I met him
11  through David. I met him in Ireland and he had
12  recommended -- well, at least I thought he had
13  recommended a visit to the sheik in Dubai.
14      Q.   Did you ever meet this sheik?
15      A.   No.
16      Q.   What was the sheik going to invest
17  in?
18      A.   Synconium partnership.
19      Q.   Now, did there come a time in 2006
20  when you had to borrow $4.5 million from
21  JPMorgan Chase for a series of investments in
22  Fingerhut-Holzer Partners?
23      A.   Did I have to borrow it? No. But
24  I did.
25      Q.   Did you choose to borrow it? And

[Page 107]

1  the $4.5 million was intended for what purpose?
2       A.   Investments in the series of
3  investments we have been talking about.
4       Q.   Were any of those investments in
5  the Haverstraw real estate properties?
6       A.   I'm not sure. It's all a function
7  of timing. Whenever it was done. There's a
8  whole series of investments made here.
9       Q.   Well, it's identified in the report
10  as being a 2006 investment.
11      A.   Okay, so if there are investments
12  made in 2006 in Haverstraw, it could be likely
13  that it's there. No, in fact, it's Beacon and
14  Monticello.
15      Q.   Now, are you familiar with the term
16  "Dellwood"?
17      A.   Dellwood. Dellwood is the
18  investment thing or the real estate thing that
19  David talked about?
20      Q.   Yes. That was the putative
21  investor scheduled to purchase these properties.
22      MR. FOLKENFLIK: No. It was the
23  putative -- he was the investee. It was the
24  partnership in which the money was being
25  invested. And Dellwood was acquiring the

[Page 108]

1  property in Haverstraw and Beacon and others.
2       Q.   Did you ever see any participation
3  by Mr. Holzer in Dellwood?
4       A.   I don't understand.
5       Q.   Did he ever show you any
6  documentation that would indicate that he had
7  purchased an interest in Dellwood and was
8  participating in the purchase of these
9  properties?
10      A.   No.
11      Q.   Did you ever ask to see any such
12  proof?
13      A.   No.
14      Q.   Do you know what the intended
15  purchase price of all of the investments upstate
16  were?
17      A.   The intended purchase price?
18      Q.   The intended purchase price.
19      MR. FOLKENFLIK: The witness
20  testified that over time new properties were
21  identified and additional purchases were made.
22  There wasn't a solitary intended purchase.
23  There wasn't a solitary intended purchase price.
24      Q.   Well, the term "$96 million"
25  appears in the documentation in the timeline of

[Page 109]

[28]  (Pages 106 to 109)

```
 1   events, number 1.  That sum of $96 million came
 2   from where?
 3       A.    Beats the hell out of me.  I don't
 4   know that number.  What does that say?
 5       Q.    It says --
 6           MR. FOLKENFLIK:  What paragraph are
 7   you on?
 8       Q.    Paragraph 1.  "I purchased half of
 9   David's interest unbeknownst to others.  The
10   major reason for the establishment of
11   Fingerhut-Holzer was to take advantage of the
12   new monies from the sale of the property, at the
13   time approximately $96 million versus the $30
14   million cost."  That's written in the first
15   person.
16       A.    Right.
17       Q.    Now, during the course of the
18   investment --
19           MR. FOLKENFLIK:  This says it was
20   approximated that the sale of properties that
21   were purchased for 30 million could take
22   place --
23       A.    He had a third and I had a half of
24   that.  So it works out.
25       Q.    Well, you were a hidden investor in
```

[Page 110]

```
 1   David's one-third, weren't you?
 2       A.    A hidden investor?
 3           MR. FOLKENFLIK:  Objection as to
 4   form.  Hidden from whom?
 5       Q.    Your interest in David's
 6   contribution was not disclosed to anyone, as
 7   best you know.
 8       A.    I have no idea.
 9       Q.    Did there come a time when you
10   bought half of David's one-third?
11       A.    That I bought half of David's
12   one-third.
13       Q.    Yes.
14       A.    I don't know.
15       Q.    You indicate in BF 0032, the sixth
16   line down, "I purchased one-half of David's
17   interest unbeknownst to others."
18       A.    Okay, then I did.  What am I gonna
19   say?
20       Q.    Why would you wish to be an unknown
21   investor in David's one-half -- in David's
22   one-third?
23       A.    Jeez, I don't know.  We've gone
24   over this.  This was a mistake.  I didn't wish
25   to do anything like that.  Okay?
```

[Page 111]

```
 1       Q.    Well, why would you need to not be
 2   revealed to the other investors?
 3           MR. FOLKENFLIK:  Objection as to
 4   form.
 5       A.    It wasn't an issue for me.
 6       Q.    Well, you're writing there, "I
 7   purchased one-half of David's interest
 8   unbeknownst to others."  Why would you have to
 9   hide the --
10           MR. FOLKENFLIK:  Objection.
11       A.    It was not up to me.
12       Q.    What was not up to you?
13       A.    I wasn't saying you have to hide
14   it.  It was his issue.  It wasn't mine.
15       Q.    Did you create a document that
16   established that you had half of this
17   investment?
18       A.    No.  N-O.
19           MR. FOLKENFLIK:  That's about the
20   seventh time you asked that question.
21       A.    Why do you keep going over this?
22   Listen, these were not good investments.  This
23   is -- I was going to say the F word, but this is
24   fraud.
25           MR. FOLKENFLIK:  That's the F word.
```

[Page 112]

```
 1       A.    What can I say?  But if you'd like,
 2   I'll tell you again, this was a mistake.  All
 3   right?
 4       Q.    Did David give you any reason why
 5   the transaction for the sale of these properties
 6   was not completed?
 7       A.    Why don't you look in the diary.
 8   It's all in there.  There were a whole series of
 9   explanations why, and they were not truthful.  I
10   don't know if you really need to go over all
11   those.  They're right in there.
12           MR. FOLKENFLIK:  And then there was
13   a point at which David claimed the transaction
14   had been completed.
15           MR. CONWAY:  I saw.  I saw it.
16           MR. FOLKENFLIK:  Okay.  And what
17   difference does this make to your clients'
18   claim?
19       Q.    Did there come a time when you
20   began investing in a stock called V Campus?
21       A.    Yup.
22       Q.    How big a position did you take in
23   V Campus?
24       A.    Well, to make it very clear, V
25   Campus we had originally financed as a private
```

[Page 113]

```
 1    company out of Weekly. Okay? And we sold it
 2    when it went public. Then I repurchased it back
 3    in, I don't know, 2001 or something like that
 4    for my own account.
 5        Q.   V Campus had gone public before
 6    2001?
 7        A.   1999 I believe.
 8        Q.   To your best recollection --
 9            MR. FOLKENFLIK: Let him finish the
10    story. It might be helpful.
11        A.   That's it. The initial investment
12    that we made in Weekly we sold out when it went
13    public. I was a board member. I left the board
14    after we sold the shares. It was a huge hit,
15    too. But it was the time that anything worked,
16    1999. Then I bought it back as a public
17    company.
18        Q.   So you divested yourself of an
19    owner's interest --
20        A.   But that was not me. That was
21    Weekly.
22        Q.   And did you extract some benefit
23    from that as a participator in Weekly?
24        A.   Yes.
25        Q.   And when --
```

[Page 114]

```
 1        A.   I had a carried interest. We had
 2    carried interests.
 3        Q.   When did you begin purchasing it on
 4    the market?
 5        A.   I don't remember exactly. It was
 6    either 2000 or 2001.
 7        Q.   And in Fingerhut-Holzer Partners
 8    you intended to continue purchasing it?
 9            MR. FOLKENFLIK: Objection.
10    Assumes facts not in evidence.
11        A.   The investment made by
12    Fingerhut-Holzer in V Campus was not in the --
13    it was not common equity, I believe it was a
14    private placement. It was a preferred stock I
15    believe.
16            MR. CONWAY: I'm going to need five
17    minutes.
18            (Recess taken.)
19    BY MR. CONWAY:
20        Q.   In reading the Thatcher document,
21    it's indicated that in 2004 Mr. Holzer informed
22    you that the Haverstraw property was going to be
23    sold for $99 million, and that their share of
24    the proceeds would be approximately $33 million.
25    So in 2004 did Mr. Holzer indicate
```

[Page 115]

```
 1    to you who the purchaser would be who would
 2    offer $99 million for the property?
 3        A.   No. I don't remember that date
 4    either, 2004. But that's not my diary I don't
 5    believe.
 6        Q.   No, this is the Thatcher Associates
 7    document. Do you disagree that the number of
 8    99 million came up in the year 2004?
 9        A.   I don't remember it.
10        Q.   Approximately what time did you
11    come to believe that you were dealing with
12    Mr. Holzer as a fraud?
13        A.   Fall of 2007. Look in the diary
14    notes.
15        Q.   I see, I see. What caused you to
16    reach that conclusion in 2007?
17        A.   A number of things, but again, if
18    you read that --
19        Q.   Reading it doesn't put it on the
20    record.
21            MR. FOLKENFLIK: Just list your
22    best recollection as you're sitting here.
23        A.   The best recollection was when he
24    told me that there was a sale and that in fact,
25    he produced a deposit for $33 million in an
```

[Page 116]

```
 1    account and showed me -- and actually, the
 2    person who was running, still is, York Tango
 3    because she was waiting for funds. And then
 4    deposited in the FH LLC account, and of course
 5    it bounced.
 6        Q.   FH LLC. The Fingerhut-Holzer
 7    account.
 8        A.   Whatever.
 9        Q.   He put that in the Fingerhut-Holzer
10    account.
11        A.   Yeah. And it bounced. JPMorgan
12    shut down all the accounts the next day.
13        Q.   Now, did that functionally stop
14    business from going forward at Fingerhut-Holzer
15    Partners?
16        A.   Well, I would say yes. Although
17    the funds inside Fingerhut-Holzer were basically
18    paying wages and rent.
19        Q.   What do you mean --
20        A.   When you say did it shut down
21    Fingerhut-Holzer, the bank stopped the ability
22    to pay salaries. That would have shut it down.
23        Q.   When JPMorgan closed the accounts,
24    did it close down all of the accounts attached
25    to Fingerhut-Holzer?
```

[Page 117]

```
 1       A.   Yes.
 2       Q.   Did that mean that you were not
 3  able to accept funds or issue funds out of the
 4  Fingerhut-Holzer accounts?
 5       A.   Yes. There weren't a lot of funds
 6  in any case, but that didn't matter. He bounc[ed]
 7  the check. There were $10,000 in the accou[nt]
 8  and he wrote a check for 30 million. It does[n't]
 9  work.
10       Q.   Now, on what account did he writ[e]
11  the $33 million check?
12       A.   What does that mean, "on what
13  account"?
14       Q.   What account was issuing the
15  $33 million?
16       A.   It was I think his own personal
17  account.
18       Q.   His personal account.
19       A.   I think so, yes. I don't remember
20  exact -- I don't remember what account it was
21  supposedly written on.
22       Q.   Did you ever see the check?
23       A.   No. Just the deposit. No, wait a
24  minute -- no, no, no, I only saw the deposit. I
25  have copies of other checks that he wrote that
```

[Page 118]

```
 1  bounced, too.
 2       Q.   Previously?
 3       A.   No. After.
 4       Q.   And is there a reason that
 5  Mr. Holzer -- is there a reason that you're
 6  aware of that Mr. Holzer would have created a
 7  fraudulent document like this at that time?
 8       A.   It's hard to understand how he
 9  could have done it and think he could have
10  gotten away with it, but it happened that he
11  knew that the person from Tango was coming over
12  and she was looking for the funds that he was
13  supposed to be contributing. And I suspect that
14  what he did was, he wrote this -- he phoned up
15  this deposit as a way of putting her off saying
16  it would take a day or so to clear. Whatever
17  the hell that meant on a wire I have no idea.
18       Q.   Now, why would the money be going
19  to Tango?
20       A.   We committed to invest in Tango.
21       Q.   When you indicated a woman was
22  coming over from Tango --
23       A.   She's the CEO.
24       Q.   The CEO wanted a check for further
25  investment in Tango.
```

[Page 119]

```
 1       A.   Well, we had committed to it.
 2       Q.   When you indicate --
 3       A.   And I had done my half and
 4  obviously David had not done his.
 5       Q.   Well --
 6       A.   You have to know her. She's tough.
 7  She's very tough. She's terrific. I wish I had
 8  20 more like her. She came over and she wanted
 9  the other half of the funds.
10       Q.   Just for the record, who is she?
11       A.   Her name is Andrea Miller. She's
12  still running the company.
13       Q.   Now, you had already extended your
14  half of the investment?
15       A.   Yes.
16       Q.   Did you extend it through
17  Fingerhut-Holzer Partners?
18       A.   No. It was me. I ended up having
19  to basically cover what he didn't do. Again,
20  for myself.
21       Q.   Was David going to issue the funds
22  from Fingerhut-Holzer?
23       A.   Well, I suspect that that was the
24  idea if in fact anybody accepted a check that
25  was written for 33 million on a $10,000 balance.
```

[Page 120]

```
 1  So if it would have gone into Fingerhut-Holzer,
 2  then it wouldn't have, so what's the difference.
 3       Q.   You would have found out that the
 4  check was fraudulent within 24 hours, correct?
 5       A.   I did.
 6       Q.   What did you then do?
 7       A.   That's when I hired Thatcher.
 8       Q.   The next day?
 9       A.   Mm-hmm. Well, actually, that's
10  probably not true. I went to -- what's his
11  name?
12            MR. FOLKENFLIK: Howard Wilson.
13       A.   Howard Wilson.
14            MR. FOLKENFLIK: Proskauer.
15       Q.   I saw that. Is Proskauer a law
16  firm with which you had dealt previously?
17       A.   Proskauer is the law firm that
18  dealt with FEGS.
19       Q.   What's that?
20       A.   The Federation of Employment
21  Guidance Service. It's the largest social
22  service agency in New York City if you exclude
23  the hospitals. I was chairman of it.
24       Q.   FEGS?
25       A.   Yes. I spent a lot of time with
```

[Page 121]

[31]  (Pages 118 to 121)

1    Proskauer.
2        Q.    And the gentleman --
3        A.    Not Howard but a couple other guys.
4    But they recommended Howard.
5        Q.    Right. Mr. Wilson was one of their
6    criminal lawyers?
7        A.    Yes.
8        Q.    And when you --
9            MR. FOLKENFLIK:  Among other
10   things.
11       A.    Yes.
12       Q.    So you had initial concern that
13   there was some criminal liability that could
14   extend to the firm and to yourself personally?
15       A.    Wouldn't you think so?
16       Q.    I agree.
17       A.    Okay.
18       Q.    Now, of course not asking what
19   Mr. Wilson's advice to you was, what did you
20   then do?
21       A.    I retained Thatcher. I needed to
22   see if there -- I wanted to see evidence of what
23   was happening and if there was something to be
24   defended against.
25       Q.    How did Thatcher come to you?

