UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
SDNY PRO SE OFFICE

2019 AUG 26   AM 9: 47

John Rapillo & Heidi Rapillo

Plaintiffs (PRO SE)

- Against –

Barry Fingerhut, et al.

Defendants

Case No. 09-CV-10429 (VSB)

Reply Memorandum of Law in
Further Support of Plaintiffs' Rule
60b Motion in Response to Max
Folkenflik's Declaration in
Opposition

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 8-26-19

Regarding Max Folkenflik's Declaration in Opposition to Plaintiffs' Rule 60b Motion:

Mr. Folkenflik declared the following to be true under penalty of perjury.

**"I HAVE NEVER BEEN COUNSEL FOR DAVID HOLZER OR ANY OTHER INDIVIDUAL HOLZER DEFENDANT."**

We vigorously disagree with Mr. Folkenflik's assertion that he had never been counsel to David Holzer and will show proof that will counter his Declaration.

Mr. Holzer was deposed on March 28, 2012 at the Greene Correctional Facility by our former attorney Robert Conway and Attorney Max Folkenflik representing Mr. Holzer (See attached Notice of Motion dated 6/24/19, Exhibit 6).

The single most important reason for this deposition was based on an agreement structured by Mr. Holzer and Robert Conway.

Mr. Holzer indicated that he was ready to reveal in a deposition undisputable evidence relating to transactions of fund transfers from Mr. Holzer to Mr. Fingerhut that were originally transferred to Mr. Holzer by the Rapillos.

The underlying basis for this agreement was that under no circumstances would Attorney Robert Conway bring any Civil Suit against Holzer's wife and three children (See attached Notice of Motion dated 6/24/19, Exhibit 6, page 125) who greatly benefited from the theft of our funds as documented in the DA's Affirmation.

As outlined above, Folkenflik vigorously defended Holzer by interjecting himself in Mr. Conway's interrogation of Holzer and tried to shut down questions from Conway relating to Rapillos' fund transfers.

Is it not a Conflict of Interest when the same attorney represents both sides of the same case and more importantly denies it to the Court under Penalty of Perjury?

How is it possible that an officer of the Court and a licensed attorney would deny that he ever represented David Holzer when there is undeniable proof.

The whole scenario goes to the heart of this case and puts in question the credibility of Holzer, Folkenflik and most importantly Fingerhut.

Regarding the Declaration of Max Folkenflik in Opposition to Plaintiffs' Rule 60b Motion, our response is as follows:

1.  In his opening statement Max Folkenflik states that the 1.6 million dollars we received for a personal injury case was a "**WINDFALL.**" In this callous and undignified remark even for Mr. Folkenflik from an officer of the Court is **OUTRAGEOUS** and **DISGRACEFUL.**  We find that the word "windfall" is so hurtful and shocking that it is beyond comprehension. John Rapillo had a catastrophic accident that to this day has left him unable to hold down a full-time job and is in constant pain.  To suggest that the financial award was a "windfall" (Dictionary = piece of unexpected good fortune) is absolutely a lie and beyond the pale.

2.  An Article was brought to our attention that we feel is germane to this case regarding Attorney Folkenflik (See Attached) as follows:

    **The U.S. Court of Appeals Third Circuit ruled that: "N.Y. Lawyer Max Folkenflik Committed Fraud on the Court."**

    Mr. Folkenflik obtained a 30-million-dollar judgment on a security case in New Jersey without notifying the Judge of a prior multimillion-dollar settlement he obtained from co-defendants in the case in New York.

    On October 18, 2017 the United States Court of Appeals for The Third Circuit was asked to decide whether Max Folkenflik, Esq. committed fraud on the Bankruptcy Court.

    The Court addressed whether Folkenflik's failure to disclose a Settlement Agreement rises to the level of intentional fraud.  "As officers of the Court, Attorneys are required to conduct themselves in a manner compatible with the role of Courts in the administration of justice.  This responsibility is sometimes albeit rarely-disregarded."

We are delineating for the Court portions of the deposition that with no uncertainty shows that Mr. Folkenflik was not attending the deposition simply as an observer but undoubtedly as Attorney for Holzer to counsel him in order to deflect any compromising issues that could affect our case. It should be noted that on page 2 of the deposition (See attached Notice of Motion dated 6/24/19, Exhibit 6) clearly states: "MAX FOLKENFLIK ATTORNEY FOR DEFENDANT DAVID HOLZER."

The deposition is replete with examples of Folkenflik functioning as Holzer's Counsel and interfering with Conway's questioning of Holzer.

Two of the most flagrant instances can be found on pages 113-115 and many other sections of the deposition. In this portion of the deposition (pages 113-115), Mr. Conway asked Mr. Holzer how he had used some of the Rapillo's stolen funds? Before Holzer could respond, <u>FOLKENFLIK INTERRUPTED</u> and began his diatribe and dictating to Holzer how to respond.

AS AN EXAMPLE:



After hearing the case against Folkenflik, the Court "determined that the record evidences an intentional scheme to improperly influence the Court.  The facts have demonstrated a deliberately planned and carefully executed scheme to defraud."

Furthermore, the Court stated "Membership in the bar is a privilege burdened with conditions.  Among the most oft-cited is the condition that attorneys will honor the duty of loyalty they owe to each of their clients.  In so doing, attorneys must not, and in most cases do not, disregard their inherent obligation to the system of Justice.  Because Folkenflik has conducted himself in a way that has improperly interfered with the administration of Justice Protection of the Court's integrity requires us to act."

Folkenflik has shown in different Courts his say anything, do anything demeanor to the extent of even defrauding the Courts.  His claims in our case should be regarded as highly suspect at best.

We feel that it is important for the Court to have this information.

3. Folkenflik states that we ignored the Court's September 1, 2018 deadline requesting an extension to our case. This is a resounding lie. Judge Broderick granted an extension in order for us to be able to move forward with our Appeal. Folkenflik as usual should get his facts straight before making statements that are false.

4. Folkenflik claims that we hold Mr. Fingerhut liable for our loss "**even though we have no factual evidence facts for this claim**."

Mr. Folkenfilk is dead wrong. As outlined in our Memorandum of Law dated 6/24/19 attached, we have listed multiple circumstances, instances and facts that counter his allegations.

We outlined point by point Fingerhut's knowledge and involvement in the theft of our funds. Outlined are key points relative to that evidence.

- Holzer transferred $200,000 of our money directly to Mr. and Mrs. Fingerhut's "personal account." Where did Mr. Fingerhut think those funds came from since he knew Holzer had NO funds of his own.
- Holzer transferred a total of $140,000 of our money to the Fingerhut-Holzer Partners account, which Fingerhut controlled.
- Holzer transferred $500,000 of V-Campus stock (which Holzer purchased with our money) to Fingerhut that he originally purchased in his name - that transfer was made on January 25, 2003, 3-months before his indictment by the D.A.'s office as outlined in D.A.'s Affirmation from Shannon Rowe and Nick Cangro's Investigation.

Fingerhut put tremendous pressure on Holzer to repay him and threatening to turn him in to the D.A.'s office thus forcing him to solicit personal acquaintances for funds (see Declaration from John Rapillo which is included in our Notice of Motion dated 6/24/19 attached). This absolutely induced Holzer to commit theft knowing full well Holzer had no money and would have to raise it any way he could.

- Fingerhut exercised complete dominance over Holzer and pressuring him to return his money and threatening his freedom by turning him in for prosecution.
- The D.A.'s Affirmation and investigation by Nick Cangro demonstrates (as the Court requested) that Fingerhut was clearly aware of the theft of the Rapillos' money.

5. Mr. Folkenfilk states that the Rapillo's were foolish and greedy by giving money to Holzer and knew that Fingerhut only got involved with investments from large corporations.

That last statement is laughable as indicated in the D.A.'s Affirmation. The only investments that were made by Fingerhut-Holzer were either from Fingerhut or from victims who invested with Holzer such as the Rapillos, Mel Block, Zackmans, Pessars and possibly others.  There were NO large corporate investors.

With respect to Max Folkenflik making the statement that we were foolish and greedy - our response is simply "**people who live in glass houses should not throw stones**" considering the fact that the U.S. Court of Appeals Third Circuit Ruled "N.Y. lawyer Max Folkenflik Committed Fraud on the Court."

**Responding to the comment that we were "Greedy":**

Since we are not sophisticated in finances, we trusted a so called friend (David Holzer) of 20 plus years, who was a broker, hoping that he would suggest a secure investment where we could draw income and support our family considering John Rapillo was no longer able to support a full-time job due to his disability. Little did we know that when we made our investments, which would have made us Partners in the profits of Fingerhut-Holzer Partners, in reality it was to defraud us of our investments by both of these individuals.

6. Folkenflik claims that there is no shred of evidence that Mr. Fingerhut had any awareness of Plaintiffs' transfers to Holzer until Fingerhut was informed of those frauds by the D.A.'s office.

- We know based on the investigation by D.A. Investigator Nick Cangro and the controlling person theory "that Fingerhut invested $13 million dollars in Fingerhut- Holzer Partners. Holzer invested just $111,000.

That being the case where did Fingerhut believe that the other funds came from?

- During Mr. Fingerhut's deposition (See attached Notice of Motion dated 6/24/19, Exhibit 3) our attorney asked Fingerhut "Do you dispute that $800,000 transferred by the Rapillos to Holzer that $500,000 V-Campus stock was purchased by Mr. Holzer and ultimately transferred directly to Mr. Fingerhut?  Mr. Fingerhut would not answer and Folkenflik chimed in and said the following: "WE DON'T KNOW IF IT WAS THE RAPILLOS' MONEY IT MIGHT HAVE BEEN AND IT MIGHT HAVE NOT BEEN."

- Since Fingerhut did not challenge the statement: "It might have been" would definitely indicate **he did not disagree** with the statement. Folkenflik realizing that he opened up a can of worms then said "we don't know if there were millions of dollars in Holzer's account." The response from attorney Conway was: "From Mr. Holzer, we know there was nothing there." Folkenflik did not challenge Conway's statement which most positively indicates, <u>HE DID NOT DISAGREE WITH HIS STATEMENT.</u>  Folkenflik realizing that he opened up a can of worms then responded," We don't know if there were millions of dollars in Holzer's account."

The response from our Attorney Conway was:

"<u>FROM MR.  HOLZER WE KNOW THERE WAS NOTHING THERE.</u>"

Folkenflik did not challenge Conway's statement which positively indicates **HE DID NOT DISAGREE.**

7. Folkenflik states that our Memorandum of Law is "replete with fabrications and undeniable facts."

- Our Memorandum of Law is totally factual.  The contents are all based on documentation that is part of Fingerhut's and Holzer's depositions and Nick Cangro's Investigation/Shannon Rowe's Affirmation from the D.A.'s office.

8. Confusion by Folkenflik regarding transfer of funds from Holzer to Fingerhut.

- <u>**He claims there is NO EVIDENCE TO INDICATE that monies Holzer transferred to Fingerhut and Fingerhut-Holzer Partners were the Rapillos.**</u>
- As indicated in Nick Cangro's Investigation and Shannon Rowe's Affirmation over $340,000 was transferred to Mr. Fingerhut and Fingerhut-Holzer Partners accounts and $500,000 of V-Campus stock was purchased with our money was also transferred to Fingerhut three months before his indictment by the D.A.'s office.

- These transfers or rather payments that Holzer made were due to pressure brought to bear by Fingerhut by threatening Holzer to turn him into the D.A. for prosecution. Mr. Fingerhut was also using Holzer as a pawn to solicit funds from personal acquaintances in order to repay debts owed to him. (See John Rapillo's Declaration attached to our Notice of Motion dated 6/24/19.

- By referring to Mr. Holzer's deposition taken on March 28, 2012 where Holzer was represented by "MAX FOLKENFLIK" Mr. Holzer had structured an agreement with our Attorney Conway that he would reveal under oath the existence of certain facts relating to transaction of funds between Holzer and Fingerhut as outlined in Shannon Rowe's Affirmation regarding the Rapillos' funds. Holzer agreed to this condition that no Civil Suit be brought against his own family (page 125 of David Holzer's deposition).

- It became obvious to Attorney Conway from the start of the deposition Holzer decided against cooperating. Folkenflik, who was representing Holzer, directed him away from answering sensitive questions which was obvious to Mr. Conway and meant to protect Fingerhut's interests in the Rapillos' case.  Why else would Fingerhut's personal attorney be representing Holzer, who was penniless and had no funds. It is entirely within reason that Fingerhut wanted an insurance policy to insure Holzer would not divulge any pertinent facts that would help the Rapillos' case and could possibly have been paying Folkenflik's legal fees for defending Holzer.

9. **Mr. Folkenflik claims that the transfer of $500,000 worth of V-Campus stock to Fingerhut originally purchased by Holzer with Rapillo funds was certainly "APPROPRIATE."**

- Given the fact that he owed Mr. Fingerhut, we definitely agree with Folkenflik's acknowledgement with respect to this issue. However, we disagree with the notion that Fingerhut did not know that the funds were Rapillos considering he knew very well that Holzer had no other funds available.  He also indicates that even if Holzer had used the Rapillos' money to pay Fingerhut "the record refutes it." That statement is a total fabrication when in fact Nick Cangro's Investigation and Shannon Rowe's Affirmation clearly lays out in detail those transfers. Additionally, it is documented in an S.E.C. Filing (See our Notice of Motion dated 6/24/19, Exhibit 7).

- Fingerhut claims the V-Campus stock became insolvent and the shares became worthless. That is a foolish statement, considering that at the time the transfer was made to Fingerhut the stock definitely had a value and was without a doubt purchased with Rapillos' funds by Holzer.

10. **Folkenflik seems to be fixated on the fact that Judge Broderick gave us the opportunity to make our case for a possible reversal of his prior Order by giving us an extension**.

- He claims that we have no basis for relief because Rule 60 is inappropriate and only applies to newly discovered evidence. He failed to mention that in our Notice of Motion dated 6/24/19 attached, we laid out in great detail "new evidence."

- Mr. Folkenflik's Declaration in Opposition to Plaintiffs' Rule 60 Motion is replete with false accusations and unsupported assertions.

11. Barry Fingerhut used his wealth and privilege to manipulate the criminal justice system, with the knowing and assistance of the DA's office, when he and representatives from Thacher Associates turned David Holzer in to the DA's office. Prior to turning David Holzer in to the DA's office, Barry Fingerhut took all of the assets from Fingerhut-Holzer Partners as reimbursement for his own losses. When reimbursement was made, at the very least, Rapillos should have received a pro-rata share since a portion of the Rapillos' funds were transferred to David Holzer and David Holzer then transferred Rapillos' funds to Fingerhut-Holzer Partners. This is confirmed in the Investigation by Nick Cangro of the DAs office and in Shannon Rowe's Affirmation.

The evidence we have presented to the Court is true, accurate and solid. Even if the Court feels more is needed, please heed the findings of the Appeals Court in its ruling against Folkenflik: "Although direct evidence of intent will rarely be available, it may be inferred from the surrounding circumstances. Folkenflik's intentions were clear." In our case, Fingerhut's intentions were clear.

For all the reasons and circumstances listed above we respectfully ask the Court to vacate the Summary Judgment Order.

Respectfully submitted,

Dated: _8/25/2019_

*Heidi Rapillo*
Heidi Rapillo

Dated: _8/25/2019_

*John Rapillo*
John Rapillo

Address:  14 Winding Lane
         Scarsdale, NY  10583

Email:  hrapillo@optonline.net

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

John Rapillo

Heidi Rapillo

Write the full name of each plaintiff or petitioner.

Case No.    09    CV  10429  (VSB)

-against-

Barry Fingerhut, et al

**NOTICE OF MOTION**

Write the full name of each defendant or respondent.

PLEASE TAKE NOTICE that

John Rapillo &
Heidi Rapillo

plaintiff or defendant

John Rapillo &
Heidi Rapillo

name of party who is making the motion

requests that the Court:

Vacate the Court's Memorandum and Order dated September 14, 2016.
Plaintiffs argue that relief from this Order is warranted
pursuant to Fed.F.Civ.P. Rule 60(b)(6).

Briefly describe what you want the court to do. You should also include the Federal Rule(s) of Civil Procedure or
the statute under which you are making the motion, if you know.

In support of this motion, I submit the following documents (check all that apply):

☒  a memorandum of law

☒  my own declaration, affirmation, or affidavit

☒  the following additional documents: Affirmation from DA Shannon Rowe, Exh. 1; Thatcher
Report, Exh. 2; Fingerhut Deposition, Exh. 3; Letter from Max Folkenflik, Exh. 4;
Plea Agree., Exh. 5; Holzer Deposition, Exh. 6. Per Court Appearance on 7/10/17,
consideration of previously submitted documents: VCampus, Schedule 13D-SEC.gov,
letters dated 2/2/17, 3/30/17, 6/14/17, 7/29/17

| 6-24-19 | | *Heidi Rapillo* 6-24-19 |
|---|---|---|
| Dated | | Signature – Heidi Rapillo |
| Heidi Rapillo & John Rapillo | | *John Rapillo* 6-24-19 |
| Name | | Signature – John Rapillo |

14 Winding Lane          Scarsdale          NY          10583
Address                           City                   State        Zip Code

914-472-8191                      hrapillo@optonline.net
Telephone Number (if available)       E-mail Address (if available)

PLAINTIFFS
COMOTION

SDNY Rev: 5/24/2016

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

John Rapillo

Fill in above the full name of each plaintiff or petitioner.

Case No. ___09___ CV 10429 (VSB) _____

-against-

Barry Fingerhut, et al

_____

_____

_____

Fill in above the full name of each defendant or
respondent.

# DECLARATION

In support of Motion to Vacate Order dated September 14, 2016 pursuant to
Fed.R.Civ.P. Rule 60(b)

Briefly explain above the purpose of the declaration, for example, "in Opposition to Defendant's
Motion for Summary Judgment."

I, _____John Rapillo_____ , declare under penalty of perjury that the

following facts are true and correct:

In the space below, describe any facts that are relevant to the motion or that respond to a court
order. You may also refer to and attach any relevant documents.

During the Spring of 2007, I was at David Holzer's home in New City, NY.

David Holzer received a phone call from Barry Fingerhut. David Holzer

reiterated the content of that conversation to me stating "All he wants is

money – he wants me to refinance my house and get more money wherever I can."

This shows the pressure Fingerhut was putting on David Holzer.



_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Attach additional pages and documents if necessary.

6 24-19
Executed on (date)                                          Signature

John Rapillo
Name                                                        Prison Identification # (if incarcerated)

14 Winding Lane                    Scarsdale          NY    10583
Address                                  City              State     Zip Code

914-472-8191                       hrapillo@optonline.net
Telephone Number (if available)          E-mail Address (if available)

Table of Contents

Affirmation of Investigator Shannon Rowe dated 2/18/09          Exhibit 1

Thacher Associates Report, October 2007                         Exhibit 2

Barry Fingerhut's Deposition dated 2/7/13                       Exhibit 3

Letter from Max Folkenflik dated 4/2/14                         Exhibit 4

David Holzer's Plea Agreement dated 4/30/09                     Exhibit 5

David Holzer's Deposition dated 3/28/12                         Exhibit 6

V-Campus – Page 3 of Schedule 13-D-SEC.gov                      Exhibit 7

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

John Rapillo & Heidi Rapillo

Plaintiffs (PRO SE)

- Against –

Barry Fingerhut, et al

Defendants

Case No. 09-CV-10429 (VSB)

Memorandum of Law to Vacate
Judgment Pursuant to Fed.R.Civ.P
60(b)(6)

## Memorandum of Law

Presently before this Court is Plaintiff's Motion to Vacate the Court's Order for Summary
Judgment dated September 14, 2016.  Plaintiffs argue that relief from this Order is
warranted under Fed.R.Civ.P60(b)(6).

### Analysis in Support of Motion for Relief from Judgment Based on Rule 60(b)

This matter is a claim for return of assets improperly removed from a partnership,
Fingerhut-Holzer Partners (the Partnership").  Barry Fingerhut ("Fingerhut") and David Holzer
("Holzer") ("the Partners") were partners from 2002 through 2008.  Plaintiffs were induced to
invest in the partnership by Holzer in October 2005, with various investments totaling $1.9
million, which was allegedly to make them partners in the profits of the business but in reality
was to defraud them of their investment.

Fingerhut was the senior partner in the partnership and the Plaintiffs were encouraged to invest in the partnership based upon his alleged business acumen.  After the investigation by the District Attorney's office it was determined that Holzer had invested very little in the partnership and embezzled significant funds.  By 2005, unbeknownst to the Plaintiffs, the partnership was in turmoil and Fingerhut was pressuring Holzer for money.

In the summer of 2007, after Fingerhut became concerned about Holzer's fraud and after several months of demanding Holzer to return his funds, Fingerhut hired Thacher Associates to investigate Holzer.  When Thacher Associates confirmed Holzer's fraud Fingerhut, representatives from Thacher Associates and Fingerhut's attorneys reported Holzer to the NYC District Attorney's office on fraud charges.

Ultimately, Holzer *was convicted of fraud and sentenced to 5 to 15 years in jail*.  During depositions for his trial, it was clear that Fingerhut knew of the investments by the Plaintiffs in his partnership but chose to ignore it.  Instead, Fingerhut took all of the Partnership's assets as reimbursement for his own losses.

The Grand Jury minutes and the Affirmation from District Attorney Shannon Rowe (Exhibit 1) in pursuing the fraud charges against Holzer ("the Criminal Record") will support the Plaintiff's position that Fingerhut knew that the money Holzer invested/transferred in The Waverly, V-Campus, Fingerhut-Holzer Partners and Fingerhut's personal account was not money belonging to Holzer.  Therefore, when reimbursement was made to Fingerhut (prior to Fingerhut reporting Holzer to the D.A.) from the partnership, at the very least, the Plaintiffs should have received a pro-rata share of the reimbursement equal to their investment in the partnership.

Therefore, the Plaintiffs respectfully request that the Court reopen the underlying Case and order that the Grand Jury information be released so that the Plaintiffs may support their

claim for Conversion damages against Fingerhut.  Fingerhut helped Holzer in Conversion by accepting stolen money.

Argument

60(b)(6) Additional Justified Relief

A.  Nonfeasance of Plaintiffs' attorney, Robert Conway:

Mr. Conway failed to present and enunciate key evidence to the Court.  These items of evidence include:

1.  The Affirmation dated February 18, 2009 N.Y. of District Attorney Investigator Shannon Rowe (Exhibit 1) which indicates that Barry Fingerhut was a direct beneficiary of funds that the Rapillos entrusted to David Holzer which was to be invested in various legitimate entities and without their knowledge those same funds were redirected to Mr. & Mrs. Barry Fingerhut's personal account as well as the Fingerhut-Holzer Partners account which was controlled by Mr. Fingerhut.

On March 23, 2006, Plaintiffs wired to David Holzer $800,000 with the understanding it was to be invested for us in legitimate entities.  On the same day (March 23, 2006), David Holzer purchased "in his name" $500,000 in V-Campus stock.  On January 25, 2008, three months before his indictment by the District Attorney, Holzer transferred all of the shares to Barry Fingerhut in lieu of a cancellation of debt that he owed to Fingerhut.  Thus, using the Rapillos' funds to pay off Fingerhut and try to pay down the funds he stole

from him.  The Affirmation from D.A. Shannon Rowe (Exhibit 1) confirms this along with the V-Campus Schedule 13-D-SEC.gov, Page 3 (Exhibit 7). The Affirmation also confirms that on December 15, 2005 and January 31, 2006, the Rapillos wired $800,000 to David Holzer.  As part of that sum, Holzer transferred $200,000 to Mr. & Mrs. Fingerhut's personal account and approximately $140,000 to the account of Fingerhut-Holzer Partners.

2. Letter dated April 2, 2014 (Exhibit 4) written by Barry Fingerhut's attorney, Max Folkenflik, where Attorney Folkenflik states, "Holzer used some of the money he received from Plaintiffs to invest in V-Campus in his own name and to pay $200,000 on an antecedent $1 million debt he owed to Fingerhut."

3. Thacher Associates Report issued October 2007 (Exhibit 2) – commissioned by Barry Fingerhut to investigate David Holzer when he suspected fraud. This report confirms David Holzer's fraud and Fingerhut reimbursing himself from the partnership before turning Holzer into the D.A.

4. Barry Fingerhut Deposition dated February 7, 2013 (Exhibit 3)

One of the key questions Mr. Conway asked Fingerhut in his deposition (Exhibit 3) was "Do you dispute that the $800,000 transferred by the Rapillos to Mr. Holzer on March 23, 2006 that $500,000 V-Campus stocks were purchased by Mr. Holzer?"  It seemed that Mr. Fingerhut did not answer the question and Mr. Folkenflik answered:  "WE DON'T KNOW IF IT WAS THE RAPILLOS' MONEY THAT MR. HOLZER USED – IT MIGHT HAVE BEEN/IT MIGHT NOT HAVE BEEN."  It is very important to keep in mind that when Mr. Folkenflik made the statement "IT MIGHT HAVE BEEN," Mr. Fingerhut did not

challenge the statement.  That nonresponse from Fingerhut would certainly indicate that he did not disagree with Folkenflik's answer (See Pages 99, 100 & 101 of Fingerhut's deposition-Exhibit 3).

Folkenflik also made the following statement: "$800,000 went into his account from the Rapillos and we don't know whether there were millions of dollars in the account."  Mr. Conway answered: "From Mr. Holzer we know there was nothing there."

Based on the comments above:

- Mr. Folkenflik speaking for Mr. Fingerhut indicates: "The funds might have come from the Rapillos?"  Since Mr. Fingerhut did not challenge those comments, HE DID NOT DISAGREE.

B.  Evidence Not Presented:

1.  Affirmation of Investigator Shannon Rowe (Exhibit 1)

Relevance:

a)  The Affirmation supports the Controlling Person Theory showing that Fingerhut invested $13 million in Fingerhut-Holzer Partners. Holzer invested just approximately $111,000.  Fingerhut was clearly able and did exercise financial pressure and control over Holzer.

Mr. Fingerhut's control over Mr. Holzer was exhibited through intimidation and coercion by forcing Mr. Holzer to repay debts owed to him any way he could and later permitting his personal attorney, Max Folkenflik, to

represent Holzer in his legal battles and most likely paying for those services.

Interesting to note that Max Folkenflik, Esq. is currently representing Mr. Fingerhut in the Rapillos' case and was also the attorney to David Holzer in the same case.  In essence, Mr. Folkenflik was representing both sides in the same case and enabled Mr. Fingerhut to continue "control" over Mr. Holzer's testimony.  Ethically, how could Mr. Fingerhut allow his lawyer to represent David Holzer, the person who embezzled millions of dollars from him if there was no collusion between Fingerhut and Holzer?

Mr. Holzer's first deposition was taken on March 28, 2012 at the Greene Correctional Facility (Exhibit 6) by Mr. Conway with Mr. Folkenflik representing him.  Mr. Holzer, prior to the deposition, had agreed to make certain information available concerning transfer of funds on the condition that no Civil Suit be brought against his family.  During the deposition, Mr. Folkenflik asked Holzer "did you at any time ask him (referring to Mr. Conway) to withdraw the names of your family members from the law suit?"  Mr. Holzer answered "We talked about it.  Yes."  (Refer to Holzer's Deposition, Page 125 (Exhibit 6).

In reviewing Holzer's deposition it is clear that Holzer had decided against cooperating and did not reveal anything with regard to Mr. Fingerhut's receipt of funds from Holzer.  In fact, his answers to questions posed to him by Mr. Conway were "I DON'T RECALL."  During Holzer's

questioning, Attorney Folkenflik directed Holzer away from answering sensitive questions.

b) The Affirmation further supports the Fraud Respondent Superior Law. The Court Record states that New York State Law "precludes suits against an employer for a theft committed by an employee so long as the employer did not induce the employee to commit the theft."

Fingerhut, by pressuring Holzer to give him his money and threatening to turn him into the D.A. forced Holzer to solicit personal acquaintances for funds (See Declaration from John Rapillo) did absolutely induce Holzer to commit theft knowing full well Holzer had no money and would have to raise it any way he could.

c) The Affirmation further endorses the claim of Fraud through Veil Piercing. N.Y. State Law states, "A Court may pierce the corporate veil where (1) the owner exercised complete domination over the corporation with respect to the transition at issue and (2) such domination was used to commit fraud.

Fingerhut exercised complete dominance over Holzer both financially by investing far more in Fingerhut-Holzer Partners than Holzer and pressuring him to return his money and by putting his freedom at risk by threatening to turn him into the District Attorney which he eventually did.

d) Claim of Conversion "Money may be the subject to conversion if it is specifically identifiable and there is an obligation to return it or treat it in a

particular Manor (Vigilant Ins. Co. of Am. Vs. Hous. Auth. Of City of El Paso, Texas 87 N.Y. 2d 36, 44 (1995).

