1 transferred -- excuse me, when the funds were
2 transferred and properties were allegedly
3 purchased, did you become a participating owner
4 in the document of title?
5   A.   No.
6       MR. FOLKENFLIK:  Counsel,
7 objection.  There was no document.
8       MR. CONWAY:  Well, they were
9 intended to be for purchases of property.
10   Q.   Correct?
11   A.   They were intended to be his
12 investment in purchases of property.
13   Q.   Did he tell you he had partners in
14 this?
15   A.   Yes.
16   Q.   Did he indicate to you what
17 percentage of partner he was?
18   A.   I believe he said a third.
19   Q.   So that each of these contributions
20 of capital would have been followed by two other
21 contributions in equal measure by the parties he
22 identified as Jeffrey Daniel Katz and Jeffrey
23 Schwartz?
24       MR. FOLKENFLIK:  Objection as to
25 form.  It's not clear at all, but you can

[Page 78]

1 establish if you care to the order of events.
2 For all we know based on your questioning thus
3 far, the purchase could have been made years
4 earlier and this could have been funding
5 Mr. Holzer's participation or some other event.
6   Q.   In your discussions with
7 Mr. Holzer, what was it did you believe he was
8 doing with these funds?
9   A.   I think it depended on the
10 properties.  But it was what I've been saying,
11 it was for purpose and development of these
12 properties.
13   Q.   And was there supposed to be a
14 master buyer at the end of this program?
15   A.   There's no such thing as a master
16 buyer.  Was there a buyer of part of the
17 properties maybe at some time, yes.
18   Q.   Was there intended to be a buyer of
19 these properties?
20   A.   I don't think it was done exactly
21 that way.  There was -- I was told at one point
22 that there was a buyer.
23   Q.   Did he indicate to you who the
24 buyer was?
25   A.   I believe he might have.  But I

[Page 79]

1 don't remember.  It's in the diary.
2   Q.   Yes, it's in the diary.  Do you
3 have any recollection of the name of the
4 prospective purchaser?
5   A.   I don't.
6   Q.   Are the contents of the Thatcher
7 document correct?
8   A.   The contents of the Thatcher
9 document.  As far as I know, yes.
10       MR. CONWAY:  Counsel, for
11 evidentiary purposes, there's no point in my
12 reading all of this.  Could we stipulate that
13 the contents of this document are based upon
14 information given to Thatcher by Mr. Fingerhut
15 as are the contents of his diaries?
16   A.   No, it's not true.
17       MR. FOLKENFLIK:  No.
18   A.   Go ahead.
19       MR. FOLKENFLIK:  We couldn't
20 stipulate that the Thatcher investigation was an
21 investigation.  Some information might have come
22 from Mr. Fingerhut --
23   A.   Correct.
24       MR. FOLKENFLIK:  -- some
25 information might have come from elsewhere.

[Page 80]

1 Mr. Fingerhut's diaries are his understanding of
2 what occurred when it involved directly him.
3 That would be first person understanding, but it
4 also involved hearsay he obtained from other
5 people, including the Thatcher people and
6 statements by David Holzer that we know are not
7 true, but in all events were hearsay.
8       What we can say is that the
9 Thatcher draft is a draft prepared by Thatcher
10 as a result of their investigation, which
11 included conversations with Mr. Fingerhut.  And
12 then Mr. Fingerhut's diaries are Mr. Fingerhut's
13 recollection contemporaneously with the date on
14 the diary of what occurred and what information
15 he had received at that time, which included
16 both third party hearsay information and
17 information he was personally aware of.
18       MR. CONWAY:  Would you stipulate to
19 the admissibility of the Thatcher document?
20   A.   I'd stipulate to its admissibility
21 as a document created by Thatcher draft, created
22 by Thatcher & Associates which was intended to
23 reflect the result of their investigation.
24       MR. CONWAY:  And you would
25 certainly stipulate to the admissibility of the

[Page 81]

1  diary notes as being Mr. Fingerhut's own
2  recollections of events for those particular
3  times? And as he indicated, as he drafted.
4      MR. FOLKENFLIK: I would stipulate
5  to the admissibility of the diary entries as
6  diary entries which reflected Mr. Fingerhut's
7  understanding contemporaneously with the date on
8  each diary, but the fact that he was either
9  personally aware of in some cases and had
10  understood from other sources in other cases.
11      Q.   Sir, why would you have extended
12  money to Mr. Holzer instead of extending money
13  to Fingerhut-Holzer Partners?
14      A.   Fingerhut-Holzer Partners?
15      Q.   Yes.
16      A.   It was my understanding that it
17  wasn't going to be done that way. Look, I can
18  tell you right now this was all a big mistake
19  that this happened, that I did it all
20  incorrectly. I'll be the first to say that. It
21  didn't go through Fingerhut-Holzer Partners.
22  There was no issue about doing that. This was
23  something that preceded Fingerhut-Holzer
24  Partners. It started in 2002.
25      MR. FOLKENFLIK: And just so the

[Page 82]

1  record's clear, I think the question intended,
2  and I believe the answer intended to refer to be
3  just referring to the payments of funds as
4  reflected on BF 000030.
5      A.   Yes. I think that's what you're
6  talking about.
7      Q.   Yes.
8      MR. FOLKENFLIK: And there are
9  other transfers of funds on 000031 which are
10  indicated not to be involving those properties.
11  The payment of money to Mr. Holzer of $1,062,000
12  that are identified as "Holzer personal."
13      MR. CONWAY: On 00031?
14      MR. FOLKENFLIK: 31. Which appears
15  to be --
16      MR. CONWAY: The 2405 and the 3850?
17      MR. FOLKENFLIK: Yes.
18      Q.   Now, the initial transfer of funds
19  by you commenced on March 27th, 2002 with the
20  transfer of $62,500. And that was transferred
21  to Mr. Holzer, correct?
22      A.   Correct.
23      Q.   Now, you two had not set up
24  Fingerhut-Holzer Partners at that time, had you?
25      A.   No.

[Page 83]

1      Q.   And Mr. Fingerhut was engaged --
2      MR. FOLKENFLIK: Mr. Holzer.
3      Q.   I apologize.
4      A.   It's all right.
5      Q.   Profusely. Mr. Holzer was still
6  engaged at another firm at the time.
7      A.   Yes.
8      Q.   So the original discussions
9  concerning the purchase of Haverstraw predate
10  Fingerhut-Holzer Partners.
11      A.   That's correct.
12      Q.   And when you were discussing this,
13  did it occur to you to ask who the investor was
14  who would buy this after the properties were
15  accumulated?
16      A.   No.
17      Q.   Did it occur to you to create an
18  arrangement between --
19      A.   By the way, I should just say that
20  I've never heard of anybody investing that way.
21  People can say that they do, but that is not a
22  condition on purchasing this. I mean, if
23  somebody comes along, great. That isn't the
24  reason the investment's made.
25      MR. FOLKENFLIK: Just to clarify

[Page 84]

1  the record, "that" meaning that there's a
2  purchaser identified in advance.
3      THE WITNESS: Right.
4      Q.   Yes. You purchase property hoping
5  to transfer it to someone later or use it
6  yourself.
7      A.   Could be.
8      Q.   Now, what was it that you were
9  purchasing with each of these?
10      MR. FOLKENFLIK: Objection. Asked
11  and answered.
12      Q.   Do you know what you were -- were
13  you purchasing bare land, were you purchasing
14  farmland? Were you purchasing dilapidated
15  structures, old houses?
16      A.   It's on this sheet. I've already
17  told you about five times what I've been
18  purchasing on each piece of property. This is
19  the other sheet, whatever it is. No, no, this
20  one here. Exhibit number 5.
21      Q.   Yes, but this document doesn't --
22      MR. FOLKENFLIK: This doesn't refer
23  to these.
24      Q.   This document doesn't indicate what
25  it was you were buying. It just indicates that

[Page 85]

[22]  (Pages 82 to 85)

1    you bought something.
2         MR. FOLKENFLIK: With all respect,
3    sir, what earthly difference does it make if
4    they had a sack of straw with the Taj Mahal on
5    the piece of land he purchased in Haverstraw to
6    your client's case, which has zero to do with
7    Haverstraw?
8         MR. CONWAY: My client's case has
9    to do with the relationship between
10   Mr. Fingerhut and Mr. Holzer.
11        MR. FOLKENFLIK: No it doesn't. It
12   doesn't have to do with the fact of whether they
13   went out to eat and what they ordered. It has
14   to do with some aspect of the relationship that
15   you may think gives you some right. So inquire
16   about that aspect of the relationship.
17        Q.   Now, sir, at any time in the
18   transfer of $12 million, did you create a
19   document between yourself and Mr. Holzer
20   concerning the nature of that transfer?
21        A.   No.
22        Q.   At any time --
23        A.   Ask me why I did it.
24        Q.   We'll get there. We'll get there.
25        A.   Okay. All right.

[Page 86]

1         Q.   At any time did you view any of
2    these properties?
3         A.   Yes.
4         Q.   And when you viewed them, what did
5    you see?
6         A.   I saw land.
7         Q.   What type of land?
8         A.   Land that was going to be
9    purchased.
10        Q.   And what was on that land?
11        A.   Grass.
12        Q.   Just grass.
13        A.   Yes. Well, there was a pier in
14   one.
15        Q.   And was there intended to be a
16   total fund necessary for the purchase of these
17   properties?
18        A.   I don't understand.
19        MR. FOLKENFLIK: Was there a dollar
20   amount that was established that had to be
21   obtained?
22        Q.   Yes. Mr. Holzer was a one-third
23   participator, correct?
24        A.   Well, that's not correct but that's
25   what I thought. No, it clearly wasn't because

[Page 87]

1    there were subsequent pieces.
2         Q.   Was there a reason that you did not
3    create documentary intent for the use of the
4    funds that you transferred to Mr. Holzer?
5         MR. FOLKENFLIK: You mean
6    documentary intent meaning that he wrote
7    something on a piece of paper?
8         Q.   Wrote something to say this is what
9    we're going to do with the money.
10        A.   Would you repeat that, please?
11        Q.   You asked me to say why didn't you
12   create a documentary history. What did you mean
13   by that?
14        A.   In the relationships that I've had
15   in Geo Capital, my other partners, we have
16   invested like this in each other's deals for I
17   guess now 30 plus years. No documentation. A
18   very heavy reliance on trust with each other.
19        Now, in the case of my partners in
20   Geo Capital and in Weekly, it's never been an
21   issue. And it's been on both sides. I've done
22   the same with them saying I'm investing in X,
23   would you like to come in, and they say yes or
24   no. That was it. And them asking me.
25        Q.   During the period that you were

[Page 88]

1    investing with Mr. Holzer, with Mr. Holzer
2    essentially contributing nothing --
3         A.   Wait, wait, I didn't know that. I
4    didn't know that he was contributing nothing.
5         Q.   When did you learn for the first
6    time --
7         A.   2007.
8         Q.   Not before?
9         A.   No. You can't tell from that. All
10   that is, is monies invested, a piece of him. I
11   didn't know that he wasn't putting his own money
12   in.
13        MR. FOLKENFLIK: The record should
14   reflect that the word "that" was referring to
15   the document on BF 30 and -- BF 30.
16        Q.   BF 23.
17        MR. FOLKENFLIK: BF 23, no. It's
18   page BF 30 in Exhibit 7.
19        Q.   During the time that you were
20   working with Mr. Holzer, did Mr. Holzer bring
21   any funds in excess of $111,000 into the
22   Fingerhut-Holzer organization?
23        MR. FOLKENFLIK: LLC.
24        Q.   LLC.
25        A.   What does that chart show?

[Page 89]

1    MR. FOLKENFLIK: By the chart he's
2  referring to a work product I created from the
3  affidavit submitted by the district attorney to
4  the court in connection with the Holzer criminal
5  conviction and restitution order. And that
6  affidavit --
7    MR. CONWAY: Is that the one that
8  was identified here?
9    MR. FOLKENFLIK: No. That
10  affidavit which you obtained from the district
11  attorney's office and was produced by you to me
12  shows a series of funds being contributed to
13  Fingerhut-Holzer Partners LLC in small amounts
14  apparently for operating expense of
15  approximately $200,000.
16    THE WITNESS: Was that 2005 and '6?
17    MR. FOLKENFLIK: It was 2005 and
18  '6.
19    Q.   And during that time, during --
20    MR. FOLKENFLIK: By the way, and
21  that's not reflected on these documents,
22  including in particular Exhibit number 3 because
23  that was operating expenses as opposed to
24  investments.
25    THE WITNESS: Correct.

[Page 90]

1    Q.   Now, you're not indicating that
2  these documents were prepared by you, were you?
3    MR. FOLKENFLIK: No, no.
4    THE WITNESS: That's not it.
5    MR. FOLKENFLIK: I'm just talking
6  about there was an affidavit supplied to me.
7  The affidavit said there were -- the following
8  payments by Mr. Fingerhut to Mr. Holzer and it
9  reflected approximately the $12 million that
10  appears on the Exhibit 7. And there were monies
11  paid by Mr. Holzer to Mr. Fingerhut and to
12  Fingerhut-Holzer Partners. If you want to ask
13  about those --
14    MR. CONWAY: They're here. I got
15  'em.
16    Q.   During the time that you were
17  together -- that you were functioning as
18  Fingerhut-Holzer Partners, did you have to
19  support Mr. Fingerhut?
20    A.   I am Mr. Fingerhut.
21    Q.   Jesus. During the time that you
22  were working with Mr. Holzer in Fingerhut-Holzer
23  Partners, did you have to support Mr. Holzer for
24  his personal needs?
25    A.   That's a tough question. I don't

[Page 91]

1  know what his personal needs were. Did I pay
2  monies --
3    Q.   Did you lend him monies?
4    A.   Did I pay monies to support the
5  rent and the overhead, yes. But there were
6  parts in whatever those two years were that he
7  did.
8    Q.   Did you give any personal funds to
9  Mr. Holzer directly for his own personal
10  expenses?
11    A.   It may have ended up that way. But
12  that was not the idea.
13    MR. FOLKENFLIK: Maybe you want to
14  bring the witness' attention and clarify what
15  page 31 on Exhibit 7 refers to.
16    THE WITNESS: Is that the Breen
17  Murray thing?
18    MR. FOLKENFLIK: Yes.
19    A.   I'm not really sure that is. That
20  might be something that he had --
21    Q.   Excuse me --
22    MR. FOLKENFLIK: Let the witness
23  finish.
24    Q.   There wasn't a question. We were
25  going there. You indicated at BF 000031 that

[Page 92]

1  there were two additional transfers to
2  Mr. Holzer which were identified as personal.
3  February 4th, 2005, $202,000; March 8, 2005,
4  $860,000. For what reason did you extend a
5  million dollars for personal expenses of
6  Mr. Holzer?
7    A.   That was to cover him on an
8  investment that we made that he couldn't cover.
9    Q.   Now, if Mr. --
10    A.   At least I thought so.
11    MR. FOLKENFLIK: I think there's a
12  reference in the diary pages to this as well.
13    Q.   Did you ever see any funds --
14    MR. FOLKENFLIK: Excuse me -- go
15  ahead.
16    Q.   Did you ever see any funds in
17  excess of $111,000 brought by Mr. Holzer into
18  Fingerhut-Holzer Partners?
19    A.   There was a series -- do you have
20  those sheets? The sheet we just talked about.
21  The thing that Max got from you.
22    MR. FOLKENFLIK: The affidavit from
23  the district attorney's office. It specifies
24  payments that were made in both directions.
25    Q.   Forgive me, I don't recall that.

[Page 93]

1      A.   A series of investments -- well,
2   he'll show you.
3      Q.   Are you familiar with the affidavit
4   of the district attorney of New York? Have you
5   read it yourself?
6      A.   I'm not sure.
7           MR. FOLKENFLIK:   That's what I sent
8   you.
9      A.   Yes.
10          MR. FOLKENFLIK:   The one that you
11  produced in this case?
12          MR. CONWAY:   Yes.
13     Q.   Now, sir, I'm going to ask this two
14  ways. The district attorney at page -- in the
15  affidavit of investigator Shannon Rowe at page
16  0000178 indicates that on December 15th, 2005,
17  shortly after -- on the day of the second
18  investment of the Rapillos, a wire of $600,000
19  to Holzer was sent and Holzer transferred
20  $200,000 to your personal account on that same
21  day.
22          Are you familiar with that event?
23     A.   I mean, I could probably look it
24  up, but I'm not familiar with the other part.
25     Q.   Did Mr. Fingerhut transfer

[Page 94]

1   $200,000 --
2           MR. FOLKENFLIK:   He is
3   Mr. Fingerhut.
4      Q.   Did Mr. Holzer transfer $200,000 to
5   your personal account on or about December 15th
6   of 2005?
7      A.   If it's in this statement by the
8   DA, then I would say yes. I mean, I can't tell
9   you offhand.
10     Q.   Now, sir, do you have the account
11  numbers for the various accounts that were
12  issued by -- that were held by Fingerhut-Holzer
13  Partners LLC?
14     A.   Bank account numbers?
15     Q.   Bank account numbers, yes.
16     A.   I do.
17     Q.   And how many different bank
18  accounts did Fingerhut Partners have?
19  Fingerhut-Holzer Partners.
20     A.   I'd have to look it up. Probably
21  four.
22     Q.   And you still have access to those
23  account numbers.
24     A.   They're all gone. I've shut them
25  all down.

[Page 95]

1      Q.   The accounts may be gone. Do you
2   have access to the numbers?
3      A.   I think so.
4      Q.   I'd ask you, we'll leave a blank in
5   the record, when you execute the deposition,
6   would you fill those in?
7      A.   If I have them, I'll give them to
8   you, sure.
9   INFORMATION REQUESTED TO BE SUPPLIED:
10  Fingerhut-Holzer Bank Account Number
11     Q.   And in light of the statements by
12  the district attorney, I would ask you to -- do
13  you have access to the accounts that you
14  yourself operated for your own personal benefit
15  on or about December 15th of 2005?
16     A.   Personal accounts?
17     Q.   Yes.
18     A.   You mean my own --
19          MR. FOLKENFLIK:   Your own bank
20  accounts.
21     Q.   You indicated --
22     A.   Yes. Yes, yes.
23     Q.   -- that you are not rejecting as
24  untrue the statement by the district attorney
25  that on December 15th you received $200,000 from

[Page 96]

1   Mr. Holzer.
2      A.   I don't accept it or reject it. I
3   don't know. I'd have to check.
4      Q.   Sir, could I ask you to include in
5   the transcript when it's executed the banks and
6   account numbers for your personal bank accounts
7   on or about December 15th of 2005.
8           MR. FOLKENFLIK:   I'll take that
9   under advisement. I think an easier way to deal
10  with this would be that we will discuss and
11  consider stipulating to the correctness of the
12  district attorney's assertion if we investigate
13  it and find it to you true.
14     A.   That's fine. I can do that. But
15  giving you the bank account is crazy.
16     Q.   Sir, with whom did you do your
17  personal banking in 2005?
18     A.   JPMorgan.
19     Q.   And you would have had investment
20  accounts as well as operating accounts and
21  personal accounts there?
22     A.   Yes.
23     Q.   And do they continue to be your
24  personal bank?
25     A.   Yes.

[Page 97]



1    Q.    And are the same personal and
2  operating accounts still active?
3    A.    I'd have to check. I don't know.
4    Q.    Now, also in the district
5  attorney's report, he indicated at page 000179
6  that on the occasion of the transfer of $800,000
7  from the Rapillos on the date of March 23rd,
8  2006, Mr. Holzer made purchase of $500,000 of a
9  stock called V Campus, and that that $500,000
10 investment was later transferred to you. Do you
11 know that to be correct, sir?
12   A.    That's not correct --
13        MR. FOLKENFLIK: Let's take a step
14 at a time. Why don't you ask about the initial
15 purchase and then ask about what happened to
16 Mr. Holzer's interest in V Campus.
17        MR. CONWAY: Well, we're going to
18 go into V Campus, but at the moment I'll just
19 ask that.
20   Q.    Do you dispute in any way that the
21 statement of the district attorney that of the
22 $800,000 transferred by the Rapillos to
23 Mr. Holzer on March 23rd, 2006, that $500,000 of
24 V Campus was purchased by Mr. Holzer and then
25 subsequently transferred to you?

[Page 98]

1        MR. FOLKENFLIK: Objection. Let me
2  take --
3        MR. CONWAY: Any way you want to
4  phrase it.
5        MR. FOLKENFLIK: Look. First of
6  all, we don't know whether it was or was not the
7  Rapillos' money that Mr. Holzer used. It may
8  have been, it may not have been. It was
9  $500,000 out of his account to V Campus.
10        MR. CONWAY: Out of Mr. Holzer's
11 account to V Campus.
12        MR. FOLKENFLIK: And $800,000 went
13 into his account from the Rapillos. We don't
14 know whether there were millions of dollars in
15 that account --
16        MR. CONWAY: From Mr. Holzer, we
17 know there was nothing there.
18        MR. FOLKENFLIK: We don't know. We
19 have assumptions and that may be correct.
20        MR. CONWAY: However, on the day he
21 received $800,000.
22        MR. FOLKENFLIK: Let's take it a
23 step at a time. There was a public filing. V
24 Campus was a public company. They publicly
25 stated in their public filing that Mr. Holzer,

[Page 99]

1  with his own funds, according to them --
2        MR. CONWAY: I have seen those
3  files.
4        MR. FOLKENFLIK: Mr. Holzer with
5  his own funds bought 500,000 shares of
6  securities on that day. We can stipulate that
7  that's what they said publicly. That's fine
8  with us.
9        MR. CONWAY: Right.
10        MR. FOLKENFLIK: Now, what happened
11 to Mr. Holzer's interest in V Campus, such as it
12 was, you can ask Mr. Fingerhut to explain. We
13 gave you documents reflecting that transaction
14 between Mr. Holzer and Mr. Fingerhut.
15        MR. CONWAY: What you gave me last
16 Friday? We'll get to that. That's still down
17 the road.
18        MR. FOLKENFLIK: Let's get to some
19 of those things that may be relevant to your
20 theories as opposed to Haverstraw.
21   Q.    Sir, did there come a time when
22 Mr. Holzer transferred to you $500,000 worth of
23 V Campus stock?
24        MR. FOLKENFLIK: Objection as to
25 form. Did there come a time when there was a

[Page 100]

1  transfer concerning -- when there was a
2  transaction concerning V Campus?
3    Q.    You want to try it that way. Sir,
4  did there come a time subsequent to the date of
5  March 23rd, 2006 where there was a transaction
6  between yourself and Mr. Holzer --
7    A.    No.
8    Q.    -- of V Campus stock?
9    A.    No.
10   Q.    Did you at any time -- did
11 Mr. Holzer at any time transfer $500,000 worth
12 of V Campus stock to you?
13   A.    That was -- I don't know. That was
14 the -- no, this was the later -- you know what?
15 I'm sorry, I'll take that back. He did. He did
16 that. That stock is worthless. But I would
17 just tell you that's what happened.
18   Q.    Okay, he gave you --
19   A.    He didn't give me a thing, believe
20 me.
21   Q.    He gave you stock that he had
22 purchased for $500,000.
23        MR. FOLKENFLIK: Counsel, there was
24 a transaction, a contingent assignment. The
25 contingencies occurred and certain securities

[Page 101]



**[Page 102]**

1  would have been transferred in accordance with
2  the contingency assignment when those
3  contingencies occurred.
4  THE WITNESS: Correct.
5  MR. FOLKENFLIK: We gave you the
6  contingent assignment. Why don't you ask about
7  it, because it doesn't refer to the 500,000
8  shares specifically. It refers to stock
9  ownership.
10  MR. CONWAY: I agree.
11  MR. FOLKENFLIK: So you're creating
12  a confusing record by --
13  MR. CONWAY: No, not intentionally.
14  MR. FOLKENFLIK: I didn't say the
15  word "intentionally."
16  MR. CONWAY: I'm following the same
17  timeline that the district attorney did.
18  MR. FOLKENFLIK: But the district
19  attorney didn't refer to the contingent
20  assignment or to the timeline.
21  MR. CONWAY: So let us clarify
22  that.
23  MR. FOLKENFLIK: So clarify it.
24  And since you have the document, why don't you
25  use it.

**[Page 103]**

1  MR. CONWAY: We'll get there, Max.
2  We'll get there. We'll get there.
3  MR. FOLKENFLIK: I doubt it.
4  Q. At the time that Mr. Holzer
5  transferred the $200,000 to you that you've
6  already referred to --
7  A. You mean paid me 200,000.
8  Q. Okay, now, was this as part of a
9  transaction that had additional elements?
10  A. I have no idea except that he owed
11  me a huge amount of money and there was a time
12  when he paid me something.
13  Q. You would not dispute the date of
14  the transfer as being December 15th, 2005.
15  MR. FOLKENFLIK: Counsel, I told
16  you we'll see if we can dig up the record and we
17  will stipulate to it. My supposition is that
18  date is correct because the affidavit was
19  supposedly prepared after review of the banking
20  records. But we will verify that and stipulate
21  to it.
22  Q. Now, sir, while you were extending
23  the portions of the $12 million over this
24  three-year period, did you ask Mr. Holzer at any
25  time for any proofs of purchase?

**[Page 104]**

1  A. Of what?
2  Q. Proofs of purchase of the
3  properties that were in question.
4  A. No.
5  Q. At any time during the multiyear
6  period when Mr. Holzer was supposedly making
7  these purchases and you were extending large
8  sums to him, did you ever discuss with him the
9  parties that were involved in the transactions?
10  Lawyers, closing companies, anything like that?
11  A. Yes. I mean, what was discussed
12  were these two guys, the other buyers.
13  Q. Did you ask where the documentation
14  was?
15  A. I've already told you I haven't.
16  We can go over this a hundred times. I will
17  tell you I have not done it, I'm not happy that
18  I didn't do it. It was a big error. Okay? But
19  you keep asking me the same question. I haven't
20  done it.
21  Q. Now, you consider this a
22  $12 million error?
23  A. At least. Does that make you feel
24  better?
25  Q. Yes.