[Page 122]

1        A.    Through Wilson.
2        Q.    Wilson recommended Thatcher?
3        A.    Yes.
4        Q.    Now, had you had conversations with
5    Mr. Holzer before you went to Proskauer relative
6    to the entire extent of your relationship?
7        A.    You mean to Wilson?
8        Q.    No. Did you have conversations
9    with Holzer. When the check bounced --
10       A.    No. Because it bounced the next
11   day, he wasn't in.
12       Q.    Did you see him before you went to
13   Thatcher?
14       A.    Did I see him before I went to
15   Thatcher? I don't know. I don't think so.
16       Q.    Now, Thatcher is not an attorney.
17       A.    He might be, but they're not a law
18   firm.
19       Q.    They don't practice as a law firm.
20       A.    He does private investigations.
21       Q.    Who did you deal with there?
22       A.    Thatcher.
23       Q.    Mr. Thatcher himself?
24       A.    Mm-hmm. And his right hand guy,
25   I'll think of it in a minute. But mainly

[Page 123]

1    Thatcher.
2        Q.    Do you recall Mr. Thatcher's first
3    name?
4            MR. FOLKENFLIK:  Toby.
5        Q.    And how long did you deal with
6    Mr. Thatcher before the document that we've
7    identified here as --
8        A.    The assignment?
9        Q.    Yes.
10           MR. FOLKENFLIK:  The assignment or
11   the Thatcher draft?
12       Q.    The Thatcher draft.
13       A.    You mean this one here?
14           MR. FOLKENFLIK:  Exhibit 7. Which
15   is dated 11/1.
16       A.    How long did I deal with him?
17           MR. FOLKENFLIK:  The witness
18   testified he went to Thatcher the day after the
19   check bounced.
20       Q.    Do we know the date the check
21   bounced?
22       A.    No, but I could find that out. It
23   was October -- I'm not sure. It was '07. It
24   should be in the notes that I have.
25       Q.    I'm sure it's there. Let's find

[Page 124]

1    the date.
2            MR. FOLKENFLIK:  It appears to be
3    that the check bounced on the 6th of June. On
4    the 5th or 6th of June. See it on BF 33. And
5    the report is dated 11/1.
6        Q.    On whose advice was it to begin the
7    daily diaries?
8        A.    I don't think it was anyone's
9    advice. It was me writing it. But I think once
10   I started, and I think I showed it to Toby, I
11   think they said continue.
12       Q.    They indicated write the diary?
13       A.    I think they told me that it wasn't
14   a bad idea. Now, they also did their own
15   independently of mine.
16       Q.    So there is other documentation
17   that may exist --
18       A.    You're looking at it.
19       Q.    By that I mean is there other
20   documentation beyond what we've identified here,
21   is there a final report, is there a further
22   investigation? Is there a side investigation,
23   anything of that nature?
24       A.    No. I mean, this basically
25   encapsulates everything. Was there a final

[Page 125]

[32]  (Pages 122 to 125)

1 document that he gave me?
2     Q.   Yes.
3     A.   I'm sure there was.
4         MR. CONWAY: By counsel, the
5 document that you extended is called a TA draft.
6         MR. FOLKENFLIK: That's correct.
7         MR. CONWAY: Do we know if there's
8 a final issuance?
9         MR. FOLKENFLIK: I don't have one.
10    Q.   Now, this particular document which
11 we've identified, when did you see it for the
12 first time?
13    A.   This document?
14    Q.   This document.
15        MR. FOLKENFLIK: By the document he
16 just means the first pages -- did you see it at
17 or about the date it is dated, 11/15/07?
18    A.   Yes. But I saw it many times
19 before that.
20    Q.   They showed you before?
21    A.   Yes, but I also had a lot of
22 conversations. They also came to the office,
23 they took apart his hard drive. They did a lot
24 of work.
25    Q.   Now, all of this predates your

[Page 126]

1 going to the district attorney.
2         MR. FOLKENFLIK: What does "all of
3 this" mean?
4     Q.   The efforts by Thatcher Associates
5 predate your going to the district attorney.
6     A.   I'm not sure that I waited until a
7 final report before I went. But clearly
8 Thatcher predated the district attorney, no
9 doubt. I mean, I had a feeling that they were
10 right.
11    Q.   Now, when they came in -- when
12 Thatcher came in they took apart from Holzer's
13 computer?
14    A.   Yes.
15    Q.   Did they --
16    A.   Well, the hard drive.
17    Q.   Did they take possession of it?
18    A.   They did and then they brought it
19 back.
20    Q.   Did they take possession of his
21 phone?
22    A.   I don't know. I don't want to add
23 any titillation here.
24        (Fingerhut Exhibit 8 for
25 identification, Bates No. BF 54 through 57)

[Page 127]

1     Q.   There were a series of documents
2 that were marked on our break. Can you identify
3 Exhibit number 8.
4     A.   I don't know who this person is.
5         MR. FOLKENFLIK: Can you identify
6 this waiver of notice of organization meeting,
7 Fingerhut-Holzer, Waverly LLC?
8     A.   I don't remember this. But is
9 there a date on here?
10    Q.   December 27th, '05.
11    A.   What is this? I don't know. This
12 is part of the creation of the document? I
13 don't know what this is.
14    Q.   No, it would not have been.
15    A.   I mean of the organization.
16        MR. FOLKENFLIK: Counsel, this
17 appears to be a document that comes from the
18 office of the Secretary of State of Delaware.
19 No, it's -- let me see. New York. It appears
20 to be an official document establishing the
21 organization Fingerhut-Holzer, the Waverly I
22 LLC.
23        MR. CONWAY: Rather than go through
24 the witness, do you want to stipulate to that?
25        MR. FOLKENFLIK: We'll look online

[Page 128]

1 and if it's an official document, we'll
2 stipulate to it.
3         MR. CONWAY: I'm sure it's correct.
4     Q.   Did Fingerhut-Holzer have an
5 investment that was known as Fingerhut-Holzer,
6 the Waverly I LLC?
7     A.   I don't remember.
8     Q.   You don't recall that?
9         MR. FOLKENFLIK: Counsel, I believe
10 that's the entity to which your client wired
11 their $300,000.
12        MR. CONWAY: Agreed.
13    Q.   And you don't have any recollection
14 of it?
15        MR. FOLKENFLIK: The witness
16 already testified about the Waverly.
17    A.   A couple times.
18        MR. FOLKENFLIK: The question is
19 the precise name and identity of the
20 organization, since there were so many with
21 confusingly similar names.
22    Q.   Did you have multiple Waverly
23 investments?
24    A.   Did I? Did I make them myself?
25    Q.   Did Fingerhut-Holzer have multiple

[Page 129]

[33] (Pages 126 to 129)

1  Waverly investments?
2      A.   I believe so. I'm not sure on
3  Waverly. A couple of them we did.
4          MR. FOLKENFLIK: If you look at
5  Exhibit number 3, the witness just to save time
6  can identify --
7      A.   No, that was Waters Edge.
8          MR. FOLKENFLIK: You can identify
9  the investments that may have had some
10  connection to the same developer as the Waverly.
11  Why don't you do that.
12      A.   Well, Waverly, Waters Edge, Village
13  Walk and Augustine Island are all the same
14  developer. All in Jacksonville.
15          (Fingerhut Exhibit 9 for
16  identification, Bates No. BF 58 through 89)
17      Q.   Now, take a look at Exhibit 9.
18  What is Exhibit number 9?
19      A.   You just gave it to me.
20      Q.   Yes, what is it?
21          MR. FOLKENFLIK: It's the operating
22  agreement of Fingerhut-Holzer Partners LLC.
23      Q.   And is this the operating document
24  of Fingerhut-Holzer Partners, as best you know?
25      A.   I assume so.

[Page 130]

1      Q.   Sir, would you take a look at the
2  date on that.
3      A.   October 25th, 2007.
4      Q.   Now, this document was created
5  after you determined that Mr. Holzer was acting
6  dishonestly within the company. Correct? For
7  what purpose would you create an operating
8  agreement after there is a fracture of the firm
9  such as you have described?
10      A.   This is really not anything to do
11  with him. This is me selling a membership
12  interest to my son. If you look under
13  "recitals." This was not the first formation of
14  this thing. This operating agreement goes back.
15      Q.   How far --
16      A.   Effective June 21, 2004.
17      Q.   Do you have a copy of an operating
18  agreement dated June 21, 2004?
19      A.   Not on me.
20      Q.   Do you still have one?
21      A.   I'm assuming I do.
22          MR. CONWAY: I'd ask that that be
23  produced.
24          MR. FOLKENFLIK: We produced what
25  we were able to locate. And if that isn't

[Page 131]

1  amongst those agreements, we've produced it.
2      A.   This was only --
3          MR. FOLKENFLIK: And I believe we
4  did. I think this was one of several documents
5  we produced to you, and there's another one
6  that's the operating agreement for
7  Fingerhut-Holzer Partners LLC that bears an
8  earlier date I believe.
9          MR. CONWAY: I don't believe that
10  we have that. What we have is the
11  Fingerhut-Holzer Fund limited partnership
12  agreement at 10/1/04.
13      A.   Well, all I could say is this is
14  the second document I've seen that refers to
15  Fingerhut-Holzer Partners LLC being formed in
16  2004. Because there's another document already
17  that we looked at.
18      Q.   Yes, we've seen it.
19          MR. FOLKENFLIK: I'll double-check.
20      A.   Look at the first paragraph, you'll
21  see.
22          MR. FOLKENFLIK: I'll double-check.
23  And if we have an earlier version of the
24  operating agreement; however, I believe the
25  operating agreement -- other than -- let me see

[Page 132]

1  this. Other than whatever adjustments were
2  required to be made because of the sale of -- a
3  capital contribution by Andrew Fingerhut, that
4  the nature of the terms of the agreement are
5  probably quite similar.
6      Q.   There came a time after June 2007
7  when you met and sat with Mr. Holzer. On that
8  occasion did you make inquiry of him concerning
9  the nature of his actions in Fingerhut-Holzer
10  and the check for $33 million? Did you ask him
11  what was going on?
12      A.   A check for what?
13      Q.   $33 million. The deposit slip for
14  $33 million.
15      A.   Oh, okay.
16      Q.   Did you meet with him and did you
17  discuss it?
18      A.   Yes. A few times.
19      Q.   What did Mr. Holzer indicate to
20  you?
21      A.   What did he indicate to me?
22      Q.   Yes.
23      A.   He said it was real.
24      Q.   He said what was real?
25      A.   The 33 million.

[Page 133]

[34]  (Pages 130 to 133)

1    Q.   And did he attempt to explain away
2  its absence?
3    A.   Its absence or it bounced?
4    Q.   Its nonexistence.
5    A.   He attempted to.
6    Q.   And what did he say about it?
7    A.   I don't remember offhand, but I
8  have it in my notes. That's why you have them.
9    Q.   I have the notes. However, I need
10  it on the transcript.
11    A.   Well, you're going to have to get
12  it off of there because I don't remember.
13    Q.   You want us to read it again?
14    A.   Do what you want.
15        MR. FOLKENFLIK: If "by the notes"
16  you mean the TA draft or the diary?
17        MR. CONWAY: I presume he means the
18  diary notes.
19        MR. FOLKENFLIK: Well, there are no
20  notes late enough. The latest diary note is
21  8/16/07.
22    A.   Then it's in the TA. Tell me what
23  you want to get.
24    Q.   What I want to know is what did
25  Mr. Holzer explain to you about his actions?

[Page 134]

1        MR. FOLKENFLIK: Did he say
2  anything about why he wrote a $33 million check
3  that bounced?
4    A.   Of course. The deal broke or this
5  or that. He was embarrassed about not admitting
6  to me that the deal didn't happen so he wanted
7  to do it. It was absurd.
8    Q.   The deal didn't happen; however,
9  were there properties that he had purchased with
10  the monies that had been extended?
11    A.   Were there properties that he had
12  purchased.
13    Q.   Yes.
14    A.   With the monies that had been
15  extended.
16    Q.   He had 20 properties there that
17  he's supposed to have purchased. Did he
18  purchase them?
19    A.   Obviously not.
20    Q.   Did you ask him what happened to
21  the money?
22    A.   Yes.
23    Q.   What did he say?
24    A.   He told me the deal broke, he told
25  me, you know, the check got lost in the mail.