The Affirmation clearly identifies Rapillos' money wired to Holzer's account that was immediately transferred to Fingerhut-Holzer Partners and Fingerhut's personal account as stated by D.A. Investigator Shannon Rowe.

e) Furthermore, the Affirmation strongly refutes Holzer's Plea Agreement (Exhibit 5) that "Holzer used Rapillos' money exclusively for himself." This is clearly not true. Holzer unquestionably used Rapillos' money to pay his debts to Fingerhut since Holzer had no money as confirmed by D.A. Investigator Shannon Rowe.

The Affirmation emphatically demonstrates, as the Court requested, that Fingerhut was clearly aware, if not actively involved in the theft of the Rapillos' money.

2. Max Folkenflik's letter of April 2, 2014 (Exhibit 4)

Relevance:

Max Folkenflik, attorney for Barry Fingerhut, admits that Holzer used Rapillos' money to pay Fingerhut, "Holzer used some of the money he received from Plaintiffs to invest in V-Campus in his own name and to pay $200,000 as an antecedent $1 million debt he owed to Fingerhut." The scope of Holzer's fraud and transfers of Rapillos' funds were later shown to far exceed this $200,000.

3. Thacher Report (Exhibit 2)

Relevance:

The investigation by Thacher Associates (Exhibit 2) verified the control and pressure put on David Holzer by Barry Fingerhut by threating to report him to the D.A.  The Report confirms David Holzer admitted to his fraudulent practices with regard to Fingerhut-Holzer Partners. On October 3, 2007 Holzer and Fingerhut signed a Contingent Assignment of Equity Interests Agreement, pursuant to which Holzer agrees that, if he has not paid the sum of $6,970,300 to Fingerhut by October 15, 2007, Holzer will (a) assign to Fingerhut all of his share of the investments made by Fingerhut-Holzer Partners (Totaling $7,274,500); and (b) at Fingerhut's request, resign from Fingerhut-Holzer Partners (See page 5 of The Thacher Associates Report Exhibit 2).

On October 9, 3007, Holzer signs a Secured Promissory Note, pursuant to which he agrees to pay Fingerhut the sum of $7,603,800.

On October 15, 2007, Holzer signs a Notice of Resignation from Barry/David Partners, LLC (Barry/David Partners was a vehicle formed by Fingerhut and Holzer that received carried interests in certain investments made by Fingerhut-Holzer Partners (See Page 5 of The Thacher Associates Report, Exhibit 2).

After the fraud became known, Holzer assigned to Fingerhut his interest in the investments made by Fingerhut-Holzer Partners; the amount of this assignment totaled $8,997,501 (See the Thacher Report Page 7, Exhibit 2). Holzer wrote two checks to Fingerhut, both of which bounced (See Fingerhut deposition, page 145, Exhibit 3). This further shows the pressure Holzer was under by Fingerhut that he would write him two checks knowing they would bounce.

Fingerhut shortly thereafter informed the D.A. of Holzer's fraud.

C.  Additional Relevant Case Laws:

a)  N.Y. Penal Law 165.40

This law states: "a person is guilty of criminal possession of stolen property in the fifth when he knowingly possesses stolen property with the intent to benefit himself or a person other than the owner thereof or to impede the recovery by an owner.

There is no question that Rapillos' money was stolen by Holzer and transferred to Fingerhut-Holzer Partners and to Fingerhut. This is undisputed by Shannon Rowe's Affirmation and Fingerhut's own attorney.

b)  Solomon R. Guggenheim Found. v. Lubell, 77 N.Y. 2d 311, 317, 567 N.Y. 2d 623, 569, N.E. 2d 426 (1991).

"An owner may seek recovery of unidentifiable stolen property, such as a piece of artwork from an innocent good faith purchase for value."

Rapillos' funds have clearly been identified by N.Y. District Attorney's investigation.

<u>Conclusion</u>

The Court asked: "If there is any evidence in the record that could reasonably support a jury's verdict for the non-moving party, summary judgment must be denied. (Marvel Characters, Inc. v Simon, 310 F.3d 280, 286 2d Cir 2002)."

We submit that based on the aforementioned evidence there is amble cause to Vacate the Summary Judgment Order.

In addition, we request that the Court order the release of all Grand Jury records in this matter.

Respectfully submitted,

John Rapillo

Heidi Rapillo

Date 6 24-19

Date 6 24-19

Address:  14 Winding Lane, Scarsdale, NY 10583

Telephone:  914-472-8191

Email:  hrapillo@optonline.net

**PRECEDENTIAL**

## UNITED STATES COURT OF APPEALS
### FOR THE THIRD CIRCUIT

———————

No. 16-3244

———————

IN RE: ANDREW E. BRESSMAN,
                                                    Debtor


JAMES A. BAXTER; ANDREW BAXTER;
J.A. BAXTER LIFE INVESTMENT TRUST;
RICHARD KATZ; ROBERT THOMAS;
EGI 1985 RETIREMENT BENEFIT TRUST


v.


ANDREW E. BRESSMAN


JAMES A. BAXTER, individually and as successor-in-
interest to the James A. Baxter Life Investment Trust;
RICHARD KATZ; ROBERT THOMAS,
                                                    Appellants


———————

On Appeal from the United States District Court
for the District of New Jersey
(D. N.J. No. 2-14-cv-05314)
District Judge:  Honorable Kevin McNulty

———————



Argued on March 20, 2017

Before: AMBRO, JORDAN and ROTH, <u>Circuit Judges</u>

(Opinion filed: October 18, 2017)

Max Folkenflik            [Argued]
Folkenflik & McGerity
1500 Broad Street
21st Floor
New York, NY 10036
                    *Counsel for Appellants*

Ryan T. Jareck
Cole Schotz
1325 Avenue of the Americas
New York, NY 10019

Michael D. Sirota            [Argued]
Warren A. Usatine
Cole Schotz
25 Main Street
Court Plaza North, P.O. Box 800
Hackensack, NJ 07601
                    *Counsel for Appellee*

———————————

OPINION

———————————

ROTH, <u>Circuit Judge</u>

In this appeal we are asked to decide whether Max Folkenflik, Esq., committed fraud on the court. The Bankruptcy Court determined that Folkenflik had intentionally deceived the court. As a result, the court vacated the default judgment it had previously entered in favor of Folkenflik's clients. The District Court affirmed. Finding no error, we will affirm.

I.

This action was commenced as an adversary complaint in a Chapter 11 bankruptcy proceeding brought by Andrew Bressman. The Plaintiffs are victims of fraudulent activities by Bressman. In the 1990's, Bressman and others had engaged in manipulation of stock prices. The Plaintiffs brought civil securities fraud and Racketeer Influenced and Corrupt Organizations Act (RICO) claims against Bressman and his co-defendants in the United States District Court for the Southern District of New York. The Plaintiffs were represented by Folkenflik. These civil actions against Bressman were stayed when Bressman filed for bankruptcy in the Bankruptcy Court for the District of New Jersey. In response, the Plaintiffs filed the adversary complaint against Bressman.

The civil securities fraud and RICO claims continued against Bressman's co-defendants before Judge John Koeltl in the Southern District of New York. On August 13, 1998, claims against the co-defendants in one of the suits were settled for ▉▉▉▉▉▉. On August 28, Folkenflik, as attorney for Plaintiffs, received the full settlement amount, minus a $75,000 prompt payment discount. The parties' Settlement Agreement,

3

approved by Judge Koeltl, was subject to a confidentiality order, which incorporated the following language from the parties' stipulated confidentiality agreement:

> It is hereby stipulated, consented and agreed to by counsel for the parties in this action, that they will not disseminate and/or publicize the existence of or disclose the financial terms of any settlement agreement with any defendants, except as further set forth in this Stipulation and order; that this confidentiality provision does not prohibit or restrict the parties from responding to any inquiry about the documents produced or their underlying facts and circumstances by any state or federal regulatory agency, including the Securities and Exchange Commission or any self-regulatory organization . . ..[1]

The adversary proceeding continued against Bressman in the Bankruptcy Court.

Several months after the Settlement Agreement was reached and the funds received, the Plaintiffs sought a default judgment in the Bankruptcy Court against Bressman. The court ordered them to submit an affidavit detailing their damages. In March 1999, Folkenflik, as their attorney, submitted an affidavit that recounted the history of the proceedings against Bressman and his co-defendants. The affidavit indicated that the damages totaled $5,195,081 plus interest. Although Folkenflik's affidavit provided a comprehensive account of the underlying proceedings, it made

---

[1] App. A38.

4

no mention of the $███ million settlement that he had obtained against Bressman's co-defendants or even of the fact of the settlement. Explicitly noting its reliance on Folkenflik's affidavit, the Bankruptcy Court entered a default judgment against Bressman for $5,195,081 on February 7, 2000. The Bankruptcy Court ordered Folkenflik to submit a separate application for RICO damages. In September 2002, the Plaintiffs filed an application for RICO damages and attorneys' fees. No mention was made in that application that the Plaintiffs had already been paid ████████ on account of their losses. In July 2003, still unaware of the Settlement Agreement, the Bankruptcy Court entered a RICO judgment for treble damages, totaling $15,585,243. The court noted that this "amount constitute[d] treble the damages found and awarded by this Court as Plaintiff's out-of-pocket losses . . .."[2] The court also awarded $910,855.93 in attorneys' fees.[3]

Bressman was incarcerated from 2003 until 2006 in connection with his conviction in New York state court for enterprise corruption and grand larceny. During that time and the seven years that followed, Folkenflik made no attempt to recover on the default judgment because, in his view, the likelihood of Bressman having substantial assets was remote. In 2013, however, Folkenflik learned that Bressman was going to receive a potential payment of $10 million, so Folkenflik set out to have the $15,585,243 judgment satisfied. He filed *ex parte* applications on behalf of the Plaintiffs in the Southern District of New York and in the District of New Jersey to appoint a receiver to search for and seize Bressman's assets.

---

[2] App. A267-68.
[3] App. A268.

5

The court in New Jersey expressed skepticism that emergency *ex parte* relief was warranted, given Folkenflik's failure to collect for ten years. The application was denied in open court and was withdrawn the same day. In New York, Judge Ramos granted the application on September 26, 2013. On October 2, Folkenflik filed a new application in the District of New Jersey asking the court to authorize the receiver, who had been appointed by the Southern District of New York, to act in New Jersey. Contrary to Local Rule, Folkenflik did not mark on the civil cover sheet that this action was related to the unsuccessful application that he had filed in the District of New Jersey several days earlier.[4] As a result, the case was assigned to a different judge who granted the *ex parte* application. Searches and seizures were executed in New York and New Jersey on October 11.

In declarations appended to Plaintiffs' *ex parte* applications, Folkenflik indicated that, as a result of post-judgment interest, the judgment against Bressman totaled $30,895,913.39. Nothing in these submissions indicated that Folkenflik had already collected $███ million on behalf of the Plaintiffs. Indeed, in his brief in support of his application in the Southern District of New York, Folkenflik stated: "With post judgment interest, the Judgment's current value is $30,895,913.39. To date – more than ten years later – Plaintiffs have not seen a dime of this amount."[5]

---

[4] During a sanctions hearing before the Southern District of New York, the court found "deeply troubling the suggestion that [Folkenflik] did not completely, fairly, and accurately disclose to [the District of New Jersey] the application they had previously made . . . ." App. A43.

[5] App. A41.

Then, on October 13, 2013, Bressman's attorney, David Wander, wrote to Folkenflik, asking if anyone had made payments on the judgment.[6] Folkenflik certified that it was not until then that he looked at the docket sheet and saw that the settlement was listed. On October 16, Folkenflik replied to Wander, stating "[t]he complete and accurate response to your specific question is no, there have not been any payments from any source regarding the Bressman Judgment."[7] Folkenflik added, in connection with this letter: "I . . . advised him of all of the facts I thought I was allowed to advise him of, given the public disclosure of the existence of the settlement, and that was what I was able to say,"[8] namely, that certain defendants were dismissed from one of the civil actions, "subject to a settlement agreement that was submitted to Judge Koeltl with the confidentiality 'so ordered' and the agreement sealed by the order of the Court in or about October 1998."[9] That action was then marked closed. Folkenflik certified that he was not aware of the reference to the settlement in the court docket until October 2013.[10]

October 2013 was the first time that the Bankruptcy Court, the District Courts in New York and New Jersey, and

---

[6] App. A368.
[7] App. A41.
[8] App. A368.
[9] App. A509-10.
[10] App. A42.

Bressman[11] learned that Folkenflik had successfully negotiated a settlement agreement with Bressman's co-defendants. The orders granting the Plaintiffs' *ex parte* applications were then vacated in both courts and the seized materials were returned.

On January 7, 2014, Judge Koeltl in the Southern District of New York held a hearing to determine whether Folkenflik was obligated to disclose the Settlement Agreement and to whom. Folkenflik argued that, absent the confidentiality order, he would have informed the Bankruptcy Court of the Settlement Agreement even though he believed it was "immaterial" and irrelevant to the underlying default judgement.[12] By oral order, the court instructed the parties to provide counsel and all involved judges with details of the Settlement Agreement.

---

[11] Although Bressman claims he was unaware of the Settlement Agreement until October 16, 2013, Folkenflik argues Bressman was aware of the Agreement as early as "sometime in the 90's." Folkenflik also contends that Bressman had constructive notice of the Settlement Agreement's existence because it was inadvertently disclosed on the Southern District of New York's public docket. The Bankruptcy Court did not credit this assertion because "Folkenflik certifie[d] that he, himself, was not aware of this public reference until October 2013." App. A42. In any event, the date when Bressman became aware of the Agreement is not germane to the merits of our discussion. The inquiry here is primarily focused on the representations that Folkenflik made to the Bankruptcy Court when he appeared *ex parte* in 1999 and which he continued to present to the Bankruptcy Court and the District Courts in the following years.
[12] App. A384.

On January 9, 2014, a hearing was held by Judge Ramos in the Southern District of New York to determine whether Folkenflik's decision to file the *ex parte* application to collect on the default judgment with no mention of the Settlement Agreement constituted sanctionable misconduct. The judge noted that the validity of the default judgment against Bressman was not at issue in that hearing.[13] At the conclusion of the hearing, the court declined to impose sanctions.

Bressman then asked the Bankruptcy Court for the District of New Jersey to reopen the proceeding related to the Plaintiffs' adversary complaint, vacate the underlying default and RICO judgments, and dismiss the Plaintiffs' complaint with prejudice on the grounds that the judgment was fraudulently obtained. On March 20, 2014, the Bankruptcy Court held a hearing. Bressman's counsel argued that "if there were ever a case to vacate a judgment based upon fraud on the Court, it's this case. There is no question that Mr. Folkenflik intentionally concealed and affirmatively misrepresented critical facts to this Court in an effort to obtain undeserved double recovery for his clients and enormous fees for himself."[14]

Folkenflik urged that he would have informed the Bankruptcy Court of the Settlement Agreement if doing so had not been prohibited by the confidentiality order. In the alternative, Folkenflik argued that Bressman's motion was untimely. The Bankruptcy Court rejected Folkenflik's contentions. Finding that Folkenflik's conduct was intentional

---

[13] App. A497-98.
[14] App. A617.

and was the type of egregious misconduct that constitutes fraud on the court, the Bankruptcy Court vacated the default judgment and dismissed the adversary complaint with prejudice. The District Court affirmed the Bankruptcy Court's order, and this appeal followed.

## II.

The District Court had jurisdiction to consider Folkenflik's appeal of the Bankruptcy Court's order under 28 U.S.C. § 158(a)(1). We have jurisdiction pursuant to 28 U.S.C. § 158(d) and 28 U.S.C. § 1291.

The Plaintiffs raise three arguments on appeal. First, they contend that Bressman's motion to vacate the default judgment was time barred. Whether the underlying motion was barred is a question of law, and as such our review is plenary.[15] Second, the Plaintiffs contend that Folkenflik's conduct does not rise to the level of egregious misconduct that constitutes intentional fraud on the court. Because the facts are not in dispute, we exercise plenary review of whether Folkenflik committed intentional fraud.[16] Finally, the Plaintiffs claim that that the sanction of dismissal with prejudice was an abuse of the Bankruptcy Court's discretion. As with other forms of equitable relief, our review of the Bankruptcy Court's decision to vacate the underlying default

---

[15] *United States v. Hull*, 456 F.3d 133, 137 (3d Cir. 2006) (citation omitted).
[16] *Id.* (citation omitted).

judgment is for abuse of discretion.[17]  We review its findings of fact for clear error.[18]

## III.

### A.

The Plaintiffs first contend that the Bankruptcy Court's grant of relief was procedurally barred because Bressman's motion was filed more than ten years after the alleged fraudulent conduct.  In the alternative, the Plaintiffs assert that the action was barred by the doctrine of laches.  We disagree with both contentions.

Federal Rule of Civil Procedure 60(b) authorizes relief from a final judgment on six separate grounds.[19]  Rule 60(b)(3) specifically permits a court to relieve a party from a final judgment for "fraud[,]  .  .  .  misrepresentation, or misconduct[,]"[20] and subsection 6 permits courts to do so for "any other reason that justifies relief."[21]  As the Plaintiffs note, Rule 60 motions alleging fraud are ordinarily subject to a one-year limitations period.[22]  Although they correctly recite the Rule's time bar, they do so to no avail.  Rule 60 has no applicability where, as here, a party requests relief from a final

---

[17] *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 248 (1944); *Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014).
[18] *Chemetron Corp. v. Jones*, 72 F.3d 341, 345 (3d Cir. 1995).
[19] Fed. R. Civ. P. 60(b).
[20] Fed. R. Civ. P. 60(b)(3).
[21] Fed. R. Civ. P. 60(b)(6).
[22] Fed. R. Civ. P. 60(c)(1).

judgment in response to an opponent's alleged fraud on the court. We settled this issue in *Averbach v. Rival Mfg. Co.*, where we held that "the one year time limit in the rule, by virtue of the rule's very text, does not apply to independent actions" such as those for fraud on the court.[23] Our decision in *Herring v. United States* reaffirmed our holding in *Averbach*: "an independent action alleging fraud upon the court is completely distinct from a motion under Rule 60(b)."[24]

This concept that the inherent power of federal courts to vacate a fraudulently obtained judgment—even years after the judgment was entered—has long been recognized by the Supreme Court.[25] Consistent with this precedent, the bankruptcy court here granted the requested relief because it found that Folkenflik committed fraud on the court. We therefore see no basis to conclude that the time limits of Rule 60 barred the court's consideration of the appellee's motion to vacate the underlying default judgment.

The Plaintiffs' contention that the doctrine of laches counsels against vacating the underlying default judgment similarly fails. "Laches is 'a defense developed by courts of

---

[23] 809 F.2d 1016, 1020 (3d Cir. 1987). Although *Averbach* was an independent action, we noted there that "the elements for a cause of action for such relief in an independent action are not different from those elements in a Rule 60(b)(3) motion . . .." *Id.* at 1022-23.

[24] 424 F.3d 384, 389 (3d Cir. 2005) (citation omitted).

[25] *See Hazel-Atlas Glass Co.*, 322 U.S. at 248-49 (recognizing that federal courts possess inherent power to vacate a judgment obtained by fraud on the court); *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 233-34 (1995) (same).

12

equity' to protect defendants against 'unreasonable, prejudicial delay in commencing suit.'"[26]  The defense "applies in those extraordinary cases where the plaintiff 'unreasonably delays in filing a suit,' and, as a result, causes 'unjust hardship' to the defendant. Its purpose is to avoid 'inequity.'"[27] The Plaintiffs bear the burden of proving that the elements of laches—"inexcusable delay in instituting suit and prejudice resulting to the respondent from such delay"—are met.[28]  Arguing that Bressman unjustifiably slept on his rights for ten years, the Plaintiffs challenge the District Court's conclusion that the elements of laches are not present.  However, because "[b]y its very nature the doctrine [of laches] addresses itself to the sound discretion of the trial judge[,] . . . absent an abuse of discretion, we will not disturb the court's determination."[29]

The Bankruptcy Court did not credit Folkenflik's assertion that Bressman was aware of the payment as early as 1999.  On appeal, the District Court affirmed that laches were not applicable here, stating:

---

[26] *SCA Hygiene Prod. Aktiebolag v. First Quality Baby Prod., LLC*, 137 S. Ct. 954, 960 (2017) (citing *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 134 S. Ct. 1962, 1967, 1973 (2014)).
[27] *Petrella*, 134 S. Ct. at 1979 (Breyer, J., dissenting) (citations omitted).
[28] *Kane v. Union of Soviet Socialist Republics*, 189 F.2d 303, 305 (3d Cir. 1951) (en banc); *see also Waddell v. Small Tube Prod., Inc.*, 799 F.2d 69, 74 (3d Cir. 1986) ("The party asserting the defense . . . bears the burden of proof." (citation omitted)).
[29] *Gruca v. U.S. Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir. 1974) (citation omitted).

A vague statement about what Bressman "heard" at some unspecified time and place during the decade of the 1990's is not much to go on. But in any event, I find that [the Bankruptcy Court] acted here within the law and the bounds of his discretion. . . . This was not an adversarial proceeding but an application for a default judgment. . . . Under the circumstances, [the Bankruptcy Court] could permissibly make an equitably based ruling "that a fraud committed upon the court could be time barred offends all notions of integrity and equity. There can be no protections against such intentional conduct."[30]

We agree. Accordingly, we cannot say the Bankruptcy Court abused its discretion in concluding that Bressman's motion was not barred by the doctrine of laches.

## B.

We next address whether Folkenflik's failure to disclose the Settlement Agreement rises to the level of intentional fraud. As officers of the court, attorneys are required "to conduct themselves in a manner compatible with the role of courts in the administration of justice."[31] This responsibility is sometimes—albeit rarely—disregarded. When, however,

---

[30] App. A9-10, citing the Bankruptcy Court, App. A45.

[31] *In re Snyder*, 472 U.S. 634, 644-45 (1985); *see also Demjanjuk v. Petrovsky*, 10 F.3d 338, 352 (6th Cir. 1993) ("As an officer of the court, every attorney has a duty to be completely honest in conducting litigation.").

14

counsel has failed to act with candor, preservation of the integrity of the judicial process may require courts to depart from their usual adherence to the principle that final judgments should be left undisturbed.[32] We confront one such situation here.

A court may set aside a judgment based upon its finding of fraud on the court when an officer of the court has engaged in "egregious misconduct."[33] We have said that such a finding "'must be supported by clear, unequivocal and convincing evidence'"[34] of "(1) an intentional fraud; (2) by an officer of the court; (3) which is directed at the court itself . . . ."[35] In addition, fraud on the court may be found only where the misconduct at issue has successfully deceived the court.[36] Folkenflik contests the Bankruptcy Court's findings on two

---

[32] *See Hazel-Atlas Glass Co.*, 322 U.S. at 244 (recognizing that that "under certain circumstances, one of which is after-discovered fraud," a court may exercise its equitable powers to vacate judgments "to fulfill a universally recognized need for correcting injustices which, in certain instances, are deemed sufficiently gross to demand a departure from rigid adherence" to the finality of judgments).

[33] *Herring v. United States*, 424 F.3d 384, 390 (3d Cir. 2005) (quoting *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions,* 538 F.2d 180, 195 (8th Cir. 1976) (internal quotation marks omitted)).

[34] *Id.* at 387 (quoting *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 538 F.2d at 195).

[35] *Id.* at 390.

[36] *Id.*

grounds: First, he claims that any fraud was not intentional,[37] and second, he argues that the alleged deceit does not constitute the kind of egregious misconduct that the fraud on the court doctrine aims to address. Both contentions are belied by the properly found facts.

Although direct evidence of intent will rarely be available, it may be inferred from the surrounding circumstances. Folkenflik's intentions were clear: He set out to recover the full amount of the default judgment without any offset for the settlement with the co-defendants. Folkenflik's scheme manifested itself in early March of 1999 when he filed an affidavit to support the default judgment he sought against Bressman. The affidavit was comprehensive: It recounted the history of the related proceedings, scrupulously detailed the damages each Plaintiff sought, provided a calculation of interest, and carefully described Folkenflik's involvement in the matter. Conspicuously, the affidavit omitted any mention of the $▇▇ million Folkenflik recovered on behalf his clients several months earlier. As Folkenflik was aware, the Bankruptcy Court was not presented with any information from Plaintiffs' adversaries or from any nonparty because Folkenflik was appearing *ex parte*.

While Folkenflik claims that he never intended to collect on the judgment without first ensuring that the appropriate offset would be applied, the record provides strong support for a conclusion to the contrary. First, this contention is discredited by Folkenflik's own assertion that he was under no obligation to inform the court of Bressman's right to a set

---

[37] By considering this argument, we are in no way conceding that fraud is not an intentional tort.

off.[38]  Second, Folkenflik indicated in his brief, supporting his *ex parte* application for a receiver in the Southern District of New York that "[w]ith post-judgment interest, the Judgment's current value is $30,895,913.39" and that "[t]o date – more than ten years later – Plaintiffs have not seen a dime of this amount."[39]  This declaration, as with Folkenflik's other attestations throughout the underlying proceedings, is grossly misleading and illustrates an intent to receive an unjustified recovery.

Folkenflik made a deceptive representation to the court in his affidavit, obtained a default judgment, had it trebled, and was awarded interest and attorneys' fees.  We have no trouble concluding that his failure to disclose the settlement reflects his intent to commit fraud on the court.[40]

Folkenflik also asserts—indefatigably—that he would have informed the court of the settlement payment had he not

---

[38] App. A384, A537-38.

[39] App. A303-04.

[40] The New York and New Jersey District Courts declined Bressman's invitation to impose sanctions in response to Folkenflik's lack of candor with respect to the 2013 *ex parte* enforcement proceedings.  Folkenflik argues that the courts' refusal to impose sanctions demonstrates that he did not act with the requisite intent.  This argument is of no moment since our determination is based on the deceptive representations Folkenflik made in the 1999 Affidavit and not with his *ex parte* enforcement applications.  Further, it is not clear whether considerations concerning sanctionable conduct are identical or analogous to those concerning fraud on the court.  We need not make this determination today.

been barred from doing so by the confidentiality order. This contention is unconvincing. Folkenflik was not, as he suggests, left only with the options of concealment or impermissible disclosure. He was aware that relevant facts were being omitted from his affidavit. Even if he believed that the confidentiality order prohibited him from disclosing to the Bankruptcy Court the existence of the Settlement Agreement, he could have so stated in his affidavit and have asked either – or both – the District Court in the Southern District of New York and the Bankruptcy Court in New Jersey for guidance. His failure to do so is consistent with an intent to defraud the court in order to maximize the recovery.

Folkenflik's alternative attempts to justify his nondisclosure fare no better. He contends that he cannot be held responsible for his omissions because he was not obligated to inform the court of Bressman's right to a setoff.[41] In his view, Bressman had notice of the adversary proceedings, failed to act, and therefore waived any defenses. Bressman denies that he had any knowledge of the settlement until October 2013. However, whether Bressman did or did not have knowledge does not forgive Folkenflik for his misrepresentations to the court. Moreover in this regard, any right to set off is not relevant to Folkenflik's failure to inform the court of the fact of the settlement. In addition, Folkenflik's position is further compromised by the fact that Bressman was absent. The *ex parte* nature of the proceedings was not a license for Folkenflik to deceive the court by deliberately failing to bring the material fact of the settlement to the court's attention.

---

[41] App. A537-38.

18

In fact, Folkenflik's duty to deal with the court honestly and with integrity was particularly important in light of the non-adversarial nature of the *ex parte* proceedings. In such a proceeding, the court depends on the integrity of appearing counsel because only he can ensure that the court has received the full scope of information pertinent to the merits of its considerations. Folkenflik was not only obligated to submit truthful information, but he was also required to disclose to the court any material information of which he was aware. Because his failure to do so has sufficiently undermined the judicial process, we conclude that a finding of fraud on the court will lie.

This determination brings us to Folkenflik's next argument: that a "fraud on the court"-based claim can succeed only when it is based on perjurious misconduct. This suggestion is based on an incorrect reading of our *Herring* opinion, which establishes that perjury by a witness does not, by itself, constitute fraud on the court.[42] Understood in its proper context, *Herring*'s pronouncement was appropriately narrow and has no relevance here since Bressman's motion does not pertain to a witness who has allegedly committed perjury. There is an important distinction between perjury that is committed by a witness and fraudulent conduct that is directed at the court by one of its own officers. The latter has a much greater likelihood of undermining the working of the normal process of adjudication because courts rely on the integrity of their officers. Folkenflik is a licensed attorney who exploited his privilege to practice before the courts by not revealing the details of a relevant settlement payment. This

---

[42] 424 F.3d at 390.

deceit maximized his clients' recovery—and, in turn, his fee. *Herring* is distinguishable.