**[Page 105]**

1  A. Good, I'm glad.
2  Q. Let's take a look at the Thatcher
3  document.
4  MR. FOLKENFLIK: Can we go off the
5  record for a moment?
6  MR. CONWAY: You certainly may.
7  (Discussion off the record.)
8  Q. During the time that you and
9  Mr. Holzer also were partners --
10  MR. FOLKENFLIK: Objection as to
11  form.
12  Q. When you and Mr. Holzer were
13  participating in Fingerhut-Holzer Partners --
14  MR. FOLKENFLIK: LLC.
15  Q. -- LLC, did Mr. Holzer show an
16  inability to pay his personal expenses?
17  MR. FOLKENFLIK: His personal
18  expenses.
19  Q. Personal expenses, yes.
20  MR. FOLKENFLIK: Other than the
21  expenses that may have been covered by the
22  $1,062,000.
23  MR. CONWAY: Right.
24  A. Do me a favor, repeat that, please.
25  Q. During the period that you were

1  functioning as Fingerhut-Holzer Partners, did
2  Mr. Holzer show you an inability to cover his
3  personal obligations?
4         MR. FOLKENFLIK: Other than the
5  $1,062,000.
6      A.  I don't believe so.
7         MR. CONWAY: That would be part of
8  it.
9      A.  Just that.
10     Q.  And what were the circumstances
11 around your extending a million dollars of your
12 personal funds to Mr. Holzer for his personal
13 needs?
14     A.  Didn't I just tell you this about
15 five minutes ago?
16        MR. FOLKENFLIK: Yes.
17     Q.  Okay.
18        Now, there were parties identified
19 in this document, a gentleman by the name of
20 Adam Gurney, an Arab investor.
21     A.  A what? What was the last name?
22        MR. FOLKENFLIK: An Arab investor.
23 A sheik.
24     A.  Sheikh Mohammed.
25     Q.  What was your hoped for involvement

[Page 106]

1  of Sheikh Mohammed with Fingerhut-Holzer
2  Partners?
3      A.  That was the Synconium limited
4  partnership.
5      Q.  And what was that about?
6      A.  That was the partnership investing
7  in the area of disabilities. It was to be a
8  limited partnership, a venture partnership
9  essentially. Adam Gurney -- I don't know what
10 kind of a friend he was with David but I met him
11 through David. I met him in Ireland and he had
12 recommended -- well, at least I thought he had
13 recommended a visit to the sheik in Dubai.
14     Q.  Did you ever meet this sheik?
15     A.  No.
16     Q.  What was the sheik going to invest
17 in?
18     A.  Synconium partnership.
19     Q.  Now, did there come a time in 2006
20 when you had to borrow $4.5 million from
21 JPMorgan Chase for a series of investments in
22 Fingerhut-Holzer Partners?
23     A.  Did I have to borrow it? No. But
24 I did.
25     Q.  Did you choose to borrow it? And

[Page 107]

1  the $4.5 million was intended for what purpose?
2      A.  Investments in the series of
3  investments we have been talking about.
4      Q.  Were any of those investments in
5  the Haverstraw real estate properties?
6      A.  I'm not sure. It's all a function
7  of timing. Whenever it was done. There's a
8  whole series of investments made here.
9      Q.  Well, it's identified in the report
10 as being a 2006 investment.
11     A.  Okay, so if there are investments
12 made in 2006 in Haverstraw, it could be likely
13 that it's there. No, in fact, it's Beacon and
14 Monticello.
15     Q.  Now, are you familiar with the term
16 "Dellwood"?
17     A.  Dellwood. Dellwood is the
18 investment thing or the real estate thing that
19 David talked about.
20     Q.  Yes. That was the putative
21 investor scheduled to purchase these properties.
22        MR. FOLKENFLIK: No. It was the
23 putative -- he was the investee. It was the
24 partnership in which the money was being
25 invested. And Dellwood was acquiring the

[Page 108]

1  property in Haverstraw and Beacon and others.
2      Q.  Did you ever see any participation
3  by Mr. Holzer in Dellwood?
4      A.  I don't understand.
5      Q.  Did he ever show you any
6  documentation that would indicate that he had
7  purchased an interest in Dellwood and was
8  participating in the purchase of these
9  properties?
10     A.  No.
11     Q.  Did you ever ask to see any such
12 proof?
13     A.  No.
14     Q.  Do you know what the intended
15 purchase price of all of the investments upstate
16 were?
17     A.  The intended purchase price?
18     Q.  The intended purchase price.
19        MR. FOLKENFLIK: The witness
20 testified that over time new properties were
21 identified and additional purchases were made.
22 There wasn't a solitary intended purchase.
23 There wasn't a solitary intended purchase price.
24     Q.  Well, the term "$96 million"
25 appears in the documentation in the timeline of

[Page 109]

[28]  (Pages 106 to 109)

events, number 1. That sum of $96 million came
from where?

    A.    Beats the hell out of me. I don't
know that number. What does that say?

    Q.    It says —

    MR. FOLKENFLIK: What paragraph are
you on?

    Q.    Paragraph 1. "I purchased half of
David's interest unbeknownst to others. The
major reason for the establishment of
Fingerhut-Holzer was to take advantage of the
new monies from the sale of the property, at the
time approximately $96 million versus the $30
million cost." That's written in the first
person.

    A.    Right.

    Q.    Now, during the course of the
investment —

    MR. FOLKENFLIK: This says it was
approximated that the sale of properties that
were purchased for 30 million could take
place —

    A.    He had a third and I had a half of
that. So it works out.

    Q.    Well, you were a hidden investor in

[Page 110]

David's one-third, weren't you?

    A.    A hidden investor?

    MR. FOLKENFLIK: Objection as to
form. Hidden from whom?

    Q.    Your interest in David's
contribution was not disclosed to anyone, as
best you know.

    A.    I have no idea.

    Q.    Did there come a time when you
bought half of David's one-third?

    A.    That I bought half of David's
one-third.

    Q.    Yes.

    A.    I don't know.

    Q.    You indicate in BF 0032, the sixth
line down, "I purchased one-half of David's
interest unbeknownst to others."

    A.    Okay, then I did. What am I gonna
say?

    Q.    Why would you wish to be an unknown
investor in David's one-half — in David's
one-third?

    A.    Jeez, I don't know. We've gone
over this. This was a mistake. I didn't wish
to do anything like that. Okay?

[Page 111]

    Q.    Well, why would you need to not be
revealed to the other investors?

    MR. FOLKENFLIK: Objection as to
form.

    A.    It wasn't an issue for me.

    Q.    Well, you're writing there, "I
purchased one-half of David's interest
unbeknownst to others." Why would you have to
hide the —

    MR. FOLKENFLIK: Objection.

    A.    It was not up to me.

    Q.    What was not up to you?

    A.    I wasn't saying you have to hide
it. It was his issue. It wasn't mine.

    Q.    Did you create a document that
established that you had half of this
investment?

    A.    No. N-O.

    MR. FOLKENFLIK: That's about the
seventh time you asked that question.

    A.    Why do you keep going over this?
Listen, these were not good investments. This
is — I was going to say the F word, but this is
fraud.

    MR. FOLKENFLIK: That's the F word.

[Page 112]

    A.    What can I say? But if you'd like,
I'll tell you again, this was a mistake. All
right?

    Q.    Did David give you any reason why
the transaction for the sale of these properties
was not completed?

    A.    Why don't you look in the diary.
It's all in there. There were a whole series of
explanations why, and they were not truthful. I
don't know if you really need to go over all
those. They're right in there.

    MR. FOLKENFLIK: And then there was
a point at which David claimed the transaction
had been completed.

    MR. CONWAY: I saw. I saw it.

    MR. FOLKENFLIK: Okay. And what
difference does this make to your clients'
claim?

    Q.    Did there come a time when you
began investing in a stock called V Campus?

    A.    Yup.

    Q.    How big a position did you take in
V Campus?

    A.    Well, to make it very clear, V
Campus we had originally financed as a private

[Page 113]

[29]  (Pages 110 to 113)

1 company out of Weekly. Okay? And we sold it
2 when it went public. Then I repurchased it back
3 in, I don't know, 2001 or something like that
4 for my own account.
5     Q.   V Campus had gone public before
6 2001?
7     A.   1999 I believe.
8     Q.   To your best recollection --
9         MR. FOLKENFLIK: Let him finish the
10 story. It might be helpful.
11     A.   That's it. The initial investment
12 that we made in Weekly we sold out when it went
13 public. I was a board member. I left the board
14 after we sold the shares. It was a huge hit,
15 too. But it was the time that anything worked.
16 1999. Then I bought it back as a public
17 company.
18     Q.   So you divested yourself of an
19 owner's interest --
20     A.   But that was not me. That was
21 Weekly.
22     Q.   And did you extract some benefit
23 from that as a participator in Weekly?
24     A.   Yes.
25     Q.   And when --

[Page 114]

1     A.   I had a carried interest. We had
2 carried interests.
3     Q.   When did you begin purchasing it on
4 the market?
5     A.   I don't remember exactly. It was
6 either 2000 or 2001.
7     Q.   And in Fingerhut-Holzer Partners
8 you intended to continue purchasing it?
9         MR. FOLKENFLIK: Objection.
10 Assumes facts not in evidence.
11     A.   The investment made by
12 Fingerhut-Holzer in V Campus was not in the --
13 it was not common equity. I believe it was a
14 private placement. It was a preferred stock I
15 believe.
16         MR. CONWAY: I'm going to need five
17 minutes.
18         (Recess taken.)
19 BY MR. CONWAY:
20     Q.   In reading the Thatcher document,
21 it's indicated that in 2004 Mr. Holzer informed
22 you that the Haverstraw property was going to be
23 sold for $99 million, and that their share of
24 the proceeds would be approximately $33 million.
25     So in 2004 did Mr. Holzer indicate

[Page 115]

1 to you who the purchaser would be who would
2 offer $99 million for the property?
3     A.   No. I don't remember that date
4 either, 2004. But that's not my diary I don't
5 believe.
6     Q.   No, this is the Thatcher Associates
7 document. Do you disagree that the number of
8 99 million came up in the year 2004?
9     A.   I don't remember it.
10     Q.   Approximately what time did you
11 come to believe that you were dealing with
12 Mr. Holzer as a fraud?
13     A.   Fall of 2007. Look in the diary
14 notes.
15     Q.   I see, I see. What caused you to
16 reach that conclusion in 2007?
17     A.   A number of things, but again, if
18 you read that --
19     Q.   Reading it doesn't put it on the
20 record.
21         MR. FOLKENFLIK: Just list your
22 best recollection as you're sitting here.
23     A.   The best recollection was when he
24 told me that there was a sale and that in fact,
25 he produced a deposit for $33 million in an

[Page 116]

1 account and showed me -- and actually, the
2 person who was running, still is, York Tango
3 because she was waiting for funds. And then
4 deposited in the FH LLC account, and of course
5 it bounced.
6     Q.   FH LLC. The Fingerhut-Holzer
7 account.
8     A.   Whatever.
9     Q.   He put that in the Fingerhut-Holzer
10 account.
11     A.   Yeah. And it bounced. JPMorgan
12 shut down all the accounts the next day.
13     Q.   Now, did that functionally stop
14 business from going forward at Fingerhut-Holzer
15 Partners?
16     A.   Well, I would say yes. Although
17 the funds inside Fingerhut-Holzer were basically
18 paying wages and rent.
19     Q.   What do you mean --
20     A.   When you say did it shut down
21 Fingerhut-Holzer, the bank stopped the ability
22 to pay salaries. That would have shut it down.
23     Q.   When JPMorgan closed the accounts,
24 did it close down all of the accounts attached
25 to Fingerhut-Holzer?

[Page 117]

[30]  (Pages 114 to 117)

1   A.   Yes.
2   Q.   Did that mean that you were not
3   able to accept funds or issue funds out of the
4   Fingerhut-Holzer accounts?
5   A.   Yes. There weren't a lot of funds
6   in any case, but that didn't matter. He bounced
7   the check. There were $10,000 in the account
8   and he wrote a check for 30 million. It doesn't
9   work.
10  Q.   Now, on what account did he write
11  the $33 million check?
12  A.   What does that mean, "on what
13  account"?
14  Q.   What account was issuing the
15  $33 million?
16  A.   It was I think his own personal
17  account.
18  Q.   His personal account.
19  A.   I think so, yes. I don't remember
20  exact -- I don't remember what account it was
21  supposedly written on.
22  Q.   Did you ever see the check?
23  A.   No. Just the deposit. No, wait a
24  minute -- no, no, no, I only saw the deposit. I
25  have copies of other checks that he wrote that

[Page 118]

1   A.   Well, we had committed to it.
2   Q.   When you indicate --
3   A.   And I had done my half and
4   obviously David had not done his.
5   Q.   Well --
6   A.   You have to know her. She's tough.
7   She's very tough. She's terrific. I wish I had
8   20 more like her. She came over and she wanted
9   the other half of the funds.
10  Q.   Just for the record, who is she?
11  A.   Her name is Andrea Miller. She's
12  still running the company.
13  Q.   Now, you had already extended your
14  half of the investment?
15  A.   Yes.
16  Q.   Did you extend it through
17  Fingerhut-Holzer Partners?
18  A.   No. It was me. I ended up having
19  to basically cover what he didn't do. Again,
20  for myself.
21  Q.   Was David going to issue the funds
22  from Fingerhut-Holzer?
23  A.   Well, I suspect that that was the
24  idea if in fact anybody accepted a check that
25  was written for 33 million on a $10,000 balance.

[Page 120]

1   bounced, too.
2   Q.   Previously?
3   A.   No. After.
4   Q.   And is there a reason that
5   Mr. Holzer -- is there a reason that you're
6   aware of that Mr. Holzer would have created a
7   fraudulent document like this at that time?
8   A.   It's hard to understand how he
9   could have done it and think he could have
10  gotten away with it, but it happened that he
11  knew that the person from Tango was coming over
12  and she was looking for the funds that he was
13  supposed to be contributing. And I suspect that
14  what he did was, he wrote this -- he phonied up
15  this deposit as a way of putting her off saying
16  it would take a day or so to clear. Whatever
17  the hell that meant on a wire I have no idea.
18  Q.   Now, why would the money be going
19  to Tango?
20  A.   We committed to invest in Tango.
21  Q.   When you indicated a woman was
22  coming over from Tango --
23  A.   She's the CEO.
24  Q.   The CEO wanted a check for further
25  investment in Tango.

[Page 119]

1   So if it would have gone into Fingerhut-Holzer,
2   then it wouldn't have, so what's the difference?
3   Q.   You would have found out that the
4   check was fraudulent within 24 hours, correct?
5   A.   I did.
6   Q.   What did you then do?
7   A.   That's when I hired Thatcher.
8   Q.   The next day?
9   A.   Mm-hmm. Well, actually, that's
10  probably not true. I went to -- what's his
11  name?
12      MR. FOLKENFLIK: Howard Wilson.
13  A.   Howard Wilson.
14      MR. FOLKENFLIK: Proskauer.
15  Q.   I saw that. Is Proskauer a law
16  firm with which you had dealt previously?
17  A.   Proskauer is the law firm that
18  dealt with FEGS.
19  Q.   What's that?
20  A.   The Federation of Employment
21  Guidance Service. It's the largest social
22  service agency in New York City if you exclude
23  the hospitals. I was chairman of it.
24  Q.   FEGS?
25  A.   Yes. I spent a lot of time with

[Page 121]

[31]   (Pages 118 to 121)

1  Proskauer.
2      Q.  And the gentleman --
3      A.  Not Howard but a couple other guys.
4  But they recommended Howard.
5      Q.  Right. Mr. Wilson was one of their
6  criminal lawyers?
7      A.  Yes.
8      Q.  And when you --
9          MR. FOLKENFLIK: Among other
10 things.
11     A.  Yes.
12     Q.  So you had initial concern that
13 there was some criminal liability that could
14 extend to the firm and to yourself personally?
15     A.  Wouldn't you think so?
16     Q.  I agree.
17     A.  Okay.
18     Q.  Now, of course not asking what
19 Mr. Wilson's advice to you was, what did you
20 then do?
21     A.  I retained Thatcher. I needed to
22 see if there -- I wanted to see evidence of what
23 was happening and if there was something to be
24 defended against.
25     Q.  How did Thatcher come to you?

                              [Page 122]

1      A.  Through Wilson.
2      Q.  Wilson recommended Thatcher?
3      A.  Yes.
4      Q.  Now, had you had conversations with
5  Mr. Holzer before you went to Proskauer relative
6  to the entire extent of your relationship?
7      A.  You mean to Wilson?
8      Q.  No. Did you have conversations
9  with Holzer. When the check bounced --
10     A.  No. Because it bounced the next
11 day, he wasn't in.
12     Q.  Did you see him before you went to
13 Thatcher?
14     A.  Did I see him before I went to
15 Thatcher? I don't know. I don't think so.
16     Q.  Now, Thatcher is not an attorney.
17     A.  He might be, but they're not a law
18 firm.
19     Q.  They don't practice as a law firm.
20     A.  He does private investigations.
21     Q.  Who did you deal with there?
22     A.  Thatcher.
23     Q.  Mr. Thatcher himself?
24     A.  Mm-hmm. And his right hand guy,
25 I'll think of it in a minute. But mainly

                              [Page 123]

1  Thatcher.
2      Q.  Do you recall Mr. Thatcher's first
3  name?
4          MR. FOLKENFLIK: Toby.
5      Q.  And how long did you deal with
6  Mr. Thatcher before the document that we've
7  identified here as --
8      A.  The assignment?
9      Q.  Yes.
10         MR. FOLKENFLIK: The assignment or
11 the Thatcher draft?
12     Q.  The Thatcher draft.
13     A.  You mean this one here?
14         MR. FOLKENFLIK: Exhibit 7. Which
15 is dated 11/1.
16     A.  How long did I deal with him?
17         MR. FOLKENFLIK: The witness
18 testified he went to Thatcher the day after the
19 check bounced.
20     Q.  Do we know the date the check
21 bounced?
22     A.  No, but I could find that out. It
23 was October -- I'm not sure. It was '07. It
24 should be in the notes that I have.
25     Q.  I'm sure it's there. Let's find

                              [Page 124]

1  the date.
2          MR. FOLKENFLIK: It appears to be
3  that the check bounced on the 6th of June. On
4  the 5th or 6th of June. See it on BF 33. And
5  the report is dated 11/1.
6      Q.  On whose advice was it to begin the
7  daily diaries?
8      A.  I don't think it was anyone's
9  advice. It was me writing it. But I think once
10 I started, and I think I showed it to Toby, I
11 think they said continue.
12     Q.  They indicated write the diary?
13     A.  I think they told me that it wasn't
14 a bad idea. Now, they also did their own
15 independently of mine.
16     Q.  So there is other documentation
17 that may exist --
18     A.  You're looking at it.
19     Q.  By that I mean is there other
20 documentation beyond what we've identified here,
21 is there a final report, is there a further
22 investigation? Is there a side investigation,
23 anything of that nature?
24     A.  No. I mean, this basically
25 encapsulates everything. Was there a final

                              [Page 125]

[32]  (Pages 122 to 125)

**[Page 126]**

1  document that he gave me?
2    Q.  Yes.
3    A.  I'm sure there was.
4    MR. CONWAY: By counsel, the
5  document that you extended is called a TA draft.
6    MR. FOLKENFLIK: That's correct.
7    MR. CONWAY: Do we know if there's
8  a final issuance?
9    MR. FOLKENFLIK: I don't have one.
10    Q.  Now, this particular document which
11  we've identified, when did you see it for the
12  first time?
13    A.  This document?
14    Q.  This document.
15    MR. FOLKENFLIK: By the document he
16  just means the first pages -- did you see it at
17  or about the date it is dated, 11/15/07?
18    A.  Yes. But I saw it many times
19  before that.
20    Q.  They showed you before?
21    A.  Yes, but I also had a lot of
22  conversations. They also came to the office,
23  they took apart his hard drive. They did a lot
24  of work.
25    Q.  Now, all of this predates your

**[Page 127]**

1  going to the district attorney.
2    MR. FOLKENFLIK: What does "all of
3  this" mean?
4    Q.  The efforts by Thatcher Associates
5  predate your going to the district attorney.
6    A.  I'm not sure that I waited until a
7  final report before I went. But clearly
8  Thatcher predated the district attorney, no
9  doubt. I mean, I had a feeling that they were
10  right.
11    Q.  Now, when they came in -- when
12  Thatcher came in they took apart from Holzer's
13  computer?
14    A.  Yes.
15    Q.  Did they --
16    A.  Well, the hard drive.
17    Q.  Did they take possession of it?
18    A.  They did and then they brought it
19  back.
20    Q.  Did they take possession of his
21  phone?
22    A.  I don't know. I don't want to add
23  any titillation here.
24    (Fingerhut Exhibit 8 for
25  identification, Bates No. BF 54 through 57)

**[Page 128]**

1    Q.  There were a series of documents
2  that were marked on our break. Can you identify
3  Exhibit number 8.
4    A.  I don't know who this person is.
5    MR. FOLKENFLIK: Can you identify
6  this waiver of notice of organization meeting,
7  Fingerhut-Waverly, Waverly LLC?
8    A.  I don't remember this. But is
9  there a date on here?
10    Q.  December 27th, '05.
11    A.  What is this? I don't know. This
12  is part of the creation of the document? I
13  don't know what this is.
14    Q.  No, it would not have been.
15    A.  I mean of the organization.
16    MR. FOLKENFLIK: Counsel, this
17  appears to be a document that comes from the
18  office of the Secretary of State of Delaware.
19  No, it's -- let me see. New York. It appears
20  to be an official document establishing the
21  organization Fingerhut-Holzer, the Waverly 1
22  LLC.
23    MR. CONWAY: Rather than go through
24  the witness, do you want to stipulate to that?
25    MR. FOLKENFLIK: We'll look online

**[Page 129]**

1  and if it's an official document, we'll
2  stipulate to it.
3    MR. CONWAY: I'm sure it's correct.
4    Q.  Did Fingerhut-Holzer have an
5  investment that was known as Fingerhut-Holzer,
6  the Waverly 1 LLC?
7    A.  I don't remember.
8    Q.  You don't recall that?
9    MR. FOLKENFLIK: Counsel, I believe
10  that's the entity to which your client wired
11  their $300,000.
12    MR. CONWAY: Agreed.
13    Q.  And you don't have any recollection
14  of it?
15    MR. FOLKENFLIK: The witness
16  already testified about the Waverly.
17    A.  A couple times.
18    MR. FOLKENFLIK: The question is
19  the precise name and identity of the
20  organization, since there were so many with
21  confusingly similar names.
22    Q.  Did you have multiple Waverly
23  investments?
24    A.  Did I? Did I make them myself?
25    Q.  Did Fingerhut-Holzer have multiple

1  Waverly investments?
2      A.   I believe so. I'm not sure on
3  Waverly. A couple of them we did.
4          MR. FOLKENFLIK: If you look at
5  Exhibit number 3, the witness just to save time
6  can identify --
7      A.   No, that was Waters Edge.
8          MR. FOLKENFLIK: You can identify
9  the investments that may have had some
10 connection to the same developer as the Waverly.
11 Why don't you do that.
12     A.   Well, Waverly, Waters Edge, Village
13 Walk and Augustine Island are all the same
14 developer. All in Jacksonville.
15         (Fingerhut Exhibit 9 for
16 identification, Bates No. BF 58 through 89)
17     Q.   Now, take a look at Exhibit 9.
18 What is Exhibit number 9?
19     A.   You just gave it to me.
20     Q.   Yes, what is it?
21         MR. FOLKENFLIK: It's the operating
22 agreement of Fingerhut-Holzer Partners LLC.
23     Q.   And is this the operating document
24 of Fingerhut-Holzer Partners, as best you know?
25     A.   I assume so.

[Page 130]

1      Q.   Sir, would you take a look at the
2  date on that.
3      A.   October 25th, 2007.
4      Q.   Now, this document was created
5  after you determined that Mr. Holzer was acting
6  dishonestly within the company. Correct? For
7  what purpose would you create an operating
8  agreement after there is a fracture of the firm
9  such as you have described?
10     A.   This is really not anything to do
11 with him. This is me selling a membership
12 interest to my son. If you look under
13 "recitals." This was not the first formation of
14 this thing. This operating agreement goes back.
15     Q.   How far --
16     A.   Effective June 21, 2004.
17     Q.   Do you have a copy of an operating
18 agreement dated June 21, 2004?
19     A.   Not on me.
20     Q.   Do you still have one?
21     A.   I'm assuming I do.
22         MR. CONWAY: I'd ask that that be
23 produced.
24         MR. FOLKENFLIK: We produced what
25 we were able to locate. And if that isn't

[Page 131]

1  amongst those agreements, we've produced it.
2      A.   This was only --
3          MR. FOLKENFLIK: And I believe we
4  did. I think this was one of several documents
5  we produced to you, and there's another one
6  that's the operating agreement for
7  Fingerhut-Holzer Partners LLC that bears an
8  earlier date I believe.
9          MR. CONWAY: I don't believe that
10 we have that. What we have is the
11 Fingerhut-Holzer Fund limited partnership
12 agreement at 10/1/04.
13     A.   Well, all I could say is this is
14 the second document I've seen that refers to
15 Fingerhut-Holzer Partners LLC being formed in
16 2004. Because there's another document already
17 that we looked at.
18     Q.   Yes, we've seen it.
19         MR. FOLKENFLIK: I'll double-check.
20     A.   Look at the first paragraph, you'll
21 see.
22         MR. FOLKENFLIK: I'll double-check.
23 And if we have an earlier version of the
24 operating agreement; however, I believe the
25 operating agreement -- other than -- let me see

[Page 132]

1  this. Other than whatever adjustments were
2  required to be made because of the sale of -- a
3  capital contribution by Andrew Fingerhut, that
4  the nature of the terms of the agreement are
5  probably quite similar.
6      Q.   There came a time after June 2007
7  when you met and sat with Mr. Holzer. On that
8  occasion did you make inquiry of him concerning
9  the nature of his actions in Fingerhut-Holzer
10 and the check for $33 million? Did you ask him
11 what was going on?
12     A.   A check for what?
13     Q.   $33 million. The deposit slip for
14 $33 million.
15     A.   Oh, okay.
16     Q.   Did you meet with him and did you
17 discuss it?
18     A.   Yes. A few times.
19     Q.   What did Mr. Holzer indicate to
20 you?
21     A.   What did he indicate to me?
22     Q.   Yes.
23     A.   He said it was real.
24     Q.   He said what was real?
25     A.   The 33 million.