[Page 135]

1  Every kind of bullshit excuse you could think
2  of. Were any of them credible? They weren't.
3        MR. FOLKENFLIK: Counsel, if you
4  look at the Thatcher report, it says that the
5  deal keeps getting delayed in the summer.
6        MR. CONWAY: I understand, I saw
7  it.
8        MR. FOLKENFLIK: And to October of
9  2007, paragraph number 7, where Holzer finally
10  admits that the Dellwood investment does not
11  exist and that he has only approximately $40,000
12  left.
13    A.   That was I believe a function of
14  Toby cornering him.
15        MR. FOLKENFLIK: Yes.
16    Q.   And how did that come to be?
17    A.   He came into the office, he and
18  another guy went in and talked to him. They
19  were wired, David admitted it. He confessed to
20  everything.
21    Q.   From June until October he was
22  still continuing to perpetrate the fraud?
23    A.   Yes. And he would continue if he
24  were here today.
25    Q.   Do you know the identities of the

[Page 136]

1  parties that came and confronted him in October?
2        MR. FOLKENFLIK: It's in the notes.
3    A.   Lincoln Ornston. Good guy.
4  Lincoln's not there anymore. He started his own
5  firm. But Toby and Lincoln. By the way, I
6  never realized you could do that, you could have
7  a wire.
8    Q.   Yes, in the State of New York
9  you're allowed.
10    A.   I never realized that. It was
11  amazing.
12        MR. FOLKENFLIK: Counsel, for the
13  record, you'll see that as late as
14  September 15th -- excuse me, I'm wrong about
15  that. Never mind.
16        (Fingerhut Exhibit 11 for
17  identification, Bates No. BF 8 through 13)
18    Q.   Sir, would you take a look at
19  Exhibit 11.
20    A.   Okay.
21    Q.   What is Exhibit 11?
22    A.   It's an assignment of his interests
23  if he doesn't pay.
24    Q.   How did you come to negotiate that?
25    A.   I called my attorney. I told him

[Page 137]

[35]  (Pages 134 to 137)

```
 1   put it together.
 2       Q.    And your attorney is named who?
 3       A.    Kevin Prakke. I think he did a
 4   really good job on this.
 5           MR. FOLKENFLIK: It's a good job.
 6       A.    It is a good document. He's only
 7   $330 an hour.
 8       Q.    $330 an hour?
 9       A.    At the time. Anyway, he wrote
10   this. He forced -- he didn't force, he gave it
11   to Holzer, he signed it. Clearly none of this
12   happened, putting up the cash, so therefore I
13   took back what essentially I had already
14   invested in, in a sense for him.
15       Q.    Was is signed by both parties. Do
16   you recognize your signature?
17       A.    Yup.
18       Q.    Do you recognize David Holzer's
19   signature?
20       A.    Yup, I sure do.
21       Q.    Now, the purpose of this document
22   was to establish what? What did you want to
23   accomplish with this?
24       A.    I wanted to have a contingency in
25   case the monies were not -- that I had put up
```

[Page 138]

```
 1   monies for him. He had ownership in certain
 2   positions as a function of monies that he owed
 3   and was supposedly paying. And I basically had
 4   that to take those properties that I already
 5   bought for myself.
 6       Q.    Now, did Mr. -- this happened
 7   before the confrontation with Mr. Thatcher?
 8       A.    I don't remember the date on that.
 9       Q.    3rd day of October.
10           MR. FOLKENFLIK: And the meeting,
11   according to the --
12       A.    It's about the same.
13           MR. FOLKENFLIK: It's about the
14   same date. It just says October. Thatcher
15   doesn't have the date in October when he
16   confronted Holzer.
17       A.    And in fact -- no. It's related
18   but I don't think Toby was directly involved in
19   giving that document to Holzer.
20           Fingerhut Exhibit 12 for
21   identification, Bates No. BF 14 through 18)
22       Q.    Now, there was also --
23           MR. FOLKENFLIK: Counsel, just to
24   make your life easier, the assignment, as
25   Mr. Fingerhut said, of the V Campus equities
```

[Page 139]

```
 1   that he bought with $500,000 that you suggested
 2   was your clients' money, which is incorrect,
 3   leaving aside the issue of whether Mr. Fingerhut
 4   pursuant to the collateral assignment agreement
 5   would be a bona fide purchaser for value without
 6   notice of the --
 7           MR. CONWAY: An issue to be
 8   resolved at another time.
 9           MR. FOLKENFLIK: Leaving that
10   aside, that stock is worthless.
11       A.    Also I bought stock myself.
12           MR. FOLKENFLIK: Yes, he bought
13   stock himself. That stock is -- the company is
14   not in business. The debtors of the company --
15           MR. CONWAY: Well, it was in
16   business in 2007.
17           MR. FOLKENFLIK: Yes. But not
18   since.
19           MR. CONWAY: And it had a value on
20   October of 2007 --
21           MR. FOLKENFLIK: Not much.
22       A.    I have a $2.3 million investment
23   here that's worthless.
24       Q.    How many shares of stock did you
25   own at the time?
```

[Page 140]

```
 1       A.    I don't know. I have no idea. I
 2   owned a lot because I bought a big piece of this
 3   preferred offering.
 4           MR. FOLKENFLIK: It's not clear
 5   that the stock, although it was trading, had
 6   actual value in October 2007 but it would be
 7   irrelevant in any event.
 8       A.    That's true. This was not a
 9   public --
10           MR. FOLKENFLIK: V Campus was
11   public.
12       A.    This was a preferred -- this was a
13   private offering, if you will. This was not
14   public shares.
15           MR. FOLKENFLIK: Your shares.
16       A.    The ones purchased. I also owned a
17   lot of common, too.
18       Q.    So the value of V Campus at the
19   time would have been greater than the $2 million
20   investment that had been made already?
21           MR. FOLKENFLIK: Maybe less.
22           MR. CONWAY: Possibly, but we don't
23   know.
24       A.    I'm not sure. I don't think a lot
25   more, if that.
```

[Page 141]

[36] (Pages 138 to 141)

1      Q.    Well, if it was worth a stated
2   value or more, then certainly the $500,000 that
3   was transferred would have been its value as of
4   the day of the transfer to you.
5            MR. FOLKENFLIK: No.
6      A.    What does -- what does transfer to
7   me mean? There was no transfer to me.
8            MR. FOLKENFLIK: What happened is
9   that --
10           MR. CONWAY: Do you want to go off
11   the record?
12           MR. FOLKENFLIK: Let's do it on the
13   record.
14     A.    Let me explain the whole thing to
15   you.
16     Q.    It has to be in response to a
17   question.
18           MR. FOLKENFLIK: Let him explain.
19   Would you explain what happened. Go ahead.
20     Q.    First, this document that you've
21   examined, the --
22     A.    Contingency?
23     Q.    The collateral contingent. That
24   was intended by you to take control and
25   possession of the interests of Mr. Holzer up to

[Page 142]

1   the value that you had extended to him.
2            MR. FOLKENFLIK: No.
3      Q.    Which was like 7 million --
4      A.    It was to take control of those
5   interests in the event that the value had not
6   been paid. Not up to the value, not contingent
7   on a particular value. Contingent on
8   non-repayment of what he owed.
9      Q.    There was also a promissory note
10   dated October 9th, 2007 for the sum of
11   $7,603,800.
12           (Fingerhut Exhibit 13 for
13   identification, Bates No. BF 15 through 18)
14     Q.    Can you identify that as the
15   promissory note that was created by you as a
16   companion document --
17     A.    What a joke.
18     Q.    -- to the prior?
19           MR. FOLKENFLIK: This is 7/6.
20     A.    What about it?
21     Q.    That's intended to be a supporting
22   document to the contingent assignment of equity
23   interests.
24     A.    I believe so.
25     Q.    That would essentially make him owe

[Page 143]

1   you in two ways; a promissory note and the
2   contingent surrender.
3      A.    Good luck.
4      Q.    And at the same time did you demand
5   and receive a resignation by Mr. Holzer from
6   Fingerhut --
7      A.    It was a little bit after I think.
8   But it was about the same time.
9            MR. FOLKENFLIK: It says
10   October 15th. The promissory note is dated
11   the 9th. The contingent assignment agreement is
12   dated the 3rd.
13     Q.    Was all of this executed at the
14   Fingerhut-Holzer offices?
15     A.    It must have been because there's
16   no other place I could grab him.
17     Q.    Do you have a present active
18   recollection of being present for this
19   execution?
20     A.    Oh, absolutely. I'm wondering if
21   it was the same -- no, it wasn't the same day as
22   Toby.
23           MR. FOLKENFLIK: Mr. Holzer did
24   deliver, just to shortcut this, two checks
25   aggregating the amount of $7 million on or about

[Page 144]

1   November 29th, 2007, both of which bounced.
2            MR. CONWAY: November 29th?
3            MR. FOLKENFLIK: Yes.
4      A.    When this was all brought to him,
5   he said, well, you know, I've just been hired
6   for -- to be a trader. I guess he had left
7   Breen Murray. I don't remember how that
8   happened. But he had just been hired by some
9   big shot trader and he was getting a 7 or
10   $8 million up-front bonus. And he was going to
11   pay me the $7 million to ameliorate this issue.
12     Q.    That's what he told you.
13     A.    No, he sent me two checks, $7
14   million, and guess what, they bounced, too.
15   Next thing, going to Sing Sing.
16     Q.    Did there come a time when -- now,
17   completing these transactions, had you decided
18   to approach the district attorney concerning
19   this?
20     A.    Yes. I had to be sure that Toby
21   could find what one needed to present to the
22   district attorney.
23     Q.    And did you approach the district
24   attorney yourself or did Mr. Thatcher do it for
25   you?

[Page 145]

[37] (Pages 142 to 145)

1    A.  I'm sure Thatcher did it. I mean,
2  I may have been with him, but I don't remember.
3    Q.  Well, do you have a present active
4  recollection of walking into the district
5  attorney's office and sitting with somebody?
6    A.  No, I never dealt with a district
7  attorney. I dealt with an ADA.
8    Q.  Well, as an assistant district
9  attorney, do you remember sitting with someone
10  at some point --
11    A.  Yes, a couple times.
12    Q.  Who did you sit with?
13    A.  I knew you were going to ask me and
14  I forgot her name.
15    Q.  Is that Ms. Pane?
16    A.  Yes. What's her first name?
17    Q.  Christine Payne.
18    A.  Yeah, that's it. She left for --
19    Q.  She was pregnant.
20    A.  Yeah, yeah. She was great. She
21  did a great job.
22    Q.  Did you then deal with the
23  successor assistant district attorney?
24    A.  Yeah, but the majority of the work
25  was done by Chris.

[Page 146]

1    Q.  Do you recall meeting any
2  successor?
3    A.  I'm not sure I met her. I talked
4  to her.
5    Q.  All right, did there come a time
6  when you were asked to testify to the grand
7  jury?
8    A.  Yes.
9    Q.  And did you do so?
10    A.  Yes. Chris was I think still the
11  ADA on that.
12    Q.  She handled the questioning of
13  you --
14    A.  Yes.
15    Q.  -- as a grand jury witness?
16    A.  Yes.
17    Q.  When was the last time you saw
18  Mr. Holzer?
19    A.  I'm not sure if it was the day that
20  Toby and Lincoln came in to have him confess.
21  There may have been one more day he was in that
22  he gave me those checks. No, you know what,
23  that's not right. This was independent I
24  believe of Toby and Lincoln. This might have
25  been a week later he was in. I had it all

[Page 147]

1  prepared and I wasn't going to let him get out
2  without doing this.
3    Q.  Mr. Prakke?
4    MR. FOLKENFLIK:  When the witness
5  said "this" he was pointing to Exhibit 13.
6    A.  I'm sorry, the contingent and the
7  promissory note.
8    Q.  That was created by your attorney?
9    A.  Yes.
10    Q.  Mr. Prakke?
11    A.  Yes.
12    Q.  When they were executed, they were
13  executed solely in the presence of Mr. Holzer
14  and not with anyone else?
15    A.  I don't know.
16    Q.  I didn't see a witness there.
17    MR. FOLKENFLIK:  I didn't see a
18  notary certificate.
19    A.  The contingent thing, there's just
20  two signatures I know, Holzer and myself.
21    Q.  All right, now you were making
22  reference to this in some regard?
23    MR. FOLKENFLIK:  No, he said there
24  were only two signatures.
25    A.  That was the next time I saw

[Page 148]

1  Holzer. He signed that, the note, and I believe
2  also maybe he was in one later time because when
3  he did his resignation, I don't remember if it
4  was the same date or not. I don't think so, it
5  was later. But not much later. So maybe I saw
6  him once or twice after he confessed.
7    Q.  Now, as regards the V Campus
8  stock --
9    MR. FOLKENFLIK:  Could we go off
10  the record for a minute?
11    MR. CONWAY:  Sure.
12    (Discussion off the record.)
13    Q.  Do you know who the founder of V
14  Campus was?
15    A.  I'm not sure. I know the guy who
16  was running it for many years.
17    Q.  Who was that?
18    A.  Of course I can't remember his name
19  either. Nat Kannan.
20    Q.  Nat Kannan?
21    A.  Nat Kannan, K-A-N-N-A-N.
22    Q.  And you indicated you were on the
23  board of V Campus?
24    A.  That was about four or five years
25  before that.