Having determined that the record evidences an intentional scheme to improperly influence the court, we next address whether Folkenflik's ploy is the kind of misconduct that the fraud on the court doctrine seeks to address. We conclude that it is. The Supreme Court has warned that fraud on the court actions must be "reserved for those cases of 'injustices which, in certain instances, are deemed sufficiently gross to demand a departure' from rigid adherence to the doctrine of res judicata."[43] Taking heed of this instruction, we held in *Herring* that only "'egregious misconduct . . . such as bribery of a judge or jury or fabrication of evidence by counsel'" can be characterized as the kind of fraud that warrants relief from a judgment.[44]

The facts here demonstrate "a deliberately planned and carefully executed scheme to defraud . . . ."[45] In his affidavit supporting his petition for a default judgment, Folkenflik omitted that Bressman's co-defendants had settled their claims in one of the New York actions: conduct which is incapable of innocent explanation. Folkenflik, in his capacity as an officer of the court, made sworn averments to obtain a default judgment and damages. Knowing that the averments had omitted a material fact, Folkenflik nevertheless allowed the Bankruptcy Court to rely upon their truthfulness. The court's reliance on the affidavit impugned its integrity.

---

[43] *United States v. Beggerly*, 524 U.S. 38, 46 (1998) (citing *Hazel-Atlas Glass Co.*, 322 U.S. at 244).
[44] 424 F.3d at 390 (citation omitted).
[45] *See Hazel-Atlas Glass*, 322 U.S. at 245.

We conclude that the misconduct at issue here is sufficiently egregious. Because there is clear, unequivocal, and convincing evidence showing that Folkenflik committed fraud on the court, we will affirm the judgment of the District Court.

## C.

Finally, Plaintiffs contend that the Bankruptcy Court could not grant relief from the default judgment without first weighing the factors set forth in *Poulis v. State Farm Fire & Casualty Co.*[46] This argument requires little discussion. "In *Poulis*, we held that a district court must consider six factors before it may dismiss a case as a sanction . . .."[47] We have since required consideration of *Poulis* in only a limited number of additional contexts.[48] "Our application of *Poulis* in those contexts comports with the underlying concern that *Poulis* sought to address, namely that dismissal as a sanction before adjudication of the merits deprives a party of her day in court."[49] Our precedents have reaffirmed that the *Poulis* factors are required to "preserve the ability of the parties to try their cases on the merits."[50] These concerns are not present here. In fact, the principle underlying *Poulis,* that disputes should be decided on their merits, is the very basis for our

---

[46] 747 F.2d 863 (3d Cir. 1984).
[47] *Knoll v. City of Allentown,* 707 F.3d 406, 408 (3d Cir. 2013).
[48] *Id.* at 409 (listing cases).
[49] *Id.*
[50] *Id.* at 410.

disfavor of default judgments.[51]  As set forth above, our review of the decision to vacate a default judgment under the circumstances presented here asks whether a court has abused its discretion.  Because the Bankruptcy Court has not done so, we will affirm.[52]

IV.

"Membership in the bar is a privilege burdened with conditions."[53]  Among the most oft-cited is the condition that attorneys will honor the duty of loyalty they owe to each of their clients.  In so doing, attorneys must not—and in most cases do not—disregard their inherent obligation to the system of justice.[54]  Because Folkenflik has conducted himself in a way that has improperly interfered with the administration of justice, protection of the court's integrity requires us to act.  In light of this responsibility, we will affirm the judgment of the District Court.

---

[51] *Harad v. Aetna Cas. & Sur. Co.,* 839 F.2d 979, 982 (3d Cir. 1988) (noting that we have "adopted a policy disfavoring default judgments and encouraging decisions on the merits" (citation omitted)).

[52] To the extent that Plaintiffs seek to use *Poulis* to challenge the Bankruptcy Court's decision to dismiss their underlying action with prejudice, the *Poulis* factors are plainly satisfied. In *Poulis,* we developed factors to consider when determining if misconduct is grave enough to warrant the drastic sanction of dismissal.  *Poulis,* 747 F.2d at 868.  A fraud on the court is unquestionably such misconduct.

[53] *In re Snyder,* 472 U.S. at 644 (citation and internal quotation marks omitted).

[54] *Id.*

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

ROBERT M. MORGENTHAU,
District Attorney of New York County,

           Plaintiff-Claiming Authority,

             -against-

David Holzer,

             Defendant.

-------------------------------------------------------------------X

Index No. 400891/08

AFFIRMATION
IN SUPPORT OF
AMENDING SUMMONS,
COMPLAINT, AND ORDER
TO SHOW CAUSE

STATE OF NEW YORK    )
                  : ss.:
COUNTY OF NEW YORK  )

           Investigator SHANNON ROWE, being duly sworn, deposes and says:

    1.      I am an Investigator, Shield #158, in the New York County District Attorney's Office, and as such I am a public servant of the kind specified in CPL 690.05(1). I have been a member of DANY Investigations for over five years. Previous to that I was an investigator with DOI for two years, and I have training and experience in investigating white collar crime, including money laundering, grand larceny and identity theft cases. I am currently assigned to an investigation involving David Holzer and Lesley Holzer, and am familiar with its facts.

    2.      Except as otherwise stated below, I make this affirmation upon information and belief based upon: (i) my review of information contained in plaintiff's files, (ii) my conversations with Barry Fingerhut, Heidi and John Rapillo, and Michael and Barbara Zackman; (iii)



000172

conversations with private investigators hired by one of the victims in this case, (iv) my review, and the review by a financial analyst, of the defendant's and the victims' bank records.

3.     I submit this affidavit in support of Plaintiff's request to add Lesley Holzer to the instant action as a non-criminal defendant, pursuant to the provisions of Article 13-A of the CPLR. I also submit this affidavit in support of Plaintiff's request to add Lesley Holzer to the TRO previously issued in the instant action.  In this case, specifically, plaintiff seeks the forfeiture from David and Lesley Holzer of certain property, to wit, $16,645,483.33 (Sixteen Million, Six Hundred and Forty-Five Thousand, Four Hundred and Eighty-Three Dollars and Thirty-Three Cents), which constitutes the "proceeds," and/or the "substituted proceeds," of the felony crime of Grand Larceny in the First Degree (Penal Law § 155.42).  Alternatively, plaintiff seeks forfeiture from the criminal defendant David Holzer for the value of the aforementioned property, to wit, the sum of $16,645,483.33 (Sixteen Million, Six Hundred and Forty-Five Thousand, Four Hundred and Eighty-Three Dollars and Thirty-Three Cents), as the instrumentality of his crimes.  Also alternatively, plaintiff seeks a money judgment against the criminal defendant David Holzer for the value of the aforementioned property in the sum of $16,645,483.33 (Sixteen Million, Six Hundred and Forty-Five Thousand, Four Hundred and Eighty-Three Dollars and Thirty-Three Cents).

## STATEMENT OF FACTS

### The Defendant's Activities With Regard to Barry Fingerhut

4. The summons and verified complaint in this action for forfeiture pursuant to Article 13-A of the CPLR, which is appended hereto as Exhibit A, is grounded upon the defendant's illegal activities during the period from on or about March, 2002 to March, 2008.  I am informed by Barry

000173

Fingerhut that Fingerhut met David Holzer while Holzer worked as a trader for Brean Murray. They formed a working relationship in which Holzer would trade Over-the-Counter (OTC) stocks for Fingerhut.

5.     As of early 2002, Holzer and Fingerhut had worked with one another for several years, and had known each other for approximately 12 years.  In March 2002, Holzer contacted Fingerhut at his place of business, GeoCapital, located at 825 Third Avenue, New York City, New York County, New York, and proposed an investment opportunity to Fingerhut.  Holzer told Fingerhut that he had formed a partnership with two other individuals, Daniel Katz and Jeffrey Schwartz, called Dellwood Partners, and that the partnership was investing in real estate in upstate New York.  Holzer asked Fingerhut to take a one-half interest in Holzer's one-third of the partnership. Fingerhut agreed.

6.     Fingerhut began wiring money in stages to Holzer to make up his half of their one-third partnership for a piece of property that Holzer claimed Dellwood was buying in Haverstraw, NY.  As time went by, Holzer told Fingerhut that Dellwood was making additional investments in real estate, in Haverstraw, Monticello, Beacon, Newburgh and Nyack, New York.  Fingerhut wired money to Holzer's account to pay for those additional investments.

7.     Fingerhut wired the following amounts on the following dates to Holzer's account at JP Morgan Chase Bank totaling $12,062,200.00:

| DATE | DEPOSIT AMOUNT |
| --- | --- |
| March 27, 2002 | $62,500 |
| April 29, 2002 | $862,500 |
| July 25, 2002 | $1,500,000 |

000174

| | |
|---|---|
| July 25, 2002 | $1,593,000 |
| October 17, 2002 | $140,000 |
| November 8, 2002 | $187,000 |
| January 13, 2003 | $266,000 |
| April 2, 2003 | $489,000 |
| July 24, 2003 | $283,000 |
| October 14, 2003 | $231,150 |
| November 24, 2003 | $383,000 |
| December 22, 2003 | $216,000 |
| February 2, 2004 | $270,000 |
| April 21, 2004 | $516,000 |
| July 23, 2004 | $900,000 |
| October 12, 2004 | $600,000 |
| November 23, 2004 | $244,000 |
| April 20, 2005 | $693,750 |
| May 17, 2005 | $289,000 |
| July 11, 2005 | $98,300 |
| August 3, 2005 | $519,000 |
| October 18, 2005 | $190,000 |
| November 9, 2005 | $300,000 |
| December 7, 2005 | $255,000 |
| December 7, 2005 | $125,000 |
| December 16, 2005 | $10,000 |
| May 23, 2006 | $360,000 |
| August 8, 2006 | $215,000 |
| September 15, 2006 | $294,000 |
| TOTAL | $12,062,200 |

8.     Holzer's bank records show that the above figures were received by him.  Those records also show that in 2002, Holzer gave over three million dollars to an individual who was apparently not connected with any company named Dellwood Partners, or with Daniel Katz or Jeffrey Schwartz.  In fact, there is no indication that any company named Dellwood Partners ever existed, and Holzer's bank records do not show any transactions with either Katz or Schwartz.  Also from 2002 to 2006, Holzer's bank records demonstrate that he and his wife lived a lavish lifestyle,

000175

spending extravagantly on clothing, travel, an interior designer, jewelry, Holzer's children's rent, his father's senior residence in upstate New York, and that these and other personal expenses were primarily how Holzer spent the money he obtained from Fingerhut.

9.     In 2004, Holzer told Fingerhut that the Haverstraw property was going to be sold for approximately $99 million, and that their share of the profit would be approximately $33 million. At that time, Fingerhut suggested to Holzer that they use the proceeds of the real estate sale to start their own partnership, through which they could manage their money by making investments. The two formed a partnership, FH Partners, and opened an office while Fingerhut waited for the proceeds from the sale of the Haverstraw property that Holzer said was imminent. During this time, as can be seen above, Fingerhut continued to pay money to Holzer for investments that Dellwood partners was supposedly making.

10.     I am further informed by Fingerhut, that in or about February 2005, Holzer asked Fingerhut to loan him some money because Holzer claimed that he had a capital call at Brean Murray, and he needed cash to pay to Brean Murray for an investment he had there. I am informed by Fingerhut that on February 4, 2005, and March 8, 2005, Fingerhut wired $202,000 and $860,000, for a total of $1,062,000, to Holzer based on Holzer's representations that Holzer had to pay the capital call and that the money would be paid back to Fingerhut. I am informed by Nick Cangro, financial analyst for the New York County District Attorney's Office ("DANY") that a review of records from Brean Murray reveal that no capital call or money was put in to Brean Murray investments in February or March of 2005. I am further informed by Nick Cangro that he has reviewed Holzer's JP Morgan Chase Bank records for the same time period, and the records reveal that the two above-described deposits were made into Holzer's

5

accounts, but that no money went to Brean Murray at that time, but rather a good portion of the money, $560,053 went to the U.S. Treasury.

11.    In the spring of 2007, Holzer told Fingerhut that the sale of the Haverstraw property had closed, and showed Fingerhut a deposit receipt from JP Morgan Chase bank showing a deposit of a check for $33.6 million into Holzer's accounts. I am informed by Nick Cangro that a review of the bank accounts show that after the $33 million check was deposited, it in fact bounced, and the account was closed thereafter.[1]

12.    In October 2007, Lincoln Ornston, of a private investigative firm named Thacher Associates, met with Holzer in FH Partners' office. Holzer admitted to Ornston that Dellwood Partners never existed, and that Holzer never had a partnership with Schwartz or Katz. He also admitted that he did not purchase property in Haverstraw, that he did not use Fingerhut's money to purchase property in Haverstraw or any other location, and that he instead used Fingerhut's money for personal and business-related expenses. Holzer also told them that all of the money was gone, and that he only had about $40,000 left in his bank accounts.

13.    Holzer promised to pay Fingerhut back, and in late November 2007 issued two checks drawn on a Citibank account made payable to Fingerhut totaling approximately $7 million. A review of Holzer's Citibank account records reveals that those checks were written on an account with insufficient funds.

---

[1] It was later determined that Holzer in fact wrote the $33.6 million check to himself, from an account that did not have sufficient funds to cover it.

6

<u>The Defendant's Activities With Regard to Heidi and John Rapillo</u>

14.     In October 2005, defendant Holzer told Heidi and John Rapillo that he was involved in some good investments, and encouraged them to invest through him.  The Rapillos gave David Holzer a total of $1.6 million between December 2005 and March 2006, believing, based on Holzer's representations, that Holzer would invest that money for them.

15.     First, on December 15, 2005, the Rapillos sent a wire for $600,000 to Holzer because Holzer told them he was investing their money in a movie theater.  DANY financial analyst Nick Cangro reviewed Holzer's bank records, and has informed me that, rather than invest the money, once the $600,000 was received in Holzer's account on December 15, 2005, Holzer transferred $200,000 to Barry Fingerhut's personal account; then on January 9, 2006, he transferred $50,000 to FH Partners' account, on January 9, 2006 Holzer also paid $35,025.63 to American Express for his personal charge card bill; on January 10, 2006, and January 13, 2006, he transferred $20,000 and $15,000 respectively to FH Partners' account; on January 17, 2006, he paid $24,360 to Mid Hudson Fence company.  Holzer also generally spent the rest of the money on smaller personal and business transactions, none of which appear to be "investments," but instead largely supported the extravagant lifestyle he and his wife were living.

16.     John and Heidi Rapillo wired $200,000 to Holzer's account on January 31, 2006, because Holzer told them he would invest their money in a penthouse project.  Rather than invest the money, however, a review of Holzer's bank records by Nick Cangro shows that after Holzer received the $200,000 from the Rapillos, on January 31, 2006, and February 10, 14, and 27, 2006, Holzer transferred $20,000, $15,000, $16,500, and $10,000, respectively, to FH Partners' account; on February 14, 2006 he paid $48,280.77 towards his American Express charge card

7

000178

bill; on March 2, 2006, he paid $8,509.61 to his Washington Mutual home mortgage account, and spent the rest of the money on smaller personal and business transactions, none of which appeared to be investments made on the Rapillos' behalf.

17.     I am informed by the Rapillos that on March 23, 2006, they wired $800,000 to Holzer because Holzer said that he would invest all of that money in a company called VCampus. Rather than invest all of that money, however, a review of Holzer's bank records by Nick Cangro shows that after Holzer received $800,000 from the Rapillos on March 23, 2006, that same day Holzer wired VCampus only $500,000. That $500,000 was initially put only in Holzer's name, and later he assigned all of his rights in that stock to Barry Fingerhut.

18.     I am further informed by Nick Cangro that on March 24, 2006, and April 21, 2006, Holzer paid $32,309.16 and $61,595.43 respectively to American Express; on March 30, 2006, and April 10 and 13, 2008, Holzer wired $25,000, $27,000, and $30,000 respectively to the FH Partners' account; on March 31, 2006, Holzer wired $17,500 to a company called CE Technologies, Inc.; on April 18, 2006, Holzer gave his daughter, Jennifer Holzer $5,000; and on April 20, 2006, Holzer paid someone named Neal Richard $20,000.

## The Defendant's Activities With Regard to Michael and Barbara Zackman

19.     I am informed by Michael Zackman, that between November 2006 and November 2007, he paid Holzer a total of $1,773,283.33. Michael Zackman informs me that this money was paid to Holzer because Holzer told him he would make him a partner in his investments if Zackman paid for half of the investment.


V-Campus Stocks

20.    I am informed by Zackman that on November 10, 2006, Zackman wired Holzer $600,000 which Zackman says he believed was for an investment Holzer had already made in Knox Lawrence International, LLC for a company called Vertex. I am further informed that on December 11, 2006, David Holzer and his wife, Lesley Holzer, and Michael and Barbara Zackman signed a partnership agreement that created a partnership with regard to the funds that were supposed to be invested. The agreement stated that the Holzers contributed $600,000 to the partnership and that the Zackmans contributed $600,000 to the partnership. I am further informed by Zackman that on December 19, 2006, Zackman wired another $175,000 to Holzer, and that on January 23, 2007, Zackman wired another $133,000 to Holzer, for further investment into Knox Lawrence. Zackman signed an addendum to his partnership with Holzer on June 11, 2007, that referenced these additional funds as investments to Knox Lawrence. A review of the amendment to the partnership agreement indicates that an additional $308,000 was contributed by the Zackmans for the Vertex deal through Knox Lawrence that would make them 50 percent owners of Holzer's holdings in that deal.

21.    I am further informed by Michael Zackman that in 2007, David Holzer told him about an investment that Knox Lawrence was doing in a company called Consonus, and asked that Zackman participate in three different investments with him in Consonus. The first investment, on May 18, 2007, was to be a $250,000 investment split three ways between David Holzer, Michael Zackman, and Barry Fingerhut. The next two payments, in October and November of 2007 were to make additional investments in Consonus through Knox Lawrence. I am informed that Michael Zackman wired to David Holzer $83,333.33 on May 18, 2007, $78,000 on October 10, 2007, and $42,000 on November 30, 2007 for these investments.

9

22.     I believe that Holzer lied to the Zackmans when he claimed that the money they sent was to buy a half share into investments that Holzer had made or was going to make through Knox Lawrence. The only way Holzer's claim could have been accurate is if he had invested in Knox Lawrence twice the total amount of money that Zackman sent for the investments, or $2,222,666.66. I am informed by Barry Fingerhut that he did not make a $250,000 investment in Knox Lawrence in May 2007 with David Holzer and Michael Zackman. A review of Holzer's bank account records show that on November 10, 2006, the same day that Zackman sent the initial $600,000 for the Vertex investment through Knox Lawrence, Holzer wired $300,000 to Knox Lawrence. I am further informed by DANY financial analyst Nick Cangro that an analysis of Holzer's JP Morgan Chase bank account records from January 2001 through June 2007 show that the total amount of money that Holzer sent to Knox Lawrence, LLC is $363,667. Furthermore, between November 10, 2006, the date of Zackman's initial payment for a purported Knox Lawrence-related investment, and December 19, 2006, the date of the next payment for what was supposed to be the Vertex deal through Knox Lawrence, there are no payments from Holzer's account to Knox Lawrence. Furthermore, from December 19, 2006, until Holzer's account was closed in June of 2007, the records show no payments were made to Knox Lawrence from Holzer's account. I am further informed by Nick Cangro that a review of Holzer's Citibank account, which was opened after Holzer's Chase account was closed in June 2007, shows that there were no payments to Knox Lawrence between June 2007 and December 2007.

23.     I am informed by Michael Zackman that on or about February 14, 2007, David Holzer asked Zackman to invest in a real estate deal in Florida called St. Augustine, through a

N00181

company called Trident. Zackman had invested with Trident in the past at Holzer's suggestion, and had sent the money for those investments directly to the lawyers who held the trust account for the company, Foley and Lardner, in Florida. For this investment, however, Holzer told Zackman to send the money directly to Holzer, as Zackman would be taking a half interest in what Holzer owned already. In order to make the $600,000 investment (which Zackman understood from Holzer to be half of Holzer's $1.2 million investment), Zackman sold some stock in his portfolio, and wired the following funds on the following dates to Holzer:

| DATE | AMOUNT WIRED |
|------|--------------|
| February 14, 2007 | $100,000 |
| March 14, 2007 | $200,000 |
| April 3, 2007 | $100,000 |
| April 16, 2007 | $25,000 |
| April 24, 2007 | $175,000 |
| **TOTAL** | **$600,000** |

24.     In fact, Holzer had only about $100,000 of his own funds invested in the St. Augustine investment at that time. In October, 2007, Holzer assigned all his rights in the St. Augustine investment to Fingerhut, not to Zackman.

25.     I am further informed by Michael Zackman that he sent Holzer a wire on July 12, 2007, for $41,650. After that wire was sent, Zackman was uncertain how Holzer was going to invest the money, and so contacted Holzer to find out. I am informed by Zackman that initially

11

000182

Holzer could not remember, but then got back to Zackman several days to a few weeks later, and told Zackman that the investment was in parking spots for a real estate investment that Zackman had made previously through Trident, called "Waverly."

26.   I believe that Holzer lied to Zackman when he said that the money Zackman was investing in the Trident investments was for half the interest that Holzer had in Trident. A review of Holzer's bank records by Nick Cangro revealed that the total amount of money Holzer sent to Foley & Lardner between January 2001 and December 2007, was $665,471.91. I am certain that no investments were made prior to January 2001 because I am further informed by Barry Fingerhut that Fingerhut had found this investment and told Holzer about the investment sometime after they started FH Partners in 2004.

27.   I was further informed by Barbara Zackman that on October 9, 2007, she transferred $20,300.00 from her and Michael Zackman's account at Citibank to Holzer's Citibank account. They did this because David Holzer told them there were legal bills connected with one of their investments equaling $36,600, of which they had to pay half, and that he also wanted to borrow another $2,000, which he would return at a later time. I am further informed that later, possibly in January 2008, Holzer did pay them back $2,000. I am informed by Nick Cangro, however, that a review of Holzer's bank records show that Holzer did not use the $18,300 he kept to pay legal fees, nor did he invest it for them. Instead, on October 9, 2007, the same day he received the money from them, he paid American Express $16,280 for his charge card bill.

000183

## The Defendant's Activities with Regard to Barry Pessar

28.     I am informed by Michael Zackman that Barry Pessar told Zackman that he gave Holzer $150,000 to invest during the week of March 24, 2008.

29.     I am further informed by Nick Cangro that a review of records recently received from Citibank shows that on March 13, 2008, Holzer had a negative balance of $13,333.29 in his bank account.  On March 27, 2008, Holzer received a deposit in the amount of $150,000, and that money was withdrawn from the account between March 27, 2008, and April 3, 2008, through checks in amounts no larger than $22,000.  On April 3, 2008, the balance in Holzer's account was $15,517.60.  This activity is consistent with the defendant's prior pattern of taking money from would-be "investors" and then using the money for his own personal benefit rather than investing it on their behalf.

## The Proceeds of the Defendant's Crimes

30.     Based on the foregoing, and based on my training and experience, it is my opinion that the defendant has been engaging in a pattern of activity that constitutes numerous crimes, including but not limited to the felony crime of Grand Larceny in the First Degree (Penal Law § 155.42).

31.     The total proceeds of defendant Holzer's criminal activities, with regard solely to Barry Fingerhut, in this case is $13,124,200.00.  This figure represents the total sum of the funds that Barry Fingerhut gave to the defendant from March 27, 2002 to September, 15, 2006, during which time the defendant fraudulently represented that he was investing the money.  In addition, the proceeds of Holzer's crimes against Heidi and John Rapillo is $1,600,000.00.  This figure represents

13

000184

the total sum of the funds that the Rapillos sent to Holzer during the period between December 2005 and March 2006. In addition, the total proceeds of the defendant's crimes against Michael and Barbara Zackman are $1,771,283.33, which figure represents the total amount of money sent by the Zackmans to Holzer from November 2006 until November 2007, minus the $2,000.00 that was returned to them. Lastly, the proceeds of the defendant's crime against Barry Pessar is $150,000.00, the amount of money that Pessar gave to Holzer during the week of March 24, 2008. Thus, by adding up these amounts, the total proceeds of defendant's crimes in the instant case is $16,645,483.33 (Sixteen Million, Six Hundred and Forty-Five Thousand, Four Hundred and Eighty-Three Dollars and Thirty-Three Cents).[2]

### Lesley Holzer's Receipt Of The Illegal Proceeds

32.     The investigation has determined that defendant David Holzer is married to Lesley Holzer, and that they reside at 10 Sky Drive, New City, New York. A review of property records shows that 10 Sky Drive in New City, New York, is jointly owned by the defendant and his wife, Lesley Holzer. From 2002 through the present this appears to be their primary address, and the investigation has revealed that they live there together. At the time of the defendant's arrest, he and his wife also shared a rented apartment in Manhattan, at 50 East 78th Street, Apartment 10A. They have three children in common, aged 23, 29 and 31.

33.     I am informed by Nick Cangro, that he reviewed the defendant's bank records, and that from March, 2002, to June, 15, 2007, the defendant and Lesley Holzer shared a joint checking

---

[2] Criminal defendant David Holzer's activities constitute a well-known type of scheme called a "Ponzi" scheme, in which a defendant will steal from new victims to pay back previous victims. The investigation in this case revealed that David Holzer's Ponzi scheme actually began prior to his first theft in 2002 from Barry Fingerhut, and that he had at least one prior victim.

000185

account, number ending in 5365, at Chase Bank. I am further informed that from June 14, 2007, they shared a joint checking account, number ending in 0313, at Citibank. During both those periods of time, neither the defendant nor Lesley Holzer appeared to have any other personal checking accounts.

34.     I am informed by Nick Cangro that both the defendant and Lesley Holzer regularly wrote checks from their joint checking accounts at both Chase and Citibank, and that they both appeared to pay their living expenses and personal bills from those accounts. These expenses included mortgage payments for the house in New City, rent for the apartment in Manhattan which they shared, utilities for both addresses, and credit card bills. I am informed that a review of the defendant and Lesley Holzer's credit card bills show purchases such as jewelry, expensive family vacations, cars, furs, designer clothing, high-end electronics, and furniture.

35.     I have been informed by Nick Cangro of the information from here through paragaraph 41, based on his review of the defendant and Lesley Holzer's joint bank records and tax returns.[3] In 2002, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $4,579,011.17. Of that sum, $4,345,000.00 came from deposits made by Barry Fingerhut, one of the defendant's victims. In their joint federal tax return for that year, however, the defendant and Lesley Holzer declared a total income of $144,403.00. They then claimed $76,929.00 in deductions, and demanded a $21,395.00 refund.

36.     In 2003, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $1,971,592.62. Of that sum, $1,868,150.00 came from deposits made by Barry Fingerhut. In their joint federal tax return for that year, however, the

---

[3] Copies of the tax returns were obtained with subpoenas to the Holzers' accountants, and are not copies of the final, signed returns that were actually filed with the Internal Revenue Service.

000186

defendant and Lesley Holzer declared a total income of $107,239.00. They then claimed $116,022.00 in deductions, and demanded a $6,641.00 refund.

37.   In 2004, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $2,606,237.58. Of that sum, $2,530,000.00 came from deposits made by Barry Fingerhut. In their joint federal tax return for that year, however, the defendant and Lesley Holzer declared a total income of $115,542.00. They then claimed $110,156.00 in deductions, and declared that they owed $304.00 in taxes.

38.   In 2005, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $4,329,298.68. Of that sum, $4,112,050.00 came from deposits made by Barry Fingerhut and Heidi Rapillo. In their joint federal tax return for that year, however, the defendant and Lesley Holzer declared a total income of -$496,515 (negative income), based on an income of $52,795.00 and then by writing off $3,000.00 in capital losses and $546,310.00 in business losses from Fingerhut Holzer Associates. On the Profit & Loss statement attached to the defendant and Lesley Holzer's taxes, they claimed that FH Associates earned $0.00 income in that year. They then demanded a refund of $1,619.00.

39.   In 2006, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $3,147,861.04. Of that sum, $2,844,000.00 came from deposits made by Heidi Rapillo, Barry Fingerhut and Michael Zackman. In their joint federal tax return for that year, however, the defendant and Lesley Holzer declared a total negative income of $891,623.00. This was based on an income of $42,189.00, and then by writing off $3,000.00 in capital losses, $408,161.00 in business losses from Fingerhut Holzer Associates, and a net operating loss carryover of $522,651.00. They claimed a refund of $1,654.00.

000187

40.     From January, 2007, through May, 2007, the total deposits made to the defendant and Lesley Holzer's joint checking account at Chase bank was approximately $883,038.55. Of that sum, $641,333.33 came from deposits made by Michael Zackman. As of May 29, 2007, the balance in that checking account was $8,788.32. On May 30, 2007, the defendant wrote himself a check for $33,600,000.00 and deposited it into the joint checking account he held with his wife, and showed the deposit slip to Barry Fingerhut. However, on June 5, 2007, the bank stopped payment on the check for insufficient funds, prompting the bank to subsequently close the account on June 15, 2007. The defendant and Lesley Holzer opened a joint Citibank checking account on June 14, 2007.