[Page 133]

[34] (Pages 130 to 133)

1    Q.   And did he attempt to explain away
2  its absence?
3    A.   Its absence or it bounced?
4    Q.   Its nonexistence.
5    A.   He attempted to.
6    Q.   And what did he say about it?
7    A.   I don't remember offhand, but I
8  have it in my notes. That's why you have them.
9    Q.   I have the notes. However, I need
10 it on the transcript.
11   A.   Well, you're going to have to get
12 it off of there because I don't remember.
13   Q.   You want us to read it again?
14   A.   Do what you want.
15       MR. FOLKENFLIK: If "by the notes"
16 you mean the TA draft or the diary?
17       MR. CONWAY: I presume he means the
18 diary notes.
19       MR. FOLKENFLIK: Well, there are no
20 notes late enough. The latest diary note is
21 8/16/07.
22   A.   Then it's in the TA. Tell me what
23 you want to get.
24   Q.   What I want to know is what did
25 Mr. Holzer explain to you about his actions?

[Page 134]

1       MR. FOLKENFLIK: Did he say
2  anything about why he wrote a $33 million check
3  that bounced?
4    A.   Of course. The deal broke or this
5  or that. He was embarrassed about not admitting
6  to me that the deal didn't happen so he wanted
7  to do it. It was absurd.
8    Q.   The deal didn't happen; however,
9  were there properties that he had purchased with
10 the monies that had been extended?
11   A.   Were there properties that he had
12 purchased.
13   Q.   Yes.
14   A.   With the monies that had been
15 extended.
16   Q.   He had 20 properties there that
17 he's supposed to have purchased. Did he
18 purchase them?
19   A.   Obviously not.
20   Q.   Did you ask him what happened to
21 the money?
22   A.   Yes.
23   Q.   What did he say?
24   A.   He told me the deal broke, he told
25 me, you know, the check got lost in the mail.

[Page 135]

1  Every kind of bullshit excuse you could think
2  of. Were any of them credible? They weren't.
3       MR. FOLKENFLIK: Counsel, if you
4  look at the Thatcher report, it says that the
5  deal keeps getting delayed in the summer.
6       MR. CONWAY: I understand, I saw
7  it.
8       MR. FOLKENFLIK: And to October of
9  2007, paragraph number 7, where Holzer finally
10 admits that the Dellwood investment does not
11 exist and that he has only approximately $40,000
12 left.
13   A.   That was I believe a function of
14 Toby cornering him.
15       MR. FOLKENFLIK: Yes.
16   Q.   And how did that come to be?
17   A.   He came into the office, he and
18 another guy went in and talked to him. They
19 were wired, David admitted it. He confessed to
20 everything.
21   Q.   From June until October he was
22 still continuing to perpetrate the fraud?
23   A.   Yes. And he would continue if he
24 were here today.
25   Q.   Do you know the identities of the

[Page 136]

1  parties that came and confronted him in October?
2       MR. FOLKENFLIK: It's in the notes.
3    A.   Lincoln Ornston. Good guy.
4  Lincoln's not there anymore. He started his own
5  firm. But Toby and Lincoln. By the way, I
6  never realized you could do that, you could have
7  a wire.
8    Q.   Yes, in the State of New York
9  you're allowed.
10   A.   I never realized that. It was
11 amazing.
12       MR. FOLKENFLIK: Counsel, for the
13 record, you'll see that as late as
14 September 15th -- excuse me, I'm wrong about
15 that. Never mind.
16       Fingerhut Exhibit 11 for
17 identification, Bates No. BF 8 through 13)
18   Q.   Sir, would you take a look at
19 Exhibit 11.
20   A.   Okay.
21   Q.   What is Exhibit 11?
22   A.   It's an assignment of his interests
23 if he doesn't pay.
24   Q.   How did you come to negotiate that?
25   A.   I called my attorney. I told him

[Page 137]

[35]   (Pages 134 to 137)

1   put it together.
2       Q.   And your attorney is named who?
3       A.   Kevin Prakke. I think he did a
4   really good job on this.
5           MR. FOLKENFLIK: It's a good job.
6       A.   It is a good document. He's only
7   $330 an hour.
8       Q.   $330 an hour?
9       A.   At the time. Anyway, he wrote
10  this. He forced -- he didn't force, he gave it
11  to Holzer, he signed it. Clearly none of this
12  happened, putting up the cash, so therefore I
13  took back what essentially I had already
14  invested in, in a sense for him.
15      Q.   Was is signed by both parties. Do
16  you recognize your signature?
17      A.   Yup.
18      Q.   Do you recognize David Holzer's
19  signature?
20      A.   Yup, I sure do.
21      Q.   Now, the purpose of this document
22  was to establish what? What did you want to
23  accomplish with this?
24      A.   I wanted to have a contingency in
25  case the monies were not -- that I had put up

[Page 138]

1   monies for him. He had ownership in certain
2   positions as a function of monies that he owed
3   and was supposedly paying. And I basically had
4   that to take those properties that I already
5   bought for myself.
6       Q.   Now, did Mr. -- this happened
7   before the confrontation with Mr. Thatcher?
8       A.   I don't remember the date on that.
9       Q.   3rd day of October.
10          MR. FOLKENFLIK: And the meeting,
11  according to the --
12      A.   It's about the same.
13          MR. FOLKENFLIK: It's about the
14  same date. It just says October. Thatcher
15  doesn't have the date in October when he
16  confronted Holzer.
17      A.   And in fact -- no. It's related
18  but I don't think Toby was directly involved in
19  giving that document to Holzer.
20          Fingerhut Exhibit 12 for
21  identification, Bates No. BF 14 through 18)
22      Q.   Now, there was also --
23          MR. FOLKENFLIK: Counsel, just to
24  make your life easier, the assignment, as
25  Mr. Fingerhut said, of the V Campus equities

[Page 139]

1   that he bought with $500,000 that you suggested
2   was your clients' money, which is incorrect,
3   leaving aside the issue of whether Mr. Fingerhut
4   pursuant to the collateral assignment agreement
5   would be a bona fide purchaser for value without
6   notice of the --
7           MR. CONWAY: An issue to be
8   resolved at another time.
9           MR. FOLKENFLIK: Leaving that
10  aside, that stock is worthless.
11      A.   Also I bought stock myself.
12          MR. FOLKENFLIK: Yes, he bought
13  stock himself. That stock is -- the company is
14  not in business. The debtors of the company --
15          MR. CONWAY: Well, it was in
16  business in 2007.
17          MR. FOLKENFLIK: Yes. But not
18  since.
19          MR. CONWAY: And it had a value on
20  October of 2007 --
21          MR. FOLKENFLIK: Not much.
22      A.   I have a $2.3 million investment
23  here that's worthless.
24      Q.   How many shares of stock did you
25  own at the time?

[Page 140]

1       A.   I don't know. I have no idea. I
2   owned a lot because I bought a big piece of this
3   preferred offering.
4           MR. FOLKENFLIK: It's not clear
5   that the stock, although it was trading, had
6   actual value in October 2007 but it would be
7   irrelevant in any event.
8       A.   That's true. This was not a
9   public --
10          MR. FOLKENFLIK: V Campus was
11  public.
12      A.   This was a preferred -- this was a
13  private offering, if you will. This was not
14  public shares.
15          MR. FOLKENFLIK: Your shares.
16      A.   The ones purchased. I also owned a
17  lot of common, too.
18      Q.   So the value of V Campus at the
19  time would have been greater than the $2 million
20  investment that had been made already?
21          MR. FOLKENFLIK: Maybe less.
22          MR. CONWAY: Possibly, but we don't
23  know.
24      A.   I'm not sure. I don't think a lot
25  more, if that.

[Page 141]

1   Q.   Well, if it was worth a stated
2   value or more, then certainly the $500,000 that
3   was transferred would have been its value as of
4   the day of the transfer to you.
5       MR. FOLKENFLIK:  No.
6   A.   What does -- what does transfer to
7   me mean?  There was no transfer to me.
8       MR. FOLKENFLIK:  What happened is
9   that --
10      MR. CONWAY:  Do you want to go off
11  the record?
12      MR. FOLKENFLIK:  Let's do it on the
13  record.
14  A.   Let me explain the whole thing to
15  you.
16  Q.   It has to be in response to a
17  question.
18      MR. FOLKENFLIK:  Let him explain.
19  Would you explain what happened.  Go ahead.
20  Q.   First, this document that you've
21  examined, the --
22  A.   Contingency?
23  Q.   The collateral contingent.  That
24  was intended by you to take control and
25  possession of the interests of Mr. Holzer up to

[Page 142]

1   the value that you had extended to him.
2       MR. FOLKENFLIK:  No.
3   Q.   Which was like 7 million --
4   A.   It was to take control of those
5   interests in the event that the value had not
6   been paid.  Not up to the value, not contingent
7   on a particular value.  Contingent on
8   non-repayment of what he owed.
9   Q.   There was also a promissory note
10  dated October 9th, 2007 for the sum of
11  $7,603,800.
12      (Fingerhut Exhibit 13 for
13  identification, Bates No. BF 15 through 18)
14  Q.   Can you identify that as the
15  promissory note that was created by you as a
16  companion document --
17  A.   What a joke.
18  Q.   -- to the prior?
19      MR. FOLKENFLIK:  This is 7/6.
20  A.   What about it?
21  Q.   That's intended to be a supporting
22  document to the contingent assignment of equity
23  interests.
24  A.   I believe so.
25  Q.   That would essentially make him owe

[Page 143]

1   you in two ways; a promissory note and the
2   contingent surrender.
3   A.   Good luck.
4   Q.   And at the same time did you demand
5   and receive a resignation by Mr. Holzer from
6   Fingerhut --
7   A.   It was a little bit after I think.
8   But it was about the same time.
9       MR. FOLKENFLIK:  It says
10  October 15th.  The promissory note is dated
11  the 9th.  The contingent assignment agreement is
12  dated the 3rd.
13  Q.   Was all of this executed at the
14  Fingerhut-Holzer offices?
15  A.   It must have been because there's
16  no other place I could grab him.
17  Q.   Do you have a present active
18  recollection of being present for this
19  execution?
20  A.   Oh, absolutely.  I'm wondering if
21  it was the same -- no, it wasn't the same day as
22  Toby.
23      MR. FOLKENFLIK:  Mr. Holzer did
24  deliver, just to shortcut this, two checks
25  aggregating the amount of $7 million on or about

[Page 144]

1   November 29th, 2007, both of which bounced.
2       MR. CONWAY:  November 29th?
3       MR. FOLKENFLIK:  Yes.
4   A.   When this was all brought to him,
5   he said, well, you know, I've just been hired
6   for -- to be a trader.  I guess he had left
7   Breen Murray.  I don't remember how that
8   happened.  But he had just been hired by some
9   big shot trader and he was getting a 7 or
10  $8 million up-front bonus.  And he was going to
11  pay me the $7 million to ameliorate this issue.
12  Q.   That's what he told you.
13  A.   No, he sent me two checks, $7
14  million, and guess what, they bounced, too.
15  Next thing, going to Sing Sing.
16  Q.   Did there come a time when -- now,
17  completing these transactions, had you decided
18  to approach the district attorney concerning
19  this?
20  A.   Yes.  I had to be sure that Toby
21  could find what one needed to present to the
22  district attorney.
23  Q.   And did you approach the district
24  attorney yourself or did Mr. Thatcher do it for
25  you?

[Page 145]

1      A.    I'm sure Thatcher did it.  I mean,
2  I may have been with him, but I don't remember.
3      Q.    Well, do you have a present active
4  recollection of walking into the district
5  attorney's office and sitting with somebody?
6      A.    No, I never dealt with a district
7  attorney.  I dealt with an ADA.
8      Q.    Well, as an assistant district
9  attorney, do you remember sitting with someone
10 at some point --
11     A.    Yes, a couple times.
12     Q.    Who did you sit with?
13     A.    I knew you were going to ask me and
14 I forgot her name.
15     Q.    Is that Ms. Pane?
16     A.    Yes.  What's her first name?
17     Q.    Christine Payne.
18     A.    Yeah, that's it.  She left for --
19     Q.    She was pregnant.
20     A.    Yeah, yeah.  She was great.  She
21 did a great job.
22     Q.    Did you then deal with the
23 successor assistant district attorney?
24     A.    Yeah, but the majority of the work
25 was done by Chris.

[Page 146]

1      Q.    Do you recall meeting any
2  successor?
3      A.    I'm not sure I met her,  I talked
4  to her.
5      Q.    All right, did there come a time
6  when you were asked to testify to the grand
7  jury?
8      A.    Yes.
9      Q.    And did you do so?
10     A.    Yes.  Chris was I think still the
11 ADA on that.
12     Q.    She handled the questioning of
13 you --
14     A.    Yes.
15     Q.    -- as a grand jury witness?
16     A.    Yes.
17     Q.    When was the last time you saw
18 Mr. Holzer?
19     A.    I'm not sure if it was the day that
20 Toby and Lincoln came in to have him confess.
21 There may have been one more day he was in that
22 he gave me those checks.  No, you know what,
23 that's not right.  This was independent I
24 believe of Toby and Lincoln.  This might have
25 been a week later he was in.  I had it all

[Page 147]

1  prepared and I wasn't going to let him get out
2  without doing this.
3      Q.    Mr. Prakke?
4           MR. FOLKENFLIK:  When the witness
5  said "this" he was pointing to Exhibit 13.
6      A.    I'm sorry, the contingent and the
7  promissory note.
8      Q.    That was created by your attorney?
9      A.    Yes.
10     Q.    Mr. Prakke?
11     A.    Yes.
12     Q.    When they were executed, they were
13 executed solely in the presence of Mr. Holzer
14 and not with anyone else?
15     A.    I don't know.
16     Q.    I didn't see a witness there.
17          MR. FOLKENFLIK:  I didn't see a
18 notary certificate.
19     A.    The contingent thing, there's just
20 two signatures I know, Holzer and myself.
21     Q.    All right, now you were making
22 reference to this in some regard?
23          MR. FOLKENFLIK:  No, he said there
24 were only two signatures.
25     A.    That was the next time I saw

[Page 148]

1  Holzer.  He signed that, the note, and I believe
2  also maybe he was in one later time because when
3  he did his resignation, I don't remember if it
4  was the same date or not.  I don't think so, it
5  was later.  But not much later.  So maybe I saw
6  him once or twice after he confessed.
7      Q.    Now, as regards the V Campus
8  stock --
9           MR. FOLKENFLIK:  Could we go off
10 the record for a minute?
11          MR. CONWAY:  Sure.
12          (Discussion off the record.)
13     Q.    Do you know who the founder of V
14 Campus was?
15     A.    I'm not sure.  I know the guy who
16 was running it for many years.
17     Q.    Who was that?
18     A.    Of course I can't remember his name
19 either.  Nat Kannan.
20     Q.    Nat Kannan?
21     A.    Nat Kannan, K-A-N-N-A-N.
22     Q.    And you indicated you were on the
23 board of V Campus?
24     A.    That was about four or five years
25 before that.

[Page 149]

[38]  (Pages 146 to 149)

1    MR. FOLKENFLIK: He testified he
2  was on the board when it went public.
3    A.   Right, from about 1995 to '98 or
4  '9.
5    Q.   Was V Campus affiliated with any
6  particular university?
7    A.   Any particular university?
8    Q.   University, yes.
9    A.   I don't think so.
10    MR. FOLKENFLIK: I think the V
11  stands for virtual.
12    A.   Its first name was University
13  Online. If that's what you're thinking.
14    Q.   That was its formal name.
15    A.   Yeah, it's a little complicated
16  because they bought a number of companies, and
17  one of the companies they bought became bigger
18  than them. But they were initially called
19  University Online when we invested in it as
20  to -- as a Weekly investment. When it went
21  public it was still called University Online.
22    Q.   Did it have any call letters that
23  you would know on the stock --
24    A.   UOLC I think. I mean, it was
25  over-the-counter. They then bought a series of

[Page 150]

1  those days, probably a 3, 4 million investment,
2  so it was probably 25 to 30 percent post Weekly
3  owned of University Online.
4    Q.   How many shares did
5  Fingerhut-Holzer own at its peak?
6    A.   They never owned University Online.
7    Q.   When your records indicate V
8  Campus, what is it referring to?
9    A.   V Campus. That's after they
10  changed the name. It wasn't the same company.
11  They bought a number of other companies.
12    Q.   The company that went public is not
13  the same company as V Campus?
14    A.   The company that went public was
15  University Online. They bought at least two
16  other companies and then changed their name to V
17  Campus.
18    Q.   All right, when they became V
19  Campus, what was their stock value?
20    A.   I don't know offhand. Probably not
21  a great deal different than when we sold it.
22    Q.   And what did you sell it for?
23    A.   As I said, I think it was like 25,
24  30 million. Actually, it was probably more. I
25  don't know. I don't remember. It was a mistake

[Page 152]

1  companies, one was called Pro Soft, and there
2  was a second. And I think at the time they
3  bought the second -- the first or the second
4  company, they renamed the company to V Campus
5  because it was more than just a University
6  Online.
7    Q.   And do you know what it was
8  capitalized at when it went public?
9    MR. FOLKENFLIK: By "capitalized"
10  you mean the market cap?
11    Q.   Market cap.
12    A.   Oh, lord, I don't. I would say it
13  was probably, given where we were as an investor
14  where we had probably no more than 10 million
15  pre on the investment, I would say it was
16  probably somewhere in the 25, $30 million range
17  when it went public.
18    Q.   When you say 10 million preferred,
19  you had 10 million shares?
20    A.   No, 10 million pre money in the
21  value.
22    Q.   How many shares --
23    A.   This is all long prior to the
24  events at issue. I would have to go back and
25  look at it. But given what we would do back in

[Page 151]

1  to buy it then because clearly it went down a
2  lot. What ended up happening with the company
3  had nothing to do with the equity value. What
4  happened was that the company was really,
5  really, really poorly run. However, the Pro
6  Soft product was a terrific product. It's a
7  CIW --
8    MR. FOLKENFLIK: Just talk about
9  what happened to the equity in the company.
10    A.   Okay, well, what happened was it
11  was mismanaged. Never generated enough cash and
12  was always in a position of trying to get cash,
13  get new equities, et cetera, et cetera. That
14  was the preferred piece that we show in there.
15    Q.   And then --
16    A.   Wait a minute. I'm not finished.
17  That didn't work either. The company was in
18  really sorry shape. I then lent the company
19  money.
20    Q.   How much?
21    A.   I don't know. A million dollars,
22  maybe more. I wasn't the only one. There was
23  another group called Gott Bettor.
24    Q.   Gott Bettor?
25    A.   Yes. G-O-T-T, B-E-T-T-O-R. They

[Page 153]

[39] (Pages 150 to 153)

1 loaned the company money, I loaned the company
2 money. The company couldn't pay it off. As you
3 can see, Nat had pretty good ideas about what
4 the company should be, but it was terribly
5 managed. But it wasn't just that, there were
6 other issues, too.
7       Anyway, so what ended up happening
8 was that there was what is known I guess as a
9 friendly foreclosure. I'm taking a couple
10 years -- it sounds like it happened right away
11 but this is years later. And the friendly
12 foreclosure was all the equity was wiped out.
13 This wasn't a bankruptcy, although the way the
14 directors handled it, it was terrible.
15       Q.    Well, who was foreclosing?
16       A.    The debtors were foreclosing.
17 There was not enough equity to go around. So
18 every share I ever owned is gone.
19       Q.    When exactly did this occur?
20       A.    2008.
21       Q.    This would be after the date of --
22 pursuant to your agreement with Holzer --
23       A.    I got all the shares back and they
24 were worthless. That's good.
25       Q.    Where was the stock held at the

[Page 154]

1 time of the transfer back?
2       A.    Where was the stock held --
3       Q.    What was Fingerhut-Holzer holding?
4 Were they holding warrants, stock sheets? What
5 were they holding?
6       A.    The only thing they were holding
7 was this preferred issue.
8       Q.    And in what form did it manifest
9 itself?
10       MR. FOLKENFLIK: You mean were
11 there actual shares issued?
12       MR. CONWAY: Yes.
13       MR. FOLKENFLIK: Physical shares?
14       MR. CONWAY: Yes.
15       A.    I don't know. I'm not sure. May
16 have been but they were not publicly traded
17 shares. They were preferred shares.
18       MR. FOLKENFLIK: They might have
19 been held as a book entry.
20       Q.    They would be in an account
21 somewhere?
22       MR. FOLKENFLIK: It might have been
23 held as a book entry on the books of the --
24       A.    V Campus reported it all so there's
25 gotta be -- they're all in their documents.

[Page 155]

1       MR. CONWAY: Give me a few minutes
2 with my clients.
3       (Recess taken.)
4 BY MR. CONWAY:
5       Q.    No more questions.
6       MR. FOLKENFLIK: I have nothing.
7       (TIME NOTED: 2:50 p.m.)

[Page 156]

1           INSTRUCTIONS TO WITNESS
2
3       Please read your deposition over
4 carefully and make any necessary corrections.
5 You should state the reason in the appropriate
6 space on the errata sheet for any corrections
7 that are made.
8       After doing so, please sign the
9 errata sheet and date it.
10       You are signing same subject to the
11 changes you have noted on the errata sheet,
12 which will be attached to your deposition.
13       It is imperative that you return the
14 original errata sheet to the deposing attorney
15 with thirty (30) days of receipt of the
16 deposition transcript by you. If you fail to
17 do so, the deposition transcript may be deemed
18 to be accurate and may be used in court.

[Page 157]

1  I have read the foregoing transcript of
2  my deposition given on February 7, 2013, and it
3  is true, correct and complete, to the best
4  of my knowledge, recollection and belief,
5  except for the corrections noted hereon
6  and/or list of corrections, if any, attached
7  on a separate sheet herewith.
8
9
10
11
12
13  BARRY FINGERHUT
14
15
16
17  Subscribed and sworn to
18  before me this _____ day
19  of _____, 20____.
20
21
22
23  Notary Public
24
25

[Page 158]

1  C E R T I F I C A T E
2
3  STATE OF NEW YORK }
4                     : SS.
5  COUNTY OF NEW YORK }
6
7          I, SUZANNE PASTOR, a Shorthand
8  Reporter and Notary Public within and for the
9  State of New York, do hereby certify:
10         That BARRY FINGERHUT, the witness
11  whose deposition is hereinbefore set forth, was
12  duly sworn by me and that such deposition is a
13  true record of the testimony given by the
14  witness.
15         I further certify that I am not
16  related to any of the parties to this action by
17  blood or marriage, and that I am in no way
18  interested in the outcome of this matter.
19         IN WITNESS WHEREOF, I have hereunto
20  set my hand this_____, 2013.
21
22
23         SUZANNE PASTOR
24
25

[Page 160]

1
2          E R R A T A   S H E E T
3          I, BARRY FINGERHUT, do hereby certify that I
4  have read the foregoing transcript of my testimony, and
5  further certify that it is a true and accurate record
6  of my testimony (with the exception of the corrections
7  listed below).
8  PAGE LINE        CORRECTION
9  _____ _____ _____
10 _____ _____ _____
11 _____ _____ _____
12 _____ _____ _____
13 _____ _____ _____
14 _____ _____ _____
15 _____ _____ _____
16 _____ _____ _____
17 _____ _____ _____
18 _____ _____ _____
19 _____ _____ _____
20 _____ _____ _____
21  Signed under the pains and penalties this
22  day of _____, 2013.
23
24 _____
25         BARRY FINGERHUT

[Page 159]

1              INDEX
2
   WITNESS      EXAMINATION BY      PAGE
3
   Mr Fingerhut   Mr. Conway          3
4
5
6          EXHIBITS
7
   FINGERHUT   DESCRIPTION         PAGE
8
   Exhibit 1  BF 90 through 112       11
9
   Exhibit 2  Bates No. BF 07        35
10
   Exhibit 3  Legible Copy of Bates No.   37
              BF 7
11 Exhibit 4  Bates No. K-1        60
12 Exhibit 5  Bates No. BF 23      66
13 Exhibit 6  Bates No. BF 25 through   72
              46
14
   Exhibit 7  Bates No. BF 25 through   73
15            46
16 Exhibit 8  Bates No. BF 54 through  127
              57
17
   Exhibit 9  Bates No. BF 58 through  130
18            89
19 (Exhibit 10 marked but not presented)
20 Exhibit 11 Bates No. BF 8 through 13  137
21 Exhibit 12 Bates No. BF 14 through  139
              18
22
23 Exhibit 13 Bates No. BF 15 through  143
              18
24
25 (Exhibits retained by counsel )

[Page 161]

[41]  (Pages 158 to 161)

1

INDEX (Continued)

2

INFORMATION REQUESTED TO BE SUPPLIED     PAGE

3

1. Law Firm Hired to Draft Corporate     14

Documents

4

2. Law Firm Representing     23

Fingerhut-Holzer Partners

5

6

3. Fingerhut-Holzer Bank Account Number  96

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

[Page 162]

877-479-2484          U.S. LEGAL SUPPORT, INC.   www.uslegalsupport.com

# FOLKENFLIK & McGERITY LLP

### ATTORNEYS AT LAW
1500 BROADWAY
NEW YORK, NEW YORK 10036

TELEPHONE: 212-757-0400
FAX: 212-757-2010

WRITER'S E-MAIL: mfolkenflik@fmlaw.net

April 2, 2014

*VIA ECF*

Honorable Vernon S. Broderick
United States District Judge
United States Courthouse
Southern District of New York
40 Foley Square, Room 415
New York, New York 10007-1312

Re: *Rapillo v. Fingerhut, Holzer et al.*, Docket No.: 09-CV-10429(GBD)

Dear Judge Broderick:

I represent Defendant Barry Fingerhut ("Fingerhut") and the various corporate entities named in the Amended Complaint in this action. (Fingerhut-Holzer Partners LLC is hereinafter referred to as "F-H LLC" and the other corporate defendants are referred to as the "Remaining Entity Defendants.") The only other defendant, David Holzer ("Holzer"), was criminally convicted on a plea of guilty for stealing $1.6 million from Plaintiffs and over $11 million from Fingerhut, as well as nearly $2 million from others. Holzer is appearing *pro se*.