[Page 149]

[38]  (Pages 146 to 149)

**[Page 150]**

1       MR. FOLKENFLIK: He testified he
2   was on the board when it went public.
3       A.   Right, from about 1995 to '98 or
4   '9.
5       Q.   Was V Campus affiliated with any
6   particular university?
7       A.   Any particular university?
8       Q.   University, yes.
9       A.   I don't think so.
10      MR. FOLKENFLIK: I think the V
11  stands for virtual.
12      A.   Its first name was University
13  Online. If that's what you're thinking.
14      Q.   That was its formal name.
15      A.   Yeah, it's a little complicated
16  because they bought a number of companies, and
17  one of the companies they bought became bigger
18  than them. But they were initially called
19  University Online when we invested in it as
20  to -- as a Weekly investment. When it went
21  public it was still called University Online.
22      Q.   Did it have any call letters that
23  you would know on the stock --
24      A.   UOLC I think. I mean, it was
25  over-the-counter. They then bought a series of

**[Page 151]**

1   companies, one was called Pro Soft, and there
2   was a second. And I think at the time they
3   bought the second -- the first or the second
4   company, they renamed the company to V Campus
5   because it was more than just a University
6   Online.
7       Q.   And do you know what it was
8   capitalized at when it went public?
9       MR. FOLKENFLIK: By "capitalized"
10  you mean the market cap?
11      Q.   Market cap.
12      A.   Oh, lord, I don't. I would say it
13  was probably, given where we were as an investor
14  where we had probably no more than 10 million
15  pre on the investment, I would say it was
16  probably somewhere in the 25, $30 million range
17  when it went public.
18      Q.   When you say 10 million preferred,
19  you had 10 million shares?
20      A.   No, 10 million pre money in the
21  value.
22      Q.   How many shares --
23      A.   This is all long prior to the
24  events at issue. I would have to go back and
25  look at it. But given what we would do back in

**[Page 152]**

1   those days, probably a 3, 4 million investment,
2   so it was probably 25 to 30 percent post Weekly
3   owned of University Online.
4       Q.   How many shares did
5   Fingerhut-Holzer own at its peak?
6       A.   They never owned University Online.
7       Q.   When your records indicate V
8   Campus, what is it referring to?
9       A.   V Campus. That's after they
10  changed the name. It wasn't the same company.
11  They bought a number of other companies.
12      Q.   The company that went public is not
13  the same company as V Campus?
14      A.   The company that went public was
15  University Online. They bought at least two
16  other companies and then changed their name to V
17  Campus.
18      Q.   All right, when they became V
19  Campus, what was their stock value?
20      A.   I don't know offhand. Probably not
21  a great deal different than when we sold it.
22      Q.   And what did you sell it for?
23      A.   As I said, I think it was like 25,
24  30 million. Actually, it was probably more. I
25  don't know. I don't remember. It was a mistake

**[Page 153]**

1   to buy it then because clearly it went down a
2   lot. What ended up happening with the company
3   had nothing to do with the equity value. What
4   happened was that the company was really,
5   really, really poorly run. However, the Pro
6   Soft product was a terrific product. It's a
7   CIW --
8       MR. FOLKENFLIK: Just talk about
9   what happened to the equity in the company.
10      A.   Okay, well, what happened was it
11  was mismanaged. Never generated enough cash and
12  was always in a position of trying to get cash,
13  get new equities, et cetera, et cetera. That
14  was the preferred piece that we show in there.
15      Q.   And then --
16      A.   Wait a minute. I'm not finished.
17  That didn't work either. The company was in
18  really sorry shape. I then lent the company
19  money.
20      Q.   How much?
21      A.   I don't know. A million dollars,
22  maybe more. I wasn't the only one. There was
23  another group called Gott Better.
24      Q.   Gott Better?
25      A.   Yes. G-O-T-T, B-E-T-T-O-R. They

1 loaned the company money, I loaned the company
2 money. The company couldn't pay it off. As you
3 can see, Nat had pretty good ideas about what
4 the company should be, but it was terribly
5 managed. But it wasn't just that, there were
6 other issues, too.
7     Anyway, so what ended up happening
8 was that there was what is known I guess as a
9 friendly foreclosure. I'm taking a couple
10 years -- it sounds like it happened right away
11 but this is years later. And the friendly
12 foreclosure was all the equity was wiped out.
13 This wasn't a bankruptcy, although the way the
14 directors handled it, it was terrible.
15   Q.   Well, who was foreclosing?
16   A.   The debtors were foreclosing.
17 There was not enough equity to go around. So
18 every share I ever owned is gone.
19   Q.   When exactly did this occur?
20   A.   2008.
21   Q.   This would be after the date of --
22 pursuant to your agreement with Holzer --
23   A.   I got all the shares back and they
24 were worthless. That's good.
25   Q.   Where was the stock held at the

[Page 154]

1 time of the transfer back?
2   A.   Where was the stock held --
3   Q.   What was Fingerhut-Holzer holding?
4 Were they holding warrants, stock sheets? What
5 were they holding?
6   A.   The only thing they were holding
7 was this preferred issue.
8   Q.   And in what form did it manifest
9 itself?
10     MR. FOLKENFLIK: You mean were
11 there actual shares issued?
12     MR. CONWAY: Yes.
13     MR. FOLKENFLIK: Physical shares?
14     MR. CONWAY: Yes.
15   A.   I don't know. I'm not sure. May
16 have been but they were not publicly traded
17 shares. They were preferred shares.
18     MR. FOLKENFLIK: They might have
19 been held as a book entry.
20   Q.   They would be in an account
21 somewhere?
22     MR. FOLKENFLIK: It might have been
23 held as a book entry on the books of the --
24   A.   V Campus reported it all so there's
25 gotta be -- they're all in their documents.

[Page 155]

1     MR. CONWAY: Give me a few minutes
2 with my clients.
3     (Recess taken.)
4 BY MR. CONWAY:
5   Q.   No more questions.
6     MR. FOLKENFLIK: I have nothing.
7     (TIME NOTED: 2:50 p.m.)

[Page 156]

INSTRUCTIONS TO WITNESS

    Please read your deposition over
carefully and make any necessary corrections.
You should state the reason in the appropriate
space on the errata sheet for any corrections
that are made.
    After doing so, please sign the
errata sheet and date it.
    You are signing same subject to the
changes you have noted on the errata sheet,
which will be attached to your deposition.
    It is imperative that you return the
original errata sheet to the deposing attorney
with thirty (30) days of receipt of the
deposition transcript by you. If you fail to
do so, the deposition transcript may be deemed
to be accurate and may be used in court.

[Page 157]

```
 1    I have read the foregoing transcript of
 2  my deposition given on February 7, 2013, and it
 3  is true, correct and complete, to the best
 4  of my knowledge, recollection and belief,
 5  except for the corrections noted hereon
 6  and/or list of corrections, if any, attached
 7  on a separate sheet herewith.
 8
 9
10
11
12
13          BARRY FINGERHUT
14
15
16
17    Subscribed and sworn to
18  before me this _____ day
19  of _____, 20_____.
20
21
22
23    Notary Public
24
25
```

[Page 158]

```
 1            CERTIFICATE
 2
 3  STATE OF NEW YORK }
 4                     : SS.
 5  COUNTY OF NEW YORK }
 6
 7      I, SUZANNE PASTOR, a Shorthand
 8  Reporter and Notary Public within and for the
 9  State of New York, do hereby certify:
10      That BARRY FINGERHUT, the witness
11  whose deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is a
13  true record of the testimony given by the
14  witness.
15      I further certify that I am not
16  related to any of the parties to this action by
17  blood or marriage, and that I am in no way
18  interested in the outcome of this matter.
19      IN WITNESS WHEREOF, I have hereunto
20  set my hand this_____, 2013.
21
22
23          SUZANNE PASTOR
24
25
```

[Page 160]

```
 1          E R R A T A  S H E E T
 2
 3      I, BARRY FINGERHUT, do hereby certify that I
 4  have read the foregoing transcript of my testimony, and
 5  further certify that it is a true and accurate record
 6  of my testimony (with the exception of the corrections
 7  listed below).
 8  PAGE LINE       CORRECTION
 9
10      ____  ____  _____
11      ____  ____  _____
12      ____  ____  _____
13      ____  ____  _____
14      ____  ____  _____
15      ____  ____  _____
16      ____  ____  _____
17      ____  ____  _____
18      ____  ____  _____
19      ____  ____  _____
20
21    Signed under the pains and penalties this
22  day of _____, 2013.
23
24
25          BARRY FINGERHUT
```

[Page 159]

```
 1              INDEX
 2
 3  WITNESS      EXAMINATION BY      PAGE
 4  Mr Fingerhut  Mr. Conway          3
 5
 6            EXHIBITS
 7  FINGERHUT   DESCRIPTION         PAGE
 8  Exhibit 1  BF 90 through 112     11
 9  Exhibit 2  Bates No. BF 07       35
10  Exhibit 3  Legible Copy of Bates No.  37
                 BF 7
11  Exhibit 4  Bates No. K-1         60
12  Exhibit 5  Bates No. BF 23       66
13  Exhibit 6  Bates No. BF 25 through   72
                 46
14
15  Exhibit 7  Bates No. BF 25 through   73
                 46
16  Exhibit 8  Bates No. BF 54 through   127
                 57
17
18  Exhibit 9  Bates No. BF 58 through   130
                 89
19  (Exhibit 10 marked but not presented)
20  Exhibit 11  Bates No. BF 8 through 13  137
21  Exhibit 12  Bates No. BF 14 through   139
                 18
22
23  Exhibit 13  Bates No. BF 15 through   143
                 18
24  (Exhibits retained by counsel )
25
```

[Page 161]