41.     From May, 2007 through December 2007, of the approximately $812,047.89 that was deposited into the Holzers' joint checking account, $181,950.00 was deposited by Michael or Barbara Zackman.[4] During that time, on November 29, 2007, the defendant wrote two checks to Barry Fingerhut, one for $5,600,000.00 and one for $1,400,000.00. At that time, the defendant and Lesley Holzer's joint checking account contained a little more than $9,000.00. Both checks bounced.[5]

42.     All of the money deposited into the defendant and Lesley Holzer's joint checking accounts by Fingerhut, the Zackmans, the Rapillos, and Barry Pessar were sent via wire transfer, and therefore the source of those funds appeared directly on the joint bank statements. The bank statements show an address of 10 Sky Drive in New City.

---

[4] Much of the remaining deposits appear to have come from sales of personal items such as jewelry and a car.
[5] The defendant's accountant did not send copies of the Holzers' 2007 tax returns, so those are not examined here.

000188

43.     It is clear from the defendant and Lesley Holzer's joint bank statements that Lesley Holzer obtained and spent a substantial portion of the proceeds of the defendant's crimes.

WHEREFORE, I respectfully urge that plaintiff's application for a temporary restraining order pending determination of the motion for a preliminary injunction be granted together with such other and further relief as to this court may seem just and proper, and the costs of this motion.

Dated: New York, New York
        February 1̲8̲ , 2009

_____
Investigator Shannon Rowe

Sworn to before me
This 1̲8̲ᵗʰ day of
February, 2009.

_____
Notary Public

MADELEINE GUILMAIN
Notary Public, State of New York
No. 02GU6181568
Qualified in Queens County
My Commission Expires 02/04/20 1̲2̲

18

000189

000190



# THACHER ASSOCIATES

### BARRY FINGERHUT/DAVID HOLZER

## Barry Fingerhut

Education: BA, University of Maryland 1967; MBA, NYU 1969
Professional: Co-Founder of Wheatley Partners (Currently a Partner)
Former President of GeoCapital LLC
Former General Partner of Weiss, Peck & Greer
Formerly with First Manhattan Co.
President/Board Member of FEGS Health and Human Services; Board Member of Achievement First; Board Member of Apollo International; Board Member of Edufund International; Board Member of WeatherWise USA
Overseer to the Stern School of Business at NYU

## David Holzer

Date of Birth: 11/14/49
SSN: 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
Address 1: 10 Sky Drive, New City, NY (owned)
Address 2: 50 E. 78th Street, NY, NY (rented)
Education: BA, City College 1971
Professional: 1971 – 1975: Abraham & Co.
1975 – 2002: Brean Murray & Co.

Prior Legal Issues:

*Brean Murray*: Our research indicates that in 1982 Holzer was named head of the firm's Capital Markets group, and that he remained in that position until he left the firm in 2002. Brean Murray was investigated by the SEC and by NY AG Spitzer in 2003 regarding market timing/late trading issues during the period from 2001 to 2003 (regarding trades made by the firm for its hedge fund clients). In 2005, Brean Murray settled with the SEC regarding charges that the firm had placed thousands of abusive mutual fund trades for at least five hedge funds between 2001 and 2003; the firm paid a fine of $150K. A *New York Post* article published on November 3, 2003, reported that in 2001 the firm had formed a "special situations" group "to help facilitate market timing for some of its hedge fund clients."

*US Tax Court*: Holzer and his wife Lesley filed a petition (docket number 7490-04) against the Commissioner of Internal Revenue on May 4, 2004. A stipulated decision was entered into the record on March 30, 2005. Further details about this decision were not available online.

1



TT0006417



THACHER
ASSOCIATES

<u>Chronology</u>

| | |
|---|---|
| 1980s/1990s | Brean Murray/Holzer handle trades/clearing operations for firm(s) where Fingerhut is employed, and Fingerhut and Holzer develop a business relationship |
| 2002 | (1) Holzer informs Fingerhut that he has formed a partnership with two other individuals (Jeffrey Schwartz, Chairman/CEO of Traffix Inc.; and Daniel Katz, President/CEO Katz & Associates Corp.); Holzer tells Fingerhut that the partnership is called Dellwood Partners, and that it has been formed to make real estate investments in upstate New York (Rockland County) |
| | (2) Holzer asks Fingerhut if he would like to take a 1/2 interest in Holzer's 1/3 interest in Dellwood; Fingerhut agrees; Fingerhut does not perform any due diligence on Dellwood (i.e., he does not review the partnership documents; he does not contact Schwartz or Katz) |
| | (3) Holzer informs Fingerhut that Dellwood has identified a piece of property in Haverstraw, NY to purchase; Fingerhut wires funds to Holzer's personal account to cover his 1/2 interest in Holzer's 1/3 interest |
| | (4) During 2002, Fingerhut sends 4 wires to Holzer's personal account, totaling $2,689,500; all wires have been sent at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood |
| 2003 | Fingerhut sends 6 wires to Holzer's personal account, totaling $1,868,150; all wires have been sent at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood |
| 2004 | (1) Fingerhut sends 5 wires to Holzer's personal account, totaling $2,530,000; all wires have been sent at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood |
| | (2) Holzer informs Fingerhut that the Haverstraw property is going to be sold for approximately $99 million, and that their share of the proceeds will be approximately $33 million |
| | (3) Fingerhut and Holzer form Fingerhut/Holzer Partners (FH Partners) for the purpose of investing the proceeds of their share of the sale of the Haverstraw property (Fingerhut will identify the investments to be made by FH Partners, and Fingerhut and Holzer will fund the investments 50-50); FH Partners rents office space |

2

TT0006418



(4) Holzer informs Fingerhut that the sale of the Haverstraw property has been delayed

(5) Based on Holzer's repeated representations that the sale of the Haverstraw property is definite and imminent, Fingerhut begins to make investments on behalf of FH Partners, funding his share and the bulk of Holzer's share out of his own pocket; during the next 3 years, Holzer will fund some of the investments made by FH Partners out of his own pocket, but the bulk of his share of the amounts invested will be "fronted" for him by Fingerhut (Fingerhut "fronts" this money for Holzer based on Holzer's representations that he will use his share of the proceeds of the sale of the Haverstraw property to repay Fingerhut for the amounts Fingerhut has fronted for him)

2005    (1) Holzer continues to inform Fingerhut that the sale of the Haverstraw property has been delayed, but that the sale is definite and imminent; Holzer provides various excuses for the delays, ranging from soil remediation issues to the buyer not showing up at the closing with enough cash

(2) Fingerhut sends 8 wires to Holzer's personal account, and provides one bank check to Holzer, totaling $3,318,750; the wires and bank check have been provided at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood

(3) Based on Holzer's representations that the sale of the Haverstraw property is definite and imminent, Fingerhut continues to front money for Holzer with respect to investments made by FH Partners

2006    (1) Based on Holzer's representations that the sale of the Haverstraw property is definite and imminent, Fingerhut continues to front money for Holzer with respect to investments made by FH Partners

(2) Based on Holzer's representations that the sale of the Haverstraw property is definite and imminent, Fingerhut personally borrows $4.5 million from JPMorgan Chase to make two investments on behalf of FH Partners

(3) Fingerhut sends 2 wires to Holzer's personal account, totaling $575,000; both wires have been sent at Holzer's request based on his representations regarding the properties allegedly purchased by Dellwood

2007    (1) (Winter) Fingerhut develops idea for a venture capital partnership called Syncomium Partners; Adam Gurney, an Irish investor introduced to Fingerhut by Holzer, reviews a draft PPM and is interested in investing in

TT0006419



**THACHER**
ASSOCIATES

Syncomium; Gurney allegedly shows the PPM to Sheikh Mohammed bin Rashid al Maktoum of Dubai, and the Sheikh is allegedly interested in investing in Syncomium; various meetings/conference calls with Gurney and the Sheikh and/or his business advisor(s) are cancelled at the last minute. (As of the date hereof: (a) Gurney and a business partner, JP McManus, have informed Fingerhut that they are prepared to invest $15 million in Syncomium; (b) the Sheik and/or his business advisor(s) have informed Fingerhut that the Sheikh and his brother are prepared to invest $300 million; (c) Gurney, McManus, and the Sheikh have been provided with all necessary documentation for the investment in Syncomium, but have not yet signed the documents or wired the promised funds.)

(2) (Spring/Summer) Holzer informs Fingerhut that the sale of the Haverstraw property has finally closed; Holzer shows Fingerhut a deposit receipt from JPMorgan Chase showing a deposit of a check for $33 million into one of FH Partners' accounts at the bank; Holzer tells Fingerhut, however, that the funds have not yet cleared; Fingerhut calls JPMorgan chase to find out when the funds will clear, and is told that (a) the check was written on an account with insufficient funds to cover the full amount of the check (the account on which the check was written had approximately $40,000 to $50,000 in it); (b) the FH Partners account into which the check was deposited has been frozen; and (c) the bank's fraud unit is launching an investigation into Holzer having deposited a phony $33 million check

(3) (Spring/Summer) Fingerhut meets with attorney Howard Wilson of the firm Proskauer Rose LLP to discuss whether Holzer's kiting of the $33 million check, and JPMorgan Chase's subsequent investigation, could result in any criminal liability for Fingerhut

(4) (Spring/Summer) Holzer informs Fingerhut that the sale of the Haverstraw property fell apart months ago; Holzer later informs Fingerhut that new buyers have been found to purchase their 1/3 interest in the Haverstraw property, and that the sale price for their 1/3 interest is $25 million (Holzer tells Fingerhut that the buyers are Alan Elkin, CEO of Active International, and Arthur Wagner, President of Active International [Wagner lives on the same street as Holzer, at 14 Sky Drive]); however, the sale of their 1/3 share is continually delayed, with Holzer offering multiple excuses for the delays

(5) (Spring/Summer) Fingerhut asks Holzer if the investments in Syncomium to be made by Gurney, McManus and the Sheiks are real -- Holzer tells Fingerhut that they are real

4

TT0006420



# THACHER
## ASSOCIATES

(6) (Summer/Fall) Fingerhut hires Thacher Associates to look into Holzer and Dellwood; Thacher determines that Dellwood does not exist and that Holzer has been defrauding Fingerhut

(7) (October) Toby Thacher and Lincoln Ornston of Thacher Associates meet with Holzer in his office at FH Partners; Holzer admits to them, and subsequently to Fingerhut, that (a) Dellwood does not exist; (b) everything he has told Fingerhut about Dellwood, including the alleged purchase of the land in Haverstraw, was a lie; (c) he has used the funds provided by Fingerhut for personal and business-related expenses, and that all of the money has been spent; and (d) neither Schwartz nor Katz were involved in the scheme; Holzer further states that (i) he has only approximately $40K in his savings/checking account, and no brokerage accounts; (ii) his wife and his children do not know that Dellwood is a fiction; (iii) he will immediately obtain a second mortgage on his house and provide all proceeds to Fingerhut; (iv) he will attempt to find a way to pay back to Fingerhut all of the money he has stolen; (v) he will provide Fingerhut and Thacher Associates will all bank account statements for the previous 5 years so that Thacher can determine what happened to the funds provided by Fingerhut to Holzer (which at that time amounted to over $18 million)



(8) (October 3) Holzer and Fingerhut sign a Contingent Assignment of Equity Interests Agreement, pursuant to which Holzer agrees that, if he has not paid the sum of $6,970,300 to Fingerhut by October 15, he will (a) assign to Fingerhut all of his share of the investments made by FH Partners (totaling $7,274,500); and (b) at Fingerhut's request, resign from FH Partners

(9) (October 9) Holzer signs a Secured Promissory Note, pursuant to which he agrees to pay Fingerhut the sum of $7,603,800

(10) (October 15) Holzer signs a Notice of Resignation from Barry/David Partners, LLC (Barry/David Partners was a vehicle formed by Fingerhut and Holzer that received carried interests in certain investments made by FH Partners)

(11) (October/November) Holzer tells Fingerhut that he has (a) obtained all bank account statements for the past five years, and that he will provide them to Fingerhut for review; (b) obtained a second mortgage from Citibank in the amount of approximately $1.45 million; (c) obtained cash from the sale of jewelry in the amount of approximately $560K; and (d) obtained a job as a trader with Buzzy Geduld (formerly of Herzog, Heine & Geduld), that Geduld has paid him an upfront bonus of $6 million, and that he (Holzer) will immediately wire all of the funds listed above to Fingerhut (totaling approximately $8 million)

5


THACHER
ASSOCIATES

(12) (October/November) Holzer continues to tell Fingerhut that he will wire approximately $8 million into Fingerhut's account, and that he will meet with Fingerhut to provide the bank statements; to date, no wires have been received by Fingerhut, and Holzer has not provided Fingerhut with the bank statements

<u>Amounts Stolen by Holzer</u>

(1) Cash: **$11,850,400**

- Based on Holzer's representations regarding properties allegedly purchased by Dellwood Partners, between 2002 and 2006 Fingerhut wired $10,981,400 to Holzer

- Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, Fingerhut loaned Holzer an amount equal to $869,000 (Holzer informed Fingerhut that this amount was needed by Brean Murray for a capital call; Holzer later admitted to Thacher, Ornston, and Fingerhut that no such capital call was made, and that Holzer lied to Fingerhut to obtain these funds)

(2) Other Amounts: **$10,284,968**

- Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, between 2004 and 2007 Fingerhut "fronted" $7,274,500 for Holzer to cover investments made by FH Partners

- Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, between 2004 and 2007 Fingerhut covered Holzer's share of the overhead expenses incurred by FH Partners; such share was equal to $330,468

- Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, Fingerhut fronted an additional $430,000 on behalf of Holzer in connection with a real estate investment made by FH Partners

- Based on Holzer's representations regarding the sale of the Haverstraw property allegedly purchased by Dellwood Partners, and with Holzer's full knowledge, Fingerhut personally took out a $4,500,000 million loan from JPMorgan Chase in order to make additional investments on behalf of FH Partners; Holzer's share of this loan amount was $2,250,000

TT0006422



**THACHER**
**ASSOCIATES**

TOTAL: $22,135,368

(3) Interest on Cash Payments and Other Amounts: $2,570,548

TOTAL: $24,705,916

(4) After the fraud became known, Holzer assigned to Fingerhut his interest in the investments made by FH Partners; the amount of this assignment totaled: $8,997,501

NET AMOUNT OWED TO FINGERHUT: $15,708,415

7





# THACHER
## ASSOCIATES

330 WEST 42ND STREET, 23RD FLOOR
NEW YORK, NY 10036
PHONE: (212) 845-7500
FAX: (212) 845-7549

## MEMORANDUM

**TO:** XXXXXXXXX

**FROM:** LINCOLN ORNSTON

**SUBJECT:** DAVID M. HOLZER

**DATE:** XXXXXXX

This memorandum summarizes the results of public record research conducted by Thacher Associates, LLC ("Thacher Associates"), pursuant to your request, regarding David M. Holzer. Our research included online searches for records of Mr. Holzer's personal identifiers and reported addresses, general background information, corporate affiliations, professional licenses, litigation and bankruptcy filings, US Tax Court filings, US Securities and Exchange Commission ("SEC") filings, criminal records, asset ownership, Uniform Commercial Code ("UCC") filings, lien and judgment filings and Internet and media accounts.

Please note that electronic database research includes only those jurisdictions that are available online, rather than every jurisdiction in which public records may be filed. Please note also that the date coverage of available online records varies considerably from one jurisdiction to another, and may not always include relevant time periods.

Our research was focused on the jurisdictions in which Mr. Holzer has reportedly lived and/or worked, namely the State of New York and New Jersey. We also conducted online civil litigation, lien, judgment, Internet and media research for Mr. Holzer's previous employer, Brean Murray & Company as well as two (2) affiliates, Vcampus Corporation and Vion Pharmaceuticals.

It should also be noted that Brean Murray & Company is also affiliated with Brean-Murray, Foster Securities Inc., (Mr. Holzer is listed in the corporate records for this entity name) and Brean-Murray Inc. Due to a merger after Mr. Holzer left the company in 2002 they are also know as Brean-Murray, Carret & Co, LLC. Our online research encompassed all entity names which we reference as "Brean Murray."

© 2007 by Thacher Associates, LLC, 330 W 42nd St, NY, NY 10036. For more information, please call (212) 845-7500. Disclaimer: The information contained in this report is based upon data obtained from a number of government and other public and private sources. Thacher Associates, LLC assumes no responsibility for the accuracy or completeness of the information from its sources, for errors occurring in data transmission or conversion, or in any respect for losses or damages resulting from use of this information.



## EXECUTIVE SUMMARY

### Professional Background

According to the information provided to Thacher Associates, Mr. Holzer worked at Abraham & Co. from 1971-1975 as a proprietary trader after earning a Bachelor of Arts from City College. In 1975, Mr. Holzer joined Brean-Murray as head of proprietary trading and was promoted to the head of capital markets in 1982. He worked as the head of capital markets until 2002 and joined your partnership in 2004.

### Media – Brean Murray

An online review of media identified that Mr. Holzer's previous employer, Brean Murray, was investigated by the Securities and Exchange Commission ("SEC") for improper mutual fund trading practices as well Eliot Spitzer when he was Attorney General for New York State. Specifically, the *New York Post* reported on November 3, 2003, that the SEC subpoenaed Brean Murray for documents providing information about hedge funds, mutual funds, and brokerage firms – including Bank of America, Lehman Brothers and Bear Stearns Securities Corp. The article further notes that while Mr. Holzer was still there, *"Brean Murray formed a 'special situations' group in 2001 to help facilitate market timing for some of its hedge fund clients, say people familiar with the company."*

According to an article published by *TheStreet.com* on February 17, 2005, Brean-Murray settled charges issued by the SEC that they *"placed thousands of abusive mutual fund trades for at least five (5) hedge funds between 2001 and 2003."* The article further reports that the SEC contended brokers at Brean Murray engaged in both market-timing and late trading on behalf of their hedge fund customers. Hence, Brean Murray was fined $150,000 to settle the SEC's enforcement action.

Although Mr. Holzer was not personally implicated in the activities referenced above, he was still with Brean Murray in 2001 and therefore potentially aware of activities that took place.

Please refer to the section of this report herein entitled Media and Internet for a more detailed summary.

### Litigation – David Holzer

An online review of available civil filings in the State of New York and New Jersey identified six (6) cases filed between June 1991 and March 1994 naming Mr. Holzer as a defendant. Please refer to the section of this report herein entitled State and Local Court – David Holzer for a more detailed summary.

2

TT0006425



## THACHER ASSOCIATES

US Tax Court

A search of US Federal Tax Court records identified the following petition pertaining to Mr. Holzer:

- David and Lesley Holzer filed a petition (docket number 7490-04) against the Commissioner of Internal Revenue on May 4, 2004. A stipulated decision was entered into the record on March 30, 2005. Further details about this decision were not available online.

UCC Filings Judgments & Liens

An online review of UCC, judgments and lien filings in New York State and New Jersey identified seven (7) judgments and liens naming Mr. Holzer as a debtor between May 1991 and March 1994. Please refer to the section of this report herein entitled UCC Filings, Judgments and Liens – David Holzer for a more detailed summary.

**FINDINGS**

Personal Identifiers

| | |
|---|---|
| Name: | David M. Holzer |
| Date of Birth: | November 14, 1949 |
| Social Security No.: | 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 (issued in the State of New York between and 1966) |

Mr. Holzer currently resides at 10 Sky Drive, New City, New York 10965 (Rockland County).

The addresses set forth below have also been reported for Mr. Holzer. These addresses may include properties which Mr. Holzer may have rented or owned, in which he may have temporarily resided, or with which he may have had some other association (e.g., Mr. Holzer may have used such addresses on credit applications or other documents, and the information included on such applications or other documents may have eventually been listed in an electronic database).[1]

The following addresses in New York have been reported for Mr. Holzer:

- 22 Georgetown Oval, New City, New York 10956 (Rockland County)
- 231 Tenafly Road, Englewood, New Jersey 07631 (Bergen County)
- 3555 Oxford Avenue, Bronx, New York (Bronx County)

---

[1] *The primary purpose of identifying these addresses is to determine the various jurisdictions in which criminal and litigation research must be conducted.*

TT0006426

 THACHER ASSOCIATES

<u>Criminal Records</u>

*Federal Court*

A review of electronically available criminal records conducted with the District of New Jersey and the Southern District of New York did not identify any records pertaining to Mr. Holzer.

*State Court - New York*

A review of electronically available criminal records conducted with the New York State Office of Court Administration did not identify any records pertaining to Mr. Holzer.

*State Court – New Jersey*

A review of electronically available criminal records conducted with the New Jersey State Police is currently pending and we will forward the results upon receipt. We also conducted an online of New Jersey Superior Court conviction records covering the period of January 2, 1997 through February 8, 2007 and no records pertaining to Mr. Holzer were identified.

*National Criminal Index[2]*

A search of the National Criminal Index did not identify any records with respect to Mr. Holzer.

*State and Federal Inmate Databases*

Searches of online inmate databases maintained by New York State, the City of New York, New Jersey and the Federal Bureau of Prisons did not identify any records with respect to Mr. Holzer.[3]

<u>Business Affiliations</u>

Searches of business databases, corporate filings and Internet sources identified the following entities related to Mr. Holzer:

---

[2] *The National Criminal Index is a database of over 50 million criminal records, including felony, misdemeanor, and inmate records, from databases maintained by states and counties throughout the United States.*

[3] *The Federal Bureau of Prison's inmate locater database contains information on all federal inmates presently or previously incarcerated since 1982.*

TT0006427



- **Brean Murray, Foster Securities, Inc.** This is an inactive entity that was incorporated in Delaware on August 28, 1978 and withdrew their active status on December 11, 1987. Mr. Holzer is listed in the corporate records as an officer.

- **Vcampus Corporation** This is an active entity that was incorporated in Delaware on March 20, 1985. This is a public company and according to a Form 10-K/A filed with the Securities and Exchange Commission on December 31, 2006, Mr. Holzer is "one of our largest beneficial shareholders" owning at least ten percent (10%) of their stock. Mr. Holzer, pursuant to Section 16(a) of the Exchange Act, filed Form 3 on December 5, 2006, as required by individuals owning ten percent (10%) or more of common stock.

- **Vion Pharmaceuticals, Inc.** This is an active entity that was incorporated in Delaware on April 20, 1995. According to his credit header data, Mr. Holzer has an unidentified relationship with this firm.

Litigation

*Federal Court – David Holzer*

A review of electronically available civil filings in the District of New Jersey and Southern District of New York did not identify any records pertaining to Mr. Holzer.

*Federal Court – Brean Murray*

A review of electronically available civil filings nationwide for Brean, Murray identified approximately forty (40) Securities Commodities actions naming the Brean Murray companies as a defendant. Over thirty (30) of these matters were filed between December 2003 and July 2004. These cases could possibly pertain to the Securities Exchange Commission investigating Brean Murray for improper mutual trading practices in 2003. Brean Murray ultimately settled with the SEC in February 2005. Eliot Sptizer, at the time New York State's Attorney General, also investigated the Brean Murray. Further details about these investigations are provided in the Media and Internet section of this report.

*Federal Court – Vcampus Corporation*

A review of electronically available civil filings nationwide identified the following case naming Vcampus Corporation as a party:

- *Techsearch LLC vs. Eschool.com Inc. and Vcampus Corp*, case number 4:01-cv-00126, a patent infringement suit filed with the United States District Court for the Southern District of Texas on January 12, 2001. The defendants filed counterclaims and a stipulation of dismissal without prejudice was entered into the record on May 7, 2002, closing the case.

5



**THACHER ASSOCIATES**

*Federal Court – Vion Pharmaceuticals*

A review of electronically available civil filings nationwide did not identify any matters naming Vion Pharmaceuticals as either a plaintiff or defendant.

*State and Local Court – David Holzer*

A review of electronically available civil filings in the State of New York and New Jersey identified the cases summarized below as pertaining to Mr. Holzer::

- *Bank of New York (Harrison) vs. David and Lesley Holzer,* case number 0067651993. A civil suit filed with the Supreme Court for Civil Suits for Rockland County, New York on March 8, 1994. This matter was also disposed with a pre-note and settled on March 8, 1994.

- *Norma Grossman vs. Across America Leasing, Aleet Leasing Corp. All Island Leasing, All Metro Car Leasing Inc., Citbank, Foster Securities, Inc., David M. Holzer, Maguire Brokerage, Murray Brean, North American Insurance Co., Philadelphia Insurance Co. and Royal Insurance Co.,* case number 12102593. A civil suit filed with the Supreme Court for Civil Suits for New York County, New York on January 20, 1994. Further details regarding the status of this matter were not available online.

- *Federated Dept. Store Inc. vs. David M. Holzer,* case number 00002574392. A $829 civil summons filed with the Civil Summons Civil Court of the City of New York on July 16, 1992. Further details regarding the status of the matter wee not available online.

- *Norman Grossman vs. David M. Holzer, et al.,* case number 03033592. A civil suit filed on November 6, 1992 with the Supreme Court for Civil Suits in New York County, New York. Further details regarding the status of this matter were not available online.

- *Citibank, N.A. vs. David Holzer,* et al., case number 0084041991. A civil suit filed on March 18, 1992 with the Supreme Court for Civil Suits for Rockland County, New York. This matter was disposed with a pre-note and settled on March 18, 1992.

- *Fred Marcus Inc. vs. David Holzer,* case number 00002915391. A $2,894 civil summons filed with the Civil Summons Civil Court of the City of New York on June 19, 1991. Further details regarding the status of this matter were not available online.

TT0006429



**TA THACHER ASSOCIATES**

*State Court – Brean Murray*

A review of electronic civil filings in the State of New York identified twenty (20) cases naming the Brean Murray companies as party. Fifteen (15) of these matters listed the Brean Murray companies as a defendant.

*State Court – Vcampus Corporation*

A review of available electronic civil filings in state courts nationwide identified the following matters pertaining to Vcampus Corporation:

*Gerri Knilans vs. Vcampus Corporation,* case number SC-032820, a civil case filed with Ventura County California Superior Court on May 15, 2002. Further details about the status of this matter were not available online.

*Sage Interactive vs. Vcampus Corporation,* case number SCV-308527, a civil suit filed with San Francisco County California Superior Court on December 14, 1999. Further details about the status of this matter were not available online.

*State Court –Vion Pharmaceuticals*

A review of available electronic civil filings in state courts nationwide did not identify any matters naming Vion Pharmaceuticals as a party.

Bankruptcy Filings

- A review of electronically available bankruptcy filings nationwide did not identify any records naming David M. Holzer, Social Security Number 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, as the subject of a bankruptcy matter.

US Tax Court

A search of US Federal Tax Court records for petitions/trials involving tax disputes with the Internal Revenue Service identified the following proceeding involving Mr. Holzer:

- David and Lesley Holzer filed a petition (docket number 7490-04) against the Commissioner of Internal Revenue on May 4, 2004. A stipulated decision was entered into the record on March 30, 2005. Further details about this decision were not available online.

UCC Filings, Judgments and Liens – David Holzer

A review of electronically available UCC filings, judgments and liens in the State of New York and New Jersey identified following records pertaining to Mr. Holzer.

TT0006430



- David Holzer is named the debtor to the Bank of New York in a $7,221 judgment filed on March 22, 1994 in Rockland County, New York. This matter was satisfied on February 20, 1998.

- David Holzer is named the debtor to Bloomingdales in a $989 judgment filed on April 7, 1993 in New York County, New York. This matter was satisfied on October 7, 1988.

- David Holzer is named the debtor to Malliouhana EC LTD. in a $8,117 judgment filed in Rockland County, New York on August 19, 1993. This matter was satisfied on October 19, 1994.

- David Holzer is named the debtor to Fred Marcus Inc. in a $2,410 judgment filed in New York County, New York on May 1, 1992. Further details about the status of this matter were not available online.

- David Holzer is named the debtor to G E Capital Corp. in a $2,169 judgment filed in Rockland County, New York on February 19, 1992. This matter was satisfied on May 6, 1994.

- David Holzer is named the debtor to the New York State Tax Commission in a $32,989 judgment filed in Rockland County, New York on May 7, 1991. This matter was satisfied on June 16, 1994.

- David Holzer is named the debtor to the New York State Tax Commission in a $4,629 judgment filed in Rockland County, New York on May 7, 1991. This matter was satisfied on March 12, 1997.

UCC Filings, Judgments and Liens – Brean Murray

A review of electronically available UCC filings, judgments and liens in the State of New York identified over 100 UCC filings naming Brean Murray as the debtor. Also identified were two (2) matters naming Brean Murray as creditors including a $945,000 judgment against their former broker Lorne Caplan who is referenced in the media section.