Plaintiffs seek to recover $1.9 million they lost in four "investments," plus "treble damages" *and* punitive damages, from Fingerhut, F-H LLC, and the Remaining Entity Defendants, directly, and not vicariously, for alleged breach of fiduciary duty and fraud under the Investment Advisors Act (the First and Second Causes of Action), securities fraud based on Section 10b of the Securities Exchange Act of 1934 and Rule 10b-5 (the Third Cause of Action), and common law counts of fraud (the Fourth and Fifth Causes of Action), conversion (the Sixth Cause of Action), and breach of fiduciary duty (Seventh, Eighth, and Ninth Causes of Action). They are suing the Defendants as principals, yet none of the Defendants had anything to do with Holzer's crimes, except as victims.

I am writing this letter, therefore, to request a pre-motion conference pursuant to Rule 4.A of Your Honor's Individual Rules & Practices in Civil Cases with regard to a motion for summary judgment dismissing all claims against my clients.

The underlying relevant facts are undisputed. Holzer and Fingerhut were in business together, investing their own money in various businesses through F-H LLC. Holzer had lauded Fingerhut's investment acumen to Plaintiffs, who were Holzer's friends. Plaintiffs wanted to invest



FOLKENFLIK
LTR

POLKENFLIK & M^cGERITY LLP

Honorable Vernon S. Broderick
April 2, 2014
Page 2

with Holzer and Fingerhut, but Plaintiffs knew that F-H LLC was *not accepting retail clients and would not take their money*. However Holzer had a plan to circumvent F-H LLC's refusal to take investments from Plaintiffs. Holzer told Plaintiffs about certain companies in which, allegedly, Fingerhut and Holzer were investing. Because the amount Plaintiffs were investing was "not substantial enough," for Plaintiffs to invest directly, Holzer offered to "pool it" with Fingerhut's and Holzer's investment.

Plaintiffs were in some sort of undisclosed investment partnership with Holzer. Holzer never told Plaintiffs that Fingerhut was aware of this "pooling" scheme, and Plaintiffs admit that they do not know that Fingerhut was aware of the scheme. Holzer and Fingerhut deny that Fingerhut had any awareness of or involvement in Holzer's frauds. Discovery has not produced a shred of evidence, to the contrary.

Plaintiffs made four investments based on Holzer's advice. The first was a $300,000 investment in a Florida real estate limited partnership called the The Waverly I LLC, ("Waverly I"), made pursuant to signed subscription agreements. Waverly I failed due to a downturn in the Florida real estate market. Plaintiffs have not identified any impropriety with respect to that investment. The Manhattan District Attorney's office found the Waverly I investment was legitimate, and discovery has produced no evidence that it was not.

Plaintiffs invested $1.6 million in three separate "investments" made by wire transfer to Holzer's personal bank account, held jointly with his wife, and then stolen by him (the "Stolen Investments"): (a) an alleged investment called Waverly II ($200,000), (b) an alleged investment in a public company called V-Campus ($800,000), and (c) an alleged investment in a "dinner theater" in Boca Raton whose name the Plaintiff does not know, and apparently never knew ($600,000). There is no documentation of any nature with respect to those three "investments."

Holzer's thefts from Plaintiffs came to light after an investigation revealed Holzer's thefts from Fingerhut. As with Plaintiffs, Fingerhut had given Holzer money to invest which was stolen. The results of the investigation were taken to the Office of the Manhattan District Attorney, and that led to the revelation that Holzer had stolen millions of dollars from others, including Plaintiffs.

None of Plaintiffs' claims can be sustained against any Defendant other than Holzer. Plaintiffs do not assert that the Remaining Entity Defendants had any involvement of any nature in Holzer's crimes, or any connection at all, direct or indirect, with the Plaintiffs. Other than "group pleading" allegations, there is nothing in the Amended Complaint about them. Those defendants appear to have been simply thrown into the case without any basis, other than some historical relationship between those Defendants and either Fingerhut or Holzer.

Neither F-H LLC nor Fingerhut are registered investment advisors, nor are they subject to the Investment Advisors Act, since they did not provide investment advice "for compensation." 15

FOLKENFLIK & McGERITY LLP
   Honorable Vernon S. Broderick
   April 2, 2014
   Page 3

U.S.C. § 80b-2 (11); *Kassover v. UBS AG*, 619 F. Supp. 2d 28, 32 (S.D.N.Y. 2008)( the parties must have "entered into an investment advisory contract in order for the Advisers Act to apply"). Neither F-H LLC nor Fingerhut made any misrepresentation to, or had any communication with, Plaintiffs concerning the Stolen Investments, which by itself precludes a direct claim against them under Section 10b and Rule 10b-5. *See, Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. ___, 131 S. Ct. 2296, 2302 (2011); *Fezzani v. Bear, Stearns & Co.*, 716 F.3d 18, 24-25 (2d Cir. 2013). It also precludes a direct claim of fraud. *See, Lama Holding Co. v. Smith Barney Inc.*, 88 N.Y.2d 413, 421 (1996); *Deutsche Bank Natl. Trust Co. v Gordon*, 84 A.D.3d 443, 443-444 (1st Dep't 2011).

   Neither Fingerhut nor F-H LLC had a fiduciary relationship with Plaintiffs thereby precluding the breach of fiduciary duty claims. *See, De Kwiatkowski v. Bear, Stearns & Co.*, 306 F.3d 1293, 1302 (2d Cir. 2002)(broker/customer relationship not sufficient to create fiduciary relationship); *Compania Sud-Americana De Vapores, S.A. v. IBJ Schroder Bank & Trust Co.*, 785 F. Supp. 411, 426 (S.D.N.Y. 1992)(ordinary business relationship not sufficient). Neither Fingerhut nor F-H LLC had or have any dominion or control of the money given by Plaintiffs to Holzer, thereby dooming the conversion claim. *Dobroshi v Bank of Am., N.A.*, 65 AD3d 882, 885, (1st Dept 2009), *lv dismissed* 14 N.Y.3d 785 (2010); *Eden Roc, LLP v Marriott Int'l., Inc.*, 2013 N.Y. Misc. LEXIS 4301, 22-24 (Sup. Ct. N.Y. Sept. 18, 2013). Holzer used some of the money he received from Plaintiffs to invest in V-Campus *in his own name* and to pay $200,000 on an antecedent $1 million debt he owed to Fingerhut. Those facts do not support a valid conversion claim as to Fingerhut or F-H LLC. *Cf. Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 54-55 (2d Cir. 2005) (payment of antecedent debt even with knowledge money obtained fraudulently not fraudulent conveyance).

   F-H LLC is not liable for Holzer's thefts on the (unpleaded) theory of *respondeat superior*. *Goldstein v. United States*, 14 Fed. Appx. 115, 116 (2d Cir. N.Y. 2001) (no *respondeat superior* liability for employee theft); *Rymanowski v. Pan American World Airways, Inc.*, 70 A.D.2d 738, 739 (N.Y. App. Div. 3d Dep't 1979), *aff'd*, 49 N.Y.2d 834, 835 (1980)(same). As a member of the LLC, Fingerhut is not liable for the wrongs of Holzer or the any liability of F-H LLC. "A limited liability company (LLC) is a hybrid business entity that offers its members limited liability as if they were shareholders of a corporation...". *Riley v. Tencara, LLC (In re Wolverine, Proctor & Schwartz, LLC)*, 447 B.R. 1, 35 (Bankr. D. Mass. 2011), *quoting*, Ann K. Wooster, Annotation, *Construction and Application of Limited Liability Company Acts -Issues Relating to Personal Liability of Individual Members and Managers of Limited Liability Company as to Third Parties*, 47 A.L.R. 6th 1 (2009).

                                    Respectfully,

                                    Max Folkenflik

cc:   Robert J. Conway, Esq. (*via e-mail*)

5

## PLEA AGREEMENT

1.      This plea agreement is entered into between the District Attorney of the County of New York (hereinafter "the District Attorney") and David Holzer.  This memorandum of Agreement constitutes the entire agreement between Mr. Holzer and the District Attorney.  There are no promises, agreements, or conditions, express or implied, other than those set forth in this Agreement and in the Stipulation in Anticipation of Discontinuance in the case of Morgenthau v. Holzer, Index No. 400891/2008, (hereinafter "the Stipulation") attached hereto and incorporated herein.  No modification of this agreement will be valid or binding on either party unless put into writing and signed by both parties.

2.      The parties will appear before the Court where New York County Indictment No. 2280/2008 ("the Indictment") is pending and request that the Court approve this Agreement.  This Agreement will become effective only upon the Court's approval.  Upon the Court's approval, Mr. Holzer will plead guilty as set forth in Paragraph 3 below.  At the time of the plea, Mr. Holzer will withdraw any pending motions, and will waive all defenses and all rights of appeal.

3.      Mr. Holzer agrees to plead guilty to counts One, Three, Four and Five of New York County Indictment No. 2280/2008.  Those counts charge him with three counts of the crime of Grand Larceny in the First Degree, Penal Law §155.42, a Class B Felony, and one count of the crime of Grand Larceny in the Second Degree, Penal Law §155.40, a class C Felony, in full satisfaction of the indictment.  The maximum permissible sentence for each count of Grand Larceny in the First Degree is an indeterminate term of imprisonment of 8 1/3 to 25 years, and an

1

HOLZER
PLEA
AGREEE

indeterminate term of imprisonment of 5 to 15 years for the count of Grand Larceny in the Second Degree, plus applicable monetary sanctions such as a fine, restitution and reparation. The minimum permissible sentence for each count of Grand Larceny in the First Degree is an indeterminate term of imprisonment of 1 to 3 years, and a non-incarceratory sentence for the count of Grand Larceny in the Second Degree. The counts may run consecutively.

4.       Upon his guilty plea, Mr. Holzer will allocute under oath to the following facts:

Between March 2002 and April 2008, I stole more than $16 million from Barry Fingerhut, Heidi and John Rapillo, Michael and Barbara Zackman, and Barry Pessar. Beginning in 2002, I invited Barry Fingerhut, someone I had known for 15 years, to invest in Dellwood Partners, an entity that I represented to Barry Fingerhut was making real estate investments. Between March 2002 and September 2006, Barry Fingerhut gave me more than $12 million to invest in Dellwood Partners. In fact, Dellwood Partners did not exist, and I used that money for my own personal use.

Between December 2005 and March 2006, I took $1.6 million from Heidi and John Rapillo, people I had known for more than 20 years. I represented to them that I would invest their money in a movie theater and in a penthouse project. In fact, I did not invest any money on their behalf. I used the Rapillo's money for my own personal use, and I invested some of it on my own behalf.

Between November 2006 and November 2007, I took more than $1.7 million from Barbara and Michael Zackman, people with whom I had been friends for more than 20 years. I represented to them that I would invest their money in a company called Vertex and a company called Consonus. In February, 2007, I told them that I would invest their money in a real estate deal in Florida through a company called Trident. In fact, I did not invest any money on their behalf. I used the Zackman's money for my own personal use, and I invested some of it on my own behalf.

In March 2008, I invited Barry Pessar, someone I had known for about 10 years, to invest in a company called Versadial. Based on representations that I made, Barry Pessar gave me $150,000 for the investment in Versadial. I did not in fact invest Barry Pessar's money with Versadial, but used it for my own personal use.

In this manner, I stole more than $16 million from the above-named parties without their permission or authority.

MANHATTAN DA OFFICE    Fax:1212-335-9600            Apr 30 2009 01:34pm  P004/006

5.      By the time of the plea, Mr. Holzer will execute the Stipulation in which he agrees to forfeit the assets listed in the Stipulation to the District Attorney, as Plaintiff-Claiming Authority in Morgenthau v. David Holzer, New York County Index No. 400891/2008, for distribution pursuant to Article 13-A of the Civil Procedure Law and Rules.  The proceeds of the liquidation of assets will be ordered released to the New York County District Attorney's Office pursuant to the Stipulation attached hereto and incorporated herein.

6.      Mr. Holzer shall liquidate the particular assets as defined in the Stipulation and forfeit all of the proceeds of such liquidation to the District Attorney.  Those certain assets include the house located at 10 Sky Drive, New City, New York, and the furniture and other personal property contained therein (hereinafter "the Assets").  Mr. Holzer shall complete the liquidation of the Assets and forfeit the proceeds to the District Attorney before March 24, 2010, at which time he will be sentenced.  Mr. Holzer shall make all reasonable efforts to obtain the highest possible price for the Assets.  Mr. Holzer shall pay the proceeds of the liquidation of the Assets by bank check payable to "The New York County District Attorney's Office SAF Escrow Account," and sent to the attention of Assistant District Attorney Madeleine Guilmain, 1 Hogan Place, New York, NY 10013.  Mr. Holzer hereby waives any claim that the adjournment of sentencing is unreasonable.  If Mr. Holzer liquidates the Assets and forwards the proceeds to the District Attorney prior to March 24, 2010, the District Attorney and Mr. Holzer agree to jointly request that the Court permit them to advance the case for sentencing to a mutually agreeable date prior to March 24, 2010.

7.      Should Mr. Holzer satisify the requirements set forth in paragraphs 6 above, the District Attorney and Mr. Holzer will recommend jointly that Mr. Holzer be sentenced to an indeterminate

3

term of 5 to 15 years incarceration on each of the four counts to which he pleaded guilty pursuant to Paragraph 3, above, all to run concurrently with each other, in full satisfaction of the indictment.

8.     Should Mr. Holzer fail to liquidate all of the Assets and turn all of the proceeds over to the District Attorney for distribution as described in Paragraph 6 above, the District Attorney and Mr. Holzer shall jointly recommend to the Court that Mr. Holzer be sentenced to an indeterminate prison term of from 6 to 18 years on each count of Grand Larceny in the First Degree to which he pleaded guilty pursuant to Paragraph 3 above, and an indeterminate prison term of 5 to 15 years on the count of Grand Larceny in the Second Degree to which he has pleaded guilty pursuant to Paragraph 3 above, all to run concurrently with each other.

9.     Mr. Holzer shall not commit any further crimes.  Whether such further crimes have been committed by Mr. Holzer shall be determined exclusively by the Honorable Thomas Farber, or should he be unavailable, by any other New York County Supreme Court Justice who succeeds Justice Farber as the sentencing judge.  Should Mr. Holzer violate this paragraph, the District Attorney may request any sentence authorized by law as set forth in paragraph 2 of this Agreement. Mr. Holzer understands that the Court has the authority to impose any lawful sentence, including consecutive sentences.

10.    The District Attorney shall not be deemed, by any act, statement, or omission, to have waived any violation of this Agreement unless such waiver is put into writing and signed by both parties.

4

11.    This Agreement is limited to the New York County District Attorney and cannot bind other government agencies.  It is understood that this Agreement binds only the New York County District Attorney and Mr. Holzer.

Dated: New York, New York
       April 30, 2009

_____
David Holzer, Defendant

_____
Ronald Rubinstein
Attorney for Defendant

_____
Hope Korenstein
Assistant District Attorney

_____
Michele Shulman
Deputy Chief, Frauds Bureau

5

6

Page 1

1

2          UNITED STATES DISTRICT COURT
           SOUTHERN DISTRICT OF NEW YORK

3          ────────────────────────────────────────────
           JOHN RAPILLO and HEIDI RAPILLO,

4
                                        Plaintiffs,

5                   - against -

6          BARRY FINGERHUT,
           DOUGLAS HOLZER,

7          FINGERHUT-HOLZER PARTNERS LLC,
           FINGERHUT-HOLZER EQUITIES, INC.,

8          FINGERHUT-HOLZER, INC.,
           FINGERHUT-HOLZER FUND, L.P.,

9          GEO CAPITAL PARTNERS, INC.,
           FINGERHUT-HOLZER THE WAVERLY I, LLC,

10         FINGERHUT-HOLZER THE WAVERLY II, LLC,

11                                      Defendants.

12         ────────────────────────────────────────────

13         EXAMINATION BEFORE TRIAL of a Defendant,

14         DAVID HOLZER, held pursuant to Notice in the

15         above-entitled matter on the 28th day of March,

16         2012, commencing at approximately, 10:15 a.m.;

17         held at Greene Correctional Facility, 165 Plank

18         Road, Coxsackie, New York, before Cynthia

19         Schultz, a Court Reporter and Notary Public in

20         and for the State of New York.

21

22

23

24

25


HOLZER
DEPOSITION

Page 2

Page      2

```
1   APPEARANCES:
2
    MARSHALL CONWAY & BRADLEY, P.C.
3   45 Broadway
    New York, New York 10006
4   (ROBERT J. CONWAY, ESQ., of Counsel)
    Attorneys for the Plaintiffs
5   JOHN RAPILLO and HEIDI RAPILLO.
6
7   FOLKENFLIK & MCGERITY
    1500 Broadway
8   New York, New York 10036
    (MAX FOLKENFLIK, ESQ., of Counsel)
9   Attorneys for the Defendant, DAVID HOLZER
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 3

Page     3

```
 1                    I N D E X
 2  TO TESTIMONY
 3  WITNESS              BY              PAGE
    DAVID HOLZER         MR. CONWAY        5
 4                       MR. FOLKENFLIK   119
 5
    TO EXHIBITS (Retained by Counsel)
 6
    EXHIBIT            DESCRIPTION        PAGE
 7  Plaintiff's 1  Money Transfer Document dated  91
                    October 19, 2005, consisting
 8                  of two pages
 9  Plaintiff's 2  Money Transfer Document Dated  98
                    December 15, 2005
10
    Plaintiff's 3  Money Transfer Document Dated  99
11                  January 31, 2006
12  Plaintiff's 4  Money Transfer Document Dated  99
                    March 23, 2006
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

Page      4

```
1      F E D E R A L        S T I P U L A T I O N S
2      IT IS HEREBY STIPULATED AND AGREED by and
3      between the attorneys for the respective parties
4      hereto that filing, sealing and certification be
5      and the same are hereby waived.
6
7      IT IS FURTHER STIPULATED AND AGREED that all
8      objections, except as to the form of the
9      question, shall be reserved to the time of the
10     trial.
11
12     IT IS FURTHER STIPULATED AND AGREED that the
13     within examination may be subscribed and sworn
14     to before any notary public with the same force
15     and effect as though subscribed and sworn before
16     the court.
17
18
19
20
21
22
23
24
25
```

D. Holzer - March 28, 2012

Page 5

Page      5

1    THIS IS THE ORAL DEPOSITION OF DAVID HOLZER,

2    called as/on behalf of the DEFENDANT herein,

3    produced pursuant to NOTICE on March 28, 2012,

4    before CINDY SCHULTZ, a Court Reporter and

5    Notary Public in and for the State of  New York.

6

7                    * * * * * *

8                    DAVID HOLZER

9            called as the witness, hereinbefore

10   named, being first duly cautioned and sworn or

11   affirmed by CINDY SCHULTZ, the Court Reporter

12   and Notary Public herein, to tell the truth, the

13   whole truth, and nothing but the truth, was

14   examined and testified as follows:

15   EXAMINATION BY

16   MR. CONWAY:

17

18       Q     Would you please state your name

19   for the record.

20       A     David Holzer.

21       Q     Mr. Holzer, good morning.

22       A     Morning.

23       Q     My name is Bob Conway, and I

24   represent John and Heidi Rapillo on the matter

25   that we have before the Court.

D. Holzer - March 28, 2012

Page 6

Page     6

1              MR. CONWAY:    Off the record.

2

3                   (At which time, a discussion

4              was held off the record.)

5

6    BY MR. CONWAY:

7         Q    Mr. Holzer, how old are you?

8         A    Sixty-two.

9         Q    And your date of birth?

10        A    11/14/49.

11        Q    And your Social Security number?

12        A    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.

13        Q    And, Mr. Holzer, you and I have met

14   once before.  Have we not?

15        A    Correct.

16        Q    Here, I came up and spoke to you

17

privately?

18        A    Correct.

19        Q    Okay.  Sir, where were you born?

20        A    Manhattan.

21        Q    And where did you go to school?

22        A    I went to Stuyvesant High School,

23   City College, and I went to - after that, I

24   took some courses, about three years' worth of

25   courses at the New York Institute of Finance.

D. Holzer - March 28, 2012

```
 1        Q      Did you get a degree from City

 2   College?

 3        A      Yes.

 4        Q      In what field?

 5        A      History major.

 6        Q      What year did you graduate City

 7   College?

 8        A      Finally, in 1974.

 9        Q      And did you then move directly to

10   the New York Institute of Finance?

11        A      No.

12        Q      Okay.  What did you do upon

13   graduation from college?

14        A      I was working part-time at a place

15   called Abraham Company.

16               THE WITNESS:   Could I ask you

17          one question, off the record?

18               MR. CONWAY:   Certainly.

19

20               (At which time, a discussion

21          was held off the record.)

22

23               MR. FOLKENFLIK:   Can we

24          keep this on the record?

25               THE WITNESS:  Yeah.  Sure.
```

D. Holzer - March 28, 2012

Page    8

```
 1              No problem.
 2                   MR. FOLKENFLIK:   The deponent
 3              has been handed a copy of the
 4              Amended Complaint.
 5                   THE WITNESS:   Okay.
 6                   MR. FOLKENFLIK:   Sure.
 7                   THE WITNESS:   And it had
 8              listed -
 9                   MR. FOLKENFLIK:   Could you
10              just start from the beginning?
11                   THE WITNESS:   Oh.  Sorry.
12              Yes.  I received, in the mail,
13              approximately three months ago - I
14              can't remember, two months ago - the
15              one-page Complaint amended, as per
16              this (indicating), and, on it, it
17              had my family's name on it.
18    BY MR. CONWAY:
19         Q    Okay.  That was the original
20
      Complaint?
21         A    Well, why did I get that three
22      months ago?
23         Q    I'm not sure.
24              Did you change address or
25      something?  Did somebody change an address?
```

D. Holzer - March 28, 2012

1          A      We changed an address only as of

2      last Friday.

3          Q      This is the original Complaint

4      (indicating).

5          A      I have the original Complaint.

6          Q      This is the Complaint that was

7      amended.

8          A      Okay.  This is the current

9      Complaint and we all agree on this now?

10             I don't care about this

11      (indicating).

12          Q      Yes.  That's it now.

13          A      Okay.  I'll read it.  It's Barry

14      Fingerhut, David Holzer, Fingerhut-Holzer

15      Partners LLC, Fingerhut-Holzer Equities,

16      Fingerhut-Holzer, Incorporated,

17      Fingerhut-Holzer, L.P., GeoCapital Partners,

18      Fingerhut-Holzer The Waverly I, LLC,

19      Fingerhut-Holzer Waverly II, LLC.

20             We're all in agreement those are

21      the people being sued?

22          Q      Yes.

23          A      Very good.  Thank you.

24          Q      Now, the Abraham firm, in what

25      capacity were you at the Abraham firm?

D. Holzer - March 28, 2012

Page 10

Page    10

1         A        I was an over-the-counter order

2    clerk.

3         Q        And for how many years did you

4    perform this service for the Abraham Company?

5         A        From -

6                  I'm trying to think.  I was in the

7    service, six months after that.  From 19 - May

8    of '69, I was a Junior in high school.  Then,

9    till September of '69, I was full-time at

10   Abraham Company from -

11                 I had worked part-time there while

12   I was going to school.  Nineteen-seventy,

13   summertime - I don't remember what month,

14   actually - until 1974 when they were acquired

15   by another firm.

16        Q        By whom were they acquired?

17        A        Lehman Brothers.

18        Q        And did you follow the

19   Abraham firm to Lehman Brothers?

20        A        I did for a while.  Yes.

21        Q        All right.  And for how long were

22   you with the Lehman Brothers?

23        A        A year or so.  Maybe less, maybe

24   more.