[41]  (Pages 158 to 161)

```
 1      INDEX (Continued)
 2      INFORMATION REQUESTED TO BE SUPPLIED    PAGE
 3      1. Law Firm Hired to Draft Corporate   14
           Documents
 4
        2. Law Firm Representing              23
 5         Fingerhut-Holzer Partners
 6      3. Fingerhut-Holzer Bank Account Number 96.
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

[Page 162]

4

# FOLKENFLIK & McGERITY LLP

### ATTORNEYS AT LAW

1500 BROADWAY
NEW YORK, NEW YORK 10036

TELEPHONE: 212-757-0400
FAX: 212-757-2010

WRITER'S E-MAIL: mfolkenflik@fmlaw.net

April 2, 2014

_VIA ECF_

Honorable Vernon S. Broderick
United States District Judge
United States Courthouse
Southern District of New York
40 Foley Square, Room 415
New York, New York 10007-1312

Re: _Rapillo v. Fingerhut, Holzer et al._, Docket No.: 09-CV-10429(GBD)

Dear Judge Broderick:

I represent Defendant Barry Fingerhut ("Fingerhut") and the various corporate entities named in the Amended Complaint in this action. (Fingerhut-Holzer Partners LLC is hereinafter referred to as "F-H LLC" and the other corporate defendants are referred to as the "Remaining Entity Defendants.") The only other defendant, David Holzer ("Holzer"), was criminally convicted on a plea of guilty for stealing $1.6 million from Plaintiffs and over $11 million from Fingerhut, as well as nearly $2 million from others. Holzer is appearing _pro se_.

Plaintiffs seek to recover $1.9 million they lost in four "investments," plus "treble damages" _and_ punitive damages, from Fingerhut, F-H LLC, and the Remaining Entity Defendants, directly, and not vicariously, for alleged breach of fiduciary duty and _fraud_ under the Investment Advisors Act (the First and Second Causes of Action), securities fraud based on Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 (the Third Cause of Action), and common law counts of fraud (the Fourth and Fifth Causes of Action), conversion (the Sixth Cause of Action), and breach of fiduciary duty (Seventh, Eighth, and Ninth Causes of Action). They are suing the Defendants as principals, yet none of the Defendants had anything to do with Holzer's crimes, except as victims.

I am writing this letter, therefore, to request a pre-motion conference pursuant to Rule 4.A of Your Honor's Individual Rules & Practices in Civil Cases with regard to a motion for summary judgment dismissing all claims against my clients.

The underlying relevant facts are undisputed. Holzer and Fingerhut were in business together, investing their own money in various businesses through F-H LLC. Holzer had lauded Fingerhut's investment acumen to Plaintiffs, who were Holzer's friends. Plaintiffs wanted to invest

**FOLKENFLIK & McGERITY LLP**

Honorable Vernon S. Broderick
April 2, 2014
Page 2

with Holzer and Fingerhut, but Plaintiffs knew that F-H LLC was *not accepting retail clients and would not take their money*. However Holzer had a plan to circumvent F-H LLC's refusal to take investments from Plaintiffs. Holzer told Plaintiffs about certain companies in which, allegedly, Fingerhut and Holzer were investing. Because the amount Plaintiffs were investing was "not substantial enough," for Plaintiffs to invest directly, Holzer offered to "pool it" with Fingerhut's and Holzer's investment.

Plaintiffs were in some sort of undisclosed investment partnership with Holzer. Holzer never told Plaintiffs that Fingerhut was aware of this "pooling" scheme, and Plaintiffs admit that they do not know that Fingerhut was aware of the scheme. Holzer and Fingerut deny that Fingerhut had any awareness of or involvement in Holzer's frauds. Discovery has not produced a shred of evidence to the contrary.

Plaintiffs made four investments based on Holzer's advice. The first was a $300,000 investment in a Florida real estate limited partnership called the The Waverly I LLC, ("Waverly I"), made pursuant to signed subscription agreements. Waverly I failed due to a downturn in the Florida real estate market. Plaintiffs have not identified any impropriety with respect to that investment. The Manhattan District Attorney's office found the Waverly I investment was legitimate, and discovery has produced no evidence that it was not.

Plaintiffs invested $1.6 million in three separate "investments" made by wire transfer to Holzer's personal bank account, held jointly with his wife, and then stolen by him (the "Stolen Investments"): (a) an alleged investment called Waverly II ($ 200,000 ), (b) an alleged investment in a public company called V-Campus ($800,000), and (c) an alleged investment in a "dinner theater" in Boca Raton whose name the Plaintiff does not know, and apparently never knew ($ 600,000). There is no documentation of any nature with respect to those three "investments."

Holzer's thefts from Plaintiffs came to light after an investigation revealed Holzer's thefts from Fingerhut. As with Plaintiffs, Fingerhut had given Holzer money to invest which was stolen. The results of the investigation were taken to the Office of the Manhattan District Attorney, and that led to the revelation that Holzer had stolen millions of dollars from others, including Plaintiffs.

None of Plaintiffs' claims can be sustained against any Defendant other than Holzer. Plaintiffs do not assert that the Remaining Entity Defendants had any involvement of any nature in Holzer's crimes, or any connection at all, direct or indirect, with the Plaintiffs. Other than "group pleading" allegations, there is nothing in the Amended Complaint about them. Those defendants appear to have been simply thrown into the case without any basis, other than some historical relationship between those Defendants and either Fingerhut or Holzer.

Neither F-H LLC nor Fingerhut are registered investment advisors, nor are they subject to the Investment Advisors Act, since they did not provide investment advice "for compensation." 15

FOLKENFLIK & McGERITY LLP

Honorable Vernon S. Broderick
April 2, 2014
Page 3

U.S.C. § 80b-2 (11); *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 32 (S.D.N.Y. 2008)( the parties must have "entered into an investment advisory contract in order for the Advisers Act to apply"). Neither F-H LLC nor Fingerhut made any misrepresentation to, or had any communication with, Plaintiffs concerning the Stolen Investments, which by itself precludes a direct claim against them under Section 10b and Rule 10b-5. *See, Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. ___, 131 S. Ct. 2296, 2302 (2011); *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 24-25 (2d Cir. 2013). It also precludes a direct claim of fraud. *See, Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996); *Deutsche Bank Natl. Trust Co. v Gordon*, 84 A.D.3d 443, 443-444 (1st Dep't 2011).

Neither Fingerhut nor F-H LLC had a fiduciary relationship with Plaintiffs thereby precluding the breach of fiduciary duty claims. *See, De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002)(broker/customer relationship not sufficient to create fiduciary relationship); *Compania Sud-Americana De Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 426 (S.D.N.Y. 1992)(ordinary business relationship not sufficient). Neither Fingerhut nor F-H LLC had or have any dominion or control of the money given by Plaintiffs to Holzer, thereby dooming the conversion claim. *Dobroshi v Bank of Am., N.A.*, 65 AD3d 882, 885, (1st Dept 2009), *lv dismissed* 14 N.Y.3d 785 (2010); *Eden Roc, LLP v Marriott Intl., Inc.*, 2013 N.Y. Misc. LEXIS 4301, 22-24 (Sup. Ct. N.Y. Sept. 18, 2013). Holzer used some of the money he received from Plaintiffs to invest in V-Campus *in his own name* and to pay $200,000 on an antecedent $1 million debt he owed to Fingerhut. Those facts do not support a valid conversion claim as to Fingerhut or F-H LLC. *Cf. Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54-55 (2d Cir. 2005) (payment of antecedent debt even with knowledge money obtained fraudulently not fraudulent conveyance).

F-H LLC is not liable for Holzer's thefts on the (unpleaded) theory of *respondeat superior*. *Goldstein v. United States*, 14 Fed. Appx. 115, 116 (2d Cir. N.Y. 2001) (no *respondeat superior* liability for employee theft); *Rymanowski v. Pan American World Airways, Inc.*, 70 A.D.2d 738, 739 (N.Y. App. Div. 3d Dep't 1979), *aff'd*, 49 N.Y.2d 834, 835 (1980)(same). As a member of the LLC, Fingerhut is not liable for the wrongs of Holzer or the any liability of F-H LLC. "A limited liability company (LLC) is a hybrid business entity that offers its members limited liability as if they were shareholders of a corporation...". *Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 35 (Bankr. D. Mass. 2011), *quoting*, Ann K. Wooster, Annotation, *Construction and Application of Limited Liability Company Acts -Issues Relating to Personal Liability of Individual Members and Managers of Limited Liability Company as to Third Parties*, 47 A.L.R. 6th 1 (2009).

Respectfully,

Max Folkenflik

cc:   Robert J. Conway, Esq. (*via e-mail*)

MANHATTAN DA OFFICE    Fax:1212-335-9880        Apr 30 2009 01:34pm P002/006

## PLEA AGREEMENT

1.      This plea agreement is entered into between the District Attorney of the County of New York (hereinafter "the District Attorney") and David Holzer. This memorandum of Agreement constitutes the entire agreement between Mr. Holzer and the District Attorney. There are no promises, agreements, or conditions, express or implied, other than those set forth in this Agreement and in the Stipulation in Anticipation of Discontinuence in the case of Morgenthau v. Holzer, Index No. 400891/2008, (hereinafter "the Stipulation") attached hereto and incorporated herein. No modification of this agreement will be valid or binding on either party unless put into writing and signed by both parties.

2.      The parties will appear before the Court where New York County Indictment No. 2280/2008 ("the Indictment") is pending and request that the Court approve this Agreement. This Agreement will become effective only upon the Court's approval. Upon the Court's approval, Mr. Holzer will plead guilty as set forth in Paragraph 3 below. At the time of the plea, Mr. Holzer will withdraw any pending motions, and will waive all defenses and all rights of appeal.

3.      Mr. Holzer agrees to plead guilty to counts One, Three, Four and Five of New York County Indictment No. 2280/2008. Those counts charge him with three counts of the crime of Grand Larceny in the First Degree, Penal Law §155.42, a Class B Felony, and one count of the crime of Grand Larceny in the Second Degree, Penal Law §155.40, a class C Felony, in full satisfaction of the indictment. The maximum permissible sentence for each count of Grand Larceny in the First Degree is an indeterminate term of imprisonment of 8 1/3 to 25 years, and an

1



Page 1

1

2  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK

3  _____

   JOHN RAPILLO and HEIDI RAPILLO,

4
                              Plaintiffs,

5        - against -

6  BARRY FINGERHUT,
   DOUGLAS HOLZER,

7  FINGERHUT-HOLZER PARTNERS LLC,
   FINGERHUT-HOLZER EQUITIES, INC.,

8  FINGERHUT-HOLZER, INC.,
   FINGERHUT-HOLZER FUND, L.P.,

9  GEO CAPITAL PARTNERS, INC.,
   FINGERHUT-HOLZER THE WAVERLY I, LLC,

10 FINGERHUT-HOLZER THE WAVERLY II, LLC,

11                            Defendants.

12 _____

13  EXAMINATION BEFORE TRIAL of a Defendant,

14  DAVID HOLZER, held pursuant to Notice in the

15  above-entitled matter on the 28th day of March,

16  2012, commencing at approximately, 10:15 a.m.;

17  held at Greene Correctional Facility, 165 Plank

18  Road, Coxsackie, New York, before Cynthia

19  Schultz, a Court Reporter and Notary Public in

20  and for the State of New York.

21

22

23

24

25

```
 1    APPEARANCES:

 2

      MARSHALL CONWAY & BRADLEY, P.C.

 3    45 Broadway

      New York, New York 10006

 4    (ROBERT J. CONWAY, ESQ., of Counsel)

      Attorneys for the Plaintiffs

 5    JOHN RAPILLO and HEIDI RAPILLO.

 6

 7    FOLKENFLIK & MCGERITY

      1500 Broadway

 8    New York, New York 10036

      (MAX FOLKENFLIK, ESQ., of Counsel)

 9    Attorneys for the Defendant, DAVID HOLZER

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1                    I N D E X
2    TO TESTIMONY
3    WITNESS                 BY                  PAGE
     DAVID HOLZER        MR. CONWAY               5
4                        MR. FOLKENFLIK         119
5

     TO EXHIBITS  (Retained by Counsel)
6
     EXHIBIT               DESCRIPTION          PAGE
7    Plaintiff's 1  Money Transfer Document dated  91
                    October 19, 2005, consisting
8                   of two pages
9    Plaintiff's 2  Money Transfer Document Dated  98
                    December 15, 2005
10
     Plaintiff's 3  Money Transfer Document Dated  99
11                  January 31, 2006
12   Plaintiff's 4  Money Transfer Document Dated  99
                    March 23, 2006
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

Page        4

1      F E D E R A L        S T I P U L A T I O N S

2      IT IS HEREBY STIPULATED AND AGREED by and

3      between the attorneys for the respective parties

4      hereto that filing, sealing and certification be

5      and the same are hereby waived.

6

7      IT IS FURTHER STIPULATED AND AGREED that all

8      objections, except as to the form of the

9      question, shall be reserved to the time of the

10     trial.

11

12     IT IS FURTHER STIPULATED AND AGREED that the

13     within examination may be subscribed and sworn

14     to before any notary public with the same force

15     and effect as though subscribed and sworn before

16     the court.

17

18

19

20

21

22

23

24

25

D. Holzer - March 28, 2012

Page 5

Page        5

1    THIS IS THE ORAL DEPOSITION OF DAVID HOLZER,

2    called as/on behalf of the DEFENDANT herein,

3    produced pursuant to NOTICE on March 28, 2012,

4    before CINDY SCHULTZ, a Court Reporter and

5    Notary Public in and for the State of  New York.

6

7                    * * * * * *

8                    DAVID HOLZER

9            called as the witness, hereinbefore

10   named, being first duly cautioned and sworn or

11   affirmed by CINDY SCHULTZ, the Court Reporter

12   and Notary Public herein, to tell the truth, the

13   whole truth, and nothing but the truth, was

14   examined and testified as follows:

15   EXAMINATION BY

16   MR. CONWAY:

17

18        Q     Would you please state your name

19   for the record.

20        A     David Holzer.

21        Q     Mr. Holzer, good morning.

22        A     Morning.

23        Q     My name is Bob Conway, and I

24   represent John and Heidi Rapillo on the matter

25   that we have before the Court.

D. Holzer - March 28, 2012

1              MR. CONWAY:    Off the record.

2

3                    (At which time, a discussion

4              was held off the record.)

5

6     BY MR. CONWAY:

7              Q      Mr. Holzer, how old are you?

8              A      Sixty-two.

9              Q      And your date of birth?

10             A      11/14/49.

11             Q      And your Social Security number?

12             A      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.

13             Q      And, Mr. Holzer, you and I have met

14     once before.  Have we not?

15             A      Correct.

16             Q      Here, I came up and spoke to you

17

       privately?

18             A      Correct.

19             Q      Okay.  Sir, where were you born?

20             A      Manhattan.

21             Q      And where did you go to school?

22             A      I went to Stuyvesant High School,

23     City College, and I went to - after that, I

24     took some courses, about three years' worth of

25     courses at the New York Institute of Finance.

D. Holzer - March 28, 2012

Page 7

Page          7

1        Q      Did you get a degree from City

2   College?

3        A      Yes.

4        Q      In what field?

5        A      History major.

6        Q      What year did you graduate City

7   College?

8        A      Finally, in 1974.

9        Q      And did you then move directly to

10   the New York Institute of Finance?

11        A      No.

12        Q      Okay.  What did you do upon

13   graduation from college?

14        A      I was working part-time at a place

15   called Abraham Company.

16              THE WITNESS:   Could I ask you

17          one question, off the record?

18              MR. CONWAY:    Certainly.

19

20              (At which time, a discussion

21          was held off the record.)

22

23              MR. FOLKENFLIK:    Can we

24          keep this on the record?

25              THE WITNESS:   Yeah.  Sure.

Page        8

1              No problem.

2                      MR. FOLKENFLIK:    The deponent

3              has been handed a copy of the

4              Amended Complaint.

5                      THE WITNESS:   Okay.

6                      MR. FOLKENFLIK:    Sure.

7                      THE WITNESS:   And it had

8              listed -

9                      MR. FOLKENFLIK:    Could you

10             just start from the beginning?

11                     THE WITNESS:   Oh.  Sorry.

12             Yes.  I received, in the mail,

13             approximately three months ago - I

14             can't remember, two months ago - the

15             one-page Complaint amended, as per

16             this (indicating), and, on it, it

17             had my family's name on it.

18     BY MR. CONWAY:

19         Q     Okay.  That was the original

20     Complaint?

21         A     Well, why did I get that three

22     months ago?

23         Q     I'm not sure.

24             Did you change address or

25     something?  Did somebody change an address?

1         A      We changed an address only as of

2    last Friday.

3         Q      This is the original Complaint

4    (indicating).

5         A      I have the original Complaint.

6         Q      This is the Complaint that was

7    amended.

8         A      Okay.  This is the current

9    Complaint and we all agree on this now?

10              I don't care about this

11   (indicating).

12        Q      Yes.  That's it now.

13        A      Okay.  I'll read it.  It's Barry

14   Fingerhut, David Holzer, Fingerhut-Holzer

15   Partners LLC, Fingerhut-Holzer Equities,

16   Fingerhut-Holzer, Incorporated,

17   Fingerhut-Holzer, L.P., GeoCapital Partners,

18   Fingerhut-Holzer The Waverly I, LLC,

19   Fingerhut-Holzer Waverly II, LLC.

20              We're all in agreement those are

21   the people being sued?

22        Q      Yes.

23        A      Very good.  Thank you.

24        Q      Now, the Abraham firm, in what

25   capacity were you at the Abraham firm?

Page 10

Page    10

1          A      I was an over-the-counter order

2      clerk.

3          Q      And for how many years did you

4      perform this service for the Abraham Company?

5          A      From -

6                 I'm trying to think.  I was in the

7      service, six months after that.  From 19 - May

8      of '69, I was a Junior in high school.  Then,

9      till September of '69, I was full-time at

10     Abraham Company from -

11                I had worked part-time there while

12     I was going to school.  Nineteen-seventy,

13     summertime - I don't remember what month,

14     actually - until 1974 when they were acquired

15     by another firm.