UCC Filings, Judgments and Liens – Vcampus Corporation

A review of electronically available UCC filings, judgments and liens nationwide identified approximately twenty-eight (28) UCC filings and eight (8) judgments naming Vcampus Corporation as a debtor.

TT0006431



## THACHER ASSOCIATES

<u>UCC Filings, Judgments and Liens – Vion Pharmaceuticals</u>

A review of electronically available UCC filings, judgments and liens nationwide identified eleven (11) UCC filings and one (1) judgment naming Vion Pharmaceuticals as a debtor.

<u>Regulatory and Administrative Actions</u>

*Office of Foreign Assets Control*

The Office of Foreign Assets Control ("<u>OFAC</u>") administers a series of laws that impose economic sanctions against hostile targets to further US foreign policy and national security objectives. Management of these sanctions is entrusted to the Secretary of the Treasury. OFAC is responsible for promulgating, developing, and administering the sanctions for the Secretary under eight basic statutes,[4] and all of the bank regulatory agencies cooperate in ensuring financial institution compliance with the Regulations.

The laws and regulations administered by OFAC apply to all American citizens and permanent resident aliens wherever they are located; individuals and entities located in the United States (including all foreign branches, agencies, rep offices, etc.); corporations organized under US law, including foreign branches; and entities owned or controlled by any of the above, the most important being foreign-organized subsidiaries of US corporations.

OFAC promulgates and regularly updates a list of those individuals and entities that the US government has determined are threats to US national security and interests. This list is entitled "Specially Designated Nationals and Blocked Persons." The list comprises individuals and entities, which are owned or controlled by, or acting for or on behalf of, the Governments of target countries or are associated with international narcotics trafficking or terrorism. These individuals and entities are listed on the Treasury Department's Specially Designated Nationals and Blocked Persons list so that persons subject to the jurisdiction of the United States will know that they are prohibited from dealing with them and that they

---

[4] *Trading With the Enemy Act, 50 U.S.C. App. §§ 1-44 ("TWEA") [North Korea, Cuba, Transaction Control Regulations]; International Emergency Economic Powers Act, 50 U.S.C. §§1701-06 ("IEEPA") [Libya, Iraq, Serbia & Montenegro Bosnia, UNITA, Sierra Leone, Liberia, Sudan, Iran, the Balkans, Terrorism, Narcotics, Nonproliferation, the Taliban and Burma]; Iraqi Sanctions Act, Pub.L. 101-513, 104 Stat. 2047-55 ("ISA") [Iraq]; United Nations Participation Act, 22 U.S.C. § 287c ("UNPA") [Iraq, Libya (part), UNITA, Serbia & Montenegro, Sierra Leone, and Liberia]; International Security and Development Cooperation Act ("ISDCA") codified at 22 U.S.C 2349 aa-9 (Iran); The Cuban Democracy Act ("CDA"), 22 U.S.C. § 6001-10 [relating to Cuba]; The Cuban Liberty and Democratic Solidarity (LIBERTAD) Act, 22 U.S.C. 6021-91, [relating to Cuba]; The Antiterrorism and Effective Death Penalty Act, (enacting 8 U.S.C. 219, 18 U.S.C. 2332d and 18 U.S.C. 2339b) [Cuba, North Korea, Iran, Iraq, Libya, Syria and Sudan]; The Foreign Narcotics Kingpin Designation Act, Pub L. No. 106-120, tit. VIII, 113 Stat 1606, 1626-1636 (1999) (to be codified at 21 U.S.C. §§1901-1908) and; The Criminal Code at 18 U.S.C. § 1001.*

9

TT0006432



TA **THACHER** ASSOCIATES

must block all property within their possession or control in which these individuals and entities have an interest.

Mr. Holzer is not listed on OFAC's Specially Designated Nationals and Blocked Persons list.

*SEC Records*

An online search was performed for any SEC records referencing Mr. Holzer, including, but not limited to, Forms 3, 4 and 5, Schedule 13D and Schedule 13G.[5] Online research identified numerous references to Mr. Holzer pertaining to his status as a beneficial stock holder for Vcampus Corp. We reference the most recent filing in the corporate affiliations section above.

*National Association of Securities Dealers*

Online searches were conducted with the National Association of Securities Dealers ("NASD") for any information pertaining to Mr. Holzer. No records relating to Mr. Holzer, including registrations and/or disclosure events, are currently on file with the NASD.

*National Futures Association*

Inquiries conducted with the National Futures Association ("NFA") for information pertaining to Mr. Holzer identified that he became a member of NFA on August 20, 1984. Mr. Holzer's status as an active member was withdrawn on August 31, 1985. It should also be noted, there are no NFA or Commodity Futures Trade Commission ("CFTC") regulatory actions or reparations cases, or NFA arbitration awards, reported for Mr. Holzer.

<u>Asset Ownership</u>

A review of Mortgage, Deed Transfer and Tax Assessor records in the State of New York and New Jersey identified the following property records pertaining to Mr. Holzer:

- **10 Sky Drive, New City, New York 10956.** This property, a single-family residence, was purchased by David and Lesley Holzer on March 1, 1999 for $350,000 from URARN Associates. According to the Tax Assessor's Office of New City, New York, the 2007 total assessed value for this property is $467,800.

---

[5] *Forms 3, 4 and 5 disclose directors, officers or owners of more than ten percent (10%) of a class of equity securities (initial filing, changes and annual reports, respectively); Schedule 13D discloses beneficial ownership (i.e., voting or investment power) of individuals who have acquired more than five percent (5%) of certain registered equity securities; and Schedule 13G discloses passive investors (i.e., those who own less than twenty percent (20%) of the class of securities and do not seek to influence control of the issuer).*

TT0006433



## TA THACHER ASSOCIATES

<u>Driver Records</u>

Searches conducted with the New York State Department of Motor Vehicles indicate that Mr. Holzer has a valid Class D driver's license which is set to expire on November 14, 2010.

<u>Professional Licenses</u>

Inquiries conducted with the New York State Division of Licensing Services as well as the New Jersey Department of Consumer Affairs did not identify any professional license records with respect to Mr. Holzer.

<u>US Patents and Trademarks</u>

Searches of the US Patent and Trademark Office's online database were performed for any patents, patent applications and trademarks held by Mr. Holzer. No records were identified.

<u>Media and Internet</u>

A comprehensive media review, consisting of over 30,000 print, radio, television and Internet sources, identified the following article pertaining to Mr. Holzer:

- *The New York Times*. **November 9, 2001 (See Exhibit One)**. An article entitled, "Shares Are Mixed Despite An Early Boost From Europe," quoted Mr. Hozler in his professional capacity at Brean Murray as saying, *"You're gong to see a cumulative effect of rate cuts, and I think you're going to see a huge rally into the end of the year. There's no return in bonds, C.D.'s are yielding under two percent (2%), and investors have to switch to the equity market. Money managers are going to get fired if they sit on cash."*

A similar review of the Brean Murray companies identified the following articles of interest:

- *The Associated Press*. **May 16, 2006 (See Exhibit Two)**. An article entitled, "Stamford Man Gets Three (3) Years In Federal Prison For Defrauding Investors," reports that a former investment named Lorne Caplan banker who worked for Brean Murray Carteret & Co., LLC was sentenced to three (3) years in prison for cheating investors. According to the article, Mr. Caplan pleaded guilty to wire fraud and admitted he improperly took $990,000 in investor funds for his own use.

- *Newsday*. **May 14, 2005 (See Exhibit Three)**. An article entitled, "Former Hedge Fund Manager Testifies At Bank Broker's Trial," reports that former hedge fund manager for Canary Capital Partners LLC testified he was told by two (2) people at Brean Murray that a reputable law firm named LeBouef, Lamb, Greene and MacRae advised late trading was legal. Its possible Mr. Stern was told this prior to

11



THACHER
ASSOCIATES

Mr. Hozler's leaving Brean Murray in 2002. According to the article, Mr. Stern's late trading was a catalyst for a sweeping investigation of the mutual fund industry.

- *TheStreet.com.* **February 17, 2005 (See Exhibit Four)**. An article entitled, "Brokerage Brean Murray Settles Market-Timing Case," reports that Brean Murray settled charges issued from the SEC that they *"placed thousands of abusive mutual fund trades fro at least five (5) hedge funds between 2001 and 2003."* According to the article, the SEC contended that brokers at Brean Murray engaged in both market-timing and late trading on behalf of their hedge fund customers which included Canary Capital Partners. Brean Murray was fined $150,000 to settle the SEC's enforcement action.

  The article further reports that in September 2004, two (2) former Brean Murray brokers alleged that a lawyer had given them faulty advice it was OK to engage in late trading through Brean Murray's trading platform.

  Harold McGuire, Brean Murray's attorney and a partner with Entwistle & Cappucci said that, *"The fact of the matter is there isn't anyone left at Brean Murray who has significant knowledge of these activities."* One (1) of those people may be Mr. Hozler who was a high ranking person at this small brokerage firm.

- *The New York Post.* **November 3, 2003 (Exhibit Five)**. An article entitled, A Broader View In Brean Murray Request, SEC Eyes Lehman, BOFA," reports that the SEC subpoenaed Brean Murray in their ongoing investigation of improper mutual fund trading practices. According to the article,

  *"New York Attorney General Eliot Spitzer is also looking at the firm say people familiar with his investigation into whether funds allowed select clients to buy and sell shares at prices not available to most investors.*

  *The SEC subpoena requests that Brean Murray, a small brokerage house based in Midtown, provide all information related to a number of hedge funds, mutual funds and brokerage firms – including Bank of America, Lehman Brothers and Bear Stearns Securities Corp."*

  The article further reports that, *"Brean Murray formed a 'special situations' group in 2001 to help facilitate market timing for some of its hedge fund clients, say people familiar with the company."*

  It should be noted that Mr. Holzer was still with Brean Murray in 2001 and therefore potentially aware of the activities referenced above. However, Mr. Holzer is not implicated personally in this article or any of the others referenced in the previous bullet points.

12



A similar media review identified numerous references to Vcampus Corporation but no articles appeared to be integrity related. There were no articles identified for Vion Pharmaceuticals.

TT0006436



## THACHER ASSOCIATES

**Exhibit One**

<u>Source: Lexis-Nexis</u>

The New York Times

November 9, 2001 Friday
Late Edition - Final

## THE MARKETS: STOCKS & BONDS;
## Shares Are Mixed Despite an Early Boost From Europe

**BYLINE:** By Reuters

**SECTION:** Section C; Column 3; Business/Financial Desk; Pg. 6

**LENGTH:** 544 words

Blue-chip stocks ended with modest gains yesterday while technology stocks slipped as the market ran into a wall of profit taking after a big rally built on interest rate cuts by European central banks.

Stocks also slid after the Oct. 2 minutes of the Federal Reserve's panel that sets interest rate said the Sept. 11 attacks could worsen the buildup of inventory -- a persistent problem for technology companies -- and that its current rate-cutting could be reversed if the economy expanded too quickly.

Investors remained uncertain, with signs of an expected recovery still absent and corporate profits in dismal shape. The Nasdaq composite index has also risen 28 percent since it hit a three-year low on Sept. 21, a move that has prompted some investors to lock in profits, analysts said.

"Now we're just getting some normal profit taking and pullback after a big move," said James Volk, co-director of institutional trading at D. A. Davidson & Company. "There are still a number of people who are skeptical, including myself, as to when and to what extent this economy is going to turn around."

The technology-heavy Nasdaq composite index, which at one point had climbed 2.8 percent, ended with a loss of 9.76 points, or 0.5 percent, at 1,827.77. The Dow Jones industrial average rose 33.15 points, or 0.4 percent, at 9,587.52. The broader Standard & Poor's 500-stock index rose 2.74 points, or 0.3 percent, to 1,118.54.

American stocks initially bolted higher after the European Central Bank and the Bank of England cut rates by a surprisingly hefty half a percentage point. The reductions came on the heels of a similar cut by the Federal Reserve on Tuesday.

14

TT0006437



THACHER ASSOCIATES

"To really combat recession and recessionary pressures here at home, we need to see the rest of the world firm up a little bit," said Charles Payne, an analyst at Wall Street Strategies. "The interest rate cut by the E.C.B. caught a lot of people off guard in a good way."

At the Dow's high of the day -- up almost 170 points -- the blue-chip index had erased all of the steep loss it made after the Sept. 11 attacks on the Pentagon and the World Trade Center sent the market tumbling. The Nasdaq and S.& P. 500 have already clawed back from their post-attack losses as investors looked past the bleak economic environment and bet on a comeback.

"You're going to see a cumulative effect of rate cuts, and I think you're going to see a huge rally into the end of the year," said **David Holzer**, managing director of trading at Brean Murray & Company. "There's no return in bonds, C.D.'s are yielding under 2 percent, and investors have to switch to the equity market. Money managers are going to get fired if they sit on cash." --------------------

Treasuries Are Lower
By Bloomberg News

Treasury bond prices fell yesterday as a decline in jobless claims and interest rate cuts by European central banks signaled the United States economy could rebound sooner than originally thought.

The 10-year Treasury note fell 22/32, to a price of 105 21/32. The note's yield, which moves in the opposite direction from the price, rose to 4.28 percent from 4.22 percent on Wednesday. The price of the 30-year Treasury bond fell 1 7/32, to 107 30/32. The bond's yield rose to 4.86 percent from 4.79 percent on Wednesday.

TT0006438



**THACHER ASSOCIATES**

**Exhibit Two**

Source: Lexis-Nexis

May 16, 2006 Tuesday 2:01 AM GMT

## Stamford man gets 3 years in federal prison for defrauding investors

**SECTION:** STATE AND REGIONAL

**LENGTH:** 266 words

**DATELINE:** NEW YORK

A former investment banker who was sentenced Monday to three years and a month in prison deserved no leniency because he "had everything going for him" when he cheated investors, a judge said.

Lorne Caplan, of Stamford, Conn., apologized to U.S. District Judge Shira Scheindlin for hurting his family and investors. He had pleaded **guilty** to wire **fraud,** admitting he improperly took $990,000 in investor funds for his own use.

The judge said she wanted to send a message that those who commit white-collar **crimes** will be punished severely.

"This was completely a person of privilege who made his own bed," she said. "This man had everything going for him."

The judge said Caplan, who worked at **Brean Murray,** Carret & Co. LLC, stole from at least seven investors in response to a financial crisis he caused himself by spending far more than he earned. She said such **crimes** sometimes leave investors shattered.

"It's not a violent **crime,** but it destroys lives just the same," she said.

She ordered Caplan, 41, to pay back $945,000. She said the government can pursue any assets Caplan might have or he can pay it off through 10 percent of his salary for 20 years after he gets out of prison.

Caplan from June 2001 to January 2002 arranged the transfer of client funds to his accounts in New York, Florida and Holland, prosecutors said. Clients who had planned to invest in a medical equipment company had their funds diverted.

He provided New York-based Brean Murray with three phony letters purportedly signed by the chief executive of the medical equipment company authorizing the transfers, prosecutors said.

16

TT0006439



# THACHER ASSOCIATES

**Exhibit Three**

Source: Lexis-Nexis

Newsday

May 14, 2005, Saturday

## Former hedge fund manager testifies at bank broker's trial

**BYLINE:** By Susan Harrigan

**LENGTH:** 512 words

A former hedge fund manager whose late trading of mutual funds set off a sweeping investigation of the mutual fund industry said yesterday that he "felt uncomfortable" with the practice, and that "in retrospect it was unfair."

Edward Stern, who managed the hedge fund Canary Capital Partners Llc, testified as a government witness at the trial of a former Bank of America broker, Theodore Sihpol III.

It was the first time Stern has spoken publicly about his 2003 settlement of charges of abusive trading brought by New York State Attorney General Eliot Spitzer, who went on to extract more than $ 3 billion in settlements from mutual funds he accused of abetting such practices.

Siphol is charged with larceny, securities fraud and falsifying business records. He faces up to 30 years in prison if he's convicted and a fine of $ 200,000.

Dressed in a dark gray suit and blue shirt and speaking slowly, Stern, a son of billionaire publisher, real estate and pet-food magnate Leonard Stern, said he placed trades through Sihpol after the 4 p.m. market close because "my job was to get the least amount of risk for the most amount of gain."

Sihpol's attorneys are contending that Sihpol's actions were known and approved by higher-ups at Bank of America, but are also trying to show that late trading isn't **illegal.** In an answer that the presiding judge cautioned the jury would constitute "hearsay," Stern answered "yes" when asked by defense lawyer Paul Shechtman if he had been told that a "reputable" law firm had issued a legal opinion that late trading was lawful.

Stern said that information had come from two people at **Brean Murray,** another brokerage that traded mutual funds for him, and he believed the name of the law firm was LeBoeuf.

In an interview, Steven Davis, chairman of LeBoeuf, Lamb, Greene and MacRae, said, "We emphatically deny that LeBoeuf ever issued an opinion on this point, and we have a

17

TT0006440



feeling that it may be a case of mistaken identity." Don Fletcher, senior vice president of Brean Murray, declined to comment. Both firms are based in Manhattan.

Stern said he once "had a cup of coffee" with Kenneth D. Lewis, the bank's chairman and chief executive. The two "just talked about the economy," rather than about Stern's business with the bank, he said. Robert Stickler, a spokesman for Bank of America, said "we don't discuss customer relationships," but that a meeting between Lewis and a customer would have been "quite common."

In 2004, Bank of America settled charges with Spitzer and federal regulators for $ 675 million. Neither the bank nor Stern, who paid $ 40 million to settle in 2003, admitted or denied wrongdoing.

18

TT0006441



## THACHER ASSOCIATES

**Exhibit Four**

Source: Lexis-Nexis

TheStreet.com

TheStreet.com

February 17, 2005 Thursday

## Brokerage Brean Murray Settles Market-Timing Case

**BYLINE:** By Matthew Goldstein, Senior Writer

**SECTION:** MARKETS; Matthew Goldstein

**LENGTH:** 674 words

**Brean Murray** settled Securities and Exchange Commission charges Thursday that the small New York brokerage placed thousands of **abusive** mutual fund trades for at least five hedge funds between 2001 and 2003.

The SEC contends that brokers at Brean engaged in both market-timing and late trading on behalf of their hedge fund customers, which included Canary Capital Partners. Brean will pay $150,000 to settle the enforcement action, according to an SEC administrative order.

The administrative order also places blame on the clearing firm that permitted the late trading to occur, saying it also violated federal securities laws because of Brean's wrongful trading. The order doesn't identify the clearing firm by name, but people familiar with the investigation say it is Bear Stearns (BSC:NYSE).

In a civil lawsuit filed in September, two former Brean brokers alleged that a lawyer had given them faulty advice in telling them it was OK to engage in late trading through Bear's clearing platform. The two brokers, Ryan Goldberg and Michael Grady, who are still being investigated by the SEC and New York Attorney General Eliot Spitzer, claimed the lawyer had committed malpractice.

The brokers were not charged in the SEC action against Brean. In the civil lawsuit, Goldberg and Grady identified Canary, Veras Investment Partners and Tewksbury Capital, formerly called Trout Trading, as their customers.

Market-timing, or frequent trading of mutual fund shares, is legal, but it is prohibited under most mutual fund prospectuses because it can dilute the value of a portfolio's holdings. Late trading is the buying or selling of mutual fund shares after their 4 p.m. closing price, in order to take advantage of late-breaking or market-moving news.

TT0006442



Regulators and prosecutors say late trading is an illegal practice, and a number of offenders are facing criminal charges.

The SEC notified Bear last June that it is considering filing civil charges against the firm's big clearing operation. Regulators believe Bear processed and financed abusive mutual fund trades for dozens of hedge funds and small brokerages.

Earlier this week, TheStreet.com reported that the SEC recently notified three former Bear brokers and Peter R. Murphy, a senior managing director, that they too could face civil charges for assisting hedge funds engaged in abusive trading of mutual fund shares. Murphy is one of the highest-ranking executives in Bear's big clearing and operations division.

Earlier Thursday, Bloomberg reported that Vincent Dicks, a top manager in Bear's private client group, also received a so-called Wells notice from the SEC. Bloomberg also reported the SEC was on the verge of settling with Brean.

People familiar with the investigation say at least one other current Bear employee has been informed he could be facing a possible enforcement action and additional Wells notices may be forthcoming.

A Bear spokeswoman said the brokerage has been cooperating with the SEC.

"Bear Stearns has taken significant action since the onset of the industrywide mutual fund investigation," said the spokeswoman, Elizabeth Ventura. "Under the auspices of the audit committee of the board of directors, we conducted an in-depth internal review of mutual fund trading practices. As a result of this internal review, we took swift and decisive disciplinary action -- including the termination of certain employees -- and, we proactively shared the information from this thorough review with the SEC."

SEC officials declined to comment.

Late last year, Bear increased its **litigation** reserve by about $100 million to cover the cost of a potential settlement with securities regulators over the firm's **alleged** involvement in the mutual fund trading **scandal.**

Harold McGuire, Brean's attorney and a partner with Entwistle & Cappucci, said his client is "very happy" to put the matter behind it.

"The fact of the matter is there isn't anyone left at **Brean Murray** who has significant knowledge of these activities," he said.

TT0006443



**THACHER ASSOCIATES**

## Exhibit Five

Source: Lexis-Nexis

The New York Post

November 3, 2003, Monday

# A BROADER VIEW ; IN BREAN MURRAY REQUEST, SEC EYES LEHMAN, BOFA

**BYLINE:** JENNY ANDERSON

**SECTION:** All Editions; Pg. 033

**LENGTH:** 643 words

The SEC has subpoenaed New York-based brokerage house **Brean Murray** in the agency's ongoing **investigation** of improper mutual fund trading practices, in an apparent attempt to dig deeper into some of Wall Street's biggest firms, The Post has learned.

New York Attorney General Eliot Spitzer is also looking at the firm, say people familiar with his **investigation** into whether funds allowed select clients to buy and sell shares at prices not available to the most investors.

The SEC subpoena requests that **Brean Murray,** a small brokerage house based in Midtown, provide all information related to a number of hedge funds, mutual funds and brokerage firms - including Bank of America, Lehman Brothers and Bear Stearns Securities Corp.

Spokesmen for all three firms declined comment.

The SEC subpoena also sought information on a list of hedge funds that named Canary Capital Partners, Tidewater Capital, Trout Trading Fund, Trout Trading Management Company, Peconic Capital Fund, Diamant Asset Management, Diamant Master Fund, Lighthouse Multi-Strategy Fund and Veras Investment Partners. (Trout Trading became Tewksbury Capital in April 2002).

Execs at those funds could not be reached by press time.

The subpoena also requested information on some mutual funds, including: Alger, Alliance, Deutsche Bank, Federated Investors, Invesco, Vanguard, Strong and Massachusetts Financial Services.

Brean Murray formed a "special situations" group in 2001 to help facilitate market timing for some of its hedge fund clients, say people familiar with the company.

TT0006444



## THACHER ASSOCIATES

Michael Grady and Ryan Goldberg were in charge of the group - which had Tewksbury Capital as one of its top clients.

Goldberg and Grady left in April to form their own hedge fund, called Epic Partners. They have been back working at Brean Murray in recent weeks to help the firm comply with the subpoena, say people familiar with the company.

Neither Grady nor Goldberg could be reached for comment.

"We do not believe we have done anything wrong," said A. **Brean Murray,** the company's chairman and CEO. "We have been subpoenaed for information and that's something we have fully complied with."

A SEC spokesman declined to comment.

One of the hedge funds listed in the subpoena - Canary Capital Partners - and its principal, Edward Stern, agreed with New York State Attorney General Eliot Spitzer in early September to pay $40 million to settle charges of late-day trading, which is **illegal,** and market timing, which is generally discouraged by mutual fund prospectuses and is considered a breach of fiduciary duty, because it drives down investor returns.

The ever-widening investigation of mutual funds has uncovered improper practices by a number of money managers and stock brokers and the firms they work for.

Firms have scrambled to fire or suspend almost three dozen execs because of improper trading.

The SEC prohibits late-day trading because it allows investors to take advantage of information that isn't available when a fund's closing price is set each day at 4 p.m.

Market timing, which is rapid in-and-out trading, is discouraged because it can benefit the investors who use it to the detriment of other mutual fund holders.

Widening **investigation**

The SEC has subpoenaed documents from brokerage **Brean Murray** for a **probe** into trading practices. The regulators want documents related to numerous other firms, including the following broker dealers and hedge funds, among others:

Broker Dealers

* Bank of America

* Lehman Brothers

* Bear Stearns

Hedge Funds

* Canary Canadian Imperial Holdings

* Epic Advisors

* Douglas Allen Ram Fund

* Tidewater Capital

22

TT0006445



* Trout Trading
* Peconic Capital
* Diamant

23

TT0006446

**Suits, Liens, Judgments in NY**
No records found

TT0006447

- *The Associated Press.* **May 16, 2006 (See Exhibit Two).** An article entitled, "Stamford Man Gets Three (3) Years In Federal Prison For Defrauding Investors," reports that a former investment named Lorne Caplan banker who worked for Brean Murray Carteret & Co., LLC was sentenced to three (3) years in prison for cheating investors. According to the article, Mr. Caplan pleaded guilty to wire fraud and admitted he improperly took $990,000 in investor funds for his own use.

- *Newsday.* **May 14, 2005 (See Exhibit Three).** An article entitled, "Former Hedge Fund Manager Testifies At Bank Broker's Trial," reports that former hedge fund manager for Canary Capital Partners LLC testified he was told by two (2) people at Brean Murray that a reputable law firm named LeBouef, Lamb, Greene and MacRae advised late trading was legal. It's possible Mr. Stern was told this while prior to Mr. Hozler's leaving Brean Murray in 2004. According to the article, Mr. Stern's late trading was a catalyst for a sweeping investigation of investigations in the mutual fund industry.

- *TheStreet.com.* **February 17, 2005 (See Exhibit Four).** An article entitled, "Brokerage Brean Murray Settles Market-Timing Case," reports that Brean Murray settled charges issued from the SEC that they *"placed thousands of abusive mutual fund trades fro at least five (5) hedge funds between 2001 and 2003."* According to the article, the SEC contended that brokers at Brean Murray engaged in both market-timing and late trading on behalf of their hedge fund customers which included Canary Capital Partners. Brean Murray was fined $150,000 to settle the SEC's enforcement action.

  The article further reports that in September 2004, two (2) former Brean Murray brokers alleged that a lawyer had given them faulty advice it was OK to engage in late trading through Brean Murray's trading platform.

  Harold McGuire, Brean Murray's attorney and a partner with Entwistle & Cappucci said that, "The fact of the matter is there isn't anyone left at Brean Murray who has significant knowledge of these activities." One (1) of those people may be Mr. Hozler who was a high ranking person at this small brokerage firm.

- *The New York Post.* **November 3, 2003 (Exhibit Five).** An article entitled, A Broader View In Brean Murray Request, SEC Eyes Lehman, BOFA," reports that the SEC subpoenaed Brean Murray in their ongoing investigation of improper mutual fund trading practices. According to the article,

  *"New York Attorney General Eliot Spitzer is also looking at the firm say people familiar with his investigation into whether funds allowed select clients to buy and sell shares at prices not available to most investors.*

*The SEC subpoena requests that Brean Murray, a small brokerage house based in Midtown, provide all information related to a number of hedge funds, mutual funds and brokerage firms – including Bank of America, Lehman Brothers and Bear Stearns Securities Corp."*

The article further reports that, *"Brean Murray formed a 'special situations' group in 2001 to help facilitate market timing for some of its hedge fund clients, sapy people familiar with the company."*

It should be noted that Mr. Hozler was still with Brean Murray when this article was published and therefore potentially aware of the activities referenced above. However, Mr. Hozler is not implicated personally in this article or any of the others referenced in the previous bullet points.

TT0006449



THOMAS D. THACHER II
PRESIDENT/CEO

THACHER ASSOCIATES, LLC
330 WEST 42ND STREET, 23RD FLOOR
NEW YORK, NY 10036
TELEPHONE (212)845-7525
FAX (212)845-7510
TDBY@THACHERASSOCIATES.COM

September 10, 2007

Mr. Barry K. Fingerhut
Fingerhut/Holzer Partners, L.L.C.
399 Park Avenue, 32nd Floor
New York, New York 10021

Re:  Ownership/Sale of Properties in New York State

Dear Barry:

This will confirm your retention of Thacher Associates, LLC ("Thacher Associates") in connection with your request that we conduct an analysis and investigation of circumstances surrounding the purported sale to you of an ownership interest in certain properties (the "Properties") located in New York State.

### BACKGROUND

You have advised us that David Holzer, your partner in Fingerhut/Holzer Partners, L.L.C., has informed you that (1) he owns a one-third interest in a partnership called Dellwood Partners, L.P. ("Dellwood"); (2) his partners in Dellwood are Jeffrey L. Schwartz and Daniel Katz, each of whom holds a one-third interest in the partnership; and (3) Mr. Holzer's one-third interest in one of the Properties, located in Haverstraw, New York (the "Haverstraw Property") is about to be sold for approximately $25 million.  You have also advised us that you own one-half of Mr. Holzer's ownership interest in Dellwood.