25        Q        And what did you do when you were

D. Holzer - March 28, 2012

```
 1     affiliated with Lehman Brothers?
 2          A      I started trading the
 3     over-the-counter list.
 4          Q      Okay.  And where did you go after
 5     leaving Lehman Brothers?
 6          A      Nineteen-seventy-five, I went to
 7     Brean Murray Foster Securities.  Brean Murray,
 8     Inc.
 9          Q      And what was the business of Green
10     (sic) Murray, Incorporated?
11          A      General business.  It was a general
12     brokerage firm.  Merchant banking, investment
13     banking, over-the-counter trading, New York
14     Stock Exchange trading, and asset management.
15          Q      And what was your role for the firm
16     while you were there?
17          A      At the time, I was head of
18     over-the-counter trading.
19                     MR. FOLKENFLIK:   At what time
20                is this, did you say?
21                     MR. CONWAY:   Nineteen-seventy
22                -five.
23                     MR. FOLKENFLIK:   From the
24                beginning.
25                     MR. CONWAY:   Right.
```

D. Holzer - March 28, 2012

Page 12

Page    12

1    BY MR. CONWAY:

2         Q      You were head of trading from 1975?

3         A      No.   I was the head of

4    over-the-counter trading.

5         Q      Head of over-the-counter trading.

6    Okay.

7                Do you recall what your earnings

8    were at the time?   Best estimate.

9         A      Maybe, 40,000 a year.

10        Q      And for how many years did you

11   continue with Green Murray, Incorporated?

12        A      Brean, B-r-e-a-n Murray.

13        Q      Brean, with a "B"?

14        A      Brean.

15        Q      Brean, with a B.   Okay.   I thought

16   you said Green.   Okay.   Sorry.

17                And for how long were you with

18   Brean Murray?

19        A      Twenty-eight years.

20        Q      And what was your highest position

21   at Brean Murray?

22        A      Partner in charge of all capital

23   markets.

24        Q      And what was your highest rate of

25   salary in that capacity?

D. Holzer - March 28, 2012

Page 13

Page       13

```
 1       A      I -
 2              You know what?  I take the fifth.
 3       Q      All right.
 4              Are we talking, like, talking in
 5       excess of a hundred?
 6       A      I don't see the relevance.  I take
 7       the fifth.
 8              MR. FOLKENFLIK:   Just to
 9              advise the witness, the Fifth
10              Amendment isn't a privilege as to
11              relevance.  It's a privilege as to
12              possible incrimination.
13              THE WITNESS:   Well, what if I
14              think I'm possibly incriminating
15              myself?
16              MR. FOLKENFLIK:   Well, you
17              need to have a basis for that.
18              THE WITNESS:   And the basis -
19              I have to explain the basis to you?
20              MR. FOLKENFLIK:   Not
21              necessarily.  But, for 20 years ago,
22              it wouldn't matter.
23       A      What's the question?
24       Q      What were your highest earnings?
25       A      Approximately, 800,000 a year.
```

D. Holzer - March 28, 2012

```
 1          Q     All right.   And were you married at

 2    the time?

 3          A     Correct.  I was.

 4          Q     To whom were you married?

 5          A     Leslie Holzer.

 6          Q     And when and where did you marry

 7    Ms. Holzer?

 8          A     I married her September 6th, 1970;

 9    Lincoln Park Jewish Center, Yonkers, New York.

10          Q     And do you have any children?

11          A     Three.

12          Q     Their names and ages, please.

13          A     Jennifer Holzer, 36; Douglas

14    Holzer, 32; Joshua Holzer, 26.

15          Q     You're talking faster than I can

16    write.

17                Jennifer's 36?

18          A     Correct.

19          Q     And the next?

20          A     Douglas Holzer, 32; Joshua Holzer,

21    26.

22          Q     All right.  Those are their ages

23    now?

24          A     Didn't you ask me now?

25          Q     Yes.
```

D. Holzer - March 28, 2012

Page 15

Page    15

```
 1        A      Okay.  I'm giving you now.

 2        Q      Good.  Now, during the period of –

 3               MR. FOLKENFLIK:   If I may

 4         suggest to the witness.  Obviously,

 5         there are reasons why you might want

 6         to conclude this as quickly as

 7         possible.  So, less dueling over the

 8         questions and simple yes or no

 9         answers would accomplish that.

10               THE WITNESS:   Okay.  I'll try

11         my best.

12    BY MR. CONWAY:

13        Q      We haven't any interest in

14     prosecution or any other thing like that.

15        A      I understand what you're doing

16     here, and I'll try to answer as succinctly and

17     rapidly as possible.

18        Q      Good.

19               MR. FOLKENFLIK:   It's for

20         your own benefit.

21    BY MR. CONWAY:

22        Q      Now, do you know who the principals

23     of Brean Murray were?

24        A      They changed a lot over the years.

25     I was a principal for all those years.
```

D. Holzer - March 28, 2012

1              Brean Murray, himself, was a

2    principal for all those years.

3              Jerome Barry was a principal for

4    all those years.

5              And then there was interchangeable

6    pieces over the whole period of time.

7         Q    Were you an equity holder for any of

8    those years?

9         A    Correct.

10        Q    And how large an equity did you

11   hold?

12        A    I'm the third largest equity

13   holder.

14        Q    How large, what percentage?

15        A    Oh, I don't know.

16        Q    Best estimate.

17        A    Probably, the highest percentage

18   was probably 27, 25 per cent.  Somewhere

19   around there.

20        Q    Now, when did you stop working for

21   Brean Murray?

22        A    I don't recall the actual date.

23   Two-thousand-and-two, three.  I don't even

24   recall.

25        Q    During the period of your

D. Holzer - March 28, 2012

1        involvement with Brean Murray, was your wife

2        employed outside the home?

3            A      No.

4            Q      Did she participate in the Brean

5        Murray business in any way?

6            A      No.

7            Q      Saleswoman, or something?

8            A      No.

9            Q      Did your children ever join you in -

10           A      No.

11           Q      Now, do you know a Barry Fingerhut?

12           A      Yes.

13           Q      And when did you come to know Barry

14       Fingerhut for the first time?

15           A      I would say, probably, 1984, maybe.

16           Q      And what was Mr. Fingerhut doing at

17       the time, professionally?

18           A      He was one of the - one of two

19       partners of GeoCapital.

20           Q      And who was the other partner?

21           A      Irwin Lieber.

22           Q      And do you know when Mr. Fingerhut

23       and Mr. Lieber had set up?

24           A      I don't.

25           Q      What was the business of GeoCapital?

D. Holzer - March 28, 2012

Page      18

```
 1        A     Asset management.

 2        Q     Now, when you say "asset

 3   management," what do you mean by that term,

 4   specifically?

 5        A     I mean they garner assets from

 6   different people and put it towards the equity

 7   markets or private placements, or whatever

 8   their charter was.  I don't know what their

 9   charter was.

10        Q     They manage people's money?

11        A     That's correct.

12        Q     Now, in managing people's money, did

13   they have broker's licenses?  Did they do

14   broker's work themselves or did they hire

15   outside agencies?

16        A     They - I don't know the answer to

17   that.

18        Q     And how did you come to meet

19   Mr. Fingerhut for the first time?

20        A     I met Mr. Fingerhut for the first

21   time through, probably, one of the formal

22   partners at the firm.

23             MR. FOLKENFLIK:   Meaning,

24        Brean Murray?

25             THE WITNESS:  No.  I'm trying
```

D. Holzer - March 28, 2012

```
 1                to remember who it was, in

 2                particular.  Might have been Brian

 3                Harrah (Phonetic Spelling) who was

 4                head of sales.

 5                     MR. FOLKENFLIK:   And - excuse

 6                me - at Brean Murray?

 7                     THE WITNESS:   Yes.

 8    BY MR. CONWAY:

 9           Q     Okay.   And was your involvement

10      with Mr. Fingerhut professional or personal?

11           A     Professional.

12           Q     And were you involved in business

13      transactions together, at the outset?

14                Did you meet him in a deal, or -

15           A     I was not involved together with

16      Barry Fingerhut professionally, no.

17           Q     Well, in 1984.

18           A     No.   Not my whole time working at

19      Brean Murray.

20           Q     Okay.   And did there come a time

21      when you began business relations with

22      Mr. Fingerhut, even if you were not together?

23           A     Never while I was at Brean Murray,

24      as I recall.

25           Q     What -
```

D. Holzer - March 28, 2012

Page 20

Page    20

1          A     I'm gonna change that.  I can't

2    recall.

3          Q     You can't recall if you did any

4    business with Mr. Fingerhut?

5          A     You're talking personally?

6          Q     Personal business.

7          A     I don't recall.

8          Q     Okay.

9          A     If I was at Brean Murray then.

10         Q     All right.  Now, what was the nature

11   of Mr. Fingerhut's business at GeoCapital; what

12   did he do for them?

13               MR. FOLKENFLIK:    Objection.

14               Asked and answered.

15   BY MR. CONWAY:

16         Q     Was he Chief Executive?  Was he a

17   salesman?

18               What did he do?

19               THE WITNESS:   What did you

20               say just now?

21               MR. FOLKENFLIK:   I said

22               objection, but he corrected it.

23               THE WITNESS:   Yeah.  Okay.

24               Say it now.   Rephrase it.

25               MR. FOLKENFLIK:   If you know

D. Holzer - March 28, 2012

1              what his title or function was

2              within GeoCapital, other than

3              partner.

4         A     I - let me go -

5              Let me say this.  I did not work at

6    GeoCapital, I did not know the inner workings

7    at GeoCapital, and I'm not gonna say what I

8    think happened there.  Okay?

9         Q     That's fine.

10        A     So, if you're - if you're -

11             If the course of your questions are

12   gonna concern GeoCapital, I don't know.

13        Q     Don't worry.  We're fine.

14        A     Okay.

15        Q     Do you have any idea in what state

16   GeoCapital was incorporated?

17        A     No.

18        Q     Did they have an office in New York?

19        A     Yes.

20        Q     Do you know where that office was?

21        A     It was on - right off 3rd Avenue

22   and 49th Street.  I don't recall, offhand.

23   Forty-ninth or 50th.  I can't recall the exact

24   address.

25        Q     And did you continue a professional

D. Holzer - March 28, 2012

 1      relationship with Mr. Fingerhut during the

 2      period that you were at Brean Murray?

 3          A     Yes.

 4          Q     And what type of relationship was

 5      that?

 6                Was it a financial relationship?

 7                Was it a personal relationship?

 8          A     It was a financial relationship

 9      where Brean Murray Foster Securities - which

10      it was called at the time - sold research to

11      GeoCapital, who was consumed by partners and

12      portfolio managed sales.

13                How it was broken up at that time,

14      I do not know.  We sold them research, they

15      paid us back in commissions.

16          Q     To your knowledge, how large a firm

17      was GeoCapital?

18          A     I have no idea.

19          Q     And how was your investment returned

20      in commissions, if the information was used, if

21      purchases were made?

22          A     Do you want me to explain the whole

23      process -

24          Q     Yes.  Please.  Yes.  If you would.

25          A     - of selling -

D. Holzer - March 28, 2012

Page 23

Page    23

1        Q       Yeah.

2        A       - research to a firm?

3        Q       Yeah.

4                MR. FOLKENFLIK:    Is it soft

5        dollars?

6                THE WITNESS:    No.  Not

7        necessarily.  Soft dollars could be

8        paid.

9                MR. FOLKENFLIK:    Okay.

10       A       Anyway, what typically happens is,

11       you go into a firm, such as GeoCapital, from

12       Brean Murray.  You bring an institutional

13       sales person, a research analyst, maybe the

14       guy running the trading desk, which was me.

15               You make a presentation to the

16       investments committee of GeoCapital saying,

17       "We like Apple because blah, blah, blah, blah,

18       blah."  Okay?

19               Now, they say, "Okay.  We like that

20       idea.  We're gonna buy Apple," or, "We're not

21       gonna buy Apple, but you came here, took the

22       time, sold us this.  We're gonna pay you

23       back."

24               How do they pay us for that

25       service?  That's a service.  They'll call up

D. Holzer - March 28, 2012

Page 24

Page    24

1     the next day.  Somebody on the order desk, or

2     one of the portfolio managers, and say, "Okay.

3     Buy me a hundred-thousand shares of Apple.

4              You charge a commission, or, at the

5     time, it was a spread, 'cause it's a

6     negotiated market.  Take a little bit of that

7     spread.

8              Buy it at, let's say, a hundred,

9     and you sell it to GeoCapital at

10    one-hundred-and-one-eighth.

11       Q    All right.  Is the one-eighth your

12    commission?

13       A    Your commission, spread, whatever

14    you wanna call it.  Credit.  That's, very

15    basically, what happens.

16       Q    And were you involved in these

17    research sales with Mr. Fingerhut himself?

18       A    Sometimes, yes.  Sometimes, no.

19       Q    And did a personal relationship

20    develop between yourself and Mr. Fingerhut

21    during these years?

22       A    Yes.

23       Q    And when did that personal

24    relationship commence, to the best of your

25    knowledge?

D. Holzer - March 28, 2012

Page 25

Page    25

```
 1        A      Personal relationship commenced on
 2   June 16th, 1992.
 3              I don't know.
 4                   MR. FOLKENFLIK:    So that was
 5         a facetious answer?
 6                   THE WITNESS:    Yes.
 7   BY MR. CONWAY:
 8        Q              Oh.  So that was a facetious
 9   answer.  You don't know?  Okay.
10        A      You're asking a question that's
11   hard to answer.  I can't tell you.  You know
12   what I'm saying?
13        Q      All right.  Did there come a time
14   when you began to social -
15        A      I'm sorry.
16        Q      That's okay.
17              When you began to socialize with
18   Mr. Fingerhut, outside of business?
19        A      I don't recall.
20        Q      And did there come a time when you
21   left Brean Murray?
22        A      Yes.
23        Q      And what was the purpose of your
24   leaving Brean Murray?
25        A      The over-the-counter market was,
```

D. Holzer - March 28, 2012

```
 1        basically, finished.  That's why I left.
 2             Q      And you leave Brean Murray when?
 3             A      After Brean died, also.  Firm
 4        started to falter.
 5             Q      And what year was this?
 6             A      Around two-thousand-and-two.  He
 7        might not have died at the time when I left.
 8        It was -
 9                    I'm not sure.  I don't remember.  I
10        don't recall the exact date, but he was dying.
11             Q      And did you leave for any other
12        business pursuits?
13             A      I went to trade my own account at
14        one of my friend's firms.
15             Q      And what firm did you go to?
16             A      Dahlman Weiss.  Dahlman Simon
17        Weiss, maybe it was.
18             Q      Can you spell it?
19             A      I don't remember.  D-a-l-h-m-a-n
20        (sic)
21             Q      Dahlman Weiss?
22             A      Yeah.
23                    And there was a third.  Simon, or
24        Dahlman Weiss Rose.
25             Q      Now, at that time, in 2002, you took
```

D. Holzer - March 28, 2012

1    your client base with you?

2         A    No.  No.  I said I went to trade my

3    own account.

4         Q    Meaning what?

5         A    I had $20, I bought $20 worth of

6    stock and I sold it for $30.

7         Q    And did you have a financial stake?

8         A    Stake?  No.

9         Q    When you went there, what capital or

10   funds were you using at Dahlman Weiss to make

11   purchases?

12        A    My own.

13        Q    And what were your assets at the

14   time, when you began with Dahlman?

15        A    I don't know.

16        Q    All right.

17             Are we talking in excess of a

18   million?

19        A    I don't recall.

20        Q    And for how long did you remain

21   trading your own account at Dahlman Weiss?

22        A    I don't remember exactly, but,

23   probably, up until the time I opened up

24   Fingerhut-Holzer, or whatever the date of that

25   was.

D. Holzer - March 28, 2012

Page 28

Page    28

1        Q       Do you recall when that was?  Was it

2    2002, 2003?

3        A       Exact date, I don't recall.

4        Q       Okay.  Best estimate.

5        A       It's easy enough to find out.  I

6    just don't know what date.

7                Was it 2004?

8        Q       All right.  Fingerhut-Holzer was

9    what?

10       A       Fingerhut-Holzer was a partnership

11   set up as an LLC.

12       Q       Now, how had Fingerhut-Holzer

13   Partners emerged?

14               What was the background for the

15   creation of that organization?

16       A       Just two gentlemen getting together

17   and deciding they wanted to open up a hedge

18   fund.

19       Q       Okay.  And did you approach

20   Mr. Fingerhut or did Mr. Fingerhut approach

21   you?

22       A       Kind of evolved.  I'm not sure who

23   approached who, or it just evolved as such.

24   There was no actual, "Hey.  You wanna be my

25   partner?"

D. Holzer - March 28, 2012

Page 29

Page    29

```
 1              It wasn't like that.
 2              So, I don't know the evolution,
 3    exactly.  I don't recall.
 4         Q    Was Mr. Fingerhut still with
 5    GeoCapital at the time?
 6         A    Yes.
 7         Q    And did he have any other business
 8    interests of which you were aware?
 9         A    Yes.
10         Q    And what were the other business
11    interests that you know of?
12         A    I'm trying to remember the name.
13    Barry Rubenstein.  I just don't remember the
14    name.
15         Q    Who was Mr. Rubenstein?
16         A    He was one of the partners in the
17    other firm that he was involved with.  It
18    might come to me.
19         Q    In GeoCapital?
20         A    No.
21              Wasn't the question Did he have any
22    other interests?
23         Q    Yes.
24         A    Okay.  And I said, yes.
25         Q    Yes.
```

D. Holzer - March 28, 2012

```
 1        A      You said, "With whom?  What was

 2   it?"

 3              I don't recall the name of the

 4   firm.  I just remember one of his partners was

 5   Barry Rubenstein.  That's all I can help you

 6   with.

 7        Q      All right.  And who was

 8   Mr. Rubenstein?

 9        A      His partner in that firm.

10        Q      Now, was Mr. Rubenstein a financier,

11   was he a broker, was he -

12        A      He was a financial professional.

13        Q      And did he and Mr. Fingerhut own

14   businesses together?

15        A      Businesses?  They owned stakes in

16   things.  They owned equity in certain

17   businesses.  They owned stocks.  They owned

18   private placements together.

19        Q      Did Mr. Fingerhut have a specialty

20   in the market?

21              Was he a technologist guy?

22              Was he a real estate guy?

23              Was he a commodities guy?

24        A      He was a general analyst.  He had a

25   general, good working knowledge of the whole
```

D. Holzer - March 28, 2012

Page 31

Page    31

1    equities market, as far as I'm concerned.

2                    But was he a specialist?  I

3    wouldn't consider him a specialist.  He may

4    have started out as a specialist.  I don't

5    know.

6         Q      All right.  He was, basically, an

7    analyst?

8         A      He was a portfolio manager with

9    analytical abilities.

10         Q      Do you recall if there was any

11    meetings between yourself and Mr. Fingerhut for

12    the discussing of an ongoing business

13    relationship between the two of you?

14         A      There were meetings, sure.

15         Q      Where were those meetings held?

16         A      I don't recall.

17         Q      Were they held at your offices, his

18    offices, over dinner, over lunch, some other

19    time?

20         A      It could have been any of them.  I

21    just don't recall, specifically, where they

22    were.

23         Q      What was the nature of the

24    discussions between yourself and Mr. Fingerhut

25    as to ongoing business relationships?

D. Holzer - March 28, 2012

Page    32

1        A      The nature of the discussion was

2    how to make people money, basically.  What we

3    wanted to do to do that.

4        Q      Okay.    And was Fingerhut-Holzer

5    Partners the first organization that the two of

6    you put together?

7        A      Yes.

8        Q      And what was the business of

9    Fingerhut-Holzer Partners?

10       A      Specific business was to manage

11   assets in the best way possible in any field

12   we chose.

13       Q      Now, did you have any licenses in

14   the financial industry?  Were you a licensed

15   broker?

16       A      Personally?

17       Q      Yes.

18       A      I probably had eight or nine

19   different licenses.

20       Q      Which would include what?

21       A      A Series 24, Series 55, Series 7,

22   Series 63, Series 8, Registered Options

23   Principal, member of the New York Stock

24   Exchange.

25       Q      Did you have a seat on the Stock

D. Holzer - March 28, 2012

Page 33

Page      33

1        Exchange?

2              A       At one time.  Yes.

3                      Well, we always did.  I held the

4        seat for two years.

5              Q       Okay.  Fingerhut-Holzer Partners

6        held a seat?

7              A       No.

8              Q       Well, that's what we're here to find

9        out.

10             A       Fingerhut-Holzer Partners had no

11       licenses.  Fingerhut-Holzer Partners did not

12       and was not a member of the New York Stock

13       Exchange.

14                     You asked, specifically, if I held

15       certain licenses.  That was over the course of

16       my professional career at Brean Murray, and

17       then Brean Murray Foster Securities, which it

18       became.

19             Q       All right.  So you held a seat on

20       the stock market while at Brean Murray?

21             A       Correct.

22             Q       But it was not yours?

23             A       It was partially mine.  I was the

24       general partner.

25             Q       When you left Brean Murray, did you

D. Holzer - March 28, 2012

Page 34

Page    34

```
 1        leave the seat behind or -
 2                A       The seat was sold, way prior to
 3        that.
 4                Q       Sold.
 5                        When was the last time you had
 6        seats in the market?
 7                A       Seats?
 8                Q       Seats, plural.
 9                A       The last seat was sold, and I'm not
10        sure about the date.  I'd say, probably, in
11        the late '90s we sold it.  The first one was
12        sold in the early '90s.  We bought them in the
13        early '70s.  Thirty-six-thousand-dollars and
14        $43,000.
15                Q       And, just as a curiosity, what were
16        they sold for?
17                A       Two-million and a million-six, or
18        something like that.
19
20                        (At which time, a discussion
21                was held off the record.)
22
23        BY MR. CONWAY:
24                Q               Now, when you and
25        Mr. Holzer -
```

D. Holzer - March 28, 2012

1          A       I am Mr. Holzer.

2          Q       Yes, sir.  When you and

3     Mr. Fingerhut -

4          A       Yes.

5          Q       - were sitting to discuss your

6     future together, what was it that the two of

7     you intended to do as a professional

8     arrangement?

9                   MR. FOLKENFLIK:   Objection.

10              Asked and answered.

11                   THE WITNESS:   I was just

12              gonna - well, go ahead.

13                   MR. FOLKENFLIK:   Go ahead.

14              You can answer it again.

15          A       To make people money.

16          Q       And was Fingerhut-Holzer Partners

17     LLC a company organized in the State of New

18     York?

19          A       You know, I don't recall if it was

20     set up in New York State or Delaware.  I think

21     New York State.

22          Q       Did you have an attorney?

23          A       Yes.

24          Q       Who was the attorney responsible for

25     setting up the LLC?

D. Holzer - March 28, 2012

```
 1       A      I don't remember the name anymore.
 2       Q      And did the two of you go and engage
 3   the -
 4       A      Yes.
 5       Q      - the law firm to set up the
 6   corporation?
 7       A      Yes.
 8       Q      And is there any doubt in your mind
 9   that Fingerhut-Holzer Partners LLC was a
10   business corporation?
11       A      Any doubt?
12       Q      Yes.  Is there any doubt that it was
13   a corporation?
14       A      No doubt.
15       Q      Okay.  Did it operate in New York?
16       A      Yes.
17       Q      Did it register itself as a
18   financial house, in any way?
19       A      No.  We were not required to.
20       Q      Now, to the best of your knowledge,
21   was stock issued on Fingerhut-Holzer Partners?
22       A      Stock certificates?
23       Q      Stock certificates.
24              MR. FOLKENFLIK:   Objection.
25              Counselor, there is a limited
```

D. Holzer - March 28, 2012

Page 37

Page     37

```
 1              liability corporation.   There are
 2              memberships.   All right?
 3   BY MR. CONWAY:
 4        Q              Did you and Mr. Fingerhut
 5   share ownership of Fingerhut-Holzer Partners?
 6        A      Yes.
 7        Q      All right.   Was it an equal division
 8   of ownership?
 9        A      I'm trying to remember if there
10   were other people involved.   I don't recall
11   right now.   It was equal between me and him,
12   though.
13        Q      All right.   There may have been
14   third-party participants whose names escape you
15   at the moment?
16        A      Yes.
17        Q      But you and Mr. Fingerhut were equal
18   partners?
19        A      Correct.
20        Q      And what was the division of
21   responsibility within the company; what did Mr.
22   Fingerhut do and what did you do?
23        A      Well, it was a mixed bag.   We each
24   did our own thing.   He, basically, would have
25   been the portfolio manager.   I would have been
```

D. Holzer - March 28, 2012

Page 38

Page    38

```
 1     the trader.
 2          Q      So he was the -
 3          A      He would have been long-term, I
 4     would have been short-term.
 5          Q      He was responsible for picking the
 6     equities and making determinations on
 7     investment vehicles?
 8          A      Yes.
 9          Q      And you would have been - you were
10     the hands-on salesman, mover -
11                 MR. FOLKENFLIK:   Objection to
12                 the term "salesman."  That's not
13                 what the witness said.  It's a
14                 different term.
15                 THE WITNESS:   That's correct.
16     BY MR. CONWAY:
17          Q      Okay.  I understand.
18                 Your function would have been
19     exactly what?
20          A      Trading.
21          Q      Did you trade in your own name or
22     did you trade through a third-party?
23          A      What do you mean, "through a
24     third-party"?
25          Q      Did you do your own trading within
```

D. Holzer - March 28, 2012

Page 39

Page   39

1     the company?

2          A     Yes.

3          Q     All right.  Were you licensed and

4     permitted to trade your stocks within your

5     company?

6          A     I'll explain something to you.

7          Q     Please, yes.  Do.

8          A     I might be long-winded, but -

9          Q     That's okay.

10         A     - maybe it will short circuit some

11    of the questions.