16         Q      By whom were they acquired?

17         A      Lehman Brothers.

18         Q      And did you follow the

19     Abraham firm to Lehman Brothers?

20         A      I did for a while.  Yes.

21         Q      All right.  And for how long were

22     you with the Lehman Brothers?

23         A      A year or so.  Maybe less, maybe

24     more.

25         Q      And what did you do when you were

D. Holzer - March 28, 2012

1       affiliated with Lehman Brothers?

2               A       I started trading the

3       over-the-counter list.

4               Q       Okay.  And where did you go after

5       leaving Lehman Brothers?

6               A       Nineteen-seventy-five, I went to

7       Brean Murray Foster Securities.  Brean Murray,

8       Inc.

9               Q       And what was the business of Green

10      (sic) Murray, Incorporated?

11              A       General business.  It was a general

12      brokerage firm.  Merchant banking, investment

13      banking, over-the-counter trading, New York

14      Stock Exchange trading, and asset management.

15              Q       And what was your role for the firm

16      while you were there?

17              A       At the time, I was head of

18      over-the-counter trading.

19                              MR. FOLKENFLIK:  At what time

20                      is this, did you say?

21                              MR. CONWAY:  Nineteen-seventy

22                      -five.

23                              MR. FOLKENFLIK:  From the

24                      beginning.

25                              MR. CONWAY:  Right.

Page     12

1  BY MR. CONWAY:

2        Q     You were head of trading from 1975?

3        A     No.  I was the head of

4  over-the-counter trading.

5        Q     Head of over-the-counter trading.

6  Okay.

7              Do you recall what your earnings

8  were at the time?  Best estimate.

9        A     Maybe, 40,000 a year.

10       Q     And for how many years did you

11  continue with Green Murray, Incorporated?

12       A     Brean, B-r-e-a-n Murray.

13       Q     Brean, with a "B"?

14       A     Brean.

15       Q     Brean, with a B.  Okay.  I thought

16  you said Green.  Okay.  Sorry.

17              And for how long were you with

18  Brean Murray?

19       A     Twenty-eight years.

20       Q     And what was your highest position

21  at Brean Murray?

22       A     Partner in charge of all capital

23  markets.

24       Q     And what was your highest rate of

25  salary in that capacity?

D. Holzer - March 28, 2012

Page    13

```
 1       A     I -
 2             You know what?  I take the fifth.
 3       Q     All right.
 4             Are we talking, like, talking in
 5   excess of a hundred?
 6       A     I don't see the relevance.  I take
 7   the fifth.
 8                  MR. FOLKENFLIK:    Just to
 9             advise the witness, the Fifth
10             Amendment isn't a privilege as to
11             relevance.  It's a privilege as to
12             possible incrimination.
13                  THE WITNESS:   Well, what if I
14             think I'm possibly incriminating
15             myself?
16                  MR. FOLKENFLIK:   Well, you
17             need to have a basis for that.
18                  THE WITNESS:   And the basis -
19             I have to explain the basis to you?
20                  MR. FOLKENFLIK:   Not
21             necessarily.  But, for 20 years ago,
22             it wouldn't matter.
23       A     What's the question?
24       Q     What were your highest earnings?
25       A     Approximately, 800,000 a year.
```

D. Holzer - March 28, 2012

Page    14

1          Q      All right.   And were you married at

2     the time?

3          A      Correct.  I was.

4          Q      To whom were you married?

5          A      Leslie Holzer.

6          Q      And when and where did you marry

7     Ms. Holzer?

8          A      I married her September 6th, 1970;

9     Lincoln Park Jewish Center, Yonkers, New York.

10         Q      And do you have any children?

11         A      Three.

12         Q      Their names and ages, please.

13         A      Jennifer Holzer, 36; Douglas

14     Holzer, 32; Joshua Holzer, 26.

15         Q      You're talking faster than I can

16     write.

17                Jennifer's 36?

18         A      Correct.

19         Q      And the next?

20         A      Douglas Holzer, 32; Joshua Holzer,

21     26.

22         Q      All right.   Those are their ages

23     now?

24         A      Didn't you ask me now?

25         Q      Yes.

D. Holzer - March 28, 2012

Page 15

Page    15

1       A     Okay.  I'm giving you now.

2       Q     Good.  Now, during the period of -

3             MR. FOLKENFLIK:   If I may

4             suggest to the witness.  Obviously,

5             there are reasons why you might want

6             to conclude this as quickly as

7             possible.  So, less dueling over the

8             questions and simple yes or no

9             answers would accomplish that.

10            THE WITNESS:   Okay.  I'll try

11            my best.

12  BY MR. CONWAY:

13      Q     We haven't any interest in

14  prosecution or any other thing like that.

15      A     I understand what you're doing

16  here, and I'll try to answer as succinctly and

17  rapidly as possible.

18      Q     Good.

19            MR. FOLKENFLIK:   It's for

20            your own benefit.

21  BY MR. CONWAY:

22      Q     Now, do you know who the principals

23  of Brean Murray were?

24      A     They changed a lot over the years.

25  I was a principal for all those years.

1              Brean Murray, himself, was a

2       principal for all those years.

3              Jerome Barry was a principal for

4       all those years.

5              And then there was interchangeable

6       pieces over the whole period of time.

7          Q      Were you an equity holder for any of

8       those years?

9          A      Correct.

10         Q      And how large an equity did you

11      hold?

12         A      I'm the third largest equity

13      holder.

14         Q      How large, what percentage?

15         A      Oh, I don't know.

16         Q      Best estimate.

17         A      Probably, the highest percentage

18      was probably 27, 25 per cent.  Somewhere

19      around there.

20         Q      Now, when did you stop working for

21      Brean Murray?

22         A      I don't recall the actual date.

23      Two-thousand-and-two, three.  I don't even

24      recall.

25         Q      During the period of your

Page     17

```
 1      involvement with Brean Murray, was your wife

 2      employed outside the home?

 3           A      No.

 4           Q      Did she participate in the Brean

 5      Murray business in any way?

 6           A      No.

 7           Q      Saleswoman, or something?

 8           A      No.

 9           Q      Did your children ever join you in -

10           A      No.

11           Q      Now, do you know a Barry Fingerhut?

12           A      Yes.

13           Q      And when did you come to know Barry

14      Fingerhut for the first time?

15           A      I would say, probably, 1984, maybe.

16           Q      And what was Mr. Fingerhut doing at

17      the time, professionally?

18           A      He was one of the - one of two

19      partners of GeoCapital.

20           Q      And who was the other partner?

21           A      Irwin Lieber.

22           Q      And do you know when Mr. Fingerhut

23      and Mr. Lieber had set up?

24           A      I don't.

25           Q      What was the business of GeoCapital?
```

D. Holzer - March 28, 2012

Page    18

1          A      Asset management.

2          Q      Now, when you say "asset

3    management," what do you mean by that term,

4    specifically?

5          A      I mean they garner assets from

6    different people and put it towards the equity

7    markets or private placements, or whatever

8    their charter was.  I don't know what their

9    charter was.

10         Q      They manage people's money?

11         A      That's correct.

12         Q      Now, in managing people's money, did

13   they have broker's licenses?  Did they do

14   broker's work themselves or did they hire

15   outside agencies?

16         A      They - I don't know the answer to

17   that.

18         Q      And how did you come to meet

19   Mr. Fingerhut for the first time?

20         A      I met Mr. Fingerhut for the first

21   time through, probably, one of the formal

22   partners at the firm.

23               MR. FOLKENFLIK:    Meaning,

24         Brean Murray?

25               THE WITNESS:    No.  I'm trying

Page      19

1              to remember who it was, in

2              particular.  Might have been Brian

3              Harrah (Phonetic Spelling) who was

4              head of sales.

5                   MR. FOLKENFLIK:   And - excuse

6              me - at Brean Murray?

7                   THE WITNESS:   Yes.

8    BY MR. CONWAY:

9         Q    Okay.   And was your involvement

10   with Mr. Fingerhut professional or personal?

11        A    Professional.

12        Q    And were you involved in business

13   transactions together, at the outset?

14             Did you meet him in a deal, or -

15        A    I was not involved together with

16   Barry Fingerhut professionally, no.

17        Q    Well, in 1984.

18        A    No.  Not my whole time working at

19   Brean Murray.

20        Q    Okay.   And did there come a time

21   when you began business relations with

22   Mr. Fingerhut, even if you were not together?

23        A    Never while I was at Brean Murray,

24   as I recall.

25        Q    What -

D. Holzer - March 28, 2012

1        A      I'm gonna change that.  I can't

2    recall.

3        Q      You can't recall if you did any

4    business with Mr. Fingerhut?

5        A      You're talking personally?

6        Q      Personal business.

7        A      I don't recall.

8        Q      Okay.

9        A      If I was at Brean Murray then.

10       Q      All right.  Now, what was the nature

11   of Mr. Fingerhut's business at GeoCapital; what

12   did he do for them?

13              MR. FOLKENFLIK:   Objection.

14              Asked and answered.

15   BY MR. CONWAY:

16       Q      Was he Chief Executive?  Was he a

17   salesman?

18              What did he do?

19              THE WITNESS:   What did you

20          say just now?

21              MR. FOLKENFLIK:   I said

22          objection, but he corrected it.

23              THE WITNESS:   Yeah.  Okay.

24          Say it now.   Rephrase it.

25              MR. FOLKENFLIK:   If you know

D. Holzer - March 28, 2012

```
 1                 what his title or function was

 2                 within GeoCapital, other than

 3                 partner.

 4         A     I - let me go -

 5                 Let me say this.  I did not work at

 6     GeoCapital, I did not know the inner workings

 7     at GeoCapital, and I'm not gonna say what I

 8     think happened there.  Okay?

 9         Q     That's fine.

10         A     So, if you're - if you're -

11                 If the course of your questions are

12     gonna concern GeoCapital, I don't know.

13         Q     Don't worry.  We're fine.

14         A     Okay.

15         Q     Do you have any idea in what state

16     GeoCapital was incorporated?

17         A     No.

18         Q     Did they have an office in New York?

19         A     Yes.

20         Q     Do you know where that office was?

21         A     It was on - right off 3rd Avenue

22     and 49th Street.  I don't recall, offhand.

23     Forty-ninth or 50th.  I can't recall the exact

24     address.

25         Q     And did you continue a professional
```

1        relationship with Mr. Fingerhut during the

2        period that you were at Brean Murray?

3             A     Yes.

4             Q     And what type of relationship was

5        that?

6                   Was it a financial relationship?

7                   Was it a personal relationship?

8             A     It was a financial relationship

9        where Brean Murray Foster Securities - which

10       it was called at the time - sold research to

11       GeoCapital, who was consumed by partners and

12       portfolio managed sales.

13                  How it was broken up at that time,

14       I do not know.  We sold them research, they

15       paid us back in commissions.

16            Q     To your knowledge, how large a firm

17       was GeoCapital?

18            A     I have no idea.

19            Q     And how was your investment returned

20       in commissions, if the information was used, if

21       purchases were made?

22            A     Do you want me to explain the whole

23       process -

24            Q     Yes.  Please.  Yes.  If you would.

25            A     - of selling -

```
 1        Q     Yeah.

 2        A     - research to a firm?

 3        Q     Yeah.

 4              MR. FOLKENFLIK:    Is it soft

 5        dollars?

 6              THE WITNESS:    No.  Not

 7        necessarily.  Soft dollars could be

 8        paid.

 9              MR. FOLKENFLIK:    Okay.

10        A     Anyway, what typically happens is,

11   you go into a firm, such as GeoCapital, from

12   Brean Murray.  You bring an institutional

13   sales person, a research analyst, maybe the

14   guy running the trading desk, which was me.

15              You make a presentation to the

16   investments committee of GeoCapital saying,

17   "We like Apple because blah, blah, blah, blah,

18   blah."  Okay?

19              Now, they say, "Okay.  We like that

20   idea.  We're gonna buy Apple," or, "We're not

21   gonna buy Apple, but you came here, took the

22   time, sold us this.  We're gonna pay you

23   back."

24              How do they pay us for that

25   service?  That's a service.  They'll call up
```

D. Holzer - March 28, 2012

1     the next day.  Somebody on the order desk, or

2     one of the portfolio managers, and say, "Okay.

3     Buy me a hundred-thousand shares of Apple.

4             You charge a commission, or, at the

5     time, it was a spread, 'cause it's a

6     negotiated market.  Take a little bit of that

7     spread.

8             Buy it at, let's say, a hundred,

9     and you sell it to GeoCapital at

10    one-hundred-and-one-eighth.

11       Q     All right.  Is the one-eighth your

12    commission?

13       A     Your commission, spread, whatever

14    you wanna call it.  Credit.  That's, very

15    basically, what happens.

16       Q     And were you involved in these

17    research sales with Mr. Fingerhut himself?

18       A     Sometimes, yes.  Sometimes, no.

19       Q     And did a personal relationship

20    develop between yourself and Mr. Fingerhut

21    during these years?

22       A     Yes.

23       Q     And when did that personal

24    relationship commence, to the best of your

25    knowledge?

D. Holzer - March 28, 2012

Page 25

Page    25

```
 1          A       Personal relationship commenced on

 2    June 16th, 1992.

 3                   I don't know.

 4                       MR. FOLKENFLIK:    So that was

 5               a facetious answer?

 6                       THE WITNESS:    Yes.

 7    BY MR. CONWAY:

 8          Q                Oh.  So that was a facetious

 9    answer.  You don't know?  Okay.

10          A       You're asking a question that's

11    hard to answer.  I can't tell you.  You know

12    what I'm saying?

13          Q       All right.  Did there come a time

14    when you began to social -

15          A       I'm sorry.

16          Q       That's okay.

17                   When you began to socialize with

18    Mr. Fingerhut, outside of business?

19          A       I don't recall.

20          Q       And did there come a time when you

21    left Brean Murray?

22          A       Yes.

23          Q       And what was the purpose of your

24    leaving Brean Murray?

25          A       The over-the-counter market was,
```

1    basically, finished.  That's why I left.