### SERVICES

You have asked Thacher Associates to undertake an investigation and analysis to determine the bonafides of the above representations by David Holzer.  You have further asked that, based on information obtained in the course of that investigation and analysis, we assist you in taking appropriate steps to remediate any issues identified.  It is anticipated that such assistance will involve, at a minimum, database research, field interviews and ongoing consultation with you and counsel.

### CONFIDENTIALITY

We agree that any and all information and documents received from you, your agents or any other consultant you have retained or will retain relating to this matter are presumptively privileged and confidential.  All information and documents that Thacher Associates or any of our investigative associates or consultants develop during the course of providing these services

TT0006450

Barry Fingerhut
September 10, 2007
Page 2 of 4

 THACHER ASSOCIATES

disclose any information and documents received or developed in connection with this matter unless we have received written authorization from you, or are required by law to do so.

In the event that any third-party, including a governmental entity, attempts to obtain documents or information related to this matter from Thacher Associates, our investigative associates or our consultants, by subpoena, other compulsory process or otherwise, to the extent we are permitted by law under the circumstances to do so, Thacher Associates will immediately notify you of that fact, afford you an opportunity to contest such third-party efforts and otherwise follow your direction with respect to our response. You agree to indemnify us for all costs and expenses reasonably incurred, including both reasonable legal expenses and the costs of Thacher Associates' and our investigative associates' and consultants' time, in responding to any such effort to obtain information or documents from Thacher Associates in connection with this matter.

You agree, however, that nothing herein shall prevent or prohibit Thacher Associates, our investigative associates or consultants from complying with any order of a court of competent jurisdiction, or a government or other official acting within his actual or apparent authority, for the production of documents or the provision of information.

### INDEMNIFICATION

You agree to hold harmless and indemnify Thacher Associates, our investigative associates and consultants, against and pay for all claims, damages and costs (including reasonable attorney's fees and disbursements) arising out of this engagement, except for such claims, damages and costs allegedly arising from any actions by Thacher Associates where it is finally adjudicated that such actions by Thacher Associates, our investigative associates or consultants were illegal, grossly negligent, or were beyond the scope of this engagement.

### FEES AND COSTS

In order to efficiently manage the fees and costs associated with the engagement, we will perform our services in incremental phases, and not proceed to a new phase without first advising you of the anticipated scope and costs of such new phase. We anticipate that the first phase of the engagement ("Phase I") will be comprised of (1) electronic database research regarding Mr. Holzer, Mr. Schwartz, Mr. Katz, Dellwood, and the Haverstraw Property; (2) on-site manual research regarding Dellwood and the Haverstraw Property; and (3) multiple meeting and telephone conferences with you.

Upon completion of Phase I, we will provide you with oral and/or written reports (at your discretion) detailing our findings, and setting forth our recommendations with respect to additional steps ("Phase II") that can be taken in furtherance of your interests. We agree that we will not to take any actions which would cause the total fees of Phase I, excluding expenses and applicable taxes, to exceed $25,000, without first discussing such actions with you.

Should you request that we extend the engagement to include a Phase II, we agree to consult with you regarding the scope and anticipated costs of our services to be provided during Phase II, and to set a maximum fee, excluding expenses and applicable taxes, for Phase II.

TT0006451

Barry Fingerhut
September 10, 2007
Page 3 of 4

 **THACHER ASSOCIATES**

Thacher Associates bills on an hourly basis, plus costs and expenses, in accordance with the attached schedule. Thacher Associates will send its invoices directly to you.

### RETAINER

We ask that you provide us with a $10,000 retainer. The retainer will be held by Thacher Associates and will be applied against our final invoice for services. To the extent any amount remains in the retainer after it is applied against our final invoice, the balance will immediately be returned to you.

### EXECUTION

Your signature below indicates that you agree to engage Thacher Associates under the terms and conditions set forth herein.

We look forward to working with you on this matter.

Sincerely,

Thomas D. Thacher II

**Acknowledged & Agreed:**

BARRY K. FINGERHUT

By: _____   Dated: 9/11/07

TT0006452

Barry Fingerhut
September 10, 2007
Page 4 of 4

 THACHER
ASSOCIATES

## FEE SCHEDULE

Principals (Thacher/DeLuca) ----------------------------------------------425/390

Project Manager (Ornston) --------------------------------------------350

Senior Investigator --------------------------------------------------285

Senior Research Analyst----------------------------------------------200

Analyst ------------------------------------------------------------175

Research Associate --------------------------------------------------150

TT0006453

2887-1

Fingerhut

TT0006454

Project: 2852-1
Assets Identified

| No. | Description | Identifying Number (Serial/Plate/VIN) (if known) | Vehicle Insurance/Loss Payee (if applicable) | Purchase Date (if known) | Purchase Price (if known) | Appraised Value (if known) | Date of Appraisal (if applicable) | Notes | Source Doc.# |
|---|---|---|---|---|---|---|---|---|---|
| 1 | 2003 Mercedes Benz G500 | NY BAX4288; VIN:WDCYR49EX3X143849 | | | | $51,917 | 5/12/2005 | Driver listed as Lesley E. Holzer, Garaged in New City, NY | 8,9,10 |
| 2 | 2004 Mercedes Benz SL500 convertible | NY:43BYS580; VIN:WDBSK75F44F073868 | | | | $88,500 | 5/12/2005 | | 8,9,10,17 |
| 3 | 2005 Aston Martin Vanquish | VIN #:SCFAC24345B501806 | | Spring 2005 | | $296,000 | 5/12/2005 | "agreed value" from Chubb insurance policy document dated 5/12/05 | |
| 4 | 2005 Land Rover LR3 | NY:E2E9281; VIN:SALVA254756A010088 | CAB East LLC Loan #:67877088 | | | $55,000 | 5/12/2005 | Driver listed as Joshua D Holzer, Garage location listed as Buffalo, NY | 8,9,10,17 |
| 5 | 2005 Porsche Cabriolet | VIN #:WP0CB399X5S756645 | | | | $116,250 | 4/2/2007 | | 13,17 |
| 6 | 2005 Porsche Cayenne | VIN #:WP1AC29176LA92302 | Porsche Financial Services, Loan #:50000017233 | | | $89,300 | 5/12/2005 | | |
| 7 | 2006 Land Rover Range Rover | VIN #:SALSH234764A034586 | Sovereign Bank Vehicle Financing Magnum Leasing Corp. | | | $73,980 | 4/2/2007 | | 13,17 |
| 8 | Bulgari Chronometer Watch with black rubber strap | | | | | $5,300 | 6/22/2000 | deleted from Chubb insurance policy 9/10/04 | 6 |
| 9 | Cartier 18k R.G. Demoiselle on bracelet diamond bezel | | | 9/21/2005 | $20,243 | | | | 12 |
| 10 | Cartier Tank Americaine 18K White Gold Men's Watch | | | | | $25,100 | 6/13/2006 | added to Chubb insurance policy 6/13/06 | 14 |

TT0006456

Project: 2852-1
Assets Identified

| No. | Description | Identifying Number (Serial Plate, VIN) (if known) | Vehicle/ Insurance Loss Payee (if applicable) | Purchase Date (if known) | Purchase Price (if known) | Appraised Value (if known) | Date of Appraisal (if applicable) | Notes | Source Doc. # |
|-----|-------------|----------------------------------------------------|------------------------------------------------|--------------------------|----------------------------|----------------------------|-----------------------------------|-------|----------------|
| 11 | Ladies Emerald Cabochon Beads, 9 strands (467 carats) | | | | | $12,500 | 6/7/2005 | | 11 |
| 12 | Men's Chronograph Watch with green leather strap | #BK30500-100590 | | | | $4,900 | 7/21/1994 | deleted from Chubb insurance policy 9/10/04 | 6 |
| 13 | Men's Jaeger LE Coultre Watch with brown ostrich strap | #2270.10.006 | | | | $10,200 | 11/21/1995 | deleted from Chubb insurance policy 9/10/04 | 6 |
| 14 | Rolex Daytona Oyster Perpetual Swiss Wrist Watch 18K gold bracelet, silver arabic dial, sapphire crystal | Serial: Z276016A Style: 116509/71437849 | | | | $22,000 | 11/21/2006 | | 16 |
| 15 | Rolex GTS White | | | | | $10,600 | | sold to Tourneau on 9/2/04 when purchasing Yachtmaster | 6 |
| 16 | Rolex Yachtmaster | Serial: F089392 Style:R166286508/7676 | | 9/2/2004 | $19,200.00 | $19,200 | | added to Chubb Insurance policy 9/10/04 | 6 |
| 17 | Vacheron Constantin 18K RG Chronograph Watch with crocodile strap | | | | | $18,711 | 7/28/2004 | added to Chubb Insurance policy 7/28/04 | 3 |

TT0006457

Project: 2852-1
David Holzer: Documents Index

| No. | Description | Document Date (if known) | Time Period Covered from | Time Period Covered to | Account Number (if applicable) | Individuals on Account (if applicable) | Total Pages |
|---|---|---|---|---|---|---|---|
| 1 | American Express Platinum Card; 2004 Year-End Summary; addressed to Jennifer Holzer | Feb-05 | 1/1/2004 | 12/31/2004 | Account #: 3713-880330-14002 (includes activity for card no's: 3713-880330-13020 and 3713-880330-13517) | Jennifer Holzer; David Holzer; Lesley Holzer | 28 (double-sided) |
| 2 | American Express Platinum Card; 2005 Year-End Summary; addressed to Jennifer Holzer | Feb-06 | 1/1/2005 | 12/31/2005 | Account #: 3713-880330-14002 (includes activity for card no's: 3713-880330-13020 and 3713-880330-13517) | Jennifer Holzer; David Holzer; Lesley Holzer | 17 (double-sided) |
| 3 | Chubb Masterpiece Policy Coverage Update | 7/28/2004 | 6/13/2004 | 6/13/2005 | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 4 | Chubb Masterpiece Policy Rate Sheet | 9/1/2004 | - | - | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 5 | Chubb Masterpiece Policy Coverage Update | 9/2/2004 | 6/13/2004 | 6/13/2005 | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 6 | Lawley Richwood Letter Re: Addition of Watches to Policy | 9/10/2004 | 6/13/2004 | 6/13/2005 | Policy #: 12170325-01 | David M. Holzer | 4 |
| 7 | Lawley Richwood Letter Re: Changes to Chubb Auto & Homeowner's Policy | 5/6/2005 | 6/13/2005 | 6/13/2006 | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 2 |
| 8 | Lawley Richwood "Authorization for Physical Damage Coverage Mandatory Photo Inspection" Notices (for 2004 Mercedes SL500; 2005 Land Rover LR3; 2003 Mercedes G500) | 5/6/2005 | - | - | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 3 |
| 9 | Chubb Vehicle Detail Premium Update | 5/12/2005 | 4/21/2005 | 4/21/2006 | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 5 (double-sided) |
| 10 | New York State Vehicle Inspection Reports (for 2004 Mercedes SL500; 2005 Land Rover LR3; 2003 Mercedes G500) | 5/19/2005 | - | - | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 3 |

TT0006458

Project: 2852-1
David Holzer: Documents Index

| No. | Description | Document Date (if known) | Time Period Covered from | Time Period Covered to | Account Number (if applicable) | Individuals on Account (if applicable) | Total Pages |
|---|---|---|---|---|---|---|---|
| 11 | Fax from David Holzer to Sandy (@ Lawley Richwood) Re: Addition to "personal items" with Appraisal for jewelry attached | 6/7/2005 | - | - | - | David Holzer | 2 |
| 12 | Fax from David Holzer to Sandy (@ Lawley Richwood) Re: Adding watch to "our personal items" - with Receipt attached | 9/21/2005 | - | - | - | David Holzer | 3 |
| 13 | Chubb Vehicle Premium Update | 4/21/2006 | ? | ? | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 1 (double-sided; missing page) |
| 14 | Chubb Masterpiece Policy Coverage Update | 6/13/2006 | 6/13/2006 | 6/13/2007 | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 15 | Chubb Masterpiece Policy Rate Sheet | 6/13/2006 | - | - | Policy #: 12170325-01 | David M. Holzer & Lesley E. Holzer | 1 |
| 16 | Fax from David Holzer to Sandy (@ Lawley Richwood) Re: Adding Rolex to "floater policy" -- with Appraisal attached | 11/21/2006 | - | - | - | David Holzer | 2 |
| 17 | Chubb Auto Insurance Policies (Vehicle ID Cards and Premium Summary Renewal) | 2/21/2007 | 4/21/2007 | 4/21/2008 | Policy #: 12170325-03 | David M. Holzer & Lesley E. Holzer | 28 (double-sided) |

TT0006459

Project: 2852-1
David Holzer
Insurance Policies Identified

| Policy Number | Insurance Agent | Insurance Provider | Type of Policy | Annual Premium | Additional Information |
|---|---|---|---|---|---|
| 12170325-01 | Lawley Richwood (Hawthorne, NY) | Chubb | Homeowner's | $9,000/year | |
| 12170325-02* | | *Chubb* | | | *no sign of a policy with this number, but assume it may exist or have existed at one point* |
| 12170325-03 | Lawley Richwood (Hawthorne, NY) | Chubb | Auto Insurance | $11,000+/year | |
| 12170325-04 | Lawley Richwood (Hawthorne, NY) | Chubb | Excess Liability | | Issued May 2005; described as a "$10,000,000 excess liability policy issued over 2 locations and five vehicles" |

TT0006460

American Express Account #s Identified

| American Express Account Number | Name on Account | Period Active | Notes |
|---|---|---|---|
| 3713-880330-14002 | Jennifer Holzer | 2004-2005 | All three cards linked via single Amex Platinum Card Account; have 2004 and 2005 Year-End Summaries |
| 3713-880330-13020 | David Holzer | 2004-2005 | |
| 3713-880330-13517 | Lesley Holzer | 2004-2005 | |

| | | | |
|---|---|---|---|
| 3717-500471-21026 | David Holzer | 2005? | Have single receipt showing large purchase on 9/21/05 |

TT0006461

| No. | Description | Document Date (if known) | Time Period Covered from | to | Account Number (if applicable) | Individuals on Account (if applicable) | Total Pages |
|-----|-------------|--------------------------|--------------------------|-----|--------------------------------|----------------------------------------|-------------|
| 6 | Lawley Richwood Letter Re: Addition of Watches to Policy | 9/10/2004 | 6/13/2004 | 6/13/2005 | Policy #: 12170325-01 | David M. Holzer | 4 |

TT0006462

3

[Page 1]

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

------------------------------------x

JOHN RAPILLO AND HEIDI RAPILLO,

Plaintiffs,

Civil Action No.

09-CV-10429

-against-

(GBD)

BARRY FINGERHUT, DAVID HOLZER,

FINGERHUT-HOLZER PARTNERS, LLC,

FINGERHUT-HOLZER EQUITIES, INC.,

FINGERHUT-HOLZER, INC., FINGERHUT-

HOLZER FUND L.P., GEO CAPITAL

PARTNERS, INC., FINGERHUT-HOLZER

THE WAVERLY I, LLC, FINGERHUT-

HOLZER THE WAVERLY II, LLC,

LESLIE HOLZER, DOUGLAS HOLZER,

JENNIFER HOLZER, JOSHUA HOLZER

and JOSEPH HOLZER,

Defendants.

------------------------------------x

February 7, 2013

11:00 a.m.


Deposition of BARRY FINGERHUT, taken by

Plaintiffs, pursuant to notice, at the offices

of Folkenflik & McGerity, 1500 Broadway, New

York, New York, before SUZANNE PASTOR, a

Shorthand Reporter and Notary Public within and

for the State of New York.

1    A P P E A R A N C E S:
2
3    MARSHALL, CONWAY & BRADLEY, P.C.
    Attorneys for Plaintiffs
    45 Broadway
4    New York, New York 10006
5    BY:  ROBERT J. CONWAY, ESQ.
    (212) 619-4444
6    rconway@mcwpc.com
7
   FOLKENFLIK & McGERITY, LLP
8    Attorneys for Defendants and the Witness
    1500 Broadway
9    New York, New York 10036
10    BY:  MAX FOLKENFLIK, ESQ.
    (212) 757-0400
11    mfolkenflik@fmlaw.com
12
13    ALSO PRESENT:
14    JOHN RAPILLO
15    HEIDI RAPILLO
16
17
18
19
20
21
22
23
24
25

[Page 2]

---

1    A.   July 2nd, 1945.
2    Q.   And your social security number?
3    A.   Social security number?
4      MR. FOLKENFLIK: We object. Unless
5 there's a reason for it.
6      MR. CONWAY: I always ask pedigree.
7      MR. FOLKENFLIK: That doesn't
8 matter. We'll object. We'll talk about giving
9 you the social security number in a confidential
10 submission in the event that it becomes
11 important. As you know, if this document were
12 ever submitted to the court, you'd have to
13 redact it anyhow.
14      MR. CONWAY: What we can do is ask
15 the reporter to include on it the last four
16 digits --
17      MR. FOLKENFLIK: Those are the four
18 digits that contain all the useful information.
19 So the answer is respectfully no. I decline.
20 You can ask the judge.
21    Q.   What is your country of origin,
22 sir?
23    A.   My country of origin?
24    Q.   Of origin.
25    A.   The U.S. But it's Washington, D.C.

[Page 4]

---

1      BARRY FINGERHUT,
2 residing at 7884 East Clinton Drive, Scottsdale,
3 Arizona 85260, having been first duly sworn by
4 the Notary Public (Suzanne Pastor), was examined
5 and testified as follows:
6 EXAMINATION BY
7 MR. CONWAY:
8    Q.   Mr. Fingerhut, I'm going to ask you
9 a number of questions. If any of those
10 questions are unclear, please feel free to say
11 so.
12      Sir, the address is 1230 West
13 Washington Street, Tempe, Arizona, that is a
14 business for you?
15    A.   Yes.
16    Q.   Could I have your residence address
17 there?
18    A.   7884 East Clinton Drive, that's in
19 Scottsdale 85260.
20    Q.   All right, sir, how old are you
21 today?
22    A.   How old am I today?
23    Q.   Yes.
24    A.   67.
25    Q.   And your date of birth?

[Page 3]

---

1 I'm not sure what that is.
2    Q.   That may not be ours.
3    A.   That's right. That's where I was
4 born.
5    Q.   Where were you educated, sir?
6    A.   Where was I educated?
7    Q.   Yes.
8    A.   Undergraduate school at the
9 University of Maryland, and then graduate at
10 NYU. That's an MBA.
11    Q.   What did you study at Maryland?
12    A.   At Maryland?
13    Q.   Yes.
14    A.   I had a BS degree.
15    Q.   In what? Math, science?
16    A.   Actually, pre law. Then I made the
17 right decision. Got an MBA instead.
18    Q.   If this weren't a transcript, I'd
19 agree with you.
20      And where did you find employment
21 after you left NYU?
22    A.   My initial job was at Aetna Life
23 and Casualty.
24    Q.   In what capacity?
25    A.   I was an investment analyst.

[Page 5]

---

[2]  (Pages 2 to 5)

**[Page 6]**

1　Q.　What year was that?
2　A.　1969.
3　Q.　And for how long did you remain
4　with Aetna?
5　A.　Two years. 1971 I came back to New
6　York, worked for a firm called Weiss, Peck &
7　Greer.
8　Q.　Is Weiss Peck one word?
9　A.　No, two words.
10　Q.　And what was the business of Weiss,
11　Peck & Greer?
12　A.　They were investment advisors,
13　specialists and venture capitalists.
14　Q.　For how many years were you with
15　Weiss Peck?
16　A.　Let me see, I left Weiss Peck in
17　'78. I joined them in '71, so I guess that was
18　seven years. Then I went to a firm called First
19　Manhattan Company. And I left them --
20　Q.　Was that a bank or a private
21　investment house?
22　A.　It was an investment advisory firm.
23　And broker. Mainly investment advisory.
24　Q.　Had you become a broker at any
25　time?

**[Page 7]**

1　A.　No. Well, I shouldn't say that. I
2　passed the exams that you need -- well, that's
3　not really brokerage. It's really a -- it's a
4　Wall Street partnership, it's a GS65 I think.
5　Whatever it is. It's a capital --
6　Q.　Were you working off someone else's
7　license or the firm license?
8　A.　No, no. I just needed to pass this
9　to become a general partner. But it was really
10　an advisory firm.
11　Q.　Did you ever yourself practice as a
12　broker?
13　A.　No. I'm not a broker.
14　Q.　And for how many years were you
15　with First Manhattan?
16　A.　I left there in the spring of 1981
17　to join a partner at a firm called Geo Capital
18　Corp. That is a registered investment advisory
19　firm. We sold the firm in 1997. I needed to
20　stay --
21　MR. FOLKENFLIK: Just wait until he
22　asks a question.
23　Q.　To whom was that firm sold in 1997?
24　A.　Affiliated Managers Group. AMG is
25　the ticker symbol.

**[Page 8]**

1　Q.　Did Geo Capital cease to exist at
2　that point or did it remain a legally viable
3　entity?
4　A.　When it was sold you mean?
5　Q.　Yes.
6　A.　No. It was sold and controlled
7　by -- or owned I should say by AMG. And part of
8　the deal was that I needed to stay for a certain
9　period of time, which I did, until 2003 I think.
10　Q.　Now, did Geo Capital have an
11　investment specialty? Oil, technologies,
12　foreign, whatever it may be.
13　A.　We did.
14　Q.　What was that specialty?
15　A.　We were small cap investors. And I
16　was an asset -- the asset investor, if you will.
17　Q.　Did Geo Capital invest with its own
18　money or clients' money?
19　A.　No, no, it was an advisory firm.
20　It wasn't our capital. It was all clients.
21　Q.　Did you have any affiliation with
22　any other investment firm that did directly own
23　stocks or equities or bonds or anything of that
24　nature?
25　A.　I'm not sure what you mean by

**[Page 9]**

1　"relationship."
2　Q.　While you were working for Geo
3　Capital, did you have any sideline occupations
4　or investments?
5　A.　The only thing that we did
6　separately was, this is another entity, but my
7　partner and I with another partner formed an
8　operation called Weekly Partners, which was a
9　venture fund, or a venture partnership I should
10　say. We now have seven partnerships in Weekly
11　Partners. That was started in '92.
12　Q.　All right, and that's still an
13　operational business?
14　A.　Yeah, but the business is -- I
15　mean, the funds are ending.
16　MR. FOLKENFLIK: He'll ask a
17　question. You just answer his question.
18　Q.　And who were the people with whom
19　you founded Weekly?
20　A.　One was my partner at Geo, his name
21　was Irwin Lieber. And the other was Barry
22　Rubinstein.
23　Q.　Now, when Geo was purchased, did
24　you move on to a different professional vehicle?
25　MR. FOLKENFLIK: He already

[3]　(Pages 6 to 9)

```
1    answered that he stayed with Geo Capital for
2    seven years.
3        Q.   Yes, you stayed with Geo.  When Geo
4    was sold --
5            MR. FOLKENFLIK:  After it was sold
6    he stayed.
7        Q.   After it was sold did you continue
8    to stay with Geo?
9        A.   Yes.  I couldn't leave.  That was
10   part of the deal.
11       Q.   So you stayed until 2005?
12       A.   No.  Late 2003 or 2004.
13       Q.   And did you leave by mutual
14   agreement?
15           MR. FOLKENFLIK:  He sold the
16   business.
17       Q.   You then sold the remainder of the
18   business that was yours.
19           MR. FOLKENFLIK:  He sold the entire
20   business and he had to stay on as part of the
21   contract.
22       A.   That was the deal.
23       Q.   So if the contract extended for
24   seven years and you leave in 2003, you would
25   have left in five years.  I presume -- you left
```

[Page 10]

```
1    by agreement --
2        A.   It was '97 when we sold it.  Then I
3    think I left in maybe it was early 2004.  But it
4    was around that time.
5        Q.   All right, your contract with
6    them -- your obligations to them expired.
7        A.   Correct.
8        Q.   What did you then do?
9        A.   I formed what I thought was a
10   family partnership.
11       Q.   With whom?
12       A.   With David Holzer.
13       Q.   And what year was that?
14       A.   2004 I believe.
15       Q.   We have been sent a document
16   identified as the Fingerhut-Holzer Fund LP
17   Limited Partnership agreement dated October 1 of
18   2004.  Does that sound like the organization
19   that you founded at that time?
20       A.   That was I think an entity.
21       Q.   Why don't you take a look at that.
22           (Fingerhut Exhibit 1 for
23   identification, Bates No. BF 90 through 112)
24       Q.   Sir, can you identify that document
25   that's been passed to you?
```

[Page 11]

```
1        A.   Yes.
2        Q.   And what is that document?
3        A.   What is it.
4        Q.   Yes.  What was it intended to be?
5        A.   It was a partnership agreement to
6    do a limited partnership, an investment vehicle.
7        Q.   And is that the memorialization of
8    an arrangement between yourself and David Holzer
9    for the operation of a business known as
10   Fingerhut-Holzer Partners?
11           MR. FOLKENFLIK:  Excuse me.  Its'
12   Fingerhut-Holzer Fund LP.  Correct?
13           MR. CONWAY:  Yes.
14           MR. FOLKENFLIK:  Fingerhut-Holzer
15   Fund LP.
16       Q.   Is there a Fingerhut-Holzer
17   Partners LLC document?
18       A.   Here?  I don't see it here.
19       Q.   Does one exist?
20       A.   I believe so.
21       Q.   And where would that be?
22       A.   Probably by your left hand.
23       Q.   What I have is the operating
24   agreement of October 25th, 2007.
25       A.   I don't know.  I don't know the
```

[Page 12]

```
1    answer to that.
2            MR. FOLKENFLIK:  I will represent
3    that we contacted the, for want of a better
4    word, corporate lawyers who were representing
5    Mr. Fingerhut in connection with the formation
6    of a number of these businesses and whatever
7    documents they were able to find about the
8    organizational structure of the Fingerhut-Holzer
9    entities we produced.
10           MR. CONWAY:  All right, now, by
11   counsel, was that lawyers who were responsible
12   for the drafting of the document in 2004?
13           MR. FOLKENFLIK:  Either responsible
14   for the drafting of the document in 2004 or
15   successors to the person who drafted the
16   document.
17       Q.   Let me ask you this.  Sir, what law
18   firm drafted the initial arrangement between
19   yourself and Mr. Holzer?
20       A.   I don't remember the name.  I mean,
21   it's on the document.
22           THE WITNESS:  Do you remember the
23   name?
24           MR. FOLKENFLIK:  No.
25       Q.   Was there --
```

[Page 13]

[4]  (Pages 10 to 13)

1    A.    They're on Third Avenue and 54th
2  Street, I know that. But I don't remember the
3  name.
4        MR. CONWAY:   Counselor, if you
5  could, is there anything --
6        MR FOLKENFLIK:   If you want the
7  name of the firm I contacted, leave a space in
8  the transcript and I'll supply it to you.
9  INFORMATION REQUESTED TO BE SUPPLIED:
10    Law Firm Hired to Draft Corporate Documents
11    Q.    Now, in 2004, did you determine to
12  open a business with David Holzer?
13    A.    I just told you.
14    Q.    And you indicated that you thought
15  that was a family business.
16    A.    A family business to the extent
17  that it was only us making investments.
18    Q.    By "us" do you mean you and
19  Mr. Holzer?
20    A.    Mm-hmm. I thought so.
21    Q.    Excuse me?
22    A.    At least I thought so at the time.
23    Q.    And when and where did you meet
24  Mr. Holzer for the first time?
25    A.    Oh, lord. Probably -- well, he was

[Page 14]

1  a trader for Breen Murray and I was doing
2  business with Breen Murray probably about the
3  time I joined Irwin in Geo Capital. That's like
4  early '80s. So it was 22 -3 years.
5    Q.    Sure. You finish and then I go.
6  You had known him for two or three years?
7    A.    23 years.
8    Q.    And had Mr. Holzer been involved in
9  business transactions with you over those 23
10  years?
11    A.    Mr. Holzer was a broker I used in
12  buying securities and selling securities in Geo
13  Capital as us being a registered advisor.
14    Q.    During the 23 years you knew him
15  prior to the creation of Fingerhut-Holzer
16  Partners, had you ever been aware of any
17  criminal investigations involving Mr. Holzer by
18  any authority?
19    A.    No.
20    Q.    Had you ever heard of any lawsuits
21  filed against him for his work or the manner in
22  which he operated as a broker.
23        MR. FOLKENFLIK:   And this is in
24  what period?
25    Q.    In the 23 years prior to the

[Page 15]

1  founding of Fingerhut-Holzer Partners.
2    A.    No.
3    Q.    Did the two of you develop a social
4  relationship during those 20 years in addition
5  to being --
6    A.    Yes. But it was primarily
7  business. I mean. I knew his family.
8    Q.    You saw each other on occasion, but
9  it was principally business.
10    A.    It was pretty rare.
11    Q.    When you saw each other socially,
12  what type of relationship did you have? Dinner,
13  traveling?
14    A.    I think it was dinner a couple of
15  times. But we -- well, it wasn't at that point.
16  Later there was a safari we went on. But that
17  wasn't until after 2004.
18    Q.    Now, what prompted you prior to
19  2004 to select David Holzer to go into business
20  with?
21    A.    Well, I talked to him every day,
22  probably every business day a few times. Got to
23  know him pretty well, thought he was -- I
24  thought he was a pretty good trader. You gotta
25  understand what trading meant back then.