12               Anybody can trade their own money

13    anywhere, any time, any person.  You could be

14    banned from the securities industry for life,

15    you could be stripped of every license you

16    ever had, but anybody can trade their own

17    account.

18               Do you understand what I'm saying?

19         Q     Yes.

20         A     Okay.  Now, what's the question?

21               MR. FOLKENFLIK:   Just to cut

22               this short, did you trade through a

23               brokerage firm?

24               THE WITNESS:   Through one?

25               Yes.  You have to.  We cannot

D. Holzer - March 28, 2012

```
1              execute our own trades.

2       A      Is that what you were asking?

3       Q      Yes.  That's what I was asking.

4       A      I misunderstood then.

5       Q      Okay.

6       A      Yes.  We traded through a brokerage

7   - I traded through a brokerage firm.

8       Q      All right.  And what was the

9   brokerage firm?  Which one?

10      A      Probably, Dahlman Rose, still.

11  Dahlman Rose.

12      Q      Okay.

13      A      And other accounts.  I can't recall

14  who they were.

15      Q      But there were other trading

16  organizations you used?

17      A      Yeah.  This place kind of dims your

18  memory a little bit.

19      Q      Did Fingerhut-Holzer Partners have

20  assets?

21      A      Assets?  No.  Just what was set up

22  in the LLC as we went along.  There was no

23  assets in Fingerhut-Holzer Partners.

24      Q      Okay.  How did Fingerhut-Holzer -

25              MR. FOLKENFLIK:    Can I
```

D. Holzer - March 28, 2012

Page 41

Page    41

```
 1            interrupt you?
 2                  MR. CONWAY:    Sure.  Go ahead.
 3                  MR. FOLKENFLIK:    What do you
 4            mean by, "just what was set up in
 5            the LLC?"
 6                       Contributions at the time
 7            of
 8                  THE WITNESS:    No.  There was
 9            no contributions at the time of
10            incorporation.    Zero.    As we went
11            along and we were able - and we did
12            a certain deal and a separate LLC
13            was set up for each deal, it was
14            funded at that time.
15                  MR. FOLKENFLIK:    Okay.  So
16            there were no funds which you traded
17            through Fingerhut-Holzer?
18                  THE WITNESS:    Zero funds.
19            Zero.
20                  MR. FOLKENFLIK:    But it was -
21            for want of a better term - a
22            holding company for other LLCs -
23                  THE WITNESS:    That's -
24                  MR. FOLKENFLIK:    - that were
25            set up to do specific transactions?
```

D. Holzer - March 28, 2012

Page  42

Page      42

```
 1              THE WITNESS:    That's
 2      absolutely correct.
 3              MR. FOLKENFLIK:    Okay.
 4      And Fingerhut- Holzer, other than
 5      indirectly through the separate LLCs
 6      that were set up for specific
 7      transactions, it didn't have a
 8      portfolio that it traded out of?
 9              THE WITNESS:    That's correct.
10              MR. FOLKENFLIK:    Only through
11      the other subsidiaries.
12              THE WITNESS:    As each sub -
13      as each sub was set up, they were
14      funded for whatever the specific
15      investment vehicle was for that LLC.
16  BY MR. CONWAY:
17      Q      Right.  Was Mr. Fingerhut the
18      gentleman who brought in most of the investors?
19              MR. FOLKENFLIK:    Well,
20      objection.  Assumes facts not in
21      evidence.
22              MR. CONWAY:    No.  That's what
23      we're here to find out.
24              MR. FOLKENFLIK:    Who invested
25      in the separate subsidiary LLC?
```

D. Holzer - March 28, 2012

Page 43

Page    43

```
 1                    THE WITNESS:    Customers.
 2    BY MR. CONWAY:
 3         Q     All right.  Was Mr. Fingerhut the
 4    principal party bringing in the customers?
 5         A     No.
 6         Q     Did you bring in an equal volume of
 7    customers?
 8         A     I don't recall.
 9         Q     Now, was Mr. Fingerhut responsible
10    for designing the investments for the customers?
11         A     Designing the investments?  What's
12    that mean, exactly?
13                   MR. FOLKENFLIK:   Just ask him
14              an open-ended question and he'll
15              explain it.
16    BY MR. CONWAY:
17         Q     The thing is, what I wanna know,
18    more specifically, is, did Mr. Fingerhut make
19    the approach to the clients and say, "I'm
20    suggesting that you invest in this particular
21    vehicle"?
22         A     No.  Not all the time.
23         Q     Okay.  Did he do it on occasion?
24         A     Sometimes.
25         Q     All right.  Did customers come to
```

D. Holzer - March 28, 2012

1    him and say, "This is what I would like to do.

2    Can you be my vehicle to do it?"

3         A      Not necessarily.

4         Q      Okay.  Can you describe what it was

5    that he did, as best you can.

6         A      Barry was an idea guy.  He came up

7    with an idea and then we put it into play.

8    That's what he did.

9         Q      And what were some of his ideas for

10   Fingerhut-Holzer Partners?

11        A      For Fingerhut-Holzer Partners?

12        Q      Yes.

13        A      Zero.  However, for the

14   subsidiaries -

15        Q      Yeah.  Okay.  Fine.  For the

16   investors and subsidiaries, tell me what some

17   of his ideas were.

18        A      Some of the ideas were real estate

19   investments in Florida.  Private placements in

20   New York.

21        Q      And what do you mean by "Private

22   placements in New York"?

23        A      Money with privately held

24   companies.

25        Q      What else?

D. Holzer - March 28, 2012

Page 45

Page    45

```
1        A      Some public stock, publicly traded
2   stock.
3        Q      What else?
4        A      That's it.
5        Q      Now, when investor money came in,
6   into what particular vehicle was it placed?
7        A      LLCs.
8        Q      Each investment -
9        A      Set up LLCs at J.P. Morgan Chase.
10              What?
11       Q      Each investments had an LLC.  By
12   that, do you mean a company or an account?
13       A      The - the LLC was domiciled at J.P.
14   Morgan Chase.
15              MR. FOLKENFLIK:   The record
16              should reflect that the witness
17              gestured toward the copy of the
18              Amended Complaint.
19   BY MR. CONWAY:
20       Q      So, when money came in, it was
21   directed to J.P. Morgan Chase?
22       A      Yes.
23       Q      And limited liability corporations
24   were set up for these investments?
25       A      Correct.
```

D. Holzer - March 28, 2012

Page 46

Page    46

```
 1        Q      All right.  Were they set up through
 2    the same lawyer that you used?
 3        A      I don't recall.  We might have
 4    changed lawyers because they were too
 5    expensive, as I recall.
 6               I just don't remember who we
 7    changed to after the initial firm was set up.
 8        Q      All right.  Where did you have your
 9    place of business?
10        A      399 Park  Avenue.
11        Q      And how many employees did
12    Fingerhut-Holzer Partners have?
13        A      Including the partners?
14        Q      Yeah.
15        A      I think, seven.
16        Q      And who were the seven?
17        A      Barry Fingerhut, David Holzer,
18    Andrew Fingerhut.
19        Q      Is that Mr. Fingerhut's son?
20        A      That's correct.
21               Brooke Fingerhut.
22        Q      Is that his daughter?
23        A      That's correct.
24               Douglas Holzer, and we had a
25    receptionist.  I don't recall her name.
```

D. Holzer - March 28, 2012

```
 1        And we had a - I don't remember his name...

 2        CFO.  I don't remember his name.

 3                     MR. FOLKENFLIK:    Can I get

 4                the question read back, please?  The

 5                original question.

 6                        (At which time, the

 7                requested portion of testimony was

 8                read back by the stenographer.)

 9    BY MR. CONWAY:

10        Q      Now, how did Fingerhut-Holzer make

11    its money,  Fingerhut-Holzer Partners make its

12    money?

13        A      We didn't.

14        Q      What does that mean?

15               Where was the income stream for

16    Fingerhut-Holzer?

17        A      There was no income stream.

18        Q      How were you and Mr. Fingerhut

19    profiting from Fingerhut-Holzer Partners?

20        A      There was no profit.

21        Q      Well, how did you earn a living at

22    the time?

23        A      We didn't earn a living.

24        Q      Well, what was the purpose of

25    Fingerhut-Holzer Partners if not to make a
```

D. Holzer - March 28, 2012

Page 48

Page    48

```
1     profit?
2            A      To earn a living.
3            Q      All right.      And you never made
4     any money with -
5            A      No.
6            Q      Never ever?
7            A      No.
8            Q      Now, is this the year 2003?
9            A      I don't recall the exact year.   I
10    think it was 2003, or 2004, maybe.   I just
11    don't recall.
12           Q      And what income sources did you have
13    in 2003?
14           A      Trading.
15           Q      Trading in?
16           A      My own account.
17           Q      And what was the quantum value of
18    your trading account?
19           A      I don't remember.
20           Q      And what was Mr. Fingerhut's source
21    of income?
22           A      I have no idea.
23           Q      Now, in setting up Fingerhut-Holzer
24    Partners, there was an intention to earn money
25    there; correct?
```

D. Holzer - March 28, 2012

Page 49

Page    49

1          A      That's correct.

2          Q      And how were you going to earn –

3     what was the plan to earn money?

4          A      By the investment process.

5          Q      By participating in the investment

6     process with your customers?

7          A      That's correct.

8          Q      And that never took place?

9          A      The investment process took place.

10    Nothing ever came to fruition.  You have to

11    sell something to make money.

12         Q      All right.

13                So, was Fingerhut Partners a failed

14    business investment?

15         A      Was it a failed business

16    investment?  Yes.

17         Q      And it never made any money at all?

18         A      No.

19         Q      Did you file taxes for 2003?

20         A      Yes.

21         Q      And did –

22         A      Don't say two-thousand-and-three

23    when I'm not sure of the year.  I don't recall

24    if it was two-thousand-and-three.  It's public

25    record, I know that.

D. Holzer - March 28, 2012

Page 50

Page    50

```
 1              So, I mean,  it's very easy to find
 2    out when Fingerhut-Holzer Partners was
 3    initiated.
 4          Q     Okay.  Now, did you have business
 5    interests separate from Fingerhut-Holzer
 6    Partners at the time?
 7          A     No.  Business interests?
 8          Q     Business interests.  Yes.
 9          A     No.
10                MR. FOLKENFLIK:    Excluding
11                your personal trading.
12          A     I had investments, yes.
13          Q     That were your own?
14          A     Yes.
15          Q     Were they under the umbrella of
16    Fingerhut-Holzer?
17          A     No.
18          Q     Were they under any other corporate
19    entity?
20          A     No.
21          Q     All right.  Were they entirely held
22    within your own name?
23          A     In my name.  Correct.
24          Q     Was your wife a participant in any
25    of this?
```

D. Holzer - March 28, 2012

Page 51

Page    51

```
 1          A       I don't recall.

 2          Q       Now, you and Mr. Fingerhut were

 3    partners.   Correct?

 4          A       Yes.

 5                    MR. FOLKENFLIK:   I have to

 6                object, to the extent that he uses

 7                the term in a legal sense.

 8    BY MR. CONWAY:

 9          Q       You may answer.

10          A       Yes.

11          Q       Okay.  And the two of you -

12          A       Let's - let's just clarify this.

13    There was an LLC.

14          Q       Right.

15          A       You understand the LLC?

16          Q       I understand.

17          A       Okay.

18          Q       All right.

19                    MR. FOLKENFLIK:   Excuse me.

20                That was to clarify the partners

21                question that you were an LLC?

22                    THE WITNESS:   Right.

23    BY MR. CONWAY:

24          Q       And did you and Mr. Fingerhut agree

25    on the outline of the purposes of
```

D. Holzer - March 28, 2012

1     Fingerhut-Holzer Partners?

2          A     There was no written outline.

3          Q     All right.  Did you agree, "This is

4     the business we are involved in, and this is" -

5          A     There's no - there was no model.

6          Q     All right.  Did you set out to make

7     money together?

8          A     Yes.

9          Q     Was it your intention to share

10    profits together?

11         A     Yes.

12         Q     And, in creating the LLCs, was this

13    intended to a method of, a vehicle for making

14    profits?

15         A     Yes.

16         Q     All right.

17              And how exactly was profit to be

18    made through the LLCs that were created by

19    investments that came to Fingerhut-Holzer

20    Partners?

21         A     How it was supposed to be created

22    was, you purchased whatever asset you

23    purchased, put it into the LLC, divide up the

24    players' participation by the amount of money

25    they put in.



D. Holzer - March 28, 2012

Page 53

Page    53

1              So, if there was a million-dollars

2      and Joe Blow put in ten per cent, he owned a

3      hundred-thousand-dollars worth of that

4      investment, just prorated out.

5              Now, if that particular asset grew

6      to be ten-million-dollars, he owned that

7      percentage of ten-million-dollars.

8              And then, when we sold it, he

9      liquidated and he made money on it.

10         Q     Okay.   The employees had to be paid.

11             Who was responsible for paying

12     those employees during the period that

13     Fingerhut-Holzer Partners was not earning

14     money?

15         A     Barry Fingerhut and David Holzer.

16         Q     Both of you together paid your

17     children's salaries out of your personal

18     earnings; out of your personal holdings?

19         A     Correct.

20         Q     And what exactly did Andrew

21     Fingerhut do for the company?

22         A     Andrew Fingerhut was an analyst.

23         Q     And what did Brooke Fingerhut do for

24     the company?

25         A     She was never there.   I don't know.

D. Holzer - March 28, 2012

Page 54

Page    54

1        Q        But she was listed as an employee

2    and received compensation, but didn't do much

3    work within the confines of the office?

4        A        I never saw her there.

5        Q        Okay.  What did David Holzer do?

6        A        David?

7        Q        Excuse me.  Douglas Holzer.  I'm

8    sorry.

9        A        Douglas Holzer was set up to do

10   trading.

11       Q        And did he do any trading within the

12   confines of the company?

13       A        No.

14       Q        What was Douglas Holzer doing at the

15   time that he was with Fingerhut-Holzer

16   Partners?

17       A        Nothing.

18       Q        Was he in school, was he -

19       A        He was graduating.

20       Q        Did he do any work at the firm?

21       A        He would come up with trading

22   ideas.  Because there was no money to invest

23   in them, they went to nought.

24       Q        All right.  Did he spend much time

25   at the office?

D. Holzer - March 28, 2012

Page 55

Page    55

1          A     All the time, every day.

2          Q     Every day.

3                So, at the office, on a daily

4     basis, would be you, Mr. Fingerhut, your son,

5     his son, and the receptionist?

6          A     His -

7                Andrew Fingerhut?

8          Q     Yeah.

9          A     He lived in Los Angeles.

10         Q     Did he work for the firm from a

11    distance?

12         A     Yes.

13         Q     Okay.  Did he work on a daily basis?

14         A     As far as I know.

15         Q     Now, who was responsible for footing

16    the costs of creating the work space at 399

17    Park Avenue?

18         A     It was a turn-key operation.  It

19    was there.

20         Q     Okay.  You took it from the

21    building?

22         A     No.  We sublet it from - from a -

23    that firm.  I don't know the name.

24         Q     All right.  Did you and Mr. Holzer

25    set up a -

D. Holzer - March 28, 2012

1                    MR. FOLKENFLIK:    Mr.

2                           Fingerhut.

3                    MR. CONWAY:    I'm sorry.

4       BY MR. CONWAY:

5           Q       Did you and Mr. Fingerhut set up a

6       working account from which you would make

7       payments such as the first month's rent?

8           A       Yes.  We had a - a - we had a firm

9       checking account.

10          Q       All right.

11                  And that checking account was in

12      the name of Fingerhut-Holzer Partners LLC?

13          A       Yes.

14          Q       All right.

15                  And both of you would have been

16      signatories to it?

17          A       Yes.

18          Q       Was Mr. Fingerhut in the office on a

19      regular basis?

20          A       Not - not in the first year or so

21      of operation.

22          Q       Did there come a time when he became

23      more actively involved in the company?

24          A       After the first year or so of

25      operation.

D. Holzer - March 28, 2012

Page 57

Page   57

1       Q       All right.

2               And were you at the firm on a

3       regular basis?

4       A       Yes.

5       Q       Where were you living at the time?

6       A       10 Sky Drive.

7       Q       Where's that?

8       A       New City, New York.

9       Q       And did you commute into the city

10      every day?

11      A       I did.

12      Q       Now, was your service account, that

13      you paid rent and mortgage and employees out

14      of, was there also any second or third

15      accounts?

16      A       You're talking about personal or

17      business?

18      Q       Business, business only.

19      A       You referred to it as what, a

20      service account?

21      Q       Yes.  The account for

22      Fingerhut-Holzer Partners.

23      A       Just one account.

24      Q       One account.

25              There were no other accounts?

D. Holzer - March 28, 2012

1          A     No.

2                Well, for each LLC, an account has

3     to be set up.   Because, when you open up an

4     LLC, you have a vehicle in there.

5                Whatever that piece of merchandise

6     is has to be bought from an account attached

7     to that particular LLC.  Every LLC is an

8     individual entity.   That's why they're set

9     up.  They - they're not living, per se, but

10    they're - that's an entity.

11               Like a human being, that's an

12    entity.   It's an investment deal.  Limited

13    liability company.

14               So when you open one up, you have

15    to open up a corresponding banking

16    relationship with that LLC that does banking,

17    and you must open up an account with it.

18         Q     Who did that for Fingerhut-Holzer?

19         A     Andrew and - I can't remember his

20    last name.  I can't remember his last name.

21    The CFO.

22               Just keep going, and I'll think of

23    it.

24         Q     Okay.  There was a CFO on -

25         A     Yes.  That was the other employee,

D. Holzer - March 28, 2012

Page 59

Page      59

1        I said, that was there every single day.

2                        MR. FOLKENFLIK:   Just to try

3                and cut this short.  If I understand

4                your answer correctly, when there

5                was an investment to be made, there

6                was an investment vehicle set up as

7                a separate LLC.  It would then be

8                funded, at that time, and the

9                membership interests would be

10               delivered to each of the funding

11               sources.

12                       And then, whenever

13               investment was made to that LLC, it

14               was made to the bank account

15               established for that LLC -

16                       THE WITNESS:   Correct.

17                       MR. FOLKENFLIK:   At J.P.

18               Morgan Chase.

19                       THE WITNESS:   Absolutely

20               correct.

21                       MR. FOLKENFLIK:   Are all

22               those steps correct?

23                       THE WITNESS:   That's

24               absolutely correct.

25                       MR. FOLKENFLIK:   So, the

D. Holzer - March 28, 2012

Page 60

Page    60

1          process was, you came up with an

2          investment idea; correct?

3                  THE WITNESS:    Correct.

4                  MR. FOLKENFLIK:    Then created

5          an investment LLC; correct?

6                  THE WITNESS:    Correct.

7                  MR. FOLKENFLIK:    Then

8          membership interests were acquired

9          by the investors in the LLC;

10         correct?

11                 THE WITNESS:    Correct.

12                 MR. FOLKENFLIK:    And then the

13         funds for the membership interests

14         would be deposited directly into an

15         account in the name of the LLC at

16         J.P.  Morgan Chase.

17                 THE WITNESS:    The only step

18         that has to be reversed - the money

19         comes in first, then the percentages

20         are established.

21                 MR. FOLKENFLIK:    Okay.  The

22         money would go into the LLC -

23                 THE WITNESS:    First.

24                 MR. FOLKENFLIK:    - in the

25         J.P.  Morgan Chase LLC account.

D. Holzer - March 28, 2012

Page 61

Page    61

1              THE WITNESS:    Correct.   Then

2      you can establish percentages, and

3      somebody could say, "I want "X"

4      amount."   But, all of a sudden, only

5      "X" amount comes in.   So, as soon as

6      the money's funded in the LLC, each

7      participant gets a certain

8      percentage of the LLC.

9                   And then, as he said, the

10     checking accounts opened up and paid

11     out.

12          MR. FOLKENFLIK:    And then the

13     investment is made from that

14     checking account?

15          THE WITNESS:    That's correct.

16          MR. FOLKENFLIK:    Okay.

17  BY MR. CONWAY:

18      Q          And   Andrew Fingerhut was

19  responsible for doing this from his Los Angeles

20  residence?

21      A      He was an analyst.

22      Q      Well, who's the party who actually

23  filled out the -

24          MR. FOLKENFLIK:    He said the

25          CFO.

D. Holzer - March 28, 2012

Page 62

Page    62

1          A     Yeah.   CFO guy.   I can't think of

2     his name.   It's crazy that I can't think of

3     his name.

4                  Just put CFO.   Refer to him as

5     "CFO."   He was there.

6          Q     My clients have identified a Mr.

7     Blum.

8          A     Oh.   That's it.

9          Q     Does that sound familiar?

10          A     Mr. Blum.

11                  MR. FOLKENFLIK:   Mister,

12              what, Blum?

13                  MR. CONWAY:   Yeah.   Mr. Blum.

14          A     That's the guy.

15          Q     What's Mr. Blum's first name?

16          A     His father was Howard Blum.

17          Q     Was Mr. Blum a young man?

18          A     Yes.

19          Q     And Mr. Blum is the CFO?

20          A     Yes.

21          Q     And, as CFO, he was responsible for

22     the manual work that had to be done -

23          A     That's correct.

24          Q     - and setting up all these things?

25          A     That's correct.

D. Holzer - March 28, 2012

Page 63

Page    63

1       Q       That was his job?

2       A       Correct.

3       Q       How many different LLCs were set up

4  by Fingerhut-Holzer?

5       A       I don't know.

6       Q       Are we talking in excess in ten?

7       A       I don't recall.  No.

8       Q       In excess of a hundred?  Somewhere

9  in between?

10      A       You said in excess of ten.  I said

11 no.  It cannot be in excess of a hundred.

12      Q       But I thought you said you didn't

13 know?

14      A       No.  I don't know for sure.  It was

15 not in excess of ten.

16      Q       All right.

17              To the best of your recollection,

18 how many investment LLCs were set up by

19 Fingerhut-Holzer Partners?

20      A       Four, five, maybe.

21      Q       Okay.  And who were the

22 participators in those four or five different

23 investments?

24      A       I - I don't recall.  I don't recall

25 the names.

D. Holzer - March 28, 2012

Page 64

Page    64

```
 1        Q      Okay.
 2                    MR. FOLKENFLIK:   Why don't
 3        you show the witness the list -
 4                    MR. CONWAY:    All right.
 5        All right.  We're getting there.
 6        We're getting there.
 7                    MR. FOLKENFLIK:   Round about.
 8   BY MR. CONWAY:
 9        Q      Now, amongst the defendants
10        identified here are a number of other
11        companies, including Fingerhut-Holzer Equities,
12        Incorporated.
13                    Are you familiar with that company?
14        A      Not particularly.  I mean, I - I
15        don't recall anymore.
16                    You know, just keep reading and
17        I'll tell you if I'm familiar with any.
18        Q      Fingerhut-Holzer, Incorporated.
19        Fingerhut-Holzer Fund, L.P.  Fingerhut-Holzer
20        The Waverly I, LLC.
21        A      I mean, I remember some of them.  I
22        just don't remember what went into them.  Some
23        of them were real estate.  Some of them might
24        have been a magazine that we put money into.
25        Some of them might have been hedge funds.
```

D. Holzer - March 28, 2012

Page 65

Page    65

1              I just don't remember which fit

2      with which.  You understand what I'm saying?

3          Q     All right.  Now, when you set up a -

4      when an LLC was set up, did it invite

5      participation from other parties, other than

6      the originals?

7          A     Once it was set up, it was closed.

8          Q     Once it was set up it was closed?

9      There were no others?

10          A     In the initial funding, we'd set

11      up, for the LLCs, different funding charts,

12      investments.  Might have been Waverly I,

13      Waverly II, Waverly III, Waverly IV.

14              You understand?

15          Q     When you indicated -

16          A     You don't expand upon an LLC.

17          Q     When you indicated that

18      Mr. Fingerhut had an interest in real estate,

19      when real estate was being marketed and

20      investors came to participate, purchase

21      apartments, things like that, where would the

22      money go?

23              MR. FOLKENFLIK:    Purchase

24          what?

25              MR. CONWAY:    Purchase

D. Holzer - March 28, 2012

Page 66

Page   66

```
1              apartments.

2                    MR. FOLKENFLIK:    Objection.

3              The purchase of apartments is

4              different from the purchase of an

5              interest in an LLC.

6         A     That's why you set up an LLC.

7         Q     All right.

8         A     The LLC does the purchasing of

9    whatever that vehicle is, whether it's

10   apartments, parking spaces, it doesn't matter.

11              The investor owns a piece of the

12   LLC which owns the whole investment.

13        Q     All right.  So my question was -

14        A     Yeah.

15        Q     - after the LLC is set up, does it

16   invite contributions from investors for

17   specific purposes and specific points in the

18   investment?

19        A     Not that particular LLC.  You set

20   up one, two, three, four, five.  If it's the

21   same investment, if it's in the same real

22   estate complex, or the same privately held

23   company, it will be a different tranche of

24   money with a different LLC.

25              Reason being is, you cannot change
```

D. Holzer - March 28, 2012

Page  67

Page    67

1     the percentage ownership of the first one by

2     putting more money into it.  You can't do

3     that.

4          Q     I understand.

5          A     So that's how it works.

6          Q     Now, are you familiar with John and

7     Heidi Rapillo?

8          A     Yes.

9          Q     When did you meet John and Heidi

10    Rapillo for the first time?

11         A     John Rapillo, probably, in 1976,

12    '77.

13         Q     And what was the nature of your

14    early involvement with Mr. Rapillo?

15         A     Mine, particularly?  Very little.

16         Q     Okay.

17               What was the relationship of anyone

18    in your family?