2           Q      And you leave Brean Murray when?

3           A      After Brean died, also.  Firm

4    started to falter.

5           Q      And what year was this?

6           A      Around two-thousand-and-two.  He

7    might not have died at the time when I left.

8    It was -

9                  I'm not sure.  I don't remember.  I

10   don't recall the exact date, but he was dying.

11          Q      And did you leave for any other

12   business pursuits?

13          A      I went to trade my own account at

14   one of my friend's firms.

15          Q      And what firm did you go to?

16          A      Dahlman Weiss.  Dahlman Simon

17   Weiss, maybe it was.

18          Q      Can you spell it?

19          A      I don't remember.  D-a-l-h-m-a-n

20   (sic)

21          Q      Dahlman Weiss?

22          A      Yeah.

23                 And there was a third.  Simon, or

24   Dahlman Weiss Rose.

25          Q      Now, at that time, in 2002, you took

D. Holzer - March 28, 2012

Page 27

Page    27

1    your client base with you?

2          A    No.  No.  I said I went to trade my

3    own account.

4          Q    Meaning what?

5          A    I had $20, I bought $20 worth of

6    stock and I sold it for $30.

7          Q    And did you have a financial stake?

8          A    Stake?  No.

9          Q    When you went there, what capital or

10   funds were you using at Dahlman Weiss to make

11   purchases?

12         A    My own.

13         Q    And what were your assets at the

14   time, when you began with Dahlman?

15         A    I don't know.

16         Q    All right.

17              Are we talking in excess of a

18   million?

19         A    I don't recall.

20         Q    And for how long did you remain

21   trading your own account at Dahlman Weiss?

22         A    I don't remember exactly, but,

23   probably, up until the time I opened up

24   Fingerhut-Holzer, or whatever the date of that

25   was.

D. Holzer - March 28, 2012

Page 28

Page    28

1          Q       Do you recall when that was?  Was it
2     2002, 2003?
3          A       Exact date, I don't recall.
4          Q       Okay.  Best estimate.
5          A       It's easy enough to find out.  I
6     just don't know what date.
7                  Was it 2004?
8          Q       All right.  Fingerhut-Holzer was
9     what?
10         A       Fingerhut-Holzer was a partnership
11    set up as an LLC.
12         Q       Now, how had Fingerhut-Holzer
13    Partners emerged?
14                 What was the background for the
15    creation of that organization?
16         A       Just two gentlemen getting together
17    and deciding they wanted to open up a hedge
18    fund.
19         Q       Okay.  And did you approach
20    Mr. Fingerhut or did Mr. Fingerhut approach
21    you?
22         A       Kind of evolved.  I'm not sure who
23    approached who, or it just evolved as such.
24    There was no actual, "Hey.  You wanna be my
25    partner?"

```
 1                  It wasn't like that.

 2                  So, I don't know the evolution,

 3      exactly.  I don't recall.

 4          Q     Was Mr. Fingerhut still with

 5      GeoCapital at the time?

 6          A     Yes.

 7          Q     And did he have any other business

 8      interests of which you were aware?

 9          A     Yes.

10          Q     And what were the other business

11      interests that you know of?

12          A     I'm trying to remember the name.

13      Barry Rubenstein.  I just don't remember the

14      name.

15          Q     Who was Mr. Rubenstein?

16          A     He was one of the partners in the

17      other firm that he was involved with.  It

18      might come to me.

19          Q     In GeoCapital?

20          A     No.

21                  Wasn't the question Did he have any

22      other interests?

23          Q     Yes.

24          A     Okay.  And I said, yes.

25          Q     Yes.
```

D. Holzer - March 28, 2012

```
 1          A       You said, "With whom?   What was

 2      it?"

 3               I don't recall the name of the

 4      firm.   I just remember one of his partners was

 5      Barry Rubenstein.   That's all I can help you

 6      with.

 7          Q       All right.   And who was

 8      Mr. Rubenstein?

 9          A       His partner in that firm.

10          Q       Now, was Mr. Rubenstein a financier,

11      was he a broker, was he -

12          A       He was a financial professional.

13          Q       And did he and Mr. Fingerhut own

14      businesses together?

15          A       Businesses?   They owned stakes in

16      things.   They owned equity in certain

17      businesses.   They owned stocks.   They owned

18      private placements together.

19          Q       Did Mr. Fingerhut have a specialty

20      in the market?

21               Was he a technologist guy?

22               Was he a real estate guy?

23               Was he a commodities guy?

24          A       He was a general analyst.   He had a

25      general, good working knowledge of the whole
```

Page    31

1      equities market, as far as I'm concerned.

2              But was he a specialist?  I

3      wouldn't consider him a specialist.  He may

4      have started out as a specialist.  I don't

5      know.

6          Q    All right.  He was, basically, an

7      analyst?

8          A    He was a portfolio manager with

9      analytical abilities.

10         Q    Do you recall if there was any

11     meetings between yourself and Mr. Fingerhut for

12     the discussing of an ongoing business

13     relationship between the two of you?

14         A    There were meetings, sure.

15         Q    Where were those meetings held?

16         A    I don't recall.

17         Q    Were they held at your offices, his

18     offices, over dinner, over lunch, some other

19     time?

20         A    It could have been any of them.  I

21     just don't recall, specifically, where they

22     were.

23         Q    What was the nature of the

24     discussions between yourself and Mr. Fingerhut

25     as to ongoing business relationships?

D. Holzer - March 28, 2012

1        A       The nature of the discussion was

2    how to make people money, basically.  What we

3    wanted to do to do that.

4        Q       Okay.    And was Fingerhut-Holzer

5    Partners the first organization that the two of

6    you put together?

7        A       Yes.

8        Q       And what was the business of

9    Fingerhut-Holzer Partners?

10       A       Specific business was to manage

11   assets in the best way possible in any field

12   we chose.

13       Q       Now, did you have any licenses in

14   the financial industry?  Were you a licensed

15   broker?

16       A       Personally?

17       Q       Yes.

18       A       I probably had eight or nine

19   different licenses.

20       Q       Which would include what?

21       A       A  Series 24, Series 55, Series 7,

22   Series 63, Series 8, Registered Options

23   Principal, member of the New York Stock

24   Exchange.

25       Q       Did you have a seat on the Stock

Page    33

1      Exchange?

2              A      At one time.  Yes.

3                     Well, we always did.  I held the

4      seat for two years.

5              Q      Okay.  Fingerhut-Holzer Partners

6      held a seat?

7              A      No.

8              Q      Well, that's what we're here to find

9      out.

10             A      Fingerhut-Holzer Partners had no

11     licenses.  Fingerhut-Holzer Partners did not

12     and was not a member of the New York Stock

13     Exchange.

14                    You asked, specifically, if I held

15     certain licenses.  That was over the course of

16     my professional career at Brean Murray, and

17     then Brean Murray Foster Securities, which it

18     became.

19             Q      All right.  So you held a seat on

20     the stock market while at Brean Murray?

21             A      Correct.

22             Q      But it was not yours?

23             A      It was partially mine.  I was the

24     general partner.

25             Q      When you left Brean Murray, did you

1     leave the seat behind or -

2          A     The seat was sold, way prior to

3     that.

4          Q     Sold.

5                When was the last time you had

6     seats in the market?

7          A     Seats?

8          Q     Seats, plural.

9          A     The last seat was sold, and I'm not

10    sure about the date.  I'd say, probably, in

11    the late '90s we sold it.  The first one was

12    sold in the early '90s.  We bought them in the

13    early '70s.  Thirty-six-thousand-dollars and

14    $43,000.

15         Q     And, just as a curiosity, what were

16    they sold for?

17         A     Two-million and a million-six, or

18    something like that.

19

20                     (At which time, a discussion

21                was held off the record.)

22

23    BY MR. CONWAY:

24         Q               Now, when you and

25    Mr. Holzer -

D. Holzer - March 28, 2012

```
 1          A     I am Mr. Holzer.

 2          Q     Yes, sir.  When you and

 3     Mr. Fingerhut -

 4          A     Yes.

 5          Q     - were sitting to discuss your

 6     future together, what was it that the two of

 7     you intended to do as a professional

 8     arrangement?

 9                    MR. FOLKENFLIK:    Objection.

10               Asked and answered.

11                    THE WITNESS:    I was just

12               gonna - well, go ahead.

13                    MR. FOLKENFLIK:    Go ahead.

14               You can answer it again.

15          A     To make people money.

16          Q     And was Fingerhut-Holzer Partners

17     LLC a company organized in the State of New

18     York?

19          A     You know, I don't recall if it was

20     set up in New York State or Delaware.  I think

21     New York State.

22          Q     Did you have an attorney?

23          A     Yes.

24          Q     Who was the attorney responsible for

25     setting up the LLC?
```

D. Holzer - March 28, 2012

```
 1          A       I don't remember the name anymore.
 2          Q       And did the two of you go and engage
 3     the -
 4          A       Yes.
 5          Q       - the law firm to set up the
 6     corporation?
 7          A       Yes.
 8          Q       And is there any doubt in your mind
 9     that Fingerhut-Holzer Partners LLC was a
10     business corporation?
11          A       Any doubt?
12          Q       Yes.  Is there any doubt that it was
13     a corporation?
14          A       No doubt.
15          Q       Okay.  Did it operate in New York?
16          A       Yes.
17          Q       Did it register itself as a
18     financial house, in any way?
19          A       No.  We were not required to.
20          Q       Now, to the best of your knowledge,
21     was stock issued on Fingerhut-Holzer Partners?
22          A       Stock certificates?
23          Q       Stock certificates.
24                  MR. FOLKENFLIK:    Objection.
25                  Counselor, there is a limited
```

Page     37

1                      liability corporation.   There are

2                      memberships.   All right?

3     BY MR. CONWAY:

4          Q                Did you and Mr. Fingerhut

5     share ownership of Fingerhut-Holzer Partners?

6          A      Yes.

7          Q      All right.   Was it an equal division

8     of ownership?

9          A      I'm trying to remember if there

10    were other people involved.   I don't recall

11    right now.   It was equal between me and him,

12    though.

13         Q      All right.   There may have been

14    third-party participants whose names escape you

15    at the moment?

16         A      Yes.

17         Q      But you and Mr. Fingerhut were equal

18    partners?

19         A      Correct.

20         Q      And what was the division of

21    responsibility within the company; what did Mr.

22    Fingerhut do and what did you do?

23         A      Well, it was a mixed bag.   We each

24    did our own thing.   He, basically, would have

25    been the portfolio manager.   I would have been

```
 1     the trader.

 2          Q     So he was the -

 3          A     He would have been long-term, I

 4     would have been short-term.

 5          Q     He was responsible for picking the

 6     equities and making determinations on

 7     investment vehicles?

 8          A     Yes.

 9          Q     And you would have been - you were

10     the hands-on salesman, mover -

11               MR. FOLKENFLIK:   Objection to

12               the term "salesman."  That's not

13               what the witness said.  It's a

14               different term.

15               THE WITNESS:   That's correct.

16     BY MR. CONWAY:

17          Q     Okay.  I understand.

18               Your function would have been

19     exactly what?

20          A     Trading.

21          Q     Did you trade in your own name or

22     did you trade through a third-party?

23          A     What do you mean, "through a

24     third-party"?

25          Q     Did you do your own trading within
```

1    the company?

2            A    Yes.

3            Q    All right.  Were you licensed and

4    permitted to trade your stocks within your

5    company?

6            A    I'll explain something to you.

7            Q    Please, yes.  Do.

8            A    I might be long-winded, but -

9            Q    That's okay.

10           A    - maybe it will short circuit some

11   of the questions.

12               Anybody can trade their own money

13   anywhere, any time, any person.  You could be

14   banned from the securities industry for life,

15   you could be stripped of every license you

16   ever had, but anybody can trade their own

17   account.

18               Do you understand what I'm saying?

19           Q    Yes.

20           A    Okay.  Now, what's the question?

21               MR. FOLKENFLIK:   Just to cut

22               this short, did you trade through a

23               brokerage firm?

24               THE WITNESS:   Through one?

25               Yes.  You have to.  We cannot

D. Holzer - March 28, 2012

Page 40

Page    40

1                 execute our own trades.

2          A     Is that what you were asking?

3          Q     Yes.  That's what I was asking.

4          A     I misunderstood then.

5          Q     Okay.

6          A     Yes.  We traded through a brokerage

7     - I traded through a brokerage firm.

8          Q     All right.  And what was the

9     brokerage firm?  Which one?

10         A     Probably, Dahlman Rose, still.

11    Dahlman Rose.

12         Q     Okay.

13         A     And other accounts.  I can't recall

14    who they were.

15         Q     But there were other trading

16    organizations you used?

17         A     Yeah.  This place kind of dims your

18    memory a little bit.

19         Q     Did Fingerhut-Holzer Partners have

20    assets?

21         A     Assets?  No.  Just what was set up

22    in the LLC as we went along.  There was no

23    assets in Fingerhut-Holzer Partners.

24         Q     Okay.  How did Fingerhut-Holzer -

25                 MR. FOLKENFLIK:   Can I

D. Holzer - March 28, 2012

Page 41

Page    41

1              interrupt you?

2                   MR. CONWAY:   Sure.   Go ahead.

3                   MR. FOLKENFLIK:   What do you

4              mean by, "just what was set up in

5              the LLC?"

6                        Contributions at the time

7              of

8                   THE WITNESS:   No.   There was

9              no contributions at the time of

10             incorporation.   Zero.   As we went

11             along and we were able - and we did

12             a certain deal and a separate LLC

13             was set up for each deal, it was

14             funded at that time.