[Page 16]

1    Q.    All right, tell me what trading
2  meant back then.
3    A.    Well, first of all, you have to
4  understand that the types of positions that we
5  owned were small companies. Relatively
6  illiquid. We used initially a base of -- a top
7  of a hundred million in market value, so as we
8  got larger we owned more and more different
9  companies. Got to a point where we had -- we
10  filed 13Gs, which are 5 percent or greater as an
11  advisor, not as an independent person, on about
12  40 companies.
13        So buying and selling securities
14  was important in the sense of who you used, what
15  firm you used, how deep they made the market, et
16  cetera. It was not like buying IBM, that kind
17  of stuff.
18    Q.    Mm-hmm.
19    A.    Pretty much continues to be like
20  that now.
21    Q.    Now, the 40 companies would have
22  been owned by Geo Capital?
23    A.    No, they would be owned by the
24  clients of Geo Capital. We managed money, when
25  I started we were about -- when I joined my

[Page 17]

**[Page 18]**

1  partner we had about 60 million under
2  management.
3    Q.   So --
4    A.   When we sold we were about -- well,
5  by the time I left in 2004, we were about 3
6  billion.
7    Q.   So Geo was essentially a management
8  company that --
9    A.   Investment advisory firm.
10   Q.   Investment advisory. And clients
11  would place money with you to be invested based
12  upon your best judgment, but the money continued
13  to be the clients'. It was not your money.
14   A.   Correct. Clients made a fee for us
15  to manage their money.
16   Q.   And at its height Geo managed how
17  large a total --
18   A.   About 3 billion.
19   Q.   And that would be 3 billion in
20  2003?
21   A.   Yeah, 2003/2004. When we sold it
22  was about -- in '97 it was like two and a
23  quarter billion. This, by the way, is a large
24  amount for smaller cap. You should know.
25   Q.   Now, when you severed your

**[Page 19]**

1  relationship with Geo Capital, you were then
2  opening a new venture for yourself?
3    A.   Yes.
4    Q.   And were you intending to in the
5  venture invest your own money or also
6  clients' --
7    A.   My own money.
8    Q.   Principally your own or investors'
9  money?
10   A.   I'm sorry.
11   MR. FOLKENFLIK: He just answered
12  the question.
13   Q.   You were planning to invest your
14  own money in Fingerhut-Holzer Partners?
15   MR. FOLKENFLIK: Answer out loud.
16  Don't just shake your head.
17   Q.   You have to answer orally so that
18  the --
19   A.   Yes.
20   Q.   Now, was it also your intent under
21  Fingerhut-Holzer Partners to invest for other
22  people and guide their --
23   A.   Not necessarily. That was not my
24  initial idea. I could have stayed at Geo for
25  that.

**[Page 20]**

1    Q.   At the time that you were looking
2  for a partner --
3    MR. FOLKENFLIK: Objection.
4    Q.   At the time you were setting up
5  your next venture after Geo --
6    A.   I already had a next venture. I
7  had Weekly at this time, too.
8    Q.   Weekly also. For what particular
9  purpose were you setting up a venture with
10  Mr. Holzer? What was different from
11  Fingerhut-Holzer than from Weekly?
12   A.   Weekly we didn't -- this was not
13  our money in Weekly. Weekly was a limited
14  partnership. The difference being -- you know
15  the difference between an advisory firm and a
16  partnership.
17   Q.   Yes.
18   A.   So in Weekly we could be both
19  general partners and to a certain extent limited
20  partners. But we were essentially managing
21  other people's money also in Weekly. In that
22  case it was primarily institutional money.
23  Actually so was Geo. But Fingerhut-Holzer was
24  just family monies.
25   Q.   Fingerhut-Holzer was to be the

**[Page 21]**

1  vehicle for the investment of your own money.
2    A.   Correct.
3    Q.   Now, did there come a time when you
4  and Mr. Holzer came to an oral agreement to set
5  up a firm together? This is before you sit down
6  with lawyers, did you agree to do business
7  together?
8    A.   Yes.
9    Q.   Did Mr. Holzer have a similar sum
10  of money to invest in Fingerhut-Holzer Partners
11  as did you?
12   A.   I don't know what he had, but he
13  certainly gave me the impression that he had
14  capital. I didn't ask him the specific number.
15   Q.   And when you agreed to go into
16  business together, did the two of you
17  subsequently sit down with lawyers for the
18  purpose of drafting a document to memorialize
19  your arrangement?
20   A.   Yes.
21   Q.   All right, and do you at this time
22  remember the name of the lawyers that you sat
23  down with?
24   A.   It's the same group I just
25  mentioned that I don't remember the name.

**[Page 22]**

```
 1         MR. FOLKENFLIK: Well, we had
 2   received materials from Manning Fulton --
 3         THE WITNESS: That's Kevin. That's
 4   his new firm.
 5         MR. FOLKENFLIK: And Fulton &
 6   Skinner PA. Pardon me?
 7         THE WITNESS: That's not the guys
 8   who set it up. This is the guy from North
 9   Carolina who I've used now for about 12, 15
10   years.
11      Q.   Are you still doing business with
12   him?
13      A.   Not the guys who set up the fund.
14   The firm. Those were a different group. This
15   is a guy I've used now for just about everything
16   I've done since I don't know how long. It's a
17   long time.
18      Q.   Manning Fulton & Skinner is the law
19   firm in North Carolina?
20         MR. FOLKENFLIK: Yes.
21         MR. CONWAY: Do we have an address,
22   by counsel?
23         THE WITNESS: He just moved there
24   last week. He was with Williams & Mullin. Do
25   you know that firm?
```

**[Page 23]**

```
 1      Q.   No.
 2      A.   He's in Raleigh.
 3         MR. FOLKENFLIK: He's in Raleigh,
 4   North Carolina.
 5      Q.   The gentleman who you followed to
 6   Manning, Fulton & Skinner, what was his name?
 7      A.   Kevin Prakke, P-R-A-K-K-E.
 8      Q.   And he was with the law firm that
 9   set up Fingerhut-Holzer Partners?
10      A.   No. He was the one who I have used
11   for a long time. The guys who set up that, I
12   don't remember their names, as I've said
13   already.
14      Q.   They were also in North Carolina?
15      A.   No. They were on Third Avenue in
16   the 50s. But I don't remember their name.
17   Obviously that was --
18      Q.   Forgive me just for checking my
19   records.
20         If we leave a blank in the records,
21   do you think you'll be able to find the --
22      A.   I should.
23   INFORMATION REQUESTED TO BE SUPPLIED:
24      Law Firm Representing Fingerhut-Holzer
25   Partners
```

**[Page 24]**

```
 1      Q.   Do you know if that firm on Third
 2   Avenue in New York in the 50s is still an
 3   operating entity?
 4      A.   I think so. I think so.
 5      Q.   Now, do you recall if you and
 6   Mr. Holzer sat down together to discuss the
 7   arranging of Fingerhut-Holzer Partners?
 8      A.   I believe so.
 9      Q.   And was there eventually prepared a
10   document which announced the existence of a
11   relationship between yourself and Mr. Holzer as
12   business partners?
13         MR. FOLKENFLIK: Announced?
14      Q.   Not announced. Created.
15   Established.
16         MR. FOLKENFLIK: Do you mean was
17   there an operating agreement?
18      Q.   Well, first, was there a document
19   that was prepared that indicated an ongoing
20   arrangement between yourself and Mr. Holzer to
21   do business together?
22      A.   My assumption is yes. The LLC was
23   set up for that reason.
24      Q.   And there was a Fingerhut-Holzer
25   Partners LLC. Was that set up in Delaware or in
```

**[Page 25]**

```
 1   New York?
 2      A.   It was set up on Third Avenue. I
 3   don't know where the hell it was. Either one.
 4   I think it was Delaware actually.
 5      Q.   Your operating agreement of 2007
 6   refers to a Delaware limited liability company.
 7      A.   Okay. Good guess. You don't have
 8   the law firm there?
 9      Q.   I believe Mr. Holzer used the name
10   of a law firm in his deposition. I do not have
11   his deposition transcript with me. But he may
12   have identified it.
13         MR. FOLKENFLIK: I don't believe he
14   did. I just reread it yesterday.
15         MR. CONWAY: He may not have used
16   the name. I remember him saying there was a law
17   firm in New York that did their work. He may
18   not have included the name.
19         MR. FOLKENFLIK: That's the law
20   firm Mr. Fingerhut is referring to on Third
21   Avenue I believe.
22      Q.   When a corporation was set up in
23   Delaware --
24      A.   I think this is LLC.
25      Q.   When a limited liability
```

1  corporation was set up known as Fingerhut-Holzer
2  Partners, was there an arrangement for each of
3  you to share in that corporation?
4      MR. FOLKENFLIK: That arrangement
5  is reflected in the operating agreement. Which
6  we've produced to you.
7      MR. CONWAY: Dated October 25th,
8  2007.
9      Q.  For the period prior to 2007, was
10 there an agreement between the two of you to
11 share in the investments and in the profits of
12 Fingerhut-Holzer Partners?
13     A.  I can't tell you. I don't
14 remember.
15     Q.  When you went into business with
16 Mr. Holzer, what was the arrangement that you
17 understood to be memorialized in the
18 corporation?
19     MR. FOLKENFLIK: Go ahead.
20     A.  I think it was fairly
21 straightforward. It was both of us investing,
22 and in one way or another, I don't remember
23 exactly, sharing the profits. But again, this
24 was essentially a family office.
25     Q.  Now, by both investing, was the

[Page 26]

1  intention that each of you would produce the
2  same amount of money to invest?
3      A.  Not necessarily.
4      Q.  Was it understood that each of you
5  would benefit equally from the good work of
6  Fingerhut-Holzer Partners?
7      MR. FOLKENFLIK: What does that
8  mean?
9      A.  I don't understand that.
10     MR. FOLKENFLIK: Objection.
11     Q.  Would you each take profits on a
12 50/50 basis?
13     A.  I think it was basically only --
14 there were no profits per se that would be
15 outside of the monies managed. If you see what
16 I'm saying.
17     Q.  Yes, I do.
18     A.  The profits would be a function of
19 how much you had in it. And you should
20 understand that I was the one who was the
21 investor.
22     Q.  We're just about to get there.
23         Was there a division of
24 responsibility between the two of you in the
25 operating of Fingerhut-Holzer Partners?

[Page 27]

1      A.  I was the one who was the investor.
2      Q.  By using the term "investor" you
3  were the one who picked the investments and
4  decided what sums were to be invested?
5      MR. FOLKENFLIK: Answer out loud.
6      A.  Yes, I was, yes, yes.
7      Q.  And what function did Mr. Holzer
8  serve?
9      A.  Basically was doing the trading.
10     Q.  Now, in the furtherance of this
11 business, did you open a place of business?
12     A.  We had an office.
13     Q.  And where was that?
14     A.  The initial office was in Citicorp
15 Center.
16     Q.  In the Citicorp building?
17     A.  Mm-hmm.
18     Q.  For how long were you in the
19 Citicorp building?
20     A.  That's a good question. Long after
21 Fingerhut-Holzer, but let's see, it was 2004 I
22 guess we were there. And then I left. We
23 subleased from Park Avenue Equities.
24     Q.  Was that the premises at 399 Park
25 Avenue?

[Page 28]

1      A.  Yes. And they moved in -- I think
2  they moved in 2006 maybe. 2006. To 149 East
3  49th Street, just south of Saks where I leased
4  space.
5      Q.  149?
6      A.  David wasn't there at that time.
7      Q.  149 East 49th Street?
8      A.  Yes, I think it was 149. Maybe 140
9  East 49th. Beautiful building.
10     Q.  And that would be after
11 Mr. Holzer's difficulties.
12     A.  He was gone. But until that time I
13 was at Citicorp.
14     Q.  Do you recall when you opened the
15 premises at 399 Park Avenue?
16     A.  It was sometime around that time,
17 2004.
18     Q.  Now, what was the division of
19 operations between the Citicorp building and 399
20 Park Avenue? What did you do in each place?
21     A.  399 Park was the Citicorp Center.
22     Q.  I'm sorry.
23     A.  You mean the other one?
24     Q.  Yes.
25     A.  Same thing.

[Page 29]

[8]  (Pages 26 to 29)

```
 1      Q.   What did you do in the two places?
 2           MR. FOLKENFLIK: They didn't -- I
 3   don't believe, but you ask the witness, that
 4   they had both offices simultaneously.
 5      A.   No, no, we didn't.
 6           MR. FOLKENFLIK: They just moved.
 7   They moved their office.
 8      A.   It wasn't "we," it was me going to
 9   49th Street when the guy --
10      Q.   When David left.
11      A.   No. When Bill Mayer ran Park
12   Avenue Equities moved his office to 140 East
13   49th Street. So I went with him. That's all.
14   Citicorp wanted $125 a square foot rent.
15   Ridiculous.
16      Q.   Now, when you're referring to the
17   Citicorp building and 399 Park Avenue, you're
18   referring to the same office?
19      A.   Yes.
20      Q.   And the signage at 399 Park Avenue,
21   that was Fingerhut-Holzer Partners?
22      A.   Yes.
23           MR. FOLKENFLIK: LLC?
24      A.   LLC.
25      Q.   LLC. And how large a space was

                              [Page 30]
```

```
 1   that?
 2      A.   Good question. I'd say 2500 square
 3   feet, something like that. The office in total
 4   was maybe twice that size, but we only occupied
 5   part of that office.
 6      Q.   Did you have a superior landlord?
 7      A.   I didn't think he was that good. A
 8   superior landlord. We subleased.
 9      Q.   Subleased from whom?
10      A.   From Park Avenue Equities.
11           MR. FOLKENFLIK: Do you mean to ask
12   who was the master lessor?
13      Q.   Yes, that's fine.
14           MR. FOLKENFLIK: If you know.
15      A.   I don't think it was -- this was a
16   very odd situation. They subleased from another
17   group, I don't remember the name of the other.
18   From my perspective, I only subleased from Park
19   Avenue Equities.
20      Q.   Do you know if there still exists a
21   lease for Fingerhut-Holzer Partners LLC for that
22   space?
23      A.   There wasn't a lease when we
24   left -- when I left Citicorp Center.
25      Q.   All right, was this a handshake

                              [Page 31]
```

```
 1   agreement between you?
 2      A.   Yes.
 3      Q.   Who were you shaking hands with?
 4      A.   Bill Mayer. In fact, I use his
 5   office now when I come to the city. He's moved
 6   again.
 7      Q.   Now, would you describe the space
 8   that you tenanted at 399 Park Avenue? How many
 9   offices, file rooms, conference rooms?
10           MR. FOLKENFLIK: Let me say,
11   Mr. Conway, I recognize that under the federal
12   rules the way to respond to questioning that is
13   irrelevant is to terminate the deposition and
14   seek a court order. But you have --
15           MR. CONWAY: Not with a guy in
16   Arizona.
17           MR. FOLKENFLIK: You have requested
18   the witness to come from out of town and these
19   questions have less than zero to do with the
20   claims in this case.
21           MR. CONWAY: They don't.
22           MR. FOLKENFLIK: As to what the
23   file room looked like.
24           MR. CONWAY: No, no, the
25   question --

                              [Page 32]
```

```
 1           MR. FOLKENFLIK: All of these
 2   questions --
 3           MR. CONWAY: The question is what
 4   did the office look like.
 5           MR. FOLKENFLIK: And that has zero
 6   to do with the facts at issue in the case. I'm
 7   just mentioning it because there may come a time
 8   when I will terminate the deposition and we'll
 9   move on.
10      A.   There were three -- basically three
11   offices and then like a secretarial area for a
12   couple desks.
13      Q.   And who were the employees of
14   Fingerhut-Holzer Partners LLC?
15      A.   Well, the most important was Jackie
16   Cohen, who was my secretary,
17      Q.   Did you maintain an office there
18   for yourself?
19      A.   I had an office there.
20      Q.   Did Mr. Holzer have an office
21   there?
22      A.   Yes.
23      Q.   And the third office went to
24   Jackie?
25      A.   No. No.

                              [Page 33]
```

[9]  (Pages 30 to 33)

1      Q.   Who --
2      A.   Jackie was the secretary.
3      Q.   What was Jackie's last name?
4      A.   Cohen.
5      Q.   And who else worked in that space?
6      A.   David's daughter.
7      Q.   What was her name?
8      A.   I don't remember. I don't
9 remember.
10     Q.   Was the space --
11     A.   She was -- I guess she was the
12 secretary. I'm not sure what she did.
13     Q.   Were there any other family members
14 that worked there?
15     A.   Yes, one of his sons worked there.
16 And I'm sorry, I had another employee, too.
17 There was a guy name Brandon Blum, who was like
18 a treasurer.
19     Q.   Did Mr. Holzer do his trading out
20 of that office?
21     A.   I believe so.
22     Q.   And did you spend time at that
23 office?
24     A.   Every day. Just about.
25     Q.   We've been given a document, I'll

[Page 34]

1 ask that it be marked.
2          (Fingerhut Exhibit 2 for
3 identification, Bates No. BF 07)
4      Q.   What exactly is that, sir?
5      A.   Beats me. I can't even see it.
6 Obviously the schedule -- the investment
7 schedule.
8      Q.   Now, there's a document -- are you
9 familiar with that document?
10     A.   Yes.
11     Q.   What is that document?
12     A.   The schedule of investments that we
13 made at FH.
14     Q.   And FH is Fingerhut-Holzer?
15     A.   Yes.
16     Q.   Does the left column indicate the
17 name of particular investment vehicles that
18 would be under a Fingerhut-Holzer umbrella?
19     A.   Yes.
20     Q.   Could you indicate any familiarity
21 with those investments?
22     A.   Say that again.
23     Q.   Could you indicate any familiarity
24 with those investments?
25     A.   I have familiarity with all.

[Page 35]

1      Q.   Could you go down that column and
2 tell us what they are.
3      A.   Okay. I wish I had my glasses.
4      Q.   Do you need a pair of glasses?
5          MR. FOLKENFLIK:  Do you have a
6 better copy?
7          MR. CONWAY:  No. This is what you
8 sent us.
9          MR. FOLKENFLIK:  Yeah, but I
10 printed out the same copy I sent to you and it's
11 legible.
12         MR. CONWAY:  Do you want to blow
13 this up?
14         MR. FOLKENFLIK:  I can get another
15 copy.
16     A.   It doesn't matter.
17     Q.   Do you need glasses?
18         MR. FOLKENFLIK:  It's okay.
19     A.   A real estate investment in
20 Jacksonville, CE Technology --
21     Q.   Who are Barry/David Partners?
22         MR. FOLKENFLIK:  Why don't we go in
23 order.
24     Q.   Yes, down the line. What is
25 Barry/David Partners?

[Page 36]

1      A.   That's probably the general partner
2 of this investment.
3      Q.   By Barry/David, is that the two of
4 you? Barry, you, and David, Mr. Holzer?
5      A.   I would suspect so.
6      Q.   Below that?
7      A.   Does it say CE Tech?
8      Q.   CE Tech, yes.
9      A.   CE Tech was a technology company
10 involved in training. And I can't see what
11 it's --
12     Q.   DH Breen Murray Investment.
13     A.   I don't know what that is.
14         MR. FOLKENFLIK:  Why don't I get
15 another copy, Barry.
16         THE WITNESS:  Okay.
17         MR. CONWAY:  And of course we'll
18 say nothing in your absence.
19         (Recess taken.)
20         MR. FOLKENFLIK:  Exhibit 3 is a
21 cleaner copy of the document that's been marked
22 that bears production number BF 000007.
23         (Fingerhut Exhibit 3 for
24 identification, Legible Copy of Bates No. BF 7)
25     Q.   We have replaced Exhibit 2 with

[Page 37]

**[Page 38]**

1  Exhibit 3 which is a larger copy of Exhibit 2.
2       Sir, is this a document which would
3  have been kept in the ordinary course of the
4  business of Fingerhut-Holzer Partners?
5       A.   I would suspect yes. This is just
6  a compilation of investments.
7       Q.   And would it be part of the
8  business of Fingerhut partners to keep such a
9  document?
10      A.   Yes.
11      Q.   And would such a document be made
12  contemporaneously with the information included
13  herein?
14      MR. FOLKENFLIK: By
15  "contemporaneously with the information," do you
16  mean that the document -- that each time there
17  was an investment, simultaneously the number was
18  recorded on the sheet?
19      MR. CONWAY: Not necessarily on
20  this sheet, but it would have been recorded so
21  that it could in time be placed on this sheet.
22      MR. FOLKENFLIK: Why don't you just
23  ask the witness how this document was prepared
24  or for what purpose.
25      MR. CONWAY: Okay, I want to be

**[Page 39]**

1  sure it's admissible.
2       Q.   Sir, how exactly was this --
3       MR. FOLKENFLIK: I will stipulate
4  to the admissibility of this document.
5       Q.   Sir, how would this document be
6  prepared?
7       MR. FOLKENFLIK: How was it
8  prepared?
9       Q.   How would it be prepared?
10      A.   It was compiled as a function of
11  the investment. It probably would have been
12  prepared by Brandon Blum, our treasurer.
13      Q.   Continuing down, what is DH Breen
14  Murray Investment?
15      A.   I'm not certain what that is.
16      Q.   What is Edu Fund?
17      A.   Edu Fund was a company involved in
18  educating -- well, education, but basically
19  financing student loans for foreign students in
20  the states.
21      Q.   What is KLI?
22      A.   KLI is Knox Lawrence. And it's a
23  company that essentially -- at this time at
24  least was essentially a merchant banker. They
25  owned different types of investments.

**[Page 40]**

1       Q.   And from reading this document, can
2  you indicate what type of investments
3  Fingerhut-Holzer participated in?
4       MR. FOLKENFLIK: At Knox Lawrence.
5       Q.   At Knox Lawrence, yes.
6       A.   That Fingerhut-Holzer Partners I
7  believe is just a GP piece of the overall
8  investment in Knox Lawrence.
9       Q.   It's indicated below that there is
10  a letter of credit.
11      A.   Okay.
12      Q.   Of $100,000. How did
13  Fingerhut-Holzer come to be in possession of
14  that?
15      A.   It's a good question. I have no
16  idea. We didn't use a letter of credit. This
17  was something supposedly -- well, you see what
18  it is.
19      Q.   Can you tell me what it is, based
20  upon the document?
21      A.   No.
22      Q.   Below that, Upstate New York Real
23  Estate. What is that?
24      A.   What is it or what did I think it
25  was?

**[Page 41]**

1       Q.   What do you think that means?
2       A.   That means investments that we in
3  theory made in Haverstraw and a number of other
4  spots upstate in New York.
5       Q.   And below that, Tango Publishing
6  Corporation.
7       A.   That was a company involved in a
8  website called Your Tango about women's love and
9  relationships.
10      Q.   And was Fingerhut-Holzer making
11  investments in Tango Publishing?
12      A.   Yes.
13      Q.   Below that --
14      A.   I'm the chairman.
15      Q.   You're the chairman of Tango?
16      A.   Mm-hmm.
17      Q.   Is Tango still an active
18  corporation?
19      A.   Yes.
20      Q.   Below that, the Waverly, what is
21  that?
22      A.   That is real estate development in
23  Jacksonville. Or was.
24      Q.   Now, in the columns next to it,
25  intended FP contributions, intended DH

1   contributions and total contributions, what does
2   that mean?
3      A.   That means that there was a number,
4   a total of 5.7 million, of which I had supplied
5   half and was -- assuming that the other half
6   would be supplied by Holzer.
7      Q.   Below that, C Campus Corporation,
8   what is that?
9      A.   It's no more, but that was a
10   company involved in education, basically in
11   building websites, maintaining websites for a
12   lot of member organizations. ISC Squared, a
13   number of nonprofits.
14      Q.   Now, in the column that reads
15   "total investments," it's indicated 2.3 million.
16   And apparently each of you and Mr. Holzer to
17   contribute 1,150,000. Does this document
18   reflect that each of you had actually
19   contributed 1,150,000 --
20      A.   No.
21      Q.   -- to the --
22      A.   It shows me advancing a certain
23   portion to Holzer.
24      Q.   All right, so as we move to the
25   next column, "gross total funds by Barry

[Page 42]

1   Fingerhut to David Holzer." You would have
2   advanced 2,812,500, and --
3      A.   Wait a minute, are you talking
4   about -- that's Waverly.
5      Q.   Excuse me. V Campus. You would
6   have advanced $650,000, and the column of "David
7   Fingerhut to BF" contains --
8      A.   That's David Holzer.
9      Q.   David Holzer to Barry Fingerhut,
10   that includes nothing. So does that mean that
11   you made the contribution of $650,000?
12      A.   Yes.
13      Q.   And Mr. Holzer made nothing?
14      A.   Correct.
15      Q.   And as we look below that at the
16   investment Waters Edge --
17      A.   Village Walk first.
18      Q.   Village Walk, what is Village Walk?
19      A.   That's another real estate
20   development down in Jacksonville.
21      Q.   And below that there is Waters Edge
22   initial investments.
23      A.   Mm-hmm.
24      Q.   Waters Edge with a date, Waters
25   Edge with another date. What do those numbers

[Page 43]

1   comport with?
2      A.   Waters Edge was another real estate
3   development, and these are different portions of
4   investments at different times in the
5   development.
6      Q.   Now, as we proceed to the second
7   column, these would be the intended
8   contributions by Barry Fingerhut. The third
9   column is "Intended David Holzer investment
10   contributions," and in most instances that is
11   equal, correct?
12      A.   Yes.
13      Q.   And the fourth column reflects how
14   much was actually paid on the investment by you.
15      A.   Yes.
16      Q.   The fifth column indicates how much
17   on the investment was actually paid by David
18   Holzer.
19      A.   Yes. Not much.
20      Q.   And in the investment totals, if
21   I'm correct, reading from the document Barry
22   Fingerhut had advanced $19,302,501.
23      A.   19 million?
24      Q.   That's what it says. Am I reading
25   19 million?

[Page 44]

1      A.   I'm not sure where you're looking
2   at. On the bottom? Sorry.
3      Q.   $19,302,501, is that correct?
4      A.   That's what it says.
5      Q.   And in the David Holzer column,
6   $7,385,500 contributed by him. Correct?
7      MR. FOLKENFLIK: What is the
8   number?
9      A.   No.
10      Q.   7,385,500 is the David Holzer
11   total.
12      MR. FOLKENFLIK: No --
13      Q.   That's by you --
14      A.   To me.
15      Q.   -- to you. Okay, got it. The
16   David Holzer column is only $111,000.
17      A.   Correct.
18      MR. FOLKENFLIK: That's DH to BF.
19      Q.   The third column, the 19,302,501,
20   over and above your contribution, where did the
21   rest of that money come from?
22      A.   It wasn't made.
23      Q.   The 19 million was an intended
24   investment that was not funded, is that correct?
25      A.   That's what it looks like.