19         A     Mr. Rapillo was an interior

20    decorator that my wife hired.

21         Q     All right.

22               And did you come to meet

23    Mr. Rapillo over the years, after being

24    introduced by your wife?

25         A     Here and there.

D. Holzer - March 28, 2012

Page 68

Page    68

1          Q       And did there come a time when your

2     relationship with Mr. and Mrs. Rapillo grew to

3     a personal friendship?

4          A       Yes.  But after he got married.

5          Q       All right.

6                  And you met him as a bachelor?

7          A       Yes.

8          Q       Okay.

9                  And he subsequently married Heidi

10    Rapillo?

11         A       Right.

12         Q       And when, approximately, was that?

13         A       I have no idea.

14         Q       And did a friendship develop after

15    he married?

16         A       Yes.

17         Q       How did that occur?

18         A       My wife invited them over for

19    dinner, they invited us for dinner, every -

20    couple times a year.

21         Q       And, at any time, did you solicit

22    business investment from Mr. Rapillo in the

23    Fingerhut-Holzer Enterprises?

24         A       Yes.

25         Q       Okay.

D. Holzer - March 28, 2012

Page 69

Page    69

1               Approximately, when was that?

2       A       I don't recall.

3       Q       Are we talking in the 1990s, or -

4       A       I don't recall.

5               No.  Later.  Two-thousand-three,

6       four.  I don't recall the exact date, though.

7       Maybe even later.

8       Q       Are you aware that Mr. Rapillo had

9       an accident that caused him a personal injury?

10      A       Yes.

11      Q       Are you aware that he had a personal

12      injury matter that he won in court?

13      A       Yes.

14      Q       And are you aware that, from this,

15      he extracted a sum of, approximately,

16      two-point-seven-five-million-dollars?

17      A       I knew he extracted some.  I didn't

18      know exactly how much.

19      Q       And this was in the summer of 2004.

20      A       Yes.

21      Q       In two-thousand-and-four,

22      Fingerhut-Holzer Partners was in operation.

23      Was it not?

24      A       Wasn't or was?

25      Q       Was in operation.

Page      70

```
 1          A      I - I'm not sure.  I think so, but
 2   I'm not sure.    Pretty sure.  I can't answer
 3   that question.
 4          Q      Did there come a time when you had
 5   conversations with Mr. Rapillo for the purpose
 6   of promoting investment with the
 7   Fingerhut-Holzer operation?
 8          A      Yes.
 9          Q      And when and where do you recall
10   having a conversation for the first time with
11   Mr. Rapillo concerning the investment funds?
12          A      My house.
13          Q      And where was that?
14          A      Where was it?
15          Q      Your house at Sky Drive?
16          A      Yes.
17          Q      And what was the occasion, holiday,
18   birthday?
19          A      I don't know.
20          Q      And what was the nature of your
21   conversations?
22          A      I don't recall.  It was - he - he
23   actually initiated.   Said he was hardly
24   getting any money from wherever he had his
25   money in.  Some bonds, or something.
```

D. Holzer - March 28, 2012

Page 71

Page      71

1        Q       And did he make a request of you?

2        A       Yeah.  He - he actually - he said,

3    "I'm not getting a good return on my money.

4    He's got me in some municipal bonds."

5              I don't really recall exactly what

6    it was.

7              And then I said, "Well, we're doing

8    a real estate investment.  Maybe you wanna put

9    some money in there."

10       Q       And what real estate investment were

11   you referring to?

12       A       Well, it was in Saint

13   Augustine.  I just don't remember if it was

14   Waverly.  I can't remember which particular

15   one.

16       Q       Were there multiple investments in

17   Saint Augustine?

18       A       There was different -

19       Q       Or multiple projects.

20       A       Yeah.

21       Q       And what were the nature of your

22   discussions with Mr. Rapillo?

23              MR. FOLKENFLIK:   Objection.

24         Why don't you ask him what he said.

25              MR. CONWAY:   I'm trying to.

D. Holzer - March 28, 2012

Page 72

Page    72

1    BY MR. CONWAY:

2            Q        What were the nature of your

3    discussions?

4                    MR. FOLKENFLIK:    What did you

5            say to him, what did he say to you?

6            A      I said, "We're going to make an

7    investment in different condominium complexes

8    within Saint Augustine."

9                    I don't recall the actual name of

10   the place now.   Can't remember.

11                   But, anyway, and, "Would

12   you like to put money into this real estate?"

13           Q       And what, in specific, were you

14   suggesting?

15           A       That he buy it at "X" number of

16   dollars and sell it at "X" number of dollars.

17   I don't recall the exact numbers.

18           Q       Buy what, in specific?

19           A       A piece of the Waverly, which is

20   the LLC that invested in the condominiums in

21   Florida.

22           Q       And when you say buy, "a piece of

23   the Waverly," what exactly did you mean?

24                   An apartment, a chunk of the

25   investment?

D. Holzer - March 28, 2012

Page 73

Page   73

1        A     No.   I told him what the Waverly

2    would invest in and he would own a particular

3    amount of that.

4              Let's say - I don't recall the

5    initial investment, but say it was

6    five-million-dollars.

7              All right?  I'm just saying that

8    for a number.  It may not be the right number.

9    But you put in "X" amount of dollars in there,

10   you'll own "X" piece of this specific LLC.

11             If we sell it for a specific

12   amount, double the money, you'll make double

13   your money.

14             If we sell it for three times,

15   you'll make three times your money.

16             And so on and so forth.

17        Q     All right.  Now, were you intending

18   that he participate in the general ownership of

19   the Waverly,  or was there any specific element

20   to which -

21                  MR. CONWAY:   Max.  Max.  It's

22             a simple question.

23                  MR. FOLKENFLIK:   No.  It

24             isn't.

25        Q     All right.  Were you suggesting that

D. Holzer - March 28, 2012

Page 74

Page    74

1      he participate in the ownership interest of the

2      Waverly?

3                A      Yes.

4                Q      Okay.

5                       MR. FOLKENFLIK:   Objection.

6                By "the Waverly," do you mean the

7                LLC or the apartment complex that

8                bore that name?

9                       THE WITNESS:   Yes.

10                      MR. FOLKENFLIK:   Which, which

11               is it?  The LLC or?

12                      THE WITNESS:   LLC.

13                      MR. CONWAY:   Okay.  Max, I

14               have to ask you to just save your

15               questions until your opportunity.

16                      MR. FOLKENFLIK:   You gotta

17               get it -

18                      MR. CONWAY:   I understand.  I

19               understand.

20                      MR. FOLKENFLIK:   Counselor,

21               you gotta get the corporate

22               structure right.  When you ask

23               questions that are susceptible to

24               confusing answers, it's

25               objectionable.

D. Holzer - March 28, 2012

Page    75

1              MR. CONWAY:    That's what we

2         do.

3              MR. FOLKENFLIK:    No.    That's

4         not what we do.

5              MR. CONWAY:    Yes.   We want

6         accuracy.

7              MR. FOLKENFLIK:    We want the

8         truth.

9              MR. CONWAY:    We want

10         accuracy.

11             THE WITNESS:    You don't have

12         to tell me that.   I understand what

13         you're trying to do.

14    BY MR. CONWAY:

15         Q    The phrase, Waverly Phase I,

16    Fingerhut-Holzer The Waverly I, LLC, what was

17    that?

18         A    It was an investment vehicle to buy

19    a certain amount of apartment units in a

20    particular Saint Augustine real estate

21    development, initiated by a gentleman down

22    there named Joe Buckley.

23         Q    And Joe Buckley -

24         A    Ron Buckley.

25         Q    Ron Buckley.

D. Holzer - March 28, 2012

1                    Was Ron Buckley a real estate

2    investor in Saint Augustine?

3         A      He was a developer.

4         Q      Now, Mr. Buckley and his

5    organization would be the owner of the land and

6    develop the product?

7         A      I don't know the infrastructure of

8    Trident Realty.    That was the name of theirs.

9         Q      But Fingerhut-Holzer The Waverly I

10   was an investment vehicle to buy apartments in

11   that structure?

12        A      That's correct.

13        Q      They were not owners of the

14   structure.    They would be owners of the

15   apartments?

16        A      Who are you saying "they," Waverly?

17        Q      The investors in Fingerhut-Holzer

18   The Waverly I.

19        A      That's correct.

20        Q      So, have you ever met Ron Buckley?

21        A      Yes.

22        Q      And was Mr. Buckley's interest

23   solely real estate and development, as best you

24   know?

25        A      Yes.

D. Holzer - March 28, 2012

Page 77

Page      77

1              Q      And was he responsible, also, for

2      Fingerhut-Holzer, for that which constituted

3      the investments of Fingerhut-Holzer The Waverly

4      II, LLC?

5              A      Was he responsible?

6                     MR. FOLKENFLIK:   Objection.

7              Just let me note my objection.  You

8              have it backwards.

9                     MR. CONWAY:   Okay.  Well,

10             straighten it out.

11                    MR. FOLKENFLIK:   Was Waverly

12             a single real estate development?

13                    THE WITNESS:   Was the Waverly

14             - say it again.  I'm sorry.

15                    MR. FOLKENFLIK:   The Waverly

16             -

17                    THE WITNESS:   Yes.

18                    MR. FOLKENFLIK:   - that Mr.

19             Buckley created as a developer

20             through Trident, was that a real

21             estate development series of

22             condominium complexes?

23                    THE WITNESS:   That was what

24             Trident Realty,  who was the

25             principal owner being Ron Buckley,

D. Holzer - March 28, 2012

Page 78

Page    78

1          created or was trying to create in

2          that village in Saint Augustine.

3                    MR. FOLKENFLIK:   Okay.

4          And that was referred to as The

5          Waverly.   Correct?

6                    THE WITNESS:   Yeah.   I'm

7          saying the LLC was The Waverly, but

8          that was The Waverly.

9                    MR. FOLKENFLIK:   But

10          Fingerhut-Holzer Waverly I, LLC

11          bought certain condominium units or

12          other property within The Waverly

13          structure; correct?

14                    THE WITNESS:   Correct.

15                    MR. FOLKENFLIK:   And

16          Fingerhut-Holzer Waverly II bought

17          different condominium units -

18                    THE WITNESS:   Correct.

19                    MR. FOLKENFLIK:   - within the

20          same development.

21                    THE WITNESS:   Which, we went

22          through that, why we created the

23          LLC.

24    BY MR. CONWAY:

25          Q    That's what I'm here to find out.

D. Holzer - March 28, 2012

1          A     Yes.   Okay.   So, now, are you good

2    on that?

3          Q     Yes.

4          A     Okay.

5          Q     So Trident Realty was the real

6    estate investor - the real estate developer who

7    was building that which was the Waverly

8    complex?

9          A     Correct.

10         Q     And Fingerhut-Holzer Partners

11   created two LLCs, the purposes of which were to

12   buy units in that developing property?

13         A     Yes.   You got it now.

14         Q     And were there multiple

15   participators in Fingerhut Waverly I and

16   Fingerhut Waverly II?

17         A     Yes.

18         Q     So, if two or more individuals were

19   interested in purchasing apartments there, they

20   would participate within Waverly I or Waverly

21   II?

22         A     Correct.

23         Q     Was there a limit as to how many

24   participators could be in the Waverly I

25   project?

D. Holzer - March 28, 2012

Page 80

Page   80

```
 1        A      I don't recall the total amount of
 2   money, so if we reached the saturation point
 3   in terms of we raised the total amount of
 4   money, then it was cut off.
 5              So there was a limit.  Yes.  The
 6   answer's a limit.
 7        Q      Okay.  Do you remember how -
 8        A      How many?
 9        Q      Yes.
10        A      No.
11        Q      Now, different parties would invest
12   in the Waverly I and, if you wanted, in the
13   Waverly II.  Correct?
14        A      It wasn't an open-ended investment.
15   Is that what you're implying?
16        Q      Well, if an individual was
17   acceptable to you, you would put them into one
18   of those?
19        A      Well, there was no Waverly II
20   unless Waverly I was done.  Once Waverly I was
21   done, that was the end of that.
22        Q      All right.
23        A      Then you moved to Waverly II.
24        Q      Did you finish Waverly I?
25        A      Well, it's Waverly II.  Yes.
```

D. Holzer - March 28, 2012

Page 81

Page    81

1          Q      Okay.

2                 How many units were involved in

3    Waverly I?

4          A      I don't recall.

5          Q      Can you describe the property that

6    was being built in Florida?

7                 Was it townhouses?

8                 Was it apartment houses?

9          A      It was a combination of townhouses

10   and single-family homes.

11         Q      So everything would be two stories

12   or below?

13         A      I don't recall the exact structure.

14   I'm sorry.

15                MR. FOLKENFLIK:   I think we

16            have plans -

17                THE WITNESS:   I'm sure you

18            do.

19                MR. FOLKENFLIK:   - that

20            describe what the structures looked

21            like.

22         A      There were five in the last ones,

23   as I recall.

24         Q      Five stories tall?

25         A      I think.

D. Holzer - March 28, 2012

Page 82

Page    82

```
 1          Q     Now, on the occasion that you
 2     discussed this with Mr. Rapillo, were you
 3     suggesting that he make a purchase of one of
 4     these apartments?
 5          A     It's not of an apartment.
 6          Q     It's not of an apartment?
 7          A     The direct investment was in the
 8     Waverly.
 9                So he wasn't buying an apartment,
10     per se, he was buying a piece of the total
11     investment, which included, again,  multiple
12     units and/or single-family homes, and/or
13     parking spaces.
14                     MR. FOLKENFLIK:   Commercial
15                spaces?
16                     THE WITNESS:   I don't recall
17                if we had any participation in
18                commercial space.  I don't think so.
19                But I know we did buy parking
20                spaces,  individual units, and
21                single-family homes.
22     BY MR. CONWAY:
23          Q     All right.
24                So if I put in ten-dollars, I
25     wasn't buying an apartment, I was buying a
```

D. Holzer - March 28, 2012

Page 83

Page      83

1     portion of your investment?

2          A      Correct.

3          Q      And where was the money-making

4     potential for Fingerhut-Holzer Partners in this

5     project?

6          A      Oh.  For the partnership itself?

7          Q      Right.

8          A      I don't remember how the LLC was

9     set up.  If we took a certain portion of the

10    profit or was there a fee involved, I can't

11    remember.  I cannot recall, off the top of my

12    head.

13               So not only did Fingerhut-Holzer

14    participate in the Waverly I and II as a

15    proprietary interest -

16               You know what that is.  Right?

17         Q      Yes.

18         Q      But we also were going to get a

19    percentage of some fee pay-out I cannot

20    remember.

21         Q      All right.

22               So there would be profit back from

23    an investment like Fingerhut The Waverly I,

24    back to Fingerhut-Holzer Partners?

25         A      Yeah.  There would be a fee paid.

D. Holzer - March 28, 2012

```
 1      It's not a profit.

 2                   See, you have to understand the

 3      difference between profit and fees.

 4           Q      I understand.

 5           A      Okay.  So you wanna rephrase that

 6      question?

 7                       MR. FOLKENFLIK:   Can I make

 8                   it easy for you?

 9                       THE WITNESS:   Yeah.

10                       MR. FOLKENFLIK:   Who was the

11                   managing member of the

12                   Fingerhut-Holzer Waverly I, LLC?

13                       THE WITNESS:   The actual

14                   managing member?

15                       MR. FOLKENFLIK:   Yeah.

16                       THE WITNESS:   Was Barry.

17                       MR. FOLKENFLIK:   Personally

18                   or through an LLC?

19                       THE WITNESS:   Through the

20                   LLC.

21                       MR. FOLKENFLIK:   Which LLC?

22                       THE WITNESS:   The I and II.

23                       MR. FOLKENFLIK:   Okay.

24                       THE WITNESS:   He was the one

25                   managing.
```

D. Holzer - March 28, 2012

Page 85

Page    85

1              MR. FOLKENFLIK:    And the

2      management of the LLC,

3      Fingerhut-Holzer Waverly I was who?

4              THE WITNESS:    It was

5      Fingerhut-Holzer Partners.

6              MR. FOLKENFLIK:    Fingerhut-

7      Holzer Partners was the manager?

8              THE WITNESS:    That's correct.

9              MR. FOLKENFLIK:    And so the

10     managing -

11             THE WITNESS:    The managing

12     person of that entity was Barry.  So

13     the managing - he's correct.

14             MR. FOLKENFLIK:    So the

15     managing member would be paid -

16             THE WITNESS:    Would be paid a

17     fee.  That's correct.

18             MR. FOLKENFLIK:    And if there

19     was a fee paid -

20             THE WITNESS:    That's who it

21     was paid to.

22                 Are we straight on that?

23             MR. FOLKENFLIK:    And the fee

24     would be paid on the sale of the

25     assets -

D. Holzer - March 28, 2012

Page 86

Page    86

```
 1                  THE WITNESS:   Correct.
 2                  MR. FOLKENFLIK:    - of the
 3             Waverly I.
 4                  THE WITNESS:   And the LLC
 5             would be closed down.
 6                  MR. FOLKENFLIK:   And the LLC
 7             would be closed down.  The managing
 8             member, Fingerhut-Holzer Partners,
 9             LLC would receive a fee, and all of
10             the members, the investors, would
11             receive their participation?
12                  THE WITNESS:   Correct.
13    BY MR. CONWAY:
14        Q     Where are the documents that
15    constitute the corporate jacket and corporate
16    records of Fingerhut-Holzer Partners?
17        A     I couldn't tell you.  They existed,
18    that I can tell you.
19             And I can't tell you where there
20    are.
21        Q     Were they kept at the
22    Fingerhut-Holzer firm?
23        A     They were kept at the firm.
24        Q     Okay.  And did the firm have a safe
25    or a vault or a secured space where these
```

Page      87

1      records would be kept?

2           A      We had a secured space.

3           Q      Were you around when the

4      Fingerhut-Holzer office space was closed?  Or

5      were you - were you -

6           A      Incarcerated?

7           Q      Incarcerated.  Yes.

8           A      You can say it.

9           Q      Good.

10          A      I don't know.  I - I wasn't around,

11     but I don't know if they were still domiciled

12     there or not.  I tend to doubt it.

13          Q      All right.

14                 Do you know where the records went

15     for Fingerhut-Holzer Partners?

16          A      Like I said, I wasn't there for the

17     actual closing,  so I can't tell you where the

18     physical records are now.

19          Q      Do you know where the -

20                 I'm just gonna ask this, and I know

21     the answer.

22                 Do you have any idea where the

23     records of Fingerhut-Holzer Incorporated are?

24          A      No.

25          Q      Do you have any idea where the

D. Holzer - March 28, 2012

Page      88

```
 1     records of Fingerhut-Holzer Equities,

 2     Incorporated are?

 3         A     No.

 4         Q     Do you have any idea where the

 5     records of Fingerhut- Holzer Fund L.P. are?

 6         A     No.

 7         Q     Do you have any idea where the

 8     records of Fingerhut-Holzer The Waverly I, LLC

 9     are?

10         A     No.

11         Q     Do you have any idea where the

12     records of Fingerhut-Holzer The Waverly II, LLC

13     are?

14         A     No.

15         Q     Now, was there any infringement on

16     Mr. Fingerhut's access to these records at the

17     time that Fingerhut-Holzer Partners ceased

18     operation?

19         A     What do you mean?

20               I don't understand the question.

21         Q     Okay.

22               Was there anything that would have

23     imposed upon Mr. Fingerhut's access to these

24     records at the time that Fingerhut-Holzer

25     closed?  Did anybody -
```

Page    89

1         A      Give me an example.

2         Q      Did anybody prevent him from gaining

3    access to these records?

4         A      I don't know the answer to that.

5         Q      Have you ever discussed where these

6    records were, with Mr. Fingerhut?

7         A      I'm just trying to remember if he

8    visited me in jail and we talked about that.

9    No.  He never visited me after that.

10        Q      He visited you once in jail?

11        A      No.

12        Q      Oh.  Oh.

13        A      So we never talked.

14        Q      I thought you said you didn't

15   remember if he came to see you.

16               Did he visit you in jail or not?

17        A      No.

18        Q      Okay.

19               So, on the occasion of your arrest,

20   Fingerhut-Holzer Partners was still around,

21   still in operation?

22        A      I'm not sure if it was still

23   Fingerhut-Holzer Partners anymore.

24        Q      Well, what was the name on the door?

25        A      I don't know.

D. Holzer - March 28, 2012

Page 90

Page    90

1        Q        Well, there was a time when it was

2    Fingerhut-Holzer Partners?

3        A        Correct.

4                 MR. FOLKENFLIK:    LLC.

5        Q        LLC.

6                 Are you aware of the name on the

7    door changing at any time?

8        A        No.  I would assume - I would

9    assume Holzer was taken off.

10       Q        After the arrest?

11       A        I don't know that.

12       Q        Okay.  Do you know if there was a

13   successor corporation to Fingerhut-Holzer

14   Partners?

15       A        No.

16       Q        Now, you're speaking to Mr. Rapillo

17   about making an investment in Fingerhut-Holzer

18   The Waverly I.

19                And did Mr. Rapillo indicate a

20   desire to make such a investment?

21       A        Yes.

22       Q        Do you recall what his initial

23   investment was?

24       A        I don't recall.

25       Q        If I were to tell you that on

D. Holzer - March 28, 2012

Page 91

Page    91

1       October 19th, two-thousand-and-five, he made a

2       three-hundred-thousand-dollar investment, does

3       that sound familiar?

4               A       That does sound familiar.  Yes.

5               Q       Can you identify this document?

6               A       (The witness examined the

7       document.)

8                       MR. CONWAY:    Could we have

9                       this marked Plaintiff's 1?

10                          (At which time, Plaintiff's

11                      Exhibit 1, Money Transfer Document

12                      dated October 19, 2005, consisting

13                      of two pages, was marked for

14                      identification.)

15      BY MR. CONWAY:

16              Q       Can you identify this document?

17                      MR. FOLKENFLIK:    Why don't we

18                      state, for the record, that you

19                      marked for identification –

20                      MR. CONWAY:    Well, it's been

21                      identified.    This is Exhibit 1,

22                      Plaintiff's Exhibit 1.

23                      MR. FOLKENFLIK:    Plaintiff's

24                      Exhibit 1, marked for

25                      identification, which appears to be

D. Holzer - March 28, 2012

Page 92

Page    92

1              a composite exhibit?

2                    MR. CONWAY:    Two pages.

3                    MR. FOLKENFLIK:    Thank you.

4         A     (The witness examined the

5     document.)

6              What do you want me to tell you on

7     this?

8         Q     Have you ever seen that document

9  before today?

10         A     No.  But I -I know of it.

11         Q     You do.  Okay.

12         A     Yeah.

13         Q     And is that a record of a

14     three-hundred-thousand-dollar transfer from Mr.

15     and Mrs. Rapillo?

16         A     Yes.

17         Q     On the Waverly investment?

18                    MR. FOLKENFLIK:    Objection.

19              No foundation.  You can answer.

20                    THE WITNESS:    Should I

21              answer?

22                    MR. FOLKENFLIK:    You can

23              answer.

24         A     Yes.

25         Q     Okay.  Now, who are Foley & Lardner?

D. Holzer - March 28, 2012

Page 93

Page      93

1          A      Foley & Lardner was the escrow

2    agent for Trident Realty, as I remember, but

3    I'm not one-hundred per cent sure.

4          Q      Are Foley & Lardner a law firm?

5          A      Yes.

6          Q      Now, did Foley & Lardner participate

7    in the management of Trident Realty or any of

8    its participators, other than being an escrow

9    agent?

10         A      No.

11                As - as far as I know, no.

12         Q      Now, when these funds were

13   transferred on a Citibank reference, do you

14   remember who held the Fingerhut-Holzer Partners

15   bank accounts at the time?

16                There are two references here.

17         A      It would be J.P. Morgan Stanley

18   Trust.  Wachovia -

19                Look.  One reference is gonna be

20   from the receiving end, which is, I assume,

21   Wachovia was Foley & Lardner's bank.

22                A law firm doesn't hold it, a bank

23   holds it in escrow for Foley & Lardner.  So,

24   I'm assuming that Wachovia is the actual bank

25   that held the escrow money for Foley &

D. Holzer - March 28, 2012

Page 94

Page      94

1      Lardner.

2              Q        Now, the year of transfer here is

3      October 19th, two-thousand-and-five.

4              A        Yes.

5              Q        Fingerhut-Holzer Partners was still

6      in operation at the time?

7              A        Yeah.

8              Q        Okay.  Do you recall having income

9      for yourself in the year 2004?

10             A        Do I recall?

11             Q        Having income.

12             A        I don't recall.  I was in trading.

13     I don't know.

14             Q        All right.  Did you file taxes for

15     the year 2004?

16             A        Yes.

17             Q        Do you know where those taxes are

18     today?

19             A        They're in the U.S. government.  I

20     don't know.

21                      MR. FOLKENFLIK:   The taxes?

22             Q        All right.

23                      Do you have copies of your taxes?

24                      MR. FOLKENFLIK:   You mean tax

25                 returns?