15                  MR. FOLKENFLIK:   Okay.   So

16             there were no funds which you traded

17             through Fingerhut-Holzer?

18                  THE WITNESS:   Zero funds.

19             Zero.

20                  MR. FOLKENFLIK:   But it was -

21             for want of a better term - a

22             holding company for other LLCs -

23                  THE WITNESS:   That's -

24                  MR. FOLKENFLIK:   - that were

25             set up to do specific transactions?

D. Holzer - March 28, 2012

Page 42

Page     42

1              THE WITNESS:    That's

2       absolutely correct.

3              MR. FOLKENFLIK:    Okay.

4       And Fingerhut- Holzer, other than

5       indirectly through the separate LLCs

6       that were set up for specific

7       transactions, it didn't have a

8       portfolio that it traded out of?

9              THE WITNESS:    That's correct.

10             MR. FOLKENFLIK:    Only through

11      the other subsidiaries.

12             THE WITNESS:    As each sub -

13      as each sub was set up, they were

14      funded for whatever the specific

15      investment vehicle was for that LLC.

16  BY MR. CONWAY:

17       Q      Right.  Was Mr. Fingerhut the

18  gentleman who brought in most of the investors?

19             MR. FOLKENFLIK:    Well,

20      objection.  Assumes facts not in

21      evidence.

22             MR. CONWAY:    No.  That's what

23      we're here to find out.

24             MR. FOLKENFLIK:    Who invested

25      in the separate subsidiary LLC?

D. Holzer - March 28, 2012

1                  THE WITNESS:    Customers.

2    BY MR. CONWAY:

3         Q      All right.  Was Mr. Fingerhut the

4    principal party bringing in the customers?

5         A      No.

6         Q      Did you bring in an equal volume of

7    customers?

8         A      I don't recall.

9         Q      Now, was Mr. Fingerhut responsible

10   for designing the investments for the customers?

11        A      Designing the investments?  What's

12   that mean, exactly?

13                  MR. FOLKENFLIK:    Just ask him

14            an open-ended question and he'll

15            explain it.

16   BY MR. CONWAY:

17        Q      The thing is, what I wanna know,

18   more specifically, is, did Mr. Fingerhut make

19   the approach to the clients and say, "I'm

20   suggesting that you invest in this particular

21   vehicle"?

22        A      No.  Not all the time.

23        Q      Okay.  Did he do it on occasion?

24        A      Sometimes.

25        Q      All right.  Did customers come to

D. Holzer - March 28, 2012



1     him and say, "This is what I would like to do.

2     Can you be my vehicle to do it?"

3          A     Not necessarily.

4          Q     Okay.  Can you describe what it was

5     that he did, as best you can.

6          A     Barry was an idea guy.  He came up

7     with an idea and then we put it into play.

8     That's what he did.

9          Q     And what were some of his ideas for

10    Fingerhut-Holzer Partners?

11         A     For Fingerhut-Holzer Partners?

12         Q     Yes.

13         A     Zero.  However, for the

14    subsidiaries -

15         Q     Yeah.  Okay.  Fine.  For the

16    investors and subsidiaries, tell me what some

17    of his ideas were.

18         A     Some of the ideas were real estate

19    investments in Florida.  Private placements in

20    New York.

21         Q     And what do you mean by "Private

22    placements in New York"?

23         A     Money with privately held

24    companies.

25         Q     What else?

D. Holzer - March 28, 2012

Page 45

Page     45

```
 1        A       Some public stock, publicly traded

 2     stock.

 3        Q       What else?

 4        A       That's it.

 5        Q       Now, when investor money came in,

 6     into what particular vehicle was it placed?

 7        A       LLCs.

 8        Q       Each investment -

 9        A       Set up LLCs at J.P. Morgan Chase.

10                What?

11        Q       Each investments had an LLC.  By

12     that, do you mean a company or an account?

13        A       The - the LLC was domiciled at J.P.

14     Morgan Chase.

15                   MR. FOLKENFLIK:   The record

16                should reflect that the witness

17                gestured toward the copy of the

18                Amended Complaint.

19     BY MR. CONWAY:

20        Q       So, when money came in, it was

21     directed to J.P. Morgan Chase?

22        A       Yes.

23        Q       And limited liability corporations

24     were set up for these investments?

25        A       Correct.
```

D. Holzer - March 28, 2012

Page 46

Page    46

```
 1          Q      All right.  Were they set up through
 2     the same lawyer that you used?
 3          A      I don't recall.  We might have
 4     changed lawyers because they were too
 5     expensive, as I recall.
 6                 I just don't remember who we
 7     changed to after the initial firm was set up.
 8          Q      All right.  Where did you have your
 9     place of business?
10          A      399 Park  Avenue.
11          Q      And how many employees did
12     Fingerhut-Holzer Partners have?
13          A      Including the partners?
14          Q      Yeah.
15          A      I think, seven.
16          Q      And who were the seven?
17          A      Barry Fingerhut, David Holzer,
18     Andrew Fingerhut.
19          Q      Is that Mr. Fingerhut's son?
20          A      That's correct.
21                 Brooke Fingerhut.
22          Q      Is that his daughter?
23          A      That's correct.
24                 Douglas Holzer, and we had a
25     receptionist.  I don't recall her name.
```

D. Holzer - March 28, 2012

```
 1      And we had a - I don't remember his name...
 2      CFO.  I don't remember his name.
 3                  MR. FOLKENFLIK:   Can I get
 4              the question read back, please?  The
 5              original question.
 6                      (At which time, the
 7              requested portion of testimony was
 8              read back by the stenographer.)
 9      BY MR. CONWAY:
10          Q    Now, how did Fingerhut-Holzer make
11      its money,  Fingerhut-Holzer Partners make its
12      money?
13          A    We didn't.
14          Q    What does that mean?
15               Where was the income stream for
16      Fingerhut-Holzer?
17          A    There was no income stream.
18          Q    How were you and Mr. Fingerhut
19      profiting from Fingerhut-Holzer Partners?
20          A    There was no profit.
21          Q    Well, how did you earn a living at
22      the time?
23          A    We didn't earn a living.
24          Q    Well, what was the purpose of
25      Fingerhut-Holzer Partners if not to make a
```

D. Holzer - March 28, 2012

Page 48

Page    48

1   profit?

2         A     To earn a living.

3         Q     All right.     And you never made

4   any money with -

5         A     No.

6         Q     Never ever?

7         A     No.

8         Q     Now, is this the year 2003?

9         A     I don't recall the exact year.  I

10  think it was 2003, or 2004, maybe.  I just

11  don't recall.

12        Q     And what income sources did you have

13  in 2003?

14        A     Trading.

15        Q     Trading in?

16        A     My own account.

17        Q     And what was the quantum value of

18  your trading account?

19        A     I don't remember.

20        Q     And what was Mr. Fingerhut's source

21  of income?

22        A     I have no idea.

23        Q     Now, in setting up Fingerhut-Holzer

24  Partners, there was an intention to earn money

25  there; correct?

D. Holzer - March 28, 2012

```
 1        A       That's correct.

 2        Q       And how were you going to earn -

 3    what was the plan to earn money?

 4        A       By the investment process.

 5        Q       By participating in the investment

 6    process with your customers?

 7        A       That's correct.

 8        Q       And that never took place?

 9        A       The investment process took place.

10    Nothing ever came to fruition.  You have to

11    sell something to make money.

12        Q       All right.

13                So, was Fingerhut Partners a failed

14    business investment?

15        A       Was it a failed business

16    investment?  Yes.

17        Q       And it never made any money at all?

18        A       No.

19        Q       Did you file taxes for 2003?

20        A       Yes.

21        Q       And did -

22        A       Don't say two-thousand-and-three

23    when I'm not sure of the year.  I don't recall

24    if it was two-thousand-and-three.  It's public

25    record, I know that.
```

D. Holzer - March 28, 2012

1              So, I mean,  it's very easy to find

2      out when Fingerhut-Holzer Partners was

3      initiated.

4          Q    Okay.  Now, did you have business

5      interests separate from Fingerhut-Holzer

6      Partners at the time?

7          A    No.  Business interests?

8          Q    Business interests.  Yes.

9          A    No.

10                MR. FOLKENFLIK:   Excluding

11              your personal trading.

12          A    I had investments, yes.

13          Q    That were your own?

14          A    Yes.

15          Q    Were they under the umbrella of

16      Fingerhut-Holzer?

17          A    No.

18          Q    Were they under any other corporate

19      entity?

20          A    No.

21          Q    All right.  Were they entirely held

22      within your own name?

23          A    In my name.  Correct.

24          Q    Was your wife a participant in any

25      of this?

JSIP No. 92240C 30 8

ITEM 1 &&150 SECURITY AND ISSUER

The class of equity securities to which this Statement on Schedule 13D (the "Statement") relates is the Common Stock, $0.01 par value ("Common Stock") of VCampus Corporation, a Delaware corporation ("VCampus"), with its principal executive offices located at 1850 Centennial Park Drive, Suite 200, Reston, VA 20151.

ITEM 2 &&150 IDENTITY AND BACKGROUND

        (a).  NAME          Barry R. Fingerhut

    (b).  BUSINESS ADDRESS  399 Park Avenue, 32nd Floor, New York, NY 10022

 (c).  EMPLOYMENT      Investment Manager; Fingerhut Partners, LLC

        (d).  During the last five years, Mr. Fingerhut has not been convicted in a criminal proceeding (excluding traffic or similar violations).

        (e).  During the last five years, Mr. Fingerhut has not been a party to a civil proceeding of a judicial or administrative body of competent jurisdiction which resulted in (i) a judgment, decree or final order enjoining future violations of, or prohibiting or mandating activities subject to, federal or state securities laws or (ii) finding any violation with respect to such laws.

        (f).  Mr. Fingerhut is a citizen of the United States.

ITEM 3.  SOURCE AND AMOUNT OF FUNDS OR OTHER CONSIDERATION

On May 18, 2004, $125,000 in principal amount of a convertible note held by Mr. Fingerhut was automatically converted, upon shareholder approval, into 76,788 shares of the Common Stock of VCampus. On March 23, 2006 Mr. Fingerhut used $1,150,000 of his personal funds to purchase 1,150 shares of Series B-1 Preferred Stock of VCampus and a warrant for the purchase of 500,000 shares of the Common Stock of VCampus (the &#147;B-1 Warrant&#148;). In satisfaction of VCampus&#146; cash dividend obligation to Mr. Fingerhut for the quarters ended June 30, 2006, September 30, 2006, December 31, 2006, March 31, 2007 and June 30, 2007, VCampus issued a total of 247 shares of Series B-1 Preferred Stock, in the aggregate, to Mr. Fingerhut. In exchange for Mr. Fingerhut's agreement to accept future dividends in additional shares of Series B-1 Preferred Stock instead of cash, on October 31, 2006 VCampus issued a warrant to Mr. Fingerhut for the purchase of 500,000 shares of VCampus Common Stock (in replacement of the B-1 Warrant) and a new warrant for the purchase of an additional 225,000 shares of VCampus Common Stock. Additionally, on October 31, 2006, VCampus filed an Amended Certificate of Designations for the Series B-1 Preferred Stock which, among other things, made the Series B-1 Preferred Stock immediately convertible, at the option of the holder, into VCampus Common Stock and changed the formula that determines the conversion price. The current conversion price floor for the Series B-1 Preferred Stock is $0.37 per share. Based upon the fact that the Series B-1 Preferred Stock became immediately convertible into VCampus Common Stock at $0.37 per share, Mr. Fingerhut's beneficial ownership of VCampus Common Stock could be deemed to have increased by 3,356,756 shares effective on October 31, 2006.
On January 25, 2008, 307.5 shares of Series A-1 Preferred Stock (convertible into a total of 1,025,000 shares of common stock at $0.30 per share) and 1,397 shares of Series B-1 Preferred Stock (convertible into a total of 3,775,676 shares of common stock at $0.37 per share) were transferred to Mr. Fingerhut by a business associate as consideration for the cancellation of debt owed to Mr. Fingerhut by the business associate in an amount equal to the original purchase price of the shares acquired by the business associate.  Mr. Fingerhut disclaims beneficial ownership of the shares of common stock issuable to him upon conversion of the Series B-1 Preferred Stock and upon exercise of the Series B-1 Warrant to the extent that

Schedule 13D

CUSIP No. 92240C 30 8

such shares may not be deemed beneficially owned by him by virtue of the conversion price and exercise price not being fixed.

ITEM 4.  PURPOSE OF TRANSACTION

Mr. Fingerhut acquired his shares of VCampus for investment and not with the purpose of changing or influencing the control of VCampus.  Mr. Fingerhut does not have any plan or proposal which relates to or would result in any actions enumerated in subitems (a) through (j) of Item 4 of Schedule 13D, except that Mr. Fingerhut may dispose of some or all of the Common Stock or may acquire additional shares of Common Stock from time to time, depending upon price and market conditions, evaluation of alternative investments, and other factors and Mr. Fingerhut has from time to time in the past and is currently in discussions with VCampus management and the other holders of VCampus convertible debt and preferred stock regarding the terms under which Mr. Fingerhut and other investors would convert their debt and preferred securities into common stock.  No definitive terms have been agreed upon, but such recapitalization, if consummated, could result in a change in control of the Company and/or the composition of the Board of Directors.

Rapillo
14 Winding Lane
Scarsdale, NY 10583

Pro Se Unit
U.S. District Court
Southern District
500 Pearl Street, Room 200
New York, NY 10007

RECEIVED
SDNY PRO SE OFFICE
2019 JUN 27 AM 11: 11