[Page 45]

[12]  (Pages 42 to 45)

```
 1    Q.   And we have your funding of
 2  $7,385,500, and Mr. Holzer's funding of
 3  $111,000, correct?
 4    A.   That's what it says.
 5    Q.   The next column is the net total --
 6    A.   By the way, you skipped one
 7  investment.
 8    Q.   I did?  Which one?
 9    A.   Zing.
10    Q.   What is Zing?
11    A.   Zing is actually a company called
12  Coalition Works.  They are a company that's
13  monetized food coupons.  The kind you clip in
14  the weekends.
15    Q.   Now, this document does not bear a
16  date.  Do you know what year this document would
17  have been created?
18    A.   It was 2007 for sure because you
19  could see that the latter investments are made
20  in that period.
21    Q.   Now, the Waters Edge investments
22  are after 2007.
23    A.   No.  They're during 2007.
24    Q.   During 2007.
25    A.   Correct.  And Tango also I see.
```

[Page 46]

```
 1    Q.   Now, proceeding to the right there
 2  is a column identified as "net total funds
 3  advanced by Barry Fingerhut to David Holzer."
 4  At the bottom of that column the number is
 5  7,274,500.
 6    A.   Yes.
 7    Q.   And did you consider that an
 8  indebtedness by Mr. Holzer to you?
 9    A.   I'm not certain how to answer that.
10  I would assume yes.
11    Q.   The next column is "net ownership."
12  The bottom figure is 17,579,500.  How should we
13  interpret that column?
14    A.   I think it's pretty clear the way
15  you should interpret it.  The ownership was that
16  I fronted the majority, more than the majority,
17  just about every penny that was supposedly to be
18  supplied by Holzer.
19    Q.   Now, the --
20    A.   In addition to my own.
21    Q.   Sure.  The BF ownership
22  contributions and the DH ownership contributions
23  result in a differential of about 10 to 1.  If
24  you look at the bottom of your column, 17
25  million, and Mr. Holzer's column of $1,700,000.
```

[Page 47]

```
 1  That would be approximately a 10 to 1 ratio to
 2  your benefit.
 3    A.   Yes.
 4    Q.   Did this constitute a
 5  disappointment to you?
 6    A.   Are you kidding?
 7    Q.   No, I'm afraid I have to ask that
 8  seriously.
 9    A.   Yes.
10    Q.   After the commencement of the
11  Fingerhut-Holzer partnership, did there come a
12  time when it became apparent to you that
13  Mr. Holzer did not have the funds necessary to
14  be a partner of equal contribution to you and
15  Fingerhut-Holzer Partners?
16    A.   Yes.
17    Q.   And did that constitute a -- did
18  that bother you?
19    A.   Yes.
20    Q.   And did you attempt to rectify that
21  in any way?
22    A.   Yes.
23    Q.   How did you attempt to rectify it?
24    A.   Well, it's a long story, but I
25  basically attempted to rectify it by beginning
```

[Page 48]

```
 1  an investigation of what was going on with
 2  Mr. Holzer.
 3    Q.   Now, when you say investigation,
 4  what do you mean by that?
 5    A.   Private investigation.
 6    Q.   Did you hire a private
 7  investigator?
 8    A.   Yes.
 9    Q.   And who was that?
10    A.   Thatcher.  I forgot the other guy.
11         MR. FOLKENFLIK:  Thatcher
12  Associates.
13         MR. CONWAY:  Why don't we go off
14  the record for a second.
15         (Discussion off the record.)
16    Q.   Sir, after some discussions off the
17  record, your counsel has pointed out that there
18  is a certificate of cancellation which indicates
19  that a limited liability company known as
20  Fingerhut-Holzer Partners was incorporated on
21  June 21st, 2004 in the State of Delaware.  Would
22  you have any reason to disagree with that?
23    A.   No.
24    Q.   And to the best of your knowledge,
25  Fingerhut-Holzer Partners LLC was incorporated
```

[Page 49]

[13]  (Pages 46 to 49)

FINGERHUT
7274500

HOLZER
111,000

1   in Delaware on or about June 21st of 2004.
2       A.   If that's what it says.
3       Q.   Were there other businesses that
4   you and Mr. Holzer became involved in?
5       A.   Other businesses?
6           MR. FOLKENFLIK:  Other than what?
7       A.   You mean other than --
8       Q.   Other than Fingerhut-Holzer
9   Partners.
10      A.   Oh, there may have been
11  Fingerhut-Holzer Fund or Management or whatever.
12  There were a lot of names.  But it was
13  essentially all the same.  I don't think most of
14  them were used.
15      Q.   The other names were Fingerhut --
16  are you familiar with Fingerhut-Holzer Equities,
17  Inc.?
18      A.   No.
19      Q.   Do you know if there was another
20  company that you and Mr. Holzer operated which
21  operated under the name of Fingerhut-Holzer
22  Equities?
23      A.   No.
24      Q.   Do you know of a business
25  identified as Fingerhut-Holzer, Inc.?

[Page 50]

1   LLC?
2       Q.   For the LLC, yes.
3       A.   Fingerhut-Holzer Partners LLC?
4       Q.   Yes.
5       A.   Yes.
6       Q.   Now, as one of the business avenues
7   in Fingerhut-Holzer Partners, did you then begin
8   taking in investments and managing them for
9   other people?
10      A.   Not consciously, no.
11      Q.   Are you aware of any parties that
12  came into Fingerhut-Holzer as investors?
13          MR. FOLKENFLIK:  As investment
14  advisees?
15          MR. CONWAY:  Okay, we'll use that
16  term.
17      Q.   As investment advisees.
18          MR. FOLKENFLIK:  Answer out loud.
19      A.   No.  No, no, no.
20      Q.   Are you familiar with Mr. and Mrs.
21  Rapillo?
22      A.   I am now.
23      Q.   And during the course of the
24  investment life of Fingerhut-Holzer Partners,
25  did Mr. and Mrs. Rapillo become clients of that

[Page 52]

1       A.   No.
2       Q.   Are you familiar with a
3   Fingerhut-Holzer Fund LP?
4       A.   That sounds familiar.
5       Q.   What was Fingerhut-Holzer Fund LP?
6       A.   It's likely that it was a fund that
7   was initially done to be the fund that would
8   comprise Synconium, which is a --
9       Q.   We'll get to that.  Because you've
10  responded in that fashion, what is Synconium?
11      A.   What was it.
12      Q.   What was it?
13      A.   It was a proposed limited
14  partnership that would invest within the fields
15  of disabilities.
16      Q.   And was that --
17      A.   New technologies.
18      Q.   Was that set up in or around 2004?
19      A.   No.  It was later than that.
20      Q.   It was set up somewhere between
21  2004 and 2008?
22      A.   Yes, I think right in the middle.
23      Q.   Now, the principal operating entity
24  was Fingerhut-Holzer Partners?
25          MR. FOLKENFLIK:  You mean for the

[Page 51]

1   firm?
2           MR. FOLKENFLIK:  Fingerhut-Holzer
3   Partners LLC.
4       Q.   Fingerhut-Holzer Partners LLC.
5       A.   Not that I would define as
6   "client."  There was no fee charged.
7       Q.   How would you define the
8   relationship between Fingerhut-Holzer Partners
9   and Mr. and Mrs. Rapillo?
10          MR. FOLKENFLIK:  The LLC.
11      Q.   The LLC.
12      A.   To be honest, I don't know.  I
13  don't know what they were doing there.  I know
14  that there was an investment in one of these
15  investments.  Aside from that, I didn't know
16  them.
17      Q.   Now, are you familiar that an
18  investment of $300,000 was made with
19  Fingerhut-Holzer Partners and placed in an
20  investment vehicle called the Waverly I?
21          MR. FOLKENFLIK:  Objection.
22  Misstates facts not in evidence.  There was
23  never an investment that was made through
24  Fingerhut-Holzer Partners LLC in Waverly.  There
25  was a direct investment in the Waverly.

[Page 53]

[14]  (Pages 50 to 53)

1    A.   Fingerhut-Holzer Partners did not
2  oversee that.  That was a direct investment that
3  they made.  It was not under the aegis of
4  Fingerhut-Holzer Partners.  There was no fee or
5  anything taken.  Or carried interest.  At least
6  not by me.  I should say that.
7    Q.   Do you know if that was arranged by
8  Mr. Holzer?
9    A.   I don't know what it was.
10  Certainly it was not arranged by me.  Okay?
11    MR. FOLKENFLIK:  If by "arranged"
12  you mean Mr. Holzer sent a subscription
13  agreement which your clients testified was
14  filled out and returned to Foley & Lardner
15  together with a check, it appears according to
16  your client's testimony that's what occurred.
17  And I don't recall your asking Mr. Holzer
18  specifically about that investment.
19    Q.   Sir, could you tell us what you
20  know about the Rapillo investment in the
21  Waverly?
22    A.   What I know is what you just told
23  me.  It was a separate investment made by them.
24    Q.   Was it made through Mr. Holzer?
25    A.   I have no idea.

[Page 54]

1    Q.   Was it made through
2  Fingerhut-Holzer Partners?
3    A.   No.
4    Q.   Is there a record of funds coming
5  in to Fingerhut-Holzer from the Rapillos?
6    A.   Not that I'm aware of.  I've never
7  seen it.
8    MR. FOLKENFLIK:  Counsel, you have
9  a copy of the check so we know who the check
10  went to.  And it didn't go to Fingerhut-Holzer
11  Partners LLC.
12    Q.   Now, are you aware at any time
13  prior to 2008 that Mr. Holzer was dealing with
14  individual investors?
15    A.   No.
16    Q.   When did you learn of the identity
17  of the Rapillos for the first time?
18    A.   I think you called the office after
19  the investment went sour or something.  I'm not
20  really sure, but it wasn't -- it was only after
21  the fact that I remember anything with Rapillo.
22    MR. FOLKENFLIK:  The record should
23  reflect that when the witness used the word
24  "you" he was looking at Heidi Rapillo.
25    MR. CONWAY:  As opposed to me.

[Page 55]

1    MR. FOLKENFLIK:  As opposed to you.
2    Q.   Sir, early on in the investment in
3  the year 2004 --
4    A.   The investment?
5    Q.   The investment that was
6  Fingerhut-Holzer Partners.
7    MR. FOLKENFLIK:  It's not --
8    Q.   Excuse me, correct, I'll rephrase
9  that.
10    During the period -- early in the
11  operating of Fingerhut-Holzer Partners, did it
12  become apparent to you that Mr. Holzer did not
13  have the assets that he had indicated to you
14  prior to the commencement of Fingerhut-Holzer
15  Partners?
16    A.   No.
17    Q.   When exactly did you learn for the
18  first time that Mr. Fingerhut did not have --
19    MR. FOLKENFLIK:  Mr. Holzer.
20    Q.   Excuse me, Mr. Holzer.  I
21  apologize.
22    A.   2007.
23    Q.   You did not realize that at any
24  time prior?
25    A.   No.  If you read the diary you'll

[Page 56]

1  see.
2    Q.   Well, I read the diary as of 2007.
3  Did Mr. Holzer make any contributions --
4    MR. FOLKENFLIK:  Counsel, can I
5  help you a little on this?  You're using the
6  word "assets."  Assets means a lot of things,
7  but it doesn't necessarily mean liquid cash.
8    MR. CONWAY:  I understand.  We'll
9  deal with that.
10    Q.   Now, sir, you've indicated that by
11  2007 your contributions to the Fingerhut-Holzer
12  assets was 10 times that of Mr. Holzer.
13    A.   Actually, it was more than 10
14  times.
15    Q.   More than 10 times.  How much
16  greater would it have been?
17    A.   Well, it's on the sheet right
18  there.  7 plus million versus whatever the
19  numbers that he has.
20    Q.   110,000.
21    A.   That's a stretch, 110.
22    Q.   All right, he may not have
23  contributed 110,000?
24    A.   There's a whatchamacallit, a
25  $50,000 note there.  I don't know what that is.

[Page 57]

[15]   (Pages 54 to 57)

1    Q.   So if he only contributed 111,000,
2  that effectively made Mr. Holzer a
3  non-contributor to Fingerhut-Holzer Partners,
4  correct?
5    A.   Well, that --
6        MR. FOLKENFLIK:  To the assets.
7    Q.   To the assets.
8    A.   To the assets, yes.
9    Q.   Now, that would have been
10 noticeable to you in 2004, 2005, 2006 and 2007.
11   A.   Not true.  Because the majority of
12 the investments were made in 2007.  And
13 actually, there was a lot that he would state
14 that he already had invested that he was going
15 to put in, which was some of that real estate
16 piece there.
17   Q.   All right, now, the issue of the
18 real estate, did you use a name for that within
19 the firm?
20       MR. FOLKENFLIK:  By the real estate
21 you mean the Upstate New York --
22   Q.   The Upstate New York real estate.
23 What was that intended to be?  What did you call
24 it?  Did you call it the Suffern investment, did
25 you call it the New York State investment?  What

[Page 58]

1  would you call it?
2    A.   I don't know.  Are you looking for
3  a name?
4    Q.   Yes.
5    A.   I don't know.
6    Q.   How did you refer to it when you
7  were with --
8    A.   Well, they were different pieces of
9  property.
10   Q.   What was the nature of the
11 investment?
12   A.   It was real estate development.
13   Q.   And how was that development to
14 occur?  Did you have to accumulate the property
15 first, did you have to make purchase of the
16 property?  Did the property exist as a whole?
17   A.   I think it was a function of the
18 piece that we owned.  As an example, Haverstraw
19 was a property that was purchased and then --
20 well, I thought it was being purchased and then
21 developed.
22       MR. FOLKENFLIK:  And counsel, it
23 might help to look at the document we've
24 produced bearing production number BF 000023,
25 which is a schedule of investments in the

[Page 59]

1  Upstate New York properties and the purpose of
2  the investment -- the purpose of each
3  investment.
4    A.   Well, at least I thought it was.
5        MR. FOLKENFLIK:  The claimed
6  purpose is probably a better way to put it.
7    Q.   Now, you're talking JM 000023?
8        MR. FOLKENFLIK:  BF.
9    A.   This is what it looks like.
10       Why don't we take 5.
11       MR. CONWAY:  Sure.
12       (Recess taken.)
13       (Fingerhut Exhibit 4 for
14 identification, Bates No. K-1)
15 B MR. CONWAY:
16   Q.   Sir, could you identify that as --
17 this is -- could you identify Exhibit 4?
18   A.   Looks like a K-1 to me.
19   Q.   And was that K-1 sent pursuant to
20 the cover letter that is the face page of
21 Exhibit 4 by Fingerhut-Holzer Partners to the
22 Rapillo family indicating that this is your K-1
23 for 2005?
24   A.   That's what it says.
25   Q.   All right, and if you would flip

[Page 60]

1  the K-1, would you identify the address of the
2  Waverly investment.
3    A.   Yes, okay.
4    Q.   Would you indicate that for the
5  record, please.
6    A.   It's the address 399 Park.
7    Q.   And on the cover letter at the
8  face, what is the address of Fingerhut-Holzer
9  Partners?
10   A.   Same one.
11   Q.   All right, so could you say, sir,
12 that there was a business relationship between
13 Fingerhut-Holzer Partners and the Rapillo family
14 that existed at least as regards the Waverly
15 investment?
16       MR. FOLKENFLIK:  Objection as to
17 form.  I don't know what "business relationship"
18 is.
19   Q.   I'll phrase it again.  Was there a
20 business relationship as reflected in those
21 documents between Fingerhut-Holzer Partners and
22 the Rapillo family?
23       MR. FOLKENFLIK:  Objection as to
24 form.  Counsel, are you aware of the
25 relationship between Fingerhut-Holzer Partners

[Page 61]

[16]  (Pages 58 to 61)

LLC and Fingerhut-Holzer the Waverly?

MR. CONWAY: Yes, I am. I'm fully familiar with it.

MR. FOLKENFLIK: It was the managing member.

MR. CONWAY: I'm fully familiar with it.

MR. FOLKENFLIK: If you want to ask precisely about that, your question will make sense.

Q. First, sir, do you identify the cover letter as being from Fingerhut-Holzer Partners?

A. Yes.

Q. And that a K-1 was issued from Fingerhut-Holzer Partners concerning an investment within the Fingerhut-Holzer family of businesses?

A. Yup.

Q. And were Mr. And Mrs. Rapillo investors in that investment?

A. I suspect so. I don't see any fee or anything like that. This means nothing to me.

Q. Well --

[Page 62]

A. We didn't charge them for this. I mean, I don't know what it is.

Q. Whether or not they were charged anything would be Mr. Holzer's option, would it not?

MR. FOLKENFLIK: Objection as to form.

A. I don't know.

Q. I'll phrase it another way.

A. It would not be -- I mean, anybody could invest this way, or we could always do a K-1 for them. But it has nothing to do with partnership -- or a client position.

Q. Well, we'll allow the courts to determine what it means.

MR. FOLKENFLIK: The documents in question determine what it means.

MR. CONWAY: Yes, exactly.

MR. FOLKENFLIK: And they make it clear that the Rapillos are not clients of the managing member of the LLC -- or the LP. The Rapillos are investors in the LP. The managing member has certain obligations to send out documents on behalf of the LP.

Q. Now, sir, when did you become aware

[Page 63]

of an investment possibility for yourself and for Fingerhut-Holzer in property in Haverstraw?

A. Property in Haverstraw? I don't know, you'd have to look on the sheet that shows the timing of these properties.

MR. FOLKENFLIK: Counsel, I do note that your client never purported to have invested in property in Haverstraw.

MR. CONWAY: Yes, my client did not.

Q. Sir, do you know if K-1s were issued to the Rapillos in 2005, 2006, 2007?

A. I'd have to ask Brandon.

Q. Did there come a time when relative to the Waverly investment you had a phone call with Heidi Rapillo concerning additional needs for investments in order to sustain that business opportunity?

A. I only remember a phone call. I don't remember the reason.

Q. Now, why would you have called?

A. I didn't. I believe it was Heidi calling us.

MR. FOLKENFLIK: I think that was the testimony earlier. As well as the testimony

[Page 64]

by your client.

Q. Did you have a conversation with the Rapillos in which you made a request of additional funds necessary for the Waverly I investment?

A. I think that was discussed on that call. And I believe it was a capital call for all investors.

Q. And did you make any indication if there was further contribution by the Rapillos, that you would zero out their investments?

A. No. Why would I do that? If there was no further investment, then we would wipe out the initial investment? Is that what you said?

Q. Yes.

A. No.

Q. Now, what was --

A. That's pretty tough.

Q. What was the investment in upstate properties to be? What was the intended investment?

A. Didn't I just answer that?

Q. Forgive me, could I ask you again.

A. It was land development in

[Page 65]

RAPILLO #INVESTORS

```
 1    different spots upstate. Well, I mean, in
 2    whatever the county across the river.
 3        Q.    What was to be developed?  A mall,
 4    a swimming pool, a hotel?
 5        A.    I think it depended on the spot.
 6        Q.    Were the plots of land contiguous?
 7        A.    No. Why don't you take a look at
 8    that sheet.
 9        Q.    Sure, that's fine.
10              MR. FOLKENFLIK:  Did you find it?
11              MR. CONWAY:  I had it here a second
12    ago amidst everything else I had.
13              MR. FOLKENFLIK:  Do you want me to
14    make a copy and you'll mark it?  As I say, it's
15    number 23 in the production numbers.
16        Q.    Having directed me to it, I had it
17    and now I don't have it. So if I could ask you
18    to make an additional copy, I'd appreciate it.
19              (Fingerhut Exhibit 5 for
20    identification, Bates No. BF 23)
21              MR. FOLKENFLIK:  The witness does
22    not have in front of him Exhibit 5.
23              MR. CONWAY:  Well, I'd like he and
24    I to be on the same page.
25              MR. FOLKENFLIK:  Why don't you take

                                    [Page 66]
```

```
 1    a look at the exhibit and then hand it to him.
 2        Q.    Sir, would you consider yourself a
 3    skilled investor?
 4        A.    That's a tricky question. I would
 5    suppose so. Certainly in equities.
 6        Q.    Now, a document has been presented
 7    by your counsel identified as -- it's Bates
 8    stamped BF 000023. What does this purport to
 9    be, sir?
10        A.    This is a series of investments in
11    properties upstate. Should I have known
12    about --
13              MR. FOLKENFLIK:  Wait until he asks
14    a question.
15        Q.    Wait for me.
16              Now, sir, these indicate a series
17    of -- does this indicate a series of land
18    purchases in Haverstraw, New York, Beacon, New
19    York and Newburgh, New York?
20        A.    Yes. Monticello too, it looks
21    like.
22              MR. FOLKENFLIK:  And Nyack.
23        Q.    Who was supposed to be purchasing
24    these?
25        A.    Who was supposed to be purchasing

                                    [Page 67]
```

```
 1    these.
 2        Q.    Yes. Who was the purchaser for
 3    value?
 4        A.    We were participating in a purchase
 5    that Holzer was participating with another
 6    group. This was buying a piece of his share.
 7        Q.    Now, what did Mr. Holzer say to you
 8    about this particular investment group?
 9        A.    It's all in the diary, if you would
10    look at it.
11        Q.    We'll get to the diary. Are you
12    familiar with the name Daniel Katz?
13        A.    I know the name. I don't know who
14    it is.
15        Q.    Are you familiar with the --
16        A.    Cass?
17        Q.    Katz, K-A-T-Z.
18              Are you familiar with the name
19    Jeffrey Schwartz?
20        A.    It sounds like a relative. No, I
21    don't know.
22        Q.    Were these two parties identified
23    by Mr. Holzer as his fellow investors in the
24    Haverstraw investment?
25        A.    You know, I think so, but again,

                                    [Page 68]
```

```
 1    you'd have to look at the notes. It's in there,
 2    whatever the names are.
 3        Q.    We'll get to the notes.
 4        A.    Okay.
 5        Q.    And did you advance funds for
 6    Mr. Holzer to make purchase of his portion of an
 7    investment in real estate properties upstate?
 8        A.    Yes.
 9        Q.    And for how long did you continue
10    doing this?
11        A.    If you look on this chart, it goes
12    from '02 to '05.
13        Q.    And --
14        A.    Excuse me, '06.
15        Q.    And did you make a series of
16    investments in this process?
17        A.    Yes.
18        Q.    Now, how were those funds
19    transferred by you?
20        A.    To Holzer.
21              MR. FOLKENFLIK:  You mean did he
22    write a check or wire the funds?
23        Q.    Yes.
24        A.    Yes.
25        Q.    How was it transferred? By check

                                    [Page 69]
```

**[Page 70]**

```
 1   or wire?
 2       A.   I think primarily wire.
 3       Q.   To what account?
 4       A.   To Holzer's account.
 5       Q.   To Holzer individually?
 6       A.   Yes.
 7       Q.   And in doing so, did you have any
 8   record of that -- record of your transfer to
 9   Mr. Holzer?
10       A.   Yes.
11       Q.   What was the record?
12       A.   Wire transfers.
13       Q.   Was that the only record?
14       A.   Yes.
15       Q.   And for how long did you go on
16   making payments on this investment?
17       A.   It's right here on the chart.
18   Depending on the investment made, in some cases
19   it went on for a year for Haverstraw.  I mean,
20   you can break it down here.  But basically from
21   2002 to 2006, depending on the properties.
22       Q.   And did you at any time ask to see
23   documents of title memorializing the purchase?
24       A.   No.  But I did see plans, at least
25   initial investment plans in Haverstraw and I
```

**[Page 71]**

```
 1   believe in Monticello.
 2       Q.   And what was to be developed?
 3       A.   The land was going to be developed,
 4   both in shopping areas, shopping malls.
 5       Q.   The documents that you saw, the
 6   plans, who produced them?
 7       A.   David.
 8       Q.   By producing then you mean he
 9   showed them to you?
10       A.   Showed them to me.
11       Q.   Who was the producer of them?
12       A.   I don't know.  An architect.
13       Q.   Do you still have copies of those?
14       A.   No.
15       Q.   Do you know what happened to what
16   it is that David showed you?
17       A.   No.  They're obviously fraudulent.
18   Okay?
19       Q.   When did you come to realize
20   that -- I'll withdraw that.
21       A.   2007.
22       Q.   I'm withdrawing the question.
23   Sir, in the document which we will
24   identify -- I suppose we should identify it
25   right now.  The documents dated TA draft
```

**[Page 72]**

```
 1   11/15/07 is an investigation by whom?
 2       A.   I don't know what the document is.
 3   You have to show me.
 4       Q.   This is the Thatcher Associates --
 5       MR. FOLKENFLIK:  Why don't you mark
 6   a copy of the document.
 7       MR. CONWAY:  We have an entire
 8   document here, we'll make that 6.
 9       A.   That includes the diary.
10       (Fingerhut Exhibit 6 for
11   identification, Bates No. BF 25 through 46)
12       MR. FOLKENFLIK:  I'd like to note
13   for the record that Exhibit 6, first of all, the
14   copy that's marked is a copy which includes
15   sections that are apparently inadvertently
16   redacted because there were stickers placed on
17   them.
18       MR. CONWAY:  That's my copy.
19       MR. FOLKENFLIK:  Well, it's a
20   copy --
21       THE WITNESS:  What is the sticker?
22       MR. FOLKENFLIK:  Those red --
23       THE WITNESS:  I understand.  But
24   what's it for?
25       MR. FOLKENFLIK:  Just to mark the
```

**[Page 73]**

```
 1   sheet.  So I think we need to mark a clean copy
 2   of this document.  Do you have a clean copy?
 3       MR. CONWAY:  I didn't notice that
 4   when I re-produced it.  I'm sure I did
 5   everything.  Do we have a clean copy?
 6       MR. FOLKENFLIK:  I can get a clean
 7   copy.  How much longer do you anticipate?
 8       MR. CONWAY:  Certainly past lunch.
 9       MR. FOLKENFLIK:  You're going to
10   break for lunch?
11       MR. CONWAY:  I don't need to.
12       MR. FOLKENFLIK:  How much longer?
13       MR. CONWAY:  Right now I would
14   guess probably till 3.  Best guess.
15       MR. FOLKENFLIK:  Do you want to
16   break for lunch?
17       THE WITNESS:  Sure.
18       MR. FOLKENFLIK:  I'll make
19   arrangements for that, and why don't we take a
20   few minutes and I'll get a document that we can
21   use as an exhibit.
22       (Recess taken.)
23       (Fingerhut Exhibit 7 for
24   identification, Bates No. BF 25 through 46)
25   BY MR. CONWAY:
```

**[Page 74]**

1      Q.   Sir, would you take a look at

2 what's been marked as TA draft 11/15/07, BF

3 000025.

4      MR. FOLKENFLIK: Yes, before you

5 question the witness, it goes through BF 000046,

6 and this is not one document; it was a composite

7 of several documents. And continue with your

8 examination, sir.

9      Q.   Sir, would you tell us -- have you

10 seen this document before?

11      A.   Yes.

12      Q.   And what is this?

13      A.   There's two pieces. One is a diary

14 that I wrote, which is the second one. The

15 first is I believe a compilation from Thatcher.

16      Q.   Thatcher Associates.

17      A.   Excuse me, Thatcher Associates

18 regarding the whole situation with

19 Fingerhut-Holzer.

20      Q.   Is this a document that you caused

21 to have prepared having approached Thatcher and

22 asking for an investigation into Mr. Holzer?

23      A.   Yes.

24      Q.   And this would be --

25      A.   At least the first part. Page 1 to

**[Page 74]**

**[Page 75]**

1 5.

2      Q.   And this occurred --

3      MR. FOLKENFLIK: Just for the

4 record, 1 to 5 means the pages marked BF 25

5 through BF 31.

6      Q.   And this is dated 11/15/07. So it

7 would be the latter part of 2007.

8      A.   Yes.

9      Q.   And adding thereafter is a series

10 of diary -- is a document called "a timeline of

11 events" on page 000032.

12      A.   I'm sorry, I believe that's

13 actually also part of their work. What I wrote

14 started on 00036.

15      MR. FOLKENFLIK: Can I just point

16 out one thing to the witness? You notice it

17 uses the first person, "I purchased one half of

18 David's interest." Paragraph 1. So it may be

19 something you prepared. Rather than Thatcher

20 Associates.

21      THE WITNESS: I don't know, maybe I

22 did.

23      MR. FOLKENFLIK: In any event,

24 continue on.

25      Q.   And sir, this continues thereafter

**[Page 75]**

**[Page 76]**

1 with inserts that are marked "diary."

2      A.   Yes.

3      Q.   And those diary notes are yours.

4      A.   Correct.

5      Q.   Dictated by you or typed by you?

6      A.   Correct.

7      Q.   They are of your origin.

8      A.   Correct.

9      Q.   And the inserts that were created

10 as a result of the difficulties at the firm?

11      A.   Yes.

12      Q.   And are the contents of these diary

13 notes true, as best you know?

14      A.   As best I know.

15      Q.   And did you create these for the

16 purpose of the investigation in the business?

17      A.   Yes, but it was also for my own

18 keeping.

19      Q.   And was this intended to be made

20 part of the business record of Fingerhut-Holzer

21 Partners?

22      A.   That was one of the purposes.

23      Q.   And have these diary notes been

24 kept by Fingerhut-Holzer through the present and

25 your --

**[Page 76]**

**[Page 77]**

1      A.   There is no Fingerhut-Holzer

2 anymore.

3      Q.   To the end of the existence of

4 Fingerhut-Holzer these were held.

5      A.   Yes.

6      Q.   Now, sir, in that on page 00030

7 there are a series of investments made by you in

8 the Haverstraw property, correct?

9      A.   Yes. I think it's the same as

10 this, right?

11      MR. FOLKENFLIK: It's a different

12 schedule, but --

13      A.   The same numbers.

14      Q.   Same thing. And on each of the

15 inserts reflected here it is intended to

16 memorialize that you issued funds from your

17 personal wealth to David Holzer for the purchase

18 of these properties.

19      A.   That's correct.

20      Q.   And was there any type of business

21 record other than the transfer memorializing an

22 arrangement between yourself and Mr. Holzer for

23 the future sale of these properties?

24      A.   No.

25      Q.   When these properties were

**[Page 77]**

**[20]  (Pages 74 to 77)**