Page 95

Page    95

```
1                 MR. CONWAY:    Tax returns.
2        A     Yeah.
3        Q     Okay.
4              Are those taxes in the possession
5    of your wife, as best you know?
6                 MR. FOLKENFLIK:    Tax returns?
7                 MR. CONWAY:    Tax returns,
8          yes.
9        A     No.  They're probably in possession
10   of J. H. Cohn now.  I forget if I was using
11   them at the time.
12       Q     J.H. Cohn is an accountant?
13       A     They're an accounting firm.
14       Q     And where are they?
15       A     They're in - the main office is in,
16   what is it, Parsippany, New Jersey?
17   Somewhere around there.  Parsippany, Roseland.
18   Roseland.  Roseland, New Jersey.
19       Q     And for how long had you used J.H.
20   Cohn as your accountant?
21       A     Long time.  Twenty years, maybe.
22       Q     Are you still using them at this
23   time -
24       A     No.
25       Q     - or your wife?
```

D. Holzer - March 28, 2012

Page 96

Page      96

```
 1         A     I use one of the former partners.
 2         Q     And who is that?
 3         A     John Lotito.
 4         Q     And where does Mr. Lotito have his
 5    place of business?
 6         A     Mahwah, New Jersey.
 7         Q     Now, when this
 8    three-hundred-thousand-dollars was transferred,
 9    to your knowledge, was it received by
10    Fingerhut-Holzer or was it sent directly to the
11    escrow account?
12               MR. FOLKENFLIK:   Objection.
13         A     No.  It's sent right there
14    (indicating) where it went.
15         Q     All right.
16               You're indicating the Wachovia Bank
17    in Florida was the destination?
18         A     Yeah.  Exactly.
19               MR. FOLKENFLIK:   And the name
20               of the account is Foley & Lardner,
21               LLP --
22               THE WITNESS:   Trust account.
23               MR. FOLKENFLIK:   -- in Trust
24               account.
25         A     We're clear on that.  Right?
```

D. Holzer - March 28, 2012

Page 97

Page    97

1         Q     I'm clear.

2         A     Okay.

3         Q     Now, do you recall what your income

4    was in 2005?

5               MR. FOLKENFLIK:    Asked and

6               answered.

7         Q     Okay.   Are you -

8               MR. FOLKENFLIK:    And, I might

9               add, totally irrelevant to anything.

10              I mean, this is all very

11              interesting, but if we could have a

12              higher percentage of questions

13              relating to the Rapillo case -

14              MR. CONWAY:   We're getting

15              there.

16              MR. FOLKENFLIK:    - that would

17              be helpful.

18   BY MR. CONWAY:

19        Q     Sir, there was a second transfer by

20   Mr. Rapillo.

21              MR. CONWAY:   Could we have

22              this marked as Plaintiff's 2?

23                  (At which time, Plaintiff's

24              Exhibit 2, Money Transfer Document

25              Dated December 15, 2005, was marked

Page    98

```
1                     for identification.)

2    BY MR. CONWAY:

3            Q            If you would, take a look at

4    this.

5                    MR. FOLKENFLIK:    This is

6            Exhibit?

7                    MR. CONWAY:    Exhibit 2.

8                    MR. FOLKENFLIK:    Two.

9            A      (The witness examined the

10   document.)

11           Q      Have you ever seen this document

12   before?

13           A      Maybe.  I'm not sure.  I don't

14   remember.

15           Q      All right.

16                  Does the document indicate that, on

17   December 15th, there was a transfer from Heidi

18   Rapillo to the account of David and Leslie

19   Holzer at J.P. Morgan Chase Bank?

20           A      Correct.

21           Q      In the sum of $600,000?

22           A      Six-hundred?

23           Q      Next page.

24           A      It says two-hundred here.

25           Q      I thought it said six-hundred.
```

D. Holzer - March 28, 2012

Page 99

Page    99

```
 1      A      Where does it say on yours?
 2             Why's it only say two-hundred?
 3                     MR. FOLKENFLIK:    Can I see
 4             the exhibit,  please?
 5
 6                     (At which time, a discussion
 7             was held off the record.)
 8
 9                     MR. CONWAY:    Please mark
10             these two also.
11                     (At which time, Plaintiff's
12             Exhibit 3, Money Transfer Document
13             Dated January 31, 2006, was marked
14             for identification.)
15                     (At which time, Plaintiff's
16             Exhibit 4, Money Transfer Document
17             Dated March 23, 2006, was marked for
18             identification.)
19      BY MR. CONWAY:
20      Q      I'll ask you to take a look at
21      document Number 2.
22      A      I can make everybody's life real
23      easy if you want me to make one statement.
24                     MR. FOLKENFLIK:    We'll give
25             you an opportunity.
```

Page 100

Page    100

1           A       Okay.   So what am I looking for

2      here now?

3           Q       Take a look at that document.

4                   MR. FOLKENFLIK:    Hold on.

5                   Hold on.

6                        If you ask him to look at

7                   something, identify it by exhibit

8                   number.

9                   MR. CONWAY:    Exhibit Number 2

10                  in front of him, dated December

11                  15th,   2005.

12          A       (The witness examined the

13     document.)

14                  Okay.

15                  And that's from Heidi Rapillo to

16     David and Leslie Holzer, amount is 600,000,

17     and it went to Citibank -

18          Q       Went from Citibank to J.P. Morgan

19     Chase.

20          A       Who wrote this on the bottom here

21     (indicating)?

22          Q       I don't know.

23          A       (The witness examined the

24     document.)

25                  MR. FOLKENFLIK:    Is that your

D. Holzer - March 28, 2012

1              handwriting, sir, the notes?

2                   MR. CONWAY:   No.

3         A    Do you know who wrote the notes?

4         Q    No.

5              We're fine.  Probably Heidi's.

6         A    Well, we don't know.  We don't know

7    what it means.

8         Q    No.  It's a reference to the prior

9    transfer.

10        A    The one we talked about before?

11        Q    Yeah.  The one we talked about

12   already.

13        A    2921058968?

14             Is that the transfer number, the

15   first transfer we were talking about?  292 -

16        Q    Yes.

17        A    - 1058968?

18        Q    Yes.  That's correct.

19        A    So we're all in agreement that this

20   is the -

21        Q    Yeah.

22        A    - reference number.  Okay.

23             MR. FOLKENFLIK:   You just

24        have to testify about what you

25        understand from the document, not be

D. Holzer - March 28, 2012

1                concerned -

2                     THE WITNESS:    Right.

3    BY MR. CONWAY:

4         Q      To your knowledge, what was the

5    purpose of this transfer?

6                What were Mr. and Mrs. Rapillo

7    involving themselves in with this transfer?

8         A      They thought they were - as I

9    recall, this was gonna be in Waverly also.

10        Q      All right.

11               And, instead, it was directed to

12   your personal account?

13        A      That's correct.

14        Q      And why was that, sir?

15        A      Because I lied to them.

16        Q      Now, let's take a step back, if we

17   may.

18               You were convicted of a crime

19   involving Mr. Fingerhut, as well as others.

20               What was the nature of the crime,

21   for which you were sentenced, involving

22   Mr. Fingerhut?

23        A      What was the nature of the crime?

24        Q      Right.

25               You've been convicted already.

D. Holzer - March 28, 2012

Page 103

Page    103

```
 1      Nothing else can happen to you.
 2                    MR. FOLKENFLIK:   Can I - can
 3              I -
 4   BY MR. CONWAY:
 5         Q      Could you describe -
 6                    MR. FOLKENFLIK:   I just wanna
 7              hear the question.
 8   BY MR. CONWAY:
 9         Q      Could you describe -
10                    MR. CONWAY:   I'll start -
11              I'll say it again.
12                    MR. FOLKENFLIK:   Yes.
13   BY MR. CONWAY:
14         Q      Would you describe the circumstances
15      which gave rise to a criminal arrest in your
16      involvement with Mr. Fingerhut?
17                    MR. FOLKENFLIK:   Objection.
18   BY MR. CONWAY:
19         Q      What went on between the two of you
20      that gave rise to the -
21                    MR. FOLKENFLIK:   Which "two
22              of you"?
23   BY MR. CONWAY:
24         Q      Mr. Fingerhut and yourself.
25                    MR. FOLKENFLIK:   Objection.
```

```
 1              Assumes facts not in evidence.

 2    BY MR. CONWAY:

 3         Q     All I wanna do is -

 4         A     I don't recall.

 5         Q     Okay.  What was the nature of the

 6    financial issue, between yourself and

 7    Mr. Fingerhut, that resulted in you being

 8    arrested?

 9         A     I don't recall.

10         Q     Okay.  Did you owe Mr. Fingerhut

11    money?

12         A     When?

13         Q     On or about December 15th of 2005.

14         A     I don't recall.

15         Q     Do you have any recollection why it

16    is that you're in jail?

17         A     I took money that didn't belong to

18    me.

19         Q     From who?

20         A     From Heidi Rapillo and John

21    Rapillo.

22         Q     Anyone else?

23         A     Amongst others.

24         Q     Did you take money from

25    Mr. Fingerhut?
```

Page    105

1          A      Did I take it?

2          Q      Did you gain control of it in any

3     way?

4          A      Did I gain control of it?  You

5     mean, did -

6                 Just extrapolate that out a little

7     bit.

8          Q      All right.  What is the nature of

9     your relationship with Mr. Fingerhut that

10    resulted in your being arrested?

11         A      I don't know.

12                MR. FOLKENFLIK:   Mr. Holzer,

13             did you plead guilty -

14                THE WITNESS:   Yes.

15                MR. FOLKENFLIK:   - to any

16             crimes concerning the transactions

17             you had with Mr. Fingerhut?

18                THE WITNESS:   Yes.

19                MR. FOLKENFLIK:   What was the

20             nature of the transactions to which

21             you pleaded guilty?

22                THE WITNESS:   Stole money.

23                MR. FOLKENFLIK:   From?

24                THE WITNESS:   Mr. Fingerhut.

25                MR. FOLKENFLIK:   Okay.

Page    106

1    BY MR. CONWAY:

2         Q      Okay.  How much was stolen?

3         A      Twelve - I don't - I don't recall

4    the exact amount.

5         Q      And -

6         A      More than ten-million.

7         Q      And how did you do that?

8         A      I don't recall the exact nature of

9    how I actually did it.

10               MR. FOLKENFLIK:   Can you

11               explain, in your own words,

12               approximately, what occurred in

13               connection with the stealing of

14               money from Mr. Fingerhut that you

15               just testified to?

16               THE WITNESS:   Okay.  You want

17               a whole lengthy --

18    BY MR. CONWAY:

19         Q      Yeah.  If you could.

20               MR. FOLKENFLIK:   As long or

21               as short as you think is necessary

22               to explain it.

23               THE WITNESS:   Okay.  I'm

24               trying to think.

25         A      I'll invoke the fifth here,  and I

D. Holzer - March 28, 2012

1    can.

2         Q    Crime is over.

3         A    Well, what if I say something that

4    wasn't directly related to that?

5         Q    You're covered.

6         A    Who says I'm covered?  I'm taking

7    the fifth.

8              Next question.

9         Q    Did there come a time that you came

10   to be at odds with Mr. Fingerhut in your

11   business relationship?

12        A    I don't recall.

13        Q    Did there come a time when you were

14   attempting to return money to Mr. Fingerhut?

15        A    I don't recall.

16        Q    What happened to the money that Mr.

17   and Mrs. Rapillo sent you on December 15th?

18        A    What happened to the money, that

19   particular monies?

20        Q    Yes.

21        A    I don't remember.

22        Q    Was that money used for personal

23   benefit?

24        A    Possibly.

25        Q    Is any of that money still in your

D. Holzer - March 28, 2012

Page 108

Page    108

1       possession?

2              A      No.

3              Q      Did any of that money -

4                     Was any of that money given to

5       Mr. Fingerhut?

6              A      No.

7              Q      Take a look at -

8                     MR. FOLKENFLIK:    Just to save

9              time in the future - nor any entity

10             affiliated with him?

11                    THE WITNESS:    No.

12      BY MR. CONWAY:

13             Q      Take a look at document Number 3,

14      the January 31st.

15             A      That I can recall.

16                    I have to quantify that last one.

17                    I'm sorry.  You wanna repeat the

18      question?

19                    MR. FOLKENFLIK:    No.   That's

20             fine.

21             A      (The witness examined the

22      document.)

23                    Okay.  This is January 31st, '06?

24             Q      Right.

25                    And does that indicate a transfer

D. Holzer - March 28, 2012

Page 109

Page    109

1      of funds from the Rapillos to you?

2          A      Correct.

3          Q      And how much was that?

4          A      How much was it?

5      Two-hundred-thousand-dollars.

6          Q      And what was the purpose of —

7                 In your dealings with them, what

8      was the nature, what was the intent for that

9      money?

10         A      I don't remember, for this

11     particular amount.

12         Q      Take a look at transfer Number 4.

13         A      (The witness examined the

14     document.)

15                MR. FOLKENFLIK:   Would you

16            please identify the document.

17                MR. CONWAY:   Yes.   It's

18            document Number 4.

19                MR. FOLKENFLIK:   Exhibit

20            Number 4?

21                MR. CONWAY:   Exhibit Number

22            4.   Exhibit Number 4, dated March —

23                THE WITNESS:   March 23rd,

24            '06.

25

D. Holzer - March 28, 2012

Page 110

Page    110

```
 1    BY MR. CONWAY:

 2         Q      March 23rd, does that indicate a

 3    transfer of $800,000?

 4         A      Yes.

 5         Q      And were those funds transferred to

 6    your personal account again?

 7         A      Yes.

 8         Q      And what happened to those funds?

 9         A      Don't recall.

10         Q      Are you familiar with a term called

11    "VCampus"?

12         A      Yes.

13         Q      What is VCampus?

14         A      VCampus?

15         Q      Yeah.

16         A      VCampus was an online education

17    company.

18         Q      And who were the principals of

19    VCampus?

20         A      The principals -

21                It was publicly traded.  There was

22    no principals.

23                VCampus was a publicly traded

24    company trading on the over-the-counter

25    market.
```

D. Holzer - March 28, 2012

1          Q      And did Fingerhut-Holzer Partners

2     have an interest in VCampus?

3          A      Fingerhut-Holzer Partners?   No.

4          Q      Did Mr. Fingerhut have an interest

5     in that?

6          A      Yes.

7          Q      What was the interest that

8     Mr. Fingerhut had?

9          A      He owned stock.

10                He owned debt, also.

11         Q      He was a creditor of the company, is

12    that what you mean?

13         A      Yes.   In effect, he was.

14         Q      And where was the headquarters of

15    VCampus?

16         A      Virginia.   Reston, Virginia, I

17    think it was.

18         Q      Reston, Virginia?

19         A      I think.   I'm not sure.

20         Q      Did you yourself own stock in

21    VCampus?

22         A      Yes.

23         Q      How much did you own?

24         A      I can't recall.   Maybe,

25    nine-million shares.

D. Holzer - March 28, 2012

Page 112

Page   112

```
 1          Q       And what were those shares trading
 2     at at their height?
 3          A       At their height?
 4          Q       Yes.
 5          Q       During the period I owned them?
 6                  Are you asking me during the period
 7     that I owned them?
 8          Q       During the period you owned them.
 9          A       Probably -
10                  I can't answer that question.  The
11     nine-million shares was accumulated over the
12     course of a few years.  The stock fluctuated.
13                  So when I owned nine-million
14     shares, the high point for the stock might
15     have been three.
16                  When I owned four-million shares,
17     it might have been 12.
18                  So it's not a question that you can
19     answer with any accuracy.
20          Q       All right.
21                  Did you own a high of
22     twelve-million shares?
23          A       No.  I said nine-million.
24          Q       Oh.  I thought you indicated -
25                  Was nine-million the highest -
```

D. Holzer - March 28, 2012

Page 113

Page    113

```
 1          A      Yes.
 2          Q      Was VCampus associated with any
 3   university or organization?
 4          A      Associated in what way?
 5          Q      Was it affiliated so that -
 6          A      No.
 7          Q      Was any of the $800,000 that was
 8   transferred on March 15th of 2006 given to
 9   Mr. Fingerhut?
10          A      No.
11          Q      Did all of that money remain with
12   you?
13          A      Remain with me?
14                 Well, it did not go to
15   Mr. Fingerhut,  right.
16          Q      Where did it go?
17          A      It went into different various
18   assorted and sundry items.  I just don't
19   recall.
20          Q      Such as?
21          A      Could have gone into VCampus.
22                 Could have gone into Waverly.
23                 Could have gone into gasoline.
24                 Could have gone into the
25   supermarket, groceries.
```

D. Holzer - March 28, 2012

Page 114

Page   114

1                    I don't recall the exact

2      destination of the monies.

3                         MR. FOLKENFLIK:   When you say

4                    "could have gone" these places, it

5                    was treated as your personal money?

6                         THE WITNESS:   Yes.  Did not -

7                    he asked me if it went to

8                    Mr. Fingerhut.

9                         MR. FOLKENFLIK:   Yes.

10                        THE WITNESS:   I said, no.

11     The answer is no.

12                        MR. FOLKENFLIK:   It was

13                   treated as your money.

14                        THE WITNESS:   That's correct.

15                        MR. FOLKENFLIK:   And you did

16     with it what you did with it.

17                        THE WITNESS:   That's correct.

18                        MR. FOLKENFLIK:   And that's

19     true of the prior 200,000.

20                        THE WITNESS:   Correct.

21                        MR. FOLKENFLIK:   Correct?

22                        THE WITNESS:   That's correct.

23                        MR. FOLKENFLIK:   True of all

24     the money you got?

25                        THE WITNESS:   That's correct.

D. Holzer - March 28, 2012

Page 115

Page   115

```
 1                MR. FOLKENFLIK:   Same answer
 2          going forward?
 3                THE WITNESS:   That's correct.
 4          Going forward, you got the same
 5          answer.
 6  BY MR. CONWAY:
 7          Q    Now, did any of that find its way to
 8     Mr. Fingerhut?
 9                MR. FOLKENFLIK:   Asked and
10          answered.  He can answer again.
11          A    No.
12          Q    And when were you arrested?
13          A    What day?
14          Q    Yeah.  Do you know?
15          A    May - May 22nd of '08.
16               Should be, like, my day that lives
17     in infamy.  Right?
18               Yeah.  May 22nd of '08, I think.
19     Pretty sure.
20          Q    When was the last time you saw
21     Mr. Fingerhut before today?
22          A    Before today?
23               Maybe, January of '08 or December
24     of '07, or thereabouts.
25          Q    And where did you meet him, where
```



Page 116

Page   116

1    did you see him?

2         A      I don't recall.  Probably, the

3    office.

4         Q      All right.  This is before your

5    arrest?

6         A      That's before I was arrested.

7         Q      And how did the police come to learn

8    of any criminal activity on your part?

9         A      I would hazard a guess as to say

10   that it was instigated by a private

11   investigator that Barry Fingerhut hired.

12        Q      Do you know the name of the

13   gentleman?

14        A      No.

15        Q      And did the investigator contact

16   you?

17        A      Did he contact me?

18        Q      Yes.

19               Did he contact you in any way in

20   his investigation?

21        A      Well, yeah.  We had a meeting.

22        Q      You and he?  Where was that?

23        A      In the office.

24        Q      And what was the nature of the

25   discussion?

D. Holzer - March 28, 2012

Page 117

Page   117

```
 1        A      How I stole money from various
 2   different people.
 3        Q      All right.
 4               And you don't remember the name of
 5   this investigator?
 6        A      I didn't hire him.  No.
 7        Q      Well, he obviously identified
 8   himself to you when you were speaking to him.
 9        A      I don't remember.  You could stick
10   me with 14 pins, I wouldn't remember the guy's
11   name, nor would I care.
12        Q      Do you know Barry and Charlotte
13   Pessar (Phonetic Spelling)?
14        A      Pessar?
15        Q      Pessar.
16        A      Yes.
17        Q      And who are they?
18        A      Friends of mine; were previous
19   friends of mine.
20        Q      And what was your relationship with
21   Mr. and Mrs. Pessar, for investment purposes?
22        A      Nothing.
23               I mean, one instance, and it's a
24   totally unrelated item to the
25   Fingerhut-Holzer.
```

D. Holzer - March 28, 2012

Page 118

Page    118

```
 1          Q       What was the instance and how is it
 2     unrelated?
 3          A       Well, it was just me and them.  Had
 4     nothing to do with Fingerhut-Holzer.
 5                  And I don't recall the actual name
 6     of the product.
 7          Q       Okay.  Do you know a Barbara and
 8     Michael Zachman (Phonetic Spelling)?
 9          A       Yes.
10          Q       And who are they?
11          A       Friends of ours.
12          Q       And did you have a business
13     relationship with them?
14          A       Business relationship?  Yes.
15          Q       Were they investors with you?
16          A       Yes.
17          Q       How much did they invest?
18          A       I don't recall.
19          Q       Did Mr. and Mrs. Pessar invest with
20     you?
21          A       Yes.
22          Q       Did a Mr. Mel Block (Phonetic
23     Spelling) invest with you?
24          A       No.
25          Q       Okay.
```

D. Holzer - March 28, 2012

Page 119

Page     119

1          A      The last question?

2          Q      Okay.

3                 About Mel Block?

4          A      Yeah.

5                 Ask that question again.

6          Q      Did you have a business relationship

7     with Mel Block?

8          A      I invoke my Fifth Amendment right.

9                 MR. CONWAY:    Okay. I have

10          nothing further.

11                MR. FOLKENFLIK:    Just a

12          couple quick questions.

13                THE WITNESS:    Sure.

14                MR. FOLKENFLIK:    Couple quick

15          ones.

16                     EXAMINATION

17    BY MR. FOLKENFLIK:

18          Q      VCampus, was there any Fingerhut-

19    Holzer subsidiary LLC that invested in VCampus?

20          A      No.

21          Q      Okay.

22                 Do you recall any discussions with

23     the Rapillos about a dinner theater?

24          A      A what?

25          Q      A dinner theater investment?

D. Holzer - March 28, 2012

Page 120

Page    120

1        A       A  dinner theater?

2        Q       Yes.

3        A       Oh.

4                A dinner theater?

5        Q       Yeah.

6        A       The only discussion that -

7                Now, this whole dinner theater that

8        came up was when I was talking about Waverly.

9        It wasn't about a dinner theater, it was about

10       a theater complex in one section of the

11       Waverly.

12               I know - I had nothing to say about

13       we were owning it, or anything.  I said

14       "There's a big theater there.  It's gonna draw

15       a lot of people there.  There's a whole

16       complex there that people are gonna wanna live

17       near."  Food courts and a Merrill Lynch

18       complex that was right there.

19               I don't know where that came from.

20       I saw it in there, and it was too late already

21       to change it.

22               But it was in there, and you plead,

23       and what am I gonna say, "Change that dinner

24       theater thing"?

25               That thing was never impugned to be

D. Holzer - March 28, 2012

Page 121

Page    121

1  owned by anybody.

2      Q     Okay.

3            Leaving aside what it was

4  represented to be, did any of the

5  Fingerhut-Holzer subsidiary entities invest in

6  a dinner theater?

7      A     No.

8      Q     Okay.

9            Waverly II, did any of the

10 Fingerhut-Holzer investment entities invest in

11 Waverly II?

12     A     Waverly II?  Yes.

13     Q     Okay.

14           And were those investments, to the

15 extent that investors invested in that,

16 handled in the same way as Waverly I,

17 substantially?

18     A     Yes.

19     Q     And so that any investor who wished

20 to invest in Waverly II received subscription

21 documents?

22     A     Yes.

23     Q     And signed them?

24     A     Yes.

25     Q     Just as Waverly I.

D. Holzer - March 28, 2012

Page 122

Page    122

1           And sent them to the investment

2    entity, right, for acceptance?

3           A       Right.

4           Q       And if they were accepted, then they

5    sent the check.

6                   Right?

7           A       Correct.

8           Q       And the check was sent, or a wire

9    was sent to Foley & Lardner's trust account

10   again?

11          A       Escrow account.  Correct.

12          Q       The escrow.

13                  And they would receive documents

14   indicating they were members in the Waverly

15   II, LLC?

16          A       I'm not sure if we ever sent out

17   documents or they used their cancelled check

18   as the confirmation of their involvement.

19          Q       Okay.

20          A       I'm really not sure of that.

21          Q       One way or another, they -

22          A       If they did have an involvement,

23   then it was either the cancelled check

24   themselves in the Waverly, or there were

25   documents, and that, Blum would have handled

D. Holzer - March 28, 2012

Page 123

Page   123

1      it.  I don't know.

2            Q      Okay.

3                   And Waverly -

4            A      Same thing -

5                   Just let me say one other thing,

6      please.  Same thing with the subscription

7      documents.  I never actually saw those.

8                   It would also, again, be Blum

9      handling it.

10           Q      Okay.

11                  And, as far as you know, he handled

12     them in a regular manner?

13           A      As far as I know.  Yes.

14           Q      Completely on the up-and-up?

15           A      Yes.

16           Q      And the Waverly was not a success?

17           A      It wasn't a - I don't know.

18           Q      Oh.  You don't know.  Okay.

19                  Whether the Waverly succeeded or

20     failed, you have no idea?

21           A      I don't know.  I have no idea.

22           Q      Okay.  I'm just asking.

23                  But you're not aware of it

24     succeeding or failing for any improper -

25           A      No.  Not aware.

D. Holzer - March 28, 2012

Page 124

Page   124

1          Q     As far as you know, everything about

2     the Waverly investment was perfectly lawful and

3     on the up-and-up?

4          A     What was that next question?

5          Q     As far as you know, everything about

6     the Waverly investment was perfectly lawful, on

7     the up-and-up?

8          A     Yes.

9          Q     And is that true of all the

10     Fingerhut-Holzer subsidiaries?

11          A     Yes.

12               MR. FOLKENFLIK:   Give me just

13          one second.

14

15               (At which time, there was a

16          brief pause in the proceedings.)

17

18               MR. FOLKENFLIK:   Nothing

19          further.

20               MR. CONWAY:   Okay.  We're

21          done.

22               MR. FOLKENFLIK:   Oh.  Oh.  I

23          do have one question, if we can.

24     BY MR. FOLKENFLIK:

25          Q     Mr. Conway said he had a meeting